1  John T. Jasnoch (CA 281605)
2  jjasnoch@scott-scott.com
   **SCOTT+SCOTT ATTORNEYS AT LAW LLP**
3  600 W. Broadway, Suite 3300
   San Diego, CA 92101
4  Tel.: 619-233-4565
   Fax: 619-236-0508
5
6  *Counsel for Plaintiffs and the Proposed Class*
7
8
9              **UNITED STATES DISTRICT COURT**
10             **CENTRAL DISTRICT OF CALIFORNIA**
11             **WESTERN DIVISION**

| | |
|---|---|
| 12  JOHNNY JOHNSON, EZRA BOEKWEG, MARIO PALOMBINI, and ADAM TITCHER, Individually and on Behalf of All Others Similarly Situated, | Case No. 2:22-cv-08909-FMO-PLA |
| 13 | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| 14 | |
| 15                Plaintiffs, | |
| 16        v. | <u>DEMAND FOR JURY TRIAL</u> |
| 16  YUGA LABS, INC., WYLIE ARONOW, GREG SOLANO, KEREM ATALAY, ZESHAN ALI, NICOLE MUNIZ, JASMIN SHOEMAKER, PATRICK EHRLUND, CHRISTOPHER LYONS, ALEXIS OHANIAN, AMY WU, MAARIA BAJWA, SOTHEBY'S HOLDINGS INC., GUY OSEARY, MIKE WINKELMANN, MADONNA LOUISE CICCONE, PARIS HILTON, JAMES FALLON, ELECTRIC HOT DOG, INC., UNIVERSAL TELEVISION, LLC, JUSTIN BIEBER, AUSTIN RICHARD POST, CALVIN BROADUS JR., KEVIN HART, WARDELL STEPHEN CURRY II,  ADIDAS AMERICA INC., ADIDAS VENTURE B.V., IVAN SOTO-WRIGHT, and MOONPAY USA LLC, | |
| 25                Defendants. | |

27
28

FIRST AMENDED CLASS ACTION COMPLAINT - CASE NO. 2:22-cv-08909-FMO-PLA

# TABLE OF CONTENTS

I.     NATURE OF THE CASE...................................................................... 1
II.    PARTIES .............................................................................................. 5
       A.    Plaintiffs .................................................................................. 5
       B.    Defendants ............................................................................... 6
III.   JURISDICTION AND VENUE ......................................................... 12
IV.    FACTUAL ALLEGATIONS.............................................................. 13
       A.    Yuga Labs Background........................................................... 15
             1.    The Founders ................................................................ 15
             2.    The Fifth Ape - Oseary ................................................ 21
             3.    The Facilitator – MoonPay .......................................... 26
       B.    The Misleading Promotion and Sale of Yuga Securities....... 37
             1.    The First Scheme – The Deceptive Sotheby's Auction .......... 37
             2.    The Second Scheme – Deceptive Celebrity Promotions.......... 50
             3.    Other Manipulation of the Price and Market for Yuga Financial Products ................................................................ 115
       C.    The Dump – The price of Yuga Securities Plummets ..................... 127
V.     THE YUGA FINANCIAL PRODUCTS ARE SECURITIES UNDER *HOWEY* ........................................................................................ 132
       A.    Yuga Financial Products Investors Invested Money Securities ....... 133
       B.    Yuga Financial Products Investors Were Intertwined in a Common Enterprise with Defendants ............................... 133
       C.    Investors Purchased the Yuga Financial Products with a Reasonable Expectation of Profit from Owning Them .................. 135
       D.    Investors Expected Profits from the Yuga Financial Products to Be Derived from the Managerial Efforts of the Executive Defendants ............................................................................. 137
       E.    Investors Would Not Reasonably Have Understood that the Financial Products Sold by Yuga Were Securities ....................... 142
       F.    Application Of The SEC's 2019 Framework Indicates That The Yuga Financial Products are Securities.................................. 144
VI.    ADDITIONAL RELIANCE ALLEGATIONS ......................................... 148
VII.   CLASS ACTION ALLEGATIONS ............................................... 155
VIII.  PRESUMPTION OF RELIANCE .................................................. 157
IX.    CAUSES OF ACTION .................................................................... 159
       FIRST CAUSE OF ACTION............................................................ 159
       SECOND CAUSE OF ACTION ...................................................... 167
       THIRD CAUSE OF ACTION .......................................................... 176
       FOURTH CAUSE OF ACTION ...................................................... 184
       FIFTH CAUSE OF ACTION ........................................................... 186

SIXTH CAUSE OF ACTION..................................................................187
SEVENTH CAUSE OF ACTION ...........................................................190
EIGHTH CAUSE OF ACTION...............................................................203
NINTH CAUSE OF ACTION ..................................................................205
TENTH CAUSE OF ACTION .................................................................207
ELEVENTH CAUSE OF ACTION.........................................................210
TWELTH CAUSE OF ACTION .............................................................213
THIRTEENTH CAUSE OF ACTION......................................................215
X.   PRAYER FOR RELIEF.................................................................216
XI.  JURY DEMAND ...........................................................................216

Lead Plaintiffs Johnny Johnson, Ezra Boekweg, Mario Palombini, and additional named plaintiff Adam Titcher (collectively "Plaintiffs"), individually and on behalf of all others similarly situated, bring this action against Yuga Labs, Inc. ("Yuga" or the "Company"), Wylie Aronow, Greg Solano, Kerem Atalay, Zeshan Ali, Nicole Muniz, Jasmin Shoemaker, Patrick Ehrlund, Christopher Lyons (the "Executive Defendants"), Alexis Ohanian, Amy Wu, Maaria Bajwa (the "Ape DAO Board Defendants"), Sotheby's Holdings Inc., Guy Oseary, Mike Winkelmann, Madonna Louise Ciccone, Paris Hilton, James Fallon, Electric Hot Dog, Inc., Universal Television, LLC, Justin Bieber, Austin Richard Post, Calvin Broadus, Jr., Kevin Hart, Wardell Stephen Curry II,  adidas America Inc., and adidas Ventures B.V. (the "Promoter Defendants"), Ivan Soto-Wright, and MoonPay USA LLC ("MoonPay," and together with Ivan Soto-Wright, the "MoonPay Defendants") (collectively, with the Company, the Executive Defendants, Ape DAO Board Defendants, and the Promoter Defendants, the "Defendants").  The following allegations are based upon personal knowledge as to Plaintiffs' own facts, upon investigation by Plaintiffs' counsel, and upon information and belief where facts are solely in possession of Defendants.

I.      NATURE OF THE CASE

*"Celebrities and NFTs Are a Match Made in Hell...*
*Somehow, star endorsements have found a new low."*
-Amanda Mull, The Atlantic

1.      Plaintiffs bring this action on behalf of all investors who purchased Yuga's non-fungible tokens ("NFTs") or ApeCoin tokens ("ApeCoin")[1] between April 23, 2021 and the present (the "Class Period"), and were damaged thereby.

---

[1]      Yuga's various collections of so-called "Bored Ape" NFTs (including the Bored Ape Yacht Club ("BAYC"), Mutant Ape Yacht Club ("MAYC"), Bored Ape Kennel Club ("BAKC" NFT collections), ApeCoins, and virtual land in the Otherside (aka "Otherdeed" NFTs) are collectively referred to as the "Yuga Financial Products" or the "Yuga securities."

FIRST AMENDED CLASS ACTION COMPLAINT - CASE NO. 2:22-cv-08909-FMO-PLA

2.  Celebrity promotions of cryptocurrencies are fraught with problems.  As the U.S. Securities and Exchange Commission ("SEC") previously stated: "Celebrities and others are using social media networks to encourage the public to purchase stocks and other investments. These endorsements may be unlawful if they do not disclose the nature, source, and amount of any compensation paid, directly or indirectly, by the company in exchange for the endorsement."[2]  According to *The Atlantic*: "Celebrity endorsements—of a product, a brand, an idea, a haircut—have been around for ages, but they've become especially thick on the ground in recent years, as stars have developed their own direct-advertising channels on social media. For people with something to sell, a celebrity's fan base provides an easy, responsive audience."[3]

3.  This case epitomizes these concerns as it involves a vast scheme between a blockchain start-up company, Yuga, a highly-connected Hollywood talent agent (Defendant Guy Oseary), and a front operation (MoonPay), who all united for the purpose of promoting and selling a suite of unregistered digital financial assets. Executive Defendants Aronow, Solano, Atalay, Ali and Muniz and Promotor Defendant Oseary together devised a plan to leverage their vast network of A-list musicians, athletes, and celebrity clients and associates to misleadingly promote and sell the unregistered Yuga Financial Products.

4.  Investment in Yuga's flagship NFT collection, the Bored Ape Yacht Club, purportedly gave investors membership into the "Bored Ape ecosystem" (*i.e.*, the overall brand and its synergistic relationship between the Yuga Financial Products and related applications). The underlying marketing message was simple: "joining

---

[2]    Statement, *SEC Statement Urging Caution Around Celebrity Backed ICOS*, U.S. Sec. & Exch. Comm'n (Nov. 1, 2017), https://www.sec.gov/news/public-statement/statement-potentially-unlawful-promotion-icos.

[3]    Amanda Mull, *Celebrities and NFTs Are a Match Made in Hell*, The Atlantic (Feb. 4, 2022), *available at* https://www.theatlantic.com/technology/archive/2022/02/nft-jimmy-fallon-paris-hilton-millionaire/621486/.

First Amended Class Action Complaint - Case No. 2:22-cv-08909-FMO-PLA

1    the club" (*i.e.*, buying a Yuga NFT) brings investors status and provides them access

2    to events, benefits, and other lucrative investment opportunities exclusive to Yuga

3    Financial Product holders.  The perceived exclusivity of Bored Ape Yacht Club's

4    membership was driven by endorsements of highly influential celebrities.  But this

5    purported interest in, and endorsement of the BAYC NFTs was a sham manufactured

6    by Oseary and MoonPay at the behest of the Company and the Executive Defendants.

7    While the Promoter Defendants publicly touted their high dollar "purchases" of

8    BAYC NFTs, the truth is that they were given the NFTs for free (often along with

9    additional compensation) in exchange for promoting the BAYC NFTs to an

10   unsuspecting public.

11         5.     In order to make the promotion of, and subsequent interest in, the BAYC

12   NFTs appear to be organic (as opposed to being solely the result of a paid promotion),

13   the Company needed a way to discreetly pay their celebrity cohorts.  To do this,

14   Oseary tapped into a different part of his network: the MoonPay Defendants.

15   Oseary's venture capital firm, Sound Ventures, was one of the early investors in

16   MoonPay, along with, *inter alia*, Defendants Justin Bieber, Paris Hilton, Jimmy

17   Fallon, Austin Post, Calvin Broadus, Jr., Kevin Hart, and Wardell Stephen Curry II.

18   MoonPay purports to be a white-glove service designed to help the super-rich and

19   celebrities buy NFTs "'without all the hassle of setting up a wallet, buying crypto,

20   using that crypto to purchase an NFT and then taking custody of it.'"[4]  In truth, the

21   Executive Defendants and Oseary used their connections to MoonPay and its service

22   as a covert way to compensate the Promoter Defendants for their promotions of the

23   BAYC NFTs without disclosing it to unsuspecting investors. Moreover, certain of

24   the Promoter Defendants failed to disclose that they themselves had equity interests

25   in MoonPay.

26   _____

27   [4]     Ryan Weeks, *MoonPay has quietly set up a concierge service to help
     celebrities buy NFTS*, THE BLOCK (Nov. 5, 2021),  https://www.theblock.co/post/12

28   5483/moonpay-concierge-celebrities-nft?utm_source=rss&utm_medium=vrss.

6.      Defendants' promotional campaign was wildly successful, generating billions of dollars in sales and re-sales.  The manufactured celebrity endorsements and misleading promotions regarding the launch of an entire BAYC ecosystem were able to artificially increase the interest in and price of the Yuga Financial Products during the Class Period, causing investors to purchase these losing investments at drastically inflated prices.  Manipulative trading practices were also implemented by insiders in conjunction with the celebrity endorsements, in order to further generate artificial trading volume and price inflation.

7.      The staggering profits of the BAYC NFTs were not enough for the Company and Executive Defendants.  Next, they cut out the artifice of the NFT altogether and went a more direct route to making money: they created their own out of thin air.  At the height of the BAYC NFT endorsement scheme, the Executive Defendants minted unregistered digital financial assets called ApeCoins and promoted that BAYC NFT owners would receive an airdrop of ApeCoins for membership in the club.  In doing so, the Executive Defendants, Oseary, and the Ape DAO Board Defendants sought to obscure their own sales of their massive ApeCoin allocations directly to retail purchasers.  At no point did any of the Defendants register these securities with the SEC.

8.      In addition, Executive Defendants Aronow, Solano, Atalay, and Ali disguised their control of Yuga to avoid scrutiny and facilitate this scheme.  This conspiracy among the Executive Defendants and Oseary, then carried out with assistance of the Ape DAO Board Defendants, the Promoter Defendants, and the MoonPay Defendants, raked in millions for them all.  Meanwhile, investors were left with staggering losses.

9.      Plaintiffs bring this class action on behalf of themselves and an objectively identifiable Class consisting of all investors that purchased the unregistered Yuga Financial Products between April 23, 2021 and the present.

## II.    PARTIES

### A.    Plaintiffs

10.    Lead Plaintiff Johnny Johnson ("Johnson") is a citizen of Texas and resides in Georgetown, Texas. As set forth in the previously filed certification (ECF No. 74-2), Plaintiff Johnson invested in Yuga NFTs during the Class Period. Plaintiff Johnson also purchased ApeCoin tokens on U.S. based cryptocurrency exchanges. Johnson purchased the Yuga securities in reliance on the misleading promotions from the Company and the Promoter Defendants (described in detail below), and he suffered investment losses as a result of Defendants' conduct.

11.    Lead Plaintiff Ezra Boekweg is a citizen of Texas and resides in Waco, Texas. As set forth in the previously filed certification (ECF No. 74-2), Plaintiff Boekweg invested in Yuga NFTs during the Class Period. Plaintiff Boekweg also purchased ApeCoin tokens on U.S. based cryptocurrency exchanges. He also purchased Otherdeed NFTs associated with the Otherside metaverse Yuga was purportedly developing. Boekweg purchased the Yuga securities in reliance on the misleading promotions from the Company and the Promoter Defendants (described in detail below), and he suffered investment losses as a result of Defendants' conduct.

12.    Lead Plaintiff Mario Palombini ("Palombini") is a resident and citizen of Portugal. As set forth in the previously filed certification (ECF No. 74-2), Plaintiff Palombini purchased the Mutant Ape Yacht Club, and Otherdeed NFTs on a US-based exchange. Palombini purchased the Yuga Financial Products on a US-based exchange in reliance on the misleading promotions from the Company and the Promoter Defendants (described in detail below), and he suffered investment losses as a result of Defendants' conduct.

13.    Plaintiff Adam Titcher ("Titcher") is a resident and citizen of California. As set forth in the previously filed certification (ECF No. 1-2), Plaintiff Titcher purchased a Mutant Ape Yacht Club ("MAYC") NFT via the U.S.-based NFT

5

exchange OpenSea. Titcher also purchased an Otherdeed NFT associated with the Yuga metaverse, Otherside, via the U.S.-based NFT exchange on OpenSea.  Titcher purchased the Yuga Financial Products in reliance on the misleading promotions from the Company and the Promoter Defendants (described in detail below), and he suffered investment losses as a result of Defendants' conduct.

**B.    Defendants**

14.    Defendant Yuga is a Delaware corporation, registered on February 8, 2021, with its headquarters located at 1850 Towers Crescent Plaza, Suite 200, Tysons, VA 22182.  On June 16, 2022, Yuga registered with the California Secretary of State to transact business within California.

15.    Defendant Wylie Aronow ("Aronow") is a resident and citizen of South Carolina, living in Mount Pleasant, South Carolina.  Aronow is the co-founder/creator of the Company, served as a consultant and spokesperson for the Company, exercised control over the Company and directed and/or authorized, directly or indirectly, the sale and/or solicitations of Yuga Financial Products to the public.  Defendant Aronow was listed as Vice President in the official paperwork filed with the California Secretary of State.

16.    Defendant Greg Solano ("Solano") is a resident and citizen of Florida, living in Fort Lauderdale, Florida.  Solano is the co-founder/creator of the Company, served as a consultant and spokesperson for the Company, exercised control over the Company and directed and/or authorized, directly or indirectly, the sale and/or solicitations of Yuga Financial Products to the public.  Defendant Solano was listed as Yuga's Chief Executive Officer on official paperwork filed with the California State of State.

17.    Kerem Atalay ("Atalay") is a resident and citizen of Missouri, living in St. Louis, Missouri.  Atalay is the co-founder/creator of the Company, served as a developer, consultant and spokesperson for the Company, exercised control over the

Company and directed and/or authorized, directly or indirectly, the sale and/or solicitations of Yuga Financial Products to the public.

18.    Zeshan Ali ("Ali") is a resident and citizen of California, living in Los Angeles, California.  Ali is the co-founder/creator of the Company, served as a developer, consultant and spokesperson for the Company, exercised control over the Company and directed and/or authorized, directly or indirectly, the sale and/or solicitations of Yuga Financial Products to the public.

19.    Defendant Nicole Muniz ("Muniz") is a resident and citizen of New York, living in Brooklyn, New York.  Muniz is the Chief Executive Officer ("CEO") of the Company, served as a consultant and spokesperson for the Company, exercised control over the Company and directed and/or authorized, directly or indirectly, the sale and/or solicitations of Yuga Financial Products to the public.  Defendant Muniz filed the paperwork with the California Secretary of State for Yuga to do business in the state of California and was listed as Chief Financial Officer ("CFO") and Secretary.

20.    Defendant Jasmin Shoemaker ("Shoemaker") is a resident and citizen of New York, living in Brooklyn, New York.  Shoemaker is the Chief Operating Officer ("COO") of the Company, served as a consultant and spokesperson for the Company, exercised control over the Company and directed and/or authorized, directly or indirectly, the sale and/or solicitations of Yuga Financial Products to the public.

21.    Defendant Patrick Ehrlund ("Ehrlund") is a resident and citizen of New York, living in Brooklyn, New York.  Ehrlund is the Chief Creative Officer ("CCO") and minority partner of the Company, served as a consultant and spokesperson for the Company, exercised control over the Company and directed and/or authorized, directly or indirectly, the sale and/or solicitations of Yuga Financial Products to the public.

22.   Defendant Christopher Lyons ("Lyons") is a resident and citizen of Florida, living in Plantation, Florida.  Lyons served as a board member, consultant and spokesperson for the Company, exercised control over the Company and directed and/or authorized, directly or indirectly, the sale and/or solicitations of Yuga Financial Products to the public.

23.   Defendant Alexis Ohanian ("Ohanian") is a resident and citizen of Florida, living in Jupiter, Florida.  Ohanian served as a board member of the Ape DAO, served as a consultant and spokesperson for the Company, exercised control over the Ape DAO, Ape Foundation, and the Company and directed and/or authorized, directly or indirectly, the sale and/or solicitations of Yuga Financial Products to the public.  Ohanian's SevenSevenSix was one of several investors in Yuga during the $450 million funding round.

24.   Defendant Amy Wu ("Wu") is a resident and citizen of California, living in San Francisco, California.  Wu served as a board member of the Ape DAO, served as a consultant and spokesperson for the Company, exercised control over the Ape DAO, Ape Foundation, and the Company and directed and/or authorized, directly or indirectly, the sale and/or solicitations of Yuga Financial Products to the public.

25.   Defendant Maaria Bajwa ("Bajwa") is a resident and citizen of California, living in Glendale, California.  Bajwa served as a board member of the Ape DAO, served as a consultant and spokesperson for the Company, exercised control over the Ape DAO, Ape Foundation, and the Company and directed and/or authorized, directly or indirectly, the sale and/or solicitations of Yuga Financial Products to the public.

26.   Defendant Guy Oseary ("Oseary") is a resident and citizen of California, living in Santa Monica, California.  Oseary acted as a minority partner, consultant and spokesperson for the Company, exercised control over the Company and directed and/or authorized, directly or indirectly, the sale and/or solicitations of Yuga

First Amended Class Action Complaint - Case No. 2:22-cv-08909-FMO-PLA

Financial Products to the public.  Oseary's Sound Ventures was one of several investors in Yuga during the Seed funding rounds.

27.    Defendant Mike "Beeple" Winkelmann ("Winkelmann") is a resident and citizen of South Carolina, living in North Charleston, South Carolina. Winkelmann acted as a promoter for the Company and solicited sales of Yuga securities to the public.

28.    Defendant Paris Hilton ("Hilton") is a resident and citizen of California, living in Malibu, California.  Hilton acted as a promoter for the Company and solicited sales of Yuga securities to the public.

29.    Defendant Madonna Louise Ciccone ("Ciccone") is a resident and citizen of California, living in Hidden Hills, California.  Ciccone acted as a promoter for the Company and solicited sales of Yuga securities to the public.

30.    Defendant Justin Bieber ("Bieber") is a resident and citizen of California, living in Hidden Hills, California.  Bieber acted as a promoter for the Company and solicited sales of Yuga securities to the public.

31.    Defendant James "Jimmy" Fallon ("Fallon") is a resident and citizen of New York, living in New York, New York.  Fallon acted as a promoter for the Company, and solicited sales of Yuga securities to the public.

32.    Defendant Electric Hot Dog, Inc. ("EHD" f/k/a Holiday Road) is a New York corporation, with its headquarters located at 200 Park Avenue South, 8th Floor, New York, NY 10003. EHD is Defendant Fallon's personal production company, as well as being the production company for *The Tonight Show* ("*Tonight Show*"), of which Defendant Fallon is the host.  EHD is also the production company for several other projects, including the show "Password," filmed in Los Angeles, County, California.  EHD acted as a spokesperson for the Company, exercised control over Defendant Fallon and the content and disclosures of the *Tonight Show*, and directed

9

1 and/or authorized, directly or indirectly, the sale and/or solicitations of Yuga
2 securities to the public.

3      33.    Defendant Universal Television, LLC ("Universal") is a New York
4 corporation, with its headquarters located at 100 Universal City Plaza, Universal City,
5 CA 91608.  On May 17, 2011, Universal registered with the California Secretary of
6 State to transact business within California. Universal is the production company for
7 the *Tonight Show*, of which Defendant Fallon is the host.  Universal acted as an
8 indirect spokesperson for the Company by virtue of its exercise of control over both
9 Defendant Fallon and the content and disclosures of the *Tonight Show*, and directed
10 and/or authorized, directly or indirectly, the sale and/or solicitations of Yuga
11 securities to the public.

12      34.    Defendant Paris Hilton ("Hilton") is a resident and citizen of California,
13 living in Malibu, California.  Hilton acted as a promoter for the Company and
14 solicited sales of Yuga securities to the public.

15      35.    Defendant Austin Richard "Post Malone" Post ("Post") is a resident and
16 citizen of Utah, living in Cottonwood Heights, Utah.  Post acted as a promoter for the
17 Company, and solicited sales of Yuga securities to the public.

18      36.    Defendant Calvin "Snoop Dogg" Broadus, Jr. ("Broadus") is a resident
19 and citizen of California, living in Diamond Bar, California.  Broadus acted as a
20 promoter for the Company, and solicited sales of Yuga securities to the public.

21      37.    Defendant Kevin Hart ("Hart") is a resident and citizen of California,
22 living in Calabasas, California.  Hart acted as a promoter for the Company, and
23 solicited sales of Yuga securities to the public.

24      38.    Defendant Wardell Stephen Curry II ("Curry") is a resident and citizen
25 of California, living in Atherton, California.  Curry acted as a promoter for the
26 Company, and solicited sales of Yuga securities to the public.

27
28

39.     Defendant adidas America Inc. ("Adidas") is an Oregon corporation, with its headquarters located at 5055 N Greeley Avenue, Portland, Oregon 97217. On March 29, 2010, Adidas registered with the California Secretary of State to transact business within California.  Adidas is the parent of adidas Ventures B.V., the venture capital fund acquired by Adidas to make investments in start-up companies. Throughout the Class Period, Adidas acted as an agent and direct or indirect spokesperson for the Company by virtue of its capital investment in the Company, and directed and/or authorized, directly or indirectly, the solicitations of the Yuga Financial Products, as well as its own NFT collaboration with Yuga.  Upon information and belief, Adidas controls and/or oversees the operations and management of the "adidas Originals" brand line, under which the "adidas Originals: Into The Metaverse" NFT collaboration with Yuga was launched.

40.     Defendant adidas Ventures B.V. is a corporate venture capital firm with its headquarters located at Hoogoorddreef 9 A, 1101BA, Amsterdam, Netherlands. Founded in 2011, adidas Ventures B.V. started as a separate venture capital fund called Hydra Ventures until it was fully incorporated into the Adidas corporate structure in or around 2017.  At the time of its acquisition by Adidas, Hydra Ventures was focused on "pursuing opportunities in nascent, fast-growing and American markets."[5] adidas Ventures B.V. currently operates as the investment arm of Adidas. adidas Ventures B.V. is a backer of Yuga, having participated in the Yuga seed funding round on March 22, 2022.  adidas Ventures B.V. acted as an agent for the Company by virtue of its capital investment in the Company, and directed and/or authorized, directly or indirectly, the solicitations of Yuga securities to the public.

---

[5]     *Did you hear? Adidas backs new venture investment and development firm called Hydra Ventures*, OUTSIDE BUS. J. (Aug. 29, 2011), https://www.outsidebusinessjournal.com/brands/did-you-hear-adidas-backs-new-venture-investment-and-development-firm-called-hydra-ventures/.

11

41.     Defendant Ivan Soto-Wright ("Soto-Wright") is a resident and citizen of Florida, living in Miami, Florida.  Soto-Wright served as the CEO of MoonPay during the Class Period, and acted as a promoter for the Company, and solicited sales of Yuga securities to the public.

42.     Defendant MoonPay USA LLC ("MoonPay") is a Delaware corporation, with its headquarters located at 1111 Brickell Avenue, 10th Floor, Miami, Florida 33131.  MoonPay acted as an agent and indirect spokesperson for the Company by virtue of it being controlled, in part, by Defendant Oseary, directed and/or authorized, directly or indirectly, the solicitations of Yuga securities to the public.  On April 30, 2021, MoonPay registered with the California Secretary of State to transact business within California.

43.     Defendant Sotheby's Holdings Inc. ("Sotheby's") is a Delaware corporation, with its headquarters located at 1334 York Avenue, New York, New York 10021.  Sotheby's acted as a promoter for the Company, and solicited sales of Yuga securities to the public.

## III.   JURISDICTION AND VENUE

44.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §1332.  Plaintiffs bring this civil action seeking to represent a Class of more than 100 plaintiffs pursuant to Federal Rule of Civil Procedure 23.  Plaintiffs are citizens of California, Florida, and Texas.  10 of the 29 named Defendants are citizens of California; all of the other Defendants reside outside of California.  Plaintiffs seek an award exceeding $5,000,000, exclusive of interest and costs, on behalf of themselves and the putative Class.

45.     The Court has general jurisdiction over Defendants Ali, Wu, Bajwa, Oseary, Ciccone, Bieber, Hilton, Broadus, Hart, and Curry as they are all residents of the State of California and are thus "at home" in the forum.

46.     The Court has general jurisdiction over Defendant Universal because its principal places of business are in California, and thus it is "at home" in the forum.

47.     This Court may exercise jurisdiction over Defendants because they have continuous and systematic contacts with this District, do substantial business in this State and within this District, and engage in unlawful practices in this District as described in this Complaint, so as to subject themselves to personal jurisdiction in this District, thus rendering the exercise of jurisdiction by this Court proper and necessary.

48.     Venue is proper in this judicial District pursuant to 28 U.S.C. §1391(b) because Defendants live and/or conduct business in this District, and a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District.

## IV.     FACTUAL ALLEGATIONS

49.     Cryptocurrency, or crypto, is a form of digital asset that exists virtually and uses cryptography to secure transactions.  Cryptocurrencies use a decentralized system to record transactions and issue new units.  The first cryptocurrency was Bitcoin, which was launched in 2009.   As of March 2022, there are 18,465 cryptocurrencies in existence.[6]

50.     Anyone can create a new cryptocurrency.  An internet search will provide you step-by-step instructions with video for creating a new cryptocurrency in less than an hour.  Once created, the new cryptocurrency can be traded on cryptocurrency exchanges.   Exchanges can be centralized such as Coinbase, Crypto.com, Gemini, BitMart and others, or decentralized (Dex) such as Uniswap, Pancake Swap, and others.

---

[6]     Josh Howarth, *How Many Cryptocurrencies are There In 2022?*, EXPLODING TOPICS (July 19, 2022), https://explodingtopics.com/blog/number-of-cryptocurrencies.

51. Cryptocurrency is stored in crypto "wallets", which are physical devices or online software used to store the private keys to the owner's cryptocurrencies securely. Wallets have unique identifiers called "Wallet IDs." There is no limit on the number of wallets a person can control.

52. Transactions of cryptocurrencies are recorded in a "blockchain," which serves as a distributed public ledger. The amount of cryptocurrency transacted, the sender's wallet address, the recipient's wallet address and the date and time of the transfer for every transfer of cryptocurrency between digital wallets can be publicly viewed on the blockchain by using any number of websites like www.blockchain.com/explorer or www.etherscan.io.

53. The identity of an owner of a particular wallet is not publicly available from the blockchain. However, an owner can choose to reveal themselves. Or, since users usually have to reveal their identity in order to receive services or goods, many times the owner of a wallet can be deduced from a wallet's transactions or by matching wallet data with other identifiable data points such as a user's IP address or Know Your Customer ("KYC") information provided to an exchange or other intermediary or market maker.

54. Like physical money, cryptocurrencies are fungible, meaning that they can be traded or exchanged, one for another. For example, one bitcoin is always equal in value to another bitcoin. Conversely, NFTs are cryptographic assets with unique identification codes and metadata that distinguish them from each other and cannot be replicated. Unlike fungible cryptocurrencies, NFTs cannot be traded or exchanged at equivalency. However, the price of NFTs within a given collection is highly correlated and the relative value of the collection can often be assessed by its floor price—the lowest price an NFT in the collection can be purchased for. For example, if the floor price for an NFT collection is five ether or ETH (the native cryptocurrency for the Ethereum blockchain), it means that the lowest price someone

First Amended Class Action Complaint - Case No. 2:22-cv-08909-FMO-PLA

can pay for an NFT that is not currently in an auction is five of the cryptocurrency token ether.  Floor price is one of the key metrics investors consider when evaluating the intrinsic value for an NFT.

55.     Besides being traded and exchanged, some cryptocurrencies can also be used for governance over the particular project or for some artificially created purpose or use.  For example, cryptocurrencies can be used as a form of in-game virtual currency in an online video game.  Cryptocurrencies can also be used as an incentive for players who earn special tokens as part of the game that can be swapped for other tokens or sold for cash.

56.     Similarly, a cryptocurrency can be used as virtual currency for purchases made within the metaverse.  The "metaverse" refers to a virtual-reality space in which users can interact with a computer-generated virtual environment and other users. Analysts predict that the metaverse has the potential to generate up to $5 trillion in value by 2030.[7]

### A.     Yuga Labs Background

#### 1.     The Founders

57.     Yuga is a cryptocurrency-related NFT company founded in February 2021 by a group of friends: Defendants Aronow, Solano, Atalay, and Ali. The four founders were joined by Defendant Muniz.

58.     Ali first met Atalay when they were at the University of Virginia, and then both met Solano while studying computer science at the University of Maryland. Solano was also friends with Aronow, sharing a mutual interest in literature and online gaming.

59.     In February 2021, Solano contacted Aronow about starting an NFT project. During the early conception of the BAYC brand, Aronow brought in Muniz

---

[7]     *See, e.g.*, *Value Creation in the Metaverse*, MCKINSEY & COMPANY, https://www.mckinsey.com/capabilities/growth-marketing-and-sales/our-insights /value-creation-in-the-metaverse (last visited Oct. 27, 2022).

to discuss both the creative and business side of the project. According to an interview of both Solano and Aronow, they described the early formation of Yuga as follows:

> Despite his interest in digital collectibles, Solano did not buy his first NFT until early 2021. Shortly thereafter, in February, Solano texted Aronow to start an NFT project of their own. Aronow said: "We immediately started to conceive. One of the ideas was a public digital canvas, which Aronow shared with his longtime friend Nicole Muniz, who is now the CEO of Yuga. She keenly predicted that someone would paint on it. a little brother."

> These people did just that. Aronow said: "I was like, where would you draw a phallus? The answer was: on the bathroom wall of a dive bar. So what kind of people would go there?" The kind of people he knew on Crypto Twitter who made their fortunes in cryptocurrencies but still only wanted to play MMORPGs online and not live the luxury life of the expected multi-millionaire.

> Aronow sent Solano a "whole article" to plan the idea, where the name "Bored Ape Yacht Club" came up. "As the great editor, Solano said—'That's it. That's it'" recalls Aronow. The concept evolved–in cryptocurrencies, [M]illionaires are real apes, and the term "ape" means that someone living in 2021 will compulsively invest in a new project without doing much research. Aronow said he and Solano started a limited liability company the next day.[8]

60.     Atalay and Ali served as the developers of the BAYC NFT collection, working on the technical side of the ERC-721 token's creation while Solano and Aronow served as Yuga's creative department.

61.     Initially, Solano, Aronow, Atalay, and Ali hid their respective identities from the public, instead operating under the following pseudonyms/alter egos to avoid scrutiny from the public and investors during the early launch of the Company:

> a.     Wylie Aronow went by "Gordon Goner";

---

[8] *Interview with the founder of BAYC Boring [sic] Ape: the biggest success story in the NFT world*, COINYUPPIE (Aug. 8, 2022), https://coinyuppie.com/interview-with-the-founder-of-bayc-boring-ape-the-biggest-success-story-in-the-nft-world/.

b.      Greg Solano went by "Gargamel";

c.      Kerem Atalay went by "EmperorTomatoKetchup"; and

d.      Zeshan Ali went by "Sass."

62.     Yuga develops and sells to investors a variety of digital assets, which fall into two basic categories: (1) various NFT collections; (2) an ApeCoin native token, and titles to metaverse virtual land NFTs called Otherdeeds.

63.     Initially, the lion's share of Yuga's business comes from the sale of its various NFT collections.  Yuga also programmed its NFTs so that the Company receives a 2.5% royalty every time one of its NFTs is resold on the secondary market. Yuga reportedly earned $127 million in profits from its NFT business in 2021.[9] According to a Yuga pitch deck that was leaked online, the "BAYC collections alone account for approximately 10% of the volume on OpenSea," the largest NFT marketplace in the world.[10]

64.     On April 20, 2021, the Company and Executive Defendants Aronow, Solano, Atalay, and Ali created the BAYC collection of NFTs, minting 10,000 BAYC NFTs.  The Company boasted that ownership of these BAYC NFTs "double[d] as [a] membership to a digital club" that would give its owners access to "member's-only benefits."[11]

---

[9]      Ryan Weeks, *Bored Ape startup plans virtual land sales, APECoin token to kickstart metaverse gaming project*, THE BLOCK (Mar. 25, 2022), https://www.theblock.co/post/137829/bored-ape-yacht-club-yuga-labs-virtual-land-sales-metaverse.

[10]     *Yuga Labs Pitch Deck: BAYC founders raised $450M from Andreesen Horowitz*, at *28, YUGA LABS, INC. (Mar. 19, 2022), https://www.slideshare.net/PitchDecks/yuga-labs-pitch-deck-bayc-founders-project-455m-nft-revenue-2022 ("*Yuga Labs Pitch Deck*").

[11]     Bored Ape Yacht Club (@BoredApeYC), TWITTER (Apr. 17, 2021, 12:31 AM, https://twitter.com/BoredApeYC/status/1383276899749691394; Bored Ape Yacht Club (@BoredApeYC), TWITTER (Apr. 17, 2021, 1:04 PM), https://twitter.com/BoredApeYC/status/1383466417329106949.

17

65.     To encourage followers to BAYC's Twitter account, the Company offered to give away a Bored Ape NFT to anyone who followed @boredapeyc in Twitter and liked, commented on, and retweeted BAYC's promotional giveaway.[12]

66.     As the name suggests, the BAYC NFTs feature pictures of an animated ape with a bored facial expression.  The NFTs within the collection vary somewhat, having certain unique traits and characteristics.  In fact, these BAYC NFTs are distinguished and valued by the accessories that adorn the digital ape.  For example, a BAYC NFT wearing sunglasses is generally considered to be more rare (and thus more valuable) than one that does not have a similar fashion accessory.

67.     On April 24, 2021, Yuga launched the BAYC NFT collection, selling all 10,000 BAYC NFTs over the course of a week through the official public launch date of April 30, 2021.

68.     Insiders and influencers were given inside information concerning the mint.  For example, an influencer known as "Dingaling" is considered one of the most successful NFT investors and one of the biggest, if not the biggest holder of Yuga assets.[13]  On August 23, 2021, Dingaling tweeted that he had "100 apes from mint still untouched."[14]  Dingaling's identity was recently unmasked as Dinghau Xiao, a high ranking Binance executive.[15]  Xiao was listed as a director in legal documents filed in Bermuda for an entity named Binance (Bermuda) Ltd.  Xiao was also part of

---

[12]     Bored Ape Yacht Club (@BoredApeYC), TWITTER (April 17, 2021, 1:03 PM), https://twitter.com/BoredApeYC/status/1383466067419299840.

[13]     *This Bored Ape Yacht Club Whale Became The Club's Largest Holder This Weekend*, THE BORED APE GAZETTE (Dec. 5, 2021), https://www.theboredapegazette.com/post/this-bored-ape-yacht-club-whale-became-the-club-s-largest-holder-this-weekend.

[14]     Dingaling (@dingalingts), TWITTER (Aug. 23, 2021, 7:37 A.M.), https://twitter.com/dingalingts/status/1429814982959525897.

[15]     Nicholas Kitonyi, *Doxed NFT Whale's Portfolio Shows Deep Ties to a Major Crypto Exchange*, NFT GATORS (Nov. 8, 2022), https://www.nftgators.com/doxed-nft-whales-portfolio-shows-deep-ties-to-a-major-crypto-exchange/.

a joint venture between FTX's Sam Bankman-Fried and Binance, personally owning 5% of West Realm Shires Inc.[16]  West Realm Shires Inc. owned 100% of West Realm Shires Services, Inc.,[17] which was the entity that operated as FTX US, the domestic arm of the FTX exchange.[18]

69.  Xiao, with inside information based on his executive role at Binance and/or FTX, minted dozens of Bored Ape NFTs in the opening mint.  After the BAYC mint went live on the evening of April 30, 2021, Xiao minted 40 BAYC NFTs at 2:45am on May 1, 2021 in two transactions.  Thereafter, Xiao minted twenty BAYC NFTs at 2:54am, another twenty BAYC NFTs at 3:03am, and another 20 at 3:15a.m.

70.  Yuga's portfolio of NFT collections is collectively worth billions.  The BAYC collection alone was valued in the billions of dollars, with the floor price at around $114,000 as of August 2022, according to *CoinGecko*.  Capitalizing on the success of its BAYC collection, Yuga also created a spinoff brand NFT collection, the Mutant Ape Yacht Club collection, worth approximately $427 million.[19]  In addition, Yuga's NFT collection portfolio contains acquisitions by the Company, including owning the rights to the CryptoPunks (a series of avatars in an eight-bit art style worth approximately $970 million in total) and Meebits collections.  These acquisitions were funded thanks, in part, to the seed investments from a16z and Ape DAO Board member Christopher Lyons.

---

[16]    *Id.*

[17]    Order Revoking Money-Transmitter License, *Dept. of Fin. Institutions v. West Realm Shire Servs. Inc. d/b/a FTX US*, Admin. Action No. 2022-AH-0024 (Ky. Dep't of Fin. Institution Dec. 2, 2022), https://kfi.ky.gov/Documents/NONDEP;%202022-AH-0024%20West%20Realm%20Shires%20Services%20Inc..pdf.

[18]    Press Release, *Order to Cease and Desist Issued to West Realm Shires Services Inc. d/b/a FTS US Becomes Final*, GEORGIA DEP'T OF BANKING & FIN. (Dec. 8, 2022), https://dbf.georgia.gov/press-releases/2022-12-08/order-cease-and-desist-issued.

[19]    Mutant Ape Yacht Club (MAYC) NFTs are created by combining two digital assets created by Yuga: a BAYC NFT and a SERUM NFT.  The idea being that the "serum" would turn the buyer's "bored ape" into a "mutant ape."

19

71.     On June 18, 2021, the Company and Executive Defendants Aronow, Solano, Atalay, and Ali launched a spinoff collection for Bored Ape holders called Bored Ape Kennel Club (BAKC).  These Defendants then launched the Mutant Ape Yacht Club (MAYC) on August 28, 2021.

72.     In September 2021, Defendant Muniz began serving as Yuga's CEO.

73.     On February 4, 2022 an article on BuzzFeed.com ("*BuzzFeed*") revealed the identity of Defendants Solano and Aronow.  Shortly thereafter, Aronow posted a picture of himself on his Gordon Goner Twitter account, offering that he was revealing his face because he was "doxxed[20] against my will."[21]  Similarly, Solano posted his own picture on his Crypto Gargamel (Garga.eth) Twitter account, stating "[g]ot doxed [sic] so why not."[22]

74.     After Defendants Solano, Aronow, Atalay, Ali, and Muniz were able to massively increase interest in the BAYC NFTs and the idea of cross-utilization of those NFTs through the misleading promotional campaign executed by the Promoter Defendants, the Executive Defendants and Oseary turned towards expanding the Bored Ape brand beyond NFTs.  First, Muniz suggested new financial spin-off products like the MAYC and Bored Ape Kennel Club NFT collections.  The Company would then cross-promote the collections on BAYC's Twitter account by encouraging people to "adopt" Bored Ape Kennel Club dog NFTs through their

---

[20]     "Dox" means to publicly identify or publish private information about someone without their consent.

[21]     GordonGoner.eth (Wylie Aronow) (@GordonGoner), TWITTER (Feb. 4, 2022, 4:55 PM),  https://twitter.com/GordonGoner/status/1489764541084930048?s=20&t=g1mRpxWbWmWNzjxw385m2A.

[22]     Garga.eth (Greg Solano) (@CryptoGarga), TWITTER (Feb. 4, 2022, 5:10 PM), https://twitter.com/CryptoGarga/status/1489768443771596800?s=20&t=g1mRpxWbWmWNzjxw385m2A.

1  BAYC NFT purchases[23] and boasting that the NFT combination raised "50 ETH . . .
2  for charity."[24]

3      75.   Next, came Yuga's version of printing its own money: ApeCoin tokens
4  (discussed further below).

5      76.   Finally, in an effort to artificially generate some actual use for these
6  various unregistered Yuga securities (beyond making corporate insiders filthy rich),
7  the Executive Defendants claimed to be creating its own collective virtual shared
8  space or "metaverse" platform, Otherside.  The Otherside metaverse was billed to be
9  Yuga's persistent, immersive virtual world that users could interact with using digital
10 avatars from the BAYC, MAYC, or other Yuga NFT collections.  Executive
11 Defendants, Oseary, and the Ape DAO Board Defendants touted ApeCoin tokens as
12 the Otherside's native currency.  Yuga and its executives promoted the Otherdeed
13 NFTs (and related plots of "land" in the Otherside metaverse) as an extension of the
14 BAYC ecosystem and the place where the BAYC NFTs could grow, prosper, and
15 interact with others "in the club."

16     **2.**    **The Fifth Ape - Oseary**

17     77.   On October 12, 2021, the Company announced in a *Variety* Magazine
18 exclusive article that it had signed a representation deal with Defendant Oseary to
19 expand the BAYC NFTs into movies, TV, music, and gaming, and promoted the
20 *Variety* article through BAYC's Twitter account.[25]  In truth, Oseary was officially

21

22 [23]    Bored Ape Yacht Club (@BoredApeYC), Twitter (June 21, 2021, 10:49
23 AM), https://twitter.com/BoredApeYC/status/1407032879377534980.
   [24]    Bored Ape Yacht Club (@BoredApeYC), Twitter (June 26, 2021, 7:10 AM),
24 https://twitter.com/BoredApeYC/status/1408789893749350402.
   [25]    Shirley Halperin, *Bored Ape Yacht Club Creators Yuga Labs Sign*
25 *Representation Deal With Madonna, U2 Manager Guy Oseary (Exclusive)*, Variety
26 (Oct. 12, 2021), https://variety.com/2021/digital/news/bored-ape-yacht-club-yuga-
   labs-sign-with-madonna-u2-manager-guy-oseary-1235086011/; Bored Ape Yacht
27 Club (@BoredApeYC), Twitter (Oct. 12, 2021, 6:50 AM),
28 https://twitter.com/BoredApeYC/status/1447922609266601990.

First Amended Class Action Complaint - Case No. 2:22-cv-08909-FMO-PLA

1 brought in to actively recruit the Promoter Defendants to solicit sales of the BAYC

2 NFTs and other Yuga Financial Products, which they did.

3     78.    While each of the Executive Defendants played their part in the

4 organizing of the misleading promotion scheme (discussed further below), none was

5 more instrumental than the so-called "Fifth Ape" Defendant Oseary, who spent years

6 in Hollywood building relationships with the Promoter Defendants.  For example,

7 when Defendant Fallon assumed the *Tonight Show* hosting role on February 17, 2014,

8 one of his first two guests was the world-famous rock band U2.  As the band's

9 manager at the time, Oseary facilitated this appearance and helped Fallon's career

10 take off.  Fallon also regularly attends an annual MTV Video Music Awards after-

11 party hosted by Oseary.

12     79.    Oseary has experience in soliciting unregistered crypto securities to

13 retail investors via Hollywood promotions.  In May 2018, Oseary introduced Ripple's

14 XRP token to retail investors by organizing a highly publicized $4 million donation

15 from Oseary and business partner Ashton Kutcher given to Ellen DeGeneres's charity

16 during the show.[26]  The donation was purportedly made in the form of XRP tokens.

17     80.    Oseary also conducts business with Defendant Bieber's manager

18 Scooter Braun via their start-up investment funds A-Grade Investments and SB

19 Projects, respectively.  More directly, Oseary has been Defendant Ciccone's personal

20 manager and business partner for decades.  And Oseary's social media company

21 Pearpop received its initial financial backing from Defendant Hilton (along with Ape

22 DAO Board Defendant Ohanian individually).  Finally, Oseary's network extends to

23 other talent management agencies like the Creative Arts Agency ("CAA"), which

24

25

---

26  [26]    Tom Huddleston Jr., *Ashton Kutcher gave Ellen DeGeneres $4 million in*

27 *cryptocurrency for her charity — here's what you need to know about Ripple's XRP*,
CNBC (May 24, 2018), https://www.cnbc.com/2018/05/24/ashton-kutcher-gave-

28 ellen-degeneres-ripples-xrp-for-charity.html.

FIRST AMENDED CLASS ACTION COMPLAINT - CASE NO. 2:22-cv-08909-FMO-PLA

1  also represents Defendants Ciccone, Fallon.  Oseary's Sound Ventures partner,

2  Ashton Kutcher, is also represented by CAA.

3      81.     Oseary is further linked to several of the Promoter Defendants via their

4  mutual early investments in a cryptocurrency company, MoonPay.  Significantly,

5  many of MoonPay's early investors were made up of Oseary's immediate and

6  extended network.  For example, Oseary and Sound Ventures were also early

7  investors in MoonPay.  Other early MoonPay backers include Defendants Paris

8  Hilton, Justin Bieber (and his manager Scooter Braun), Austin Post, Calvin Broadus,

9  Jr., and Kevin Hart.  CAA is also an initial backer of MoonPay.

10     82.     Oseary saw an opportunity to profit from using his celebrity contacts to

11  promote the sale of Yuga securities, and he took it.  Oseary used NFT artist and

12  business partner Defendant Mike "Beeple" Winkelmann to facilitate a meeting with

13  Yuga and the Executive Defendants, so that Oseary could pitch his plan to promote

14  Yuga and the BAYC NFT collection.  Defendant Aronow admitted that "'[w]e didn't

15  really know why he [*i.e.* Oseary] was so interested in us – it was a little perplexing.'"

16  According to Aronow, Oseary eventually managed to "'become integral to the

17  process of basically everything that we do.'"[27]

18     83.     Oseary had an overlapping financial interest in promoting MoonPay's

19  services, which was synergistic with the related interest that he and the Yuga

20  executives had in promoting the BAYC NFT collection.  His plan would effectively

21  allow him, the Executive Defendants, and MoonPay (as well as the Promoter

22  Defendants Bieber, Hilton, Post, Broadus, and Hart, who each separately had a

23  financial interest in MoonPay) to all financially benefit from the cross-pollination

24  and promotional efforts for the Yuga Financial Products.

25     84.     The Executive Defendants, in conjunction with Oseary, tapped into their

26  collective networks to recruit high-profile celebrities to promote the sale of Yuga's

27  

28  [27]    *Id.*

23

collections of NFTs, particularly the BAYC NFTs.  Together, Oseary, the MoonPay Defendants, and the Promoter Defendants each shared the strong motive to use their influence to artificially create demand for the Yuga securities, which in turn would increase use of MoonPay's crypto payment service to handle this new demand.  At the same time, Oseary could also use MoonPay to obscure how he paid off his celebrity cohorts for their direct or off-label promotions of the Yuga Financial Products.

85.    Upon information and belief, Oseary also worked as a fixer for Yuga and the Executive Defendants.  On June 24, 2022, Yuga filed a trademark infringement claim against artist Ryder Ripps ("Ripps") related to the sale of Ripps' satirical NFT collection that Ripps has indicated is meant to shed light on the use of racist imagery and tropes within the BAYC NFT collection and its branding.

86.    In a declaration submitted by Ripps in support of his anti-SLAPP motion, he describes an interaction he had with Defendant Oseary regarding Ripps' claims that the BAYC NFTs contained hidden racist imagery:

> In December 2021, Guy Oseary, Yuga's talent manager, called me to discuss the public statements I had made about Yuga's neo-Nazi symbolism. On the call, Oseary made a series of vague threats, saying "I can be a nice guy or I can be a not nice guy" and that I would be better off being friends with Yuga. Oseary suggested that he understood Yuga used racist dog whistles by stating "who am I to judge someone's art." Oseary stated that he would help me if I kept silent and that he could make my life difficult if I did not cooperate. Oseary also offered to introduce me to Kanye West, not realizing that I already worked with him, and later added me to a text message thread with West's manager. When I had not posted anything new criticizing Yuga for about one week and unpinned a tweet criticizing Yuga, Oseary left me a voice memo thanking me for my silence.[28]

---

[28]    Declaration of Ryder Ripps, *Yuga Labs, Inc. v. Ryder Ripps et. al.*, No. 2:22-cv-04355-JFW-JEM (C.D. Cal. Oct. 3, 2022) (ECF No. 48-1), at ¶7.

24

87.     The same day that the *BuzzFeed* article exposed the identities of Solano and Aronow, which were previously hidden from the public and investors, Oseary posted the following message[29] on his Twitter account:



88.     Notably, Oseary cropped this photo in an effort to continue to hide the identities of Executive Defendants Ali and Atalay since they were not revealed in the *BuzzFeed* exposé.

89.     However, four days later, on February 8, 2022, Executive Defendants Atalay and Ali also posted pictures that revealed their true identities in the wake of

---

[29]     Guy Oseary (@guyoseary), TWITTER (Feb. 4, 2022, 5:13 PM), https://twitter.com/guyoseary/status/1489769181532753924?s=20&t=S3hmrMbihKgkSvhVgBWJPw.

FIRST AMENDED CLASS ACTION COMPLAINT - CASE NO. 2:22-cv-08909-FMO-PLA

the outing of Solano and Aronow.[30]  Oseary, ever the promoter, immediately posted the uncropped picture he previously posted with the following statement:[31]



### 3.     The Facilitator – MoonPay

90.     MoonPay is a company founded by Defendant Ivan Soto-Wright, which purports to provide a service that allows investors (particularly high-net-worth investors) to buy and trade NFTs "without hassle."  The mechanics of how such transactions are executed or who is ultimately paying to buy the NFTs is unclear.

---

[30]     Sass (Zeshan Ali), (@SassBAYC), TWITTER (Feb. 8, 2022, 12:46 PM), https://twitter.com/SassBAYC/status/1491151597682180096?s=20&t=g1mRpxWb WmWNzjxw385m2A; EmperorTomatoKetchup (Kerem Atalay) (@TomatoBAYC), TWITTER (Feb. 8, 2022, 12:46 PM), https://twitter.com/TomatoBAYC/status/1 491151593055879168?s=20&t=g1mRpxWbWmWNzjxw385m2A.

[31]     Guy Oseary (@guyoseary), TWITTER (Feb. 8, 2022, 1:04 PM), https://twitter.com/guyoseary/status/1491155912718897154?lang=en.

FIRST AMENDED CLASS ACTION COMPLAINT - CASE NO. 2:22-cv-08909-FMO-PLA

1   According to Soto-Wright, his business started operations in the United Kingdom
2   ("UK") before moving into other countries in Europe.

3        91.   In an interview with the crypto news outlet Protos, Defendant Soto-
4   Wright disclosed that he "started this in Europe, in the UK, [a]nd open banking wasn't
5   ready."[32] Soto-Wright went on to reveal that regulators in the UK and/or potential
6   users were "sketched out" by services offered by Soto-Wright's proto-version of
7   MoonPay, Saveable, a start-up company offering crypto payment services that was
8   ultimately acquired by a UK competitor Plum: "Like, wait, I'm going to give this
9   random service that I've never heard of access to my bank account so it can read my
10  transaction history and then move money around. Uh, no thanks. So yeah, I think I
11  learned that the hard way."[33]

12       92.   Soto-Wright further promoted himself and his crypto payment
13  businesses as having a fiduciary obligation to inform investors about the nature of the
14  financial products those investors purchased because of his services:

15         Like, you know, moving people into a savings product is kind of
16  like flossing your teeth. It's like, you need to do that. Right. . . . And I
    think that's so good because people are now getting financial education
17  in some way. Like, they're gonna make some mistakes.

18         They're gonna invest in stupid stuff. They're going to invest in
19  meme coins and shit points. And, you know, the reality is part of that,
    you know, *we need to do our job, uh, in terms of a fiduciary to make*
20  *sure that the people are doing their own research and, uh, diligencing*
21  *what they're buying*.[34]

22       93.   Later in the interview, when Soto-Wright was asked about the
23  particulars of why the crypto payment business in the UK "didn't work," Soto-Wright
24  vaguely claimed that his "waving the white flag" and selling his business to Plum
25

26  _____
    [32]   *Bootstrapping an ambitious idea in crypto*, MIXERGY.COM (Aug. 25, 2021),
27  https://mixergy.com/interviews/moonpay-with-ivan-soto-wright/.
    [33]   *Id.*
28  [34]   *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT - CASE NO. 2:22-CV-08909-FMO-PLA

was because he was "focus[ed] too much on the regulatory side of getting our regulatory approval."  Soto-Wright stated that he sold his "regulatory licenses" so that his competitor could "skip the. . . pain . . . that I went through 13 months at the financial conduct authority.  So *I could hold client money and move money into [a] security*.  So, uh, that's what happened.  So it wasn't like, it wasn't a win for me."  When discussing the "know your customer" responsibilities a business like MoonPay is obligated to abide by, Soto-Wright acknowledged: "[*W]e're selling a financial instrument* to some extent, right?"[35]

94.    Soto-Wright went on to state that:

[T]he reality is we had to turn it on first in Europe because in the United States, it was just extremely hard, like even getting bank accounts, uh, for crypto. I mean, *now it's getting a little bit better, but even getting, you know, getting bank accounts related to cryptocurrency, I mean, you would get shut down*.

And a lot of cases, banks just didn't want to take on the risk. They didn't understand it. It was too complex. Uh, but my, that was kind of the reason why I saw this as such a huge opportunity, because I felt that in the longterm banks would change their tune. And that's exactly what you're seeing now. Uh, something that was, can kind of consider it.

Uh, sketchy or, you know, I'd say like red or Amber on kind of like the traffic light, uh, is now turning green.[36]

95.    Soto-Wright further promoted that MoonPay's diligence regarding its regulatory and fiduciary obligations was part of an effort to "combat money laundering" and the "risk of fraud."[37]

96.    On May 26, 2021, the Malta Financial Services Authority ("MFSA") issued the following directive against MoonPay: "The MFSA considers that the Company is not in a position to adhere in full to the requirements of Chapter 3 of the

---

[35]    *Id.*
[36]    *Id.*
[37]    *Id.*

1  Virtual Financial Assets Rulebook ("the Rules") and therefore on 26 May 2021, the
2  MFSA directed the Company to cease the on-boarding of new clients with immediate
3  effect."[38]  Among other things, Chapter 3 of the Rules, a license holder in Malta must
4  maintain effective risk management and compliance policies and procedures.

5      97.    On April 13, 2022, MoonPay announced that "Music, sports, and
6  entertainment VIPs invest $87 million in MoonPay," stating that "60 influential
7  figures and organizations from the worlds of music, sports, media and entertainment
8  have collectively invested $87M in the company."  Included on this list are Anthony
9  Kiedis of Red Hot Chili Peppers (managed by Oseary), Sound Ventures (Oseary),
10  Defendant Hilton, Defendant Bieber (and his manager Scooter Braun), Defendant
11  Post, Defendant Broadus, Defendant Hart, as well as Gwyneth Paltrow (via Kinship
12  Ventures), Thomas Pentz (Diplo), Alexander Pall and Andrew Taggart of the
13  Chainsmokers (via Mantis VC), Nayvadius Wilburn Cash (Future) ("Wilburn Cash")
14  (via DreamCrew Entertainment), and Abel Tesfaye (The Weeknd) ("Tesfaye").[39]
15  CAA is also an initial backer of MoonPay via Connect Ventures.  Additionally, Yuga
16  securities promoter and wife of Ape DAO Board Defendant Ohanian, Serena
17  Williams, has ties to MoonPay via her board membership on Sorare, a collection of
18  fantasy soccer NFTs.

19      98.    Behind the scenes, MoonPay's entire business was a sham.

20      99.    MoonPay's alleged fraudulent and deceptive conduct (described in
21  detail below) is supported by the account of a former MoonPay employee
22  ("Confidential Witness 1" or "CW1") that worked for the company for the majority
23  of 2022.  CW1 was one of approximately five Compliance personnel at MoonPay.

24

25  ───────────────
    [38]    Notice, *MoonPay Limited ("the Company")* MALTA FIN. SERVS. AUTH. (May
26  26, 2021), https://www.mfsa.mt/publication/moonpay-limited-the-company/.
    [39]    Geoffrey Lyons, *Music, sports, and entertainment VIPs invest $87 million in*
27  *MoonPay*, MOONPAY (Apr. 13, 2022), https://www.moonpay.com/blog/investor-
    announcement.
28

According to CW1, Compliance personnel performed Enhanced Due Diligence ("EDD"), Know Your Customer (KYC) and Anti-money Laundering ("AML") checks on MoonPay customers, which are required by law for certain types of financial transactions. Given CW1's role in the Compliance group, CW1 had unique heightened access to files and data associated with MoonPay customer financial transactions: a level of access restricted to a small handful of personnel at the Company.

100. The Compliance group was charged with ensuring that each customer was properly screened, including customers that transacted through MoonPay's partners. Low-risk customers – those that, for example, sought to transact at lower dollar value and/or in fewer instances – were automatically screened through automatic software. High-risk customers, including those who sought to transact at high volumes, were manually screened by a Compliance employee.

101. All Compliance employees, including Confidential Witness 1, utilized the MoonPay Dashboard – the company's primary proprietary mainframe database and platform. The MoonPay Dashboard housed all customer information, including all customer profile and transactional data. The MoonPay Dashboard also included data associated with compliance checks for all NFT purchases, including those that occurred through one of MoonPay's most prominent NFT partners, OpenSea. Such checks were also performed for all transactions that were executed by or on behalf of MoonPay executives. According to CW1, every customer that transacted through MoonPay would have gone through either automated screening, or for high-risk customers, manual screenings completed by the Compliance group.

102. As Confidential Witness 1 confirmed, all intra-crypto transactions are captured on the Ethereum blockchain, but the missing element in that blockchain transactional trail is the initial transaction, where fiat (e.g., U.S. Dollar) is exchanged for digital assets. Importantly, the MoonPay Dashboard captures the transactional

data – including the person in question and, as required, data such as their address, proof of income and bank account statements, driver's license, passport, or other form of identification, and a picture of themselves (or "selfie") that utilizes technology to detect liveness – when fiat currency is utilized to purchase ETH or by extension, an NFT.

103.   To perform their functions, the Compliance team was granted access to a restricted area in the MoonPay Dashboard.  This enabled each of them (including CW1) to access, view, and make changes to sensitive customer information.  All MoonPay customers were subject to standard, automated KYC and AML screening.  However, any transactions that were above a certain monetary threshold – at or around $25,000, cumulatively, over a certain timeframe – required the Compliance team to manually perform EDD as well.  EDD checks were also triggered when customers were based in certain known high-risk countries.  EDD checks also involved so-called "wallet-screening."   This screening is performed by the Compliance team using a third-party financial forensics platform called TRM Labs ("TRM").   TRM assisted the Compliance team in identifying wallets that were flagged for potential or actual sanctions violations, terrorist financing, darknet transactions, and other nefarious or suspicious activity.  Any such hits on the TRM platform required the Compliance team to conduct additional reviews to either confirm such activities or approve the wallet, thereby enabling the customer associated with that wallet to perform transactions via MoonPay.

104.   While at MoonPay, Confidential Witness 1 sought to become more familiarized with the Company's offerings and began questioning MoonPay's business practices, specifically surrounding its Concierge service.  Moreover, CW1 became aware of public reports that celebrities were being investigated and sued for unlawfully promoting the sale of crypto assets, which only increased CW1's suspicions of MoonPay's Concierge service.

105.   MoonPay's Concierge service was portrayed as an exclusive, by-invitation-only service that catered to celebrities and other high-net worth individuals.  At its core, Concierge is a sales group charged with selling NFTs to these high-end clients, and providing additional ancillary services associated with the purchase of NFTs.  According to CW1, MoonPay's Concierge associates attended various industry functions and pitched the benefits of the Concierge service to this demographic.  Confidential Witness 1 was also present at some of these functions, including one at Soho House during NFT.NYC,[40] and another during New York Fashion Week 2022.

106.   As time went on, Confidential Witness 1's concerns about MoonPay's Concierge service increased, prompting further investigation by CW1.  First, CW1 began checking the MoonPay Dashboard to try to identify any compliance checks that might have been conducted on Concierge clients.  In particular, CW1 ran targeted searches within the MoonPay Dashboard for all the highly publicized Concierge celebrity clientele, including, but not limited to, Defendants Bieber, Hilton, and Ciccone.  Significantly, for Confidential Witness 1's entire tenure at MoonPay, CW1 did not identify a single (1) celebrity client profile, (2) related compliance check results for such clients, or (3) transactional information for such clients, in the MoonPay Dashboard.

107.   Standing alone, the fact that no Concierge clients had any presence on the MoonPay Dashboard was troubling enough due to the representations MoonPay

---

[40]   Soho House is a global private members club with a reputation for hosting high-profile "celebrity" and high-net worth individuals from the entertainment, art, and fashion industries.  Soho House boasts an intensive application process with a waitlist of over 30,000 people globally.  The exclusive and star-studded nature of Soho House is such a known fact that it served as the basis for the plot for a Season 6 episode of Sex and the City, in which one of the characters unsuccessfully tries to infiltrate the same Soho House location in Manhattan's Meatpacking District that the MoonPay Concierge team visited during NFT.NYC.  Concierge Associate Justin Johnson also serves on the committee for Soho House's Austin location.

and the Promoter Defendants had been making publicly in connection with the ostensible purchase of NFTs.  But this also raised a red flag for CW1 because not including these celebrities in the Dashboard system ran contrary to the supposed value-add MoonPay touted to its clients.  According to CW1, after a client is screened, approved, and in the MoonPay Dashboard system, they would be able to engage in unlimited crypto transactions going forward – across all MoonPay's partners' platforms and services through the MoonPay Passport service[41] – without ever having to go through the compliance vetting and wallet-creation process again. As such, notwithstanding whether the publicly reported/celebrity promoted transactions actually occurred, the fact that no information was identified for these celebrities anywhere within the MoonPay Dashboard suggested to Confidential Witness 1 that these celebrities were not, and would not be in the future, availing themselves of the very service MoonPay had claimed to provide them.

108.  In early 2022, Confidential Witness 1 expressed interest to their supervisors – Elise Messerli ("Messerli") (Compliance Associate promoted to Head of Product Risk in August 2022)[42] and Pieter Schoeman ("Schoeman") (Compliance Associate promoted to Head of Regulatory Compliance in August 2022) – in learning

---

[41]     SanKrit K, *Your passport to the Web3 economy*, MOONPAY (Nov. 22, 2022), https://www.moonpay.com/learn/web3/your-passport-to-the-web3-economy; *Web3 Passport Home Page*, MoonPay (last visited Aug. 3, 2023), https://www.moonpay.com/web3-passport.

[42]     Messerli and Defendant Soto-Wright were both previously involved with a venture capital firm, HODL Venture Capital. *See Hodl VC Team and Co-Investors*, PITCHBOOK (last visited Aug. 3, 2023), https://pitchbook.com/profiles/investor/491088-88#team.   According to a lawsuit filed in the Delaware Chancery Court, HODL Venture Capital duped small investors into selling their stakes for pittances as part of a scheme to "clear out" small partners before the $555 million series A financing round.  *See* Mike Lenoard, *MoonPay Backers Duped Early Investor Before Financing, Suit Says*, BLOOMBERG (Mar. 23, 2022), https://news.bloomberglaw.com/esg/moonpay-backers-duped-early-investor-before-financing-suit-says.

more about the Concierge service.  Schoeman and Messerli reported to MoonPay co-founder, Chief Operating Officer, and Chief Financial Officer, Max Crown ("Crown") until late December 2021.  After late December 2021, Schoeman and Messerli reported to Compliance Director EMEA, Simon Knight.  In turn, Knight reported to Max Crown.  Crown was deeply involved in all aspects of the MoonPay business, and he was principally in charge of the Concierge service.  In addition to serving as CFO and COO and leading the Concierge program, Crown also oversaw the Compliance department.[43]

109.  Based on CW1's ongoing interactions with Messerli and Schoeman, CW1 got the impression that neither was knowledgeable (at least to any significant degree) about the Concierge service beyond that of a typical employee.  This surprised CW1 as they expected a reasonable compliance department to have greater insight into the workings of the Concierge program than what CW1 observed in Messerli and Schoeman.[44]

---

[43]   According to his LinkedIn profile, Crown is "Responsible for Compliance, Legal, and Finance" for HODL.vc: the venture capital firm and incubator that founded MoonPay. *See Max (Maximilian) Crown*, LinkedIn (last visited Aug. 3, 2023), https://www.linkedin.com/in/maxcrown/?originalSubdomain=uk.  At HODL, Crown serves alongside Soto-Wright, the entity's co-Founder.  There does not appear to be any record of Crown having attended law school or being licensed to practice law.  It is further noted that, consistent with the seemingly cavalier and high-risk approach to legal compliance at MoonPay, Soto-Wright and Crown derived the name "HODL" from an acronym that stands for "Hold On for Dear Life."  *See How MoonPay Plans to Onboard the World Into Web3*, NFT Now (Jan. 25, 2023), https://nftnow.com/podcasts/how-moonpay-plans-to-onboard-the-world-into-web3/, at   5:20.   Soto-Wright's   Instagram   handle   is   Ivanhodl: https://www.instagram.com/ivanhodl/.

[44]   In August 2022, MoonPay reorganized the reporting structure for the Compliance team.  From that point until October 2022, CW1 reported to the newly hired Director of Governance and Regulatory Affairs, Eduardo Gutierrez Fernandez, who, in turn, reported to the also newly hired Chief Compliance Officer, Brent Crider.  The only reporting line that remained the same was that Crown stood at the top,

---

FIRST AMENDED CLASS ACTION COMPLAINT - CASE NO. 2:22-cv-08909-FMO-PLA

110.   Confidential Witness 1 later scheduled a meeting with London-based Head of MoonPay Concierge, Charlotte Laborde.  Laborde reported to COO Crown. She was initially hired as "Strategy Lead to the COO" and was promoted to Head of Concierge as of May 2022.  During this meeting, CW1 sought to learn more about the Company and the Concierge service specifically.  Based on the conversation with Laborde, CW1 concluded that insofar as the practices of the Concierge service, MoonPay did not appear to pay any heed to financial regulations within the U.S.

111.   Given the absence of Concierge client data in the MoonPay Dashboard, as well as the meeting with Laborde and the news reports about other unlawful celebrity endorsements of digital assets, Confidential Witness 1 drafted a memorandum expressing concerns with MoonPay's seemingly unlawful business practices. CW1 submitted the memo to Messerli and Schoeman in or around May 2022, but neither responded to the substance of the memo.  Instead, both Messerli and Schoeman advised CW1 on more than one occasion over the course of at least five months that they were pressed for time and could not comment on CW1's submission.  To the knowledge of CW1, Messerli and Schoeman never addressed the contents of the memo.

112.   The primary concern that Confidential Witness 1 outlined in the memo was that MoonPay was potentially running afoul of securities laws and other laws associated with the financial services industry.  CW1 expressed concerns that celebrities were promoting the sale of these products without disclosing their own

_____

receiving direct reports from Crider and his subordinates.  It should also be noted that around the same time, MoonPay brought on a number of new executives including Asiff Hirji ("Hirji") who notably is the ex-president of Coinbase, and an ex-operating adviser at the leading Yuga Labs backer, venture capital firm Andreessen Horowitz. Hirji is now acting president of MoonPay.  *See* Ben Strack, *Latest in Crypto Hiring: MoonPay Adds Range of Senior Execs*, BLOCKWORKS (July 15, 2022), https://blockworks.co/news/latest-in-crypto-hiring-moonpay-adds-range-of-senior-execs;  *Asiff Hirji*, LINKEDIN (last visited Aug. 3, 2023), https://www.linkedin.com/in/asiff-hirji/.

financial interests in those very same products.  CW1 also expressed concerns in the memo as to whether MoonPay may have been in violation of certain licensing requirements (*e.g.*, Broker-Dealer, FINRA, etc.) given the nature of its business. CW1 noted that the Concierge service was developed and operated solely by sales personnel and was seemingly detached from any internal legal oversight, including what CW1 deemed to be the required regulatory checks that the Compliance department should have performed.  As Confidential Witness 1 observed, MoonPay's Concierge service was being run more like a used car dealership as opposed to a business selling sophisticated financial instruments that were subject to securities laws.

\*     \*     \*

113.   Oseary and the Executive Defendants sold and/or solicited the sales of Yuga securities by relying on a tried-and-true marketing strategy: celebrity endorsements.  With the approval of the Executive Defendants and Ape DAO Board Defendants, Oseary applied this classic strategy to the modern world of blockchain-related financial products and securities.

114.   Oseary, the MoonPay Defendants, and Promoter Defendants Hilton, Bieber, Post, Broadus, and Hart, each had a financial interest in MoonPay.  Likewise, celebrity influencers Thomas Pentz (Diplo), Alexander Pall and Andrew Taggart (The Chainsmokers), Wilburn Cash (Future), and Tesfaye (The Weeknd) also had financial interests in MoonPay and each made promotional posts for Bored Ape NFTs.   Upon information and belief as investors in MoonPay, the individual Defendants had direct or indirect control over MoonPay and its marketing, particularly with respect to those promotional efforts each of these individual Defendants personally engaged in, respectively.

115.   Ultimately, "[t]he [BAYC NFT] series serves as a kind of fan club on steroids that encourages owners of the NFTs to move through an ever-growing and

exclusive list of events and opportunities."[45]  And the Company presents the Bored Ape ecosystem as a brand that is organically beloved by some of the most famous celebrities in the world.  But the truth is that the Company's entire business model relies on using insidious marketing and promotional activities from A-list celebrities that are highly compensated (without disclosing such), to increase demand of the Yuga securities by convincing potential retail investors that the price of these digital assets would appreciate and that, as members of "the club," these investors would be given exclusive access to additional financial products and benefits.

### B.    The Misleading Promotion and Sale of Yuga Securities

116.    After the launch of the BAYC NFT collection in March 2021, the Company began a multi-pronged scheme to promote additional sales of the BAYC NFTs (and other Yuga-owned NFT collections), of which Yuga would take a 2.5% fee on every resale.

### 1.    The First Scheme – The Deceptive Sotheby's Auction

117.    The first order of business for the Company and its founders was to create an air of legitimacy around the BAYC NFT collection to generate investors' interest and hype around the Bored Ape brand.  To do this, Yuga colluded with fine arts broker, Defendant Sotheby's, to run a deceptive auction of a lot of 101 BAYC NFTs.  This special sale was called "Ape In!"

118.    In the lead up to the BAYC auction, Sotheby's representatives misleadingly promoted both the auction and the BAYC NFT collection on the Sotheby's social media accounts and with statements to various news outlets.  These promotions were amplified and further disseminated by the Company through its various social media accounts.

---

[45]    Shirley Halperin, *From Maverick to Mogul, Madonna's Manager Guy Oseary Transcends the Music World to Take on NFTs*, VARIETY, https://variety.com /2022/music/news/guy-oseary-nft-madonna-u2-manager-1235325286/ (last visited Oct. 27, 2022).

119.   For example, on August 27, 2021, Sotheby's Head of Contemporary Art Auctions, Max Moore, posted an advertisement for the BAYC auction from his Twitter account, which included an animation of gold Bored Ape walking his golden Kennel Club dog, along with the Sotheby's and BAYC logos and the dates of the BAYC auction.[46]

120.   On August 28, 2021, Sotheby's promoted the BAYC auction as a landmark event for the storied arts dealer: "It's official. For the first time in our 277-year history, apes and kennels are storming Sotheby's. The @BoredApeYC sale starts September 2. Ape In."[47]   The promotion included the same animated video of the gold Bored Ape walking his golden Kennel Club dog from Moore's earlier post. Sotheby's official Twitter account also changed its profile picture to a golden Bored Ape in front of a golden Bored Ape Kennel Club dog to publicize the BAYC auction.

121.   On August 30, 2021, the Sotheby's Twitter account again promoted the sale of BAYC NFTs, stating that "Bored Ape Yacht Club and Bored Ape Kennel Club have paved the way for what NFT art communities can be.  Whether it's your online identify, a shared culture, or you just want to ape in . . . the @BoredApeYC sale starts September 2."[48]   The post then provided a link that leads investors to a Sotheby's website that solicits the sale of Yuga securities.   In particular, the Sotheby's website on that day advised that there were "3 Days Until Bidding Opens" on "2 September 2021 - 10:00 EDT - New York."[49]   On September 1, 2021, the website had counted down to "1 Day Until Bidding Opens."

---

[46]   Max Moore (@MaxMoore_Art) Twitter (Aug. 27, 2021 9:58 AM), https://twitter.com/MaxMoore_Art/status/1431300201738735618?s=20.

[47]   Sotheby's (@Sothebys) Twitter (Aug. 28, 2021 7:00 AM), https://twitter.com/Sothebys/status/1431617671842381831?s=20.

[48]   Sotheby's (@Sothebys) Twitter (Aug. 30, 2021 9:00 AM), https://twitter.com/Sothebys/status/1432372722114433024?s=20.

[49]   *Ape In! Auction Page – Archived*, Sotheby's (Sept. 2, 2021), https://web.archive.org/web/20210830162645/https://www.sothebys.com/en/buy/auction/2021/ape-in?cmp=social____twitter_bored_ape_nft_aug-2021.

First Amended Class Action Complaint - Case No. 2:22-cv-08909-FMO-PLA

122. The August 30, 2021 ad from Sotheby's also contained an animated video of various Bored Apes partying at "Club Sotheby's" and promoting Yuga Labs and its NFT collections. The video further directs investors to "Ape In" (*i.e.*, to make a purchase of Yuga securities), inviting them to "learn more at sothebys.com/boredape," and it ending with images of the BAYC and Sotheby's logos.[50]

123. Sotheby's Co-Head of Digital Art Sales, Michael Bouhanna, reposted Sotheby's August 30 ad, advising investors: "This is your chance to own 1% of @BoredApeYC and become the 3rd biggest owner of one of the most important and in-demand NFT projects."[51]

124. On September 2, 2021 Moore reposted an announcement from Farokh Sarmad that he would be hosting "the official Sotheby's x Bored Ape Yacht sale on Spaces at 11 AM ET!"[52] Notably Sarmad is the founder and host of Rug Radio, a purportedly decentralized media platform that serves as a launchpad, incubator, brand builder, and accelerator for blockchain-related projects. According to the Rug Radio website, Yuga Labs is a "partner" with Rug Radio.

125. Moore publicly touted the BAYC auction during the @farokh x @Sotheby's Twitter Spaces live events.[53] For example, on September 3, 2021, during the first Sotheby's x BAYC Twitter Space hosted by Rug Radio, Moore claimed that the BAYC NFT collection had "made it to the gold level of art" by being offered for sale by an art dealer of Sotheby's status,[54] stating:

---

[50] Sotheby's Aug. 30, 2021 Tweet, *supra* n.48.

[51] Michael Bouhanna (@michaelbouhanna) TWITTER (Aug. 30, 2021 9:02 AM), https://twitter.com/michaelbouhanna/status/1432373042521546752?s=20.

[52] Farokh (@farokh), TWITTER (Sept. 2, 2021 4:50 PM), https://twitter.com/farokh/status/1433532835722416132?s=20.

[53] *See Partner with Rug Radio*, RUG RADIO (last visited Aug. 3, 2023), https://www.rug.fm/lfg.

[54] *See* Wave Ninja, *The Traditional Collector*, SUBSTACK (May 2, 2023), https://waveninja.substack.com/p/the-traditional-collector.

FIRST AMENDED CLASS ACTION COMPLAINT - CASE NO. 2:22-cv-08909-FMO-PLA



126.  Notably, Moore, during the promotion of another NFT auction conducted by Sotheby's, previously acknowledged that the stamp of approval from a Sotheby's endorsement can induce investors to make purchases of NFTs: "***I do expect some collectors who maybe have never purchased an NFT to make their first NFT purchase in this sale, given that it is a Sotheby's sale***."[55]  Moore went on to acknowledge that Sotheby's stood to gain from the sale of NFTs beyond simply the sales themselves.  Sotheby's hoped that NFT sales (facilitated by Sotheby's) would enable it to tap into a younger demographic of investors.  According to Moore, the "sales [of NFTs] should help Sotheby's attract new collectors who may not have interacted with the house before."  Moore further added: "It's a much younger audience, which I think is quite interesting for Sotheby's as well."[56]

127.  Upon information and belief, Sotheby's was aware of the vast amounts of money it stood to gain by soliciting sales of NFTs from investors through its promoted auctions.  One month after the BAYC auction, in October 2021, Sotheby's opened a NFT trading platform called the "Sotheby's Metaverse,"[57] which, upon information and belief, operated (or attempted to operate) as an unregistered broker

---

[55]    *Auction Houses Sotheby's, Phillips Latest to Join NFT Craze*, NDTV (Apr. 13, 2021),   https://www.ndtv.com/world-news/auction-houses-sothebys-phillips-latest-to-join-nft-craze-2412260.

[56]    *Id.*

[57]    Sotheby's Metaverse (@Sothebysverse) TWITTER (Oct. 14, 2021, 9:01 AM), https://twitter.com/Sothebysverse/status/1448680330194530312?s=20.

FIRST AMENDED CLASS ACTION COMPLAINT - CASE NO. 2:22-CV-08909-FMO-PLA

of securities.  During an interview for the launch of the Sotheby's Metaverse, it stated that it planned on "extend[ing] NFT activities into areas such as contemporary art, museums and masterworks, luxury and fashion, sports, music and Entertainment, and science and technology."[58]

128.   Sebastian Fahey, Executive Lead for the Sotheby's Metaverse and Managing Director of the company's business in Europe, the Middle East and Asia noted that "'[w]hen Sotheby's first entered the world of NFTs earlier this year, it was immediately clear that we had so far only scratched the surface of the potential of this new medium, and NFTs.'"[59]  During the same interview with Fahey, Moore added: "'Since then, we have spent months exploring every aspect of the digital art landscape, aligning with some of the most influential minds of the NFT movement to architect a custom marketplace that prioritises curation and customisation.'"[60]

129.   This falls in line with Moore's statement April 2021 regarding Sotheby's designs capitalizing on the booming NFT market and its investors: "My primary focus right now is establishing these roots [with NFT investors like Plaintiffs and the Class], these connections, establishing these relationships, understanding what drives their collecting habit . . . . ***Then we'll be able to kind of target them in a way that we would never have done before***."[61]

130.   On September 9, 2021 the Sotheby's Auction House held the promoted auction on behalf of Yuga.  As the auction was underway, Moore continued to promote the sale of BAYC NFTs by pointing to the then-current bid of $20 million

---

[58]   Raffaele Redi, *Sotheby's launches NFT Metaverse featuring Paris Hilton and Aoki*, Currency.com (Oct. 15, 2021), https://currency.com/sotheby-s-launches-nft-metaverse-featuring-paris-hilton-and-aoki.

[59]   *Id.*

[60]   *Id.*

[61]   *Auction houses want to be part of the latest trend in art world*, Economic Times (Apr. 14, 2021), https://economictimes.indiatimes.com/magazines/panache/auction-houses-want-to-be-part-of-the-latest-trend-in-art-world-sothebys-phillips-join-nft-craze/articleshow/82060210.cms?from=mdr

First Amended Class Action Complaint - Case No. 2:22-cv-08909-FMO-PLA

for the lot of BAYC NFTs.[62]  In the end, Sotheby's claimed to have sold the lot of BAYC NFTs to a purportedly anonymous buyer for $24.4 million.  This bid far exceeded the upper estimate of $18 million, $240,000 per BAYC NFT, Sotheby's had publicly predicted.[63]  This price was more than $100,000 more than the floor price for BAYCs at the time.

131.   Bouhanna stated in a Twitter post on September 9, 2021: "Our Ape In! auction @Sothebys just achieved an outstanding $26.2M – a great indicator of the level of confidence in this amazing NFT project.  This is just the beginning.  Congrats to BAYC."[64]

132.   More importantly, following the final bid on the lot of BAYC NFTs, a Sotheby's representative affirmed during the September 9, 2021 @farokh x @Sotheby's Twitter Space that the winning bidder was a "traditional" collector.[65] Upon information and belief, this Sotheby's representative was Max Moore. Notably, Moore has, during the promotion of another Sotheby's NFT auction, both used the term and confirmed its distinction from new crypto investors naïve to Sotheby's as a trading platform: "'These new crypto investors have a very different aesthetic and a very different taste profile than a traditional collector would and so

---

[62]    Max Moore (@MaxMoore_Art), TWITTER (Sept. 9, 2021 12:31 AM), https://twitter.com/MaxMoore_Art/status/1435868430679175170?s=20.

[63]    *101 Bored Ape Yacht Club – Lot 1*, SOTHEBY'S (last visited Aug. 3, 2023), https://www.sothebys.com/en/buy/auction/2021/ape-in/101-bored-ape-yacht-club; Darius McQuaid, *NFT of Bored Apes sells for over $24m at Sotheby's auction*, CURRENCY.COM (Sept. 10, 2021), https://currency.com/nft-of-bored-apes-sells-for-over-24m-at-sotheby---s-auction.

[64]    Michael Bouhanna (@michaelbouhanna), TWITTER (Sept. 9, 2021), https://twitter.com/michaelbouhanna/status/1435971090061332488?s=20.

[65]    *See* Wave Ninja, *supra* n.54 (claiming to have personally heard this representation).

42

1   it's important to provide a mix and a range of collectible at Sotheby's to attract a wide

2   variety of audience.'"[66]

3          133.   Indeed, concurrent reports confirmed Sarmad's recap of the September

4   9th Twitter Space conversation.   While recordings of the @farokh x @Sotheby's

5   Twitter spaces are not publicly available, contemporaneous accounts by those

6   listening live during these spaces personally recalled hearing the "traditional" remark

7   from a Sotheby's representative.[67]   For example, Sarmad stated: "Winner of the

8   $24.4M lot of 101 Bored Apes is a traditional buyer and had to KYC through

9   Sotheby's."[68]   As another post from the day relayed the following:



16          134.   Likewise, a longstanding member of the BAYC community,

17   TheGovernor.eth, also confirmed that Moore had "said that the buyer of the 101 ape

18   lot was a traditional art collector," adding that such a feat hadn't "happened in an

19   NFT auction before."[69]

20

21

22

23

24

---

25   [66]    *Crypto-artist Pak's single grey pixel NFT sold for $1.36 million*, ARTREVIEW (Apr. 15, 2021), https://artreview.com/crypto-artist-pak-single-grey-pixel-nft-sold-

26   for-1-36-million-dollars/.

27   [67]    Wave Ninja, *supra* n.54.

    [68]    *Id.*

28   [69]    *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT - CASE NO. 2:22-cv-08909-FMO-PLA

1





135.   The Company's official Twitter account also promoted the successful sale of the BAYC NFT lot during the Sotheby's auction and congratulated the undisclosed "buyer," stating in particular: "What an historic moment for the club: the @Sotheby's auction of 101 Bored Apes has closed at over $24m.  Congratulations and THANK YOU to the whole ape community.  To the buyer, I think we speak for everybody when we say: WELCOME TO THE CLUB. 🙈🙉🙊"[70]

136.   Concurrently, in an *ARTnews* article published on the same day as the BAYC auction (*i.e*., September 9, 2021) Sotheby's Bouhanna discussed the BAYC auction and confirmed that "legacy art collectors were also heavily involved in the bidding."[71]

137.   Bouhanna further directly promoted the BAYC NFT collection (and implicitly confirmed the authenticity of Sotheby's BAYC auction) in written

---

[70]    Bored Ape Yacht Club (@BoredApeYC), TWITTER (Sept. 9, 2021), https://twitter.com/BoredApeYC/status/1435976278797164551?s=20.

[71]    Shanti Escalante-De Mattei, *Sotheby's Brings in $26 Million with Bored Ape NFT Bundle*, ARTNEWS (Sept. 9, 2021), https://www.artnews.com/art-news/market/sothebys-bored-ape-nft-sale-1234603344/.

FIRST AMENDED CLASS ACTION COMPLAINT - CASE NO. 2:22-cv-08909-FMO-PLA

statements to traditional news outlets.  For example, again on September 9, 2021, Bouhanna downplayed the possibility of any danger to investors of there being an NFT market bubble, particularly for the BAYC NFT collection.   In particular, Bouhanna stated that "although there is financial speculation on NFTs, [Bouhanna] sees the Bored Apes as works of art."  Bouhanna then unambiguously declared "the NFT market is not a bubble," explaining:

> People were talking about a bubble in March, in June etc, and then we see that the market is even stronger today so I think they've been proven wrong . . . I think it's a very organic market with great collectors who have great appreciation of art."[72]

138.   Sotheby's Senior Administrator of Contemporary Art, Hallie Freer, also issued a statement justifying the high price of the BAYC NFT collection versus a similar lot of Yuga's Kennel Club NFT collection being auctioned by Sotheby's.  In particular, on September 9, 2021, Freer explained that the disparity between the two lots was chalked up to the relatively older vintage of the BAYC NFTs: "'[T]he apes have been on the market much longer – since late April – while the dogs were released in early August.'"[73]

139.   Bouhanna also made the rounds with the cryptocurrency-focused press outlets following the auction and promoted the BAYC NFTs: "'The Bored Ape Yacht Club project is one of the most exciting and creative NFT collectibles since the launch of CryptoPunks, and has become a major force in pop culture.'"[74]

---

[72]     Elizabeth Howcroft, *Set of "Bored Ape" NFTs sells for $24.4 mln in Sotheby's online auction*, REUTERS (Sept. 9, 2021), https://www.reuters.com/lifestyle/set-bored-ape-nfts-sell-244-mln-sothebys-online-auction-2021-09-09/.

[73]     Kevin Donovan, *Bored Ape NFT lots sell at auction for $24.4m, $1.8m*, CAPITAL.COM (Sept. 9, 2021), https://capital.com/bored-ape-nft-lots-sell-at-auction-for-24-4m-1-8m.

[74]     Tracy Wang, *Sotheby's Auction of 101 Bored Ape NFTs Fetches $24M, Smashing Estimates*, COINDESK (Sept. 9, 2021), https://www.coindesk.com/markets/2021/09/09/sothebys-auction-of-101-bored-ape-nfts-fetches-24m-smashing-estimates/.

FIRST AMENDED CLASS ACTION COMPLAINT - CASE NO. 2:22-cv-08909-FMO-PLA

140.   The promotions of the Sotheby's auction of the BAYC NFT collection were effective in cloaking the Yuga securities in the air of legitimacy.  As one news outlet observed: "The fact that this [BAYC NFT] auction is being handled by the Contemporary Art department at Sotheby's *speaks volumes*."[75]

141.   Shortly after the Sotheby's auction and its related promotions, BAYC NFTs hit a then new all-time high floor price around 43 ETH per NFT.  The following chart indicates how much impact the Sotheby's auction and its promotion had on the price of BAYC NFTs:



142.   This initial boost, however, was rooted in deception.   Sotheby's representations that the undisclosed buyer was a "traditional" collector had misleadingly created the impression that the market for BAYC NFTs had crossed over to a mainstream audience.  The Company and its founders likewise touted the Sotheby's stamp of approval that the auction was above board.  But the reality of the winning "bid" of the Sotheby's auction exposes the falsity of those statements.  In

---

[75]      Donovan, *supra* n.73 (emphasis added).

46

truth, it was not a "traditional" buyer that made the winning bid in the BAYC NFT auction, but rather the now-defunct cryptocurrency exchange FTX.[76]

143.   FTX has several deep ties to Yuga such that it would be mutually beneficial for both Yuga and FTX (as well as Sotheby's) if the BAYC NFT collection were to rise in price and trading volume activity.  Upon information and belief, given the extensive financial interests shared by Yuga, Sotheby's and FTX, each knew that FTX was the real buyer of the lot of BAYC NFTs at the Sotheby's auction at the time that Sotheby's representatives were publicly representing that a "traditional" buyer had made the purchase.

144.   According to the transaction data available on the Ethereum blockchain, following the auction, on September 22, 2021, Sotheby's transferred the lot of BAYC NFTs to wallet address  0xf8e0C93Fd48B4C34A4194d3AF436b13032E641F3,[77] which, upon information and belief, is owned/controlled by FTX.  This wallet previously sent 13 ETH to a "Blockfolio"/FTX US exchange in April of 2020 —— prior to the launch of FTX US in May 2020 and FTX's NFT sales platform in December 2021.[78]  This form of interaction often indicates a relationship between this wallet and the exchange.

145.   Moreover, for the launch of its NFT platform, on December 1, 2021, FTX put out a promotional video that featured more BAYC NFTs from the Sotheby's

---

[76]     As of the filing of this complaint, top executives of FTX and its sister trading arm Alameda Research ("Alameda") have either pled guilty to or are defending against significant criminal charges related to fraud, money laundering, and other securities law violations,

[77]     Transaction     Hash:     0x43802846b97e4a5785a069ed6f845b8c96ad8a59ba e6cbfebf2990dd1eb59f39     ETHERSCAN     (Sept.     22,     2021,     4:57     PM), https://etherscan.io/tx/0x43802846b97e4a5785a069ed6f845b8c96ad8a59bae6cbfeb f2990dd1eb59f39.

[78]     Transaction     Hash:     0xdb8eee2a48976c47666ccf80c99d9dbe90f40e6e e54835779145e1d3a0f9c499,     ETHERSCAN     (Apr.     14,     2020,     1:27     AM), https://etherscan.io/tx/0xdb8eee2a48976c47666ccf80c99d9dbe90f40e6ee54835779 145e1d3a0f9c499.

47

auction.[79]   Promoter Defendant Stephen Curry, who as discussed further below misleadingly promoted the FTX  platform and the BAYC NFT collection, tacitly endorsed this joint FTX/BAYC ad, replying: "Cool announcement video, but my editing skills are missed 😂."[80]   Importantly, the promotional video showcased certain BAYC NFTs which were plainly identifiable from the lot of BAYC NFTs from the Sotheby's auction.  For example, BAYC NFT #5812 and #3432 can be seen in the video, and as of the filing of this amended complaint, remain in wallets owned and/or controlled by FTX.[81]

146.   FTX even promoted the listing of precisely "101" BAYC NFTs on FTX US.[82]  Moreover, when the BAYC NFTs were sold on the FTX US NFT exchange, the securities initially needed to be transferred to a deposit wallet that had frequent and large transactions with other known FTX and/or Alameda wallets.  In fact, as discussed further below, these wallets received millions of dollars' worth of ApeCoin under highly dubious circumstances.

147.   Indeed, screenshots of FTX's NFT marketplace indicate that the only BAYC NFTs available for purchase were exclusively from the lot of BAYC NFTs at the Sotheby's auction.  For example, one image posted on November 23, 2021 showed BAYC NFTs #4465, 5211, 7468, 7824, 7826, 7976, 7978, and 8181,[83] which all were transferred to the same wallet that held BAYC NFTs #5812 and #3432

---

[79]    FTX   (@FTX_Official),   TWITTER   (Dec.   1,   2021   7:56   AM), https://twitter.com/FTX_Official/status/1466073606618820610?s=20.

[80]    Stephen Curry (@StephenCurry30), TWITTER (Dec. 3, 2021 10:52 AM), https://twitter.com/StephenCurry30/status/1466842814738690049?s=20.

[81]    *Token: BoredApeYachtClub*,   ETHERSCAN (last visited Aug. 4, 2023), https://etherscan.io/token/0xbc4ca0eda7647a8ab7c2061c2e118a18a936f13d?a=0xf02e86d9e0efd57ad034faf52201b79917fe0713.

[82]    *See* Conor (Conor Grogan) (@gconorgrogan), TWITTER (Dec. 21, 2022 7:30 AM), https://twitter.com/jconorgrogan/status/1605586391332552706?s=20.

[83]    alto – dollar.eth (@etheraltog), TWITTER (Nov. 23, 2022 7:08 AM), https://twitter.com/etheraltog/status/1595434120703778819?s=20.

48

FIRST AMENDED CLASS ACTION COMPLAINT - CASE NO. 2:22-cv-08909-FMO-PLA

1  discussed above.  The floor price for BAYC NFTs fell 9.7% from 49 ETH on
2  November 19, 2021 (the same day Defendant Broadus promoted the BAYC NFT
3  collection as being in "excellent hands with . . . tech & entertainment maven
4  @guyoseary managing the overall BAYC IP"[84]) down to 44.21 ETH on November
5  23, 2021 when news that FTX was the Sotheby's auction's real winning bidder was
6  revealed to the market.[85]

7     148.   Notably, FTX priced these BAYC NFTs so aggressively high that it
8  created arbitrage opportunities.  As one BAYC NFT investor noted on December 5,
9  2021: "The real BAYC floor right now is on FTX.  Apes offered at 49 [eth] vs.
10 Opensea at 52 [eth].  Almost an arb."[86]

11    149.  On  January  2,  2022,  a  high-profile  BAYC  NFT  trader,
12 @franklinisbored, confirmed that "101 apes are viewable on the @ftx_us @Ftx_Nfts
13 exchange . . . and some were listed and bought for under ape floor by myself [and
14 others] to arb."[87]  As the transaction recorded on the Ethereum blockchain reveals,
15 @franklinisbored  purchased  BAYC  NFT  #5211  (which  was  included  in  the
16 Sotheby's auction) from the FTX.US NFT marketplace on January 2, 2022.[88]

17    150.  Ultimately, the Sotheby's auction was a huge promotion for Yuga and
18 the  BAYC NFT collection's legitimacy as an investment.  Behind this scheme,
19 Defendants Yuga and Sotheby's were conspiring with FTX (and, upon information

---

[84]    Cozomo de' Medici (Snoop Dogg) (@CozomoMedici), TWITTER (Nov. 18, 2021), https://twitter.com/CozomoMedici/status/1461483915189764103?s=20.
[85]    *Bored Ape Yacht Club (BAYC)*, COINGECKO (last visited Aug. 3, 2023), https://www.coingecko.com/en/nft/bored-ape-yacht-club.
[86]    NFTstats.eth  (@punk9059),  TWITTER  (Dec.  5,  2021  7:36  AM), https://twitter.com/punk9059/status/1467518139617341442?s=20.
[87]    Franklin  (@franklinisbored),  TWITTER  (Jan.  1,  2022  9:05  PM), https://twitter.com/franklinisbored/status/1477506421923135494?s=20.
[88]    Transaction  Hash:  0x92e077608e8d2bc95f564531034ca128b63 5efb62a522969af325c21760fa25b, ETHERSCAN (Jan. 02, 2022, 3:01 PM), https://etherscan.io/tx/0x92e077608e8d2bc95f564531034ca128b635efb62a522969a f325c21760fa25b.

49

and belief given her connection to both the Ape Coin DAO and FTX, Defendant Amy Wu) to manipulate the price of the BAYC NFT collection.   The misleading promotions of the auction by the Company and Sotheby's successfully induced additional purchases of the BAYC NFT collection.   Moreover, this first deceptive scheme set the stage for Yuga to misleadingly offer and sell additional financial products by raising the profile of the Bored Ape brand with the public.

## 2.  The Second Scheme – Deceptive Celebrity Promotions

151.   As Defendant Soto-Wright admitted: the "hardest thing to solve" when building a new company was "getting those customers on your platform."[89]

152.   After the Sotheby's auction set the stage, the Company brought in Defendant Oseary and his troupe of celebrity influencers and venture capital connections to begin the second scheme to sell Yuga securities: deceptively promote the artificially inflated BAYC NFTs to investors like Plaintiffs and the Class.

153.   One of Oseary's first moves was to pull some strings at CAA whereby "Jenkins the Valet", one of the Bored Ape NFTs was purportedly signed in September 2021 to be represented by CAA, "across Books, Film, TV, Podcast, and more."[90] CAA also announced that it was signing NFT collector "0xb1" to help monetize their NFTs.  0xb1 confirmed the deal on Twitter, saying that they will "work hard to bring open license NFT brands & properties mainstream," starting with their Bored Ape Yacht Club collection.[91]

---

[89]   MIXERGY.COM, *supra* n.32.
[90]   Jenkins The Valet (@jenkinsthevalet), TWITTER (Sept. 22, 2021 9:27 AM), https://twitter.com/jenkinsthevalet/status/1440714371848572928?s=20.
[91]   Yogita Khatri, *Hollywood talent agency CAA signs NFT collector '0xb1' to help them monetize their piece*s, THE BLOCK (Oct. 9, 2021), https://www.theblock.co/linked/119987/hollywood-talent-agency-caa-signs-nft-collector-0xb1-to-help-them-monetize-their-pieces; Oxb1 (@0x_b1), TWITTER (Oct. 8, 2021 1:35 PM), https://twitter.com/0x_b1/status/1446529804262678563?s=20.

50

154. Next, Oseary orchestrated the promotion of the BAYC NFT collection in a feature article in *Rolling Stone* magazine, which, upon information and belief, appears to be Oseary's go-to choice for promoting his business endeavors.[92]

155. On November 1, 2021, *Rolling Stone* published an article titled "How Four NFT Novices Created a Billion-Dollar Ecosystem of Cartoon Apes" (the "*Rolling Stone* article"), which likened Defendants Solano, Aronow, Atalay and Ali to "internet rock stars" and repeatedly touted the BAYC collection of NFTs and its related metaverse platform.[93]   The *Rolling Stone* article candidly notes that Defendants Solano, Aronow, Atalay and Ali "started out with unsharpened goals of capitalizing on a very clear trend."[94]

156. In conjunction with the publication of the *Rolling Stone* article (which was a promotional piece about Yuga and its founders Defendants Solano, Aronow, Atalay and Ali in everything but name), the Company collaborated with *Rolling Stone* magazine on the latter's collector edition magazine featuring "never-before-seen BAYC artwork." The issue offered investors the chance to see "early sketches of the swamp club, get to know the original apes, and find out how the creative minds behind one of the most valuable NFT collections in history bring their ideas to life." Most importantly, the cover of this issue prominently featured a BAYC NFT.

---

[92]    For example, a May 4, 2021 article in *Rolling Stone* magazine titled "You Can Learn How to Perform Directly From Madonna, Now" promoted a business venture owned by Defendant Oseary: Bright, which, according to *Rolling Stone*, is "a star-studded educational livestreaming platform that pledges classes and lessons from celebrities." *See* https://www.rollingstone.com/pro/news/madonna-bright-celebrity-classes-guy-oseary-1164390/.

[93]    Samantha Hissong, *How Four NFT Novices Created a Billion-Dollar Ecosystem of Cartoon Apes*, ROLLING STONE (Nov. 1, 2021), https://www.rollingstone.com/culture/culture-news/bayc-bored-ape-yacht-club-nft-interview-1250461/.

[94]    *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT - CASE NO. 2:22-cv-08909-FMO-PLA

1    According to *Rolling Stone*'s online store, all 2,500 copies of the *Rolling Stone* x
2    Bored Ape Yacht Club Limited-Edition Zine were sold out.[95]

3    157.   The Company tweeted a video of the *Rolling Stone* cover showcasing
4    the BAYC NFT and told its BAYC followers that auction details would be
5    forthcoming.[96]  The Company then promoted and held an auction on the BAYC and
6    MAYC NFT *Rolling Stone* covers on November 15, 2021,[97] and a similar BAYC
7    *Rolling Stone* cover auction in June 2022 for both a BAYC NFT and "a print of the
8    art signed by Yuga Labs' founders, the artist, and the CEO of Rolling Stone."[98]

9    158.   On November 1, 2021, Oseary posted a picture of the cover of *Rolling*
10   *Stone* magazine with the following caption: "First @RollingStone NFT cover…
11   Congrats @BoredApeYC."[99]

12   159.   On November 4, 2021, future board member of the Ape DAO,
13   Defendant Bajwa promoted a BAYC party taking place and teased that celebrity
14   musician "Da Baby" had "mutated his ape right before going on stage at

15
16
17
18

---

19   [95]    Rolling Stone x Bored Ape Yacht Club Limited-Edition Zine, ROLLING STONE
20   SHOP,  https://shop.rollingstone.com/products/rolling-stone-x-bored-ape-yacht-club-
     special-collectors-edition-zine (last visited Nov. 29, 2022).
21   [96]    Bored Ape Yacht Club (@BoredApeYC), TWITTER (Nov. 1, 2021, 8:26 AM),
     https://twitter.com/BoredApeYC/status/1455194570669576197.
22   [97]    Bored Ape Yacht Club (@BoredApeYC), TWITTER (Nov. 13, 2021, 9:11 AM),
23   https://twitter.com/BoredApeYC/status/1459569714796052488.  The *Rolling Stone*
     covers ultimate sold for 100 ETH and 47 ETH.  *See* Bored Ape Yacht Club
24   (@BoredApeYC),     TWITTER     (Nov.    15,    2021,    5:27    PM),
     https://twitter.com/BoredApeYC/status/1460419265547407361.
25   [98]    Bored Ape Yacht Club (@BoredApeYC), TWITTER (June 22, 2022, 6:19 AM),
26   https://twitter.com/BoredApeYC/status/1539598893771628544.
27   [99]  Guy   Oseary   (@guyoseary),   TWITTER   (Nov.   1,   2021,   9:32   AM),
     https://twitter.com/guyoseary/status/1455211104448094211?s=20&t=s22ecLQKFg
28   igc5iiuUVeew.

FIRST AMENDED CLASS ACTION COMPLAINT - CASE NO. 2:22-cv-08909-FMO-PLA

1   @BoredApeYC party tonight 👀 . . . probably nothing."[100]  Bajwa's celebrity-related

2   promotion was a precursor of what was to come.

3       160.   Another early instance of Oseary's solicitation scheme being executed

4   took place during an episode of the *Tonight Show* that aired on November 11, 2021.

5   In a broadcast to millions of viewers, Defendant Fallon promoted MoonPay and the

6   BAYC NFT collection during an interview with Defendant Winkelmann.  Fallon

7   announced that he "got his first NFT" through MoonPay, claiming that he "did his

8   homework" on how to purchase an NFT and found MoonPay, which Fallon asserted

9   was "like the PayPal of crypto."  After shilling MoonPay's services, credibility, and

10  future growth prospects, Fallon announced that he "bought an ape" (*i.e.*, BAYC NFT

11  #599), to which guest Winkelmann expressed approval. Winkelman posted the

12  *Tonight Show* promotion of the BAYC NFTs and MoonPay to his personal Instagram

13  account, wherein it received over 676,000 views.[101] Upon information and belief,

14  MoonPay and/or Oseary, along with the Executive Defendants, recruited and paid

15  Fallon and Winkelmann to promote both MoonPay and the BAYC collection of NFTs

16  during this segment on the *Tonight Show*.  Notably, Winkelmann is direct business

17  partners with Oseary in another NFT platform company, WENEW.

18      161.   Fallon did not disclose that he had a financial interest in MoonPay or

19  that he was likewise financially interested, directly or indirectly, in the increased sale

20  and popularity of Yuga securities.  Nor did EHD or broadcast partner Universal

21  disclose that this purportedly organic segment on the *Tonight Show* was in reality a

22  paid advertisement for the BAYC collection of NFTs and MoonPay by two celebrities

23

24

25

26

---

[100]   Maaria.eth (@maariabajwa), TWITTER (Nov. 4, 2011, 1:23 AM), https://twitter.com/maariabajwa/status/1456130064270217217?s=20.
[101]   https://www.instagram.com/p/CWJI-cJp5Fu/?hl=en

53

1   (Fallon and Winkelmann) who are business partners with an investor (Oseary) in both

2   Yuga and MoonPay.[102]

3       162.   That same day, the MoonPay Twitter account posted a clip from the

4   segment with Fallon promoting MoonPay and the BAYC NFTs with a caption

5   stating: "So this just happened.   @jimmyfallon reveals to @beeple on the

6   #TheTonightShow that he just bought his first Bored Ape by @BoredApeYC with

7   MoonPay!   🚀👀."[103]   MoonPay's statement that "[s]o this just happened"

8   misleadingly suggested to investors that the promotion of MoonPay and the BAYC

9   NFT collection on the *Tonight Show* was something that occurred spontaneously.

10   Likewise, MoonPay's statement that Fallon had "just bought his first Bored Ape by

11   @BoredApeYC with MoonPay!" failed to disclose that in truth, Fallon's segment

12   with Winkelmann was just a promotion of the BAYC NFTs and MoonPay that was

13   orchestrated behind the scenes by Oseary, Soto-Wright, and the Executive

14   Defendants.

15       163.   On November 12, 2021, Fallon promoted the BAYC NFT he supposedly

16   "bought," asking the Yuga official Twitter account if he had "[p]ermission to come a

17   bored?"[104]   That same day, Defendant Soto-Wright responded to Fallon's promotion

18   stating: "Congrats @jimmyfallon & @BoredApeYC! We ♡ you from

19

20

---

21   [102]   Adding to the web of interconnectivity amongst the Defendants, in May 2022,

22   Defendants Winkelmann and Ciccone, with the help of MoonPay, together launched

23   another NFT project: The Mother of Creation.  MoonPay promoted this relationship
   on its Twitter account on May 11, 2022.  MoonPay (@moonpay), TWITTER (May 11,

24   2022,     12:50     PM),     https://twitter.com/moonpay/status/152447702339312

25   8451?s=20&t=r7ZcS2DtK_Vt4UPk03r1AQ.

   [103]   MoonPay (@moonpay), TWITTER (Nov. 11, 2021, 3:38 AM), https://twitter.co

26   m/moonpay/status/1458761049075769351?s=20&t=ntA_vzg_M2poZo2ADKag7g.

27   [104]   Jimmy Fallon (@jimmyfallon), TWITTER (Nov. 12, 2021, 6:20 AM),
   https://twitter.com/jimmyfallon/status/1459164143626424321?s=20&t=pnZMGBip

28   1cJ52yjSd_e3-g.

@MoonPayHQ!"[105]   On November 17, 2021, Fallon again promoted the BAYC NFTs, asking his 53.1 million Twitter followers to "[n]ame my ape! Drop your suggestions below" and tagging "@BoredApeYC #BAYC #BoredApeYachtClub #NFTs."[106]   These promotions from Soto-Wright and Fallon failed to disclose that Fallon's promotion of the BAYC NFTs and MoonPay was not because of Fallon's genuine interest in BAYC NFTs but rather solely due to the financial interest Fallon shared with Soto-Wright, Oseary, and the Executive Defendants.

164.   Plaintiffs saw the promotions by Fallon and Winkelmann (which were authorized by Defendants Universal and EHD) on the *Tonight Show* regarding the Company's collection of BAYC NFTs, as well as Fallon's promotions on his social media accounts.  Plaintiffs were induced to purchase and/or continue to hold Yuga securities as a result of these misleading promotions.

165.   Notably, MoonPay's transfer to Fallon of BAYC NFT #599 was one of the first times that MoonPay ever transacted in a BAYC NFT.

166.   Upon information and belief, each of the Promoter Defendants received a BAYC NFT and/or other fiat or cryptocurrency from MoonPay and/or Yuga as compensation for fraudulently promoting the sale of the Yuga securities.

167.   For example, a combined search of the Ethereum Blockchain Explorer ("Etherscan") and the NFT marketplace OpenSea shows that a wallet owned and controlled by Defendant Post received over $1.4M in ether cryptocurrency directly from MoonPay in addition to a BAYC NFT at the same time Post released a promotion for MoonPay and Yuga disguised as a music video.

---

[105]   Ivan Soto-Wright (@isotowright), TWITTER (Nov. 12, 2021, 7:27 AM), https://twitter.com/isotowright/status/1459181031186173980?s=20&t=pnZMGBip1cJ52yjSd_e3-g.

[106]   Jimmy Fallon (@jimmyfallon), TWITTER (Nov. 17, 2021, 11:42 AM), https://twitter.com/jimmyfallon/status/1461011913479962630?s=20&t=b7UnEi0ycK49kgQy3FiFPg.

168.   In particular, on October 29, 2021, digital wallet address 0xbea020c3bd417f30de4d6bd05b0ed310ac586cc0 labeled as "Post Malone" (the "Post Malone Wallet") received 75.1 ether (valued at $331,746.76 at the time of the transaction) from wallet address 0xd75233704795206de38cc58b77a1f660b5c60896, which is publicly labeled as "MoonPay" (the "MoonPay Wallet").[107] Two days later, on October 31, 2021, the Post Malone Wallet received 100 ether or $429,010 from the MoonPay Wallet.[108]

169.   On November 15, 2021, Defendant Post uploaded a music video onto his official YouTube channel entitled "One Right Now."[109]  This video featured Defendant Post and MoonPay investor Tesfaye (The Weeknd).  The beginning of the video features a segment where Post uses the MoonPay app on his phone to purchase a BAYC NFT.

---

[107]   Transaction   Hash:   0xc50f01603b668b384d8ff595e9ddd1f69b7c97846f3c4fc27852bbca91c25530,   ETHERSCAN   (Oct.   29,   2021,   8:54   AM), https://etherscan.io/tx/0xc50f01603b668b384d8ff595e9ddd1f69b7c97846f3c4fc27852bbca91c25530.
[108]   Transaction   Hash:   0x339efa1b3a6dff394b79a2703bc6a73e33eb4f8e99f3a0226e707e251da0ac8d,   ETHERSCAN   (Oct.   31,   2021,   10:34   AM),   https://etherscan.io/tx/0x339efa1b3a6dff394b79a2703bc6a73e33eb4f8e99f3a0226e707e251da0ac8d.
[109]   Post   Malone,   *One   Right   Now*,   YOUTUBE   (Nov.   15,   2021), https://youtu.be/Tc0tLGWIqxA.

56

170.   That same day, BAYC promoted the video from Post and Tesfaye on its Twitter account[110]:



171.   MoonPay also promoted the Post and Tesfaye video on its Twitter account, only minutes before BAYC[111]:



---

[110]   Bored Ape Yacht Club (@BoredApeYC), Twitter (Nov. 15, 2021, 1:14 PM), https://twitter.com/BoredApeYC/status/1460355554342227973.
[111]   MoonPay (@moonpay), Twitter (Nov. 15, 2021, 1:03 PM), https://twitter.com/moonpay/status/1460352762798084105?s=20&t=mHWXj4 WYC5OUt2zg9 LWA.

57

172.   MoonPay's statement that "this just happened" misleadingly suggested to investors that the promotion of MoonPay and the BAYC NFT collection within the so-called music video from Defendant Post and MoonPay investor Tesfaye was something that occurred because of their genuine interest in the BAYC NFTs.  This, and MoonPay's statement that Post had "aped into @BoredApeYC by purchasing his first NFT with MoonPay," failed to disclose that this music video was just a promotion of the BAYC NFTs and MoonPay that was orchestrated behind the scenes by Oseary, Soto-Wright, and the Executive Defendants.

173.   On November 19, 2021, the Post Malone Wallet received another 50 ether (worth $214,963.50) from the MoonPay Wallet.[112]  The last payment that the Post Malone Wallet received from the MoonPay Wallet was on November 21, 2021 for 100 ether, which was then worth $426,461.[113]  In total, the MoonPay Defendants facilitated the payment of $1,402,181.26 to Defendant Post over the course of a month.

174.   Plaintiffs saw Post's promotion of the Company's collection of BAYC NFTs and were induced to purchase and/or continue to hold Yuga securities as a result.

175.   The MoonPay Wallet also sent BAYC NFTs to other Promoter Defendants during November 2021 in order to solicit the sales of Yuga securities, of which the Company held a perpetual 2.5% ownership interest in and received as much in royalty fees from any subsequent sales of those same NFTs.

---

[112]   Transaction   Hash:   0x729899f138ab93d6c20707783b62e16e04093e481 d11e45bc2e3648b6ab3773b, ETHERSCAN (Nov. 19, 2021, 2:55 AM), https://etherscan.io/tx/0x729899f138ab93d6c20707783b62e16e04093e481d11e45b c2e3648b6ab3773b.

[113]   Transaction Hash: 0xc21a66ee9a3d1ddf6f72c780e4165b7e915cf6cfb642092 30c9af5993de284f9, ETHERSCAN (Nov. 21, 2021, 1:40 AM), https://ethers can.io/tx/0xc21a66ee9a3d1ddf6f72c780e4165b7e915cf6cfb64209230c9af5993de28 4f9.

FIRST AMENDED CLASS ACTION COMPLAINT - CASE NO. 2:22-cv-08909-FMO-PLA

176.  For example, on November 26, 2021, during celebrity musician DJ Khaled's 46th birthday party he appeared in a live video with Defendant Soto-Wright,[114] where they both promoted the sale of BAYC NFTs in a staged transaction that was disseminated through social media.  In particular, during the 15-second clip first posted by party attendee and BAYC member Austin Rosen, Soto-Wright supposedly helps Khaled to purchase a BAYC NFT using MoonPay's app.  Khaled can be seen video chatting with celebrity producer SwizzBeats while Soto-Wright pretends to conduct the transaction for Khaled.  Notably, Khaled tells SwizzBeats: "I just bought a bored ape. Some shit like . . . do you know about it?"  Khaled can also be seen shrugging his shoulders, tilting his head, and gesturing to those viewing the video in a manner that suggested "I don't know what this is about but I'm going along with it."  Khaled turns his phone and Soto-Wright confirms to SwizzBeats that they were discussing the BAYC NFTs.  Soto-Wright then presses "confirm" and tells Khaled "you just bought an ape."  Khaled appeared confused by the interaction in general and did not display any familiarity with the BAYC collection of NFTs at all when he was purportedly buying one of those NFTs for hundreds of thousands of dollars.

177.  Plaintiffs saw or were aware of Defendant Soto-Wright's joint promotion of the Company's collection of BAYC NFTs with DJ Khaled, and were induced to purchase and/or continue to hold Yuga securities as a result.

178.  According to the outgoing transactions of Yuga securities in the MoonPay Wallet, on November 30, 2021 the MoonPay Wallet transferred BAYC NFT #7380 – valued at 55.5 ether or approximately $220,000 at the time – to wallet

---

[114]    Lugo.eth (@WWMLD), TWITTER (Nov. 27, 2021, 9:01 AM), https://twitter.com/WWMLD/status/1464640427315892229?s=20&t=p-6BxhtTTTr_HwM5U1ZywQ.

address 0xa0ac662f58d3507a6f4a37f8532df201d9010fe7 (the "Khaled Wallet").[115] Later that same day, Khaled promoted the BAYC NFTs on his Instagram, announcing that he had joined the BAYC.[116]

179.   As this was occurring, on November 28, 2021, the MoonPay Wallet transferred BAYC NFT #4672 to wallet address 0x1616b4c7cdb4093befbcca62f3198993327a8e9e (the "Wilburn Cash Wallet").[117]   That same day, celebrity musician Wilburn Cash (Future) posted BAYC NFT #4672 on his Twitter account.[118] The next day, on November 29, 2021, MoonPay's TikTok account "moonpayhq" posted a video[119] with MoonPay promotor Wilburn Cash wherein Wilburn Cash can be seen changing his profile picture on Instagram to BAYC NFT #4672.  Wilburn Cash can also be heard saying "yessir" in approval as he endorses the BAYC NFT collection. Plaintiffs saw or were aware of MoonPay's joint promotion with Wilburn Cash  of the Company's collection of BAYC NFTs and were induced to purchase and/or continue to hold Yuga securities as a result.

---

[115]   Transaction   Hash:   0xdecec07f810b5f2c02489f96121bac5186cdcf51f930d847024e0780cbafffe4, ERC-721: 7380, ETHERSCAN (Nov. 30, 2021, 4:20 AM), https://etherscan.io/tx/0xdecec07f810b5f2c02489f96121bac5186cdcf51f930d847024e0780cbafffe4.

[116]   *DJ Khaled Just Updated His Instagram Profile Photo To His Bored Ape*, THE BORED APE GAZETTE (Nov. 30, 2021), https://www.theboredapegazette.com/post/dj-khaled-just-updated-his-instagram-profile-photo-to-his-bored-ape-the-full-story-here.

[117]   Transaction   Hash:   0xd8d155d1191c9c9381f1515c8d30483e5c8f01567dc56e358987eb5d2b00d9e5, ERC-721: 4672, ETHERSCAN (Nov. 28, 2021, 5:01 AM), https://etherscan.io/tx/0xd8d155d1191c9c9381f1515c8d30483e5c8f01567dc56e358987eb5d2b00d9e5.

[118]   Future/Freebandz (@1future), TWITTER (Nov. 28, 2021 12:47 A.M.), https://twitter.com/1future/status/1464833267710889990?s=20&t=b7UnEi0ycK49kgQy3FiFPg.

[119]   Moonpayhq   (@moonpayhq),   TIKTOK   (Nov.   28,   2021), https://www.tiktok.com/@moonpayhq/video/7035876504391257349?is_from_webapp=v1&item_id=7035876504391257349.

180.   On December 1, 2021, the MoonPay Wallet transferred BAYC NFT #5384 to wallet address 0xc213e5d1ba49e3069b7ed5ce1f53ed299b966c73, which is labeled as "diplo.eth".[120]   That same day, MoonPay investor Thomas Pentz (a famous DJ named Diplo) promoted the BAYC NFT he received from MoonPay on his Twitter account with 2.4 million followers.[121]

181.   Following his *Tonight Show* promotion, Fallon continued to promote the collection of BAYC NFTs and to solicit sales thereof on social media.  For example, Fallon created a Twitter account for his BAYC NFT #599 with the user name "Bored and Breezy."  On November 23, 2021, Fallon posted the following solicitations for the BAYC NFTs on his official and Bored and Breezy Twitter accounts:[122]

---

[120]   Transaction   Hash:   https://etherscan.io/tx/0x05981522f7f1299678b38f14758921e200512a0292ff777102d0dafca8a11bf3, ERC-721: 5384, ETHERSCAN (Dec. 1, 2021, 5:07 AM), https://etherscan.io/token/0xbc4ca0eda7647a8ab7c2061c2e118a18a936f13d?a=0xc213e5d1ba49e3069b7ed5ce1f53ed299b966c73.

[121]   Diplo   (@diplo),   TWITTER   (Dec.   1,   2021   4:28   P.M.), https://twitter.com/diplo/status/1466157259252240395?s=20&t=B6GM_EYH2EoTzTfPNF5fmQ.

[122]   Jimmy Fallon (@jimmyfallon), TWITTER (Nov. 23, 2021, 10:24 AM), https://twitter.com/jimmyfallon/status/1463166515289669650?s=20&t=b7UnEi0ycK49kgQy3FiFPg;  Bored and Breezy (@BoredAndBreezy), TWITTER (Nov. 23, 2021, 9:46 AM); https://twitter.com/BoredAndBreezy/status/1463156965308354584?s=20&t=gq3WJjWI7a_A4C49ucZPgg.

FIRST AMENDED CLASS ACTION COMPLAINT - CASE NO. 2:22-cv-08909-FMO-PLA



FIRST AMENDED CLASS ACTION COMPLAINT - CASE NO. 2:22-CV-08909-FMO-PLA

182.   These promotions gave investors the false impression that Fallon was going to be a leader or "captain" in the future BAYC community, suggesting that his continued involvement and leadership with BAYC would grow the BAYC ecosystem and calmly increase the value of their investments therein.  Plaintiffs saw Fallon's promotion of the Company's collection of BAYC NFTs and were induced to purchase and/or continue to hold Yuga securities as a result of these misleading promotions.

183.   On December 2, 2021, Defendant Adidas changed its Twitter profile @adidasoriginals avatar to a Bored Ape NFT, stating #NewProfilePic.[123]

184.   On December 11, 2021, Defendant Adidas joined the Company to promote the "ADIDAS X BORED APE YACHT CLUB – INTO THE METAVERSE" promotional video, which was published on the official BAYC YouTube channel.[124]   The video teased an upcoming collaboration between the Company and Adidas by featuring an animated Bored Ape avatar with a yellow Adidas tracksuit skydiving into an Adidas logo.  On December 17, 2021, Adidas launched the "adidas Originals: Into the Metaverse NFT (Phase 1)" collection of 30,000 NFTs, which included BAYC-related avatars wearing Adidas clothing and merchandise. This collection almost immediately sold out after minting. 29,620 NFTs priced at 0.2 ETH each sold at launch generating $43 million for Adidas and its collaborators withing 72 hours.[125]   "Adidas and partners" held onto 380 Adidas

---

[123]    adidas Originals (@adidasoriginals), TWITTER (Dec. 2, 2021, 8:36 AM), https://twitter.com/adidasoriginals/status/1466446117642584068.

[124]    Bored Ape Yacht Club, *ADIDAS X BORED APE YACHT CLUB – INTO THE METAVERSE*, YOUTUBE (Dec. 11, 2021), https://www.youtube.com/watch?v=-1vdk6IksQ0.

[125]    Ornella Hernandez, *Adidas Originals reaches second spot on OpenSea rankings with debut NFT collection*, COINTELEGRAPH (Dec. 20, 2021), https://cointelegraph.com/news/adidas-originals-reaches-second-spot-on-opensea-rankings-with-debut-nft-collection.

Metaverse NFTs for so-called "future events."[126]   Adidas offered 20,000 of the Adidas Metaverse NFTs in early access to, *inter alia*, BAYC and MAYC NFT holders.[127] Adidas sold $15.5 million dollars' worth of those 20,000 Adidas Metaverse NFTs during the early access mint, which had to pause and restart after several hours due to technical issues with MAYC investor being able to mint.  The day of the launch, Adidas, via the @adidasoriginals Twitter account, solicited sales of the Adidas Metaverse NFTs, tagging the @BoredApeYC Twitter account and providing a link that led investors to the Opensea NFT exchange and an image of the BAYC avatar wearing an Adidas tracksuit.[128]   On December 18, 2021, Ape DAO Board Defendant Bajwa also promoted the exclusivity of the Adidas and Yuga collaboration, remarking that investors could get around the limit of 2 Adidas Metaverse NFTs per wallet.[129]   The following day, December 19, 2021, Bajwa promoted the success of the Adidas Metaverse NFT collaboration with BAYC,[130] that Sotheby's earned $100M from NFT sales in 2021. 78% of bidders were new to Sotheby's and half were under 40,"[131] that Yuga was "co-developing a play-to-earn

---

[126]    Jay Peters, *Adidas sold more than $22 million in NFTs, but it hit a few snags along the way*, THE VERGE (Dec. 17, 2021 5:38 PM), https://www.theverge.com/2021/12/17/22843104/adidas-nfts-metaverse-sold-bored-ape.

[127]    *Id.*

[128]    adidas Originals (@adidasoriginals), TWITTER (Dec. 17, 2021 10:26 AM), https://twitter.com/adidasoriginals/status/1471909577658675204?s=20; adidas Originals (@adidasoriginals), TWITTER (Dec. 17, 2021 3:26 PM), https://twitter.com/adidasoriginals/status/1471985083280199680?s=20.

[129]    Maaria.eth (@maariabajwa), TWITTER (Dec. 18, 2021, 9:51 AM), https://twitter.com/maariabajwa/status/1472263218726772736?s=20.

[130]    Maaria.eth (@maariabajwa), TWITTER (Dec. 18, 2021 7:29 PM), https://twitter.com/maariabajwa/status/1472771183451860993?s=20.

[131]    Maaria.eth (@maariabajwa), TWITTER (Dec. 19, 2021 7:29 PM), https://twitter.com/maariabajwa/status/1472771185528086530?s=20.

64

FIRST AMENDED CLASS ACTION COMPLAINT - CASE NO. 2:22-cv-08909-FMO-PLA

1  game with [Yuga backer and promoter] @animocabrands.  To be launched in Q2
2  2022."[132]

3      185.  On December 20, 2021, the @adidasoriginals Twitter account promoted
4  the success of its collaboration with Yuga on the Adidas Metaverse NFT launch,
5  touting it as "one of the most widely-distributed NFT drops in history."[133]  Adidas
6  also addressed the issues with the minting process and promised investors that "[t]his
7  NFT drop is the beginning of Into the Metaverse, not the end."[134] Adidas ended this
8  Twitter thread promotion by thanking Yuga as a "pioneer[] in the space."[135]

9      186.  These promotions by Adidas and its collaboration with BAYC
10  throughout December 2021 caused the floor price of the BAYC NFT collection to
11  spike, rising from approximately 47 ETH on December 1, 2021 before the promotion,
12  to approximately 58.6 ETH by December 31, 2021.

13      187.  On January 2, 2022, Ape DAO Board Defendant Bajwa promoted Yuga
14  Financial Products to investors, stating that celebrity rapper (and close associate with
15  Defendant Broadus) "@Eminem purchased a @BoredApeYC NFT for 123.45 ETH"
16  and touting that the MAYC NFTs "saw $71M in trading volumes the last week."[136]

17      188.  Concurrently, Fallon also continued promoting BAYC NFTs on the
18  *Tonight Show*, and EHD and Universal continued to approve that such promotions
19  could be aired on the network without disclaimer.  In an even more contrived segment
20  that aired during an episode of the *Tonight Show* on January 24, 2022, Fallon
21  interviewed Defendant Paris Hilton, and they both misleadingly promoted the BAYC
22

---

23  [132]  *Id*.
    [133]  adidas Originals (@adidasoriginals), TWITTER (Dec. 20, 2021 3:14 AM),
24  https://twitter.com/adidasoriginals/status/1472888099994841090?s=20.
25  [134]  adidas Originals (@adidasoriginals), TWITTER (Dec. 20, 2021 3:14 AM),
https://twitter.com/adidasoriginals/status/1472888109205438473?s=20.
26  [135]  adidas Originals (@adidasoriginals), TWITTER (Dec. 20, 2021 3:14 AM),
https://twitter.com/adidasoriginals/status/1472888110375649282?s=20.
27  [136]  Maaria.eth (@maariabajwa), TWITTER (Jan. 2, 2022 6:31 PM),
28  https://twitter.com/maariabajwa/status/1477829825830084614.

collection of NFTs.  Fallon first tried to bolster Hiton's credentials in the NFT sector by telling the audience and investors that *Forbes* magazine had named Hilton as one of the "top 50 most influential people in the NFT space."  Fallon then immediately began promoting the BAYC NFT collection with Hilton.  Hilton claimed that she had "saw" Fallon's previous BAYC segment with Winkelmann, and "copied" Fallon's use of MoonPay to "buy an ape."  Hilton feigned interest in the BAYC NFT collection and claimed to have selected hers because it "reminded" Hilton of herself.  When the audience snickered at Hilton's half-hearted explanation for "purchasing" that particular BAYC NFT (which bore no apparent resemblance to Hilton's appearance), Fallon jumped in to show off his own BAYC NFT #599, which sported a boat captain's hat and other funny accessories.  Fallon also insisted that he "bought" that particular BAYC NFT because it reminded him of himself, to which the audience agreed and laughed off the exchange. This original segment has been uploaded on the *Tonight Show*'s official YouTube channel, which has received approximately 547,000 views as of the date of this filing.[137]   Upon information and belief, the *Tonight Show*'s channel on YouTube is owned and/or controlled by Defendant Universal.

189.   Hilton and MoonPay also promoted Hilton's appearance on the *Tonight Show* on their own extensive social media accounts.  On January 24, 2022, MoonPay posted that BAYC NFT #1294's owner "is known to enjoy 'The Simple Life' even

---

[137]   The Tonight Show, *Paris Hilton Surprises Tonight Show Audience Members By Giving Them Their Own NFTs*, YOUTUBE (Jan. 24, 2022), https://www.youtube.com/watch?v=5zi12wrh5So.

FIRST AMENDED CLASS ACTION COMPLAINT - CASE NO. 2:22-cv-08909-FMO-PLA

though they are appearing on prime time TV 'tonight'. Who could it be? 👀"[138] Defendant Hilton responded to this message with a "wink" emoji.[139]

190.   The next day, on January 25, 2022, in response to a Twitter post that proclaimed: "Wait @ParisHilton bought my ape?! HOLY @#$%!!!," Hilton stated:[140]



191.   The *Tonight Show*'s official Twitter account posted a 1:44 minute clip on January 25, 2022 of the entire segment promoting the BAYC NFT collection through MoonPay.[141]   Defendant Fallon was also on Twitter that day reposting his *Tonight Show* promotion of the BAYC NFT collection along with Defendant Hilton. In addition to a link to the *Tonight Show*'s Twitter post, Defendant Fallon included

---

[138]     MoonPay   (@moonpay),   TWITTER   (Jan.   24,   2021,   6:40   AM), https://twitter.com/moonpay/status/1485623661897961476?s=20&t=F58_qyidVksn SGdXuAyy-A.  Notably, Defendant Hilton appeared in a reality TV show called *The Simple Life*.

[139]     Paris   Hilton   (@ParisHilton),   TWITTER   (Jan.   24,   2021,   10:01   PM), https://twitter.com/ParisHilton/status/1485855428563116034?s=20&t=F58_qyidVk snSGdXuAyy-A.

[140]     Paris   Hilton   (@ParisHilton),   TWITTER   (Jan.   25,   2021,   7:19   PM), https://twitter.com/ParisHilton/status/1486131710895050756?s=20&t=8lDQAVCG lWl9GRmFFIv1PQ.

[141]     The Tonight Show (@FallonTonight), TWITTER (Jan. 25, 2022, 12:15 AM), https://twitter.com/FallonTonight/status/1485843736345161737?s=20&t=b7UnEi0 ycK49kgQy3FiFPg.

1   the caption "#WAGMI."[142]  The hashtag "#WAGMI" refers to the phrase "we are all

2   gonna make it."  This acronym is widely used by crypto investors to build confidence

3   and as a rallying cry that encourages the community to have hope for the project(s)

4   being discussed.  The inclusion of this hashtag with the BAYC NFT solicitation

5   suggested to investors that Defendant Fallon was personally aligned with them

6   instead of promoting the interests of himself and his cohorts Defendants Oseary and

7   Hilton.

8       192.   On January 31, 2022, Hilton posted the following message on Twitter

9   with an animated cartoon version of the Fallon interview of Hilton:[143]



[142]    Jimmy Fallon (@jimmyfallon), TWITTER (Jan. 25, 2022, 11:15 AM), https://twitter.com/jimmyfallon/status/1486009927999135754?s=20&t=b7UnEi0ycK49kgQy3FiFPg.

[143]    Paris Hilton (@ParisHilton), TWITTER (Jan. 31, 2021, 10:59 PM), https://twitter.com/ParisHilton/status/1488361241512800258?s=20&t=KDOjfCCoS8Ch1PbuhBS-xw.

FIRST AMENDED CLASS ACTION COMPLAINT - CASE NO. 2:22-cv-08909-FMO-PLA

193.   Hilton's Twitter promotions on January 25 and January 31, 2022 gave investors the false impression that Hilton: (1) actually bought the BAYC NFT; and (2) was enthusiastically "hanging out in the metaverse" with Fallon and that they were "BoredApeBesties."  In truth, Hilton was only promoting the BAYC NTFs and MoonPay because she was financially motivated to make those statements.  Nor did Hilton include an "ad" disclaimer in either of the January 25th or January 31th posts that would disclose to investors that this was a paid advertisement for the BAYC collection of NFTs and MoonPay.  Plaintiffs saw the promotions by Fallon and Hilton (which were authorized by Defendants Universal and EHD) on the *Tonight Show* regarding the Company's collection of BAYC NFTs, as well as Hilton's and Fallon's promotions on their respective social media accounts.  Plaintiffs were induced to purchase and/or continue to hold Yuga securities as a result of these misleading promotions by Fallon and Hilton.

194.   Importantly, Hilton and MoonPay purposefully did not disclose Hilton's direct financial interest in MoonPay and, relatedly, the increased sale of Yuga securities through MoonPay.  And again, there was no disclosure from any of the *Tonight Show's* production companies, namely Defendants Universal or EHD, regarding Hilton's and/or Fallon's financial interests in MoonPay or compensation for promoting the BAYC NFTs.  Notably, according to an internal workplace policy mandated by Universal, all employees, including Defendant Fallon, must "disclose and obtain approval for all outside work, financial interests and other personal activities/relationships that may create or appear to create a conflict."[144]  The same policy says that employees should not "use company info, resources, time, etc. for

---

[144]   Brian Contreras, *Jimmy Fallon hyped his Bored Ape NFTs on 'The Tonight Show.' Conflict of Interest?*, L.A. TIMES (Jan. 26, 2022), https://www.latimes.com/business/technology/story/2022-01-26/jimmy-fallon-nft-ape-nbc (discussing Fallon's potential conflict of interest and providing a link to the Universal policy).

FIRST AMENDED CLASS ACTION COMPLAINT - CASE NO. 2:22-cv-08909-FMO-PLA

personal benefit."  Thus, upon information and belief, Universal knew about Fallon's ties to Oseary and Yuga, along with Hilton's ties to MoonPay, and approved the promotions of BAYC NFTs on the *Tonight Show* before it was publicly aired without disclaimers.  These omissions gave the public the false impression that Hilton had been inspired to purchase a BAYC NTF after hearing that Fallon had organically purchased one of his own, when, in truth, the entire *Tonight Show* segment was just a paid promotion for the BAYC collection of NFTs and Moonpay.  Reporting on this segment noted that a "glossy-eyed Jimmy Fallon conducted one of the most forced interviews" in the history of the *Tonight Show* during this segment with Defendant Hilton.[145]  The journalist Max Read described their exchange as "profoundly unsettling."[146]

195.   If the Sotheby's auction and the *Rolling Stone* article put the Company and its founders on the map, Fallon and Hilton's *Tonight Show* promotions brought the BAYC directly into the homes of mainstream America.  But this was just the beginning for Oseary's plans for Defendants.

196.   On December 2, 2021, Adidas announced that it purchased a BAYC NFT as part of an upcoming collaboration with the Company into "the Metaverse,"[147] boasting the collaboration was "just the beginning 🚀" of going to the moon.[148]

---

[145]    Lucas Kwan Peterson, *Can NFTs save the restaurant industry or is the hype just virtual?*, L.A. TIMES (Apr. 19, 2022), https://www.latimes.com/food/story/2022-04-19/bored-ape-nft-restaurant-la-long-beach.
[146]    Max Read, *Mapping the celebrity NFT complex*, READ MAX (SUBSTACK), (Feb. 2, 2022), https://maxread.substack.com/p/mapping-the-celebrity-nft-complex?utm_source=substack&utm_medium=email&utm_content=share.
[147]    Andrew Hayward, *Adidas enters Metaverse with Bored Ape Yacht Club Ethereum NFT*, DECRYPT (Dec. 2, 2021), https://decrypt.co/87467/adidas-metaverse-bored-ape-yacht-club-ethereum-nft; adidas Originals (@adidasoriginals), TWITTER (Dec. 2, 2021, 6:49 AM), https://twitter.com/adidasoriginals/status/1466419185593036814.
[148]    Adidas (@adidasoriginals), TWITTER (Dec. 2, 2021, 11:59 AM), https://twitter.com/adidasoriginals/status/1466451992516177933.

197.   Other members of Oseary's network follow a similar pattern of promoting the BAYC collection of NFTs in connection with MoonPay.  Indeed, Oseary, in particular, was the architect of Defendants' plan for marketing the BAYC NFTs.  His primary business is managing various high-profile music acts and other entertainment celebrities, including Defendant Madonna Ciccone.  Oseary previously ran a successful talent agency called Maverick Management ("Maverick"), which, by itself and in conjunction with talent management powerhouse Live Nation, represented dozens of the most famous athletes and entertainers in the United States. Several of these athletes and entertainers just so also happen to have "joined the BAYC" in the "metaverse" and eagerly promoted that fact to would-be investors.[149]

198.   Upon information and belief, the Promoter Defendants each received Yuga Financial Products and/or other forms of consideration as part or all of their compensation for promoting the Yuga securities specifically or the Yuga brand generally.  Moreover, as equity investors in MoonPay, the Promoter Defendants directly financially benefited from the increased valuation that MoonPay would experience with such overwhelming celebrity exposure.

199.   For example, on January 31, 2022, Defendant Bieber promoted his purported purchase of BAYC NFT #3001 to his 262 million followers on Instagram.[150]  Reports indicated that Bieber paid approximately $1.29M for his Bored

---

[149]   For example, Oseary's Maverick agency represented MoonPay investor Tesfaye, who also shilled the BAYC brand in the thinly-veiled promotional music video with Defendant Post.  Similarly, Ape DAO Board Defendant Alexis Ohanian recruited his wife, tennis superstar Serena Williams, to promote BAYC NFTs. Likewise, upon information and belief, Ape DAO Board Defendant Amy Wu utilized her relationships at crypto exchange FTX to recruit world champion athlete Defendant Curry to solicit sales of the BAYC collection of NFTs.  None of these celebrity endorsements of BAYC NFTs disclosed the underlying financial interests and relationships involved.

[150]   Justin Bieber (@justinbieber), INSTAGRAM (Jan. 31, 2022), https://www.instagram.com/p/CZZhdyzFITO/?utm_source=ig_web_copy_link.

71

Ape purchase, which was upwards of five times the floor price with similar characters.  But this gross overpayment was meaningless to Bieber since, upon information and belief, he did not actually pay any money of his own for this BAYC NFT, but rather received it through a series of transactions for the purpose of compensating him. Instead, Bieber received BAYC NFT #3001 as a form of compensation for promoting the BAYC NFTs and Yuga Financial Products to his hundreds of millions of social media followers.

200.   On February 7, 2022, Bieber announced that he had "purchased" a second NFT from the Bored Ape collection (*i.e.*, BAYC NFT #3850) for around $470,000.  This BAYC NFT is considered to be particularly rare, ranking below 1% in rarity.  Upon information and belief, BAYC NFT #3850 was given to Bieber as compensation for continuing to promote and solicit sales of the Yuga securities.

201.   Plaintiffs saw Bieber's promotion of the Company's collection of BAYC NFTs and were induced to purchase and/or continue to hold Yuga securities as a result of these misleading promotions.

202.   Around that same time, on January 26, 2022, celebrity Gwyneth Paltrow similarly announced to investors that she had "joined" the BAYC and thanked MoonPay's fraudulent concierge service.[151]  MoonPay and Paltrow failed to disclose that she was a MoonPay backer and had a financial interest in its success, which, in turn, caused Paltrow to have a vested interest in the increase in sales of Yuga securities and the use of MoonPay.

203.   Defendant Hart also promoted his joining the BAYC with BAYC NFT #9258:

> While many of his celebrity friends have decided to change their profile pictures on social media platforms to their BAYC NFTs, Hart chose to approach his purchase more subtly. . . .

---

[151]   Gwyneth Paltrow (@GwynethPaltrow), TWITTER (Jan. 26, 2022, 3:33 PM), https://twitter.com/GwynethPaltrow/status/1486482496883625984?s=20&t=8mace 2uHFGDI0GYb5N0aWg.

1

2

3

4

        Interestingly, [Hart] is among the growing list of celebrities who
decided to make their first NFT purchases with the help of MoonPay.
The crypto firm paid 79.5 ETH or about $200.000 for the NFT and then
transferred it to Hart's wallet.

5

6

7

        Impressively, despite the fact that BAYC #9258 has several of the
rarest properties, MoonPay snagged the NFT below the floor price. Of
course, considering the integrity of the crypto firm and the intended final
owner, this shouldn't come as much of a surprise.[152]

8

9

10

 MoonPay also posted the following picture of Defendant Hart on its Twitter account
with the caption "Someone funny aped in today!":[153]

11

12

13

14

15

16

17

18

19

20

21



22

23

24

25

26

27

28

---

[152]    Hristina Yordanova, *Kevin Hart Joins the Bored Ape Family*, DAPPRADAR
(Jan. 24, 2022), https://dappradar.com/blog/kevin-hart-joins-the-bored-ape-family.
[153]    Swensonk7, *Comedian Kevin Hart Joined The Bored Ape Yacht Club,
According to Moonpay*, THE BORED APE GAZETTE (Jan. 24, 2022),
https://www.theboredapegazette.com/post/comedian-kevin-hart-joined-the-bored-
ape-yacht-club-according-to-moonpay.

73

204.     Plaintiffs saw the promotions from Defendants Hart and Soto-Wright regarding the Company's collection of BAYC NFTs and were induced to purchase and/or continue to hold Yuga securities as a result of these misleading promotions.

205.     On December 21, 2021, Defendant Broadus posted a picture of BAYC NFT#6723, the primates corresponding M1 and M2 Mutant Apes along with Bored Ape Kennel Club Dog #894 to his 20+ million Twitter followers.[154]  Broadus further stated: "And a huge shout out 2 to @moonpay @isotowright @C_Broadus21 and @j1mmyeth for making it happen and bringing The Who familia together."[155] Broadus boasted about BAYC a month later, calling BAYC "a cultural juggernaut" and requesting to join its advisory board so they could elevate the NFT "game to tha [sic] next level."[156]

206.     Plaintiffs saw the promotions from Broadus regarding the Company's collection of BAYC NFTs and were induced to purchase and/or continue to hold Yuga securities as a result of these misleading promotions. Indeed, Broadus' promotion was particularly influential on Plaintiffs' decision to purchase given Broadus' status as a savvy investor in NFTs.  Broadus notably refers to himself as the "King of NFTs" on social media:[157]

---

[154]     Snoop Dogg (@SnoopDogg), TWITTER (Dec. 21, 2021 10:57 AM), https://twitter.com/SnoopDogg/status/1473367017172393987.

[155]     Snoop Dogg  (@SnoopDogg), TWITTER (Dec. 21, 2021 1:57 PM), (https://twitter.com/SnoopDogg/status/1473367019542265858?s=20&t=lAVE0gdv m1Zm3hKnJ4w5bg.

[156]     Snoop Dogg (@SnoopDogg), TWITTER (Jan. 21, 2022 9:58 AM), hhttps://twitter.com/SnoopDogg/status/1484586102182727682.

[157]     Snoop   Dogg   (@SnoopDogg),   INSTAGRAM   (Nov.   25,   2021), https://www.instagram.com/p/CWt0yclrFgw/?img_index=1.



207.   In addition, as of March 1, 2022, Defendant Broadus promoted his
BAYC "Dr. Bombay" to his more than 80 million Instagram followers:[158]



208.   Defendant Broadus also acquired intellectual property rights through the
Company and used his BAYC "Dr. Bombay" to personally profit from it.  Beginning

---

[158]   Snoop   Dogg   (@SnoopDogg),   INSTAGRAM   (Mar.   1,   2022),
https://www.instagram.com/p/Cakx-4HvpG6/?hl=en.

FIRST AMENDED CLASS ACTION COMPLAINT - CASE NO. 2:22-cv-08909-FMO-PLA

on April 1, 2022, Broadus posted numerous photos to his Instagram account promoting Dr. Bombay-branded merchandise such as apparel, marijuana, an album cover, and even ice cream.[159]

209.    Broadus continued promoting his BAYC "Dr. Bombay" throughout April, May, June, and July 2022,[160] including an April 29, 2022 video posted right before Otherside NFT minting, as the price was about to increase, which garnered nearly half a million views on Instagram.[161]

210.    Other Dr. Bombay augmented reality videos posted by Defendant Broadus to his Instagram account, as a means to promote the expansive ability to use the avatar across other platforms, also garnered millions of views.  For example, a May 8, 2022 Dr. Bombay video acquired 1.4 million Instagram views;[162] a May 15,

---

[159]    Snoop   Dogg   (@SnoopDogg),   INSTAGRAM   (Apr.   1,   2022), https://www.instagram.com/p/Cb0plnqOd-B/?img_index=1;   Snoop   Dogg (@SnoopDogg),   INSTAGRAM   (Apr.   5,   2022), https://www.instagram.com/p/Cb9kSU2OGlB/?hl=en; Snoop Dogg (@SnoopDogg), INSTAGRAM (Apr. 20, 2022), https://www.instagram.com/p/CcjwCJQFLYQ/?hl=en; Snoop   Dogg   (@SnoopDogg),   INSTAGRAM   (June   21,   2022), https://www.instagram.com/p/CfE7Y2tOw92/?hl=en; Snoop Dogg (@SnoopDogg), INSTAGRAM (June 30, 2022), https://www.instagram.com/p/Cfb_4RXJtyI/?hl=eN.

[160]    Snoop   Dogg   (@SnoopDogg),   INSTAGRAM   (May   26,   2022), https://www.instagram.com/p/CeA1HoHLaHH/?hl=en;   Snoop   Dogg (@SnoopDogg),   INSTAGRAM   (May   29,   2022), https://www.instagram.com/p/CeIb9mlucXd/?hl=en; Snoop Dogg (@SnoopDogg), INSTAGRAM (June 2, 2022), https://www.instagram.com/p/CeU3IFMJCxb/?hl=en; Snoop   Dogg   (@SnoopDogg),   INSTAGRAM   (June   17, 2022),https://www.instagram.com/p/Ce7gRsdrdcs/?hl=en;   Snoop   Dogg (@SnoopDogg),   INSTAGRAM   (July   7,   2022), https://www.instagram.com/p/CfuVBsql_tt/?hl=en.

[161]    Snoop   Dogg   (@SnoopDogg),   INSTAGRAM   (April   29,   2022), https://www.instagram.com/p/Cc8pLB_pp7k/?hl=en.

[162]    Snoop   Dogg   (@SnoopDogg),   INSTAGRAM   (May   8,   2022), https://www.instagram.com/p/CdTAbSplaRM/?hl=en.

2022 video acquired over one million views;[163] a June 3, 2022 video acquired over
1.7 million views;[164] and a June 5, 2022 video acquired over 1.9 million views.[165]

211.    Defendant Broadus also posted numerous photos of himself to his
Instagram followers wearing Dr. Bombay apparel at many high-profile events, such
as his performance at Charger's Draft Fest 2022 at SoFi Stadium;[166] a May 7, 2022
performance in Miami Beach, Florida;[167] a May 14, 2022 performance in Las Vegas,
Nevada;[168] at the June 5, 2022 MTV Movie Awards in Los Angeles, California;[169]
and during a July 17, 2022 performance at Law-di-Gras in Carlsbad, California.[170]

212.    In addition, Defendant Broadus's Instagram account is flooded with
photos of him wearing Dr. Bombay apparel and posing alongside fellow celebrity
friends.[171]

---

[163]    Snoop    Dogg    (@SnoopDogg),    INSTAGRAM    (May    15,    2022),
https://www.instagram.com/p/Cdkv_tKFYCV/?hl=en.
[164]    Snoop    Dogg    (@SnoopDogg),    INSTAGRAM    (June    3,    2022),
https://www.instagram.com/p/CeVDPmUlGRH/?hl=en.
[165]    Snoop    Dogg    (@SnoopDogg),    INSTAGRAM    (June    5,    2022),
https://www.instagram.com/p/Ceb-8obFc6y/?hl=en.
[166]    Snoop    Dogg    (@SnoopDogg),    INSTAGRAM    (April    29,    2022),
https://www.instagram.com/p/Cc7vnzXroby/?hl=en.
[167]    Snoop    Dogg    (@SnoopDogg),    INSTAGRAM    (May    7,    2022),
https://www.instagram.com/p/CdQhoLNO-MH/?hl=en.

[168]    Snoop    Dogg    (@SnoopDogg),    INSTAGRAM    (May    14,    2022),
https://www.instagram.com/p/Cdj0kd7JyTz/?hl=en.
[169]    Snoop    Dogg    (@SnoopDogg),    INSTAGRAM    (June    5,    2022),
https://www.instagram.com/p/CecRhnzvxya/?hl=en.
[170]    Snoop    Dogg    (@SnoopDogg),    INSTAGRAM    (July    17,    2022),
https://www.instagram.com/p/CgILPhspwrC/?hl=en.
[171]    Snoop    Dogg    (@SnoopDogg),    INSTAGRAM    (May    14,    2022),
https://www.instagram.com/p/Cdj_RGdrDvl/?hl=en; Snoop Dogg (@SnoopDogg),
INSTAGRAM (May 14, 2022), https://www.instagram.com/p/CdkAT9Jr0MV/?hl=en;
Snoop    Dogg    (@SnoopDogg),    INSTAGRAM    (May    15,    2022),
https://www.instagram.com/p/Cdkfzfou9Gg/?hl=en; Snoop Dogg (@SnoopDogg),
INSTAGRAM (May 15, 2022), https://www.instagram.com/p/CdmIR1bv5bP/?hl=en;

213.    According to Court documents filed in the *Ripps* matter, Broadus was paid "around $1 million" to perform as a Bored Ape at the MTV Video Music awards in 2022.[172]

214.    While Defendant Broadus and other Promoter Defendants were publicly promoting the Bored Ape ecosystem and soliciting sales of the Yuga Financial Products, other Company insiders were also furthering the manipulative scheme to sale the unregistered Yuga Financial Products.  For example, a February 15, 2022 article titled "FTX's Amy Wu: How Crypto and Gamers Can All Get Along"[173] described Defendant Wu as a "prominent investor in gaming startups, [who] recently jumped from Lightspeed Ventures to FTX to lead the crypto giant's new $2 billion Web3 venture fund – a position that will entail spreading bets from FTX's war chest across new trends in gaming."  Wu explained that she believed "'[t]he fun is actually around the game mechanics and tokenomics of the game, right? ***There's [sic] ways to make like 100x or 500x return on the token*** . . . . And that's sort of the focus of a lot of these games, and so ***it attracts a certain type of player, which tends to be traders that are looking at the game as kind of like almost like a financial instrument.***"[174]  Wu's  "[c]ryptocurrency exchange FTX will funnel a chunk of its

_____

Snoop    Dogg    (@SnoopDogg),    INSTAGRAM    (June    5,    2022), https://www.instagram.com/p/CecCzHuPyY-/?hl=en; Snoop Doog (@SnoopDogg), INSTAGRAM (June 6, 2022), https://www.instagram.com/p/CedEbJ4ui2p/?hl=en; Snoop    Dogg    (@SnoopDogg),    INSTAGRAM    (June    24,    2022), https://www.instagram.com/p/CfNbn7vsDMW/?hl=en;    Snoop    Dogg (@SnoopDogg),    INSTAGRAM    (June    25,    2022), https://www.instagram.com/p/CfQKqrTL9ZI/?hl=en.
[172]    Elle Reeve, *Snoop Dogg, his ape and a question of celebrity hype*, CNN BUSINESS (Apr. 7, 2023), https://www.cnn.com/2023/04/07/business/snoop-dogg-bored-apes/index.html.
[173]    Jeff John Roberts, *FTX's Amy Wu: How Crypto and Gamers Can All Get Along*, DECRYPT (Feb. 15, 2022), https://decrypt.co/92929/ftx-vc-amy-wu-how-crypto-nft-gamers-can-get-along.
[174]    *Id.*

78

1   growing war chest into a new venture capital arm, FTX Ventures, the firm announced
2   today. The $2 billion VC fund will be led by Amy Wu, previously General Partner at
3   Lightspeed Venture Partners."[175]

4        215.    Wu previously led Lightspeed's own investment into FTX, plus FTX
5   and Lightspeed teamed up with Solana Ventures in November 2021 to launch a $100
6   million Web3 gaming co-investment fund.  In working with FTX founder and CEO
7   Sam Bankman-Fried, who she described as an "extraordinary CEO," Wu began to
8   see the potential benefits of joining the rising firm.  "When I look at what company
9   could potentially have the most impact in the industry, but then also in the world,"
10   she told Decrypt, "I think FTX is one of the most impactful that I've had the pleasure
11   of working with."[176]

12        216.    On February 18, 2022, FTX Ltd ("FTX") posted a teaser commercial for
13   its now-bankrupt cryptocurrency exchange, which featured Defendant Curry and an
14   ice sculpture of a Bored Ape.  Curry can be seen brushing off flakes of ice from the
15   unmistakable features of the BAYC NFTs.  FTX posted this teaser on its official
16   Twitter account with the following caption alluding to the BAYC NFTs: "When
17   learning about crypto, you'll be anything but bored."[177]

18        217.    BAYC retweeted FTX's post as "cool as ice," tagging both FTX and
19   Defendant Curry.[178]

20
21
22

---

[175]   Andrew Hayward, *FTX Launches $2 Billion Web3 Venture Fund Led by Lightspeed's Amy Wu*, DECRYPT (Jan. 14, 2022), https://decrypt.co/90409/ftx-launches-2-billion-web3-venture-fund-led-lightspeed-amy-wu.
[176]   *Id.*
[177]   FTX (@FTX_Official), TWITTER (Feb. 18, 2022, 10:18 AM), https://twitter.com/FTX_Official/status/1494738098034458630?s=20&t=L-3ieebP KlMIdev5LsTbcw.
[178]   Bored Ape Yacht Club (@BoredApeYC), TWITTER (Feb. 18, 2022, 2:07 PM), https://twitter.com/BoredApeYC/status/1494795754568929282.

FIRST AMENDED CLASS ACTION COMPLAINT - CASE NO. 2:22-cv-08909-FMO-PLA

218.    Plaintiffs saw the off-brand promotion from Defendant Curry regarding the Company's collection of BAYC NFTs and were induced to purchase and/or continue to hold Yuga securities as a result of this misleading promotion.

219.    On May 12, 2022, Defendant Winkelman posted an original piece of art created by him, promoting the image of a Bored Ape and citing to "Yuga Labs" in the caption.[179]  This was one of several such promotions of the Bored Ape ecosystem by Winkelman.  In fact, on one occasion on August 22, 2022, Winkelman went so far as to offer 1,000 ApeCoin tokens to 200 of his followers on Twitter as part of a promotional contest.[180]

220.    On March 16, 2022, the Company and BAYC announced the formation of the ApeCoin DAO[181] and the launch of the ApeCoin Token[182] as the "official currency of the BAYC ecosystem."[183]  BAYC stated that ApeCoin would be available "to all" and was "expected to begin trading on major crypto exchanges."[184]  BAYC explained that the Yuga would be "gifting ApeCoin DAO as a 1/1 NFT featuring a blue version of the BAYC logo," and "[t]his NFT transfers full IP rights of the derivative logo to the ApeCoin DAO, who will decide how the IP should be used."[185]  Further, 15% of the total supply of ApeCoin would be made available to BAYC and

---

[179]    Beeple    (@beeple),    TWITTER    (Mar.    12,    2022), https://twitter.com/beeple/status/1502824275929088006.

[180]    Beeple    (@beeple),    TWITTER    (Aug.    22,    2022), https://twitter.com/beeple/status/1561703958854475777.

[181]    A "DAO" refers to a decentralized autonomous organization, sometimes called a decentralized autonomous corporation.  It is an entity that claims to have no central leadership, and is collectively owned and managed by their members.

[182]    Bored Ape Yacht Club (@BoredApeYC), TWITTER (Mar. 16, 2022, 2:06 PM), https://twitter.com/BoredApeYC/status/1504202508633362436.

[183]    Bored Ape Yacht Club (@BoredApeYC), TWITTER (Mar. 16, 2022, 2:06 PM), https://twitter.com/BoredApeYC/status/1504202511837806598.

[184]    Bored Ape Yacht Club (@BoredApeYC), TWITTER (Mar. 16, 2022, 2:06 PM), https://twitter.com/BoredApeYC/status/1504202515805573123.

[185]    Bored Ape Yacht Club (@BoredApeYC), TWITTER (Mar. 16, 2022, 2:06 PM), https://twitter.com/BoredApeYC/status/1504202512877948930.

MAYC NFT holders[186] and 62% of the total ApeCoin supply would be "allocated to the ApeCoin Community."[187] BAYC then directed its followers to visit apecoin.com to learn more details.[188]

221. As part of that Ape DAO announcement, Defendant Ohanian stated: "Today we're making the 'Club' bigger with ApeCoin . . . . Web3 is being integrated into our art, music, and culture more and more everyday and it all starts with community. I believe this community will build, expand, partner, and disrupt in a massive way."[189]

222. Defendant Wu posted a picture of an BAYC NFT with the following thread on her official Twitter account: "So honored to join the @apecoin DAO board, launched today along with the $APE token."[190] "Love or hate NFTs, they have captured the consumer imagination and continue to be on the onboarding ramp for the mainstream into web3. @BoredApeYC is leading the way as the #1 NFT brand, becoming a household name and building the next gen "Disney" of our generation."[191] "@BoredApeYC has led innovation on IP frameworks, like giving NFT holders full commercial rights to their IP without a royalty. This has accelerated

---

[186] Bored Ape Yacht Club (@BoredApeYC), TWITTER (Mar. 16, 2022, 2:06 PM), https://twitter.com/BoredApeYC/status/1504202514815721472.
[187] Bored Ape Yacht Club (@BoredApeYC), TWITTER (Mar. 16, 2022, 2:06 PM), https://twitter.com/BoredApeYC/status/1504202513834201088.
[188] Bored Ape Yacht Club (@BoredApeYC), TWITTER (Mar. 16, 2022, 2:06 PM), https://twitter.com/BoredApeYC/status/1504202516736663561.
[189] Kate Irwin, *ApeCoin Launches for Bored Ape Ethereum NFT Holders with Reddit, FTX, Animoca Execs on Board*, DECRYPT (Mar. 16, 2022), https://decrypt.co/95282/apecoin-ape-launches-for-bored-apes-nft-holders-with-reddit-ftx-animoca-on-board.
[190] Amy Wu (@amytongwu), TWITTER (Mar. 16, 2022, 4:29 PM), https://twitter.com/amytongwu/status/1504238389737967622?s=20&t=bdw9Sbdaq71NFK8gF6oQqg.
[191] Amy Wu (@amytongwu), TWITTER (Mar. 16, 2022, 4:29 PM), https://twitter.com/amytongwu/status/1504238391323418628?s=20&t=bdw9Sbdaq71NFK8gF6oQqg.

awareness rather than leaked value."[192]  "More NFT brands are being minted, creating hybrid entertainment and retail empires, licensing their IP and creating 1st and 3rd party merchandise, games, shows, etc. and using hybrid web2/web3 marketing playbooks, leveraging and creating celebrity, and creating culture."[193]   "I'm absolutely honored to play a supporting role with @FTX_Official in the future of @ApeCoin DAO at the nexus of culture, gaming, entertainment. LFG! 🚀🚀🦍"[194]

223.    Additionally, a combined search of Etherscan and OpenSea shows that a wallet owned/controlled by Defendant Ciccone received BAYC NFT #4988 directly from MoonPay.  This transaction did not involve a purchase by Ciccone but rather the NFT was simply transferred to her wallet address 0x8ea95Bdc5cDddC0b7EbAd841F0c1f2cA6168b6a9  (the  "Ciccone  Wallet"). According to Etherscan and OpenSea, on March 14, 2022, the MoonPay Wallet first paid 180 ether for BAYC NFT #4988, which at the time was the equivalent $466,461. On March 23, 2022, the MoonPay wallet sent BAYC NFT #4988 to wallet address 0x6ef962ea7e64e771d3a81bce4f95328d76d7672b (which appears to have been used as a pass-through wallet).[195]  Finally, six weeks later, BAYC NFT #4988 was sent to Ciccone's wallet on May 7, 2022.[196]  Ciccone received an NFT worth almost a half

---

[192]     Amy Wu (@amytongwu), TWITTER (Mar. 16, 2022, 4:29 PM), https://twitter.com/amytongwu/status/1504238392149745664.

[193]     Amy Wu (@amytongwu), TWITTER (Mar. 16, 2022, 4:29 PM), https://twitter.com/amytongwu/status/1504238394007764992.

[194]     Amy Wu (@amytongwu), TWITTER (Mar. 16, 2022, 4:29 PM), https://twitter.com/amytongwu/status/1504238394892771333.

[195]     Transaction Hash: 0xdf3b1b59de370deb5f6105600df55650e3e24cd10127a33f93145b3ca038ac2d, ERC-721: 4988, ETHERSCAN (Mar. 23, 2022, 11:49 AM), https://etherscan.io/tx/0xdf3b1b59de370deb5f6105600df55650e3e24cd10127a33f93145b3ca038ac2d.

[196]     Transaction Hash:  0x8935a6169a603b0cc3899c0b98fb40501f6c2a708dcc4e03cdd89d6944eb5b70, ERC-721: 4988, ETHERSCAN (May 7, 2022, 7:44 AM), https://etherscan.io/tx/0x8935a6169a603b0cc3899c0b98fb40501f6c2a708dcc4e03cdd89d6944eb5b70.

---

82

1  million dollars from MoonPay for nothing except her statements promoting Yuga

2  securities.

3      224.    Transactions within the Ciccone Wallet also reveal that Defendant

4  Ciccone received Otherdeed #4988 directly from the Otherside deployer wallet

5  0x8ea95bdc5cdddc0b7ebad841f0c1f2ca6168b6a9 (the "Otherside Wallet") on May

6  16, 2022.[197]

7      225.    The Ciccone Wallet also received 100 plots of virtual land in Otherside

8  on August 5, 2022.[198]

9      226.    But there are no free lunches and these were not simple gifts.  Rather,

10  upon information and belief, MoonPay was an indirect way for Oseary and the

11  Executive Defendants to pay Ciccone to promote and/or solicit sales and re-sales of

12  the Yuga securities.

13      227.    An examination of BAYC NFT transactions in the wallet by Ciccone in

14  conjunction with her social media accounts shows that she received this particularly

15  rare and valuable BAYC NFT #4988 before she promoted BAYC to would-be

16  investors.  Shortly after MoonPay acquired BAYC NFT #4988 for Ciccone, on March

17  24, 2022, Ciccone posted the following promotion of the BAYC and its related

18  metaverse to her Twitter account:[199]

19

20

21

22  [197]    Transaction Hash:    0x62300078ce92be1784e81e65cd0421a552e7f7

23  0f1b4931e63f87285086c3c6e6, ERC-721: 4988, ETHERSCAN (May 16, 2022, 5:43 PM),  https://etherscan.io/tx/0x62300078ce92be1784e81e65cd0421a552e7f70f1b4

24  931e63f87285086c3c6e6.

25  [198]    Transaction Hash:    0xcbfb3291091e6dc1e80577526e90dfdf2a438a96 03a313989c4833d8d978bc5d,  ETHERSCAN  (Aug.  5,  2022,  10:54  AM),

26  https://etherscan.io/tx/0xcbfb3291091e6dc1e80577526e90dfdf2a438a9603a313989

27  c4833d8d978bc5d.

[199]    Madonna  (@Madonna),  TWITTER  (Mar.  24,  2022,  7:30  PM),

28  https://twitter.com/Madonna/status/1507183071551971330.

FIRST AMENDED CLASS ACTION COMPLAINT - CASE NO. 2:22-cv-08909-FMO-PLA

228.     Plaintiffs saw the promotion from Ciccone regarding the Company's collection of BAYC NFTs and were induced to purchase and/or continue to hold Yuga securities as a result of this misleading promotion.

229.     Neither MoonPay nor Ciccone disclosed that Ciccone's manager and business partner Oseary had a financial interest in MoonPay and, relatedly, the increased sale of BAYC NFTs.  Further, Ciccone failed to include an "ad" disclaimer in this post to disclose to investors that this was a paid advertisement for the BAYC collection of NFTs and MoonPay (as opposed to a genuine expression of interest in the BAYC collection or gratitude to the MoonPay Defendants for assisting in her "enter[ing] the Metaverse").

230.     MoonPay responded to Ciccone's tweet, stating that the company chose BAYC NFT #4988 for Ciccone because "we heard it call your name and it felt like home."[200]

---

[200]     MoonPay (@moonpay), TWITTER (Mar. 25, 2022, 1:29 AM), https://twitter.com/moonpay/status/1507273486737281024?lang=en.

231.    Ciccone's promotion of the BAYC NFTs and its related metaverse implied to investors that she personally selected her BAYC NFT because she was genuinely interested in the BAYC ecosystem and wanted to be a part of its growing future.  But given MoonPay's statement, it appears that, in truth, Ciccone did not even bother to choose her BAYC NFT herself, but rather it was selected for her by MoonPay, thus demonstrating that her enthusiasm for the collection of BAYC NFTs was fake.

232.    In the following weeks, Ciccone further promoted BAYC in several news outlets, including *Variety* magazine and the London newspaper *The Independent*.  For example, in the July 27, 2022 issue of *Variety* magazine – which featured Defendant Oseary on the cover with the tagline that stated "Music Mogul of the Year – NFT King: Madonna and U2 Manager Guy Oseary is Leveraging His Success to Become the Next Great Tech Whisperer" – Ciccone insisted that she "'was hellbent on getting an Ape and really specific about what I wanted: the Ape with a leather motorcycle cap on and multicolored teeth.'"[201]  Ciccone went on to state: "'I was told that it was inspired by me, and modeled after me, and it was bought by a woman who's a fan of mine. She was gonna sell it to me, but it was way too expensive.'"[202]

233.    Then, on July 28, 2022, *The Independent* published an article titled: "'I was hellbent on getting an Ape': Madonna annoyed she didn't get the NFT character she wanted."[203] In addition to echoing the statements from the *Variety* magazine

[201]    Shirley Halperin, *From Maverick to Mogul, Madonna's Manager Guy Oseary Transcends the Music World to Take on NFTs*, Variety (July 27, 2022), https://variety.com/2022/music/news/guy-oseary-nft-madonna-u2-manager-1235325286/.

[202]    *Id*.

[203]    Peony Hirwani, *'I was hellbent on getting an Ape': Madonna annoyed she didn't get the NFT character she wanted*, The Independent (July 28, 2022), https://www.independent.co.uk/arts-entertainment/music/news/madonna-angry-bored-ape-nft-b2132950.html.

1  interview, *The Independent* reported that the "63-year-old singer has revealed that

2  she was quite 'mad' over being beaten to a bid for Bored Ape No 3756."[204]

3      234.    Defendant Ciccone's statements about her inability to obtain the BAYC

4  NFT that was her first choice misleadingly suggested to investors that the Yuga

5  securities were in such high demand and so exclusive that even a highly-connected

6  celebrity like Defendant Ciccone could not get any specific NFT that she wanted.

7  Likewise, Ciccone's statement that she wanted to buy a particular BAYC NFT but

8  did not because it was "too expensive" indicated to investors that the BAYC NFT

9  were highly valuable such that one of the most successful and iconic pop singers in

10  the world could not afford to enter the exclusive club on her own terms.  These

11  statements were made to induce investors into believing that the Yuga securities were

12  investments that held extraordinary value, growth potential, and would provide future

13  financial opportunities.  Indeed, Plaintiffs saw the various promotions from

14  Defendants Ciccone, Oseary, and the MoonPay Defendants regarding the Company's

15  collection of BAYC NFTs and were induced to purchase and/or continue to hold

16  Yuga securities as a result of this misleading promotion.

17      235.    In addition to promoting the large number of A-list celebrities like

18  Ciccone that purportedly "joined the club" (*i.e.*, purchased a BAYC NFT), Oseary

19  used his own personal Twitter account to promote BAYC NFTs.

20      236.    Oseary's Twitter feed is littered with promotions for BAYC NFTs and

21  other Yuga Financial Products.  For example, on January 20, 2022, Oseary promoted

22  a tweet from Serena Williams that posted her BAYC NFT (which she received from

23  her husband, Defendant Ohanian, who also happens to be a member of the Ape DAO

24  board of directors).[205]  That same day, Oseary similarly promoted a tweet from

25

---

26  [204]    *Id.*

27  [205]    Serena Williams (@serenawilliams), TWITTER (Jan. 20, 2022, 5:41 AM), https://twitter.com/serenawilliams/status/1484159217791647751?s=20&t=iNbPm5

28  RANQEpugkz3Orziw.

FIRST AMENDED CLASS ACTION COMPLAINT - CASE NO. 2:22-cv-08909-FMO-PLA

1   professional soccer player Neymar da Silva Santos, Jr. that said: "I am an ape!
2   #community #art #BoredApeYC."[206]   Notably, not only did these promotions take
3   place on the same day within a few hours, but both BAYC NFTs promoted by Oseary,
4   Williams, and Neymar were the rare "pink" Bored Apes, which were more valuable
5   and indicate a common source of origin.

6       237.   Plaintiffs saw the promotions from Defendants Oseary and Ohanian
7   regarding the Company's collection of BAYC NFTs and were induced to purchase
8   and/or continue to hold Yuga securities as a result of these misleading promotions.

9       238.   The individual Executive Defendants, under the guise of anonymity,
10  also fraudulently promoted the Yuga securities.

11      239.   For example, on April 21, 2021, Defendant Solano promoted the growth
12  potential for the BAYC ecosystem (which could only be accessed through the
13  purchase of a BAYC NFT), stating: "The Bored Ape Yacht Club is more than just an
14  #NFT collection – the NFT grants access to a collaborative art experiment in the form
15  of a canvas only token-holders can draw on."[207]   This statement was misleading in
16  that it suggested to investors that there would be a broader ecosystem for BAYC NFT
17  holders to interact in and that the BAYC brand was poised for significant growth,
18  when, in truth, the BAYC NFTs were just a vehicle to make insiders rich at the
19  expense of investors.

20      240.   The next day, April 22, 2021, Solano again touted BAYC NFTs,
21  claiming that these NFTs "double as membership cards to an exclusive club with

---

[206]   Neymar Jr (@neymarjr), Twitter (Jan. 20, 2022, 10:24 AM), https://twitter.com/neymarjr/status/1484230264293318663?s=20&t=iNbPm5RANQEpugkz3Orziw.
[207]   Garga.eth (Greg Solano), Twitter (Apr. 21, 2021, 8:34 PM), https://twitter.com/CryptoGarga/status/1385074598241243138?s=20&t=g1mRpxWbWmWNzjxw385m2A.

First Amended Class Action Complaint - Case No. 2:22-cv-08909-FMO-PLA

benefits" and soliciting investors to participate in the BAYC NFT pre-sale on April 23, 2021.[208]

241.   On August 21, 2021, Defendant Aronow bragged "Not bad for a high school dropout" in response to a post that said "Don't look now but #BAYC Market Cap just crossed a BILLION."[209]  This exchange gave investors the false impression that BAYC NFTs were a sound investment experiencing organic growth that were poised to continue growing, when in fact the price and volume was inflated due to manipulative trading strategies.

242.   The scheme to promote the BAYC NFTs is not the first time Aronow has been accused of attempting to mislead investors.  In May 2021, a crypto company called Bitmex took Aronow to arbitration over a disputed domain name in the action *HDR Global Trading Limited v. Aronow*, Claim No. FA2104001943672.  According to the complaint, Aronow had bought the domain name bitmex.guru in 2018, which Bitmex argued was clearly designed to trick people looking for the real Bitmex website.  Aronow did not appear, and the arbitrator ordered that the domain name be transferred after his default in the proceeding.

243.   The Company itself also solicited sales at various events like "ApeFest 2021" which was held in New York on November 3, 2021 as an exclusive event for only BAYC or MAYC NFT owners.[210]  Significantly, Yuga's ApeFest 2021 event

---

[208]   Garga.eth (Greg Solano), TWITTER (Apr. 22, 2021, 3:16 PM), https://twitter.com/CryptoGarga/status/1385356793862397953?s=20&t=g1mRpxWbWmWNzjxw385m2A.

[209]   GordonGoner.eth (Wylie Aronow) (@GordonGoner), TWITTER (Apr. 21, 2021,                                     12:32                                     AM), https://twitter.com/gordongoner/status/1428938116535042049?lang=en.

[210]   Bored Ape Yacht Club (@BoredApeYC), TWITTER (Oct. 28, 2021 7:26 PM), https://twitter.com/BoredApeYC/status/1453911020137816068.

was sponsored and promoted by MoonPay,[211] which promoted an ApeFest ticket giveaway to Twitter followers.[212]   NFT artist, Oseary associate, and Defendant Winkelmann also promoted the ApeFest 2021 event on his Twitter account.[213]

244.   Likewise, MoonPay also directly solicited sales of Yuga securities.  For example, on January 11, 2022, MoonPay promoted the BAYC Miami Competition and posted the following picture of a joint MoonPay x BAYC mural on its Twitter account:[214]



---

[211]    Bored Ape Yacht Club (@BoredApeYC), TWITTER (Nov. 3, 2021), https://twitter.com/BoredApeYC/status/1456143639634071556?s=20&t=g1mRpx WbWmWNzjxw385m2A; MoonPay (@moonpay), TWITTER (Nov. 1, 2021, 10:49 AM),   https://twitter.com/moonpay/status/1455230583702003724?s=20&t=vrAWh eqx4E0TSLTJj9xpIA.

[212]    MoonPay (@MoonPay), TWITTER (Nov. 1, 2021, 10:49 AM), https://twitter.com/moonpay/status/1455230583702003724.

[213]    Beeple (@beeple), TWITTER (Nov. 3, 2021, 8:49 PM), https://twitter.com/beeple/status/1456106243391623168?s=20&t=g1mRpxWbWm WNzjxw385m2A.

[214]    MoonPay (@moonpay), TWITTER (Jan 11, 2022, 6:29 AM), https://twitter.com/moonpay/status/1480909703387484165?s=20&t=4E_x-F8TZi8 Sorr7QZls0g.

245.   In addition to the mural of a Bored Ape with the MoonPay and Yuga corporate logos, the posted image contained a QR code that, if scanned, directed investors to the MoonPay website.  On the landing page it states: "Crypto just got easy. A fast and simple way to buy and sell crypto" and there is a button stating, "Buy crypto."[215]

246.   In the midst of the celebrity promotions, Defendant Soto-Wright conducted a written Q&A interview with media outlet, The Block.  Soto-Wright falsely described the creation of the Concierge service as first spreading via word of mouth among artists, stating: "So I helped one artist figure it out.  They told another who then asked for help.  Word started to spread."  Soto-Wright later falsely described it as an accident, stating "A really happy accident I'd say.  100% organic."[216]

247.   When asked to confirm whether celebrities were not paid to promote MoonPay, Soto-Wright demurred, vaguely stating: "Everyone that uses MoonPay Concierge has a commercial relationship with the company in the sense that this is a commercial service we offer our clients.  We provide the support and then we invoice for services rendered."  In a follow-up to a question on what fees are charged to concierge clients, Soto-Wright even more vaguely responded that "[w]e're focused on delivering value to our clients.  And I think our growing list of MoonPay concierge clients agrees."[217]

248.   The promotional efforts by Oseary, the Executive Defendants, the MoonPay Defendants, and the Promoter Defendants (as well as the celebrity recruitment and solicitation efforts occurring behind the scenes with Oseary, the

---

[215]    *See* https://www.moonpay.com/.

[216]    Ryan Weeks, *'A really happy accident': MoonPay boss sheds light on how the startup is shepherding big-ticket NFT purchases*, THE BLOCK (Dec. 24, 2021), https://www.theblock.co/post/128517/moonpay-boss-on-how-the-startup-is-guiding-celebs-into-nfts.

[217]    *Id.*

MoonPay Defendants, and Defendant Adidas) were effective at increasing the popularity of, and interest in, the BAYC NFTs.  Following these promotional activities, the floor price and trading volume for BAYC NFTs exploded.  On April 30, 2022, the day of the BAYC metaverse launch, the floor price for BAYC NFTs reached the maximum price of 144.9 ether (at the time was worth approximately $395,000), which represents an 145% increase from its floor price of 49.5 ether at the start of the Class Period.  Trading volume also spiked to 12,698 ether on April 30, 2022 – up almost 280% from the 3345 ether trading volume at the start of the Class Period.

**The ApeCoin Token Sale**

249.  As investor interest in the BAYC NFTs and broader ecosystem was reaching a fevered pitch, Yuga and its founders Defendants Aronow and Solano launched the ApeCoin token ("APE") in an effort to cash in further on the misleading promotional schemes.  This was a pure cash grab by those Defendants cloaked in the air of altruistically giving back to the BAYC community of investors.

250.  Defendants enriched themselves and other insiders with billions of dollars of APE Coins.  80 million APE (8%) went to the BAYC founders, Defendants Solano, Aronow, Atalay and Ali.  150 million APE (15%) went to the Company.  140 million APE (14%) went to "launch contributors" made up of Company partners and investors, including investors Andreessen Horowitz and Animoca Brands.  150 million APE (15%) went to holders of the BAYC, MAYC, and BAKC NFTs.  1 million APE (1%) went to the Jane Goodall Legacy Foundation.  The remaining 470 million APE (47%) went to the ApeCoin DAO treasury, of which Executive Defendants Solano, Aronow, Atalay, Ali, the Company, and their investors and

1  partners maintain considerable influence over through the voting rights granted by
2  their hundreds of millions of ApeCoins.[218]

3      251.   Much like a stock issuance, Defendants thus issued themselves
4  exorbitant amounts of ApeCoin that would grant themselves voting rights to
5  influence and control any decision surrounding ApeCoin.  In addition, Defendants,
6  through the Company, the Ape DAO, and the Ape Foundation (the ApeCoin DAO's
7  Board) would promote and market the token.

8      252.   ApeCoin reached an all-time high of over $26 before plummeting to
9  approximately $1.77 per coin in August 2023.[219]  The Company, its founders, and its
10 investors' allotment of 230 million total ApeCoins it issued to themselves were thus
11 worth about $6 billion at ApeCoin's all time high, and is currently still worth more
12 than $410 million, even with prices reaching an all time low in August 2023.

13     253.   In an attempt to shield the Company, its executives, and Oseary from
14 liability related to the solicitation and sale of the unregistered securities, Oseary
15 formed the ApeCoin DAO, the Ape Foundation, and the Ape DAO Board (which was
16 governed and controlled by the Ape Foundation).  An Ape Foundation subcommittee
17 served as the ApeCoin DAO's board, which consisted of Ape DAO Board
18 Defendants Alexis Ohanian, Amy Wu, Maaria Bajwa, and non-Defendants Yat Siu
19 and Dean Steinbeck.[220]  Executive Defendants and Ape DAO Defendants used used
20 their influence and ApeCoin voting rights to pay themselves exorbitant salaries of

21

22 [218]  *What is ApeCoin (APE)*, BITSTAMP LEARN, (Nov. 16, 2022),
23 https://www.bitstamp.net/learn/cryptocurrency-guide/what-is-apecoin-ape/;
   *ApeCoin is rewarding Bored Ape insiders with billions of dollars*, QUARTZ (Mar. 23,
24 2022),         https://qz.com/2145867/apecoin-has-padded-the-pockets-of-bored-ape-
   insiders.
25 [219]  *ApeCoin*,    COINGECKO    (last    visited    Aug.    3,    2023),
26 https://www.coingecko.com/en/coins/apecoin.
27 [220]  Will Gottsegen, *What is ApeCoin and Who Is Behind It?*, COINDESK (Mar. 18,
   2022),   https://www.coindesk.com/layer2/2022/03/18/what-is-apecoin-and-who-is-
28 behind-it/.

FIRST AMENDED CLASS ACTION COMPLAINT - CASE NO. 2:22-cv-08909-FMO-PLA

1    over $20,000 per month using the 470 million Coin in the Ape DAO treasury to

2    further cash in on their scheme at the expense of retail investors.[221]

3        254.   Put another way, Oseary – with the assistance of the Executive

4    Defendants and Ape DAO Board Defendants – created the Ape Foundation and Ape

5    DAO Board in order to maintain the "veneer of plausible deniability — an

6    independent entity allocating tokens to a company and its founders, rather than that

7    company and its founders pumping their own investments."[222]

8        255.   But according to a July 25, 2022 article, "What is ApeCoin and Who is

9    Behind This Cryptocurrency?," it is the Company (not the foundation, DAO, or its

10   board) that is "responsible for all major projects and acquisitions related to the Bored

11   Ape Yacht Club family.  If you want to do something with the intellectual property

12   of the collection, you have to go through the company."  Within that article, Muniz

13   is quoted as having plans to "adopt ApeCoin as the primary currency for all new

14   products and services," which, as the article notes, "ties the asset's value to the

15   success of the Bored Ape collection as one all."[223]

16       256.   On March 16, 2022, Ape DAO Board Defendants announced the

17   impending launch of ApeCoin, releasing the following statements on the verified

18   ApeCoin Twitter account, which, upon information and belief, is owned/controlled

19   by Ape DAO Board Defendants:

20   •   "Introducing  ApeCoin  ($APE),  a  token  for  culture,  gaming,  and

21       commerce used to empower a decentralized community building at the

22       forefront of web3."[224]

23

---

24   [221]   Michael   (@MiKeMeUpP),   TWITTER   (Jun.   11,   2023,   9:18   AM).
25   https://twitter.com/MiKeMeUpP/status/1667929299033407488
     [222]   *Id.*
26   [223]   *Id.*
27   [224]   ApeCoin   (@apecoin),   TWITTER   (Mar.   16,   2022,   2:02   PM),
     https://twitter.com/apecoin/status/1504201556165644298?s=20&t=iudEUt2QH4G
28   UHTXCQ0maNg.

FIRST AMENDED CLASS ACTION COMPLAINT - CASE NO. 2:22-cv-08909-FMO-PLA

- "ApeCoin is owned and operated by the ApeCoin DAO, a decentralized organization where each token holder gets to vote on governance and use of the Ecosystem Fund. Holding ApeCoin is the only requirement for membership in the ApeCoin DAO."[225]
- "The DAO is supported by Ape Foundation, which was created to act as the legal steward of ApeCoin and administer the decisions made by the ApeCoin DAO community. (Basically someone needs to sign the checks.)."[226]
- "62% of the total supply of ApeCoin is allocated to the ApeCoin community, a portion of which (15% of total supply) will be available to claim starting tomorrow at 8:30 am ET."[227]
- "The airdrop claim consisting of 15% of the total supply of ApeCoin will be made available to @BoredApeYC NFT holders (Bored Apes and Mutant Apes, as well as #BAKC dogs paired with either #BAYC or #MAYC)."[228]
- "***For everyone else who wants to ape in: ApeCoin will be available to all and is expected to begin trading on major crypto exchanges ASAP***. We'll tweet as that happens!"[229]

257.    On that same day, Yuga's official Twitter proclaimed: "We're excited to announce we're adopting ApeCoin as the primary token for the Bored Ape Yacht

[225]    ApeCoin (@apecoin), TWITTER (Mar. 16, 2022, 2:02 PM), https://twitter.com/apecoin/status/1504201557147070465.
[226]    ApeCoin (@apecoin), TWITTER (Mar. 16, 2022, 2:02 PM), https://twitter.com/apecoin/status/1504201557914664962.
[227]    ApeCoin (@apecoin), TWITTER (Mar. 16, 2022, 2:02 PM), https://twitter.com/apecoin/status/1504201558917095427.
[228]    ApeCoin (@apecoin), TWITTER (Mar. 16, 2022, 2:02 PM), https://twitter.com/apecoin/status/1504201559781089280.
[229]    ApeCoin (@apecoin), TWITTER (Mar. 16, 2022, 2:02 PM), https://twitter.com/apecoin/status/1504201560624185346.

94

Club ecosystem as well as future products and services."[230]   Yuga coordinated ApeCoin's adoption by various influencers and brands and highlighted that adoption on its Twitter page.

258.   Yuga advertised that ApeCoin would be the ecosystem's governance token, allowing ApeCoin holders to participate in the ApeCoin DAO by voting "on how the Ecosystem Fund will be distributed by the APE Foundation to promote a diverse and self-sustaining ecosystem."[231]

259.   Yuga also advertised that ApeCoin would also provide "access to certain parts of the ecosystem that are otherwise unavailable, such as exclusive games, merch, events, and services."[232]

260.   The day after the ApeCoin launch, March 17, 2022, Ape DAO Defendant Bajwa provided instructions to investors like Plaintiffs and the Class on how to review their ApeCoin token airdrop allocation.[233]

261.   According to the Yuga Labs Pitch Deck that, upon information and belief, was used to secure the funding for Yuga, the Company and the Executive Defendants had made staggering profits off of the sales of the Yuga Financial Products in 2021, and the focus for 2022 would be on the Company's entrance to the metaverse and online gaming.

262.   The Yuga Labs Pitch Deck signaled the importance of the celebrity endorsements, bragging that "[c]elebrities are buying Apes to signal that they know what's up."[234]   The Yuga Labs Pitch Deck also introduced ApeCoin, stating

---

[230]   Yuga Labs (@yugalabs), TWITTER (Mar. 16, 2022 2:08 PM), https://twitter.com/yugalabs/status/1504202913694031884?s=20.
[231]   *ApeCoin DAO Governance*, APECOIN.COM (last visited Aug. 3, 2023), https://apecoin.com/governance.
[232]   *About ApeCoin: ApeCoin Protocol*, APECOIN.COM (last visited Aug. 3, 2023), https://apecoin.com/about.
[233]   Maaria.eth (@maariabajwa), TWITTER (Mar. 17, 2022 9:57 AM), https://twitter.com/maariabajwa/status/1504502258716725278?s=20.
[234]   *Yuga Labs Pitch Deck*, at *16.

1 "APECoin will be the currency of our metaverse. One unifying coin with which to

2 power our app store like marketplace."[235]

3   263.   Yuga planned for the Otherside MetaRPG to launch with a land sale.

4 These virtual plots of land would purportedly "corresponded to real land" in the Yuga

5 game.[236]   In order to increase demand for its ApeCoin token, Yuga announced that

6 these virtual plots of land could be purchased only with ApeCoin tokens.

7   264.   The Yuga Labs Pitch Deck stated:

8   •   The MetaRPG will be made up of 200k land plots total; all launched

9       through Animoca.

10   •   Genesis drop will be 100k plots.

11       o   30% of that will go to BAYC/MAYC, leaving ~70k for

12           public sale (and then another 100k in follow up drop).

13       o   The conservative estimate for the land price is 1 ETH each

14           plot = $200M in primary sales for the genesis drop

15           alone.[237]

16   265.   The Yuga Pitch Deck also provided the following income statement:[238]



| Income Statement | | $ IN MILLIONS |
|---|---|---|
| | Budget 2022 | Actual 2021 |
| Total Revenue | $ 539.30 | $ 137.58 |
| Cost of Goods Sold | 6.49 | 6.23 |
| Gross Profit | $ 532.81 | $ 131.35 |
| Profit % | 98.8% | 95.5% |
| Expense | | |
| Advertising and Community Building | 15.25 | 2.03 |
| Product and Technology | 37.06 | 0.19 |
| Payroll and Benefits | 17.10 | 0.06 |
| Legal and Professional | 3.20 | 0.64 |
| Other Expenses | 5.00 | 1.32 |
| Total Expense | $ 77.61 | $4.24 |
| Net Revenue | $ 455.20 | $ 127.11 |
| Net Revenue % | 84.4% | 92.4% |

---

26   [235]   *Id.*, at *62-*64.

27   [236]   *Id.*, at *73.

       [237]   *Id.*, at *74.

28   [238]   *Id.*, at *85.

FIRST AMENDED CLASS ACTION COMPLAINT - CASE NO. 2:22-cv-08909-FMO-PLA

266. Notably, Yuga's expenses for "Advertising and Community Building" in 2021 was $2,030,000, whereas the budget for 2022 was $15,250,000. This massive 650% increase in expenditures for promotions occurred right around the same time that Defendant Oseary joined the Company as a minority partner.

267. ApeCoin is touted as the main cryptocurrency of the BAYC ecosystem and, its sales exploded as a result of Defendants' promotional efforts.

268. For example, on March 16, 2022, the official ApeCoin Twitter account posted the following statement: "Introducing ApeCoin ($APE), a token for culture, gaming, and commerce used to empower a decentralized community building at the forefront of web3." The BAYC Twitter account replied to this statement. So did the Company's official account along with a caption that stated: "We're excited to announce we're adopting ApeCoin as the primary token for the Bored Ape Yacht Club ecosystem as well as future Yuga products and services."[239] Similarly, on March 16, 2022 and March 17, 2022, the ApeCoin Twitter promoted the ApeCoin token claim allocated for BAYC NFT holders. Yuga's COO, Defendant Shoemaker, amplified these promotions by disseminating them all through her own Twitter account "@SodaOps." In fact, Shoemaker consistently reposts the solicitations and misleading statements from the main BAYC, Otherside, ApeCoin, and Yuga Twitter accounts. For example, Shoemaker amplified the Company's March 11, 2022 promotion of Yuga' acquisition of the CryptoPunks and Meetbits NFT collections. Shoemaker also shared the April 23, 2022 promotions from the Company's Otherside Twitter account related to the Otherdeed mint. During late May/early June of 2022,

---

[239] ApeCoin (@apecoin), TWITTER (Mar. 16, 2022, 2;02 PM), https://twitter.com/apecoin/status/1504201556165644298?s=20&t=oYZDBOcdZ4 V1im5Ls9qmRg; Yuga Labs (@yugalabs), TWITTER (Mar. 16, 2022, 2:08 PM), https://twitter.com/yugalabs/status/1504202913694031884?s=20&t=oYZDBOcdZ4 V1im5Ls9qmRg.

1   Shoemaker repeatedly promoted marketing messages from the BAYC Twitter
2   account for ApeFest 2022.

3   269.   After just one day of trading, the Ethereum-based ApeCoin had a market
4   capitalization of almost $2 billion.

5   270.   Upon information and belief, as the Company, Executive Defendants,
6   MoonPay Defendants, and Promoter Defendants were engaged in the aforementioned
7   fraudulent promotions, Defendant Adidas, along with assistance of the MoonPay
8   Defendants and the Executive Defendants, were engaging with other celebrities,
9   influencers, and tastemakers behind the scenes to recruit them into the conspiracy to
10   solicit and sell the Yuga securities through MoonPay.

11   271.   On or about March 17, 2022, celebrity jeweler and social media
12   influencer Ben "Baller" Yang made a stunning disclosure regarding the promotion of
13   Yuga securities by the Company, the MoonPay Defendants, and Defendant Adidas,
14   confirming their collective participation in the fraudulent scheme concocted by
15   Oseary and the Executive Defendants.  In a now-deleted Twitter Spaces live video,
16   which was memorialized in a YouTube video discussing Ripps' troubling claims
17   regarding the Company and its founders Defendants Solano, Aronow, Atalay, and
18   Ali and their use of subliminal BAYC NFT collection's purportedly racist imagery,[240]
19   Yang describes his own personal experience with the conspiracy as follows:

20   **[Yang]:** "Real talk, not once, not twice, three times I've been offered a
21   Bored Ape through MoonPay. I've had Adidas hit me up in my DMs
   on Instagram: "Hey Ben, do you want to co-host a space with us? Oh
22   do you own a Bored Ape?" No I fucking don't. . . . I don't know what
   it was but the fact that some of these super top tier all-star NBA players
23   have them, and I was like this is all cap.[241] I mean, there was an NDA
24   they tried to send my agent . . .

25   **[Other Speaker]:** There's definitely NDAs in everything they do. . . .
26

---

27   [240]   Philion, *BORED APE NAZI CLUB*, YOUTUBE (June 19, 2022),
   https://www.youtube.com/watch?v=XpH3O6mnZvw.
28   [241]   The term "cap" is slang for an exaggeration or outright lie.

1

2      **[Yang]:** But what I'm saying if I was to accept one of the Bored Apes…

3      **[Other Speaker 2]:** They want you to not disclose that they had
       purchased the Ape for you.

4

5      **[Yang]:** Exactly, yeah. You know what the craziest thing about that is
       that a lot of celebrities who are going into this are probably just stoked
6      to get the ape and they don't even realize a lot of them probably a lot of
       them don't consult their legal and shit like that beforehand. ***But they***
7      ***are actually asking you to commit fraud on their behalf***.[242]

8      272.   Yang's account of the MoonPay scheme is corroborated by another

9
       social media influencer, Canadian DJ Vivie-Ann Bakos, known professionally as
10
       BLOND:ISH.   Beginning January 8, 2022, Bakos began posting her praise and
11
       support of MoonPay and BAYC, and thanked MoonPay's "concierge" service:[243]
12

13

14

15

16

17

18                          

19

20

21

22

23

24

25

26
       _____
27     [242]   Philion, *supra* n.240, at 50:40-51:53.
       [243]   BLONDISH (@blond_ish), TWITTER (Jan. 8, 2022 10:27 AM),
28     https://twitter.com/blond_ish/status/1479882505658507269?s=20.

FIRST AMENDED CLASS ACTION COMPLAINT - CASE NO. 2:22-cv-08909-FMO-PLA

273.   Bakos continued to promote MoonPay and the BAYC NFT collection in January 2022.  For example, on January 27, 2022, Bakos replied to a MoonPay promotional announcement for its NFT Checkout with "Tothemoonpay."[244]  That same day Bakos also promoted the BAYC NFT collection, tagging MoonPay investor and actress Gwyneth Paltrow and announcing that it was "🐵 🦍 time for an ape meditation collab."

274.   More significantly, Bakos explained the MoonPay scheme in a message on Discord,[245] admitting that "they gift some apes to artists."  Bakos noted that the purpose of the scheme was meant to promote "mass adoption" of the Bored Ape NFTs:



275.   Media reports have likewise confirmed the allegations of improper celebrity promotion on the part of MoonPay.  On June 9, 2022, *The Block* reported that MoonPay presented top celebrities Bored Ape Yacht Club NFTs as gifts in the hope of boosting its profile.  Two people with direct knowledge of the matter told *The Block* that MoonPay did give at least some of the celebrities the Bored Ape NFTs without expecting payment.  While a MoonPay spokesperson said that it charged its celebrity clients "in full for the price of the NFTs," another spokesperson declined to

---

[244]   BLONDISH (@blond_ish), TWITTER (Jan. 27, 2022 6:08 AM), https://twitter.com/blond_ish/status/1486702564943007752.

[245]   *See* ZachXBT (@zachxbt), TWITTER (Jan. 18, 2022 3:49 PM), https://twitter.com/zachxbt/status/1483587376043769859?s=20 (posting a screenshot of Bakos' Discord statement).

FIRST AMENDED CLASS ACTION COMPLAINT - CASE NO. 2:22-cv-08909-FMO-PLA

1   comment further when pressed on exactly when invoices were sent and whether all

2   MoonPay's clients paid their bills.[246]

3       276.   As Defendant Soto-Wright previously admitted, the "hardest thing to

4   solve" when building a new company was "getting those customers on your

5   platform."[247]   Confidential Witness 1's disclosures, combined with the revelations

6   from Bakos and Baller, demonstrate that Soto-Wright (with the assistance of Adidas)

7   resorted to fraud to solve this problem for MoonPay and Yuga.   And much like

8   Sotheby's knowingly directly promoted and facilitated the first scheme to sell

9   unregistered BAYC NFTs to investors, MoonPay knowingly promoted and

10  facilitated the second scheme to misleadingly offer and solicit sales of BAYC NFTs

11  via the MoonPay platform.

12      277.   Yuga's NFT and ApeCoin schemes positioned it to raise capital and

13  launch another financial product: so-called virtual land NFTs or Otherdeeds.

14  Specifically, on March 22, 2022, the Company announced that it closed its Series

15  Seed funding round, led by a host of venture capital firms that had direct ties to Yuga,

16  including, but not limited to, Andreessen Horowitz's a16z crypto fund (Defendant

17  Lyons), Sound Ventures (Defendant Oseary), SevenSevenSix (Defendant Ohanian),

18  Artist Capital Management (funded by Ape DAO board member Steinbeck's firm

19  Horizen Labs, which also operated the ApeCoin staking program for Yuga), Hashed

20  (funded by Animoca Brands, which itself was purchased by Yuga), Lightspeed

21  Ventures (Defendant Wu formerly served as a Lightspeed Ventures partner before

22  leaving to join FTX Ventures), and FTX Ventures (Defendant Wu served as the web3

23  investment leader before stepping down from both FTX Ventures and the Ape DAO

24

25  [246]   Ryan Weeks, *Crypto hype machine MoonPay gifted Hollywood celebs Bored

26  Apes to promote itself: sources*, THE BLOCK (June 9, 2023),
    https://www.theblock.co/post/233594/moonpay-gave-hollywood-celebs-bored-

27  apes-to-promote-itself?utm_source=twitter&utm_medium=social.

28  [247]   MIXERGY.COM, *supra* n.32.

1   Board within days of the FTX collapse).  Yuga brought in another $450 million
2   during this round.  The announcement also revealed its metaverse virtual land project,
3   Otherside.[248]

4        278.   The announcement contained the following statements from Defendants
5   Muniz, Lyons, and Oseary, respectively:

> "Already, a new economy is possible with the IP of Apes, Punks,
> and Meebits, owned by the community," said Nicole Muniz, CEO of
> Yuga Labs. "The possibilities for blockchain's impact on culture are
> endless, and so we are building a beautiful, interoperable world for
> people to explore and play in. There's a lot to come."

> "Yuga Labs has quickly become a web3 culture, gaming, and
> entertainment empire," said Chris Lyons, general partner at a16z
> crypto. "Mainstream adoption in web3 is accelerating at lightning
> speed, and Yuga is at the forefront of merging culture and innovation
> for everyone to enter the metaverse. We're thrilled to invest in this
> brilliant team and their vision, and help forge the next frontier of
> community-owned entertainment."

> "This capital will give Yuga speed to market on many things underway,
> and bring in new partners with strategic thinking that share the vision,"
> said Yuga Labs partner Guy Oseary.[249]

18        279.   On March 27, 2022, Defendant Ohanian promoted ApeCoin tokens and
19   the Bored Ape Yacht Club brand in conjunction with the 2022 Academy Awards
20   show, posting a picture of an ApeCoin cufflink and the following text:
21   "#OSCARS2022       MUST-HAVE       RED       CARPET       ACCESSORY

---

[248]   Press Release, *Yuga Labs Closes $450 Million Seed Round of Funding, Valuing the Company at $4 Billion; Confirms Plans for Metaverse Project*, BUSINESS WIRE   (Mar.   22,   2022),   https://www.businesswire.com/news/home/20220322006088/en/Yuga-Labs-Closes-450-Million-Seed-Round-of-Funding-Valuing-the-Company-at-4-Billion-Confirms-Plans-for-Metaverse-Project.
[249]   *Id.*

@BOREDAPEYACHTCLUB.[250]   Ohanian posted pictures of himself and Serena Williams on the red carpet at the Oscars and close up pictures of his ApeCoin cufflinks.[251]

280.   On March 29, 2022 FTX uploaded the full commercial with Defendant Curry to its official YouTube channel.[252]   While the commercial itself was for FTX, there were multiple not-so-hidden references to the BAYC collection of NFTs. Notably, the thumbnail of the video prominently features Curry and the Bored Ape sculpture:



281.   The slogan for this campaign also contained the same BAYC reference (i.e. "bored") that was in the teaser commercial.  The commercial itself showed Curry in various "everyday" activities while a narrator harasses Curry for advice about

[250]   Alexis Ohanian (@alexisohanian), TWITTER (Mar. 27, 2022, 2:53 PM), https://twitter.com/alexisohanian/status/1508200457214201858?s=20&t=We5Uww M3WMDYkGHgb3jgZg.
[251]   *Id.*; *see also* Chris Katje, *Here's How Alexis Ohanian Sported The Bored Ape Yacht Club at The Oscars*, BENZINGA (Mar. 28, 2022), https://www.benzinga.com/ markets/cryptocurrency/22/03/26328054/heres-how-alexis-ohanian-sported-the-bored-ape-yacht-club-at-the-oscars2.
[252]   FTX Official, *Steph Curry Is Not a Crypto Expert*, YOUTUBE (Mar. 29, 2022), https://www.youtube.com/watch?v=gsy2N-XI04o.

1 cryptocurrency and what tokens to buy.  The most significant of these segments is
2 when Curry can be seen working on an ice sculpture of a Bored Ape.  While it is
3 unclear whether other NFT projects are being referenced in this commercial, it is
4 obvious that Curry is concurrently promoting BAYC NFTs given the unmistakable
5 similarity to the art style of the BAYC NFT collection and the ice sculpture that Curry
6 is working on.  This promotion did not include any disclosure or disclaimer
7 concerning the connection between FTX and Yuga (via Defendants Wu or
8 Sotheby's), who had significant overlapping financial interests.  Instead, the
9 commercial encouraged uninformed investors to invest into digital assets like the
10 BAYC NFTs, while at the same time giving a "wink" disclaimer that this was not
11 financial advice to attempt to provide Curry with plausible deniability regarding his
12 promotion of the Yuga Financial Products.

13    282.   Defendant Curry also directly promoted BAYC NFT #7990 as his social
14 media profile picture.  The NFT itself was transferred to wallet address
15 0x3becf83939f34311b6bee143197872d877501b11, which is labeled "SC30."  Upon
16 information and belief, this wallet is owned or controlled by either Defendant Curry
17 or Curry's investment company "SC30" (or both).  According to OpenSea, BAYC
18 NFT #7990 was transferred to a wallet that has been publicly labeled as "SC30."[253]

19    283.   Plaintiffs saw Curry's thinly-veiled promotion of the collection of
20 BAYC NFTs in the FTX commercial, as well as Curry's promotion of Yuga securities
21 on his social media account.  Plaintiffs were induced to purchase and/or continue to
22 hold Yuga securities as a result of this misleading promotion.

23    284.   Approximately one month later, on April 26, 2022, Defendant Oseary
24 submitted a proposal to the Ape DAO titled: "AIP Idea: Guy Oseary as ApeCoin
25 Representative," which essentially requested that Oseary be given up to 1% of the

---

[253]   *Bored Ape Yacht Club #7990*, OPENSEA, https://opensea.io/assets/eth
ereum/0xbc4ca0eda7647a8ab7c2061c2e118a18a936f13d/7990 (last visited Dec. 4,
2022).

FIRST AMENDED CLASS ACTION COMPLAINT - CASE NO. 2:22-cv-08909-FMO-PLA

Ecosystem Fund as a slush fund for him to "utilize on behalf of the APE Foundation."[254]  The proposal is listed below:

ABSTRACT

This document proposes to make me, Guy Oseary, a representative of ApeCoin. This role will make it my job to support ApeCoin through impactful partnerships and initiatives. I will not receive any payment for my services.

\*       \*       \*

Web3 is more than just digital. The coin that will power your metaverse experience will also be powering your real-life experience. You could earn ApeCoin in the metaverse and use it as payment to attend a show by your favorite artist. Pay for a hotel with it one day and meet your friends there virtually. We are at the very early days here. Keeping ApeCoin solely in the metaverse would limit it.

***The request is for an allocation of 1% of the Ecosystem Fund for me to spend strategically on opportunities and partnerships that benefit the brand and community.*** These initiatives could include – but are not limited to – events, partnerships, and projects across gaming, TV, film, and music. ***To execute on this successfully, it is important for me to be able to engage in individual negotiations discreetly, driving more favorable terms and costs that result in higher ROI.***

RATIONALE

To promote a diverse and self-sustaining ecosystem, ApeCoin should be so ubiquitous that it's part of mainstream culture. It's my core belief that ApeCoin can lead the way in bringing more people, companies, and brands to web3, and that we can do so in an inclusive way that reflects the ApeCoin DAO values.

A LITTLE ABOUT ME

My experience in working with brands across entertainment and tech allows me to be uniquely positioned to make strategic decisions and leverage my network to close exceptional deals for ApeCoin.

---

[254]   Guy Oseary (@guyoseary), *AIP Idea: Guy Oseary as ApeCoin Representative*, APECOIN.COM (Apr. 26, 2022), https://forum.apecoin.com/t/aip-idea-guy-oseary-as-apecoin-representative/5153.

I am an entrepreneur, tech investor, and talent manager. As a teen, I started my career as an A&R executive and later as a partner in Maverick Records. We sold over 100 million albums before selling the company to Warner Music.

I've been working with and supporting artists ever since — for over 30 years now. My passion and personal interests over the last few decades have placed me at the intersection of entertainment and tech. I've been investing with my partner and friend Ashton Kutcher, who is also my co-founder in A-Grade Investments, Sound Ventures, and Sound Ventures Blockchain. Our early-stage investments include Airbnb, Uber, Spotify, Calm, Robinhood, Gitlab, Duolingo, Superrare, Opensea, and many others.

***I am also currently working with or a partner with some of the best NFT talent, including Bored Ape Yacht Club, Mutant Ape Yacht Club, CryptoPunks, Meebits***, World of Women, Sandbox, Pixel Vault, Beeple, and 10KTF.

Empowering artists and protecting them from day 1 has been a priority for me. Today, one of the most powerful tools to enable that is web3. ***I was fortunate to be one of the contributors to ApeCoin***. Like you, I was inspired by this amazing community and I've been supporting it from the moment I understood how far it can go. I want it to succeed and I'm incentivized to do all that I can to ensure that it does.

SPECIFICATIONS
Up to 1% of the Ecosystem Fund as a budget for me to utilize on behalf of the APE Foundation.

- This will only be spent on purchases and deals that directly benefit the APE Foundation.
- Any ROI gained from deals I make will go back into the Ecosystem Fund.
- Any ApeCoin from this budget that is not used during the specified period will be returned to the Ecosystem Fund.
- I will not receive any payment for my services.
- I will consult with the Board about potential deals.

FIRST AMENDED CLASS ACTION COMPLAINT - CASE NO. 2:22-cv-08909-FMO-PLA

- Details on all purchases and deals that I make will be made fully available to the ApeCoin DAO community after the fact via quarterly transparency reports that detail how much was spent, on what, and why.
- This is separate from the budgets allocated in AIP-3.

STEPS TO IMPLEMENT

1. Cartan to set up a separate Coinbase account and transfer 1% of the Ecosystem Fund.
2. Set up the account so that one of the ApeCoin DAO Board members must approve transactions.
3. Execute commercial services agreement with Ape Foundation.

TIMELINE

This would go into effect immediately if this AIP passes and would last until the next fiscal calendar closes at the end of 2023.

OVERALL COST

Up to 1% of the Ecosystem Fund, from when the proposal passes through Dec 31, 2023.[255]

285.    On April 27, 2022, Defendant Adidas promoted Phase 2 of the joint BAYC and Adidas collaboration of Adidas Metaverse NFTs.[256]  The NFT featured a moving image of a Bored Ape avatar wearing a yellow Adidas tracksuit.  The back of the image prominently featured the Company's BAYC logo.  According to the Adidas "Frequently Asked Questions" for the "Metaverse" section of its website, investors in Adidas x BAYC Into the Metaverse NFTs were entitled to claim "physical products designed in collaboration with adidas Originals [and] Bored Ape

---

[255]    *Id.*

[256]    *adidas Originals: into the Metaverse (Phase 2)*, OPENSEA, https://opensea.io/assets/ethereum/0x28472a58a490c5e09a238847f66a68a47cc76f0f/1 (last visited Dec. 4, 2022).

FIRST AMENDED CLASS ACTION COMPLAINT - CASE NO. 2:22-cv-08909-FMO-PLA

Yacht Club" as a part of Phase 2.[257]  Adidas created a false sense of urgency with the purchase of the Adidas Metaverse NFTs by putting a time limit on claiming the Adidas x BACY physical products.  Investors only had from April 28, 2022 to May 18, 2022 to claim these BAYC-related products.[258]  According to the website, "If you have an Into the Metaverse NFT, then claiming the physical merch is completely free."[259]

286.    On April 30, 2022, a few days after the Adidas promotion and Oseary's proposal, the Company minted the virtual land for its Otherside metaverse.  Within 24 hours, Yuga, Oseary, the Executive Defendants, and the Ape DAO Board Defendants generated more than $561 million from Otherside's "Otherdeed" NFT sales.  Each Otherdeed NFT is meant to be the "key to claiming land" in Otherside and its metaverse game.

287.    Some 55,000 NFTs were minted at 305 APE each, which means each Otherdeed cost about $5,800 given ApeCoin's price (approximately $19) at time of mint.  Yuga raked in over $318.7 million from this mint alone.  To add insult to injury, the minting process itself was poorly planned and executed, resulting in investors having to pay over approximately $8,000 in Ethereum gas fees, making the true cost being around $13,000 per Otherdeed.

288.    According to data from *CryptoSlam*, Otherdeed has already seen over $242 million in total secondary volume traded.  Of that figure, over $190 million was on OpenSea.[260]

---

[257]    *FAQ: Physical Product Claims*, ADIDAS.COM (last visited Aug. 3, 2023), https://www.adidas.com/metaverse/faq.

[258]    *Id*.

[259]    *Id*.

[260]    Kate Irwin, *Yuga Labs See $561 Million in Otherside Ethereum NFT sales Within 24 hours*, DECRYPT (May 1, 2022), https://decrypt.co/99156/yuga-labs-sees-561-million-in-otherside-ethereum-nft-sales-within-24-hours

289.   Due to the high number of NFTs and higher demand, the Otherdeed mint, which began at 9:00 pm EST Saturday night, immediately caused an Ethereum gas[261] war.  According to reports on the Otherdeed sale, "[t]raffic on block explorer Etherscan also led to reports that the site wasn't working for many users.  Worse, gas fees suddenly spiked to thousands of dollars per transaction."[262]  Indeed, while some were able to get their transactions processed within a few hours for a couple hundred dollars in gas fees, "others reported paying upwards of $4,000 for a single transaction. (The average gwei, or price of Ethereum gas, over the course of the night was over 6,000, *roughly 100 to 200 times normal*.)."[263]

290.   Otherside-related transactions have consumed over 64,000 ETH in gas fees at the time of this writing, which is almost $180 million.  Critics of Yuga's land sale pointed out that fees would not have to be that bad had Yuga implemented a few backend optimizations.

291.   Influencer and MoonPay investor Alexander Pall claimed to have bought two BAYC NFTs along with his bandmate Andrew Taggart.  Pall touted the "power moves" that Yuga was making giving investors IP rights "to the people that bought those things."  "While . . . they are incredibly expensive, it was a . . . fun social experiment and I think that's a lot of what you are seeing in crypto."[264]

292.   After the Otherside minting, the Company and BAYC held "ApeFest 2022" in New York, which like ApeFest 2021, was billed and promoted as an

---

[261]   The term "gas" in the crypto context refers to a unit describing the amount of computational power needed to execute specific operations on the network.  Because every Ethereum transaction (which included ApeCoin and Yuga NFT transactions) consumes computational resources, transactions come with a cost.  Gas is the fee needed to conduct an Ethereum transaction.

[262]   Irwin, *supra*. n.260.

[263]   *Id*.

[264]   Banklesshq   (@banklesshq),   TikTok   (June   21,   2022), https://www.tiktok.com/@banklesshq/video/7111625644068326699?is_from_webapp=v1&item_id=7111625644068326699.

1    exclusive event for only BAYC and MAYC NFT owners.[265]  Defendant Broadus and

2    Eminem performed as the closing act of ApeFest 2022, where they dropped a new

3    track and music video featuring their Bored Apes.[266]  BAYC and MAYC NFT holders

4    could use ApeCoin to purchase exclusive ApeFest 2022 merchandise featuring

5    Broadus and Eminem.[267]

6        293.  On July 16, 2022, Yuga published a "Litepaper" describing the

7    Otherside metaverse project.  The Litepaper acknowledged that nearly all significant

8    functionality had not yet been developed and that purchases of Otherside land would

9    thus need to rely on Yuga's efforts to develop the metaverse.[268]

10        294.  On September 7, 2022, the Ape Foundation announced that it was

11    seeking a three-month extension for the Ape DAO Board Defendants' six-month

12    inaugural term.[269]  In the letter to the "ApeCoin Community," the Ape Foundation

13    stated that "the community hasn't submitted any viable AIPs specifying what this

14    handover looks like, who might take over, or how we might conduct an election.  This

15    suggests the original election specifications were ambiguous."[270]  Accordingly, the

16    Ape Foundation proposed to extend the term, claiming that keeping the Ape DAO

17    Board Defendants in their positions would "provide continuity and stability: the

18    Foundation doesn't just execute what the community wants – it makes sure we are

19

20    [265]    Bored Ape Yacht Club (@BoredApeYC), TWITTER (June 7, 2022, 6:27 PM),
     https://twitter.com/BoredApeYC/status/1534346420341424128.
21    [266]    Bored Ape Yacht Club (@BoredApeYC), TWITTER (June 27, 2022, 2:00 PM),
22    https://twitter.com/BoredApeYC/status/1541526909951033347.
     [267]    Bored Ape Yacht Club (@BoredApeYC), TWITTER (June 23, 2022, 7:02 PM),
23    https://twitter.com/BoredApeYC/status/1540153474851246080.
24    [268]    *The Otherside Litepaper*, OTHERSIDE (July 16, 2022),
     https://otherside.xyz/litepaper.
25    [269]    Swensonk7, *The Ape Foundation Announced That Its Term Is Almost Up and*
26    *That They Want a 3 Month Extension*, THE BORED APE GAZETTE (Sep. 7, 2022),
     https://www.theboredapegazette.com/post/the-ape-foundation-announced-that-its-
27    term-is-almost-up-and-that-they-want-a-3-month-extension.
28    [270]    *Id.*

1  compliant with legal and regulatory requirements and guidance so we can operate
2  effectively."[271]  The letter proposal concluded by directing investors with questions
3  to speak with Ape DAO Board Defendant Bajwa.

4      295.  That same day, Defendant Wu posted the following message on her
5  Twitter account: "Grateful for a dynamic 6 month serving on the first @apecoin DAO
6  Special Council!  We are asking the community for an extension of 3 months to focus
7  on ironing out a first election process that balances continuity, fairness, and
8  transparency."[272]  Wu's post linked to "AIP-113: Extending AIP-1 – the DAO
9  Process," which "propose[d] a three-month extension of the terms laid out in AIP-1
10 to (1) provide time for the development of a proper and thorough Ape Foundation
11 election framework and process; (2) allow the community to better understand and
12 ultimately engage with whatever process emerges; and (3) enable the DAO to
13 continue functioning coherently beyond September 30."[273]

14     296.  On November 11, 2022, Defendant Wu resigned from her position as
15 the leader of FTX's investment arm following the revelations that FTX executives
16 had been improperly commingling investor assets and receiving personal loans from
17 the FTX hedge fund, Alameda Research.  Replacement CEO John Ray III (known as
18 the person brought in to clean up the Enron bankruptcy), in a filing with the Delaware
19 bankruptcy court, stated the following regarding FTX's Lehman Brothers-style
20 collapse that occurred during Wu's tenure:

21

22  [271]  *Id*.
23  [272]  Amy   Wu   (@amytongwu),   TWITTER   (Sep.   7,   2022   1:20   P.M.),
    https://twitter.com/amytongwu/status/1567563499156676608?s=20&t=ptw4dASRf
24  -r2XQWNZIM-EQ
25  [273]  btang, *AIP-113: Extending AIP-1 – the DAO Process*, APECOIN.COM (Sep. 7,
    2022),   https://forum.apecoin.com/t/aip-113-extending-aip-1-the-dao-process/8236.
26  Notably, AIP-113 was submitted by user "btang" and authored by Animoca.  Btang
    also proposed the staking protocol for ApeCoin.  Btang is also the founder of the
27  Cartan Group LLC, a small consulting company operating out of the Cayman Islands,
28  which, pursuant to AIP-1, receives $150,000 per month in consulting fees.

Never in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here . . . From compromised systems integrity and faulty regulatory oversight abroad, to the concentration of control in the hands of a very small group of inexperienced, unsophisticated and potentially compromised individuals, this situation is unprecedented.[274]

297.    Wu was a senior executive at FTX during the time it suffered from an "unprecedented and complete failure of corporate controls."  Eight days after resigning from FTX, on November 19, 2022, Wu announced that she would not continue to serve as an Ape DAO Board member after the expiration of her one-year term in December 2022.[275]  The announcement further disclosed that Defendant Bajwa and board member Dean Steinbeck also resigned from the Ape DAO Board under the same terms.

298.    Another way that Yuga Labs promoted sales of its BAYC NFT collection and ApeCoin tokens was through films.  On April 11, 2022, Yuga announced that the Company and Coinbase would be collaborating to produce a three-part movie series, the "Degen Trilogy", to promote BAYC and ApeCoin.  The first installment was released in June 2022 at the 4th annual "NFT.NYC" event.[276]  The Company later published this first part of the trilogy on YouTube on July 26, 2022.  As part of the movie trilogy promotion, the Company announced there was a "casting call" to holders of BAYC (and teased a second casting call for holder of the

---

[274]    Michelle Chapman, *FTX's new CEO worked on Enron's bankruptcy but he's still never seen such a 'complete failure' and 'absence of trustworthy financial information'*, FORTUNE (Nov. 17, 2022), https://fortune.com/2022/11/17/ftx-bankruptcy-filing-john-ray-never-seen-complete-failure-sam-bankman-fried/.

[275]    *Three ApeCoin Council Members Won't Run Again*, LUCKYTRADER (Nov. 19, 2022), https://luckytrader.com/news/three-ape-coin-council-members-won-t-run-again.

[276]    *Coinbase to Produce Bored Ape Yacht Club NFT Movie Trilogy*, WAYA (Apr. 24, 2022), https://waya.media/coinbase-to-produce-bored-ape-yacht-club-nft-movie-trilogy/.

112

Mutant Apes NFTs), to submit their NFTs to be considered for use in the film.  The owners of the selected NFTs would earn a licensing fee of $10,000 worth of Bitcoin or ApeCoin.[277]

299.   According to the description of Degen Trilogy: Part 1, it is a "three-part film from the biggest names in crypto and you, the community.  Enter a ragtag bunch of Degens.  Each with their own special skills and their own hidden objectives.  All chasing the same goal—ApeCoin."  The description further declared that "if they don't make it, we're not gonna make it.  Here begins the era of the Degens.[278] This failed attempt of a movie trilogy was a thinly veiled attempt to market both projects to the public and boost their value. In all likelihood that was the plan from its inception.

300.   After the release of this first part of the promotional trilogy, the project was canceled at the end of 2022 after a poor reception by the broader NFT community, which was still reeling from the collapse of FTX.

301.   ApeCoin was misleadingly promoted as being able to be used for sale of luxury goods, unique pieces of media, and other well-known brands.  On March 19, 2022, Snoop Dogg tweeted (retweeted by ApeCoin) that he would be releasing an "all Ape mixtape" that was "only 4 $Ape holders !!!".[279]

302.   On March 20, 2022, Time Magazine announced that it would be accepting ApeCoin for digital subscriptions.[280]  On March 23, 2022 online casino

---

[277]   *Id.*; Bored Ape Yacht Club (@BoredApeYC), Twitter (Apr. 11, 2022 12:00 PM), https://twitter.com/BoredApeYC/status/1513592766307225600?s=20.

[278]   Coinbase, *The Degen Trilogy: Part 1*, YOUTUBE (July 26, 2022), https://www.youtube.com/watch?v=I26DE3c48rY&ab_channel=Coinbase.

[279]   Snoop Dogg (@SnoopDogg), TWITTER (Mar. 19, 2022 9:31 PM), https://twitter.com/SnoopDogg/status/1505401536511324160.

[280]   Aaron Limbu, *Time Magazine to Start Accepting ApeCoin*, BLOCKCHAIN.NEWS (Mar. 21, 2022), https://blockchain.news/news/time-magazine-to-start-accepting-apecoin.

1  BetOnline tweeted (retweeted by ApeCoin) that it would begin accepting ApeCoin
2  for its online sportsbook and casino.[281]

3      303.   On April 30, 2022, the ApeCoin twitter announced that OpenSea is now
4  accepting ApeCoin to make NFT purchases on the platform.[282]  According to the
5  current version of the Help Center on OpenSea, however, does not list ApeCoin as
6  a core currency you can use on the platform.[283]  Searching for ApeCoin on the
7  OpenSea Help Center yields zero results.[284]

8      304.   On August 2, 2022, ApeCoin tweeted that Gucci would begin to allow
9  customers to pay for purchases in store with ApeCoin.[285]  Likewise on August 4,
10  2022, ApeCoin retweeted a tweet from luxury watch brand Tag Heuer that it would
11  also be accepting ApeCoin.[286]

12     305.   On August 18, 2022, the ApeCoin twitter confirmed that Defendant
13  Oseary had onboarded Gucci and Tag Heuer as part of his AIP-36 promotion.  It is
14  unclear whether Gucci or Tag Heuer ever actually allowed customers to make in-
15  store payments using ApeCoin as the promotions were never followed up with by
16  either brand.  A search for ApeCoin on both the Gucci and Tag Heuer websites yields
17  zero results.  In any event, the tweet from Tag Heuer has since been deleted.[287]

18

---

19  [281]   BetOnline.ag (@betonline_ag), TWITTER (Mar. 23, 2022 12:32 PM),
20  https://twitter.com/betonline_ag/status/1506715522125078529.
21  [282]   ApeCoin (@apecoin), TWITTER (Apr. 30, 2022 6:41 AM),
    https://twitter.com/apecoin/status/1520397829323182080?s=20.
22  [283]   *What Currencies can I use on OpenSea?*, OPENSEA (last visited Aug. 3, 2023),
23  https://support.opensea.io/hc/en-us/articles/1500003082521-What-currencies-can-I-
    use-on-OpenSea-
24  [284]   *Search Results*, https://support.opensea.io/hc/en-us/search?utf8=%E2%9C%9
25  3&query=apecoin.
    [285]   ApeCoin (@apecoin), TWITTER (Aug. 2, 2022 7:19 AM),
26  https://twitter.com/apecoin/status/1554472012139085825.
27  [286]   ApeCoin (@apecoin), TWITTER (Aug. 4, 2022 8:16 PM),
    https://twitter.com/apecoin/status/1555392202968268806.
28  [287]   *Search Results*, https://twitter.com/TAGHeuer/status/1554532900590292996.

*       *       *

306.   Ultimately, as one marketing report noted, the BAYC NFT collection (and Yuga itself) "would have never become so popular if it wasn't for its aggressive and engaging social media marketing strategies, particularly on Twitter."[288]

### 3.   Other Manipulation of the Price and Market for Yuga Financial Products

307.   Like the cryptocurrency industry, the NFT industry is plagued by illicit trading activity.  Wash trading, or transactions in which a seller is on both sides of the trade in order to paint a misleading picture of an asset's value and liquidity, is a particular area of concern for NFTs.  Throughout the Class Period, this practice was especially easy with NFTs, including the Yuga NFTs, as many NFT trading platforms allowed users to trade by simply connecting their various wallets to the platform, with no need to demonstrate arm's length transactions.

308.   "Circular Trades" are well-known techniques used by wash traders, in which the same wallets repeatedly buy and sell the same or different NFT.  The process involves the transfer of funds between two wallets to create fake trading volume, making it appear as if the NFT is being actively traded.  Circular trading undermines the integrity of the market by creating false demand, misleading investors and affecting the prices.

309.   In the "Seller Funded" washing trading pattern, the seller provides funds to facilitate the sale of the NFT in the marketplace.  The fake transactions in Seller Funded wash trading inflates the volume and the price of the NFT artificially.  The illusion of high demand drives up the price, especially when the purported purchaser is a celebrity or influential taste maker.

---

[288]   *3 Lessons To Learn From The Incredible Success Of Bored Ape Yacht Club NFTs*, DIGITALNOD (Mar. 29, 2022), https://digitalnod.co/blog/3-lessons-to-learn-from-bored-ape-yacht-club-nfts/.

310. "Outlier transactions" are another form of wash trades. Outlier transactions occur when parties trade at highly inflated prices outside of the overall pattern of trades. Outlier transactions can significantly deviate the average value of prices paid for an NFT, especially if it was a supposed celebrity purchase.

311. Through these methods, pervasive wash trading has artificially inflated the price and volume of the Yuga NFTs. BAYC #8099, for example, exhibits signs of wash trading.[289] Researchers found that related wallets significantly increased the price from $95,000 to $166,000 in transactions between them, before selling the artificially inflated priced NFT into the market. These inflated transactions affect volume figures and sales averages and create a misleading picture for investors about the popularity of the NFT collections.

312. The wash trading problem in the NFT industry has been extensively studied by researchers and blockchain companies. Researchers with MIT and Columbia University, for example, put out a research paper entitled NFT Wash Trading Detection.[290] In addition to BAYC NFT #8099, the researchers specifically identified BAYC NFTs #6946, 1332, 8498, 5862, and 8259 as having their price increased due to wash sales cycles. Even when using conservative detection techniques, researchers flagged 72 wash sales cycles for BAYC NFTs, 52 wash sale cycles for Mutant Apes, and 29 wash sales cycles for Otherdeeds.

313. Likewise, Zash, a company that launched a "Wash Trading Detection Service" also identified BAYC NFT #3221 has exhibiting signs of wash trading.[291]

---

[289] On the Mark Data, *Using Network Graphs to Visualize Potential Fraud on Ethereum Blockchain*, MEDIUM (Dec. 20, 2022), https://onthemarkdata.medium.com/using-network-graphs-to-visualize-potential-fraud-on-ethereum-blockchain-1d8cc0ad361d.

[290] Derek Liu, et al., *NFT Wash Trading Detection*, MIT AND COLUMBIA UNIV. (Feb. 7, 2023), https://arxiv.org/pdf/2305.01543.pdf.

[291] *Zash Launches 'Wash Trading Detection Service'*, COINMARKETCAP (Dec. 22, 2022), https://coinmarketcap.com/community/articles/63a509afd16ae879abc15cb8/.

1    Furthermore, the Zash article highlights BAYC NFTs #947, 1763, 8739, and 3738 as

2    exhibiting wash trading identifiers.  Zash found that for BAYC NFTs #3221 and

3    8738, over 60% of transactions were identified as suspected wash trades.  Likewise,

4    the trading volume from suspected wash traded BAYC NFTs accounted for 96-99%

5    of all trading volume associated with those NFTs.

6          314.   Zash also found that, for 30 days on the OpenSea platform, over 5% of

7    the Mutant Ape NFT trading volume was from suspected wash trades.

8          315.   Moreover, according to a report issued by *CoinTelegraph Research*

9    entitled "bitsCrunch NFT Wash Trade Report for 2022," Yuga's Otherdeeds NFT

10    collection was ranked as a Top 10 collection of 2022 by number of wash traded

11    NFTs.[292]

12          316.   NFT wash trades are particularly prevalent in new NFT marketplaces

13    that offer reward tokens based on the volume traded.  These marketplaces incentivize

14    wash trading behavior, making it easier for traders to engage in this fraudulent

15    activity to skew prices and the market data.  Manipulative trading on one platform

16    can impact prices on other platforms.  Indeed, the *CoinTelegraph Research* report

17    identified wash trading patterns effectuated on incentivized platforms later harming

18    victims on NFT exchanges like OpenSea.

19          317.   LooksRare is one of the largest incentivized NFT platforms, launching

20    in January 2022.  LooksRare was created by two anonymous co-founders: "Zodd"

21    and "Guts."   High levels of buying and selling of NFTs results in $LOOKS

22    rewards.  The *CoinTelegraph Research* report revealed that a staggering 96% of the

23    total volume traded on LooksRare was wash trade volume.  John Egan, CEO of

24    L'Atelier, an independent subsidiary of BNP Paribas that researches new

25    technologies, characterized the transactions on LooksRare reviewed by Reuters as

26

---

27  [292] *bitsCrunch NFT Wash Trade Report for 2022*, COINTELEGRAPH RESEARCH

28  (2022), https://research-backend.cointelegraph.com/uploads/attachments/clgcb40t96
zp5zyqn1qto49k8-bitscrunch-nft-wash-trade-report-for-2022-ct-team-0-2-3.pdf.

1  "wash trades" that would be banned in traditional markets like equities or debt
2  because they give a false impression of demand for an asset.[293]

3       318.   Importantly, Yuga Financial Asset whale connected to Binance and
4  FTX, Dinghau Xiao (Dingaling), also serves as a key advisor to LooksRare.  Xiao is
5  considered one of LooksRare's biggest advocates.  LooksRare did a private sale
6  where investors could send a maximum 37.5 ETH for an ownership interest in
7  LooksRare.[294]  Xiao's Dingaling address was LooksRare's first investor listed on the
8  blockchain for these transactions.  There were also newly created anonymous wallets
9  that put in the max value of 37.5 ETH, all sourced from Binance and for the sole
10 purpose of participating in the LooksRare private sale.  In fact, Xiao is believed to be
11 the true identity of one of LooksRare's anonymous founder, Zodd.[295]

12      319.   Shortly after the launch of LooksRare, in February 2022, Xiao became
13 the largest holder of Yuga assets.[296]  By the time of the ApeCoin air drop in March
14 2022, Xiao acquired 113 Bored Ape NFTs, 98 Mutant Ape NFTs, and 110 Kennel
15 Club NFTs.  His airdrop was over 1.43 million ApeCoin.

16      320.   After minting so many Bored Ape NFTs in the initial mint, Xiao's
17 Dingaling wallet began to purchase Bored Ape NFTs far above the floor price in the
18 lead up to the Mutant Ape NFT launch.  On August 21, 2021, when the floor price
19 was just 14.9, Xiao purchased 11 Bored Apes NFTs from 10:35am to 10:37am.  Each
20 of these purchases was significantly above the floor price, from 21.89 ETH to 22.5
21 ETH.  By August 24, 2021, the Bored Ape NFT floor price had risen to 23.25.

22

23

24

25  [293]    Elizabeth Howcroft, *Unreal demand? Irregular sales worth billions fire up wild NFT market*, REUTERS (Feb. 6, 2022), https://www.reuters.com/article/fintech-nft-looksrare-idCAKBN2KC0FZ.
26
27  [294]    Kitonyi, *supra* n.15.
28  [295]    *Id.*
    [296]    THE BORED APE GAZETTE, *supra* n.13.

321.   Importantly, Xiao is a vocal supporter of wash trading, at one time calling it "genius."[297]   Indeed, immediately after the launch of LooksRare, Xiao tweeted:[298]

> I see a lot of people talking about the wash trading on @LooksRareNFT.   So is it actually happening? Yes. Is it by design? Probably.  Is it a bad thing?  I don't think so.  In fact, I think its genius.

322.   In an interview with *Reuters*, Xiao, under his dingaling alias, admitted to being an investor and advisor to LooksRare, stated that the wash trading looked bad but may be part of the "necessary steps" to gain market share.  He further was quoted as saying "'People have been real mad about wash trading, but I'm struggling to understand why.  It's a free market."[299]

323.   By February 3, 2022, just weeks after LooksRare launched, Bored Ape NFTs had already amassed $42.1 million on LooksRare's platform.[300]   Price floors rose significantly during this time.  On January 9, 2022, before LooksRare launched, the floor prices of the Yuga NFTs were 67 ETH for Bored Apes, 13.4 ETH for Mutant Apes, and 4.987 ETH for Kennel Clubs.  By February 3, 2022, the significant amount of NFT wash trading from Xiao's LooksRare platform caused the floor prices to rise to 98 ETH for Bored Apes, 19.8 ETH for Mutant Apes, and 8.35 ETH for Kennel Clubs.

---

[297]   Kitonyi, *supra* n.15.

[298]   Dingaling   (@dingalings),   TWITTER   (Jan.   11,   2022   9:26   PM), https://twitter.com/dingalingts/status/1481135479940874241.

[299]   Howcroft, *supra* n.293.

[300]   Alyssa Exposito, *OpenSea monthly volumes top $5B as NFTs continue to mainstream*,   COINTELEGRAPH   (Feb.   3,   2022), https://cointelegraph.com/news/opensea-monthly-volumes-top-5b-as-nfts-continue-to-mainstream.

324.   Recently, LooksRare and MoonPay announced a multi-year partnership.[301]

325.   In sum, Yuga's failure to register the Yuga Financial Products led to the pervasive practices whereby bad actors, including those closely connected to Defendants, were able to manipulate prices and effectuate the scheme identified herein to inflate the price of the Yuga Financial Products.

326.   These manipulative techniques, and more, were also used by MoonPay and Ivan Soto-Wright as part of their orchestrated pump of the price of the Yuga Financial Products.

327.   MoonPay itself, and Soto-Wright personally, traded in Yuga NFTs while having material non-public information about the celebrity endorsement deals and the sources of the funds used for these purchases.

328.   Soto-Wright made these purchases through his "IvanHodl.eth" wallet. The IvanHodl wallet was funded by the Moonpay.eth wallet as well as by the Ethereum wallet address 0x7AFC12C8DD2e6591581D95586eB2c2A4905a12a9 (the "Funding" Wallet).

329.   The Moonpay.eth wallet was funded by the Funding Wallet, as well as wallets associated with Binance and FTX.  Wallets associated with FTX provided millions of dollars' worth of ETH during the Class Period, much of which was used in the various transactions identified below that were effectuated to artificially inflate the price and trading volume of Yuga NFTs.

330.   To begin, on August 30, 2021, Ivan Soto Wright purchased Mutant Ape NFT #3016 for 9.899 ETH ($31,958.53), a price far exceeding the floor price, which

---

[301]   Jamie Redman, *Moonpay and Looksrare Partner to Bring Convenient NFT Purchasing to the Masses*, BITCOIN.COM (Feb. 9, 2023), https://news.bitcoin.com/moonpay-and-looksrare-partner-to-bring-convenient-nft-purchasing-to-the-masses/.

FIRST AMENDED CLASS ACTION COMPLAINT - CASE NO. 2:22-cv-08909-FMO-PLA

1    was around 5 ETH at the time ($13,300).  Mutant Apes NFTs were first released two

2    days prior, on August 28, 2021.

3          331.   On September 18, 2021, Soto Wright purchased a BAYC NFT for 45

4    ETH ($154,609.20), a price far above the floor price.  The then-present floor price

5    was approximately 35 ETH (~$119,000).

6          332.   On September 24, 2021, Soto-Wright purchased two Kennel Club NFTs,

7    one for 13 ETH ($38,101.18) and one for 3.18 ETH ($9,320.13), each above the floor

8    price, with the 13 ETH purchase being approximately 4.5 times the then-present floor

9    price of 2.85 ETH.

10         333.   On October 5, 2021, Soto-Wright purchased a BAYC for 65 ETH

11   ($228,545.85), when the floor price was 38.5 ETH ($130,395.65).

12         334.   On October 25, 2021, Soto-Wright purchased a Bored Ape for 35.97

13   ETH ($147,582), which was above the floor price.

14         335.   On October 27, 2021, MoonPay purchased a BAYC NFT above the

15   floor price.  The next day, MoonPay transferred this BAYC NFT to Lil Baby, a hip

16   hop star that was part of MoonPay's Series A funding round.

17         336.   On November 8, 2021, MoonPay purchased a Bored Ape NFT for 46.6

18   ETH, far exceeding the floor price of 30 ETH.  Less than ten minutes later, this NFT

19   was transferred to Jimmy Fallon.

20         337.   On November 11, 2021, MoonPay purchased a Bored Ape NFT for 54

21   ETH, far exceeding the floor price of 30 ETH.

22         338.   On November 15, 2021, MoonPay purchased a Mutant Ape NFT above

23   the floor price.

24         339.   Also on November 15, 2021, at approximately 7:34 PM, MoonPay

25   purchased a Bored Ape NFT for 250 ETH, a price that was many multiplies of the

26   floor price.  Thereafter at 8:27pm, MoonPay purchased a Bored Ape NFT at 50 ETH,

27   which was also significantly higher than the floor price.  Two minutes later at 8:29

28

FIRST AMENDED CLASS ACTION COMPLAINT - CASE NO. 2:22-cv-08909-FMO-PLA

PM, MoonPay purchased a Bored Ape NFT for 55 ETH. Three minutes later at 8:32 PM, MoonPay purchased a Bored Ape NFT for 45 ETH. One minute later at 8:33 PM, MoonPay purchased a Bored Ape NFT for 50 ETH. At 8:51 PM, MoonPay purchased a Bored Ape NFT for 44.9 ETH. Finally, at 8:53 PM, MoonPay purchased a Bored Ape NFT for 48.88 ETH. Each of these transactions were significantly above the then-current floor price. The floor price of Bored Apes rose dramatically in the wake of these manipulative trades, rising from 30 ETH on November 13, 2021 to around 39 ETH on November 16, 2021.

340. On November 18, 2021, MoonPay purchased a Bored Ape NFT for 60 ETH. The price floor went from 39 ETH on November 16, 2021 to 49 ETH on November 19, 2021.

341. On November 26, 2021, MoonPay purchased a Bored Ape NFT for 69 ETH, far exceeding the floor price of 43.7 ETH.

342. On November 27, 2021, MoonPay purchased a Bored Ape NFT for 55.5 ETH, again significantly higher than the 43.7 ETH floor price.

343. On December 3, 2021, MoonPay purchased a Bored Ape NFT for 70 ETH, far above the floor price of 49 ETH.

344. On December 7, 2021, MoonPay purchased one BAYC NFT, two Mutant Apes, and one Kennel Club NFT for 85 ETH. This purchase was far above what would have been a combined floor price of approximately 63.53 ETH for the four Yuga NFTs.

345. On December 23, 2021, MoonPay purchased a Bored Ape NFT for 54.44 ETH, far above the price floor of 49 ETH.

346. On January 1, 2022, MoonPay purchased a Bored Ape NFT for 65.2 ETH, significantly above the price floor of 58 ETH.

347. On January 6, 2022, MoonPay purchased a Mutant Ape NFT for 18.95 ETH, far exceeding the floor price of 14 ETH.

348.  On January 7, 2022, MoonPay purchased a Mutant Ape NFT for 19.4 ETH, significantly above the floor price of approximately 14 ETH.

349.  On January 9, 2022, MoonPay purchased a Bored Ape NFT for 79.5 ETH, far exceeding the floor price of 67 ETH.

350.  On January 11, 2022, MoonPay purchased a BAYC NFT for 80 ETH, far exceeding the floor price of 67 ETH.  Less than 15 seconds later, MoonPay purchased a BAYC NFT for 90 ETH, again far exceeding the 67 ETH floor price.

351.  On January 14, 2022, MoonPay purchased a BAYC NFT for 79 ETH, far exceeding the 74 ETH floor price.  Later that day, MoonPay made a purchase of a BAYC NFT for 111 ETH, once again significantly exceeding the 74 ETH floor price.

352.  To make all of these purchases, as noted above, the Moonpay.eth wallet was being funded by the Funding Wallet, as well as wallets associated with FTX and Binance.  On January 21, 2022, in two transactions, an FTX wallet sent 647 ETH and 249 ETH to the Moonpay.eth wallet address.

353.  On January 22, 2022, MoonPay made a purchase of a BAYC NFT for 119 ETH, far exceeding the floor price of 83 ETH.

354.  On January 24, 2022, MoonPay made a purchase of a BAYC NFT for 93.69 ETH, far exceeding the floor price of 83 ETH.

355.  On January 26, 2022, MoonPay made a purchase of a BAYC NFT for 105 ETH, far exceeding the floor price of 83 ETH.

356.  On February 9, 2022, MoonPay purchased a BAYC NFT for 100 ETH, which exceeded the floor price.  Also on February 9, 2022, MoonPay received 124 ETH from the Binance wallet.

357.  On February 11, 2022, MoonPay received 250 ETH from the FTX wallet.  Thereafter on February 13, 2022, MoonPay received approximately 300 ETH from the FTX wallet in three transactions.

358.   On February 16, 2022, MoonPay purchased a BAYC NFT for 105 ETH, far exceeding the floor price of 97 ETH.  On February 17, 2022, MoonPay received 250 ETH from the FTX wallet.

359.   On February 18, 2022, MoonPay won an auction to buy a BAYC NFT for 200 WETH ("wrapped" eth), which far exceeded the price floor of approximately 97 ETH.

360.   On February 22, 2022, MoonPay made a purchase of a BAYC NFT for 120 ETH, significantly above the floor price of 89 ETH.  Also on February 22, 2022, MoonPay received 100 ETH from the FTX wallet.

361.   On February 23, 2022, MoonPay made a purchase of a BAYC NFT for 95 ETH, far exceeding the floor price of 89 ETH.  Also on February 23, 2022, MoonPay received 99 ETH from the FTX wallet.

362.   On February 25, 2022, MoonPay purchased a BAYC NFT for 569 ETH, approximately $1.5 million, which was many multiples of the then-current floor price of 89 ETH.  Also on February 25, 2022, MoonPay received 550 ETH from the FTX wallet.

363.   On March 2, 2022, MoonPay purchased a BAYC NFT for 112.5 ETH, significantly above the floor price of 82 ETH.  Also on March 2, 2022, MoonPay received 192 ETH from the Binance wallet.

364.   On March 8, 2022, MoonPay received 75 ETH from the FTX wallet.

365.   On March 9, 2022, MoonPay purchased a BAYC NFT for 86.9 ETH, far exceeding the floor price of 65 ETH.  Less than 20 minutes later, MoonPay purchased another BAYC significantly above the floor price for 77 ETH.  Also on March 9, 2022, MoonPay received 160 ETH from the FTX wallet.

366.   On March 10, 2022, MoonPay received 284 ETH in two transactions from the FTX wallet.  On March 11, 2022, MoonPay received 150 ETH from the FTX wallet.

FIRST AMENDED CLASS ACTION COMPLAINT - CASE NO. 2:22-cv-08909-FMO-PLA

367.   On March 13, 2022, MoonPay purchased a BAYC NFT for 100 ETH, significantly above the floor price of 70 ETH.

368.   On March 14, 2022, MoonPay purchased a BAYC NFT for 180 ETH, a price far exceeding the floor price of 88.16 ETH.  The floor price rose from 70 ETH on March 13, 2022 to 88 ETH on March 16, 2022.  Also on March 14, 2022, MoonPay received 125 ETH from the FTX wallet.

369.   On March 15, 2022, MoonPay received 88 ETH from the FTX wallet.  On March 16, 2022, MoonPay received 12 ETH from the FTX wallet.

370.   On March 17, 2022, MoonPay purchased three BAYC NFTs in the span of a minute.  These purchases, at 106.9 ETH, 108 ETH, and 108.4 ETH, were all significantly above the floor price of approximately 88 ETH.  Also on March 17, 2022, MoonPay received 322 ETH from the FTX wallet.

371.   On March 21, 2022, MoonPay made a purchase of a BAYC NFT for 110  ETH, far exceeding the floor price of 77 ETH.  Also on March 21, 2022, MoonPay received 110 ETH from the FTX wallet.

372.   On March 23, 2022, MoonPay received 115 ETH from the FTX wallet.  On March 29, 2022, MoonPay received 217 ETH from the FTX wallet.  On April 2, 2022, MoonPay received 42 ETH from the FTX wallet in two transactions.  On April 3, 2022, MoonPay received 6.9 ETH from the FTX wallet.  On April 5, 2022, MoonPay received 200 ETH from the FTX wallet.

373.   On April 6, 2022, MoonPay purchased a BAYC NFT for 195 ETH, a price significantly higher than the floor price of 107 ETH.  Also on April 6, 2022, MoonPay received 194 ETH from the FTX wallet.

374.   On April 9, 2022, MoonPay made a purchase of a BAYC NFT for 130 ETH, far exceeding the floor price of 105 ETH.

375.   On April 17, 2022, MoonPay made a purchase of a BAYC NFT for 130 ETH, far exceeding the floor price of 101 ETH.  Also on April 17, 2022, MoonPay received 130 ETH from the FTX wallet.

376.   On April 20, 2022, MoonPay made a purchase of a BAYC NFT for 155 ETH, significantly higher than the floor price of approximately 101 ETH.  Also on April 20, 2022, MoonPay received 155 ETH from the FTX wallet.

377.   On April 22, 2022, MoonPay made a purchase of a BAYC NFT for 129.99 ETH, significantly exceeding the floor price of approximately 108 ETH.

378.   On April 23, 2022, MoonPay received 45 ETH from the FTX wallet.

379.   On April 25, 2022, Soto-Wright received one Otherside Land NFT as part of a mint of 360 Otherside NFTs.  This insider mint was five days before the public mint on April 30, 2022.

380.   On April 30, 2022, MoonPay made a purchase of a BAYC NFT for 265 ETH, a price far exceeding the floor price of 128 ETH.  Also on April 30, 2022, MoonPay received transfers of 155 ETH and 265 ETH from the FTX wallet.

381.   On May 13, 2022, MoonPay received 100 ETH from the FTX wallet.  On May 16, 2022, MoonPay received 150 ETH from FTX.

382.   On May 19, 2022, MoonPay made a purchase of a BAYC NFT for 169.69 ETH, a significantly higher price than the floor price of approximately 92 ETH.  Also on May 19, 2022, MoonPay received 97 ETH from the Binance wallet.

383.   On May 19, 2022, MoonPay made a purchase of a BAYC NFT for 97 ETH, which was again above the floor price.

384.   On June 7, 2022, MoonPay made a purchase of a BAYC NFT for 103 ETH, significantly above the floor price of around 86 ETH.  Also on June 7, 2022, MoonPay received 100 ETH from the FTX wallet.

FIRST AMENDED CLASS ACTION COMPLAINT - CASE NO. 2:22-cv-08909-FMO-PLA

385.   On July 5, 2022, MoonPay made a purchase of a BAYC NFT for 125 ETH, significantly above the floor price of 88.16 ETH.   Also on July 5, 2022, MoonPay received 125 ETH from the Binance wallet.

386.   MoonPay continued to receive transfers from FTX in the summer of 2022, before FTX began experiencing the liquidity issues that ultimately led to its downfall.   After receiving just 1 ETH on October 17, 2022, and just 3 ETH on October 27, 2022, the ETH transfers from FTX stopped.   Without the steady flow of liquidity from FTX, MoonPay was unable to continue to manipulate the price of the Yuga NFTs, leading to significant drop in value and price floor among the collections.

**C.     The Dump – The price of Yuga Securities plummets**

387.   The meteoric rise of the BAYC NFTs did not last long, and the floor price of the BAYC NFT collection began to deflate from its artificially inflated high after the failed launch of the BAYC metaverse with the botched sale of virtual land in the Otherside on April 30, 2022. With celebrity promoters distancing themselves from the Yuga Financial Products; the disclosure of the U.S. Securities & Exchange Commission ("SEC") investigation of Yuga; the implosion of FTX and Alameda; and further regulatory scrutiny of unregistered securities sold as crypto assets on exchanges like Coinbase and Binance, the value of the Yuga Financial Products dropped significantly.

388.   In June 2022, exchanges that provided investors yield on their crypto investments began to experience liquidity issues and lock users out.   Voyager, was one of the largest such platforms, and was one of the few platforms where investors could earn yield on their ApeCoin.   On June 22, 2022, Voyager announced that it had significant exposure to bankrupt hedge fund Three Arrows Capital, raising significant

1    survivability concerns at the exchange.[302]  In response, the price of ApeCoin dropped
2    from 4.37 to $3.97, or approximately 9%.

3        389.   By August 2022, the MoonPay outlier transactions propping up the
4    prices had ceased.  Fewer and fewer celebrities were promoting Bored Apes and the
5    Yuga ecosystem. Without the celebrities endorsing the Yuga assets and without floor
6    prices and volumes being pumped by MoonPay, the Yuga Financial Products each
7    suffered diminution in value with decreased sales volume and fewer unique buyers.[303]
8    All of the Yuga Financial Products hit visible low points between August 19th and
9    23rd.  The Bored Ape NFT floor price dropped from 82.48 ETH on August 10, 2022
10   to 66.9 ETH on August 23, 2022.  The Mutant Ape NFT floor price also fell from
11   15.25 ETH on August 10, 2022, to a floor price of 11 ETH on August 19, 2022.  The
12   Kennel Club NFT floor price also dropped from 7.99 ETH on August 10, 2022, to
13   5.990 ETH on August 19, 2022.  The Otherdeed NFTs fell from a floor price of 2.02
14   ETH on August 7, 2022 to a floor price of 1.47 ETH on August 22, 2022.  Likewise,
15   ApeCoin dropped from $7.56 on August 5, 2022 to $4.64 on August 28, 2022.

16       390.   In September 2022, the price of ApeCoin and the Yuga NFTs dropped
17   significantly in anticipation of a significant token unlock for "launch contributors" of
18   ApeCoin.   In the 30 days prior to the unlock, ApeCoin dropped 26%.[304]   On

---

22   [302]    Sheldon Reback & Michael Bellusci, *Voyager Digital Plunges on Three
23   Arrows Exposure, Analyst Downgrade*, COINDESK (Jun. 22, 2022),
     https://www.coindesk.com/business/2022/06/22/voyager-digital-requests-loan-
24   repayment-from-3ac-considers-issuing-default-notice/.
25   [303]    Herman Hayes, *Purchases at Bored Ape Yacht Club Fall by 90% to 16-Month
     Low*, BITKAN (Oct. 8, 2022), https://bitkan.com/news/purchases-at-bored-ape-yacht-
26   club-fall-by-90-to-16-month-low-5479.
27   [304]    Andrew Hayward, *ApeCoin Treasury Set to Unlock 25 Million APE Tokens for
     Launch Contributors*, DECRYPT (Sept. 16, 2022), https://decrypt.co/109939/apecoin-
28   treasury-unlock-25m-ape-tokens?amp=1.

1 September 16, 2022 alone ApeCoin dropped approximately 9% in advance of the
2 unlock on September 17, 2022.[305]

3     391.   On October 11, 2022, *Bloomberg* reported that the SEC was conducting
4 an investigation of Yuga Labs over whether the sales of its digital assets violate
5 federal securities laws.[306] *Bloomberg* reported that the SEC was examining whether
6 certain NFTs are more akin to stocks and should follow the same disclosure rules.
7 *Bloomberg* also reported that the SEC was investigating the distribution of ApeCoin.
8 Yuga told *Bloomberg i*n a statement that it was "fully cooperating" with the inquiry.
9 In response to the news regarding the SEC investigation, the ApeCoin token dropped
10 approximately 14%.[307]

11     392.   Yuga's NFTs likewise dropped in value in the wake of the disclosure of
12 the SEC investigation.  The Bored Ape NFT floor price dropped from 75.5 ETH on
13 October 10, 2022 to 72.421 ETH on October 15, 2022.  The Mutant Ape NFT price
14 floor dropped from 14.96 ETH on October 10, 2022 to 13.440 on October 13, 2022.
15 The Kennel Club NFTs dropped from a floor price of 6.39 ETH on October 10, 2022
16 to 5.750 by October 17, 2022.  The Otherside NFTs likewise dropped from a price
17 floor of approximately 1.6 ETH on October 10, 2022 down to 1.11 ETH on October
18 21, 2022.

19     393.   The downfall of FTX had an impact on the Yuga Financial Products.
20 When both FTX and Alameda Research filed for Chapter 11 Bankruptcy on
21 November 11, 2022, each of the Yuga Financial Products had a material drop in value

---

23 [305]    *Id.*
24 [306]    Matt Robinson, *Bored-Ape Creator Yuga Labs Faces SEC Probe Over*
25 *Unregistered Offerings*, BLOOMBERG (Oct. 11, 2022),
26 https://www.bloomberg.com/news/articles/2022-10-11/bored-ape-creator-yuga-labs -faces-sec-probe-over-unregistered-offerings#xj4y7vzkg.
27 [307]    Andrew Hayward, *ApeCoin Sinks 10% After Report of SEC Probe Into Bored*
28 *Apes Creator Yuga Labs*, DECRYPT (Oct. 11, 2022), https://decrypt.co/111682/apecoin-crashes-sec-probe-bored-ape-yuga-labs.

1    in the days leading up to and following the announcement.  At the time of the
2    bankruptcy, FTX and Alameda held a number of Yuga Financial Products, which
3    were now at risk of being subject to forced liquidation in the bankruptcy.

4    394.   At the time of the FTX meltdown, users identified dozens of Yuga NFTs
5    that were held by FTX/Alameda that could be subject to liquidation or auction in
6    connection with the bankruptcy.[308]  On April 26, 2023, a director of Coinbase tweeted
7    that NFTs belonging to Alameda/FTX were transferred to a multi-signature wallet
8    belonging to the liquidator.[309]   32 BAYC NFTs were identified as being affected,
9    including especially rare tokens in the form of four "trippy" Apes, three "gold" apes,
10   and one "suited" ape.  29 Otherside NFTs were also affected, as were two Mutant
11   Apes NFTs, three M1 mutant serum NFTs, and three M2 mutant serum NFTs.

12   395.   On November 5, 2022, prior to the disclosure of the liquidity issues with
13   FTX, the BAYC NFT floor price was 64.8 ETH.  In the wake of the FTX bankruptcy,
14   the floor price of the BAYC NFT fell to a Class Period low of 50 ether (*i.e.*,
15   approximately $62,000) on November 14, 2022.  The floor price continued to drop,
16   reaching 48 ETH on November 17, 2022.  Prices continued to drop, reaching a Class
17   Period low of 28.49 ETH (approximately $55,201.63) on July 2, 2023.  This is down
18   from the all-time high of 153.70 ETH (or $420,430) that occurred in the midst of the
19   celebrity promotions and as MoonPay was manipulating prices with its outlier
20   transactions on April 30, 2022.

21   396.   The same is true for Yuga's Mutant Apes, which had a floor price of 11
22   ETH prior to the FTX disclosures.  Following the FTX and Alameda bankruptcy, the
23   floor price of Mutant Apes dropped to 8.99 ETH on November 17, 2022.  Mutant

---

[308]    Dr.Jones   (@DrJones0305),   TWITTER   (Nov.   18,   2022   2:19   AM),
https://twitter.com/DrJones0305/status/1593730628972863494?s=20&t=IHy6PXZg
DHgX-Sc5h6rmRg.
[309]    Oluwapelumi Adejumo, *FTX takes control of NFTs worth over $4M*,
CRYPTOSLATE   (Apr.   27,   2023),   https://cryptoslate.com/ftx-takes-control-of-nfts-
worth-over-4m/.

Apes had a floor price high of 40.0 ETH ($109,416) on April 30, 2022 in the midst of the celebrity promotions and MoonPay outlier transactions.  Since the FTX disclosures, the floor price continued to drop, reaching a low of 4.88 ETH ($9,475.49) on July 2, 2023.

397.   Likewise, the floor price of the Otherdeed NFT dropped from 1.192 ETH on November 5, 2022 to 0.8 ETH on November 17, 2022.  The Otherdeed floor price went from a Class Period high of 5.0 ETH (about $14,149.94) on May 1, 2022 all the way down to a low of 0.592 ETH (worth only $1,100.59) on July 27, 2023.

398.   Prices for the Bored Ape Kennel Club likewise dropped from a floor price of 4.69 ETH on November 5, 2022 to 3.65 ETH on November 17, 2022.  Kennel Club NFTs reached a Class Period high of 10.4 ETH on April 27, 2022, but have since dropped to Class Period lows of 1.85 ETH on July 3, 2023.

399.   Similarly, the FTX disclosures caused a significant drop in the price of ApeCoin. On November 5, 2022, ApeCoin traded at $5.10 per token, and dropped to $2.70 by November 13, 2022.  Trading volume of ApeCoin likewise decreased to $160.7 million,  down a staggering 99.7% from its high point during the Class Period of $5.5B on April 28, 2022:

131



## V. THE YUGA FINANCIAL PRODUCTS ARE SECURITIES UNDER *HOWEY*

400.   The SEC Framework provides guidance for analyzing whether a digital asset has the characteristics of one particular type of security – an "investment contract." As explained in the SEC Framework:

> The U.S. Supreme Court's ***Howey*** case and subsequent case law have found that an "investment contract" exists when there is the investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others.  The so-called "***Howey*** test" applies to any contract, scheme, or transaction, regardless of whether it has any of the characteristics of typical securities.  The focus of the ***Howey*** analysis is not only on the form and terms of the instrument itself (in this case, the digital asset) but also on the circumstances surrounding the digital asset and the manner in which it is offered, sold, or resold (which includes secondary market sales).  Therefore, issuers and other persons and entities engaged in the marketing, offer, sale, resale, or distribution of any digital asset will need to analyze the relevant transactions to determine if the federal securities laws apply.[310]

---

[310]    SEC Framework §I (footnotes omitted).

132

401.   The SEC Framework makes clear that "[w]hether a particular digital asset at the time of its offer or sale satisfies the *Howey* test depends on the specific facts and circumstances."[311]   The specific facts and circumstances relating to Yuga support the conclusion that the Yuga Financial Products are securities under the *Howey* test.

### A.   Yuga Financial Products Investors Invested Money Securities

402.   The SEC Framework states that: "The first prong of the *Howey* test is typically satisfied in an offer and sale of a digital asset because the digital asset is purchased or otherwise acquired in exchange for value, whether in the form of real (or fiat) currency, another digital asset, or other type of consideration."[312]

403.   Plaintiffs and the Class invested fiat, including U.S. dollars, and digital currencies, such as Bitcoin and Ethereum, to purchase Yuga Financial Products.  As explained below in the SEC Framework, investment of both fiat and digital currency meets the first prong of *Howey*.

404.   Defendants sold Yuga Financial Products to retail investors through global, online cryptocurrency exchanges during various on-going, continuous offerings.

405.   Every purchase of Yuga Financial Products by a member of the public was an investment contract.

### B.   Yuga Financial Products Investors Were Intertwined in a Common Enterprise with Defendants

406.   The profits of each investor in Yuga Financial Products are inextricably intertwined with the Company by virtue of the 2.5% royalty fee that the Company retains on every resale of a Yuga NFT.  Moreover, the success of the Bored Ape ecosystem and its native token ApeCoin depended entirely on the efforts of the

---

[311]   *Id.*, §II.
[312]   *Id.*, §II(A) (footnote omitted).

FIRST AMENDED CLASS ACTION COMPLAINT - CASE NO. 2:22-cv-08909-FMO-PLA

Company, Executive Defendants, and Ape DAO Board Defendants.  These same Defendants also held a significant number of Yuga Financial Products, which gave them the same so-called "skin in the game" as Plaintiffs and the Class.

407.   The SEC Framework states that "[i]n evaluating digital assets, we have found that a 'common enterprise' typically exists."[313]   The SEC Framework also elaborates: "Based on our experiences to date, investments in digital assets have constituted investments in a common enterprise because the fortunes of digital asset purchasers have been linked to each other or to the success of the promoter's efforts."[314]

408.   Yuga Financial Products are no exception to the SEC Framework's observation regarding the "common enterprise" element of the *Howey* test.  The prospective profits of Plaintiffs and the Class, if any, are intertwined with the fortunes of Yuga, its founders, and the Executive Defendants. Executive Defendants have conceded that Yuga used the funds from its ApeCoin to partially fund its operations. The Company, its founders, the Executive Defendants, and the Company's investors additionally issued themselves millions of ApeCoin tokens with value inextricably linked to Yuga's efforts.

409.   Additionally, investors were passive participants in the Yuga Financial Products' continuous offering, and the profits of each Plaintiff, and the Class were intertwined with those of Defendants and of other investors.

410.   The Executive Defendants also were responsible for supporting the Yuga Financial Products, pooled investors' assets, and controlled those assets.

411.   Further, Defendants held a significant stake in the Yuga Financial Products, and thus shared in the profits and risk of the project.

---

[313]    *Id*., §II(B) (footnote omitted).
[314]    *Id.* at n.11 (citing *SEC v. Int'l Loan Network, Inc.*, 968 F.2d 1304, 1307 (D.C. Cir. 1992)).

## C. Investors Purchased the Yuga Financial Products with a Reasonable Expectation of Profit from Owning Them

412.   With respect to the element of "reasonable expectation of profits," the SEC Framework states that "[a] purchaser may expect to realize a return through participating in distributions or through other methods of realizing appreciation on the asset, such as selling at a gain in a secondary market."[315]

413.   Investors in the Yuga Financial Products, including Plaintiffs and the Class, made their investment with a reasonable expectation of profits.  The primary purpose for purchasing Yuga Financial Products was to make a profit or accumulate interest.

414.   The SEC Framework lays out a number of characteristics informative of whether the "reasonable expectation of profits" element is met.  The SEC Framework states that "[t]he more the following characteristics are present, the more likely it is that there is a reasonable expectation of profit . . . ."[316]  Based on the facts above, each and every characteristic identified by the SEC Framework is present in the case of the Yuga Financial Products:

- The digital asset gives the holder rights to share in the enterprise's income or profits or to realize gain from capital appreciation of the digital asset.

- The opportunity may result from appreciation in the value of the digital asset that comes, at least in part, from the operation, promotion, improvement, or other positive developments in the network, particularly if there is a secondary trading market that enables digital asset holders to resell their digital assets and realize gains.

*     *     *

---

[315]    *Id.*, §II(C).

[316]    SEC Framework, §II(C)(2).

- The digital asset is transferable or traded on or through a secondary market or platform, or is expected to be in the future.

- Purchasers reasonably would expect that [the Defendants'] efforts will result in capital appreciation of the digital asset and therefore be able to earn a return on their purchase.

- The digital asset is offered broadly to potential purchasers as compared to being targeted to expected users of the goods or services or those who have a need for the functionality of the network.

- The digital asset is offered and purchased in quantities indicative of investment intent instead of quantities indicative of a user of the network.   For example, it is offered and purchased in quantities significantly greater than any likely user would reasonably need, or so small as to make actual use of the asset in the network impractical.

- There is little apparent correlation between the purchase/offering price of the digital asset and the market price of the particular goods or services that can be acquired in exchange for the digital asset.

- There is little apparent correlation between quantities the digital asset typically trades in (or the amounts that purchasers typically purchase) and the amount of the underlying goods or services a typical consumer would purchase for use or consumption.

- The [Defendants have] raised an amount of funds in excess of what may be needed to establish a functional network or digital asset.

- The [Defendants are] able to benefit from [their] efforts as a result of holding the same class of digital assets as those being distributed to the public.

- The [Defendants] continue[] to expend funds from proceeds or operations to enhance the functionality or value of the network or digital asset.

136

- The digital asset is marketed, directly or indirectly, using any of the following:

  o The expertise of [Defendants] or [their] ability to build or grow the value of the network or digital asset.

  o The digital asset is marketed in terms that indicate it is an investment or that the solicited holders are investors.

  o The intended use of the proceeds from the sale of the digital asset is to develop the network or digital asset.

  o The future (and not present) functionality of the network or digital asset, and the prospect that [the Defendants] will deliver that functionality.

  o The promise (implied or explicit) to build a business or operation as opposed to delivering currently available goods or services for use on an existing network.

  o The ready transferability of the digital asset is a key selling feature.

  o The potential profitability of the operations of the network, or the potential appreciation in the value of the digital asset, is emphasized in marketing or other promotional materials.

  o The availability of a market for the trading of the digital asset, particularly where the [Defendants] implicitly or explicitly promise[] to create or otherwise support a trading market for the digital asset.[317]

**D. Investors Expected Profits from the Yuga Financial Products to Be Derived from the Managerial Efforts of the Executive Defendants**

415.  The SEC Framework explains:

When a promoter, sponsor, or other third party (or affiliated group of third parties) (each, an "Active Participant" or "AP") provides essential managerial efforts that affect the success of the enterprise, and investors reasonably expect to derive profit from those efforts, then this prong of the test is met.  Relevant to this

---

[317]   *Id.*

inquiry is the "economic reality" of the transaction and "what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect." The inquiry, therefore, is an objective one, focused on the transaction itself and the manner in which the digital asset is offered and sold.[318]

416.   Specifically, with respect to the element of "[r]eliance on the [e]fforts of [o]thers," the SEC Framework states:

The inquiry into whether a purchaser is relying on the efforts of others focuses on two key issues:

- Does the purchaser reasonably expect to rely on the efforts of a[] [promoter]?

- Are those efforts "the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise," as opposed to efforts that are more ministerial in nature?[319]

417.   Plaintiffs and the Class have entirely passive roles vis-à-vis the success of the Yuga Financial Products or the Bored Ape ecosystem. Rather, the success of the Bored Ape ecosystem, and the profits the Class reasonably expected to derive from investing in the Yuga Financial Products, are dependent on the essential technical, entrepreneurial, and managerial efforts of the Company, Executive Defendants, and the Ape DAO Board Defendants.

418.   For example, when NFT exchange OpenSea temporarily delisted numerous Bored Apes from its platform in June 2022, the Company, Executive Defendants, and Ape Dao Board Defendants used their managerial efforts to work with OpenSea to resolve the issue and ensure that it did not happen again.[320]

---

[318]   *Id.*, §II(C) (footnotes omitted).
[319]   *Id.*, §II(C)(1) (footnotes omitted).
[320]   Bored Ape Yacht Club (@BoredApeYC), TWITTER (June 29, 2022, 2:22 PM), https://twitter.com/BoredApeYC/status/1542257147794300930.

FIRST AMENDED CLASS ACTION COMPLAINT - CASE NO. 2:22-cv-08909-FMO-PLA

419.   And when issues arose with NFT purchases in March 2023, the Company, Executive Defendants, and Ape DAO Board Defendants used their managerial efforts to send ETH to the affected wallets "covering the difference between the amount paid and floor."[321]

420.   Plaintiffs and the Class reasonably expected Executive Defendants and Ape DAO Board Defendants to provide significant managerial efforts, to develop and improve the Bored Ape ecosystem, and to provide and/or secure exchanges through which Yuga Financial Products can be traded or liquidated.  Defendants repeatedly represented that they would provide significant managerial efforts to achieve these objectives and make Yuga Financial Products a profitable investment by developing and attracting users to the Bored Ape ecosystem.

421.   For example, in January 3, 2022, Yuga publicly stated that "we see ourselves as temporary stewards of [the BAYC] IP that is in the process of becoming more and more decentralized.  Our ambition is for this to be a community-owned brand, with tentacles in world-class gaming, events, and streetwear.  We think there's still work to be done to ensure that what we hand over to the community is in as strong a position as it can be."[322]

422.   Yuga used the proceeds of its sales and royalties of the Yuga Financial Products to purchase other valuable intellectual property, including CryptoPunks, one of the first and most valuable NFTs on the Ethereum blockchain.

423.   Yuga Financial Products therefore derives its value entirely from the usefulness and popularity of the Bored Ape ecosystem, which is in turn highly, if not entirely, dependent on the significant technical, entrepreneurial, and managerial efforts of the Company and Executive Defendants.  The purchase of Yuga Financial

---

[321]   Bored Ape Yacht Club (@BoredApeYC), TWITTER (Mar. 15, 2023, 8:20 PM), https://twitter.com/BoredApeYC/status/1636205752753836033.
[322]   Yuga Labs (@YugaLabs), Twitter (Jan. 3, 2022  12:27 PM), https://twitter.com/yugalabs/status/1478100705542131713?s=20.

Products is thus an investment in a common enterprise, with an expectation of profits, based upon the efforts of its promoter, the Defendants.

424.    The SEC Framework lays out a number of characteristics informative of whether the "[r]eliance on the [e]fforts of [o]thers" element is met.  The SEC Framework notes that "[a]lthough no one of the following characteristics is necessarily determinative, the stronger their presence, the more likely it is that a purchaser of a digital asset is relying on the 'efforts of others . . . .'"[323]  Based on the facts above, each and every characteristic identified by the SEC Framework is present in the case of the Yuga Financial Products:

- [Defendants are] responsible for the development, improvement (or enhancement), operation, or promotion of the network [and] purchasers of the digital asset expect [Defendants] to be performing or overseeing tasks that are necessary for the network or digital asset to achieve or retain its intended purpose or functionality.

- Where the network or the digital asset is still in development and the network or digital asset is not fully functional at the time of the offer or sale [both true of ApeCoin, the Otherside metaverse, and the Bored Ape ecosystem] purchasers would reasonably expect [Defendants] to further develop the functionality of the network or digital asset (directly or indirectly).  This particularly would be the case where an AP promises further developmental efforts in order for the digital asset to attain or grow in value.

- There are essential tasks or responsibilities performed and expected to be performed by [Defendants], rather than an unaffiliated, dispersed community of network users (commonly known as "decentralized" network).

- [Defendants] create[] or support[] a market for, or the price of, the digital asset.  This can include, for example, an AP that: (1) controls the creation and issuance of the digital asset; or (2) takes other actions to support a market price of the digital asset, such as

---

[323]    *Id.*, §II(C)(1).

FIRST AMENDED CLASS ACTION COMPLAINT - CASE NO. 2:22-cv-08909-FMO-PLA

by limiting supply or ensuring scarcity, through, for example, buybacks, "burning," or other activities.

- [Defendants] ha[ve] a lead or central role in the direction of the ongoing development of the network or the digital asset.   In particular, [Defendants] play[] a lead or central role in deciding governance issues, code updates, or how third parties participate in the validation of transactions that occur with respect to the digital asset.

- [Defendants] ha[ve] a continuing managerial role in making decisions about or exercising judgment concerning the network or the characteristics or rights the digital asset represents including, for example:

  o Determining whether and how to compensate persons providing services to the network or to the entity or entities charged with oversight of the network.

  o Determining whether and where the digital asset will trade. For example, purchasers may reasonably rely on [Defendants] for liquidity, such as where the [Defendants have] arranged, or promised to arrange for, the trading of the digital asset on a secondary market or platform.

  o Determining who will receive additional digital assets and under what conditions.

  o Making or contributing to managerial level business decisions, such as how to deploy funds raised from sales of the digital asset.

  o Playing a leading role in the validation or confirmation of transactions on the network, or in some other way having responsibility for the ongoing security of the network.

  o Making other managerial judgements or decisions that will directly or indirectly impact the success of the network or the value of the digital asset generally.

- Purchasers would reasonably expect [Defendants] to undertake efforts to promote [their] own interests and enhance the value of the network or digital asset, such as where:

141

- o [Defendants] ha[ve] the ability to realize capital appreciation from the value of the digital asset. This can be demonstrated, for example, if the [Defendants] retain[] a stake or interest in the digital asset. In these instances, purchasers would reasonably expect [Defendants] to undertake efforts to promote [their] own interests and enhance the value of the network or digital asset.

- o [Defendants] distribute[] the digital asset as compensation to management or [Defendants'] compensation is tied to the price of the digital asset in the secondary market. To the extent these facts are present, the compensated individuals can be expected to take steps to build the value of the digital asset.

- o [Defendants] own[] or control[] ownership of intellectual property rights of the network or digital asset, directly or indirectly.

425. [Defendants] monetize[] the value of the digital asset, especially where the digital asset has limited functionality

426. Here, the Yuga Financial Products exhibit all of these characteristics.

**E. Investors Would Not Reasonably Have Understood that the Financial Products Sold by Yuga Were Securities**

427. In connection with the launch of the Yuga Financial Products, Defendants made statements that reasonably led Plaintiffs and Class members to conclude that the Yuga Financial Products were not securities.

428. As a threshold matter, the Defendants refused to register any of the Yuga Financial Products with the SEC, which indicated to investors that these were not securities. No valid exemption from registration requirements existed for any of the Yuga Financial Products.

429. At the time of the launch of the Yuga Financial Products, the Company, Executive Defendants, and Ape DAO Board Defendants took advantage of the market's lack of understanding and awareness concerning how cryptocurrency projects work. Considering the new technology at issue and the Company's other

statements, many investors were understandably unaware that Yuga Financial Products had fundamentally different features than Bitcoin, which the SEC has determined is not a security.

430.   The Company also indicated that it would benefit financially and use the funds raised through the sale of the Yuga Financial Products to continue to fund the Bored Ape ecosystem and support the growth of the project.

431.   At the time the Yuga Financial Products were publicly released, Defendants took advantage of the market's lack of understanding and awareness concerning how this investment contract worked.  With promises that Yuga NFTs would outperform other NFT collections (and ApeCoin would outperform other digital assets), many individuals were unaware that the Yuga Financial Products had fundamentally different features than other cryptocurrencies, including being more centralized than something like Bitcoin.  One of these primary differences is that all Yuga Financial Products were issued by the Company and Executive Defendants at creation at very little economic cost – and enormous potential upside – to them.

432.   The creation of the Yuga Financial Products occurred through a centralized process, in contrast to something like Bitcoin.  This, however, would not have been apparent at issuance to a reasonable investor.  Rather, it was only after the passage of time and disclosure of additional information about the issuer's intent and process of management that a reasonable purchaser could have known that he or she had acquired a security.

433.   Purchasers were thereby misled into believing that the Yuga Financial Products were something other than securities, when they were securities.

434.   Accordingly, it was not apparent to a reasonable investor, at issuance, that the Yuga Financial Products were securities under the law, and a reasonable investor would not have believed they were securities.

**F. Application Of The SEC's 2019 Framework Indicates That The Yuga Financial Products are Securities**

435.   The Framework described how to analyze the various facts surrounding an ICO in making the determination of whether a given digital asset is a security.

436.   In particular, the Framework provides that the "inquiry into whether a purchaser is relying on the efforts of others focuses on two key issues: Does the purchaser reasonably expect to rely on the efforts of an [Active Participant or "AP"]? Are those efforts 'the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise,' as opposed to efforts that are more ministerial in nature?"[324]

437.   The Framework further notes that the "stronger the[] presence" of the following factors, "the more likely it is that a purchaser of a digital asset is relying on the 'efforts of others.'"[325]

438.   The first factor the SEC looked at was whether an AP is responsible for the development, improvement (or enhancement), operation, or promotion of the network, particularly if purchasers of the digital asset expect an AP to be performing or overseeing tasks that are necessary for the network or digital asset to achieve or retain its intended purpose or functionality.

439.   At the time of the launch of each of the Yuga Financial Products, the Executive Defendants, Ape DAO Board Defendants, MoonPay Defendants, and Defendants Sotheby's and Adidas actively marketed the launch and the tokens' growth and utilization prospects, thereby necessitating the continued managerial efforts of the Company, Executive Defendants, and Ape DAO Board Defendants. Where the network or the digital asset is still in development and the network or digital asset is not fully functional at the time of the offer or sale, purchasers would

---

[324]    *Id.*
[325]    *Id.*

1  reasonably expect an AP to further develop the functionality of the network or digital

2  asset (directly or indirectly).

3       440.   Another factor the Framework considers is whether the AP creates or

4  supports a market for, or the price of, the digital asset.  This includes, *inter alia*,

5  whether the AP "(1) controls the creation and issuance of the digital asset; or (2) takes

6  other actions to support a market price of the digital asset, such as by limiting supply

7  or ensuring scarcity, through, for example, buybacks, "burning," or other

8  activities."[326]

9       441.   As noted above, all of the Yuga Financial Products in circulation were

10  created at the direction of the Executive Defendants, the Ape DAO Board

11  Defendants, and/or Defendant Oseary.

12       442.   The framework further states that "[a]n AP has a continuing managerial

13  role in making decisions about or exercising judgment concerning the network or the

14  characteristics or rights the digital asset represents."[327]

15       443.   Here, the Company and Executive Defendants have discussed the long-

16  term prospects on extended frames, continually noting how the utilization of the

17  intellectual property rights granted to Yuga NFT owners will grow in the future as

18  the Company builds the Bored Ape ecosystem.  Likewise, the Company and

19  Executive Defendants have touted how the use for ApeCoin tokens as a method of

20  payment within the ecosystem will grow (and, in turn, increase the price of the

21  ApeCoin tokens).

22       444.   The ability to determine whether and where the digital asset will trade

23  is another factor discussed in the Framework.  For example, "purchasers may

24  reasonably rely on an AP for liquidity, such as where the AP has arranged, or

25

26

---

27  [326]   *Id.*

28  [327]   *Id.*

promised to arrange for, the trading of the digital asset on a secondary market or platform."[328]

445.   Here, the Executive Defendants and Sotheby's had access to and did manipulate the sales of Yuga Financial Products in the first days, which had a dramatic impact on the Yuga Financial Products' price and market.

446.   Another factor the Framework notes is whether the AP has the ability to determine who will receive additional digital assets and under what conditions.  This could be, for example, "[m]aking or contributing to managerial level business decisions, such as how to deploy funds raised from sales of the digital asset."[329]

447.   Here, the Company, Executive Defendants, and Ape DAO Board Defendants are the arbiters of funding for Yuga and the Bored Ape ecosystem.

448.   Making other managerial judgements or decisions that will directly or indirectly impact the success of the network or the value of the digital asset generally.

449.   The Framework also remarks that purchasers would reasonably expect the AP to undertake efforts to promote its own interests and enhance the value of the network or digital asset, including, but not limited to, the instances where the AP "has the ability to realize capital appreciation from the value of the digital asset.  This can be demonstrated, for example, if the AP retains a stake or interest in the digital asset." According to the SEC, in these instances, "purchasers would reasonably expect the AP to undertake efforts to promote its own interests and enhance the value of the network or digital asset."[330]

450.   Here, the Executive Defendants and Ape DAO Board Defendants retain a significant interest in the Company even after selling off many Yuga Financial Products at the height of the initial launch.

---

[328]     *Id.*

[329]     *Id.*

[330]     *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT - CASE NO. 2:22-cv-08909-FMO-PLA

451.   On May 7, 2021, on CNBC's "Squawk Box" television program, chairman of the SEC Gary Gensler stated that "a lot of crypto tokens – I won't call them cryptocurrencies for this moment – are indeed securities."[331]   In addition to being the Chairman of the SEC, Mr. Gensler is also a world renowned expert on cryptocurrencies and blockchain technology, having taught the "Blockchain and Money" course at the Sloan School of Management at the Massachusetts Institute of Technology ("MIT").[332]

452.   In a June 14, 2018 speech entitled "Digital Asset Transactions: When Howey Met Gary (Plastic)" that is available on the SEC's website,[333] the following observations were made on "when a digital transaction may no longer represent a security offering":

> If the network on which the token or coin is to function is sufficiently decentralized – where purchasers would no longer reasonably expect a person or group to carry out essential managerial or entrepreneurial efforts – the assets may not represent an investment contract.  Moreover, when the efforts of the third party are no longer a key factor for determining the enterprise's success, material information asymmetries recede.  As a network becomes truly decentralized, the ability to identify an issuer or promoter to make the requisite dis-closures becomes difficult, and less meaningful.
>
> And so, when I look at Bitcoin today, I do not see a central third party whose efforts are a key determining factor in the enterprise.  The

---

[331]   Jesse Point, *SEC Chairman Gary Gensler says more investor protections are needed for bitcoin and crypto markets*, CNBC (May 7, 2021), https://www.cnbc.com/   2021/05/07/sec-chairman-gary-gensler-says-more-investor-protections-are-needed-for-bitcoin-and-crypto-markets.html.

[332]   Lectures and Materials from Chairman Gensler's MIT course are available to the public for free at: https://ocw.mit.edu/courses/sloan-school-of-management/15-s12-blockchain-and-money-fall-2018/video-lectures/session-1-introduction/.

[333]   William Hinman, Director, Division of Corporation Finance, Remarks at the Yahoo Finance All Markets Summit, *Digital Asset Transactions: When Howey Met Gary (Plastic)* (June 14, 2018), https://www.sec.gov/news/speech/speech-hinman-061418.

network on which Bitcoin functions is operational and appears to have been decentralized for some time, perhaps from inception.

453.   A key factor in determining whether a digital asset is a security or not is whether there is a centralized entity behind the digital asset.[334]  The Company is a registered Delaware corporation since February 8, 2021 and has maintained itself as the centralized entity behind the Yuga Financial Products throughout their entire existence, notwithstanding the creation of the shell entity of the so-called Ape Foundation or Ape DAO.

## VI.    ADDITIONAL RELIANCE ALLEGATIONS

454.   Plaintiffs Titcher and Palombini saw the promotions by Sotheby's and the Company on the lead up to, during, and immediately following the auction of a lot of BAYC NFTs held on September 9, 2021.  These promotions of the auction and the winning bidder being a traditional art collector, the legitimacy of Yuga and its NFT collections, and the growth/adoption potential for Yuga Financial Products were a primary factor in inducing Titcher to make his first purchase of a MAYC NFT on August 29,  2021 and then continue to hold on to that NFT subsequently.  Similarly, the Sotheby's promotion induced Plaintiff Palombini to make his purchase on April 30, 2021.  Titcher and Palombini are well aware of Sotheby's longstanding reputation as one of the premier auction houses in the world and relied on the representations by the Company and Sotheby's regarding the auctions' legitimacy.   Titcher and Palombini reasonably believed that the fact that Sotheby's was conducting an auction of the BAYC NFTs was a positive indication of the Company's future growth prospects for its NFT collections.  In addition to Sotheby's, Titcher, Johnson, and Palombini are aware of *Rolling Stone* magazine and its reputation as a high-profile publication that acts as a cultural tastemaker, and they specifically saw the

---

[334]    *Id*. (noting that the "decentralized structure" of Bitcoin and Ethereum placed these digital assets outside the "disclosure regime of the federal securities laws").

Company's November 1, 2021 promotion of BAYC NFTs on the cover of *Rolling Stone*. Titcher, Johnson, and Palombini also saw Defendant Oseary's promotion of the same as being the "First @RollingStone NFT cover." These promotions furthered the marketing message from the Company and its insiders regarding the legitimacy of Yuga and the growth potential for Yuga Financial Products, and it was a primary factor in inducing Titcher to continue to hold onto his first purchase of a MAYC NFT as well as to inducing Titcher, Johnson, and Palombini purchase additional Yuga Financial Products subsequently. Titcher, Johnson, and Palombini reasonably believed these promotions to be a validation of the relevancy and legitimacy of the BAYC NFTs and Yuga as a NFT company with real staying power.

455. Titcher, Johnson, and Palombini are aware of Defendant Fallon from his many years as a famous comedian and television talk show host. Similarly, Titcher and Palombini know of Defendant Hilton from her years as a reality television star, as well as being the heiress to Hilton hotel empires. Titcher followed the social media accounts of Fallon and Hilton during the Class Period, and he and Palombini regularly saw posts from and about Fallon and Hilton on Twitter via the trending or discovery features of the platform. Titcher, Johnson, and Palombini were likewise aware of Defendant Winkelmann as being a famous contemporary digital artist. Titcher, Johnson, and Palombini were aware of the first promotion of the BAYC NFT collection and the statements by Defendants Fallon and Winkelmann regarding MoonPay during the November 11, 2021 episode of the *Tonight Show*, as well as the related promotions by Fallon (November 12, 2021; November 17, 2021), Winkelmann (November 11, 2021), and MoonPay (November 11, 2021) on their respective Twitter and/or Instagram accounts. Titcher and Palombini also saw the second promotion of the BAYC NFT collection and MoonPay occurring during the *Tonight Show* episode that aired on January 24, 2022, and the related promotions by Fallon (January 25, 2022), Hilton (January 24, 2022; January 25, 2022, January 31,

2022), MoonPay (January 24, 2022), and Universal (January 24, 2022). Titcher and Palombini reasonably believed that both Fallon and Hilton had purchased BAYC NFTs (as opposed to being given them in exchange for promoting the Company, MoonPay, and the Yuga Financial Products).  Further, Titcher and Palombini reasonably believed that Fallon's and Hilton's promotions on the *Tonight Show* were vetted and approved by Defendants Universal and EHD, since these promotions were being aired nationally to millions of viewers during the show and the *Tonight Show*'s official social media accounts continued to promote the segment after the show. These promotions induced Titcher to continue to hold onto his first purchase of a MAYC NFT as well as inducing Titcher and Palombini to purchase additional Yuga Financial Products subsequently.

456.   Titcher and Palombini are also avid music listeners, particularly of pop music.  Thus, Titcher and Palombini have been aware of Defendant Ciccone from her decades of being a world famous pop star.  Titcher and Palombini regularly sees posts from and about Ciccone on various social media platforms via the trending or discovery features of the platform.  Titcher and Palombini specifically saw Ciccone's March 24, 2022 promotion of Yuga Financial Products and MoonPay, which was also promoted on MoonPay's Twitter account on March 24, 2022.  This promotion induced Titcher to continue to hold onto his first purchase of a MAYC NFT as well as inducing Titcher and Palombini to purchase additional Yuga Financial Products subsequently, as he reasonably believed that Ciccone's professed enthusiasm for the Bored Ape ecosystem and purported use of the MoonPay concierge service was genuine.

457.   Titcher, Palombini, and Johnson similarly know of Defendants Post and Bieber from their successful careers as pop singers and often sees posts from and about these two Defendants on social media.  Palombini specifically saw Post's November 15, 2021 music video promoting the sale of BAYC NFTs via MoonPay

and MoonPay's promotion of Post's video the same day, and reasonably believed that this video depicted an actual purchase (or reenacted an actual purchase) of Yuga Financial Products by Post using the MoonPay service.  This promotion in particular induced Titcher to continue to hold onto his first purchase of a MAYC NFT as well as inducing Palombini to purchase additional Yuga Financial Products on April 30, 2022, May 2, 2022, May 5, 2022, and May 9, 2022.  Similarly, Titcher, Johnson, and Palombini specifically saw and relied on the January 31, 2022 promotion by Defendant Bieber that he had not only purchased a BAYC NFT, but had done so at price that was significantly above the then-current floor price for BAYC NFTs. Titcher, Johnson, and Palombini also saw Bieber's February 7, 2022 promotion of the BAYC NFT collection on his personal Twitter account. Titcher reasonably believed that Bieber genuinely purchased the BAYC NFTs at such a high price because Bieber determined that was the true value of the BAYC NFT and was making the purchase of the BAYC NFT was part of his multimillion-dollar investment strategy.  This promotion in particular induced Titcher to continue to hold onto his first purchase of a MAYC NFT as well as inducing Titcher, Palombini, and Johnson to purchase additional Yuga Financial Products when he otherwise would not have done so.

458.   Titcher and Palombini are keenly aware of Defendant Broadus from the latter's multi-decade career as a world-famous rapper and television personality. Titcher and Palombini followed Broadus' social media accounts during the Class Period.  Titcher and Palombini specifically saw Broadus' promotions of the BAYC NFTs and his Dr. Bombay BAYC NFT in February, May, June, and July of 2022. These promotions, in particular, caused Titcher and Palombini to believe in the future growth prospects for the Bored Ape ecosystem and to induce Titcher to continue to hold onto his first purchase of a MAYC NFT as well as to induce Titcher and

1    Palombini to purchase additional Yuga Financial Products when he otherwise would

2    not have done so.

3         459.   In addition, Titcher, Johnson, and Palombini are life-long fans of

4    professional sports, particularly basketball.  Titcher, Johnson, and Palombini are

5    aware of Defendant Curry as a world champion basketball player with significant

6    wealth and influence, Titcher, Johnson, and Palombini saw Curry's promotion of the

7    BAYC NFT collection within the FTX commercial posted on February 18, 2022.

8    Titcher also saw Curry's September 2, 2021 post in the BAYC Discord and believed

9    that Curry's participation with the BAYC Discord indicated a genuine interest as

10   opposed to being part of a manipulative promotional scheme.  Titcher, Johnson, and

11   Palombini reasonably believed that Curry was a legitimate purchaser of BAYC NFTs

12   with a genuine interest in the Bored Ape ecosystem, and that Curry had made his

13   purchase of the BAYC NFT as part of his multi-million dollar investment strategy.

14   These promotions in particular induced Titcher to continue to hold onto his first

15   purchase of a MAYC NFT as well as inducing Titcher, Johnson, and Palombini to

16   purchase additional Yuga Financial Products when they otherwise would not have

17   done so.

18        460.   The statements and promotions by Defendants Fallon, Winkelmann,

19   Hilton, Ciccone, Post, Bieber, Broadus, and Curry gave Plaintiffs the false impression

20   that these celebrities had purchased BAYC NFTs as investors, and that they were

21   making the Yuga Financial Products a part of their respective multimillion-dollar

22   investment strategies.  Each of these promotions, individually and collectively,

23   induced Titcher to make his purchases of Yuga Financial Products on March 17,

24   2022, April 29, 2022,  and May 1, 2022; Palombini to make his purchases of Yuga

25   Financial Products on April 30, 2022, May 2, 2022, May 5, 2022, and May 9, 2022;

26   and Johnson to make his purchases of Yuga Financial Products on February 1, 2022,

27   April 15, 2022, April 17, 2022, April 19, 2022, April 21, 2022, April 24, 2022, April

28

1   26-27, 2022, and April 29, 2022.  These promotions also induced Titcher to continue
2   to hold on to his MAYC NFT investment when he otherwise would not have done
3   so.

4       461.   Titcher and Palombini saw the promotions by Defendant Adidas
5   regarding the latter's collaboration with Yuga on the "adidas Originals: into the
6   Metaverse (Phase 2)" NFT project.  For example, Titcher and Palombini saw the
7   "ADIDAS X BORED APE YACHT CLUB – INTO THE METAVERSE"
8   promotional video that was published on the official BAYC YouTube channel on
9   December 11, 2021, which featured an animated Bored Ape avatar wearing the
10  trademark Adidas jumpsuit and skydiving into an Adidas logo.   Titcher and
11  Palombini also specifically saw Adidas' April 27, 2022 promotion of the same Bored
12  Ape avatar wearing the Adidas jumpsuit with a BAYC logo on the back.  Titcher and
13  Palombini reasonably believed the joint promotions by the Company and Adidas that
14  suggested the BAYC NFT collection had become mainstream and that future
15  collaborations with an established brand like Adidas were imminent.  These particular
16  promotions induced Titcher to make further purchases of Yuga Financial Products on
17  April 30, 2022, May 2, 2022, May 5, 2022, and May 9, 2022 and induced Palombini
18  to make his purchases of Yuga Financial Products on April 30, 2022, May 2, 2022,
19  May 5, 2022, and May 9, 2022.

20      462.   Titcher, Johnson, and Palombini also followed the Yuga Twitter account
21  (and related accounts controlled by Yuga and its insiders like the official BAYC
22  (@BoredApeYC), Otherside (@othersidemeta) accounts) during the Class Period
23  and saw the promotions that the Company, Executive Defendants Aronow and
24  Solano, and/or Ape DAO Board Defendants posted (or approved/caused to be posted)
25  on that platform.  For example, Titcher, Johnson, and Palombini saw and relied on
26  the statements by the Company and Executive Defendants Muniz and Lyons
27  contained in the March 16, 2022 press release for ApeCoin and the Otherside NFT

28

1   launch by the Company.  Similarly, Titcher, Johnson, and Palombini saw and relied

2   on the Company's March 19, 2022 promotional video for the Otherside NFT

3   collection when making their subsequent purchases of Yuga Financial Products.  The

4   misleading statements and omissions within these promotions from the Company and

5   Executive Defendants Aronow, Solano, Muniz, and Lyons, in conjunction with the

6   above-mentioned promotions from Defendants Fallon, Winkelmann, Hilton, Post,

7   Bieber, Ciccone, Broadus, and Curry induced Titcher to purchase Yuga Financial

8   Products on March 17, 2022, April 29, 2022,  and May 1, 2022; induced Palombini

9   to purchase Yuga Financial Products on April 30, 2022, May 2, 2022, May 5, 2022,

10  and May 9, 2022; Palombini to make his purchases of Yuga Financial Products on

11  April 30, 2022, May 2, 2022, May 5, 2022, and May 9, 2022; and Johnson to make

12  his purchases of Yuga Financial Products on February 1, 2022, April 15, 2022, April

13  17, 2022, April 19, 2022, April 21, 2022, April 24, 2022, April 26-27, 2022, and

14  April 29, 2022.

15          463.   Similarly, Titcher and Johnson followed the ApeCoin official twitter

16  page (which, upon information and belief, is owned and/or controlled by the Ape

17  DAO Board Defendants and/or the Company) and saw the March 16, 2022 promotion

18  introducing ApeCoin tokens to investors and touting this digital asset as being able

19  to be used for gaming and "commerce."  These promotions, in addition to the March

20  16 and March 19 promotions by the Company, Executive Defendant Muniz and

21  Lyons caused Titcher and Johnson to purchase Yuga Financial Products and to

22  continue to hold their investments in Yuga securities when they otherwise would not

23  have done so.

24          464.   Titcher, Johnson, and Palombini also saw the statements and promotions

25  from Defendants Aronow that were posted and/or reposted on various social media

26  platforms.  For example, Titcher and Johnson saw Defendant Aronow's August 21,

27  2021 Twitter post touting the approximately increase in of the BAYC NFTs' market

28

cap to $1 billion dollars. Titcher and Johnson reasonably believed Aronow's statement indicated that the price of Yuga Financial Products would continue to rise and that this increase was the result of genuine investor interest.  These misleading statements and omissions by Aronow induced Titcher, Johnson, and Palombini to purchase Yuga Financial Products and to continue to hold their investments in Yuga securities when they otherwise would not have done so.

## VII.   CLASS ACTION ALLEGATIONS

465.   Plaintiffs bring this action, individually and on behalf of a nationwide Class, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and/or 23(b)(3), defined as follows:

> All persons who, during the Class Period, purchased the Yuga Financial Products and were subsequently damaged thereby.

466.   The Class Period is defined as the period between April 24, 2021, and the present.[335]

467.   Excluded from the Class are: (a) Defendants; (b) Defendants' affiliates, agents, employees, officers and directors; (c) Plaintiffs' counsel and Defendants' counsel; and (d) the judge assigned to this matter, the judge's staff, and any member of the judge's immediate family.  Plaintiffs reserve the right to modify, change, or expand the Class definition set forth above based on discovery and further investigation.

468.   **Numerosity**: The Class is so numerous that joinder of all members is impracticable.  On December 1, 2022, there were more than 103,000 unique account holders of Yuga securities.

469.   **Commonality**: Common questions of law and fact exist as to all members of each Class.   These questions predominate over questions affecting

---

[335]   Plaintiffs reserve the right to expand or amend the Class Period based on discovery produced in this matter.

individual Class members.  These common legal and factual questions include, but are not limited to:

        a.     Whether the Executive Defendants with the Promoter Defendants fraudulently marketed the Yuga securities;

        b.     Whether Executive Defendants conspired to artificially inflate the price of the Yuga Financial Products and then sell the Yuga securities to unsuspecting investors;

        c.     Whether Defendants have been unjustly and wrongfully enriched as a result of their conduct;

        d.     Whether the proceeds that the Defendants obtained as a result of the sale of the Yuga Financial Products rightfully belong to Plaintiffs and Class members;

        e.     Whether Defendants should be required to return money they received as a result of the sale of Yuga Financial Products to Plaintiffs and Class members; and

        f.     Whether Plaintiffs and Class members have suffered damages, and, if so, the nature and extent of those damages.

470.  **Typicality**: Plaintiffs have the same interest in this matter as all Class members, and Plaintiffs' claims arise out of the same set of facts and conduct as the claims of all Class members.  Plaintiffs' and Class members' claims all arise out of uniform misrepresentations, omissions, and unlawful, unfair, and deceptive acts and practices related to the sale of Yuga Financial Products.

471.  **Adequacy**: Plaintiffs have no interests that conflict with the interests of the Class and are committed to pursuing this action vigorously.  Plaintiffs have retained counsel competent and experienced in complex consumer class action litigation.  Accordingly, Plaintiffs and their counsel will fairly and adequately protect the interests of the Class.

472.  **Superiority**: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and members of the Class. The injury suffered by each individual Class member is relatively small compared to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct.  It would be virtually impossible for individual Class members to effectively redress the wrongs done to them.  Even if Class members could afford individualized litigation, the court system could not. Individualized litigation would increase delay and expense to all parties, and to the court system, because of the complex legal and factual issues of this case. Individualized rulings and judgments could result in inconsistent relief for similarly situated individuals.   By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

473.  Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the Class as a whole.

## VIII.  PRESUMPTION OF RELIANCE

474.  Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)   the omissions and misrepresentations were material;

(c)   Yuga Financial Products are traded in an efficient market;

(d)   the Yuga Financial Products were liquid and traded with moderate to heavy volume during the Class Period;

(e)   the Yuga Financial Products traded on various national cryptocurrency exchanges in the United States;

(f)     the Company was covered by securities analysts;

(g)     the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Yuga Financial Products; and

(h)     Plaintiffs and members of the Class purchased, acquired, and/or sold Yuga Financial Products between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed without knowledge of the omitted or misrepresented facts.

475.   Five factors are typically applied to determine whether a particular security meets the "efficient market" requirement: (1) whether the security trades at a high volume; (2) whether analysts follow and report on the security; (3) whether the security has market makers and arbitrageurs; (4) whether the Company is eligible to file SEC registration forms S-3; and (5) whether there are empirical facts showing a cause-and-effect relationship between unexpected corporate events or financial releases and an immediate response in the stock market. *See ScripsAmerica, Inc. v. Ironridge Glob. LLC*, No. CV14-03962 MMM(AGRx), 2015 WL 12747908, at *19 (C.D. Cal. Mar. 26, 2015).  As discussed more thoroughly above, these factors weigh in favor of finding that the Yuga securities were traded in an efficient market.  For example, ApeCoin trades a daily average volume of $183.7M.[336]  Next, as detailed herein, analysts reported on the Yuga Financial Products at issue repeatedly throughout the Class Period.  Each of these analyst reports was publicly available to investors.  And the price of Yuga Financial Products changed in relation to public statements or reports about the activities of the Company.  Indeed, the market price of Yuga securities reacted promptly to the dissemination of public information regarding the Bored Ape Yacht Club, the Ape DAO, Yuga Labs, and MoonPay. The

---

[336]   *ApeCoin*, BEINCRYPTO (last visited Dec. 4, 2022), https://beincrypto.com/price/apecoin/.

Yuga securities also used the Executive Defendants and Ape DAO Board Defendants to serve as market makers for Yuga securities liquidity.  The Defendants also engaged firms like Alameda and Wintermute to serve as market makers for the Yuga Financial Products' liquidity.

## IX.    CAUSES OF ACTION

**FIRST CAUSE OF ACTION**
**Violation of the California Unfair Competition Law**
**Cal. Bus. & Prof. Code §17200**
**(Based on Unlawful Acts and Practices)**
**(Against all Defendants)**

476.    Plaintiffs restate and reallege all preceding allegations in paragraphs 1 to 399, 454-475 above as if fully set forth herein, and further allege the following:

477.    Plaintiff Titcher is a resident of the State of California.

478.    Plaintiff Titcher paid for or purchased Yuga Financial Products in California and thus the deceptive transactions alleged herein occurred in California.

479.    At all relevant times there was in full force and effect the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §17200, *et seq.*, which prohibits, *inter alia*, "any unlawful, unfair, or fraudulent business act or practice" and "unfair, deceptive, untrue, or misleading advertising."

480.    "'[A]n act can be alleged to violate any or all three of the three prongs of the UCL — unlawful, unfair, or fraudulent.'" *Stearns v. Select Comfort Retail Corp.*, 763 F. Supp. 2d 1128, 1149 (N.D. Cal. 2010) (quoting *Berryman v. Merit Prop. Mgmt., Inc.*, 152 Cal. App. 4th 1544, 1554 (2007)).

481.    The "unlawful" prong of the UCL prohibits "anything that can properly be called a business practice and that at the same time is forbidden by law." *Cel–Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999).  By proscribing "any unlawful" business practice, the UCL permits injured consumers to "borrow" violations of other laws and treat them as unlawful competition that is

independently actionable.  In other words, an "unlawful" business practice under the UCL is a practice that violates any other law.

482.   Any violation of the California false advertising laws (*e.g*., Cal. Bus. & Prof. Code §17500) necessarily violates the "unlawful" prong of the UCL.  Likewise, any violations of other state consumer protection laws, such as New York G.B.L. §349(a); NJSA §§56:81-156 also constitutes a violation of the unlawful prong of the UCL.

483.   To meet the heightened pleading standard of Federal Rule of Civil Procedure ("Rule") 9(b) for claims that sound in fraud, plaintiffs must plead "'the who, what, when, where, and how'" of the alleged fraud.  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003).

484.   In order to have standing for a UCL claim, a plaintiff must meet the injury-in-fact requirement.  This requirement is met where a plaintiff can "show that, by relying on a misrepresentation on a product label, they 'paid more for a product than they otherwise would have paid, or bought it when they otherwise would not have done so.'"  *Reid v. Johnson & Johnson*, 780 F.3d 952, 958 (9th Cir. 2015).  A plaintiff's claims under this California statute are governed by the "reasonable consumer" test.  *Freeman v. Time, Inc*., 68 F.3d 285, 289 (9th Cir. 1995) ("'[T]he false or misleading advertising and unfair business practices claim must be evaluated from the vantage of a reasonable consumer.'").  Under the reasonable consumer standard, a plaintiff must "show that 'members of the public are likely to be deceived.'"  *Id*. (quoting *Bank of the West v. Super. Ct.*, 2 Cal. 4th 1254, 1267 (1992)).

485.   Defendants engaged in deceptive acts and practices under California law by taking advantage of the lack of knowledge, ability, experience, or capacity of Plaintiffs to a grossly unfair degree, including but not limited to, in the following ways:

(a)     knowingly and intentionally misrepresenting that it was not a traditional art collector but rather the Yuga-affiliated FTX that was the purportedly winning bidder of the Sotheby's auction and that the entire auction was a scheme to promote the BAYC NFT collection in order to artificially inflate their price;

(b)     knowingly and intentionally concealing the specific roles and overlapping ownership and/or financial interests in Yuga and MoonPay by the Executive Defendants, Ape DAO Board Defendants, and Promoter Defendants Oseary, Fallon, Winkelmann, Hilton, Post, Ciccone, Hart, and Broadus;

(c)     failing to disclose that the promotions by Promoter Defendants Fallon (with the approval and/or assistance of Defendants Universal and EHD), Winkelmann, Hilton, Ciccone, Post, Bieber, Broadus, and Curry were the result of them being paid to promote (or having a vested financial interest in the promotion of) the Yuga Financial Products instead of an organic interest/support of the Bored Ape ecosystem;

(d)     knowingly and intentionally using and/or failing to disclose the use of the Promoter Defendants to instill trust in uninformed investors to promote the financial benefits of a highly speculative and risky investment in Yuga Financial Products, in an effort to manipulate and artificially inflate the price and trading volume of the Yuga Financial Products and allow the Company, Executive Defendants, and Ape DAO Board Defendants to profit from the sale of Yuga Financial Products at those inflated prices;

(e)     knowingly and intentionally misrepresenting and/or failing to disclose that the MoonPay Concierge service promoted by Defendants Soto-Wright, MoonPay, Oseary, Fallon, Winkelmann, Hilton, Post, Ciccone, Hart, Broadus was being used as a front for the undisclosed payments from the Executive Defendants and Defendant Oseary to Promoter Defendants Fallon, Winkelmann, Hilton, Post,

1   Ciccone, Hart, and Broadus in exchange for misleadingly promoting the Yuga

2   Financial Products to investors; and

3         (f)   failing to disclose that Defendant Adidas was working with

4   MoonPay and the Company to actively conceal that the promotions from Promoter

5   Defendants and other non-named celebrity influencers were paid for (as opposed to

6   a genuine interest).

7   486.   The Company, Sotheby's, and the Executive Defendants Aronow and

8   Solano did not disclose that the winning bidder of the Sotheby's auction was FTX

9   and not a traditional art collector.  Nor did the Company, Executive Defendants, or

10  Ape DAO Board  Defendants disclose that the Promoter Defendants were paid

11  promoters and/or had overlapping underlying financial interests in Yuga and

12  MoonPay. Plaintiffs would have found it material to their decisions to purchase Yuga

13  Financial Products to know whether or not insiders, who were given the Yuga

14  Financial Products, had the ability to sell those Yuga Financial Products and create

15  massive downward pressure.  Likewise, had Plaintiffs been made aware of that

16  information at the times of their respective purchases, it would have altered their

17  decision to both purchase the Yuga Financial Products for the price they paid as well

18  and hold on to those Yuga Financial Products when they otherwise would not have

19  done so.

20  487.   The facts that the Defendants misrepresented and concealed were

21  material to the decisions of Plaintiff Titcher and the members of the Class about

22  whether to pay for or purchase Yuga Financial Products (at all or for the price they

23  paid), in that they would not have proceeded with their transactions but for the

24  deceptive, fraudulent, and false acts and practices.

25  488.   Upon making a statement of fact regarding the winning bidder of the

26  Sotheby's auction, this gave rise to a duty to disclose that information, and by failing

27  to disclose that information, Defendants are liable for a UCL fraud by omission

28

claim.  *See In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1113-14 (N.D. Cal. 2015) ("Finally, Plaintiffs have alleged that the information regarding the Carrier IQ Software was in the exclusive knowledge of Defendants.  These allegations are sufficient to plausibly allege that Defendants had exclusive knowledge of a material fact that they had a duty to disclose but chose to omit."); *see also In re Solara Med. Supplies, LLC Customer Data Sec. Breach Litig.*, 613 F. Supp. 3d 1284, 1303 (S.D. Cal. 2020) (finding that the plaintiffs adequately alleged a fraudulent omission UCL claim where they pled "a duty to disclose based upon [d]efendant's exclusive knowledge of the alleged inadequacy of its security measures").

489.  For example, the Company's misleading statements and omissions concerning the ability to use Yuga Financial Products and their related intellectual property rights relate to "'the central functionality of the product,'" which is required to plead a fraud by omission claim under the UCL.  *See Hall v. SeaWorld Ent., Inc.*, 747 F. App'x 449, 451 (9th Cir. 2018) (citing *Hodsdon v. Mars, Inc.*, 891 F.3d 857, 863 (9th Cir. 2018)).  The omissions about the intellectual property rights given to investors in the BAYC, MAYC, and BAKC NFT collections, as well as the omissions concerning the ability to use ApeCoin and virtual land in the Otherside, were only known to Executive Defendants and were contrary to representations and omissions previously made concerning the ability to use Yuga Financial Products to purchase goods and services.

490.  Further Defendants, collectively and individually, had superior knowledge of information regarding the ownership interests and ability to use the Yuga Financial Products as advertised. The fact that the Promoter Defendants had undisclosed financial interests in Yuga and MoonPay was not known to Plaintiff Titcher or the members of the Class when each was respectively deciding whether or not to purchase Yuga Financial Products, as this information was in the exclusive

1   possession of the Company, Executive Defendants, and Ape DAO Board
2   Defendants.

3       491.   To state a claim for active concealment, a plaintiff must allege specific
4   "'affirmative acts on the part of the [D]efendants in hiding, concealing or covering
5   up the matters complained of.'" *Herron v. Best Buy Co. Inc.*, 924 F. Supp. 2d 1161,
6   1176 (E.D. Cal. 2013) (citing *Lingsch v. Savage*, 213 Cal. App. 2d 729, 734 (1963)).
7   Here, the Company and Executive Defendants used their business associate
8   Defendant Oseary to act as a middleman between the public and the Company's
9   founders in order to actively conceal the true nature of the Promoter Defendants'
10  business relationships with the Company, MoonPay, and the insiders of both.

11      492.   Defendants intended for Plaintiff Titcher and the members of the Class
12  to pay for Yuga Financial Products in reliance upon the deceptive and fraudulent
13  acts and practices described herein.

14      493.   Had any of the Defendants disclosed the omitted information, Plaintiff
15  Titcher would have been aware of it because (a) he saw the actual promotions by
16  Promoter Defendants Sotheby's, Fallon, Winkelman, Hilton, Post, Bieber, Ciccone,
17  Broadus, Curry, and Adidas, and would have concurrently seen any disclosure on
18  the promotions themselves had it been included, and (b) he follows, directly or
19  indirectly, the social media accounts of, and news reports on, Defendants Sotheby's,
20  Fallon, Hilton, Post, Bieber, Broadus, Curry, and Adidas.

21      494.   As a direct and proximate result of Defendants' unlawful, unfair, and
22  deceptive practices, Plaintiffs and Class members suffered damages. The Executive
23  Defendants' activities with the Promoter Defendants caused Plaintiffs and the Class
24  members to purchase and/or hold the Yuga Financial Products when they otherwise
25  would not have done so.

26      495.   The statements from Executive Defendants and Promoter Defendants
27  Sotheby's, Fallon, Hilton, Post, Bieber, and Broadus are actionable and not puffery.

28

1    "'The distinguishing characteristics of puffery are vague, highly subjective claims

2    as opposed to specific, detailed factual assertions.'" *Orlick v. Rawlings Sporting*

3    *Goods Co*., No. CV 12-6787-GHK (RZX), 2013 WL 12139142, at *5 (C.D. Cal.

4    Feb. 20, 2013).  Under California law, there is no requirement that for a statement to

5    be actionable it must also be false — the UCL also prohibits "'advertising which,

6    although true, is either actually misleading or which has a capacity, likelihood or

7    tendency to deceive or confuse the public.'" *Williams v. Gerber Prods. Co.*, 552

8    F.3d 934, 938 (9th Cir. 2008).  Significantly, even if certain statements would be

9    non-actionable on their own, where there are multiple statements at issue, courts

10   must consider "as a whole." *Id.* at 939 n.3; *Lima v. Gateway, Inc*., 710 F. Supp. 2d

11   1000, 1007-08 (C.D. Cal. 2010) (denying motion to dismiss where some specific

12   representations could be considered puffery, but all of defendants' statements "taken

13   as a whole" might be actionable); *In re NJOY, Inc. Consumer Class Action Litig.*,

14   No. CV 14-00428 MMM (JEMx), 2015 WL 12732461, at *10 (C.D. Cal. May 27,

15   2015) ("'Even assuming . . . that some of the statements would themselves be non-

16   actionable, they "cannot be considered in isolation because they contribute to the

17   [potentially] deceptive context" of the packaging and marketing "as a whole."'")

18   (alteration in original).

19        496.  For example, Executive Defendant Aronow's August 21, 2021 post

20   stated that the BAYC NFT collection had over a billion dollars in market

21   capitalization. This statement from Aronow is a specific, detailed factual assertion

22   the Executive Defendants were using to encourage purchases and increase the price

23   of the Yuga Financial Products.  At the same time, Aronow failed to disclose that

24   these metrics were the result of conduct by the Executive Defendants that allowed

25   insiders to disproportionately increase investments in the Yuga Financial Products.

26

27

28

497.   Taken together, the misleading statements and omissions of the Defendants contributed to the deceptive marketing tactics as a whole, which were used to solicit sales of Yuga Financial Products.

498.   In the event that Plaintiffs' securities and consumer law claims are found to be inapplicable to the wrongdoing alleged herein against Defendants, Plaintiffs will be unable to obtain monetary damages in an amount that would make Plaintiffs and the members of the Class whole.

499.   In addition, Plaintiff Titcher and the Class lack an adequate remedy at law because the elements of the other state securities and consumer law claims require proof of conduct beyond that which must be shown to establish liability under the UCL and FAL.  *See M.O. Dion & Sons, Inc. v. VP Racing Fuels, Inc.*, No. CV 19-5154-MWF (SSX), 2022 WL 18281526, at *8 (C.D. Cal. Nov. 2, 2022).

500.   The lack of an adequate remedy at law entitles Plaintiffs and the Class to pursue equitable restitution under the UCL.

501.   Concurrently, "restitution under the . . . UCL would be more certain, prompt, or efficient than the legal remedies" available with state securities and consumer law claims.  *See Anderson v. Apple Inc.*, 500 F. Supp. 3d 993, 1009 (N.D. Cal. 2020) (citing *Am. Life Ins. Co. v. Stewart*, 300 U.S. 203, 214 (1937)).  For example, the price premium damages model will likely require expert analysis to calculate, whereas equitable restitution will only require a showing of what each member of the Class paid for their Yuga Financial Products.  Restitution would, therefore, be much more prompt and efficient than this remedy at law.

502.   Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices by Defendants, to obtain restitution and disgorgement of all monies generated as a result of such practices, and for all other relief allowed under Cal. Bus. & Prof. Code §17200.

**SECOND CAUSE OF ACTION**
**Violation of the California Unfair Competition Law**
**Cal. Bus. & Prof. Code §17200**
**(Based on Unfair Acts and Practices)**
**(Against All Defendants)**

503.   Plaintiffs restate and reallege all preceding allegations in paragraphs 1 to 399, 454-475 above as if fully set forth herein, and further allege the following:

504.   Plaintiff Titcher is a resident of the State of California.

505.   Plaintiff Titcher paid for or purchased Yuga Financial Products in California and thus the deceptive transactions alleged herein occurred in California.

506.   At all relevant times there was in full force and effect the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §17200, *et seq.*, which prohibits, *inter alia*, "any unlawful, unfair, or fraudulent business act or practice" and "unfair, deceptive, untrue, or misleading advertising."

507.   "'[A]n act can be alleged to violate any or all three of the three prongs of the UCL — unlawful, unfair, or fraudulent.'" *Stearns*, 763 F. Supp. 2d at 1149 (quoting *Berryman*, 152 Cal. App. 4th at 1554).

508.   Defendants engaged in business acts and practices deemed "unfair" under the UCL, because of the conduct, statements, and omissions described above. Unfair acts under the UCL have been interpreted using different tests, including: (1) whether the public policy which is a predicate to a consumer unfair competition action under the unfair prong of the UCL is tethered to specific constitutional, statutory, or regulatory provisions; (2) whether the gravity of the harm to the consumer caused by the challenged business practice outweighs the utility of the defendant's conduct; and (3) whether the consumer injury is substantial, not outweighed by any countervailing benefits to consumers or competition, and is an injury that consumers themselves could not reasonably have avoided.

509.   Defendants have engaged in, and continue to engage in, conduct that violates the legislatively declared policies of: (1) California Civil Code §§1572,1573, 1709, 1710, 1711 against committing fraud and deceit; (2) California Civil Code §1770 against committing acts and practices intended to deceive consumers regarding the representation of goods in certain particulars; and (3) the Federal Tort Claims Act ("FTCA"), 15 U.S.C. §45(a)(1), against unfair or deceptive practices. Defendants gain an unfair advantage over their competitors, whose practices relating to other similar products must comply with these laws.

510.   Defendants' affirmative acts in soliciting sales of Yuga Financial Products are unfair within the meaning of the UCL, because they constituted immoral, unethical, oppressive, and unscrupulous activity, caused substantial injury to consumers, and provided no benefit to consumers or competition.

511.   The gravity of the harm to consumers caused by actions of Defendants far outweighs the utility of their conduct.  According to a "Data Spotlight" from the Federal Trade Commission from June 3, 2022 (the "FTC Data Spotlight"), entitled: "Reports show scammers cashing in on crypto craze," "[s]ince the start of 2021, more than 46,000 people have reported losing over $1 billion in crypto to scams – that's about one out of every four dollars reported lost, more than any other payment method.  The median individual reported loss?  A whopping $2,600."[337]

512.   The FTC Data Spotlight further stated that "[r]eports point to social media and crypto as a combustible combination for fraud.  Nearly half the people who reported losing crypto to a scam since 2021 said it started with an ad, post, or

---

[337]   Emma Fletcher, *Data Spotlight: Reports show scammers cashing in on crypto craze*, FED. TRADE COMM'N (June 3, 2022), https://www.ftc.gov/news-events/data-visualizations/data-spotlight/2022/06/reports-show-scammers-cashing-crypto-craze.

message on a social media platform."[338]  Furthermore, "[d]uring this period, nearly four out of every ten dollars reported lost to a fraud originating on social media was lost in crypto, far more than any other payment method."[339]  Of the reported crypto fraud losses that began on social media, most are investment scams.[340]  Indeed, since 2021, $575 million of all crypto fraud losses reported to the FTC were about bogus investment opportunities, far more than any other fraud type.  Defendants engaged in the exact kind of bogus crypto "investment opportunity" scam that the FTC Data Spotlight reported on as causing hundreds of millions (and rising) of dollars of damage to investors.

513.   The conduct of Defendants – including, but not limited to, failing to disclose that (1) it was not a traditional art collector but rather the Yuga-affiliated FTX that was the purportedly winning bidder of the Sotheby's auction and that the entire auction was a scheme to promote the BAYC NFT collection in order to artificially inflate their price; (2) the promotions by Promoter Defendants Fallon (with the approval and/or assistance of Defendants Universal and EHD), Winkelmann, Hilton, Ciccone, Post, Bieber, Broadus, and Curry were the result of them being paid to promote (or had a vested financial interest in the promotion of) the Yuga Financial Products instead of an organic interest/support of the Bored Ape ecosystem; (3) the MoonPay Concierge service promoted by Defendants Soto-Wright, MoonPay, Oseary, Fallon, Winkelmann, Hilton, Post, Ciccone, Hart, and

---

[338]   *Id.* ("From January 1, 2021 through March 31, 2022, 49% of fraud reports to the FTC indicating cryptocurrency as the payment method specified that the scam started on social media, compared to 37% in 2020, 18% in 2019, and 11% in 2018.").

[339]   *Id.* ("From January 1, 2021 through March 31, 2022, $1.1 billion was reported to the FTC as lost to fraud originating on social media.").

[340]   *Id.* ("From January 1, 2021 through March 31, 2022, people reported to the FTC that $417 million in cryptocurrency was lost to fraud originating on social media.  $273 million of these losses were to fraud categorized as investment related, followed by romance scams ($69 million), and business imposters ($35 million).").

Broadus was not the legitimate service described by them, but rather a vehicle by which the Executive Defendants and Defendant Oseary made undisclosed payments to Promoter Defendants Fallon, Winkelmann, Hilton, Post, Ciccone, Hart, and Broadus in exchange for misleadingly promoting the Yuga Financial Products to investors; (4) Defendant Adidas had conspired with the Company and MoonPay to facilitate the Yuga promoter payments and then conceal such conduct afterwards; and (5) Executive Defendants and Ape DAO Board Defendants held a significant portion of the Float at the time of the ApeCoin token launch and thus, could (and did) create massive downward pressure on the price of ApeCoin tokens by freely selling their allocations to investors – was and is substantially injurious to consumers.  Such conduct has caused, and continues to cause, substantial injury to consumers because consumers would not have continued with the transaction but for the deceptive, fraudulent, false, and unfair acts and practices alleged herein.  For example, the Company and Executive Defendant Shoemaker continue to rely on the deceptive celebrity promotions described herein to further solicit sales of the Yuga Financial Products.  On March 23, 2023, the Company posted a second year anniversary video that contained a montage of the deceptive promotions at issue here and of the Promoter Defendants engaging in the same misconduct as occurred during the Class Period.  Shoemaker, once again, amplified the misleading Yuga promotions on her personal Twitter account, reposting the anniversary video and stating that she was "Super proud of everything this company and super epic community have achieved in such a short time.  Can't wait to see what's still to come 🚀 keep slaying BAYC fam 🐵."[341]

514.   Consumers have overpaid for Yuga Financial Products.  And the injury alleged herein is not outweighed by any countervailing benefits to consumers or

---

[341]   Jasmine Shoemaker (@SodaOps), Twitter (Apr. 23, 2022 2:15 PM), https://twitter.com/SodaOps/status/1650201780939259904?s=20.

competition.  Indeed, no benefit to consumers or competition results from the alleged conduct of Defendants.  Since consumers reasonably rely on the representations, and could not have known about the omitted disclosures, and the injury results from ordinary use of their product, consumers could not have reasonably avoided such injury.

515.   Defendants willfully and knowingly engaged in the deceptive and unfair acts and practices described above and knew or should have known that those acts and practices were unlawful and thus in violation of Cal. Bus. & Prof. Code §17200, *et seq.*

516.   These particular facts that each Defendant omitted and concealed were material to the decisions of Plaintiff Titcher and the members of the Class about whether to pay for Yuga Financial Products, in that they would not have proceeded with the transaction but for the deceptive and unfair acts and practices.

517.  Defendants' conduct harmed competition.   While the Company, Executive Defendants, and Ape DAO Board Defendants cut corners and minimized costs, their competitors spent the time and money necessary to promote financial products and/or digital assets that complied with the applicable state and federal laws. Further, the injuries suffered by Plaintiffs are not outweighed by any countervailing benefits to consumers or competition.  And because Defendants are solely responsible for their respective promotional activities and related disclosures (or lack thereof), there is no way Plaintiff Titcher, or the members of the Class could have known about the payments that Promoter Defendants received for pretending that they were interested in the BAYC NFT collection of the Bored Ape ecosystem.  There were reasonably available alternatives to further Yuga's and MoonPay's legitimate business interests, such as including disclaimers, other than the conduct alleged herein.

518.   In order to have standing for a UCL claim, a plaintiff must meet the injury-in-fact requirement.  This requirement is met where a plaintiff can "show that, by relying on a misrepresentation on a product label, they 'paid more for a product than they otherwise would have paid, or bought it when they otherwise would not have done so.'"  *Reid*, 780 F.3d at 958.  A plaintiff's claims under this California statute are governed by the "reasonable consumer" test.  *Freeman*, 68 F.3d at 289 ("'[T]he false or misleading advertising and unfair business practices claim must be evaluated from the vantage of a reasonable consumer.'").  Under the reasonable consumer standard, a plaintiff must "show that 'members of the public are likely to be deceived.'"  *Id*. (quoting *Bank of the West*, 2 Cal. 4th at 1267).

519.   To meet the heightened pleading standard of Rule 9(b) for claims that sound in fraud, plaintiffs must plead "'the who, what, when, where, and how'" of the alleged fraud.  *Vess*, 317 F.3d at 1106.

520.   Defendants engaged in deceptive acts and practices under California law by taking advantage of the lack of knowledge, ability, experience, or capacity of Plaintiffs to a grossly unfair degree, including but not limited to, in the following ways:

(a)      knowingly and intentionally misrepresenting that it was not a traditional art collector but rather the Yuga-affiliated FTX that was the purportedly winning bidder of the Sotheby's auction and that the entire auction was a scheme to promote the BAYC NFT collection in order to artificially inflate their price;

(b)      knowingly and intentionally concealing the specific roles and overlapping ownership and/or financial interests in Yuga and MoonPay by the Executive Defendants, Ape DAO Board Defendants, and Promoter Defendants Oseary, Fallon (with the approval and/or assistance of Defendants Universal and EHD), Winkelmann, Hilton, Post, Ciccone, Hart, and Broadus;

(c)     failing to disclose that the promotions by Promoter Defendants Fallon (with the approval and/or assistance of Defendants Universal and EHD), Winkelmann, Hilton, Ciccone, Post, Bieber, Broadus, and Curry were the result of them being paid to promote (or having a vested financial interest in the promotion of) the Yuga Financial Products instead of an organic interest/support of the Bored Ape ecosystem;

(d)     knowingly and intentionally using and/or failing to disclose the use of the Promoter Defendants to instill trust in uninformed investors to promote the financial benefits of a highly speculative and risky investment in Yuga Financial Products, in an effort to manipulate and artificially inflate the price and trading volume of the Yuga Financial Products and allow the Company, Executive Defendants, and Ape DAO Board Defendants to profit from the sale of Yuga Financial Products at those inflated prices;

(e)     knowingly and intentionally misrepresenting and/or failing to disclose that the MoonPay Concierge service promoted by Defendants Soto-Wright, MoonPay, Oseary, Fallon, Winkelmann, Hilton, Post, Ciccone, Hart, Broadus was being used as a front for the undisclosed payments from the Executive Defendants and Defendant Oseary to Promoter Defendants Fallon, Winkelmann, Hilton, Post, Ciccone, Hart, and Broadus in exchange for misleadingly promoting the Yuga Financial Products to investors; and

(f)     failing to disclose that Defendant Adidas had conspired with the Company and MoonPay to facilitate the Yuga promoter payments and then conceal such conduct afterwards.

521.   The facts that Defendants misrepresented and concealed were material to the decisions of Plaintiff Titcher and the members of the Class about whether to pay for or purchase Yuga Financial Products (at all or for the price they paid), in that

1    they would not have proceeded with their transactions but for the deceptive,

2    fraudulent and false acts and practices.

3        522.   Defendants intended for Plaintiff Titcher and the members of the Class

4    to pay for Yuga Financial Products in reliance upon their deceptive and fraudulent

5    acts and practices.

6        523.   Had any of the Defendants disclosed the omitted information, Plaintiffs

7    would have been aware of it because (a) they saw the actual promotions by Promoter

8    Defendants Sotheby's, Fallon (with the approval and/or assistance of Defendants

9    Universal and EHD), Hilton, Post, Bieber, Broadus, Curry, and Adidas, and would

10   have concurrently seen any disclosure on the promotions themselves had it been

11   included; and (b) they follow, directly or indirectly, the social media accounts of, and

12   news reports on, the Company and its affiliated social media accounts and Defendants

13   Sotheby's, Fallon, Hilton, Post, Bieber, Broadus, Curry, and Adidas.

14       524.   As a direct and proximate result of Defendants' unlawful, unfair, and

15   deceptive practices, Plaintiffs and Class members suffered damages.  The activities

16   of Executive Defendants, Ape DAO Board Defendants, with Defendants MoonPay,

17   Soto-Wright, and the Promoter Defendants caused Plaintiffs and the Class members

18   to purchase and/or hold the Yuga Financial Products when they otherwise would not

19   have done so.

20       525.   The statements from Executive Defendants and Promoter Defendants

21   Sotheby's, Fallon (with the approval and/or assistance of Defendants Universal and

22   EHD), Winkelmann, Hilton, Post, Bieber, Broadus, and Curry are actionable and not

23   puffery.  "'The distinguishing characteristics of puffery are vague, highly subjective

24   claims as opposed to specific, detailed factual assertions.'"  *Orlick v. Rawlings*

25   *Sporting Goods Co*., No. CV 12-6787-GHK (RZX), 2013 WL 12139142, at *5 (C.D.

26   Cal. Feb. 20, 2013).  Under California law, there is no requirement that for a statement

27   to be actionable it must also be false — the UCL also prohibits "'advertising which,

28

although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public.'" *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008).  Significantly, even if certain statements would be non-actionable on their own, where there are multiple statements at issue, courts must consider "as a whole."  *Id.* at 939 n.3; *Lima v. Gateway, Inc.*, 710 F. Supp. 2d 1000, 1007-08 (C.D. Cal. 2010) (denying motion to dismiss where some specific representations could be considered puffery, but all of defendants' statements "taken as a whole" might be actionable); *In re NJOY, Inc. Consumer Class Action Litig.*, No. CV 14-00428 MMM (JEMx), 2015 WL 12732461, at *10 (C.D. Cal. May 27, 2015) ("'Even assuming . . . that some of the statements would themselves be non-actionable, they "cannot be considered in isolation because they contribute to the [potentially] deceptive context" of the packaging and marketing "as a whole."'") (alteration in original).

526.  For example, Executive Defendant Aronow's August 21, 2021 post stated that the BAYC NFT collection had over a billion dollars in market capitalization. This statement from Aronow is a specific, detailed factual assertion the Executive Defendants were using to encourage purchases and increase the price of the Yuga Financial Products.  At the same time, Aronow failed to disclose that these metrics were the result of conduct by the Executive Defendants that allowed insiders to disproportionately increase investments in the Yuga Financial Products.

527.  Taken together, the misleading statements and omissions of the Defendants contributed to the deceptive marketing tactics as a whole, which were used to solicit sales of Yuga Financial Products.

528.  In the event that Plaintiffs' securities and consumer law claims are found to be inapplicable to the wrongdoing alleged herein against Defendants, Plaintiffs will be unable to obtain monetary damages in an amount that would make Plaintiffs and the members of the Class whole.

529.   In addition, Plaintiff and the Class lack an adequate remedy at law because the elements of the other state securities and consumer law claims require proof of conduct beyond that which must be shown to establish liability under the UCL and FAL.  *See M.O. Dion & Sons, Inc. v. VP Racing Fuels, Inc*., No. CV 19-5154-MWF (SSX), 2022 WL 18281526, at *8 (C.D. Cal. Nov. 2, 2022).

530.   The lack of an adequate remedy at law entitles Plaintiffs and the Class to pursue equitable restitution under the UCL.

531.   Concurrently, "restitution under the . . . UCL would be more certain, prompt or efficient than the legal remedies" available with state securities and consumer law claims.  *See Anderson*, 500 F. Supp. 3d at 1009 (citing *Stewart*, 300 U.S. at 214).  For example, the price premium damages model will likely require expert analysis to calculate, whereas equitable restitution will only require a showing of what each member of the Class paid for their Yuga Financial Products.  Restitution would, therefore, be much more prompt and efficient than this remedy at law.

532.   Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices by Defendants, to obtain restitution and disgorgement of all monies generated as a result of such practices, and for all other relief allowed under California Business & Professions Code §17200.

**THIRD CAUSE OF ACTION**
**Violation of the California Unfair Competition Law**
**Cal. Bus. & Prof. Code §17200**
**(Based on Fraudulent Acts and Practices)**
**(Against All Defendants)**

533.   Plaintiffs restate and reallege all preceding allegations in paragraphs 1 to 399, 454-475 above as if fully set forth herein, and further allege the following:

534.   Plaintiff Titcher is a resident of the State of California.

535.   Plaintiff Titcher paid for or purchased Yuga Financial Products in California and thus the deceptive transactions alleged herein occurred in California.

536.   At all relevant times there was in full force and effect the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §17200, *et seq.*, which prohibits, *inter alia*, "any unlawful, unfair, or fraudulent business act or practice" and "unfair, deceptive, untrue, or misleading advertising."

537.   "'[A]n act can be alleged to violate any or all three of the three prongs of the UCL — unlawful, unfair, or fraudulent.'" *Stearns*, 763 F. Supp. 2d at 1149 (quoting *Berryman*, 152 Cal. App. 4th at 1554).

538.   Any violation of the California false advertising laws (*e.g.*, §17500) necessarily violates the "fraudulent" prong of the UCL.

539.   To meet the heightened pleading standard of Rule 9(b) for claims that sound in fraud, plaintiffs must plead "'the who, what, when, where, and how'" of the alleged fraud.  *Vess*, 317 F.3d at 1106.

540.   In order to have standing under California law for a UCL claim, a plaintiff must meet the injury-in-fact requirement.  This requirement is met where a plaintiff can "show that, by relying on a misrepresentation on a product label, they 'paid more for a product than they otherwise would have paid, or bought it when they otherwise would not have done so.'" *Reid*, 780 F.3d at 958.

541.   A plaintiff's claims under this California statute are governed by the "reasonable consumer" test.  *Freeman*, 68 F.3d at 289 ("'[T]he false or misleading advertising and unfair business practices claim must be evaluated from the vantage of a reasonable consumer.'").  Under the reasonable consumer standard, a plaintiff must "show that 'members of the public are likely to be deceived.'" *Id.* at 289 (quoting *Bank of the West*, 2 Cal. 4th at 1267).

542.   Nondisclosure or concealment may also constitute actionable fraud when, *inter alia*, the defendant "actively conceals a material fact from the plaintiff" or "makes partial representations but also suppresses some material facts." *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336 (1997).  In fact, allegations of "intentional and

177

systematic concealment by the defendants of highly material facts, which were peculiarly within their knowledge and which [plaintiffs] did not suspect and could not have discovered" satisfactorily pleads a claim of fraud by omission. *See Sime v. Malouf*, 95 Cal. App. 2d 82, 99-100 (1949) (finding "significant" that defendants "concealed their identity by proceeding entirely through agents acting ostensibly in their own behalf").

543.    Further, a fraud by omission claim exists when "defendants not only had exclusive knowledge of the material facts, but knew that [plaintiff] was acting under a misapprehension, which they had cultivated." *Id.* at 100 (citing *Stewart v. Wyoming Cattle-Ranche Co.*, 128 U.S. 383, 388 (1888)); *Myers v. BMW of N. Am., LLC*, No. 16-CV-00412-WHO, 2016 WL 5897740, at *5 (N.D. Cal. Oct. 11, 2016) (finding a duty to disclose where defendant had exclusive knowledge of a product defect and made a partial representation about it and denying dismissal of UCL claim under fraud by omission theory).

544.    "'Generally, courts have not defined "exclusive" literally, but have found such claims cognizable if the defendant had "superior" knowledge of a defect that was not readily apparent and there is no or only . . . limited publicly available information about the defect.'" *Mosqueda v. Am. Honda Motor Co., Inc.*, 443 F. Supp. 3d 1115, 1133 (C.D. Cal. 2020) (quoting *Salas v. Toyota Motor Sales, U.S.A., Inc.*, No. CV 15-08629 FMO, 2016 WL 7486600, at *10 (C.D. Cal. Sept. 27, 2016)). Indeed, under California law a duty to disclose "may arise without any confidential relationship where defendant alone has knowledge of material facts that are not accessible to the plaintiff." 5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, §799, p. 1156. These factors do not require a fiduciary relationship so long as there exists "some relationship" between the defendant and plaintiff, such as "between buyer and seller." *LiMandri*, 52 Cal. App. 4t at 336. Promoter Defendants' omissions were fraudulent under these factors in *LiMandri*.

545.   These particular facts that each Defendant omitted and concealed were material to the decisions of Plaintiff Titcher and the members of the Class about whether to pay for or purchase Yuga Financial Products (at all or for the price they paid), in that they would not have proceeded with the transaction but for the deceptive, fraudulent, and false acts and practices. For example, misleading statements and omissions concerning the ability to use Yuga Financial Products and their related intellectual property rights relate to "'the central functionality of the product,'" which is required to plead a fraud by omission claim under the UCL. *See Hall*, 747 F. App'x at 451 (citing *Hodsdon*, 891 F.3d at 863.  The omissions about the intellectual property rights given to investors in the BAYC, MAYC, and BAKC NFT collections, as well as the omissions concerning the ability to use ApeCoin and virtual land in the Otherside, were only known to Executive Defendants and were contrary to representations and omissions previously made concerning the ability to use Yuga Financial Products to purchase goods and services.

546.   Defendants, collectively and individually, had superior knowledge of information regarding the ownership interests and ability to use the Yuga Financial Products as advertised.  The fact that the Promoter Defendants had undisclosed financial interests in Yuga and MoonPay was not known to Plaintiffs or the members of the Class when each was respectively deciding whether or not to purchase Yuga Financial Products, as this information was in the exclusive possession of the Company, Executive Defendants, and Ape DAO Board Defendants.

547.   To state a claim for active concealment, a plaintiff must allege specific "'affirmative acts on the part of the [D]efendants in hiding, concealing or covering up the matters complained of.'" *Herron v. Best Buy Co. Inc.*, 924 F. Supp. 2d 1161, 1176 (E.D. Cal. 2013) (citing *Lingsch v. Savage*, 213 Cal. App. 2d 729, 734 (1963)). Here, the Company and Executive Defendants used their business associate Defendant Oseary to act as a middleman between the public and the Company's

1  founders in order to actively conceal the true nature of the Promoter Defendants'

2  business relationships with the Company, MoonPay, and the insiders of both.

3       548.   Defendants intended for Plaintiffs and the members of the Class to pay

4  for Yuga Financial Products in reliance upon the deceptive and fraudulent acts and

5  practices described herein.

6       549.   Defendants engaged in deceptive acts and practices under California law

7  by taking advantage of the lack of knowledge, ability, experience, or capacity of

8  Plaintiffs to a grossly unfair degree, including but not limited to, in the following

9  ways:

10          (a)    knowingly and intentionally misrepresenting that it was not a

11  traditional art collector but rather the Yuga-affiliated FTX that was the purportedly

12  winning bidder of the Sotheby's auction and that the entire auction was a scheme to

13  promote the BAYC NFT collection in order to artificially inflate their price;

14          (b)    knowingly and intentionally concealing the specific roles and

15  overlapping ownership and/or financial interests in Yuga and MoonPay by the

16  Executive Defendants, Ape DAO Board Defendants, and Promoter Defendants

17  Oseary, Fallon, Winkelmann, Hilton, Post, Ciccone, Hart, and Broadus;

18          (c)    failing to disclose that the promotions by Promoter Defendants

19  Fallon (with the approval and/or assistance of Defendants Universal and EHD),

20  Winkelmann, Hilton, Ciccone, Post, Bieber, Broadus, and Curry were the result of

21  them being paid to promote (or having a vested financial interest in the promotion of)

22  the Yuga Financial Products instead of an organic interest/support of the Bored Ape

23  ecosystem;

24          (d)    knowingly and intentionally using and/or failing to disclose the

25  use of the Promoter Defendants to instill trust in uninformed investors to promote the

26  financial benefits of a highly speculative and risky investment in Yuga Financial

27  Products, in an effort to manipulate and artificially inflate the price and trading

28

volume of the Yuga Financial Products and allow the Company, Executive Defendants, and Ape DAO Board Defendants to profit from the sale of Yuga Financial Products at those inflated prices;

(e)   knowingly and intentionally misrepresenting and/or failing to disclose that the MoonPay Concierge service promoted by Defendants Soto-Wright, MoonPay, Oseary, Fallon, Winkelmann, Hilton, Post, Ciccone, Hart, and Broadus was being used as a front for the undisclosed payments from the Executive Defendants and Defendant Oseary to Promoter Defendants Fallon, Winkelmann, Hilton, Post, Ciccone, Hart, and Broadus in exchange for misleadingly promoting the Yuga Financial Products to investors; and

(f)   failing to disclose that Defendant Adidas had conspired with the Company and MoonPay to facilitate the Yuga promoter payments and then conceal such conduct afterwards.

550.   Had any of the Defendants disclosed the omitted information, Plaintiffs would have been aware of it because (a) they saw the actual promotions by Promoter Defendants Sotheby's, Fallon, Hilton, Post, Bieber, Broadus, Curry, and Adidas, and would have concurrently seen any disclosure on the promotions themselves had it been included, and (b) they follow, directly or indirectly, the social media accounts of, and news reports on, Defendants Sotheby's, Fallon, Hilton, Post, Bieber, Broadus, Curry, and Adidas.

551.   As a direct and proximate result of Defendants' unlawful, unfair, and deceptive practices, Plaintiffs and Class members suffered damages.  The Executive Defendants' activities with the Promoter Defendants caused Plaintiffs and the Class members to purchase and/or hold the Yuga Financial Products when they otherwise would not have done so.

552.   The statements from Executive Defendants and Promoter Defendants are actionable and not puffery.  "'The distinguishing characteristics of puffery are

vague, highly subjective claims as opposed to specific, detailed factual assertions.'" *Orlick*, 2013 WL 12139142, at \*5. Under California law, there is no requirement that for a statement to be actionable it must also be false — the UCL also prohibits "'advertising which, although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public.'" *Williams*., 552 F.3d at 938. Significantly, even if certain statements would be non-actionable on their own, where there are multiple statements at issue, courts must consider "as a whole." *Id*. at 939 n.3; *Lima*, 710 F. Supp. 2d at 1007-08 (denying motion to dismiss where some specific representations could be considered puffery, but all of defendants' statements "taken as a whole" might be actionable); *NJOY*, 2015 WL 12732461, at \*10 ("'Even assuming . . .  that some of the statements would themselves be non-actionable, they "cannot be considered in isolation because they contribute to the [potentially] deceptive context" of the packaging and marketing "as a whole."'") (alteration in original). The alleged misstatements from Executive Defendants and Promoter Defendants are specific, detailed factual assertions these Defendants were using to encourage purchases and increase the price of the Yuga Financial Products. At the same time, the Executive Defendants and Promoter Defendants each failed to disclose that the MoonPay service was a sham created to effectuate undisclosed Yuga promoter payments and that the rise in the price and trading activity for Yuga Financial Products was due to deceptive conduct by Defendants as opposed to genuine interest from investors.

553.   Taken together, the misleading statements and omissions of the various Defendants contributed to the deceptive marketing tactics as a whole, which were used to solicit sales of Yuga Financial Products.

554.   In the event that Plaintiffs' securities and consumer law claims are found to be inapplicable to the wrongdoing alleged herein against Defendants, Plaintiffs

1  will be unable to obtain monetary damages in an amount that would make Plaintiffs
2  and the members of the Class whole.

3  555.   In addition, Plaintiff and the Class lack an adequate remedy at law
4  because the elements of the other state securities and consumer law claims require
5  proof of conduct beyond that which must be shown to establish liability under the
6  UCL and FAL.  *See M.O. Dion & Sons, Inc. v. VP Racing Fuels, Inc*., No. CV 19-
7  5154-MWF (SSX), 2022 WL 18281526, at *8 (C.D. Cal. Nov. 2, 2022).

8  556.   The lack of an adequate remedy at law entitles Plaintiffs and the Class
9  to pursue equitable restitution under the UCL.

10  557.   Concurrently, "restitution under the . . . UCL would be more certain,
11  prompt, or efficient than the legal remedies" available with state securities and
12  consumer law claims.  *See Anderson v. Apple Inc*., 500 F. Supp. 3d 993, 1009 (N.D.
13  Cal. 2020) (citing *Am. Life Ins. Co. v. Stewart*, 300 U.S. 203, 214 (1937)).  For
14  example, the price premium damages model will likely require expert analysis to
15  calculate, whereas equitable restitution will only require a showing of what each
16  member of the Class paid for their Yuga Financial Products.  Restitution would,
17  therefore, be much more prompt and efficient than this remedy at law.

18  558.   Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts
19  or practices by Defendants, to obtain restitution and disgorgement of all monies
20  generated as a result of such practices, and for all other relief allowed under Cal. Bus.
21  & Prof. Code §17200.

**FOURTH CAUSE OF ACTION**
**Unregistered Offering and Sale of Securities in**
**Violation of Sections 5 and 12(a)(1) of the Securities Act of 1933**
**(Against the Company, Executive Defendants, Ape DAO Board Defendants,**
**MoonPay, Sotheby's, Adidas)**

559.   Plaintiffs, on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference paragraphs 1 to 399 and 454-475 and further allege as follows:

560.   The Company, Executive Defendants, Ape DAO Board Defendants, MoonPay Defendants, and Promoter Defendants Sotheby's and Adidas, are collectively referred to in this cause of action as the "Statutory Seller Defendants."

561.   Statutory Seller Defendants, and each of them, by engaging in the conduct described above, directly or indirectly, made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interest commerce for the purpose of sale or for delivery after sale.

562.   Yuga Financial Products are securities within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. §77b(a)(1).

563.   Plaintiffs and members of the Class purchased Yuga Financial Product securities.

564.   No registration statements have been filed with the SEC or have been in effect with respect to any of the offerings alleged herein.   No exemption to the registration requirement applies.

565.   SEC Rule 159A provides that, for purposes of Section 12(a)(2), an "issuer" in "a primary offering of securities" shall be considered a statutory seller. 17 C.F.R. §230.159A(a).   The Securities Act in turn defines "issuer" to include every person who issues or proposes to issue any security.   15 U.S.C. §77b(a)(4).   The Statutory Seller Defendants are issuers of Yuga Financial Products.

184

566.   These Statutory Seller Defendants are also liable under the solicitation prong of Section 12(a)(1).  The U.S. Supreme Court has held that statutory sellers under Section 12(a)(1) also include "the buyer's immediate seller" and any person who actively solicited the sale of the securities to plaintiff and did so for financial gain.  *See Pinter v. Dahl*, 486 U.S. 622, 644 n.21, 647 (1988); *accord*, *e.g.*, *Steed Fin. LDC v. Nomura Sec. Int'l, Inc*., No. 00 Civ. 8058, 2001 WL 1111508, at *7 (S.D.N.Y. Sept. 20, 2001).  That is, §12(a)(1) liability extends to sellers who actively solicit the sale of securities with a motivation to serve their own financial interest or those of the securities owner.  *Pinter*, 486 U.S. at 647; *Capri v. Murphy*, 856 F.2d 473, 478 (2d Cir. 1988).  As specifically alleged herein, the Statutory Seller Defendants all actively solicited sales of the Yuga Financial Products on social media, proprietary web sites, press releases, and traditional print media. Thus they are each liable under the solicitation prong, in addition to any liability flowing from their direct issuance of Yuga Financial Products.  *See Wildes v. BitConnect Int'l PLC,* 25 F.4th 1341, 1346 (11th Cir.) ("Broadly disseminated communications . . . can convey a solicitation."); *Pino v. Cardone Cap., LLC*, No. 21-55564, 2022 WL 17826876 (9th Cir. Dec. 21, 2022) (stating that "[t]o conclude that their social media communications fall outside the Act's protections would be at odds with Congress's remedial goals. As observed by the Eleventh Circuit in *Wildes*, under Defendants' interpretation of the Act, a seller liable "for recommending a security in a personal letter could not be held accountable for making the exact same pitch in an internet video.").

567.   By reason of the foregoing, the Company, Executive Defendants Aronow, Solano, Atalay, Ali, and Muniz, Ape DAO Board Defendants Shoemaker, Ehrlund, Lyons, Ohanian, Wu, Bajwa, MoonPay and its CEO Soto-Wright, and Promoter Defendants Sotheby's and Adidas, each violated Sections 5(a), 5(c), and 12(a) of the Securities Act, 15 U.S.C. §§77e(a), 77e(c), and 771(a).

568.   As a direct and proximate result of the Statutory Seller Defendants' unregistered sale of securities, Plaintiffs and the Class have suffered damages in connection with their Yuga Financial Product purchases.

**FIFTH CAUSE OF ACTION**
**Violation of Sections 15 of the Securities Act of 1933**
**(Against the Executive Defendants, Oseary, Ape DAO Board Defendants, adidas Ventures, B.V. and Individual Defendant Soto-Wright)**

569.   Plaintiffs, on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference paragraphs 1-475, and further allege as follows:

570.   This Count is asserted against Executive Defendants Aronow, Solano, Ataly, Ali, Muniz, Shoemaker, Ehrlund, Oseary, Ape DAO Board Defendants Lyons, Ohanian, Wu, and Bajwa, and Defendant Soto-Wright (collectively referred to in this cause of action as the "Control Person Defendants") under Section 15 of the Securities Act of 1933, 15 U.S.C. §77o.

571.   The Control Person Defendants, by virtue of their offices, ownership, agency, agreements or understandings, and specific acts were, at the time of the wrongs alleged herein, and as set forth herein, controlling persons within the meaning of Section 15 of the Securities Act of 1933.  The Control Person Defendants, and each of them, had the power and influence and exercised the same to cause the unlawful offer and sale of Yuga Financial Products securities as described herein.

572.   The Control Person Defendants, separately or together, possess, directly or indirectly, the power to direct or cause the direction of the management and policies of Yuga and/or MoonPay, through ownership of voting securities, by contract, subscription agreement, or otherwise.

573.   The Control Person Defendants also have the power to direct or cause the direction of the management and policies of the Company and/or MoonPay.

574.   The Control Person Defendants, separately or together, have sufficient influence to have caused the Company and/or MoonPay to submit a registration statement for the Yuga Financial Products.

575.   The Control Person Defendants, separately or together, jointly participated in the Company's and MoonPay's failure to register Yuga Financial Products.

576.   By virtue of the conduct alleged herein, the Control Person Defendants are liable for the wrongful conduct complained of herein and are liable to Plaintiffs and the Class for rescission and/or damages suffered.

## SIXTH CAUSE OF ACTION
**Violations of California Corporate Securities Law of 1968
Cal. Corp. Code §§25110 & 25503
(Qualification)
(Against the Company, Executive Defendants, Ape DAO Board Defendants, MoonPay, and Promoter Defendants Sotheby's and Adidas)**

577.   Plaintiffs on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference paragraphs 1-475, and further alleges as follows:

578.   Plaintiff Titcher brings this claim individually and on behalf of the members of the Class against the Company, Executive Defendants Aronow, Solano, Atalay, Ali, and Muniz, Ape DAO Board Defendants Shoemaker, Ehrlund, Lyons, Ohanian, Wu, and Bajwa, MoonPay, and Promoter Defendants Sotheby's and Adidas, collectively referred to in this cause of action as the "Statutory Seller Defendants."

579.   Each of the Statutory Seller Defendants are the primary violators under this cause of action.

580.   The Yuga Financial Products are securities within the meaning of the California Corporations Code.

581.   The Yuga Financial Products were and are required to be registered with the Commissioner of Corporations under California law.

582.   Section 25110 (similar to a Section 12(a)(1) claim under the federal securities law) makes it illegal, in connection with the purchase or sale of any security, for any person, directly or indirectly, to offer or sell a security in California "unless such security or transaction is exempted or not subject to qualification under Chapter 1 (commencing with Section 25100) of this part."  Further, the offer or sale of such a security "in a manner that varies or differs from, exceeds the scope of, or fails to conform with either a material term or material condition of qualification of the offering . . . shall be an unqualified offer or sale."  Cal. Corp. Code §25110.

583.   Section 25503 establishes a private remedy for damages under Section 25110 of the California Corporations Code.  In particular, violators of Section 25110 "shall be liable to any person acquiring from them the security sold in violation of that section, who may sue to recover the consideration they paid for that security with interest thereon at the legal rate, and reasonable attorney's fees, less the amount of any income received therefrom, upon the tender of that security, or for damages, if they no longer own the security, or if the consideration given for the security is not capable of being returned."  In the event that the plaintiff no longer owns the security, damages "shall be equal to the difference between (a) the purchase price plus interest at the legal rate from the date of purchase, plus reasonable attorney's fees, and (b) the value of the security at the time it was disposed of by the plaintiff plus the amount of any income received therefrom by the plaintiff."  Cal. Corp. Code §25503.

584.   Conversely, Section 25503 provides that, if the consideration given for the security is not capable of being returned then damages shall be equal to the value of that consideration plus interest at the legal rate from the date of purchase, provided the security is tendered, plus reasonable attorney's fees; and if the plaintiff no longer owns the security, damages in that case shall be equal to the difference between (a)

188

the value of the consideration given for the security plus interest at the legal rate from the date of purchase, plus reasonable attorney's fees; and (b) the value of the security at the time it was disposed of by the plaintiff plus the amount of any income received therefrom by the plaintiff.  *Id.*

585.  Under Section 25503, "[a]ny person on whose behalf an offering is made and any underwriter of the offering, whether on a best efforts or a firm commitment basis, shall be jointly and severally liable under this section."

586.  The Yuga Financial Products have not been registered with the Commissioner, are not exempt from registration, and are not federally covered.  No registration statements have been filed with any state or federal government entity or have been in effect with respect to any of the offerings alleged herein.

587.  The Statutory Seller Defendants, by engaging in the conduct described above, directly or indirectly, sold and/or offered to sell securities, making each liable for both issuer and solicitation violations under Section 25503.

588.  Plaintiffs purchased Yuga Financial Products securities from the Statutory Seller Defendants.  For example, the ApeCoin tokens were provided and/or sold into the ApeCoin liquidity pool by Executive Defendants and Ape DAO Board Defendants.  Upon information and belief, given the limited and measurable amount of individuals selling or providing the cryptocurrency to the ApeCoin token liquidity pool, a large portion (if not all) of the ApeCoin token liquidity pool were provided by Executive Defendants and Ape DAO Board Defendants (or market makers for Yuga like Wintermute and FTX who were given undisclosed loans of Yuga Financial Products to sell to the market on behalf of the Company).  These actions coincided with Plaintiffs and Class members transacting with the liquidity pools as buyers.  Thus, by providing ApeCoin tokens to the liquidity pool at the time in which Plaintiffs and the members of the Class made their ApeCoin token purchases from the liquidity pool, privity between Executive Defendants (personally and through the

Company), Ape DAO Board Defendants (personally and through the Ape Foundation and/or the Company), and Plaintiffs is established even in the absence of a direct contract linking the two parties.

589.   Privity also exists between the issuers of every Yuga NFT collection (i.e., the Company and Executive Defendants) and all those making purchases (e.g., Plaintiffs and the members of the Class) regardless of which cryptocurrency exchange was used to facilitate the transaction because these Defendants are receiving the benefit of a 2.5% fee per resale of a Yuga NFT.

590.   As discussed above, the Company, Executive Defendants, Ape DAO Board Defendants, MoonPay, and Promoter Defendants Sotheby's and Adidas actively solicited the purchase of Yuga Financial Products through social media, promotional video, press releases, traditional press, and online.

591.   By reason of the foregoing, each of the Statutory Seller Defendants have violated Sections 25110 and 25503 of the California Corporations Code.

**SEVENTH CAUSE OF ACTION**
**Violation of Sections 10b of the Securities Exchange Act of 1934 and Rule 10b-5(b) thereunder**
**(Fraudulent Statement Liability)**
**(Against the Executive Defendants, the MoonPay Defendants, the Ape DAO Board Defendants, and Sotheby's)**

592.   Plaintiffs, on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference paragraphs 1-475, and further allege as follows:

593.   Plaintiffs bring this claim for violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78j(b), and Rule 10b-5(b) promulgated thereunder, 17 C.F.R. §240.10b-5(b).

594.   The Yuga Financial Products are securities within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. §77b(a)(1).

595.   Section 10(b) and Rule 10b-5(b) make it illegal, in connection with the purchase or sale of any security, "for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange . . . to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." *Id.*

596.   The Executive Defendants, the MoonPay Defendants, Wu, and Sotheby's (with the aid of the other Defendants) carried out a plan, scheme, and course of conduct that was intended to and did deceive the retail investors – Plaintiffs and the other Class members – who acquired Yuga Financial Products pursuant to the continuous offering and thereby caused them to purchase Yuga Financial Products at artificially inflated prices.

597.   In connection with the continuous offer and sale of the Yuga Financial Products, the Executive Defendants, the MoonPay Defendants, Wu, and Sotheby's disseminated, approved, and/or endorsed the false statements described herein, which they knew or recklessly should have known were materially misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not materially misleading.

598.   The Executive Defendants, the MoonPay Defendants, Wu, and Sotheby's employed devices, schemes, and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary to make the statements made not misleading; and engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the Class members that resulted in artificially high market prices for the Yuga Financial Products, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

599.   Yuga fundamentally misrepresented the nature of the Yuga Financial Products, hawking them as memberships into a "fan club on steroids that encourages owners of the NFTs to move through an ever-growing and exclusive list of events and opportunities" instead of unregistered securities with highly inflated prices due to wash trading and other manipulative practices.  Yuga also represented that the Bored Ape NFT collection had achieved over $1 billion in trading volume, but failed to disclose that the NFT collections were significantly plagued by wash trading.

600.   Further, in offering the Yuga Financial Products, the Executive Defendants failed to disclose material aspects of Yuga's business, and made materially misleading statements, or omitted to state material facts necessary to make statements made, in the light of the circumstances under which the statements were made, not misleading.

601.   Likewise, in promoting the Yuga Financial Products, the MoonPay Defendants made materially misleading and incomplete statements.   MoonPay falsely stated the celebrities had bought their Bored Apes, when in fact they had been gifted them from MoonPay.  MoonPay omitted the material information that it was engaging in manipulative trading.

602.   Similarly, in promoting the Yuga Financial Products, Sotheby's falsely stated that the winning bidder in the Sotheby's BAYC auction that the winning bidder was a "traditional" collector and that "legacy art collectors were also heavily involved in the bidding."

**Misrepresentations and Omissions**

603.  Defendants' untrue statements and omissions of material facts in connection with the sale of Yuga Financial Products include, but are not limited to the following examples:

a. Sotheby's falsely stating that the winning "bid" of the Sotheby's auction was a traditional art collector, and omitting that it was cryptocurrency industry insiders at FTX that won the auction.

b. Defendant Solano stated that "The Bored Ape Yacht Club is more than just an #NFT collection – the NFT grants access to a collaborative art experiment in the form of a canvas only token-holders can draw on."  This statement was misleading in that it suggested to investors that there would be a broader ecosystem for BAYC NFT holders to interact in and that the BAYC brand was poised for significant growth, when, in truth, the BAYC NFTs were just a vehicle to make insiders rich at the expense of investors.

c. Defendant Solano stated that the Bored Ape NFTs "double as membership cards to an exclusive club with benefits."  This statement was misleading in that it suggested to investors that there would be a broader ecosystem for BAYC NFT holders to interact in and that the BAYC brand was poised for significant growth, when, in truth, the BAYC NFTs were just a vehicle to make insiders rich at the expense of investors.

d. Defendant Aronow bragged "Not bad for a high school dropout" in response to a post that said "Don't look now but #BAYC Market Cap just crossed a BILLION."  This exchange gave investors the false impression that BAYC NFTs were a sound investment experiencing organic growth that were poised to continue growing, when in fact the price and volume was inflated due to manipulative trading practices.

e. The MoonPay Twitter account posted a clip from the segment with Defendant Fallon promoting MoonPay and the BAYC NFTs with a caption stating: "So this just happened.  @jimmyfallon reveals to @beeple on the #TheTonightShow that he just bought his first Bored Ape by @BoredApeYC with MoonPay! 🚀 👀."  MoonPay's statement that "[s]o

193

1    this just happened" misleadingly suggested to investors that the promotion

2    of MoonPay and the BAYC NFT collection on the Tonight Show was

3    something that occurred spontaneously.  Likewise, MoonPay's statement

4    that Fallon had "just bought his first Bored Ape by @BoredApeYC with

5    MoonPay!" failed to disclose that in truth, Fallon's segment with

6    Winkelmann was just a promotion of the BAYC NFTs and MoonPay that

7    was orchestrated behind the scenes by Oseary, Soto-Wright, and the

8    Executive Defendants.

9    f.  MoonPay's statement that "this just happened" in connection with the

10   Defendant Post's video with The Weeknd video misleadingly suggested to

11   investors that the promotion of MoonPay and the BAYC NFT collection

12   within the so-called music video from Defendant Post was something that

13   occurred because of their genuine interest in the BAYC NFTs.  This, and

14   MoonPay's statement that Post had "aped into @BoredApeYC by

15   purchasing his first NFT with MoonPay," failed to disclose that this music

16   video was just a promotion of the BAYC NFTs and MoonPay that was

17   orchestrated behind the scenes by Oseary, Soto-Wright, and the Executive

18   Defendants.

19   g.  MoonPay's statement that "Someone funny aped in today!" in reference to

20   the Kevin Hart promotion misleadingly suggested Kevin Hart actually paid

21   for his Ape, and failed to disclose that it was a promotion orchestrated by

22   MoonPay, Oseary, Soto-Wright, and the Executive Defendants.

23   h.  Wu's statement that Yuga has "led innovation on IP frameworks, like

24   giving NFT holders full commercial rights to their IP without a royalty"

25   was false and misleading because NFT holders did not have full commercial

26   rights to the IP.

27

28

i. Bajwa falsely stated that celebrity rapper (and close associate with Defendant Broadus) "@Eminem purchased a @BoredApeYC NFT for 123.45 ETH" and touting that the MAYC NFTs "saw $71M in trading volumes the last week."

j. Soto-Wright falsely described the creation of the Concierge service as first spreading via word of mouth among artists, stating, "So I helped one artist figure it out. They told another who then asked for help. Word started to spread."  Soto-Wright later falsely described it as an accident, stating "A really happy accident I'd say.  100% organic."

k. When asked to confirm whether celebrities were not paid to promote MoonPay, Soto-Wright falsely stated that "Everyone that uses MoonPay Concierge has a commercial relationship with the company in the sense that this is a commercial service we offer our clients.  We provide the support and then we invoice for services rendered."

l. The Yuga pitch deck falsely proclaims that "[c]elebrities are buying Apes to signal that they know what's up" when in reality the celebrity promotions were not organic and were orchestrated by Defendant Oseary and MoonPay.

m. ApeCoin was repeatedly falsely promoted that it could be used for magazine subscriptions, luxury items like Gucci and Tag Heuer, and that it could be used on OpenSea for NFTs.  These statements were marketing ploys and were never followed up on.

604.   In order to make those statements not misleading, Defendants were obligated to disclose that:

a. The buyer at the Sotheby's auction was not a traditional art buyer, but was instead cryptocurrency industry insiders with FTX;

195

b.  The price and volume of the Yuga NFTs was heavily impacted by wash trading and other manipulative practices;

c.  A large number of the original mints of the Bored Ape NFTs were minted by Binance and/or FTX insiders;

d.  MoonPay, Soto-Wright, and Oseary were orchestrating a widespread celebrity shilling scheme;

e.  MoonPay and Soto-Wright were making manipulative trades themselves to increase trading volume and price;

f.  The Promotor Defendants had ownership interests in MoonPay and stood to financially gain from their promotions;

g.  MoonPay was gifting Bored Ape NFTs to influencers and not expecting payment for them;

h.  ApeCoin would not actually be used on NFT exchanges and would not be accepted to buy luxury goods; and

i.  Market making firms like Alameda Research and Wintermute were given secret loans of ApeCoin.

**Materiality**

605.  The forgoing misrepresentations and omissions were each material.  These representations related to critical issues concerning the viability of the Yuga Financial Product holders' investments.

606.  These misrepresentations and omissions related to, among other things: (i) the extent to which the Yuga Financial Products were subject to manipulative trading practices; and (ii) whether the hype around the Yuga Financial Products was genuine and organic or orchestrated pursuant to a fraudulent scheme.  If a reasonable investor knew that the Yuga Financial Products were subject to manipulative trading practices and were the subject of a celebrity shilling scheme, then that investor would

1   reasonably expect the price of Yuga Financial Products to be substantially lower,

2   given that the investment would be much riskier.

3       607.   Accordingly, there is a substantial likelihood that the disclosure of the

4   omitted facts would have been viewed by the reasonable investor as having

5   significantly altered the "total mix" of information made available.

6   **Scienter**

7       608.   The Executive Defendants, MoonPay Defendants, Wu, and Sotheby's

8   acted with scienter in engaging in the forgoing misconduct, in that they either had

9   actual knowledge of the misrepresentations and omissions of material facts set forth

10  herein, or acted with reckless disregard for the truth in that they failed to ascertain

11  and to disclose such facts, even though such facts were available to them.

12      609.   The Executive Defendants knew that the trading done by Binance and/or

13  FTX insiders close to the mint had outsized impacts.  Yuga knew that the celebrity

14  promotions had been done at the behest of Oseary and MoonPay.  Based on their

15  control of the smart contracts to mint the Bored Apes and their oversight of trading

16  activity, the Executive Defendants knew that the Yuga Financial Products were being

17  subjected to manipulative trading that increased volume and prices.

18      610.   The MoonPay Defendants knew that the Promotor Defendants had not

19  paid for their Bored Apes and that MoonPay had gifted them to promote the Yuga

20  Financial Products.   The MoonPay Defendants knew that they were making

21  manipulative outlier transactions to boost floor prices and increase trading volumes.

22      611.   The Ape DAO Board Defendants knew that the Promoter Defendants

23  had not actually paid for their Bored Apes and that it was a marketing ploy.  The Ape

24  DAO Board Defendants also knew ApeCoin was subject to price manipulation as

25  entities like Alameda Research and Wintermute were given secret loans.  The Ape

26  DAO Board Defendants knew that there was significant marketing to promote that

27  ApeCoin could be used for luxury item, but knew that there would be no follow

28

1  through.  The ApeDAO defendants knew that that ApeDAO structure was a pure

2  legal fiction, and an attempt by Yuga to effectuate a pure unregistered securities

3  offering.

4      612.  Sotheby's knew that a traditional art collector was not the winning

5  bidder for the Bored Ape Auction.  Sotheby's knew that FTX was the winning bidder

6  but hid this fact in order for the Yuga Financial Products to have a veneer of

7  credibility in the mainstream art world.

8  **Reliance, Economic Loss, and Loss Causation**

9      613.  As a result of the publication and dissemination of the materially false

10  and misleading information and failure to disclose material facts, as set forth above,

11  the prices of the Yuga Financial Products were artificially inflated.

12      614.  In ignorance of the fact that the prices of the Yuga Financial Products

13  were artificially inflated, and relying directly or indirectly on the false, misleading,

14  and materially incomplete statements that the Executive Defendants, MoonPay

15  Defendants, and Sotheby's made and approved, or upon the integrity of the market

16  in which the Yuga Financial Products were sold, or on the absence of material adverse

17  information that these Defendants knew or recklessly should have known of but failed

18  to disclose in public statements, Plaintiffs and the other Class members acquired

19  Yuga Financial Products at artificially high prices and were damaged thereby.

20      615.  As a direct and proximate result of the Executive Defendants, MoonPay

21  Defendants, and Sotheby's wrongful conduct, Plaintiffs and the other Class members

22  suffered damages in connection with the respective purchases of Yuga Financial

23  Products and are entitled to an award compensating them for such damages.

24      616.  Indeed, the price of the Yuga Financial Products dropped significantly

25  as Defendants disclosed, and the market discovered the truth concerning the celebrity

26  promotions, the true demand for Yuga NFTs, and the Yuga ecosystem's prospects

27  for the future.

28

617.   For example, in June 2022, exchanges that provided investors yield on their crypto investments began to experience liquidity issues and lock users out. Voyager, was one of the largest such platforms, and was one of the few platforms where investors could earn yield on their ApeCoin.   On June 22, 2022, Voyager announced that it had significant exposure to bankrupt hedge fund Three Arrows Capital, raising significant survivability concerns at the exchange.[342]   In response, the price of ApeCoin dropped from 4.37 to $3.97, or approximately 9%.

618.   By August 2022, the celebrity endorsements had dried up.   Without celebrities endorsing the Yuga assets and without floor prices being pumped by MoonPay, the Yuga Financial Products each suffered diminution in value with decreased sales volume and fewer unique buyers.[343]   All of the Yuga Financial Products hit visible low points between August 19th and 23rd.   The Bored Ape NFT floor price dropped from 82.48 ETH on August 10, 2022, to 66.9 ETH on August 23, 2022. The Mutant Ape NFT floor price also fell from 15.25 ETH on August 10, 2022, to a floor price of 11 ETH on the August 19, 2022. The Kennel Club NFT floor price also dropped from 7.99 ETH on August 10, 2022, to 5.990 ETH on August 19, 2022. The Otherdeed NFTs fell from a floor price of 2.02 ETH on August 7, 2022 to a floor price of 1.47 ETH on August 22, 2022.   Likewise, ApeCoin dropped from $7.56 on August 5, 2022 to $4.64 on August 28, 2022.

619.   In September 2022, the price of ApeCoin and the Yuga NFTs dropped significantly in anticipation of a significant token unlock for "launch contributors" of ApeCoin.   In the 30 days prior to the unlock, ApeCoin dropped 26%.[344]   On September 16, 2022 alone, ApeCoin dropped approximately 9% in advance of the unlock on September 17, 2022.[345]

---

[342]   Reback, *supra* n.302
[343]   Hayes, *supra* n.303.
[344]   Hayward, *supra* n.304.
[345]   *Id.*

199

620.   On October 11, 2022, *Bloomberg* reported that the SEC was conducting an investigation of Yuga Labs over whether the sales of its digital assets violate federal securities laws.[346]  *Bloomberg* reported that the SEC is examining whether certain NFTs are more akin to stocks and should follow the same disclosure rules. *Bloomberg* also reported that the SEC is investigating the distribution of ApeCoin. Yuga told *Bloomberg* in a statement that it was "fully cooperating" with the inquiry. In response to the news regarding the SEC investigation, the ApeCoin token dropped approximately 11%.[347]

621.   Yuga's NFTs likewise dropped in value in the wake of the disclosure of the SEC investigation.  The Bored Ape NFT floor price dropped from 75.5 ETH on October 10, 2022 to 72.421 ETH on October 15, 2022.  The Mutant Ape NFT price floor dropped from 14.96 ETH on October 10, 2022 to 13.440 on October 13, 2022. The Kennel Club NFTs dropped from a floor price of 6.39 ETH on October 10, 2022 to 5.750 by October 17, 2022.  The Otherside NFTs likewise dropped from a price floor of approximately 1.6 ETH on October 10, 2022 down to 1.11 ETH on October 21, 2022.

622.   The downfall of FTX had a significant impact on the Yuga Financial Products.  When both FTX and Alameda Research filed for Chapter 11 Bankruptcy on November 11, 2022, each of the Yuga Financial Products had a material drop in value in the days leading up to and following the announcement.  At the time of the bankruptcy, FTX and Alameda held a number of Yuga Financial Products, which were now at risk of being subject to forced liquidation in the bankruptcy.

623.   On November 5, 2022, prior to the disclosure of the liquidity issues with FTX, the BAYC NFT floor price was 64.8 ETH.  In the wake of the FTX bankruptcy, the floor price of the BAYC NFT fell to 50 ETH (*i.e.*, approximately $62,000) on

---

[346]   Robinson, *supra* n.306.
[347]   Hayward, *supra* n.307.

FIRST AMENDED CLASS ACTION COMPLAINT - CASE NO. 2:22-cv-08909-FMO-PLA

November 14, 2022. The floor price continued to drop, reaching 48 ETH on November 17, 2022. Prices continued to drop, reaching a Class Period low of 28.49 ETH (approximately $55,201.63) on July 2, 2023. This is down from the all-time high of 153.70 ETH (or $420,430) that occurred in the midst of the celebrity promotions and as MoonPay was manipulating prices with its outlier transactions on April 30, 2022.

624. The same is true for Yuga's Mutant Apes, which had a floor price of 11 ETH prior to the FTX disclosures. Following the FTX and Alameda bankruptcy, the floor price of Mutant Apes dropped to 8.99 ETH on November 17, 2022. Mutant Apes had a floor price high of 40.0 ETH ($109,416) on April 30, 2022 in the midst of the celebrity promotions and MoonPay outlier transactions. Since the FTX disclosures, the floor price continued to drop, reaching a low of 4.88 ETH ($9,475.49) on July 2, 2023.

625. Likewise, the floor price of the Otherdeed NFT dropped from 1.192 ETH on November 5, 2022 to 0.8 ETH on November 17, 2022. The Otherdeed floor price went from a Class Period high of 5.0 ETH (about $14,149.94) on May 1, 2022 all the way down to a low of 0.592 ETH (worth only $1,100.59) on July 27, 2023.

626. Prices for the Bored Ape Kennel Club likewise dropped from a floor price of 4.69 ETH on November 5, 2022 to 3.65 ETH on November 17, 2022. Kennel Club NFTs reached a Class Period high of 10.4 ETH on April 27, 2022, but have since dropped to Class Period lows of 1.85 ETH on July 3, 2023.

627. Similarly, the FTX disclosures caused a significant drop in the price of ApeCoin. On November 5, 2022, ApeCoin traded at $5.10 per token, and dropped to $2.70 by November 13, 2022. Trading volume of ApeCoin likewise decreased to $160.7 million, down a staggering 99.7% from its high point during the Class Period of $5.5B on April 28, 2022. ApeCoin price reached a Class Period low of $1.77 on July 31, 2022.

628.   In addition, as a direct and proximate result of the Executive Defendants, the MoonPay Defendants, and Sotheby's wrongful conduct, these Defendants have generated and retained ill-gotten gains in connection with the promotion and sale of the Yuga Financial Products, such that Plaintiffs and the other Class members are entitled to the disgorgement of Defendants' ill-gotten gains acquired from such misconduct.

629.   As a direct and proximate result of the false and misleading statements and omissions made by the Executive Defendants, the MoonPay Defendants, and Sotheby's to investors in order to solicit the sale of unregistered securities, Plaintiffs and the Class have suffered damages in connection with their Yuga Financial Product purchases.

630.   Plaintiffs bring this claim for violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78j(b), and Rule 10b-5(b) promulgated thereunder, 17 C.F.R. §240.10b-5(b).

631.   The Yuga Financial Products are securities within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. §77b(a)(1).

632.   Section 10(b) and Rule 10b-5(b) make it illegal, in connection with the purchase or sale of any security, "for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange . . . to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." *Id.*

**EIGHTH CAUSE OF ACTION**

**Violation of Sections 10b of the Securities Exchange Act of 1934 and Rule 10b-5(a) and (c) thereunder**
**(Scheme Liability)**
**(Against all Defendants)**

633.   Plaintiffs, on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference paragraphs 1-475, and further allege as follows:

634.   The Class Period for this cause of action is defined as the period between April 23, 2021 and the date of this filing.

635.   Plaintiffs bring this claim for violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §78j(b), and Rule 10b-5(a) and (c) promulgated thereunder, 17 C.F.R. §240.10b-5(a) and (c).

636.   The Yuga Financial Products are securities within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. §77b(a)(1).

637.   Subsections (a) and (c) of Rule 10b-5 allow a allow a suit against defendants who, with scienter, "employ any device, scheme, or artifice to defraud," or "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."  17 C.F.R. §240.10b-5.

638.   "Unlike a claim under subsection (b) of Rule 10b-5, a claim of liability for violations of subsections (a) and (c) does not require an allegation that the defendant made a false or misleading statement; rather, liability is premised on a course of deceptive or manipulative conduct."  *See Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 152-53 (1972) (observing that "the second subparagraph of [Rule 10b-5] specifies the making of an untrue statement of a material fact and the omission to state a material fact, [but] [t]he first and third subparagraphs are not so restricted"); *In re DVI, Inc. Sec. Litig*., 639 F.3d 623, 643 (3d Cir. 2011) ("We refer to claims under Rule 10b-5(a) and (c) as 'scheme liability claims' because they make

deceptive conduct actionable, as opposed to Rule 10b-5(b), which relates to deceptive statements.").

639.   Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, carried out a plan, scheme, and course of conduct which was intended to, and throughout the Class Period, did manipulate the price and trading activity of Yuga Financial Products to the detriment of the investing public, including Plaintiffs and other Class members, in connection with the purchase and/or sale of Yuga Financial Products.

640.   Defendants conspired and employed devices, schemes, and artifices and engaged in acts, practices, and a course of business as alleged herein to unlawfully manipulate and profit from the manipulation for the price of and market for Yuga Financial Products.

641.   Defendants' actions alleged herein constitute manipulative acts. Through fraudulent market making and price signaling conduct, the Company, Executive Defendants, Ape DAO Board Defendants, Sotheby's, and MoonPay Defendants falsely increased both the price of the Yuga Financial Products and appearance of market activity for the same.   Concurrently, the Company, Executive Defendants, Ape DAO Board Defendants, MoonPay Defendants, and Promoter Defendants engaged in a scheme to use a misleading marketing campaign meant to leverage the celebrity Promoter Defendants' influence in order to artificially inflate the price of and market for Yuga Financial Products.

642.   These manipulative acts were intended to and did deceive the retail investors – Plaintiffs and the other Class members – who acquired Yuga Financial Products during the Class Period and thereby caused them to purchase Yuga Financial Products at artificially inflated prices.   Thus, Plaintiffs and other Class members suffered losses as a result of the Scheme Liability Defendants' two primary deceptive

schemes and related acts, which manipulated the Yuga Financial Product marketplace.

643.   Plaintiffs and other members of the Class were damaged by relying on an assumption of an honest and fair market, free of manipulation, when buying and selling Yuga Financial Products in the marketplace.

644.   Defendants acted with scienter in connection with the manipulative acts alleged herein in that they acted knowingly and/or recklessly when they artificially inflated the price of the Yuga Financial Products and thereby interfered with the market for Yuga securities.

645.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class were damaged as a result of their purchase or sale of Yuga Financial Products.

646.   By virtue of the foregoing, each Defendant has violated Section 10(b) of the Exchange Act, and Rule 10b-5(a) and (c) promulgated thereunder.

## NINTH CAUSE OF ACTION
### Violation of Sections 20(a) of the Securities Exchange Act of 1934
**(Against the Executive Defendants, Ape DAO Board Defendants, Adidas Ventures, B.V., and Individual Defendant Soto-Wright)**

647.   Plaintiffs, on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference paragraphs 1-475, and further allege as follows:

648.   This Count is asserted against Executive Defendants Aronow, Solano, Atalay, Ali, Muniz, Shoemaker, Ehrlund, Oseary, Ape DAO Board Defendants Lyons, Ohanian, Wu, and Bajwa, and Defendant Soto-Wright, (collectively, the "Control Person Defendants") under Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §78t(a).

649.   The Control Person Defendants, by virtue of their offices, ownership, agency, agreements or understandings, and specific acts were, at the time of the

wrongs alleged herein, and as set forth herein, controlling persons within the meaning of Section 20(a) of the Securities Exchange Act.  The Control Person Defendants, and each of them, had the power and influence and exercised the same to cause the unlawful scheme to artificially increase the interest in and price of the Yuga Financial Products.

650.   The Control Person Defendants, separately or together, possess, directly or indirectly, the power to direct or cause the direction of the management and policies of the Company and/or MoonPay, through ownership of voting securities, by contract, subscription agreement, or otherwise.

651.   Executive Defendants Aronow, Solano, Atalay, Ali, Muniz, Shoemaker, and Ehrlund were all directors and officers of the Company for the relevant time period.  While not explicitly named as directors of the Company, Ape DAO Board Defendants Lyons, Ohanian, Wu, and Bajwa nevertheless were responsible for making high-level decisions for the Company that would normally be carried out by directors.  Thus, the Executive Defendants and Ape DAO Board Defendants have the power to direct or cause the direction of the management and policies of Yuga. Similarly, Defendants Soto-Wright serves as the CEO of MoonPay, and thus has the power to direct or cause the direction of the management and policies of MoonPay.

652.   The Control Person Defendants, separately or together, have sufficient influence to have caused the Company and MoonPay to engage in the fraudulent conduct described above.

653.   The Control Person Defendants, separately or together, jointly participated in the Company's and MoonPay's fraudulent conduct described above.

654.   By virtue of the conduct alleged herein, the Control Person Defendants are liable for the wrongful conduct complained of herein and are liable to Plaintiffs and the Class for rescission and/or damages suffered.

**TENTH CAUSE OF ACTION**
**Violation of Sections 25401 and 25501 of the California Corporations Code**
**(Misrepresentation Sections)**
**(Against All Defendants)**

655.   Plaintiff, on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference paragraphs 1-475, and further allege as follows:

656.   Plaintiffs bring this claim individually and on behalf of the members of the California Subclass against the Executive Defendants.

657.   This Count is asserted against Executive Defendants for violation of Sections 25401 and 25501 of the California Corporations Code.

658.   Section 25401 (similar to Rule 10b-5(b) under the federal securities law) makes it illegal, in connection with the purchase or sale of any security, for any person, directly or indirectly, to offer or sell a security in California "by means of any written or oral communications which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made . . . not misleading."  Cal. Corp. Code, §25401.

659.   Executive Defendants carried out a plan, scheme, and course of conduct that intended to and did deceive the retail investors – Plaintiffs and the other Class members – who acquired Yuga Financial Products pursuant to the continuous offering and thereby caused them to purchase Yuga Financial Products at artificially inflated prices.

660.   In connection with the continuous offering of Yuga Financial Products, Executive Defendants, Ape DAO Defendants, MoonPay Defendants, and the Promoter Defendants each disseminated, approved, and/or endorsed the false statements and omissions described herein, which these Defendants knew or recklessly should have known were materially misleading in that the statements contained material misrepresentations and failed to disclose material facts necessary

in order to make the statements made, in light of the circumstances under which they were made, not materially misleading.

661.  Defendants each employed devices, schemes, and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary to make the statements made not misleading; and engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the Class members that resulted in artificially high market prices for Yuga Financial Products in connection with the continuous offering, in violation of Section 25401 and 25501.

662.  Defendants, separately or together, directly or indirectly, caused a false statement or omission to be made in connection with the offers or sales of a security.

663.  In ignorance of the fact that the price of Yuga Financial Products was artificially inflated, and relying directly or indirectly on the false, misleading, and materially incomplete statements that Executive Defendants made and approved, or upon the integrity of the market in which the Yuga Financial Products were sold, or in the absence of material adverse information that these Executive Defendants knew or recklessly should have known of but failed to disclose in public statements, Plaintiffs and the other Class members acquired Yuga Financial Products at artificially high prices and were damaged thereby.

664.  Plaintiffs purchased Yuga Financial Products securities from the Company, Executive Defendants, Ape DAO Defendants, Sotheby's, MoonPay, and/or Adidas.  For example, the ApeCoin tokens were provided and/or sold into the ApeCoin liquidity pool by Executive Defendants and Ape DAO Board Defendants. Upon information and belief, given the limited and measurable amount of individuals selling or providing the cryptocurrency to the ApeCoin token liquidity pool, a large portion (if not all) of the ApeCoin token liquidity pool were provided by Executive Defendants and Ape DAO Board Defendants (or market makers like Wintermute and FTX who were given undisclosed loans of Yuga Financial Products to sell to the

market on behalf of the Company).  These actions coincided with Plaintiffs and Class members transacting with the liquidity pools as buyers.  Thus, by providing ApeCoin tokens to the liquidity pool at the time in which Plaintiffs and the members of the Class made their ApeCoin token purchases from the liquidity pool, privity between Executive Defendants (personally and through the Company), Ape DAO Board Defendants (personally and through the Ape Foundation and/or the Company), and Plaintiffs is established even in the absence of a direct contract linking the two parties.

665.  Privity also exists between the issuers of every Yuga NFT collection (i.e., the Company and Executive Defendants) and all those making purchases (*e.g.*, Plaintiffs and the members of the Class) regardless of which cryptocurrency exchange was used to facilitate the transaction because these Defendants are receiving the benefit of a 2.5% fee per resale of a Yuga NFT.

666.  As discussed above, the Company, Executive Defendants, Ape DAO Board Defendants, MoonPay, and Promoter Defendants Sotheby's and Adidas actively solicited the purchase of Yuga Financial Products through a misleading marketing campaign social media, promotional video, press releases, traditional press, and online.

667.  As a direct and proximate result of Executive Defendants' wrongful conduct, Plaintiffs and the other Class members suffered damages in connection with the respective purchases of Yuga Financial Products and are entitled to an award compensating them for such damages.

668.  Indeed, the price of Yuga Financial Products dropped significantly as, *inter alia,* the celebrity promoters distanced themselves from the project; the SEC investigation was disclosed; FTX and Alameda imploded; Moonpay's manipulative trading ceased; and further regulatory scrutiny of unregistered securities increased.

1  669.   By virtue of the conduct alleged herein, Executive Defendants are liable,

2  jointly or severally, for the wrongful conduct complained of herein and are liable to

3  Plaintiffs and the Class for rescission and/or damages suffered.

4  **ELEVENTH CAUSE OF ACTION**
**Violations of California Corporate Securities Law of 1968**

5  **Cal. Corp. Code §§25400 and 25500**

6  **(Manipulation Sections)**
**(Against the Company, Executive Defendants, Ape DAO Board Defendants,**

7  **MoonPay, Soto-Wright, and Sotheby's)**

8

9  670.   Plaintiffs on behalf of themselves and all others similarly situated,

10  reallege and incorporate herein by reference paragraphs 1-475, and further alleges as

11  follows:

12  671.   Plaintiff Titcher brings this claim individually and on behalf of the

13  members of the Class against the Company, Executive Defendants Aronow, Solano,

14  Atalay, Ali, Muniz, and Lyons, Ape DAO Board Defendants Shoemaker, Ehrlund,

15  Ohanian, Wu, and Bajwa, MoonPay, Defendant Soto-Wright, and Sotheby's are

16  collectively referred to in this cause of action as the "Market Manipulation

17  Defendants."

18  672.   Section 25400 makes it illegal, in connection with the purchase or sale

19  of any security, for any person in California, directly or indirectly, to effect, alone or

20  with one or more other persons, a series of transactions in any security creating actual

21  or apparent active trading in such security or raising the price of such security, for

22  the purpose of inducing the purchase or sale of such security by others.  Cal. Corp.

23  Code §25400(b).

24  673.   Other common examples of manipulation include, but are not limited to:

25  (i) transferring record ownership of securities in order to hide the true identity of the

26  beneficial owner, which is known as "parking"; (ii) sending a false pricing signal to

27  the public market; and (iii) price leadership by the manipulator.

28

674.   The Company and MoonPay, and their respective executives (*i.e.*, Executive Defendants, Ape DAO Board Defendants, and Defendant Soto-Wright), directly or indirectly, singly or in concert, by the use of the means or instrumentalities of interstate commerce, of the mails, for the purpose of creating a false or misleading appearance of active trading in ApeCoin tokens, or a false or misleading appearance with respect to the market for the Yuga Financial Products: (a) have engaged in improper parking; (b) have sent a false price signal to the market for Yuga NFTs; (c) have engaged in unlawful "price leadership." Concurrently, MoonPay and Soto-Wright (on behalf of the Company and Executive Defendants) engaged in various manipulative wash trading activities, including using circular trades, seller funded wash trading, and making outlier transactions.

675.   As noted above, the Company and MoonPay , with the assistance and/or approval of Executive Defendants, Ape DAO Board Defendants, and Defendant Soto-Wright, manipulated the price of Yuga Financial Products by: (a) transferring record ownership of ApeCoin tokens between the Company, MoonPay, and non-party FTX in order to hide the true identity of the beneficial owner (*i.e.*, Executive Defendants, Ape DAO Board Defendants, and Soto-Wright) in these seller funded wash trades, (b) having sent a false price increase signal to the market for Yuga NFTs by having MoonPay repeatedly purchase Yuga NFTs at a price significantly higher than the then-current floor price for those Yuga NFTs (*i.e.*, outlier transactions), (c) having engaged in unlawful "price leadership" by having MoonPay repeatedly bidding for and purchasing Yuga NFTs at a price significantly higher than the then-current floor price for those Yuga NFTs, and/or (d) having engaged in circular trades to create the appearance of trading activity and a market for the Yuga Financial Products.  Scheme Liability Defendants each made misleading statements regarding the exponential increase in the price of Yuga Financial Products since launch.  The Company purposefully did not disclose to investors that the percentage increases that

1    they were collectively touting was the result of price manipulation as opposed to real

2    trading activity of Yuga Financial Products.

3        676.   Concurrently, Defendant Sotheby's engaged a series of transactions

4    with FTX during the Sotheby's auction that created apparent active trading in the

5    Yuga NFTs and/or raising the price of Yuga NFTs, for the purpose of inducing the

6    purchase or sale of Yuga NFTs by others.

7        677.   The subsequent collapse of the market for, and price of, the Yuga

8    Financial Products after the manipulative activity has ceased following the collapse

9    of FTX further demonstrates the manipulative nature of the alleged conduct by the

10   Market Manipulation Defendants.

11       678.   These manipulations of the Yuga Financial Products were part of the

12   Defendants' goal of selling their unregistered securities to Plaintiffs and the Class at

13   artificially inflated prices.  The collapse of the price of Yuga Financial Products after

14   the manipulative conduct alleged herein ceased further demonstrates that the

15   Company, Executive Defendants, Ape DAO Board Defendants, MoonPay, Soto-

16   Wright, and Sotheby's violated Cal. Corp. Code, §25500(a)-(b).

17       679.   Plaintiffs and other members of the Class were damaged by relying on

18   an assumption of an honest and fair market, free of manipulation, when buying and

19   selling Yuga Financial Products in the marketplace.

20       680.   The Company, Executive Defendants, Ape DAO Board Defendants,

21   MoonPay, Soto-Wright, and Sotheby's acted with scienter in connection with the

22   manipulative acts alleged herein in that they acted knowingly and/or recklessly when

23   they artificially inflated the trading volume and price of Yuga Financial Products and

24   thereby interfered with the market for Yuga Financial Products.  Further, statements

25   by Defendants coupled with the transactions history on the Ethereum blockchain and

26   the testimony of a confidential witness plausibly indicate that each of them knew that

27   they were engaging in wash trading, outlier transactions, circular trading, matching

28

FIRST AMENDED CLASS ACTION COMPLAINT - CASE NO. 2:22-cv-08909-FMO-PLA

orders, and other manipulative efforts to raise the price of the Yuga Financial Products.

681.   As a direct and proximate result of the wrongful conduct of the Company, Executive Defendants, Ape DAO Board Defendants, MoonPay, Soto-Wright, and Sotheby's, Plaintiffs and other members of the Class were damaged as a result of their purchase or sale of Yuga Financial Products.

682.   By reason of the foregoing, the Company, Executive Defendants, Ape DAO Board Defendants, MoonPay, Soto-Wright, and Sotheby's have violated, and unless restrained and enjoined will again violate, Cal. Corp. Code, §25500(a)-(b).

683.   By virtue of the conduct alleged herein, the Company, Executive Defendants, Ape DAO Board Defendants, MoonPay, Soto-Wright, and Sotheby's are liable for the wrongful conduct complained of herein and are liable to Plaintiffs and the Subclass for rescission and/or damages suffered.

## TWELFTH CAUSE OF ACTION
### Violation of Sections 25403(b), 25504 and 25504.1 of the California Corporations Code
### (Secondary Liability Sections)
### (Against Executive Defendants, Ape DAO Board Defendants, and Defendant Soto-Wright)

684.   Plaintiffs, on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference paragraphs 1-475, and further alleges as follows:

685.   This Count is asserted against Executive Defendants Aronow, Solano, Atalay, Ali, Muniz, Shoemaker, Ehrlund, Lyons, Ape DAO Board Defendants Ohanian, Wu, and Bajwa, and Defendant Soto-Wright (collectively referred to for this cause of action as the "Secondary Liability Defendants") for violations of Sections 25403(b), 25504 and 25504.1 of the California Corporations Code.

686.   To the extent that the Company and/or MoonPay instead of the Secondary Liability Defendants are determined to be the primary violator of Sections

25110 (qualification failure) or 25401 (misrepresentations), this Count is asserted against Executive Defendants because, as officers and executives of the Company, they are each secondarily liable under Section 25504. Secondary Liability Defendants are likewise alternatively secondarily liable under Sections 25504.1 and 25403(b) for materially aiding and abetting and/or providing substantial assistance to the Company's and MoonPay primary violations of California securities laws.

687.   This Count is also asserted against the Secondary Liability Defendants because they are secondarily liable under Section 25403(b) for providing substantial assistance to the Company's, MoonPay's, and/or Sotheby's primary violations of Section 25400 (manipulation of price).

688.   Section 25504 makes the following people liable for Qualification Section (*i.e.* Cal. Corp. Code §25110 and 25503) violations: a "principal executive officer or director of a corporation so liable, every person occupying a similar status or performing similar functions, every employee of a person so liable who materially aids in the act or transaction constituting the violation, and every broker-dealer or agent who materially aids in the act or transaction constituting the violation."  Cal. Corp. Code, §25004.

689.   Section 25403(b) makes it unlawful for any person to knowingly provide "substantial assistance" to another person violating Cal. Corp. Code §25000 *et seq*.

690.   Section 25504.1 makes anyone who, with "intent to deceive or defraud," "materially assists" the primary perpetrator of a Misrepresentation Section (*i.e.* Cal. Corp. Code §25401 and 25501) violation.

691.   The conduct of Secondary Liability Defendants described above, directly or indirectly, provided substantial assistance to the Company, MoonPay, and Sotheby's, who issued the false statements and omissions made in connection with the offers or sales of Yuga Financial Products alleged herein.  This aid and assistance provides for secondary liability for the other Defendants' primary violations.

692.   Secondary Liability Defendants had knowledge of the falsity or misleading nature of the statements or omissions made in connection with the offers or sales of the Yuga Financial Products.

693.   By virtue of the conduct alleged herein, Secondary Liability Defendants are liable, jointly or severally, for the wrongful conduct of primary violators the Company, MoonPay, and Sotheby's complained of herein, and are liable to Plaintiffs and the Class for rescission and/or damages suffered.

## THIRTEENTH CAUSE OF ACTION
### Unjust Enrichment/Restitution
### (California Common Law, in the Alternative)
### (Against All Defendants)

694.   Plaintiffs restate and reallege all preceding allegations above in paragraphs 1-475 as if fully set forth herein, and further allege as follows:

695.   This cause of action for equitable relief is pled in the alternative because, if Plaintiffs' state consumer or securities law claims are found to be inapplicable to the wrongdoing alleged herein, Plaintiffs will lack an adequate remedy at law since they will be unable to obtain monetary damages in an amount that would make Plaintiffs and the members of the Class whole.

696.   The lack of an adequate remedy at law entitles Plaintiffs and the Class to pursue equitable restitution and/or disgorgement.

697.   Plaintiffs and members of the Class conferred a monetary benefit on Defendants by raising the price and trading volume of the Yuga Financial Products, which allowed Defendants to sell their Yuga Financial Products to Plaintiffs and Class members at inappropriately and artificially inflated prices.

698.   Defendants received a financial benefit from the sale of their Yuga Financial Products at inflated prices and are in possession of this monetary value that was intended to be used for the benefit of, and rightfully belongs to, Plaintiffs and members of the Class.

215

699. Plaintiffs seek restitution in the form of the monetary value of the difference between the purchase price of the Yuga Financial Products and the price those Yuga Financial Products sold for.

## X.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that this Court:

A.     Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Class defined above;

B.     Appoint Plaintiffs as representatives of the Class and their counsel as Class counsel;

C.     Award all actual, general, special, incidental, statutory, punitive, and consequential damages and restitution to which Plaintiffs and Class members are entitled;

D.     Award post-judgment interest on such monetary relief;

E.     Grant appropriate injunctive and/or declaratory relief;

F.     Award reasonable attorneys' fees and costs; and

G.     Grant such further relief that this Court deems appropriate.

## XI.   JURY DEMAND

Plaintiffs, individually and on behalf of the putative Class, demands a trial by jury on all issues so triable.

DATED: August 4, 2023

/s/ *John T. Jasnoch*

John T. Jasnoch (CA 281605)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel.: 619-233-4565
jjasnoch@scott-scott.com

*Lead Counsel for Plaintiffs*

216

1

2    Aaron M. Zigler (CA 327318)
     Nidya Gutierrez (CA 330209)
3    **ZIGLER LAW GROUP, LLC**
     308 S. Jefferson Street | Suite 333
4    Chicago, IL 60661
5    Tel: 312-673-8427
     aaron@ziglerlawgroup.com
6    nidya.gutierrez@ziglerlawgroup.com
7
     James Q. Taylor-Copeland (CA 284743)
8    **TAYLOR-COPELAND LAW**
9    501 W. Broadway, Suite 800
     San Diego, CA 92101
10   Telephone: (619) 400-4944
     Facsimile: (619) 566-4341
11   james@taylorcopelandlaw.com
12
13   *Additional Counsel for Plaintiffs*
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

217

1

## <u>CERTIFICATE OF SERVICE</u>

2   I hereby certify that on August 4, 2023, I electronically filed the foregoing

3 with the Clerk using CM / ECF, which will send notification via electronic means to

4 all counsel of record.

5 DATED: August 4, 2023

6          */s/ John T. Jasnoch*

7          John T. Jasnoch

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

First Amended Class Action Complaint - Case No. 2:22-cv-08909-FMO-PLA