John T. Jasnoch (CA 281605)
jjasnoch@scott-scott.com
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel.: 619-233-4565
Fax: 619-233-0508

*Lead Counsel for Plaintiffs and the Proposed Class*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHNNY JOHNSON, EZRA BOEKWEG, MARIO PALOMBINI, and ADAM TITCHER, JONATHAN SMITH, NEAL PATEL, HIREN PATEL, and DAVID GRAND, Individually and on Behalf of All Others Similarly Situated,<br><br>                Plaintiffs,<br><br>    v.<br><br>YUGA LABS, INC., et al.,<br><br>              Defendants. | Case No.: 2:22-cv-08909-FMO-PLA<br><br>**PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN FURTHER SUPPORT OF OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>Judge: Fernando M. Olguin<br>Date: December 12, 2024<br>Time: 10:00 a.m.<br>Courtroom: 6D |

# <u>TABLE OF CONTENTS</u>

INTRODUCTION ....................................................................................1

RELEVANT FACTUAL BACKGROUND ...................................................1

ARGUMENT .........................................................................................2

    **A.**    **Governing Law Related to The *Howey* Test** .................................2

    **B.**    **The Investment of Money Prong Is Uncontested** ...........................4

    **C.**    **The SAC Pleads A Common Enterprise Between The Class and Defendants** ...................................................................5

        **1.**    **Horizontal Commonality - Pooling** ..........................6

        **2.**    **Horizontal Commonality – Tied Fortunes** ...........................9

        **3.**    **Strict Vertical Commonality** .........................................9

    **D.**    **As Passive Participants, Plaintiffs' Expectation Was That Profits Would Be Produced By Defendants' Efforts** ...................10

        **1.**    **Promise of Profits** ...................................................11

        **2.**    **Efforts of Others** ...................................................16

        **3.**    **Defendants' Reliance on *Forman* Is Misplaced** ...................18

CONCLUSION .......................................................................................21

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Audet v. Fraser*,
    605 F. Supp. 3d 372 (D. Conn. 2022)...............................................................15, 17

*Balestra v. ATBCOIN LLC*,
    380 F. Supp. 3d 340 (S.D.N.Y. 2019)...................................................................4, 6

*Digilytic Int'l FZE v. Alchemy Fin., Inc.*,
    No. 20 CIV. 4650 (ER), 2022 WL 912965 (S.D.N.Y. Mar. 29, 2022).....................3

*Dufoe v. DraftKings Inc.*,
    No. 23-CV-10524, 2024 WL 3278637 (D. Mass. July 2, 2024)...........................3, 7

*Fedance v. Harris*,
    1 F.4th 1278 (11th Cir. 2021) .........................................................................15, 17

*Friel v. Dapper Labs, Inc.*,
    657 F. Supp. 3d 422 (S.D.N.Y. 2023)............................................................ *passim*

*Harper v. O'Neal*,
    No. 23-21912-CIV, 2024 WL 3845444 (S.D. Fla. Aug. 16, 2024) ................ *passim*

*Hocking v. Dubois*,
    885 F.2d 1449 (9th Cir. 1989) .........................................................................5, 10

*Hunichen v. Atonomi LLC*,
    No. C19-0615-RAJ-MAT, 2019 WL 7758597 (W.D. Wash. Oct. 28, 2019)...........3

*Patterson v. Jump Trading LLC*,
    710 F. Supp. 3d 692 (N.D. Cal. 2024) ......................................................3, 5, 8, 10

*Revak v. SEC Realty Corp.*,
    18 F.3d 81 (2d Cir. 1994)........................................................................................9

*SEC v. Dalius*,
    No. 2:18-CV-08497-FWS-E, 2023 WL 3988425 (C.D. Cal. May 24, 2023).........14

*SEC v. Edwards*,
    540 U.S. 389 (2004)..........................................................................................11, 12

*SEC v. Glenn Turner Enterprises, Inc.*,
    474 F.2d 476 (9th Cir. 1973) .........................................................................5, 10, 15

*SEC v. Hui Feng*,
    935 F.3d 721 (9th Cir. 2019) .........................................................................2, 13, 18

ii

*SEC v. Kik Interactive Inc.*,
  492 F. Supp. 3d 169 (S.D.N.Y. 2020) .............................................................................. *passim*

*SEC v. NAC Found.*,
  LLC, 512 F. Supp. 3d 988 (N.D. Cal. 2021) ..................................................................... *passim*

*SEC v. Pac. W. Cap. Grp., Inc.*,
  No. CV152563FMOFFMX, 2015 WL 9694808 (C.D. Cal. June 16, 2015)
  (Olguin, J) ........................................................................................................................15

*SEC v. Payward, Inc.*,
  No. 23-CV-06003, 2024 WL 4511499 (N.D. Cal. Aug. 23, 2024) ....................................3, 4

*SEC v. R.G. Reynolds Enterprises, Inc.*,
  952 F.2d 1125 (9th Cir. 1991) ...........................................................................................5

*SEC v. Ripple Labs Inc.*,
  682 F.Supp.3d 308 (S.D.N.Y. 2023) ..................................................................................15

*SEC v. Rubera*,
  350 F.3d 1084 (9th Cir. 2003) ...........................................................................................10

*SEC v. SG Ltd.*,
  265 F.3d 42 (1st Cir. 2001) ...........................................................................................3, 12

*SEC v. Telegram Grp.*,
  448 F. Supp. 3d 352 (S.D.N.Y. 2020) ................................................................6, 8, 12, 17

*SEC v. Terraform Labs Pte. Ltd.*,
  No. 23-CV-1346 (JSR), 2023 WL 4858299 (S.D.N.Y. July 31, 2023) ...............................3, 15

*SEC v. W.J. Howey Co.*,
  328 U.S. 293 (1946) ................................................................................................1, 2, 3, 11

*Solis v. Latium Network, Inc.*,
  No. 18-10255, 2018 WL 6445543 (D.N.J. Dec. 10, 2018) ..................................................4

*United Housing Foundation, Inc. v. Forman*,
  421 U.S. 837 (1975) ...............................................................................................11, 15, 16, 18

*USA v. Chastain*,
  1:22-cr-00305 (S.D.N.Y) ....................................................................................................4

*Warfield v. Alaniz*,
  569 F.3d 1015 (9th Cir. 2009) ...........................................................................2, 4, 10, 11

*Yi v. GTV Media Grp. Inc.*,
  No. 21 CIV. 2669 (VM), 2021 WL 2535528 (S.D.N.Y. June 18, 2021) ................................3

iii

*Zakinov v. Ripple Lab'ys, Inc.*,
    No. 18-CV-06753-PJH, 2020 WL 922815 (N.D. Cal. Feb. 26, 2020) ......................................4

**Statutes**

15 U.S.C. §77b(a)(1) ...........................................................................................................2

PSLRA ...........................................................................................................................5, 21

Securities Act ........................................................................................................................3

Securities Act Section 2(a)(1) .............................................................................................2

Lead Plaintiffs Johnny Johnson, Ezra Boekweg, and Mario Palombini ("Lead Plaintiffs"), and additional named plaintiffs Adam Titcher, Jonathan Smith, Neal Patel, Hiren Patel, and David Grand (together, with the Lead Plaintiffs, "Plaintiffs"), by their counsel, respectfully submit this supplemental memorandum of law in further support of Plaintiffs' Opposition to the Yuga Defendants'[1] Motion to Dismiss the Second Amended Complaint[2] (the "SAC") (ECF No. 187) (the "Supp MOL") and state as follows:

## INTRODUCTION

On August 20, 2024, this Court ordered the parties to provide additional briefing on the issue "of whether the financial products in question in this action qualify as securities within the meaning of the Securities Acts." (ECF No. 236). On October 3, 2024, the Yuga Defendants filed a consolidated opening brief (ECF No. 244), which was joined by the remaining Defendants (ECF Nos. 245, 246, 247, 248, 249, 250, 251, 252, 253, and 254). All Defendants' arguments either ignore the well-pled allegations in the SAC or contort case law on this issue. Plaintiffs respectfully submit that the SAC more than adequately alleges that each of the Yuga Financial Products are "securities" according to the relevant test set forth by the Supreme Court in *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946).

## RELEVANT FACTUAL BACKGROUND

Plaintiffs allege that the Yuga Defendants, in violation of various federal and state securities laws, improperly sold a suite of unregistered digital financial assets, which generally fall into the following two categories:

---

[1]    The "Yuga Defendants" refers to Defendants Yuga Labs, Inc. (the "Company" or "Yuga"), Wylie Aronow ("Aronow"), Greg Solano ("Solano"), Kerem Atalay ("Atalay"), Zeshan Ali ("Ali"), Nicole Muniz ("Muniz"), Jasmin Shoemaker ("Shoemaker"), Patrick Ehrlund ("Ehrlund"), Christopher Lyons ("Lyons"), and Guy Oseary ("Oseary").

[2]    Second Amended Class Action Complaint, ECF No. 179 ("SAC"). All "¶" references are to the SAC unless otherwise indicated.

1

- Non-fungible token ("NFT") collections (e.g. BAYC, MAYC, BAKC, Otherdeed, and Meebits); and

- A "native" cryptocurrency for the Bored Ape ecosystem (e.g. ApeCoin). SAC ¶1

The sale of these Yuga Financial Products, both collectively and individually, qualifies as investment contracts under the *Howey* test.

## ARGUMENT

### A.    Governing Law Related to The *Howey* Test

Under Section 2(a)(1) of the Securities Act, "investment contracts" are securities. *See* 15 U.S.C. §77b(a)(1). The Supreme Court has set forth a test to determine the existence of an investment contract (*i.e.* a security) that requires compliance with federal securities laws. *See Howey*, 328 U.S. at 300 (finding that "all the elements of a profit-seeking business are present [where] [t]he investors provide the capital and share in the earnings and profits; the promoters manage, control, and operate the enterprise"). The Ninth Circuit distilled the so-called *Howey* test into three parts: (1) an investment of money; (2) in a common enterprise; (3) with an expectation of profits produced by the efforts of others. *See Warfield v. Alaniz*, 569 F.3d 1015, 1020 (9th Cir. 2009). The Ninth Circuit also clarified that the focus of such an inquiry is on "what the purchasers were offered or promised," and accordingly, "courts conduct an objective inquiry into the character of the instrument or transaction offered based on what purchasers were led to expect." *Id*. at 1021; *see also SEC v. Hui Feng*, 935 F.3d 721, 729 (9th Cir. 2019) (confirming that the *Howey* test for unregistered securities is "objective").

"[A]n investment contract for purposes of [federal securities law] means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *Howey*, 328 U.S. at 298–99. The definition of investment contract is

2

"flexible" and "capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Id.* at 299. "[I]t is immaterial whether the enterprise is speculative or non-speculative," "whether there is a sale of property with or without intrinsic value" and "whether the promoter depicts the enterprise as a serious commercial venture or dubs it a game." *SEC v. SG Ltd.*, 265 F.3d 42, 48 (1st Cir. 2001) (analyzing the *Howey* factors).

Crucially, federal courts have recently applied the *Howey* test "to determine that similar cryptocurrency tokens intended to be sold on a blockchain or in the general market were securities within the meaning of the Securities Act." *Digilytic Int'l FZE v. Alchemy Fin., Inc.*, No. 20 CIV. 4650 (ER), 2022 WL 912965, at *11 (S.D.N.Y. Mar. 29, 2022). These federal courts **have overwhelmingly found that the sale of similar digital assets (both cryptocurrency tokens and NFTs) are investment contracts constituting securities under Howey**.[3] *See, e.g.*, *Harper v. O'Neal*, No. 23-21912-CIV, 2024 WL 3845444, at *8–10 (S.D. Fla. Aug. 16, 2024) (NFTs); *Dufoe v. DraftKings Inc.*, No. 23-CV-10524, 2024 WL 3278637, at *4 (D. Mass. July 2, 2024) (NFTs); *Friel v. Dapper Labs, Inc.*, 657 F. Supp. 3d 422 at 434-450 (S.D.N.Y. 2023) ("Dapper Labs") (NFTs); *SEC v. Payward, Inc.*, No. 23-CV-06003, 2024 WL 4511499, at *17 (N.D. Cal. Aug. 23, 2024) (tokens); *Patterson v. Jump Trading LLC*, 710 F. Supp. 3d 692, 711 (N.D. Cal. 2024) (tokens); *SEC v. Terraform Labs Pte. Ltd.,* No. 23-CV-1346 (JSR), 2023 WL 4858299, at *15 (S.D.N.Y. July 31, 2023) ("Terraform") (tokens); *SEC v. LBRY*, Inc., 639 F. Supp. 3d 211, 216–22 (D.N.H. 2022) (tokens); *Yi v. GTV Media Grp. Inc.*, No. 21 CIV. 2669 (VM), 2021 WL 2535528, at *3 (S.D.N.Y. June 18, 2021) (tokens); *SEC v. NAC Found.*, LLC, 512 F. Supp. 3d 988, 997 (N.D. Cal. 2021) (tokens); *SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169, 178 (S.D.N.Y. 2020) (tokens); *Hunichen v.*

---

[3]     Unless otherwise indicated, citations are omitted, and emphasis is added.

*Atonomi LLC*, No. C19-0615-RAJ-MAT, 2019 WL 7758597, at *14 (W.D. Wash. Oct. 28, 2019), *report and recommendation adopted*, No. 219CV00615RAJMAT, 2020 WL 1929372 (W.D. Wash. Apr. 21, 2020) (tokens); *Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 357-58 (S.D.N.Y. 2019) (tokens); *Solis v. Latium Network, Inc.*, No. 18-10255, 2018 WL 6445543, at *3 (D.N.J. Dec. 10, 2018) (tokens) *see also Zakinov v. Ripple Lab'ys, Inc.*, No. 18-CV-06753-PJH, 2020 WL 922815, at *15 (N.D. Cal. Feb. 26, 2020) ("Ripple") (tokens).

Government and regulator enforcement actions likewise demonstrate that the Yuga Financial Products are securities. First, federal prosecutors in the Southern District of New York brought insider trading charges against a manager at OpenSea in connection with the purchase and sale of NFTs. *See USA v. Chastain*, 1:22-cr-00305 (S.D.N.Y); ¶597. Further, on August 28, 2023, the SEC charged Impact Theory, LLC with conducting an unregistered offering of crypto asset securities in the form of NFTs. ¶598. The SEC found that the NFTs offered and sold to investors were investment contracts and therefore securities. Finally, on September 13, 2023, the SEC charged Stoner Cats 2 LLC with conducting an unregistered offering of crypto asset securities for its NFTs. Like Yuga, Stoner Cats used well-known actors and celebrities as part of its promotion. ¶599.

## B.    The Investment of Money Prong Is Uncontested

Defendants do not contest that the first prong under *Howey* is met. Nor could they. The first prong requires only "that the investor commit his assets to the enterprise in such a manner as to subject himself to financial loss." *Warfield*, 569 F.3d at 1021; *see also Payward*, 2024 WL 4511499, at *13 (finding allegations that investors' use of fiat currency or crypto assets to purchase tokens qualified as an investment of money).

The SAC alleges that Plaintiffs and putative class members each "invested fiat, including U.S. dollars, and digital currencies, such as Bitcoin and Ethereum, to purchase Yuga Financial Products." SAC ¶¶539, 891. These alleged facts are

sufficient to satisfy the "investment of money" prong at this stage. *See Patterson*, 710 F. Supp. 3d at 710 (finding virtually identical allegations sufficient to plead the first prong of *Howey*).    Further, the PSLRA certifications submitted by Lead Plaintiffs (74-2)[4] likewise "establishes that [each plaintiff] spent considerable money" purchasing Yuga Financial Products. *See Dapper Labs*, 2023 WL 2162747, at *9 (concluding that similar allegations established the investment prong under *Howey*).

### C.    There Is a Common Enterprise Between The Class and Defendants

The Ninth Circuit defined the term "common enterprise" to mean "one in which the fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment of third parties." *SEC v. Glenn Turner Enterprises, Inc.*, 474 F.2d 476, 482, n.7 (9th Cir. 1973).    A common enterprise exists where the investment scheme involves either "horizontal commonality" or "strict vertical commonality." *Hocking v. Dubois*, 885 F.2d 1449, 1459 (9th Cir. 1989). "Horizontal commonality describes the relationship shared by two or more investors who pool their investments together and split the net profits and losses in accordance with their pro rata investments." *Id*. By contrast, strict vertical commonality "may be established by showing that the fortunes of the investors are linked with those of the promoters." *SEC v. R.G. Reynolds Enterprises, Inc.*, 952 F.2d 1125, 1130 (9th Cir. 1991).

Defendants' argument that the allegations in the SAC do not satisfy the common enterprise prong of the *Howey* test (Supp MOL at 11-16) is untethered from reality. In truth, while only one is required, the facts alleged actually support three

---

[4]    While Defendants allude to standing concerns due to airdrops (Supp. MOL at fn. 8), they ignore that Plaintiffs have collectively purchased each of the Yuga Financial Products at issue in the action separate and apart from airdrops. *See* ECF Nos. 1-2; 74-2; 179-1, 179-2, 179-3, 179-4.

separate findings of a common enterprise: horizontal commonality (pooling); horizontal commonality (tied fortunes); and strict vertical commonality.

### 1.    The SAC Pleads Horizontal Commonality - Pooling

Federal courts have found that when a promoter sells crypto assets to investors and uses the proceeds to strengthen its ecosystem and blockchain – which in turn supports the value of the crypto asset – horizontal commonality is met. *See Balestra*, 380 F. Supp. 3d at 353-54 (adopting SEC's reasoning that "the MUN token was a security, even though it 'did not promise investors any dividend or other periodic payment.' Rather, investors were led to believe that as more individuals began using the MUN 'ecosystem,' the value of investors' MUN tokens would increase."); *see also SEC v. Kik Interactive Inc*., 492 F. Supp. 3d 169, 178-79 (S.D.N.Y. 2020); *SEC v. Telegram Grp*., 448 F. Supp. 3d 352, 369-70 (S.D.N.Y. 2020).

A review of these cases quickly shows the same or similar "pooling" allegations as those found in the SAC were sufficient to establish horizontal commonality. For example, in *Dapper Labs*, the court concluded that allegations of "pooling" of investor funds was sufficient to a common enterprise with horizontal commonality. *Dapper Labs*, 657 F. Supp. 3d at 436 (noting that pooling "may be reasonably inferred from Plaintiffs' allegations"). The court further recounted how other cryptocurrency cases had similarly determined pooling was satisfied "where allegations plausibly tied the funds received by the promoter through the offering to an improvement of the ecosystem (i.e., the private blockchain) that consequently increases the value of the token offered during the [initial coin offering]." *Id*.

The *Harper* court likewise found that horizontal commonality was adequately alleged for several reasons present here. Specifically, the court found that "the creation of the Astrals metaverse depended on initial funding from the tokens. While there seems to be an aspect of control that Plaintiffs were set to have in the gameplay, it is still clear that the success or failure of the overall investment lies in the hands of Defendants." *Harper*, 2024 WL 3845444, at *9. The court further found that

"[w]hile the community and investors own a specific NFT within the project (and can increase that specific NFT's value through gameplay), the investors and players have no control over the success of the investment into the Astrals metaverse." *Id*. at *9.

In *Draftkings*, the court noted that, specifically "[i]n cryptocurrency cases," courts have generally concluded that "the horizontal commonality is satisfied where promoters invest proceeds back into the ecosystem upon which the value of the cryptocurrency depends . . . ." *Draftkings*, 2024 WL 3278637, at *4 (collecting cases). The court there found that plaintiffs "sufficiently alleged the pooling of assets requirement, because the revenue generated by the sale of NFTs was reinvested into DraftKings's business." *Id*. at *5. The *Draftkings* court further held that pooling for horizontal commonality purposes exists for both fungible cryptocurrency tokens and NFTs. *Id*. at *5-*6. Specifically, the court found that "horizontal commonality exists even though individual investors may independently buy or sell their holdings" because "in cases involving fungible crypto, the value of every investor's holding in the cryptocurrency rises and falls uniformly with the price of the cryptocurrency, such that the fortunes of all investors are linked together by the success of the underlying blockchain technology and digital ecosystem." *Id*. at *5.

The same holds true in other cryptocurrency cases. For example, in *SEC v. Kik Interactive Inc.*, the instant messaging application Kik sold the Kin token in an effort to create a "digital ecosystem" for the buying and selling of digital products and services. *Kik*, 492 F. Supp. 3d at 173-74. The court found horizontal commonality to be alleged sufficiently, reasoning that "[t]he economic reality is that Kik, as it said it would, pooled proceeds from its sales of Kin in an effort to create an infrastructure for Kin, and thus boost the value of the investment. . . . The stronger the ecosystem that Kik built, the greater the demand for Kin, and thus the greater the value of each purchaser's investment." *Id*. at 179.

Similarly, in the *Telegram* case where Telegram sold TON tokens to fund the release of its new blockchain, the court found that horizontal commonality was established. *Telegram*, 448 F. Supp. 3d at 369. The court explained that "[t]he ability of each Initial Purchaser to profit was entirely dependent on the successful launch of the TON Blockchain." *Id*. at 369. The court held that horizontal commonality existed post-launch too, as investor profits depended on the continued success and expansion of Telegram's enterprise. *See id*. at 369-70.

In *Patterson*, the court credited plaintiffs' allegations that "investors were passive participants in the Terra Tokens' launch and potential profits of Plaintiffs and the Class were intertwined with those of Defendants and of other investors." Similarly, the court pointed to allegations that "pooled funds received from investors to develop the Terraform ecosystem and increase the value of LUNA" and that "the fortunes of LUNA purchasers were tied to one another, and each depended on the success of the Defendants' efforts and strategy and the Terraform ecosystem as a whole" were sufficient to satisfy the second prong. *See Patterson*, 710 F. Supp. 3d at 711 (also pointing to allegation that defendants "held significant amount of LUNA, tying their fortunes with LUNA investors' fortunes").

Here, the SAC alleges that the Yuga Defendants used funds from the sales of Yuga's tokens and NFT collections to maintain and improve the Bored Ape ecosystem, which includes the Otherside metaverse. In particular, the SAC alleges that Yuga held several fund-raising initiatives, including the initial offerings of various Yuga NFT collections and ApeCoin tokens. SAC ¶¶121-425. The proceeds from these sales went towards, among other things, building the so-called Otherside metaverse and related gaming applications. SAC ¶567. Yuga is also alleged to have "used the proceeds of its sales and royalties of the Yuga Financial Products to purchase other valuable intellectual property, including CryptoPunks, one of the first and most valuable NFTs on the Ethereum blockchain." SAC ¶565.

### 2.    The SAC Pleads Horizontal Commonality – Tied Fortunes

The second method of pleading "a common enterprise marked by horizontal commonality is to allege that the fortunes of each investor depend upon the profitability of the enterprise as a whole." *Dapper Labs*, 657 F. Supp. 3d at 438 (citing *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994)). As relevant here, this second consideration is satisfied where the digital asset's value is tied, and depends upon, the continued success of the blockchain. *Id.*

While Defendants argue that each NFT owner can "make profits or sustain losses independent of the fortunes of other purchasers", Plaintiffs allege significant facts to demonstrate that the price of NFTs within a collection is highly correlated, tying the fortunes of investors to the enterprise. The SAC sets forth multiple allegations that the celebrity touting scheme and wash trading activities caused the prices for Yuga NFTs in each collection to rise dramatically. *See* SAC ¶¶146, 235, 325, 439, 442, 458, 487. Likewise, Plaintiffs also allege that ApeCoin and Yuga NFT collection prices moved in tandem with each other in response to bad news. *See* SAC ¶¶513, 515, 518, 521-524, 529-531, 781, 784, 786-789, 792, 794.

### 3.    The SAC Pleads Strict Vertical Commonality

According to the SAC, Yuga investors exchanged fiat or cryptocurrency for ApeCoin tokens, which could, at the time of the exchange, be put to no use aside from online trading. Simultaneously, the Yuga Defendants retained a healthy share of ApeCoin tokens for their personal and corporate coffers. The ApeCoin ICO proceeds would fund the development of the Bored Ape ecosystem. Thus, the "fortunes" of ApeCoin ICO participants—as measured by the trading value of their ApeCoin tokens—were "linked" to the "fortunes" of Defendants—as measured by the trading value of their ApeCoin tokens or the general success of their enterprise (which would, as a matter of efficient market theory, drive the price of all Yuga Financial Products). *Howey*'s second prong is therefore satisfied. *See SEC v. NAC*

*Found., LLC*, 512 F. Supp. 3d 988, 996 (N.D. Cal. 2021) (finding strict vertical commonality satisfied in similar crypto-related securities violation claim).

### D. As Passive Participants, Plaintiffs' Expectation Was That Profits Would Be Produced By Defendants' Efforts

The third *Howey* prong, "requiring an expectation of profits produced by the efforts of others, involves two distinct concepts: whether a transaction involves any expectation of profit and whether the profits are a product of the efforts of a person other than the investor." *Warfield*, 569 F.3d at 1020. "[W]hile the subjective intent of the purchasers may have some bearing" on these questions, a court's work must consist chiefly of "an objective inquiry into the character of the instrument or transaction offered based on what the purchasers were led to expect." *NAC Found., LLC*, 512 F. Supp. 3d at 996.

To establish the third prong, the Ninth Circuit requires that "the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *Hocking*, 885 F.2d at 1455 (citing *SEC v. Glenn Turner Enterprises, Inc.*, 474 F.2d 476 (9th Cir. 1973)). The Ninth Circuit has specifically "rejected a strict interpretation of this prong in favor of a more flexible focus" on the significance of the efforts made by those other than the investor." *Patterson*, 710 F. Supp. 3d at 711 (citing *SEC v. Rubera*, 350 F.3d 1084, 1092 (9th Cir. 2003)).

Defendants argue that the SAC does not allege sufficient facts to show that Plaintiffs had any reasonable expectation of profits related to potential future sales of their Yuga Financial Product purchases. Supp MOL at 16-20. Specifically, Defendants argue that (1) the SAC does not establish that Plaintiffs reasonably believed they were promised a profit from the purchase of their Yuga Financial Products; and (2) the SAC fails to allege that such a promise of profits would be the result Defendants' managerial efforts.  Supp MOL at *id*.

### 1.    Promise of Profits

The inquiry into whether an investment contract was formed focuses on "what the purchasers were offered or promised." *See Warfield*, 569 F.3d at 1021. Under *Howey*, courts conduct an objective inquiry into the character of the instrument or transaction offered based on what the purchasers were "led to expect." *Id*. (quoting *Howey*, 328 U.S. at 298–99). Accordingly, courts have frequently examined the promotional materials associated with an instrument or transaction in determining whether an investment contract is present. *See, e.g., SEC v. Edwards*, 540 U.S. 389, 392 (2004) (observing that a payphone sale and buyback scheme involved investment contracts where promotional materials noted "potential for ongoing revenue generation"); *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 854, (1975) (noting, in the course of finding investment contract test not met, that the promotional materials "[n]owhere ... seek to attract investors by the prospect of profits" and rather "repeatedly emphasize[ ] the 'nonprofit' nature of the endeavor");

Here, for example, the SAC alleges that Defendant Aronow promoted that Yuga Financial Products had "inherent, long-term value' through Yuga's own efforts, 'Namely, the Roadmap Activations." SAC ¶558. Defendant Solano "similarly represented that Yuga's efforts, such as 'The Bathroom and other Roadmap Activations . . . give intrinsic value to hold an ape token.'" SAC ¶559. Yuga also promoted that maintaining the value of the Yuga Financial Products was "a top priority" for the Yuga Defendants. SAC ¶562-63 (detailing Yuga's statements on the "Roadmaps Activations" and their efforts to improve the value of the Yuga NFT collections). Yuga Defendants also hyped price increases for the Yuga Financial Products, promoting to investors that the "floor [price of BAYC NFTs] has crept up today" on the NFT marketplace, OpenSea. SAC ¶560; *see also* ¶561 (Defendant Solano promoting two specific BAYC NFT as being worth "all the eth[ereum cryptocurrency token]"). The Company and Defendant Aronow promoted the rising volume of Yuga Financial Products sales as well. SAC ¶564. ApeDAO

Defendant Bajwa also highlighted that Mutant Ape NFTs "saw $71M in trading volumes the last week."  ¶376.

While the aforementioned promotions may not literally include the term "profit," these statements are representative of Yuga's overall messaging about the growth potential and increasing value of the Yuga Financial Products and Bored Ape ecosystem. This demonstrates that "that potential investors would understand that [Yuga] was pitching a speculative value proposition" for its digital assets *See LBRY*, 639 F. Supp. 3d at 219 (observing that "LBRY's messaging amounts to precisely the "not-very-subtle form of economic inducement" that the First Circuit identified in [*SG Ltd.*, 265 F.3d at 54] as evidencing *Howey*'s "expectation of profits").  In short, the promotions alleged here objectively establish an expectation of profits. *See Dapper Labs*, 657 F. Supp. 3d at 443 (finding third prong met because "the 'rocket ship' emoji, 'stock chart' emoji, and 'money bags' emoji [in the challenged promotions] objectively mean one thing: a financial return on investment"); *see also Edwards*, 540 U.S. 389 at 396 ("[T]he commonsense understanding of 'profits' in the *Howey* test [is] simply 'financial returns on ... investments.'").

Additionally, while the *Howey* test is objective, the subjective intent of purchasers is still probative on the issue of what a reasonable investor would expect. *Telegram*, 448 F. Supp. 3d at 374 ("The Court's finding that the [crypto asset purchasers] had a reasonable expectation of profit is buttressed by [the purchasers'] subjective views … The subjective intent of the [purchasers] does not necessarily establish the objective intent of the reasonable purchaser. However, the stated intent of prospective and actual purchasers… may be properly considered in the Court's evaluation of the motivations of the hypothetical reasonable purchaser."). Here, Plaintiffs allege their "primary purpose" (i.e. subjective intent) for purchasing Yuga Financial Products "was to make a profit or accumulate interest." SAC ¶548. Thus, notwithstanding any other non-profit motives that Defendants now point to (Supp MOL at 16), this allegation alone is enough to make plain that Plaintiffs had

"investment intent" when purchasing their Yuga Financial Products. *See Feng*, 935 F.3d at 730-31 (finding that the requisite expectation of profit can exist alongside, and can even be secondary to, other, non-profit motives). Indeed, Defendants can only make the argument that there was no expectation of profits or link between the "subjective hopes" of investors to the contested promotions (*see* Supp MOL at 2) by either ignoring outright the allegations in the SAC or by downplaying the allegations concerning Plaintiffs' profit-based motivations for purchasing the Yuga Financial Products.

The SAC, quoting from the SEC's Framework for "Investment Contract" Analysis of Digital Assets, also provides certain characteristics that indicate a reasonable expectation of profit in the digital asset context. These include whether the digital asset provides the opportunity to realize gain from capital appreciation of the digital asset, with the SEC specifically clarifying that "[t]he opportunity may result from appreciation in the value of the digital asset that comes, at least in part, from the operation, promotion, improvement, or other positive developments in the network, particularly if there is a secondary trading market that enables digital asset holders to resell their digital assets and realize gains." SAC ¶550. Other factors weighing toward the reasonable expectation of profit are when "[t]he digital asset is transferable or traded on or through a secondary market or platform[,]" and when "[p]urchasers reasonably would expect that [the Defendants'] efforts will result in capital appreciation of the digital asset and therefore be able to earn a return on their purchase." *Id*.

Here, each of the SEC Framework characteristics described are present and show that Plaintiffs had a reasonable expectation of profit from the trading of the investors in Yuga Financial Products. *See* SAC ¶550.

Furthermore, the SAC alleges that, while Defendants promoted the Yuga NFT collections as giving investor certain intellectual property rights (*see, e.g.*, SAC ¶¶69, 310), the reality was that Plaintiffs were restricted from using the Yuga NFTs

13

however they wanted to and did not retain any intellectual property rights to the Bored Ape ecosystem branding. *See* SAC ¶384. Indeed, as the SAC states: "Yuga Labs LLC owns the commercial rights to the BAYC NFT collection – not the ape holders – and grants a limited and restrictive license to the NFT holders that dictates what the BAYC holders' personal and commercial uses of the NFTs." SAC ¶70. Yuga's placement of restrictive limitations on how purchasers could potentially "consume" Yuga Financial Products undermines a finding that their purpose is primarily consumptive.

In addition, as detailed in the SAC, Yuga's plans for consumptive uses of the Yuga Financial Products at some point in the future appear to be only speculative uses and are fact questions for which discovery is needed. Even so, "none of this 'consumptive use' was available at the time" Yuga Financial Products were offered to Plaintiffs, raising considerable doubt as to a consumptive motivation for the purchases. *See Kik*, 492 F. Supp. 3d at 180. Significantly, while they could potentially be used in the Otherside metaverse at some unspecified future date, the Yuga Financial Products were, at the time of the transaction, solely objects for trading. "Nor, given the totality of circumstances, can defendants brush away the inference that objectively reasonable purchasers of [Yuga Financial Products] would likely view their prospective trading success as a function of the Defendants' efforts: after all, the demand for [Yuga Financial Products], as reflected in those assets' pricing, would rely almost exclusively on market perception of Defendants' work [to build and support the Bored Ape ecosystem]." *See NAC*, 512 F. Supp. 3d at 997. Based on the facts alleged in the SAC and reasonable inferences drawn therefrom, the "economic reality" is that the ability to build and maintain the Bored Ape ecosystem and Otherside metaverse resided entirely within Yuga Defendants' control. This supports a finding that the final *Howey* prong is met. *See SEC v. Dalius*, No. 2:18-CV-08497-FWS-E, 2023 WL 3988425, at *9 (C.D. Cal. May 24, 2023). Indeed, these allegations demonstrate that the Yuga Defendants' managerial

and entrepreneurial efforts were "undeniably significant ones" as the success of the investment program as a whole" is "crucial to" and "hinges on" the efforts by Defendants. *See SEC v. Pac. W. Cap. Grp., Inc*., No. CV152563FMOFFMX, 2015 WL 9694808, at *6 (C.D. Cal. June 16, 2015) (Olguin, J) (quoting *SEC v. Glenn W. Turner Enter., Inc.*, 474 F.2d 476, 482 (9th Cir. 1973 and analyzing Ninth Circuit law on the efforts of others prong under *Howey*).

Nevertheless, Defendants insist that the expectation of profits prong fails because the Yuga Financial Products should be viewed as "entertainment" or a consumable item that is purchases to use (as opposed to as an investment). *See* Supp MOL at 4, 8, 18 (citing *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 852–53 (1975). As discussed further below, that same argument was rejected at both the district and appellate court levels. *See e.g.*, *Fedance v. Harris*, 1 F.4th 1278, 1288 (11th Cir. 2021); *Harper*, 2024 WL 3845444, at *9; *Audet v. Fraser*, 605 F. Supp. 3d 372, 399 (D. Conn. 2022) (granting Rule 59 motion for a new trial because the weight of evidence indicated token purchaser was motivated by an expectation of profits and "not by the desire to use Paycoin for a consumptive purpose").

In addition, Defendants' argument that there can be no expectation of profits for any Yuga Financial Product purchased on a secondary market (*see* Supp MOL at 4, 8, 18, *citing SEC v. Ripple Labs Inc*., 682 F.Supp.3d 308 (S.D.N.Y. 2023)) has likewise been previously rejected. Both the *Harper* and *Terraform* courts declined to follow the *Ripple* decision's secondary market analysis and conclusion. As Judge Rakoff in *Terraform* keenly observed: "*Howey* makes no such distinction between purchasers. And it makes good sense that it did not. That a purchaser bought the coins directly from the defendants or, instead, in a secondary resale transaction has no impact on whether a reasonable individual would objectively view the defendants' actions and statements as evincing a promise of profits based on their efforts. *Terraform*, 684 F. Supp. 3d at 197; *see also Harper*, 2024 WL 3845444, at *10 (adopting reasoning of *Terraform* and finding that "Plaintiffs have successfully

15

1  alleged that the failure or success of the enterprise hinges on Defendants' managerial

2  efforts, and not their own").

3  ### 2.    Efforts of Others

4      The aforementioned promise of profits must also be "derived from the

5  entrepreneurial or managerial efforts of others." *Forman*, 421 U.S. at 852. Plaintiffs

6  allege that the value of the Yuga Financial Products is derived almost entirely from

7  the continued operation of the Bored Ape ecosystem by the Yuga Defendants. For

8  example, according to a January 3, 2022 press release from Yuga, Defendants touted

9  themselves as "temporary stewards of [the Bored Ape] IP that is in the process of

10  becoming more and more decentralized." SAC ¶557; *see also* SAC ¶553 (alleging

11  that, while Plaintiffs had an "entirely passive roles vis-à-vis the success of the Yuga

12  Financial Products or the Bored Ape ecosystem," the success of the Bored Ape

13  ecosystem, and the profits the Class reasonably expected to derive from investing in

14  the Yuga Financial Products that relied on that ecosystem, "are dependent on the

15  essential technical, entrepreneurial, and managerial efforts of the Company,

16  Executive Defendants, and the ApeDAO Board Defendants"). The SAC also alleges

17  that Plaintiffs "reasonably expected Executive Defendants and ApeDAO Board

18  Defendants to provide significant managerial efforts, to develop and improve the

19  Bored Ape ecosystem, and to provide and/or secure exchanges through which Yuga

20  Financial Products can be traded or liquidated." SAC ¶556. Defendants repeatedly

21  represented that they would provide significant managerial efforts to achieve these

22  objectives and make Yuga Financial Products a profitable investment by developing

23  and attracting users to the Bored Ape ecosystem. SAC ¶¶553-566

24      Without Yuga's continued maintenance of the Bored Ape ecosystem and the

25  Otherside metaverse, Plaintiffs allege that the Yuga Financial Products would have

26  no value at all. SAC ¶566.  Likewise, Plaintiffs allege that the value of the Yuga

27  Financial Products in the market depends upon Yuga's ability to maintain hype and

28  keep purchasers interested in buying and trading Yuga Financial Products. SAC

¶566. Finally, as the SAC alleges, "investors were passive participants in the Yuga Financial Products' continuous offering, and the profits of each Plaintiffs and the Class were intertwined with those of Defendants and of other investors." SAC ¶545. The SAC alleges that without Defendants' fundraising efforts via product offerings, the Bored Ape ecosystem and Otherside metaverse would collapse. SAC ¶566.

Put differently, participants in the various offerings "recognized that an investment in [Yuga Financial Products] was a bet that [Yuga and the Yuga Defendants] could successfully encourage the mass adoption of [Yuga NFTs, particularly the BAYC NFT collection], thereby enabling a high potential return" on the "resale of [Yuga Financial Products]." *See NAC Found., LLC*, 512 F. Supp. 3d at 997 (citing *Telegram*, 448 F.Supp.3d at 377); *see also Kik Interactive, Inc.*, 492 F.Supp.3d at 179-80 (explaining, on analogous facts, that "the value of" an ICO investment relies heavily on the developers "entrepreneurial and managerial efforts"; without the developers' "promised digital ecosystem," a cryptocurrency token "would be worthless").

Additionally, courts have rejected Defendants' argument that the tokens were just for "entertainment" (Supp MOL at 5-6), stating that "any supposed future utility of the tokens on [defendants'] 'end-to-end entertainment' ecosystem is beside the point." *Harper*, 2024 WL 3845444, at *9. As the *Harper* court explained: "This was because "'[cryptographic] tokens sold before a network launch are securities, because investors purchasing those tokens ... rely[ ] primarily on the technical and managerial efforts of others to affect the failure or success of the enterprise.'" *Id*. (quoting *Fedance*, 1 F.4th at 1288 and observing that the Eleventh Circuit in *Fendace* had further stated that "[p]lenty of items that can be consumed or used— from cosmetics, to boats, to Scotch whisky—have been the subject of transactions determined to be securities because they had the attributes of an investment"), *see also Audet*, 605 F. Supp. 3d at 398 (rejecting consumptive use argument because, *inter alia*, there was "no mechanism" to use Paycoin for a consumptive purpose at

the time of purchase). The *Harper* court went on to state that "it was clear that Defendants were looking to develop and grow the entire operation, which could lead an objective investor to see a possibility of investment return" *Id*. at *10 (citing to partnership announcements).

Here, the SAC states that the ApeCoin tokens and each Yuga NFT were sold before the launch of the Otherside metaverse. SAC ¶401. These facts eviscerate Defendants' claim that SAC fails to allege an expectation of profit. *See Harper*, 2024 WL 3845444, at *9. In any event, an expectation of profit under *Howey* does not require the investor to be motivated solely by profit. *See Hui Feng*, 935 F.3d at 730-31. Thus, even if as Defendants now claim there were other reasons to purchase the Yuga Financial Products, Plaintiffs nevertheless allege that their "primary purpose" for purchasing Yuga Financial Products was profit. This is sufficient within the Ninth Circuit.

Further, the SAC alleges that Defendants' promotions led investors to expect that both Yuga NFT collections and ApeCoin tokens would be tradeable on stock market-like exchanges, and that these digital assets could appreciate in value through speculative trading on those exchanges. *See e.g.* SAC ¶¶245, 386, 556. These facts establish the final prong of *Howey*. *See NAC Found., LLC*, 512 F. Supp. 3d at 997.

### 3.  Defendants' Reliance on *Forman* Is Misplaced

Defendants mistakenly argue that the SAC only alleges that the Yuga Financial Products were "marketed in a way that led purchasers to expect to 'use or consume' them. Supp MOL at 2 (citing *Forman*, 421 U.S. at 852-53). The SAC unequivocally alleges that the Yuga Financial Products were bought as investments for profit and use in "commerce." Of course, even *Forman* acknowledges that courts "examine the substance—the economic realities of the transaction—rather than the names that may have been employed by the parties." *Id*. at 851-52.

Plaintiffs here allege that Defendants, in promoting the Yuga Financial Products, would personally chat with investors and create investment incentives.

*See, e.g*., SAC ¶¶75 and 215. Further, Defendants would reassure investors that the Bored Ape ecosystem was being built and/or maintained, which would cause the Yuga Financial Products to grow and increase in value. SAC ¶¶557-566. These facts undercut Defendants' consumptive use argument. Further, here, as in *Harper* and *Audet*, the "consumptive use" aspect of the Yuga NFT collections or ApeCoin tokens was not yet in play, as the Otherside metaverse either did not exist or was only marginally functional after launch. SAC ¶651.

The motivation of the purchasers is also shown in the SAC's "Additional Reliance Allegations." *See* SAC ¶¶613-23.  Many of the Plaintiffs stated that Defendants assured them, through various celebrity promotions and statements on social media, that the Yuga Financial Products were poised with "future growth prospects" and that Yuga and the Bored Ape ecosystem had "real staying power." SAC ¶¶613, 617. Plaintiffs allege that these promotions gave them the expectations that the true value of Yuga Financial Products would be higher in the future since the Promoter Defendants appeared to be purchasing Yuga Financial Products "as part of [their] multi-million-dollar investment strategy." SAC ¶¶616, 618-19. Plaintiffs likewise alleged that Defendant Curry would personally chat with investors in the BAYC Discord, leading investors to believe that the high-profile celebrity interest in Yuga Financial Products and being a part of the Bored Ape ecosystem as a whole was genuine and organic. *See* SAC ¶¶215-16, 618. Plaintiffs also alleged that Yuga's promotions by Defendant Adidas touting future brand collaborations with the Bored Ape ecosystem and Yuga NFT collections caused Plaintiffs to purchase Yuga Financial Products that they expected to increase in value because of the increase in interest in the Bored Ape ecosystem caused by the celebrity Promoter Defendants. SAC ¶620. Plaintiffs further alleged that they followed the social media accounts of Defendants and saw the promotions related to the Otherside metaverse and believed the promotional message that the value of their respective Yuga Financial Product holdings would rise after purchase. *See* SAC

¶621-22. Finally, after seeing Defendant Aronow's promotions touting the increase in the BAYC NFT market cap to $1 billion, Plaintiffs had the expectation that "the price of Yuga Financial Products would continue to rise . . . ." SAC ¶623.

The *Harper* court found facts like those alleged above "tips in favor of investment intent, rather than consumptive intent." *Harper*, 2024 WL 3845444, at *10 (concluding that Plaintiffs plausibly alleged that they were led to reasonably expect profits from the Astrals [NFT] purchases). So, too, should this Court find that the Plaintiffs' purchasing motivations are grounded in investment intent, not consumptive.

### 4. Plaintiffs Adequately Allege that Each Separate Asset is a Security

Defendants argue that Plaintiffs have conflated the assets such that the SAC purportedly makes it impossible to show how each product was sold in a securities transaction. As an initial matter, Plaintiffs allege that (1) the Defendants repeatedly promoted the cross utilization of these assets (*see* SAC ¶¶79, 81, 88), and (2) there was a common scheme to artificially inflate the price of all of the Yuga securities, and that an increase in one asset had an impact on and carried over to other assets. SAC ¶¶635-37. Moreover, any fair reading of the SAC, demonstrates that Plaintiffs have made a significant number of allegations as to the promotion and sale of each separate asset. *See* SAC ¶79 (Yuga promoting the Kennel Club NFTs); ¶¶124-126; 143 (Defendant Sotheby's promoting the Kennel Club NFTs); ¶194 (MoonPay and Celebrity promotion of Mutant Apes and Kennel Club NFTs); ¶¶221-222 (Defendant Ciccone receiving an Otherdeeds NFTs); ¶233 (Adidas promotion of Mutant Apes); ¶243 (Yuga Defendants' promotion of Mutant Ape NFTs in *Rolling Stone* magazine); ¶245 (Yuga promoting that Mutant Ape holders would receive an ApeCoin airdrop); ¶252 (Defendant Oseary promoting the Otherdeed NTFs); ¶285 (Defendant Aronow promoting Mutant Ape event); ¶290 (Defendant Atalay promoting Mutant Ape events) ¶291 (Defendant Atalay promoting commercial

rights of Meebits holders); ¶301 (Defendant Muniz promoting Meebits); ¶308 (Defendant Muniz promoting Mutants Ape and Otherside NFTs); ¶310 (Defendant Muniz promoting Meebits); ¶313 (Defendant Shoemaker promoting Mutant Apes); ¶317 (Defendant Shoemaker promoting the Otherdeed NFTs); ¶376 (ApeDAO Defendant Bajwa highlighting that Mutant Ape NFTs "saw $71M in trading volumes the last week."); ¶386 (ApeDAO Defendants promoting Bored Apes, Mutant Apes, and Kennel Club NFTs); ¶402 (Defendant Muniz promoting Meebits); ¶404 (Defendant Oseary promoting his association with the Mutant Ape Collection and Meebits); ¶417 (Yuga promotion of Mutant Ape serum in film with Coinbase).

Likewise, Plaintiffs describe which assets they purchased and the circumstances behind those purchases. *See* SAC ¶603-604 (describing Lead Plaintiff Johnson's Mutant Ape and Kennel Club NFT purchases); ¶¶605-606 (describing Plaintiff Ticher's Mutant Ape and Otherdeed NFT purchases); ¶11 (describing Lead Plaintiff Boekweg's Meebits NFT purchase); ¶12 (describing Lead Plaintiff Palombini's purchase of Mutant Ape and Otherdeed NFT purchases); *see also* Plaintiff PSLRA Certifications at ECF Nos. 1-2; 74-2; 179-1, 179-2, 179-3, 179-4.

These allegations provide sufficient detail to demonstrate how each Yuga Financial Product was sold in a securities transaction.

## CONCLUSION

For the foregoing reasons, as well as those stated in Plaintiffs' previously oppositions to Defendants' various individual motions to dismiss, Plaintiffs submit that the Yuga Motion should be denied in its entirety or, in the alternative, that Plaintiffs should be granted leave to amend their claims.

DATED: November 4, 2024          Respectfully submitted,

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

*/s/ John T. Jasnoch*

John T. Jasnoch (CA 281605)
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone:  619-233-4565
Facsimile:   619-233-0508
jjasnoch@scott-scott.com

*Lead Counsel for Plaintiffs*

**TAYLOR-COPELAND LAW**

James Q. Taylor-Copeland (CA 284743)
501 W. Broadway, Suite 800
San Diego, CA 92101
Telephone:  619-400-4944
Facsimile:   619-566-4341
james@taylorcopelandlaw.com

**ZIGLER LAW GROUP, LLC**

Aaron M. Zigler (CA 327318)
Nidya Gutierrez (CA 330209)
308 S. Jefferson Street, Suite 333
Chicago, IL 60661
Telephone:  312-673-8427
Facsimile:   312-535-5773
aaron@ziglerlawgroup.com
nidya@ziglerlawgroup.com

*Additional Counsel for Plaintiffs*

PLAINTIFFS' SUPPLEMENTAL OPPOSITION
TO DEFENDANT YUGA LABS' MOTION TO DISMISS
CASE NO. 2:22-CV-08909-FMO-PLA

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned counsel of record for Plaintiffs certifies that this brief contains 6,820 words, which

_____    complies with the word limit of L.R. 11-6.1.

_X_    complies with the 7,000-word limit set by court order dated September 5, 2024 (ECF No. 240).

DATED: November 4, 2024

                                    */s/ John T. Jasnoch*
                                    John T. Jasnoch

## **CERTIFICATE OF SERVICE**

I, John T. Jasnoch, hereby certify that on November 4, 2024, I electronically filed the foregoing with the Clerk using CM / ECF, which will send notification via electronic means to all counsel of record.

DATED:      November 4, 2024

/s/ John T. Jasnoch
John T. Jasnoch