1

2

3

4

5

6

7

8              **UNITED STATES DISTRICT COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10

11   ADONIS REAL, et al.,                    )    Case No. CV 22-8909 FMO (BFMx)
                                             )
12              Plaintiffs,                  )
                                             )    **ORDER GRANTING DEFENDANTS'**
13        v.                                 )    **MOTION TO DISMISS SECOND**
                                             )    **AMENDED COMPLAINT**
14   YUGA LABS, INC., et al.,                )
                                             )
15              Defendants.                  )
     _____      )

16

17       Having reviewed and considered all the briefing filed with respect to the Motion to

18   Dismiss (Dkt. 243, "Motion") filed by Yuga Labs, Inc., Wylie Aronow, Greg Solano, Kerem

19   Atalay, Zeshan Ali, Nicole Muniz, Jasmin Shoemaker, Patrick Ehrlund, Christopher Lyons, and

20   Guy Oseary (collectively, "defendants"), the court finds that oral argument is not necessary

21   to resolve the Motion, see Fed. R. Civ. P. 78(b); C.D. Cal. Local Rule 7-15; Willis v. Pac. Mar.

22   Ass'n, 244 F.3d 675, 684 n. 2 (9th Cir. 2001), and concludes as follows.[1]

23                              **BACKGROUND**

24       This case revolves around digital assets created and sold by defendants and

25   purchased by plaintiffs. Although the operative Second Amended Complaint ("SAC") does not

26   _____

27       [1]  Defendants Justin Bieber, Madonna Louise Ciccone, Mike Winkelman, Alexis
     Ohanian, Amy Wu, Maaria Bajwa, Wardell Stephen Curry, II, Adidas America, Inc., Adidas
28   Venture, B.V., Paris Hilton, Ivan Soto-Wright, Moonpay USA LLC, and Sotheby's Holdings Inc.
     ("Sotheby's") join in the Motion. (See Dkts. 245-254, Joinder in Motion to Dismiss). Sotheby's
     filing is styled both as a joinder and as a motion to dismiss. (See Dkt. 151, Sotheby's
     Joinder).  Because the court grants the defendants' Motion as to all products, Sotheby's
     motion will be denied as moot.

include extensive allegations about the nature of these assets, (see, generally, Dkt. 179, SAC), the fundamentals of the underlying technological landscape do not appear to be in dispute, and merit some initial background discussion.

A.    Blockchains and NFTs.

"Blockchains" are decentralized digital ledgers that can permanently store information about transactions. See Yuga Labs, Inc. v. Ripps, 144 F.4th 1137, 1150 (9th Cir. 2025); Friel v. Dapper Labs, Inc., 657 F.Supp.3d 422, 426-27 (S.D.N.Y. 2023). They are often associated with digital, or "crypto" currencies or "coins." See Dapper Labs, 657 F.Supp.3d at 427. Cryptocurrencies are, as is necessary to function as a currency, fungible by design. See, e.g., SEC v. Ripple Labs, Inc., 682 F.Supp.3d 308, 316 (S.D.N.Y.) (noting how each "unit" or "drop" of XRP is fungible, or in other words has the same value as, any other unit or drop). Information about transfers and ownership of cryptocurrencies is recorded on a blockchain, which itself may be public or private. See Dapper Labs, 657 F.Supp.3d at 427; SEC v. Kik Interactive Inc., 492 F.Supp.3d 169, 173 (S.D.N.Y. 2020).

A non-fungible token, or "NFT," is software code associated with separate, often digital, content. See Yuga Labs, 144 F.4th at 1149. The code operates as a unique digital watermark on an otherwise replicable digital file, such as an image. See id. Although the image itself might otherwise be, and remain, fungible, its association with unique software code transforms it into a unique asset that is by definition non-fungible. See id. at 1149-50; see also id. at 1153 (providing example of two NFTs that, while visually identical, are associated with different software code, and therefore constitute separate NFTs). When an NFT is first created, or "minted," it is recorded on a blockchain. See id. at 1150. All subsequent transfers of that NFT are also recorded on the blockchain. Id.

B.    Plaintiffs' SAC.

Plaintiffs' SAC, which spans over 300 pages, alleges that defendant Yuga Labs, Inc. ("Yuga") is the creator of an NFT collection known as the Bored Ape Yacht Club ("BAYC"). (See Dkt. 179, SAC at ¶¶ 1, 4, 66, 69). In all, there are 10,000 unique BAYC NFTs. (See id. at ¶ 66). Each BAYC NFT features a picture of a cartoon ape with a bored facial expression

and unique traits and characteristics. (See id. at ¶ 68). Yuga later created two spinoff NFT collections: the Mutant Ape Yacht Club ("MAYC") and the Bored Ape Kennel Club ("BAKC"). (Id. at ¶ 74). Yuga sold its NFTs, but retained "commercial rights" to each NFT, granting purchasers a "limited and restrictive license." (Id. at ¶ 70). Yuga's NFTs were recorded on the Ethereum blockchain. (Id. at ¶ 600). When a Yuga NFT was purchased, and transferred from one digital wallet to another, purchasers were charged an additional "creator earnings" fee which was paid to Yuga. (Id. at ¶ 601).

The value of a particular Yuga NFT was tied to the relative rarity of its unique traits and accessories. (Dkt. 179, SAC at ¶ 68). An NFT featuring an ape in sunglasses, for example, was rarer, and therefore more valuable than, an NFT featuring an ape without sunglasses. (Id.). Defendants promoted the NFTs, such as by announcing on social media that BAYC NFTs had sold out in a single night, and included "million-dollar apes." (Id. at ¶ 75). Defendants also solicited sales of Yuga NFTs through celebrity endorsements. (Id. at ¶ 118).

Yuga claimed to be creating a virtual shared space, or "metaverse" platform, called "Otherside," where users could interact using digital avatars from Yuga's NFT collections such as the BAYC and MAYC collections. (Dkt. 179, SAC at ¶ 81). Yuga introduced another collection of NFTs – the "Otherdeed NFTs" – to serve as virtual "plots of land" in the Otherside metaverse. (Id.) (internal quotation marks omitted). It also introduced "ApeCoin," not as an NFT, but as a cryptocurrency or "token" intended to serve as the native currency of the Otherside metaverse, including "for culture, gaming, and commerce." (Id. at ¶¶ 81, 386) (internal quotation marks omitted). Yuga also later acquired another NFT collection called "Meebits." (See id. at ¶¶ 73, 291). The named plaintiffs each purchased at least one of the six products at issue:  (1) BAYC NFTs; (2) MAYC NFTs; (3) BAKC NFTs; (4) Otherdeed NFTs; (5) Meebits NFTs; and (6) ApeCoin (collectively, "digital assets"). (See id. at ¶¶ 10-17). Plaintiffs collectively refer to these six digital assets as the "Yuga Financial Products." (Id. at ¶ 1 n. 1).

Plaintiffs assert claims individually and on behalf of a putative class of persons who, "during the Class Period, purchased the Yuga Financial Products and were subsequently

damaged thereby." (Dkt. 179, SAC at ¶ 624).  Plaintiffs assert federal claims for:  selling and solicitation of unregistered securities, in violation of §§ 5 and 12(a)(1) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77e(a), 77e(c), 77l(a), (see id. at ¶¶ 721-31); control person liability for the sale and solicitation of unregistered securities under § 15 of the Securities Act, 15 U.S.C. § 77o, (see id. at ¶¶ 732-39); and securities fraud, in violation of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and Rules 10b-5(a) and (c), 17 C.F.R. §§ 240.10b-5(a)-(c).  (See id. at ¶¶ 755-823). Plaintiffs also assert California state law claims for:  violations of the Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, et seq., (see id. at ¶¶ 638-720); violations of California Corporate Securities Law, Cal. Corp. Code §§ 25110, 25503, (see id. at ¶¶ 740-54); securities fraud in violation of Cal. Corp. Code §§ 25401, 25501, (see id. at ¶¶ 824-38); securities manipulation in violation of Cal. Corp. Code §§ 25400, 25500, (see id. at ¶¶ 839-53); secondary liability for securities manipulation under Cal. Corp. Code §§ 25403(b), 25504, 25504.1, (see id. at ¶¶ 854-63); and unjust enrichment.  (See id. at ¶¶ 864-869). Finally, plaintiffs assert claims under Florida law for violation of the:  Florida Securities and Investor Protection Act, Fla. Stat. § 517.07, (see id. at ¶¶ 870-900); and Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, et seq.  (See id. at ¶¶ 901-25).

        C.    Relevant Procedural History.

     The court previously recognized that "[t]he question of whether any, some, or all six digital assets is a security is a threshold question that governs not only the applicability of the Securities Acts and parallel state claims, but also other aspects of the case."  (Dkt. 236, Court's Order of August 20, 2024, at 8).  The court subsequently ordered the parties to submit a briefing schedule for motions to dismiss "limited to the question of whether the subject digital assets qualify as securities within the meaning of the Securities Acts."  (Id.).  In accordance with the court's order, defendants now move to dismiss the securities-related claims for failure to allege that any of the six digital assets qualify as a "security."

## LEGAL STANDARD

     A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal

1  Rules of Civil Procedure should be granted if plaintiff fails to proffer "enough facts to state a
2  claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly (Twombly), 550 U.S.
3  544, 570, 127 S.Ct. 1955, 1974 (2007); Ashcroft v. Iqbal (Iqbal), 556 U.S. 662, 678, 129 S.Ct.
4  1937, 1949 (2009); Cook v. Brewer, 637 F.3d 1002, 1004 (9th Cir. 2011). "A claim has facial
5  plausibility when the plaintiff pleads factual content that allows the court to draw the
6  reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S.
7  at 678, 129 S.Ct. at 1949; Cook, 637 F.3d at 1004; Caviness v. Horizon Cmty. Learning Ctr.,
8  Inc., 590 F.3d 806, 812 (9th Cir. 2010). Although the plaintiff must provide "more than labels
9  and conclusions, and a formulaic recitation of the elements of a cause of action will not do,"
10 Twombly, 550 U.S. at 555, 127 S.Ct. at 1965; Iqbal, 556 U.S. at 678, 129 S.Ct. at 1949; see
11 also Cholla Ready Mix, Inc. v. Civish, 382 F.3d 969, 973 (9th Cir. 2004) ("[T]he court is not
12 required to accept legal conclusions cast in the form of factual allegations if those conclusions
13 cannot reasonably be drawn from the facts alleged. Nor is the court required to accept as true
14 allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable
15 inferences.") (citations and internal quotation marks omitted). "Specific facts are not
16 necessary; the [complaint] need only give the defendant[s] fair notice of what the . . . claim is
17 and the grounds upon which it rests." Erickson v. Pardus, 551 U.S. 89, 93, 127 S.Ct. 2197,
18 2200 (2007) (per curiam) (internal quotation marks omitted); see Twombly, 550 U.S. at 555,
19 127 S.Ct. at 1964.

20      In considering whether to dismiss a complaint, the court must accept the allegations
21 of the complaint as true, Erickson, 551 U.S. at 94, 127 S.Ct. at 2200; Albright v. Oliver, 510
22 U.S. 266, 268, 114 S.Ct. 807, 810 (1994), construe the pleading in the light most favorable
23 to the pleading party, and resolve all doubts in the pleader's favor. Jenkins v. McKeithen, 395
24 U.S. 411, 421, 89 S.Ct. 1843, 1849 (1969); Berg v. Popham, 412 F.3d 1122, 1125 (9th Cir.
25 2005). "Dismissal under Rule 12(b)(6) is proper when the complaint either (1) lacks a
26 cognizable legal theory or (2) fails to allege sufficient facts to support a cognizable legal
27 theory." Somers v. Apple, Inc., 729 F.3d 953, 959 (9th Cir. 2013). A complaint may also be
28 dismissed for failure to state a claim if it discloses some fact or complete defense that will

1    necessarily defeat the claim.  See Franklin v. Murphy, 745 F.2d 1221, 1228-29 (9th Cir. 1984),

2    abrogated on other grounds by, Neitze v. Williams, 490 U.S. 319, 109 S.Ct. 1827 (1989); 2

3    Moore's Federal Practice § 12.34[4][b] ("Dismissal under Rule 12(b)(6) . . . is also appropriate

4    when a successful affirmative defense or other bar to relief on the claim is conclusively

5    established on the face of the complaint.").

6                                              **DISCUSSION**

7            The question here is whether plaintiffs' SAC adequately alleges that Yuga's digital

8    assets are securities.  As the court previously explained, "Congress did not[] . . . intend to

9    provide a broad federal remedy for all fraud[]" when enacting the Securities Act and Exchange

10   Act (collectively, the "Securities Acts").  Reves v. Ernst & Young, 494 U.S. 56, 61, 110 S.Ct.

11   945, 949 (1990) (internal quotation marks omitted); (see Dkt. 236, Court's Order of August 20,

12   2024, at 5); see also 15 U.S.C. § 77b(a)(1) (defining a security); 15 U.S.C. § 78c(a)(10)

13   (same).  "Accordingly, the task has fallen . . . ultimately to the federal courts to decide which

14   of the myriad financial transactions in our society come within the coverage of these statutes."

15   Id. (internal quotation and alteration marks omitted).

16          Under the Securities Acts, "the term 'security' [] include[s] the commonly known

17   documents traded for speculation or investment," such as "investment contract[s]."  SEC v.

18   W.J. Howey Co. (Howey), 328 U.S. 293, 297, 66 S.Ct. 1100, 1102 (1946).  Although the

19   Securities Acts do not define "investment contracts," courts, including the Supreme Court,

20   have taken the term "to mean a contract or scheme for the placing of capital or laying out of

21   money in a way intended to secure income or profit from its employment."  Howey, 328 U.S.

22   at 299, 66 S.Ct. at 1102 (internal quotation marks omitted).  "In other words, an investment

23   contract . . . [is] a contract, transaction or scheme whereby a person invests his money in a

24   common enterprise and is led to expect profits solely from the efforts of the promoter or a third

25   party."  Id. at 298-99, 66 S.Ct. at 1103.  This definition favors substance over form and looks

26   to "economic reality," and is thus "capable of adaptation to meet the countless and variable

27   schemes devised by those who seek the use of money of others on the promise of profits."

28   Id.

The Ninth Circuit has "distilled <u>Howey's</u> definition into a three-part test requiring (1) an investment of money (2) in a common enterprise (3) with an expectation of profits produced by the efforts of others."  <u>Warfield v. Alaniz</u>, 569 F.3d 1015, 1020 (9th Cir. 2009) (internal quotation marks omitted).  The court addresses each element in turn.[2]

A.   <u>Investment of Money</u>.

As an initial matter, defendants appear to suggest that prior to, and independent of, the <u>Howey</u> test, plaintiffs must plead that the Yuga digital assets were promoted or promised for financial returns, and not for "personal consumption."[3]  (Dkt. 243, Motion at 1); (Dkt. 261, Reply in Support of Motion to Dismiss ("Reply") at 2-4) (citing <u>United Hous. Found., Inc. v. Forman</u>, 421 U.S. 837, 858, 95 S.Ct. 2051, 2064 (1975)).  Even the decisions cited by defendants, however, look to <u>Forman</u> as part of the three-step <u>Howey</u> analysis, and not as some separate, threshold requirement.  <u>See</u>, <u>e.g.</u>, <u>Warfield</u>, 569 F.3d at 1022-24 (discussing <u>Forman</u> in context of first <u>Howey</u> prong, but also addressing its relevance to the meaning of "profits" under the third prong); <u>SEC v. Binance Holdings Ltd.</u>, 738 F.Supp.3d 20, 47 (D.D.C. 2024); <u>SEC v. Life Partners, Inc.</u>, 87 F.3d 536, 542-43 (D.C. Cir. 1996).  The court will proceed in similar fashion.

Many courts, in analyzing the "investment of money" prong of the <u>Howey</u> test, focus on the "money" aspect rather than the "investment" aspect.  <u>See</u>, <u>e.g.</u>, <u>Patterson v. Jump Trading LLC</u>, 710 F.Supp.3d 692, 710 (N.D. Cal. 2024) (noting that plaintiffs used fiat, including U.S. dollars, and digital currencies to purchase tokens that were later listed on currency exchanges); <u>SEC v. Payward, Inc.</u>, 2024 WL 4511499, *13 (N.D. Cal. 2024) (finding

---

[2]  As one court has pointed out, many of the cases applying the <u>Howey</u> framework to digital assets concern initial offerings of cryptocurrencies, also known as "coins," such as the ApeCoin token at issue here.  <u>See</u> <u>Dapper Labs, Inc.</u>, 657 F.Supp.3d at 433.  These cases are of only limited utility with respect to NFTs, however, as NFTs are unique by definition, whereas crypto coins or tokens are fungible by design.  <u>See</u> <u>Dufoe v. DraftKings Inc.</u>, 2024 WL 3278637, *6 (D. Mass. 2024) ("[W]hen NFTs are involved, it is less obvious that risks and profits are shared across all investors because each NFT is definitionally unique or non-fungible.").

[3]  "What distinguishes a security transaction . . . is an investment where one parts with his money in the hope of receiving profits from the efforts of others, and not where he purchases a commodity for personal consumption or living quarters for personal use."  <u>Forman</u>, 421 U.S. at 858, 95 S.Ct. at 2063.

allegations that investors committed fiat currency or crypto assets on Kraken's network "constitute[] an investment of money in an enterprise"); Harper v. O'Neal, 746 F.Supp.3d 1360, 1374 (S.D. Fla. 2024). In so doing, these courts have looked to Warfield, which stated that "[t]he investment of money prong of the Howey test requires that the investor commit his assets to the enterprise in such a manner as to subject himself to financial loss." Warfield, 569 F.3d at 1021; see Patterson, 710 F.Supp.3d at 710; Payward, 2024 WL 4511499, at *13. This is a low bar, which can be satisfied by relatively straightforward allegations. See, e.g., Patterson, 710 F.Supp.3d at 710 ("The plaintiffs plead that they . . . invested fiat, including U.S. dollars, and digital currencies. . . . These alleged facts are sufficient to satisfy the first prong.") (internal quotation marks omitted); Harper, 746 F.Supp.3d at 1374 ("Here, it is alleged that Plaintiffs invested money into Astrals Financial Products. That is enough to satisfy the "investment of money" prong at this stage."). Perhaps for the same reason, the "investment of money" prong is often uncontested. See, e.g., SEC v. NAC Found., LLC, 512 F.Supp.3d 988, 995 (N.D. Cal. 2021) (noting that only the second and third Howey prongs are in dispute); Dapper Labs, 657 F.Supp.3d at 435-36; SEC v. Telegram Grp. Inc., 448 F.Supp.3d 352, 369 (S.D.N.Y. 2020); Holland v. CryptoZoo Inc., 2025 WL 2492970, *25 (W.D. Tex. 2025); DraftKings, 2024 WL 3278637, at *4; SEC v. LBRY, Inc., 639 F.Supp.3d 211, 216 (D.N.H. 2022).

In Warfield itself, however, the "investment of money" prong was disputed, not as to whether "money" was spent, but rather, as to whether the expenditure constituted an "investment." Warfield, 569 F.3d at 1021 ("It is undisputed in this case that the purchasers . . . turned over substantial amounts of money. . . . Defendants argue, however, that the purchasers . . . made no investment of money because they lacked the intent to realize a financial gain and were motivated solely to make a charitable donation."). Warfield therefore proceeded to address that intent issue under Howey's first prong, including by reference to Forman.[4] See id. at 1021-22.

---

[4] Although Forman did identify and operate under the Howey framework, it did not discuss the three Howey prongs separately. See Forman, 421 U.S. at 852-54, 858, 95 S.Ct. (continued...)

While a purchaser's subjective intent may have "some bearing" in determining whether a plaintiff made an "investment" of money, the "focus [of the] inquiry [is] on what the purchasers were offered or promised." Warfield, 569 F.3d at 1021.  Courts therefore often look to the promotional materials associated with a sale. Id.  In Warfield, for example, the court concluded that sales of charitable gift annuities were properly characterized as investments, regardless of whether some purchasers had philanthropic motives, because the promotional materials referred to "lifetime income," "Attractive Returns," and rates of return relative to returns from the stock market. See id. at 1021-22.  Although Warfield involved financial products, even a physical good might qualify as an "investment" under the first prong of the Howey test, depending on the promises or marketing efforts made by a seller. In Smith v. Gross, 604 F.2d 639 (9th Cir. 1979), for example, the court found an investment contract to exist where a seller of earthworms advertised that:  (1) his instructions "would enable buyers to have a profitable farm"; (2) the worms would multiply at a rapid rate; (3) he would purchase worms in the future for a relatively high price; and (4) "success was guaranteed." Smith, 604 F.2d at 641-43 (finding facts "virtually identical" to chinchilla sales at issue in Miller v. Central Chinchilla Group, Inc., 494 F.2d 414 (8th Cir. 1974) where there was an investment contract).

In Forman, in contrast, a nonprofit housing cooperative issued "shares of stock" that functioned as a "recoverable deposit on an apartment," which could not be transferred to a non-tenant and, in the event a tenant-shareholder wanted to move away, had to be offered back to the issuer at the purchase price.  See 421 U.S. at 842, 95 S.Ct. at 2055-56.  In concluding that these "shares" were not securities within the meaning of the Securities Acts, the Forman court observed that "[w]hat distinguishes a security transaction . . . is an

_____

[4](...continued)
at 2060-61, 2063.  As a result, some courts have looked to Forman as part of the third, "expectation of profits" prong rather than to the "investment of money" prong.  See, e.g., Harper, 746 F.Supp.3d at 1375; Dapper Labs, 657 F.Supp.3d at 445 (observing, as part of the Howey third prong analysis, that "Forman left open the possibility that in some transactions the investor is offered both a commodity for use and an expectation of profits.") (internal quotation marks and alterations omitted); see also Warfield, 569 F.3d at 1022-1024 (discussing Forman in context of first prong, but also as bearing on the meaning of "profits" under the third prong).

investment where one parts with his money in the hope of receiving profits from the efforts of others, and not where he purchases a commodity for personal consumption or living quarters for personal use."  421 U.S. at 858, 95 S.Ct. at 2063.

    With this in mind, the court turns to plaintiffs' allegations regarding defendants' marketing efforts.  Defendants point to several allegations that Yuga NFTs were marketed for essentially consumptive uses, rather than with or for the prospect of financial gain.  (See Dkt. 243, Motion at 5-6).  Plaintiffs allege, for example, that NFT ownership conferred "membership" that provided NFT purchasers with "status" and "access to events [and] benefits."  (Dkt. 179, SAC at ¶ 4); (see, e.g., id. at ¶ 66) ("The Company boasted that ownership of these BAYC NFTs doubled as a membership to a digital club that would give its owners access to member's-only benefits.") (internal quotation marks and alterations omitted); (id. at ¶ 255) ("The Bored Ape Yacht Club is more than just an #NFT collection – the NFT grants access to a collaborative art experience[.]"); (id. at ¶ 256) ("[T]hese NFTs double as membership cards to an exclusive club with benefits[.]") (internal quotation marks omitted); (id. at ¶ 271) (noting that purchasers "could 'join in the fun' and enjoy the future perks associated with membership").  None of these alleged promotional statements can be read to tout the NFTs as investments.

    Plaintiffs respond[5] that these allegations do not bear on the "investment" analysis because "the 'consumptive use' aspect of the Yuga NFT collections . . . was not yet in play."[6] (Dkt. 255, Opp. at 19).  However, the specific "consumptive use" promotional statements described above were all made either prior to, or within a week of, April 23, 2021, the beginning of plaintiffs' proposed class period.  It appears that no plaintiff purchased any Yuga

_____

    [5]  Perhaps led astray by defendants' organization of the Motion, which in turn appears to have been influenced by defendants' misunderstanding of Forman's relationship to the Howey test, plaintiffs assert that the "investment of money" prong is "uncontested," pointing to allegations in the SAC that plaintiffs purchased Yuga NFTs with U.S. dollars and digital currencies.  (See Dkt. 255, Plaintiffs' Opposition to Motion to Dismiss ("Opp.") at 4).  As explained above, however, the pertinent question  with respect to the "investment of money" prong of the Howey test is the "investment" aspect, not the "money" aspect.  The court has considered plaintiffs' Forman related arguments in the context of the first Howey prong.

    [6]  The "consumptive use aspect" to which plaintiffs refer is the Otherside metaverse, the launch of which was not announced until April 30, 2022.  (Dkt. 179, SAC at ¶ 279).

product prior to April 30, 2021, (see, generally, Dkt. 179, SAC), and at least one plaintiff made a purchase as late as July 22, 2022.  (See id. at ¶ 613).  Thus, the "consumptive use" promotional statements described above, as well as several others, had already been made by the time any plaintiff purchased a Yuga NFT.  And plaintiffs are correct that the SAC includes, and defendants identify, several additional allegations, not listed above, regarding consumption-focused promotional statements that were made over a wide timeframe, and some of which referenced benefits that were not yet available to purchasers at the time the statements were made.  (See, e.g., Dkt. 179, SAC at ¶ 279) (referencing April 30, 2022, statement regarding launch of Otherside); (id. at ¶ 316) (referencing October 19, 2022, statement regarding use of ApeCoin to purchase physical merchandise).  But the fact that defendants promised that NFTs would confer future, as opposed to immediate, consumptive benefits does not alone transmute those benefits from consumptive to investment-like in nature.

Moreover, to affirmatively show that they made "investments" rather than consumptive purchases, plaintiffs rely largely on allegations regarding "[t]he motivation of the purchasers."  (See Dkt. 255, Opp. at 19-20).  Such subjective motivations, however, have only "some bearing" on the analysis. See Warfield, 569 F.3d at 1021.  "Under Howey, courts conduct an objective inquiry into the character of the instrument or transaction offered based on what the purchasers were led to expect."  Id. (internal quotation marks omitted) (emphasis added).  Plaintiffs argue that an objective inquiry reveals that the NFT sales were investments because defendants expressed, for example, that their "ambition is for this to be a community-owned brand, with tentacles in world-class gaming, events, and streetwear," and that other aspects of the project give the apes "inherent, long-term, value" besides individual rarity, and "also made comments on the price" of the products.  (See Dkt. 179, SAC at ¶¶ 557-58, 560) (internal quotation marks omitted).  But these promotional statements bear little resemblance to the explicit discussions of rates of return in Warfield.  Nor are the allegations here, contrary to plaintiffs' characterization, similar to those in Harper, where the defendants "would personally chat with investors and created investment incentives[,]" employed a head of

11

"Investor Relations," made estimates of expected future trading volumes, and publicized partnerships with multiple venture capital firms, including one that "made more than 100 investments." See Harper, 746 F.Supp.3d at 1365-66, 1376-77.[7]  Although plaintiffs assert that defendants would "personally chat with investors and create investment incentives[,]" (see Dkt. 255, Opp. at 18), neither the Opposition nor the allegations to which it cites provide any explanation as to what those "investment incentives" were.  In short, plaintiffs have not adequately alleged that the Yuga digital assets here were offered as investments, i.e., the allegations are insufficient to satisfy Howey's first prong.  See Cholla Ready Mix, Inc., 382 F.3d at 973 ("[T]he court is not required to accept legal conclusions cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged.  Nor is the court required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences.") (internal citations and quotation marks omitted).

        B.        Common Enterprise.

        The second prong of the Howey test, the existence of a "common enterprise," can be satisfied by either "horizontal commonality" or "vertical commonality."  Hocking v. Dubois (Hocking), 839 F.2d 560, 566 (9th Cir. 1988).[8]  The "strictest definition" of common enterprise typically involves only horizontal commonality, i.e., when investors' funds are pooled.  Id.  However, common enterprise can be defined "more broadly[] as a venture in which the fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment or of third parties."  Id. (internal quotation marks and emphasis

------

        [7]  Harper discussed those promotional efforts and Forman, largely in an analysis of Howey's third prong regarding the expectation of profits.  See Harper, 746 F.Supp.3d at 1375-77.  That third prong analysis also overlapped with the second, "common enterprise" prong, as the Eleventh Circuit, unlike this circuit, looks only to "broad vertical commonality."  Id. at 1374.

        [8]  Although Hocking was superseded by the Ninth Circuit's subsequent en banc opinion in Hocking v. Dubois, 885 F.2d 1449 (9th Cir. 1989) ("Hocking II"), the en banc panel cited to and explicitly agreed with the panel opinion's discussion of the common enterprise requirement in Hocking.  Hocking II, 885 F.2d at 1459 ("We agree with Judge Reinhardt's discussion for the panel of the Ninth Circuit law on Howey's common enterprise requirement. . . [and] accept[] either traditional horizontal commonality or, when no pooling among investors is present, a strict version of vertical commonality.").

omitted).  In horizontal commonality, there is a "relationship shared by two or more investors who pool their investments together and split the net profits and losses in accordance with their pro rata investments."  Id.  The hallmark of a horizontal common enterprise is "the tying of each individual investor's fortune to the fortunes of the other investors," which, in turn, "depend upon the profitability of the enterprise as a whole."  Revak v. SEC Realty Corp., 18 F.3d 81, 87 (2d Cir. 1994); see Hocking, 839 F.2d at 566.

Vertical commonality, in contrast, "requires that the investor and the promoter be involved in some common venture," regardless of whether there are other investors.  Hocking, 839 F.2d at 566 (internal quotation marks omitted).  "[E]ven a venture that has but a single investor can be a common [vertical] enterprise if the promoter's remuneration depends upon the success of the venture."  Id.  Where there are other investors, "the investors' fortunes need not rise and fall together" and "a pro-rata sharing of profits and losses is not required."  Revak, 18 F.3d at 87.  In other words, "[v]ertical commonality may be established by showing that the fortunes of the investors are linked with those of the promoters," rather than with those of fellow investors.[9]  SEC v. R.G. Reynolds Enters., Inc., 952 F.2d 1125, 1130 (9th Cir. 1991) (internal quotation marks omitted).  In Reynolds, for example, vertical commonality existed where the defendant took "a management fee based on a percentage of the profits, thus making his own profit contingent on the profit of his investors."  Id. at 1131.

Defendants argue that plaintiffs have not adequately alleged horizontal or strict vertical commonality.  (Dkt. 243, Motion at 12-16).  Indeed, of the over 900 paragraphs of the SAC, only six explicitly address the existence of a common enterprise.  (See Dkt. 179, SAC at ¶¶ 542-546).  Of these, only two appear to allege horizontal commonality, insofar as plaintiffs allege that "the profits of each Plaintiff . . . were intertwined with those of Defendants and of other investors," (id. at ¶ 545), and that "Defendants have conceded that Yuga used the funds

_____

[9]  Vertical commonality can be either "broad" or "strict."  Revak, 18 F.3d at 87.  Broad vertical commonality requires a link only between investors' fortunes and the efforts of a seller and promoter, while strict vertical commonality "requires that the fortunes of investors be tied to the fortunes of the promoter."  Id. at 88 (emphasis omitted).  The Ninth Circuit recognizes only strict vertical commonality.  See Hocking II, 885 F.2d at 1459.

from its ApeCoin to partially fund its operations."[10]  (Id. at ¶ 544).  These bare allegations are too conclusory to show horizontal commonality.  See Cholla Ready Mix, Inc., 382 F.3d at 973.

Although plaintiffs attempt to analogize to other cases involving digital assets, those cases are distinguishable.  In Dapper Labs, for example, the defendants operated their own private "Flow" blockchain, as well as an associated digital "FLOW" token that was not itself alleged to be a security.  See 657 F.Supp.3d at 428, 434.  Ownership of NFT products that were alleged to be securities were recorded on the private blockchain.  Id. at 429; see, e.g., Telegram Grp. Inc., 448 F.Supp.3d at 360 (S.D.N.Y. 2020) (cryptocurrency offering explicitly promoted as effort to fund development of a new blockchain); Balestra v. ATBCOIN LLC, 380 F.Supp.3d 340, 346-47 (S.D.N.Y. 2019) (same).  All secondary NFT sales, which could only be conducted in a private marketplace controlled by the defendant, were also recorded on the private Flow blockchain.  Dapper Labs 657 F.Supp.3d at 430.  Under these circumstances, the court found that the use of NFT sale proceeds for "improvement of the ecosystem" – in other words, the private blockchain – raised a plausible inference of pooling, and therefore horizontal commonality, because the private blockchain was "necessary to the value of [the NFTs]" and, by the plaintiffs' own allegation, the pooling of NFT sales revenue was necessary "to ensure the Flow Blockchain does not collapse."  See id. at 436-38.  The Dapper Labs court emphasized that its conclusion "was a close call," and highlighted "[t]he interplay among FLOW, the Flow blockchain, and [the NFTs] [a]s necessary to the totality of the scheme at issue."  See id. at 433-34.

Here, in contrast, plaintiffs have alleged no similar interconnected scheme.  Both the Yuga NFTs and ApeCoin were recorded on the Ethereum blockchain, which is not under defendants' control and does not depend upon defendants' NFTs or ApeCoin token for its survival.  (See Dkt. 179, SAC at ¶¶ 400, 600).  Plaintiffs nevertheless attempt to liken the scheme here to that in Dapper Labs and other cases, arguing by way of a single citation to over 300 paragraphs of the SAC, that defendants here invested NFT sale proceeds in the

---

[10]  This is but one example of plaintiffs' attempt to use an allegation regarding a single Yuga product – in this instance ApeCoin tokens – to serve for all of the Yuga digital assets, including NFTs.

"Bored Ape ecosystem." (See Dkt. 255, Opp. at 8). Plaintiffs have not, however, identified any specific allegations regarding the "interplay" between the NFTs and that ill-defined ecosystem, let alone allegations akin to those made in Dapper Labs.[11] (See, generally, Dkt. 255, Opp.).

Although the allegations here bear a somewhat closer resemblance to those in DraftKings, fundamental differences remain. There, the NFTs at issue were minted on a public blockchain that was itself built upon Ethereum, the same blockchain upon which the NFTs here are recorded. DraftKings, 2024 WL 3278637, at *2. And, as here, the plaintiffs alleged that "revenue generated by the sale of NFTs was reinvested into [defendants'] business." Id. at *5. Although recognizing that "when NFTs are involved, it is less obvious that risks and profits are shared across all investors because each NFT is definitionally unique or non-fungible[,]" the court nevertheless found horizontal commonality, applying the logic of Dapper Labs. Id. at *6. Central to the court's determination, however, was the fact that "[m]uch like the NFTs in Dapper Labs, the DraftKings NFTs are sold or traded in [a] Marketplace controlled by DraftKings." Id. Furthermore, "DraftKings NFTs were also kept in wallets owned by DraftKings [even] after they were sold to purchasers." Id. at *6. Thus, the court explained that "if DraftKings shut down the Marketplace . . . the value of the NFTs would plausibly drop to zero." Id. This interdependence between the proprietary marketplace and the value of the NFTs, the court concluded, was sufficient to establish "that the fortunes of the purchasers of the DraftKings NFTs are linked to a common enterprise, based on the rules of the Marketplace, which tied the purchasers to DraftKings's platform." Id.

Here, plaintiffs describe no comparable relationship, (see, generally, Dkt. 179, SAC), and indeed allege that they purchased Yuga NFTs not on any secondary market platform

---

[11] The Dapper Labs plaintiffs specifically alleged how the defendants used investor monies from NFT sales to grow the underlying ecosystem, such as "by retaining purchasers' cash on [the] books for months after withdrawals are requested . . . to prop up the value of the [crypto token]." 657 F.Supp.3d at 438 (internal quotation marks omitted); see also U.S. Sec. & Exch. Comm'n v. Kik Interactive Inc., 492 F.Supp.3d 169, 174, 178 (S.D.N.Y. 2020) (explaining how defendant deposited investor funds into single bank account and publicized a white paper listing various aspects of planned "digital ecosystem" to be funded by cryptocurrency sales); Telegram, 448 F. Supp. 3d at 360-61 (describing similar white paper).

controlled by defendants, but on independent exchanges such as OpenSea and Coinbase. (See id. at ¶¶ 14-17). In sum, plaintiffs have not alleged the type of "interplay" between the alleged securities and proprietary "ecosystem" that underpinned the logic of Dapper Labs and DraftKings, and therefore have not adequately alleged horizontal commonality.[12]

With respect to vertical commonality, plaintiffs raise a very brief argument, with no citation to the SAC, that because both investors and defendants owned ApeCoin tokens, the fortunes of investors were linked to the fortunes of defendants. (See Dkt. 255, Opp. at 9). As an initial matter, plaintiffs do not so much as attempt to argue that there was vertical commonality with respect to any of the five classes of NFTs referenced in the SAC. (See, generally, Dkt. 255, Opp.). Moreover, even as to ApeCoin, plaintiffs did not identify any allegations to support their conclusion that common ownership of ApeCoin resulted in a "link" between plaintiffs' and defendants' fortunes. (See, generally, id.). Plaintiffs have not, for example, alleged any agreement between themselves and defendants to "share profits on a percentage basis." See Reynolds, 952 F.2d at 1130. Indeed, to the extent defendants received a "creator earning fee" every time an NFT was transferred, regardless of whether the sale price of that NFT increased, decreased, or remained unchanged, plaintiffs' own allegations suggest a de-coupling of their fortunes from those of defendants, who stood to gain even if plaintiffs sold their own NFTs at a loss. (See Dkt. 179, SAC at ¶ 601); In re Ripple Labs, Inc. Litig., 2024 WL 3074379, *7 (N.D. Cal. 2024) ("[T]he key inquiry for strict vertical commonality is whether there is a direct relation between the success or failure of the investor and that of the promoter.") (internal quotation marks omitted).

In short, because plaintiffs do not adequately allege either horizontal or vertical commonality, they have failed to satisfy the "common enterprise" prong of the Howey test.

---

[12] Plaintiffs also argue that they have properly alleged horizontal commonality because "the price of NFTs within a collection is highly correlated, tying the fortunes of investors to the enterprise." (See Dkt. 255, Opp. at 9). But in the same breath, plaintiffs assert that the common ties shared by investors exist "where the digital asset's value is tied, and depends upon, the continued success of the blockchain." (Id. at 9). As discussed above, the Yuga NFTs were not built upon a private blockchain, and certainly did not depend upon the continued success of the Ethereum blockchain upon which all Yuga NFTs were recorded.

C.      Expectation of Profits Produced by the Efforts of Others.

The third prong of the Howey test requires "an expectation of profits produced by the efforts of others." Warfield, 569 F.3d at 1020. This "involves two distinct concepts: whether a transaction involves any expectation of profit[,] and whether expected profits are the product of the efforts of a person other than the investor." Id.

1.    **Expectation of Profits**.

The question whether plaintiffs reasonably expected any profits from their purchase of the digital assets overlaps somewhat with the question of whether plaintiffs made an "investment" for purposes of Howey's first prong. As discussed above, plaintiffs allege that defendants made several statements suggesting that the products at issue here were marketed for consumptive purposes, rather than as a means of deriving profits. See supra at § A. As some courts have observed, however, digital assets may have "both consumptive and speculative uses," and "[t]he fact that a product has some potential usefulness or intrinsic value will not defeat a reasonable expectation of profit where the primary motivation is profit." DraftKings, 2024 WL 3278637, at *7. Because the third Howey prong emphasizes purchaser expectations rather than the character of the instruments, the court now looks to plaintiffs' allegations through that lens.

In their discussion of the "promise of profits," plaintiffs identify statements regarding Yuga products' "inherent, long-term value," and "intrinsic value."[13] (Dkt. 179, SAC at ¶¶ 558, 559). Plaintiffs also point to defendants' statements regarding NFT prices and trade volumes.[14] (See Dkt. 179, SAC at ¶¶ 376, 560, 564). While acknowledging that these promotions do not reference "profit," plaintiffs contend that the "overall messaging about the growth potential and increasing value of the Yuga Financial Products and Bored Ape

---

[13]  Here, too, plaintiffs' conglomeration of all the products at issue leads to a lack of precision, as some of the statements, for example, pertain only to an "ape token" while others concern "the apes," and yet others identify no specific product at all. (See, e.g., Dkt. 179, SAC at ¶¶ 558-60).

[14]  Again, plaintiffs do not clearly distinguish between the products at issue. (See, e.g., Dkt. 179, SAC at ¶ 374) (referring only to BAYC and MAYC NFTs); (id. at ¶ 558) (appearing to refer to all NFTs); (id. at ¶ 559) (appearing to refer to only BAYC NFTs); (id. at 560) (no specification as to product being described).

ecosystem . . . objectively establish an expectation of profits." (Dkt. 255, Opp. at 12). The court disagrees. Statements about a product's inherent or intrinsic value are not necessarily statements about profit. That said, statements about NFT prices and trade volumes are a somewhat closer call. But even then, these statements by themselves fail to establish an expectation of profit.

The court acknowledges that the factual allegations regarding a "promise of profit" are fairly close to those in Dapper Labs. There, for example, the defendants also announced sales volumes and the prices of noteworthy NFTs via social media. Dapper Labs, 657 F.Supp.3d at 443. However, the court's conclusion that promises of profits had been made was also based on the defendants' use of "rocket ship," "stock chart," and "money bags" emoji images that, the court explained, "objectively mean one thing: a financial return on investment." Id. (internal quotation marks omitted). One defendant in Dapper Labs even promoted the NFTs as an opportunity for "younger generations" to "benefit financially." See id. (internal quotation marks omitted); see, e.g., Holland, 2025 WL 2492970, at *27 (noting promise of future benefits "years down the line," coupled with characterization of NFT ownership as "a really fun game that makes you money") (internal quotation marks omitted); LBRY, 639 F.Supp.3d at 217 (noting statements to potential investor that defendant was "negotiating private placements of [crypto token] with several other investors," and "opportunity is obvious," along with exhortation to "buy a bunch of credits, put them away safely, and hope that in 1-3 years we've appreciated even 10% of how much Bitcoin has") (internal quotation marks omitted); DraftKings, 2024 WL 3278637, at *8 (noting promises of a "high-level financial look at each NFT," and "guaranteed scarcity," along with statement that users can "keep [the] open market profit") (internal quotation marks omitted). Because such profit-focused elements are missing from the more run-of-the-mill promotional statements alleged here, it was not objectively reasonable for plaintiffs to base expectations of speculative profit on those statements.

## 2. **The Efforts of Others**.

In the absence of an objective promise of profits, the question whether plaintiffs have

satisfied the "efforts of others" aspect of <u>Howey</u>'s third prong is somewhat academic. Nevertheless, assuming for the sake of argument that plaintiffs have satisfied the remainder of the <u>Howey</u> test, the court is persuaded that the "efforts of others" requirement has been met.

The "efforts of others" analysis looks to "whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." <u>SEC v. Rubera</u>, 350 F.3d 1084, 1091–92 (9th Cir. 2003) (internal quotation marks omitted). To the extent that plaintiffs reasonably expected any profits, there are no allegations that suggest that such profits would come from plaintiffs' own efforts. (<u>See</u>, <u>generally</u>, Dkt. 179, SAC). Defendants' contention that plaintiffs "admi[t] that they own significant commercial and other rights associated with their Products," (<u>see</u> Dkt. 243, Motion at 19), is somewhat misleading. While plaintiffs do allege that defendants represented that purchasers retained significant rights, (<u>see</u> Dkt. 179, SAC at ¶¶ 310, 386, 386, 388, 410), plaintiffs also appear to allege that those, or similar, representations were misleading, and allege that "[i]n fact, Yuga Labs LLC owns the commercial rights to the BAYC NFT collection – not the ape holders – and grants a limited and restrictive license to the NFT holders that dictates what the BAYC holders' personal and commercial uses of the NFTs [sic]." (<u>See id.</u> at ¶¶ 69-70.). Plaintiffs also point to defendants' statements that the value of "the collections" was "a top priority[,]" and was tied to defendants' "own efforts, [n]amely, the 'Roadmap Activations.'" (<u>Id.</u> at ¶¶ 562, 558-59). Although the precise nature of those "activations" is not clear, it appears that plaintiffs have adequately alleged that defendants, not plaintiffs or other investors, would be responsible for developing and implementing the "roadmap" upon which the products' future value would depend.[15]

---

[15] The court is not persuaded by defendants' suggestion that, because plaintiffs bought Yuga products on the secondary market, and not from defendants, plaintiffs could not possibly have expected to benefit from defendants' efforts. (<u>See</u> Dkt. 243, Motion at 18) (citing <u>Ripple Labs</u>, 682 F.Supp.3d at 328-29). Yet, all of defendants' statements were allegedly made on social media or other public platforms. As one court explained, "[t]hese representations would presumably have reached individuals who purchased their crypto-assets on secondary markets – and, indeed, motivated those purchases – as much as it did [direct purchasers]." <u>SEC v. Terraform Labs</u>, 684 F.Supp.3d 170, 198 (S.D.N.Y. 2023). Thus, "[t]hat a purchaser
(continued...)

In short, despite satisfying this sub-prong, the plaintiffs have failed to satisfy the other Howey prongs and therefore fail to allege that any, some, or all of defendants' digital assets are a security.

### CONCLUSION

Based on the foregoing, IT IS ORDERED THAT:

1. Defendants' Motion to Dismiss **(Document No. 243) is granted**.

2. The Second Amended Complaint **(Document 179) is dismissed with leave to amend**.

3. Plaintiffs shall file a third amended complaint, attempting to cure the deficiencies set forth above, as well as the other alleged defects outlined in defendants' Motion, or a Notice of Intent to Stand on Second Amended Complaint ("Notice of Intent"), no later than **October 10, 2025**. See WMX Techs., Inc. v. Miller, 104 F.3d 1133, 1135-36 (9th Cir. 1997) ("Unless a plaintiff files in writing a notice of intent not to file an amended complaint, such dismissal order is not an appealable final decision. In a typical case, filing of such notice gives the district court an opportunity to reconsider, if appropriate, but more importantly, to enter an order dismissing the action, one that is clearly appealable."). The court expects that defendants will agree to any amendments that will or attempt to cure the alleged defects.

4. The third amended complaint must be labeled "Third Amended Complaint" ("TAC"), filed in compliance with Local Rule 3-2, and contain the case number assigned to the case. In addition, plaintiffs are informed that the court cannot refer to a prior pleading in order to make its TAC complete. Local Rule 15-2 requires that an amended pleading be complete in and of itself without reference to any prior pleading. This is because, as a general rule, an amended pleading supersedes the original pleading. See Ramirez v. Cnty. of San Bernardino, 806 F.3d 1002, 1008 (9th Cir. 2015) ("It is well-established in our circuit that an amended complaint supersedes the original, the latter being treated thereafter as

---

[15](...continued)
bought . . . in a secondary resale transaction has no impact on whether a reasonable individual would objectively view the defendants' actions and statements as evincing a promise of profits based on their efforts." Id. at 197.

non-existent.  In other words, the original pleading no longer performs any function[.]") (citations and internal quotation marks omitted).

5.  The leave to amend the court has granted should not be read as an invitation to test the boundaries of Rule 8, which requires a "short and plain statement of the claim[.]"  Fed. R. Civ. P. 8(a)(2).  The court notes that the plaintiffs' SAC exceeds the First Amended Complaint by nearly 100 pages and, in addition to the deficiencies discussed above, includes several duplicative, redundant paragraphs.  The TAC may abandon any claim, but may not add any new claims, and **shall not exceed 200 pages**.

6.  Plaintiffs are cautioned that failure to timely file a Third Amended Complaint or Notice of Intent shall result in this action being dismissed without prejudice for failure to prosecute and failure to comply with a court order.  See Fed. R. Civ. P. 41(b); Link v. Wabash R.R. Co., 370 U.S. 626, 629-30, 82 S.Ct. 1386, 1388 (1962); Edwards v. Marin Park, Inc., 356 F.3d 1058, 1065 (9th Cir. 2004) ("The failure of the plaintiff eventually to respond to the court's ultimatum – either by amending the complaint or by indicating to the court that it will not do so – is properly met with the sanction of a Rule 41(b) dismissal."); Ferdik v. Bonzelet, 963 F.2d 1258, 1260-63 (9th Cir. 1992) (affirming dismissal for failure to file amended complaint as ordered by district court).

7.  Should the TAC allege any claims predicated upon an allegation that the digital assets qualify as securities, then Yuga Labs, Inc., Wylie Aronow, Greg Solano, Kerem Atalay, Zeshan Ali, Nicole Muniz, Jasmin Shoemaker, Patrick Ehrlund, Christopher Lyons, and Guy Oseary (collectively, "defendants") may, no later than **October 24, 2025**, file a motion to dismiss ("Renewed Motion") limited to the question of whether the digital assets alleged to be securities qualify as such.  The Renewed Motion and plaintiffs' opposition shall be limited to 7,000 words each.  The Reply shall be limited to 4,000 words.  Failure to timely file a Renewed Motion shall be construed as a concession that the TAC adequately alleges that the digital assets are securities.

8.  The remaining defendants may join in the Renewed Motion and/or file their own individual or joint briefs (of no more than 1,000 words for opening briefs and 500 words for

reply briefs) addressing any defendant-specific issues.

9. Prior to filing the Renewed Motion, counsel for plaintiffs and all defendants shall, on **October 17, 2025, at 10:00 a.m.**[16] meet and confer in person, via video, or telephonically to discuss defendants' motion to dismiss.  The Renewed Motion and individual or joint briefs must include copies of all meet and confer letters as well as a declaration that sets forth, in detail, the entire meet and confer process (i.e., when and where it took place, how long it lasted and the position of each attorney with respect to each disputed issue that will be the subject of the motion).  Failure to include such a declaration will result in the Renewed Motion, as well as individual or joint briefs being denied.

10. In the event that the defendants fail to timely file a Renewed Motion, then any other remaining defendant may, no later than **October 31, 2025**, file a motion to dismiss limited to the question whether the digital assets alleged to be securities qualify as such.  Any failure to timely file such a motion may be construed as a concession that the TAC adequately alleges that the digital assets are securities.

11.  The parties shall not in any briefing or documents filed in this case attempt to incorporate, whether by reference, Appendix, or any other means, any other previous filing or any argument raised in any previous filing.  Any such effort shall be construed as an attempt to circumvent this Order and the word limitations stated herein.

12.  Defendant Sotheby's Motion to Dismiss **(Document No. 251)** is **denied as moot**.

13.  Defendants' Requests to Incorporate by Reference **(Document Nos. 244 & 262)** are **denied**.

Dated this 30th day of September, 2025.

_____
                                                        /s/
                                                Fernando M. Olguin
                                        United States District Judge

---

[16]    Counsel may agree to meet and confer at another time without seeking court approval for such an agreement.