John T. Jasnoch (CA 281605)
jjasnoch@scott-scott.com
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel.: 619-233-4565
Fax: 619-233-0508

*Lead Counsel for Plaintiffs and the Proposed Class*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| JOHNNY JOHNSON, EZRA BOEKWEG, MARIO PALOMBINI, and ADAM TITCHER, JONATHAN SMITH, NEAL PATEL, HIREN PATEL, and DAVID GRAND, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br>v.<br><br>YUGA LABS, INC., WYLIE ARONOW, GREG SOLANO, NICOLE MUNIZ, PATRICK EHRLUND, CHRISTOPHER LYONS, ALEXIS OHANIAN, AMY WU, MAARIA BAJWA, SOTHEBY'S HOLDINGS INC., GUY OSEARY, MIKE WINKELMANN, MADONNA LOUISE CICCONE, PARIS HILTON, JAMES FALLON, UNIVERSAL TELEVISION, LLC, JUSTIN BIEBER, WARDELL STEPHEN CURRY II, ADIDAS AMERICA INC., ADIDAS VENTURE B.V., IVAN SOTO-WRIGHT, and MOONPAY USA LLC,<br><br>Defendants. | Case No. 2:22-cv-08909-FMO-PLA<br><br>**THIRD AMENDED CLASS ACTION COMPLAINT**<br><br><u>DEMAND FOR JURY TRIAL</u> |

NATURE OF THE CASE ........................................................................... 1

PARTIES ................................................................................................... 3

    I.    PLAINTIFFS ............................................................................ 3

    II.   DEFENDANTS ........................................................................ 6

JURISDICTION AND VENUE ............................................................... 10

FACTUAL ALLEGATIONS .................................................................... 11

    III.  YUGA LABS BACKGROUND .......................................... 11

        A.    The Financial Products Offered ........................................ 11

        B.    The Founders ..................................................................... 13

        C.    The Fifth Ape - Oseary ..................................................... 16

        D.    The Facilitator – MoonPay ............................................... 18

    IV.  THE MISLEADING PROMOTION AND SALE OF YUGA SECURITIES ..................................................................... 25

        A.    The First Scheme – The Deceptive Sotheby's Auction ....................... 25

        B.    The Second Scheme – Deceptive Marketing Campaign ..................... 33

            1.    Promoter Defendants ..................................................... 33

            2.    Yuga Defendants ........................................................... 51

            3.    MoonPay Defendants ..................................................... 66

            4.    ApeCoin DAO Defendants ............................................ 74

        C.    The ApeCoin Token Sale and Otherside Virtual Land Sale ............... 75

        D.    Other Manipulations of the Price and Market for Yuga Financial Products .......................................................... 85

    V.   ADDITIONAL EVIDENCE OF MANIPULATIVE ACTS ..................... 94

    VI.  THE DUMP – THE PRICE OF YUGA SECURITIES PLUMMETS ..... 94

    VII. THE YUGA FINANCIAL PRODUCTS ARE SECURITIES UNDER *HOWEY* ...................................................... 102

        A.    Yuga Financial Products Investors Invested Money ......................... 102

        B.    Yuga Financial Products Investors Were Intertwined in a Common Enterprise with Defendants .......................... 115

        C.    Yuga's Marketing Led Investors to Purchase the Yuga Financial Products with a Reasonable Expectation of Profit from Owning Them ................................. 124

        D.    Yuga's Marketing Led Investors to Expect Profits from the Yuga Financial Products to Be Derived from the Managerial Efforts of the Executive Defendants ........... 125

MECHANICS OF PLAINTIFFS' PURCHASES ................................... 128

ADDITIONAL RELIANCE ALLEGATIONS ....................................... 131

CLASS ACTION ALLEGATIONS ........................................................ 137

PRESUMPTION OF RELIANCE .......................................................... 140

i

VIII.   COMMON IMPACT OF ARTIFICIAL INFLATION OF PRICES OF YUGA SECURITIES.................................................................. 141

CAUSES OF ACTION.............................................................................. 142

FIRST CAUSE OF ACTION ............................................................... 142

SECOND CAUSE OF ACTION........................................................... 144

THIRD CAUSE OF ACTION .............................................................. 145

    A.    Misrepresentations and Omissions ..................................... 147

    B.    Materiality ........................................................................... 148

    C.    Scienter................................................................................ 149

    D.    Reliance, Economic Loss, and Loss Causation ................... 150

FOURTH CAUSE OF ACTION........................................................... 151

FIFTH CAUSE OF ACTION................................................................ 153

SIXTH CAUSE OF ACTION................................................................ 155

SEVENTH CAUSE OF ACTION ........................................................ 160

EIGHTH CAUSE OF ACTION ........................................................... 165

NINTH CAUSE OF ACTION .............................................................. 173

TENTH CAUSE OF ACTION .............................................................. 179

PRAYER FOR RELIEF ........................................................................... 183

JURY DEMAND....................................................................................... 184

1   Lead Plaintiffs Johnny Johnson, Ezra Boekweg, Mario Palombini, and
2   additional named plaintiffs Adam Titcher, Jonathan Smith, Neal Patel, Hiren Patel,
3   and David Grand (collectively "Plaintiffs"), individually and on behalf of all others
4   similarly situated, bring this action against Yuga Labs, Inc. ("Yuga" or the
5   "Company"), Wylie Aronow, Greg Solano, Nicole Muniz, Jasmin Shoemaker,
6   Patrick Ehrlund, Christopher Lyons (the "Executive Defendants"), Alexis Ohanian,
7   Amy Wu, Maaria Bajwa (the "ApeDAO Board Defendants"), Sotheby's Holdings
8   Inc., Guy Oseary, Mike Winkelmann, Madonna Louise Ciccone, Paris Hilton, James
9   Fallon, Universal Television, LLC, Justin Bieber, Wardell Stephen Curry II, adidas
10  America Inc., and adidas Ventures B.V. (the "Promoter Defendants"), Ivan Soto-
11  Wright, and MoonPay USA LLC ("MoonPay," and together with Ivan Soto-Wright,
12  the "MoonPay Defendants") (collectively, with the Company, the Executive
13  Defendants, ApeDAO Board Defendants, and the Promoter Defendants, the
14  "Defendants"). The following allegations are based upon personal knowledge as to
15  Plaintiffs' own facts, upon investigation by Plaintiffs' counsel, and upon information
16  and belief where facts are solely in possession of Defendants.

17  ## NATURE OF THE CASE

18  1.    Plaintiffs bring this action on behalf of all investors who purchased
19  Yuga's non-fungible tokens ("NFTs") or ApeCoin tokens ("ApeCoin")[1] between
20  April 23, 2021 and October 6, 2023 (the "Class Period"), and were damaged thereby.

21  2.    Celebrity promotions of cryptocurrencies are fraught with problems. As
22  the U.S. Securities and Exchange Commission ("SEC") previously stated:
23  "Celebrities and others are using social media networks to encourage the public to
24  purchase stocks and other investments. These endorsements may be unlawful if they

---

[1]    Yuga's various collections of so-called "Bored Ape" NFTs (including the Bored Ape Yacht Club ("BAYC"), Mutant Ape Yacht Club ("MAYC"), Bored Ape Kennel Club ("BAKC" NFT collections), ApeCoins, and virtual land in the Otherside (aka "Otherdeed" NFTs) are collectively referred to as the "Yuga Financial Products" or the "Yuga securities."

do not disclose the nature, source, and amount of any compensation paid, directly or indirectly, by the company in exchange for the endorsement."[2]

3.    This case involves a vast scheme between a blockchain start-up company, Yuga, a highly connected Hollywood talent agent (Defendant Guy Oseary), and a front operation (MoonPay), who all united for the purpose of promoting and selling a suite of unregistered digital assets.  Executive Defendants Aronow, Solano, and Muniz and Promotor Defendant Oseary together devised a plan to leverage their vast network of A-list musicians, athletes, and celebrity clients and associates to misleadingly promote and sell the unregistered Yuga Financial Products.

4.    Interest in the Yuga NFT collections was driven by endorsements of highly influential celebrities.  But this purported interest in, and endorsement of the BAYC NFTs was a sham manufactured by Oseary and MoonPay at the behest of the Company and the Executive Defendants.  While the Promoter Defendants publicly touted their high-dollar "purchases" of BAYC NFTs, the truth is that they were given the NFTs for free (often along with additional compensation) in exchange for promoting the BAYC NFTs to an unsuspecting public.

5.    In order to make the promotion of, and subsequent interest in, the BAYC NFTs appear to be organic (as opposed to being solely the result of a paid promotion), the Company needed a way to discreetly pay their celebrity cohorts.  To do this, Oseary tapped into a different part of his network: the MoonPay Defendants.  MoonPay purports to be a white-glove service designed to help the super-rich and celebrities buy NFTs "'without all the hassle of setting up a wallet, buying crypto, using that crypto to purchase an NFT and then taking custody of it.'"[3]  In truth, the

---

[2]    Statement, *SEC Statement Urging Caution Around Celebrity Backed ICOS,* U.S. SEC. & EXCH. COMM'N (Nov. 1, 2017), https://www.sec.gov/news/public-statement/statement-potentially-unlawful-promotion-icos.

[3]    Ryan Weeks, *MoonPay has quietly set up a concierge service to help celebrities buy NFTS,* THE BLOCK (Nov. 25, 2021), https://www.theblock.co/post/125483/moonpay-concierge-celebrities-nft.

Executive Defendants and Oseary used their connections to MoonPay as a covert way to compensate the Promoter Defendants for their promotions of the BAYC NFTs without disclosing it to unsuspecting investors. Moreover, certain of the Promoter Defendants failed to disclose that they themselves had equity interests in MoonPay.

6. Defendants' promotional campaign was wildly successful, generating millions of dollars in sales and re-sales. The manufactured celebrity endorsements and misleading promotions regarding the launch of an entire BAYC ecosystem were able to artificially increase the interest in and price of the Yuga Financial Products during the Class Period, causing investors to purchase these losing investments at drastically inflated prices. Manipulative trading practices were also implemented by insiders in conjunction with the celebrity endorsements, in order to further generate artificial trading volume and price inflation.

7. The staggering profits of the BAYC NFTs were not enough for the Company and Executive Defendants. At the height of the BAYC NFT endorsement scheme, the Executive Defendants next minted unregistered digital financial assets called ApeCoins and promoted them in conjunction with the BAYC NFTs. In doing so, the Executive Defendants, Oseary, and the ApeDAO Board Defendants sought to obscure their own sales of their massive ApeCoin allocations directly to retail purchasers. At no point did any of the Defendants register these securities with the SEC or disclose the financial interest of the Promoter Defendants.

## PARTIES

### I.    PLAINTIFFS

8. Lead Plaintiff Johnny Johnson ("Johnson") is a citizen of Texas and resides in Georgetown, Texas. As set forth in the previously filed certification (ECF No. 74-2), Plaintiff Johnson invested in Yuga NFTs during the Class Period. Plaintiff Johnson also purchased ApeCoin tokens on U.S.-based cryptocurrency exchanges. Johnson purchased the Yuga securities in reliance on the misleading promotions from the Company and the Promoter Defendants, and he suffered investment losses as a

1  result of Defendants' conduct.  For his NFT purchases, Plaintiff Johnson paid the
2  2.5% royalty fee directly to Yuga Labs, placing him in direct privity with Yuga Labs
3  for a portion of the sale.

4       9.     Lead Plaintiff Ezra Boekweg is a citizen of Texas and resides in Waco,
5  Texas.  As set forth in the previously filed certification (ECF No. 74-2), Plaintiff
6  Boekweg invested in Yuga NFTs during the Class Period.  Plaintiff Boekweg also
7  purchased  ApeCoin  tokens  on  U.S.-based  cryptocurrency  exchanges.   He  also
8  purchased Otherdeed NFTs associated with  the  Otherside metaverse Yuga was
9  purportedly developing.  Boekweg purchased the Yuga securities in reliance on the
10 misleading promotions from the Company and the Promoter Defendants, and he
11 suffered  investment  losses  as  a  result  of  Defendants'  conduct.   For  his  NFT
12 purchases, Plaintiff Boekweg paid the 2.5% royalty fee directly to Yuga Labs, placing
13 him in direct privity with Yuga Labs for a portion of the sale.

14      10.    Lead Plaintiff Mario Palombini ("Palombini") is a resident and citizen
15 of Portugal.  As set forth in the previously filed certification (ECF No. 74-2), Plaintiff
16 Palombini purchased the Mutant Ape Yacht Club and Otherdeed NFTs on a U.S.-
17 based exchange.  Palombini purchased the Yuga Financial Products on a U.S.-based
18 exchange  in  reliance  on  the  misleading  promotions  from  the  Company  and  the
19 Promoter Defendants, and he suffered investment losses as a result of Defendants'
20 conduct.  For his NFT purchases, Plaintiff Palombini paid the 2.5% royalty fee
21 directly to Yuga Labs, placing him in direct privity with Yuga Labs for a portion of
22 the sale.

23      11.    Plaintiff Adam Titcher ("Titcher") is a resident and citizen of California.
24 As set forth in the previously filed certification (ECF No. 1-2), Plaintiff Titcher
25 purchased  a  Mutant  Ape  Yacht  Club  ("MAYC")  NFT  via  the  U.S.-based  NFT
26 exchange OpenSea.  Titcher also purchased an Otherdeed NFT associated with the
27 Yuga metaverse, Otherside, via the U.S.-based NFT exchange on OpenSea.  Titcher
28 purchased the Yuga Financial Products in reliance on the misleading promotions

1  from the Company and the Promoter Defendants, and he suffered investment losses
2  as a result of Defendants' conduct.  For his NFT purchases, Plaintiff Titcher paid the
3  2.5% royalty fee directly to Yuga Labs, placing him in direct privity with Yuga Labs
4  for a portion of the sale.

5          12.    Plaintiff Jonathan Smith ("Smith") is a resident and citizen of California.
6  As set forth in the previously filed certification (ECF No. 179-3, Plaintiff Smith
7  purchased ApeCoin via U.S.-based cryptocurrency exchange Coinbase.  Smith made
8  his purchases in reliance on the misleading promotions from the Company and the
9  Promoter Defendants, and he suffered investment losses as a result of Defendants'
10  conduct.

11          13.    Plaintiff Neal Patel ("Patel") is a resident and citizen of Florida.  As set
12  forth in the previously filed certification (ECF No. 179-4), Plaintiff Patel purchased
13  Yuga NFTs on U.S.-based NFT exchanges, including OpenSea.  Plaintiff Patel also
14  purchased ApeCoin tokens on U.S.-based cryptocurrency exchanges.  Patel made his
15  purchases in reliance on the misleading promotions from the Company and the
16  Promoter Defendants, and he suffered investment losses as a result of Defendants'
17  conduct.  For his NFT purchases, Plaintiff Patel paid the 2.5% royalty fee directly to
18  Yuga Labs, placing him in direct privity with Yuga Labs for a portion of the sale.

19          14.    Plaintiff Hiren Patel ("H. Patel") is a resident and citizen of Florida.  As
20  set forth in the previously filed certification (ECF No. 179-2), Plaintiff H. Patel
21  purchased Yuga NFTs on U.S.-based NFT exchanges, including OpenSea.  Plaintiff
22  H. Patel also purchased ApeCoin tokens on U.S.-based cryptocurrency exchanges,
23  including Coinbase.  H. Patel made his purchases in reliance on the misleading
24  promotions from the Company and the Promoter Defendants, and he suffered
25  investment losses as a result of Defendants' conduct.  For his NFT purchases,
26  Plaintiff H. Patel paid the 2.5% royalty fee directly to Yuga Labs, placing him in
27  direct privity with Yuga Labs for a portion of the sale.

28

15.     Plaintiff David Grand ("Grand") is a resident and citizen of Florida.  As set forth in the previously filed certification (ECF No. 179-1), Plaintiff Grand purchased ApeCoin on U.S.-based cryptocurrency exchanges, including on Coinbase.   Plaintiff Grand made his purchases in reliance on the misleading promotions from the Company and the Promoter Defendants, and he suffered investment losses as a result of Defendants' conduct.

## II.     DEFENDANTS

16.     Defendant Yuga is a Delaware corporation, registered on February 8, 2021, with its headquarters located at 1850 Towers Crescent Plaza, Suite 200, Tysons, Virginia 22182.  On June 16, 2022, Yuga registered with the California Secretary of State to transact business within California.

17.     Defendant Wylie Aronow ("Aronow") is a resident and citizen of South Carolina, living in Mount Pleasant, South Carolina.  Aronow is the co-founder/creator of the Company, served as a consultant and spokesperson for the Company, exercised control over the Company, and directed and/or authorized, directly or indirectly, the sale and/or solicitations of Yuga Financial Products to the public.  Defendant Aronow was listed as Vice President in the official paperwork filed with the California Secretary of State.

18.     Defendant Greg Solano ("Solano") is a resident and citizen of Florida, living in Fort Lauderdale, Florida.  Solano is the co-founder/creator of the Company, served as a consultant and spokesperson for the Company, exercised control over the Company, and directed and/or authorized, directly or indirectly, the sale and/or solicitations of Yuga Financial Products to the public.  Defendant Solano was listed as Yuga's Chief Executive Officer on official paperwork filed with the California Secretary of State.

19.     Defendant Nicole Muniz ("Muniz") is a resident and citizen of New York, living in Brooklyn, New York.  Muniz is the Chief Executive Officer ("CEO") of the Company, served as a consultant and spokesperson for the Company, exercised

control over the Company, and directed and/or authorized, directly or indirectly, the sale and/or solicitations of Yuga Financial Products to the public. Defendant Muniz filed the paperwork with the California Secretary of State for Yuga to do business in the state of California and was listed as Chief Financial Officer ("CFO") and Secretary.

20.    Defendant Patrick Ehrlund ("Ehrlund") is a resident and citizen of New York, living in Brooklyn, New York. Ehrlund is the Chief Creative Officer ("CCO") and minority partner of the Company, served as a consultant and spokesperson for the Company, exercised control over the Company, and directed and/or authorized, directly or indirectly, the sale and/or solicitations of Yuga Financial Products to the public.

21.    Defendant Christopher Lyons ("Lyons") is a resident and citizen of Florida, living in Plantation, Florida. Lyons served as a board member, consultant, and spokesperson for the Company, exercised control over the Company and directed and/or authorized, directly or indirectly, the sale and/or solicitations of Yuga Financial Products to the public.

22.    Defendant Alexis Ohanian ("Ohanian") is a resident and citizen of Florida, living in Jupiter, Florida. Ohanian served as a board member of the ApeDAO, served as a consultant and spokesperson for the Company, exercised control over the ApeDAO, Ape Foundation, and the Company, and directed and/or authorized, directly or indirectly, the sale and/or solicitations of Yuga Financial Products to the public. Ohanian's SevenSevenSix was one of several investors in Yuga during the $450 million funding round.

23.    Defendant Amy Wu ("Wu") is a resident and citizen of California, living in San Francisco, California. Wu served as a board member of the ApeDAO, served as a consultant and spokesperson for the Company, exercised control over the ApeDAO, Ape Foundation, and the Company, and directed and/or authorized,

directly or indirectly, the sale and/or solicitations of Yuga Financial Products to the public.

24.     Defendant Maaria Bajwa ("Bajwa") is a resident and citizen of California, living in Glendale, California.  Bajwa served as a board member of the ApeDAO, served as a consultant and spokesperson for the Company, exercised control over the ApeDAO, Ape Foundation, and the Company, and directed and/or authorized, directly or indirectly, the sale and/or solicitations of Yuga Financial Products to the public.

25.     Defendant Guy Oseary ("Oseary") is a resident and citizen of California, living in Santa Monica, California.  Oseary acted as a minority partner, consultant and spokesperson for the Company, exercised control over the Company, and directed and/or authorized, directly or indirectly, the sale and/or solicitations of Yuga Financial Products to the public.  Oseary's Sound Ventures was one of several investors in Yuga during the Seed funding rounds.

26.     Defendant Mike "Beeple" Winkelmann ("Winkelmann") is a resident and citizen of South Carolina, living in North Charleston, South Carolina.  Winkelmann acted as a promoter for the Company and solicited sales of Yuga securities to the public.

27.     Defendant Paris Hilton ("Hilton") is a resident and citizen of California, living in Malibu, California.  Hilton acted as a promoter for the Company and solicited sales of Yuga securities to the public.

28.     Defendant Madonna Louise Ciccone ("Ciccone") is a resident and citizen of California, living in Hidden Hills, California.  Ciccone acted as a promoter for the Company and solicited sales of Yuga securities to the public.

29.     Defendant Justin Bieber ("Bieber") is a resident and citizen of California, living in Hidden Hills, California.  Bieber acted as a promoter for the Company and solicited sales of Yuga securities to the public.

30.    Defendant James "Jimmy" Fallon ("Fallon") is a resident and citizen of New York, living in New York, New York.  Fallon acted as a promoter for the Company and solicited sales of Yuga securities to the public.

31.    Defendant Universal Television, LLC ("Universal") is a New York corporation, with its headquarters located at 100 Universal City Plaza, Universal City, California 91608.  On May 17, 2011, Universal registered with the California Secretary of State to transact business within California.  Universal is the production company for the *Tonight Show*, of which Defendant Fallon is the host.  Universal acted as an indirect spokesperson for the Company by virtue of its exercise of control over both Defendant Fallon and the content and disclosures of the *Tonight Show*, and directed and/or authorized, directly or indirectly, the sale and/or solicitations of Yuga securities to the public.

32.    Defendant Wardell Stephen Curry II ("Curry") is a resident and citizen of California, living in Atherton, California.  Curry acted as a promoter for the Company and solicited sales of Yuga securities to the public.

33.    Defendant adidas America Inc. ("Adidas") is an Oregon corporation, with its headquarters located at 5055 N Greeley Avenue, Portland, Oregon 97217.  On March 29, 2010, Adidas registered with the California Secretary of State to transact business within California.  Adidas is the parent of adidas Ventures B.V., the venture capital fund acquired by Adidas to make investments in start-up companies.  Throughout the Class Period, Adidas acted as an agent and direct or indirect spokesperson for the Company by virtue of its capital investment in the Company, and directed and/or authorized, directly or indirectly, the solicitations of the Yuga Financial Products, as well as its own NFT collaboration with Yuga.  Upon information and belief, Adidas controls and/or oversees the operations and management of the "adidas Originals" brand line, under which the "adidas Originals: Into The Metaverse" NFT collaboration with Yuga was launched.

34.    Defendant Ivan Soto-Wright ("Soto-Wright") is a resident and citizen of Florida, living in Miami, Florida.  Soto-Wright served as the CEO of MoonPay during the Class Period, acted as a promoter for the Company, and solicited sales of Yuga securities to the public.

35.    Defendant MoonPay USA LLC ("MoonPay") is a Delaware corporation, with its headquarters located at 1111 Brickell Avenue, 10th Floor, Miami, Florida 33131.  MoonPay acted as an agent and indirect spokesperson for the Company by virtue of it being controlled, in part, by Defendant Oseary, directed and/or authorized, directly or indirectly, the solicitations of Yuga securities to the public.  On April 30, 2021, MoonPay registered with the California Secretary of State to transact business within California.

36.    Defendant Sotheby's Holdings Inc. ("Sotheby's") is a Delaware corporation, with its headquarters located at 1334 York Avenue, New York, New York 10021.  Sotheby's acted as a promoter for the Company and solicited sales of Yuga securities to the public.

### JURISDICTION AND VENUE

37.    This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §1332.  Plaintiffs bring this civil action seeking to represent a Class of more than 100 plaintiffs pursuant to Federal Rule of Civil Procedure 23.  Plaintiffs are citizens of California, Florida, and Texas.  Ten of the 29 named Defendants are citizens of California; all other Defendants reside outside of California.  Plaintiffs seek an award exceeding $5,000,000, exclusive of interest and costs, on behalf of themselves and the putative Class.

38.    The Court has general jurisdiction over Defendants Wu, Bajwa, Oseary, Ciccone, Bieber, Hilton, and Curry as they are all residents of the State of California and are thus "at home" in the forum.

39.    The Court has general jurisdiction over Defendant Universal because its principal places of business are in California, and thus is "at home" in the forum.

40.     This Court may exercise jurisdiction over Defendants because they have continuous and systematic contacts with this District, do substantial business in this State and within this District, and engage in unlawful practices in this District as described in this Complaint, so as to subject themselves to personal jurisdiction in this District, thus rendering the exercise of jurisdiction by this Court proper and necessary.

41.     Venue is proper in this judicial District pursuant to 28 U.S.C. §1391(b) because Defendants live and/or conduct business in this District, and a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District.

## FACTUAL ALLEGATIONS

### III.    YUGA LABS BACKGROUND

#### A.    The Financial Products Offered

42.     Yuga developed and sold to investors a variety of digital assets, which fall into three basic categories: (1) the ApeCoin token; (2) titles to virtual land called "Otherdeeds"; and (3) various NFT collections (i.e., BAYC and MAYC).

ApeCoin

43.     ApeCoin (APE) is a fungible cryptocurrency token on the Ethereum blockchain, implemented as a standard ERC-20 smart contract. The Ethereum contract address for ApeCoin is 0x4d224452801aced8b2f0aebe155379bb5d594381. Launched in March 2022, ApeCoin purports to serve as the native governance and utility token of the Yuga ecosystem. The ApeCoin token is governed by a written investment contract deployed on the Ethereum blockchain, which is publicly accessible on Etherscan. This investment contract sets out the fixed supply of ApeCoin, defines how the tokens operate and transfer, and functions as the official set of rules that all holders rely upon.

<u>Otherdeed</u>

44.     Otherdeed for Otherside ("Otherdeed") is an NFT collection on the Ethereum blockchain, implemented as a standard ERC-721 smart contract. The Ethereum contract address for Otherdeed is 0x34d85c9CDeB23FA97cb08333b511ac86E1C4E258. Launched in April 2022, the Otherdeed NFTs purport to serve as the digital land deeds for Yuga Labs' Otherside metaverse project. Each Otherdeed is defined and governed by a written investment contract deployed on the Ethereum blockchain, which is publicly accessible on Etherscan. This investment contract sets the total supply of Otherdeed NFTs, specifies the attributes that distinguish one deed from another, governs how they are transferred between wallets, and functions as the official set of rules that all holders rely upon.

<u>Bored Ape Yacht Club ("BAYC")</u>

45.     Bored Ape Yacht Club ("BAYC") is an NFT collection on the Ethereum blockchain, implemented as a standard ERC-721 smart contract. The Ethereum contract address for BAYC is 0xBC4CA0EdA7647A8aB7C2061c2E118A18a936f13D. Launched in April 2021, BAYC consists of 10,000 unique NFTs, each representing a cartoon ape with distinct visual attributes. Each BAYC NFT is defined and governed by a written investment contract deployed on the Ethereum blockchain, which is publicly accessible on Etherscan. This investment contract establishes the fixed collection size, records the traits that distinguish one token from another, governs how NFTs are owned and transferred, and functions as the official set of rules that all holders rely upon

<u>Mutant Ape Yacht Club ("MAYC")</u>

46.     Mutant Ape Yacht Club ("MAYC") is an NFT collection on the Ethereum blockchain, implemented as a standard ERC-721 smart contract. The Ethereum contract address for MAYC is 0x60E4d786628Fea6478F785A6d7e704777c86a7c6. Launched in August 2021,

12

MAYC consists of up to 20,000 NFTs, created to expand the original BAYC community by introducing "mutated" versions of Bored Apes. Each MAYC NFT is defined and governed by a written investment contract deployed on the Ethereum blockchain, which is publicly accessible on Etherscan. This investment contract establishes the fixed collection size, records the attributes that distinguish each token, governs how the NFTs are owned and transferred, and functions as the official set of rules that all holders rely upon.

## B. The Founders

47. Yuga is a cryptocurrency-related NFT company founded in February 2021 by a group of friends: Defendants Aronow, Solano, along with Karem Atalay ("Atalay"), and Zeshen Ali ("Ali"). The founders were joined by Defendant Muniz.

48. In February 2021, Solano contacted Aronow about starting an NFT project. During the early conception of the BAYC brand, Aronow brought in Muniz to discuss both the creative and business side of the project. According to an interview of both Solano and Aronow, they described the idea of the BAYC as a community of people:

> on Crypto Twitter who made their fortunes in cryptocurrencies but still only wanted to play MMORPGs online and not live the luxury life of the expected multi-millionaire.
>
> Aronow sent Solano a "whole article" to plan the idea, where the name "Bored Ape Yacht Club" came up. "As the great editor, Solano said – 'That's it. That's it'" recalls Aronow. The concept evolved–in cryptocurrencies, [M]illionaires are real apes, and ***the term "ape" means that someone living in 2021 will compulsively invest in a new project without doing much research***. Aronow said he and Solano started a limited liability company the next day.[4]

49. According to these admissions from Yuga's founders, the core idea behind the BAYC NFT collection was to target uninformed investors to

---

[4] *Interview with the founder of BAYC Boring [sic] Ape: the biggest success story in the NFT world*, CoinYuppie (Aug. 8, 2022), https://web.archive.org/web/20220814094736/https://coinyuppie.com/interview-with-the-founder-of-bayc-boring-ape-the-biggest-success-story-in-the-nft-world/.

1  "compulsively invest in a new project" (i.e., BAYC) with the lure of becoming a
2  crypto millionaire who could live the luxury life of their choosing.

3      50.    Atalay and Ali served as the developers of the BAYC NFT collection,
4  working on the technical side of the ERC-721 token's creation while Solano and
5  Aronow served as Yuga's creative department.

6      51.    Initially, Solano and Aronow hid their respective identities from the
7  public, instead operating under the following pseudonyms/alter egos to avoid scrutiny
8  from the public and investors during the early launch of the Company:

9          a.    Wylie Aronow went by "Gordon Goner"; and

10         b.    Greg Solano went by "Gargamel."

11     52.    The lion's share of Yuga's business comes from the sale of its various
12  NFT collections and ApeCoin.  Yuga also programmed its NFTs so that the Company
13  receives a 2.5% royalty every time one of its NFTs is resold on the secondary market.
14  Yuga reportedly earned $127 million in profits from its NFT business in 2021.
15  According to a Yuga pitch deck that was leaked online in March 2022, the BAYC
16  collections alone account for approximately 10% of the volume on OpenSea, the
17  largest NFT marketplace in the world.

18     53.    On April 20, 2021, the Company and Defendants Aronow and Solano
19  created the BAYC collection of NFTs, minting 10,000 BAYC NFTs.

20     54.    As the name suggests, the BAYC NFTs feature pictures of an animated
21  ape with a bored facial expression.

22     55.    On April 24, 2021, Yuga launched the BAYC NFT collection, selling
23  all 10,000 BAYC NFTs over the course of a week through the official public launch
24  date of April 30, 2021.  On April 27, 2021, prior to the public launch, Solano falsely
25  represented in the BAYC Discord that "Each Bored Ape owner has full commercial
26  rights to their apes, btw."[5]  And again falsely represented on June 5, 2021, that "Our

27

28

_____

[5]      Communication made via Bored Ape Yacht Club Discord chat.

14

1  ape holders quite literally own the rights to their apes, so just make sure you get

2  permission to use them from the holders first."[6]

3      56.    In fact, Yuga Labs LLC owns the commercial rights to the BAYC NFT

4  collection—not the investors.

5      57.    The Company Defendants then launched the Mutant Ape Yacht Club

6  (MAYC) on August 28, 2021.

7      58.    One of the main platforms that the Yuga founders (i.e., Executive

8  Defendants Solano and Aronow) used to solicit sales of the Yuga NFT collections

9  was Discord.  As Defendant Solano confirmed during a promotional interview

10 published on the YouTube page of Yuga backer a16z, Discord was "so important" to

11 Yuga's efforts to directly solicit investments in Yuga Financial Products, and he had

12 spent "14 hours a day . . . 16 hours a day" in the beginning personally speaking to

13 potential investors and promoting the BAYC NFT collection.  On August 29, 2021,

14 Defendant Solano bragged to investors on Discord that the BAYC NFTs had "sold

15 out over the course of one wild night" and that they had become one of "the most

16 distributed NFT collections of our kind," promoting the price increase of the BAYC

17 NFTs and growth prospects of the collection by touting that there were "million-

18 dollar apes" following the initial mint, and that they "had so many celebrities and

19 athletes ape-in to the club that it's beginning to feel like we could field entire sports

20 teams."

21     59.    In September 2021, Defendant Muniz began serving as Yuga's CEO and

22 Defendant Ehrlund began as CCO.

23     60.    After Executive Defendants Solano, Aronow, Muniz, and Ehrlund were

24 able to massively increase interest in the BAYC NFTs and the idea of cross-

25 utilization of those NFTs through the misleading promotional campaign executed by

26 the Promoter Defendants, these Executive Defendants and Oseary turned towards

27 creating some form of use case for the BAYCNFTs within the Bored Ape Ecosystem.

28

---

[6]    *Id*.

61.    In an effort to capitalize on the artificially inflated interest in the Yuga digital assets, the Defendants minted and launched ApeCoin in 2022.

62.    Finally, in March 2022, after the market capitalization of BAYC had dropped from a high of approximately $3.1 billion on February 1, 2022, to around $1.6 billion, the Executive Defendants developed a new scheme to stimulate additional investments in BAYC NFTs.  In an effort to artificially generate financial value for these various unregistered Yuga securities, the Executive Defendants claimed to be creating a collective virtual shared space or "metaverse" platform, Otherside.  Executive Defendants, Oseary, and the ApeDAO Board Defendants touted ApeCoin tokens as the Otherside's native currency.  Yuga and its executives promoted the Otherdeed NFTs as an extension of the BAYC ecosystem that would increase the value of ApeCoins, BAYC, MAYC, and other Yuga NFT collections.

**C.    The Fifth Ape - Oseary**

63.    On October 12, 2021, the Company announced in a *Variety* magazine exclusive article that it had signed a representation deal with Defendant Oseary to expand the BAYC NFTs into movies, TV, music, and gaming, and promoted the *Variety* article through BAYC's Twitter account.  In truth, Oseary was officially brought in to actively recruit the Promoter Defendants to solicit sales of the BAYC NFTs and other Yuga Financial Products, which they did.

64.    While each of the Executive Defendants played their part in the organizing of the misleading promotion scheme (discussed further below), none was more instrumental than the so-called "Fifth Ape," Defendant Oseary, who spent years in Hollywood building relationships with the Promoter Defendants.

65.    Oseary is further linked to several of the Promoter Defendants via their mutual early investments in a cryptocurrency company, MoonPay.  Significantly, many of MoonPay's early investors were made up of Oseary's immediate and extended network.  For example, Oseary and Sound Ventures were also early

investors in MoonPay.  Other early MoonPay backers include Defendants Paris Hilton, Justin Bieber (and his manager Scooter Braun)

66.    Oseary saw an opportunity to profit from using his celebrity contacts to misleadingly promote the sale of Yuga securities, and he took it.  Oseary used NFT artist and business partner Defendant Mike "Beeple" Winkelmann to facilitate a meeting with Yuga and the Executive Defendants, so that Oseary could pitch his plan to solicit sales for Yuga.  Defendant Aronow admitted that "'[w]e didn't really know why he [i.e., Oseary] was so interested in us – it was a little perplexing.'"  According to Aronow, Oseary eventually managed to "'become integral to the process of basically everything that we do.'"

67.    Oseary had an overlapping financial interest in promoting MoonPay's services, which was synergistic with the related interest that he and the Yuga executives had in promoting the BAYC NFT collection.  His plan would effectively allow him, the Executive Defendants, and MoonPay (as well as the Promoter Defendants Bieber, and Hilton, who each separately had a financial interest in MoonPay) to all financially benefit from the cross-pollination and promotional efforts for the Yuga Financial Products.  As ApeCoin DAO member Dean Steinbeck admitted in an August 2022 ApeCoin Town Hall meeting, "[w]e as a [Ape] community put a lot of faith, for example, in Guy Oseary.  We said, you know, here's x amount of tokens and you know, please help us promote ApeCoin."

68.    The Executive Defendants, in conjunction with Oseary, tapped into their collective networks to recruit high-profile celebrities to promote the sale of Yuga's collections of NFTs, particularly the BAYC NFTs.  Together, Oseary, the MoonPay Defendants, and the Promoter Defendants each shared the strong motive to use their influence to artificially create demand for the Yuga securities, which in turn would increase use of MoonPay's crypto payment service to handle this new demand.  At the same time, Oseary could also use MoonPay to obscure how he paid off his

1  celebrity cohorts for their direct or off-label promotions of the Yuga Financial

2  Products.

3      **D.   The Facilitator – MoonPay**

4      69.    MoonPay is a company founded by Defendant Ivan Soto-Wright, which

5  purports to provide a service that allows investors (particularly high-net-worth

6  investors) to buy and trade NFTs "without hassle."  The mechanics of how such

7  transactions are executed or who is ultimately paying to buy the NFTs is unclear.

8  According to Soto-Wright, his business started operations in the United Kingdom

9  ("UK") before moving into other countries in Europe.

10      70.    In an August 2021 interview with the crypto news outlet Protos,

11  Defendant Soto-Wright disclosed that regulators in the UK and/or potential users

12  were "sketched out" by services offered by Soto-Wright's proto-version of MoonPay,

13  Saveable, a start-up company offering crypto payment services

14      71.    Soto-Wright further promoted himself and his crypto payment

15  businesses as having a fiduciary obligation to inform investors about the nature of the

16  financial products those investors purchased because of his services:

17          They're gonna invest in stupid stuff.  They're going to invest in
        meme coins and shit points.  And, you know, the reality is part of that,

18          you know, *we need to do our job, uh, in terms of a fiduciary to make*
        *sure that the people are doing their own research and, uh, diligencing*

19          *what they're buying*.

20  [Emphasis added.]

21      72.    Later in the interview, when Soto-Wright was asked about the

22  particulars of why the crypto payment business in the UK "didn't work," Soto-Wright

23  stated he was "focus[ed] too much on the regulatory side of getting our regulatory

24  approval."  Soto-Wright stated that he sold his "regulatory licenses" so that his

25  competitor could "skip the . . . pain . . . that I went through 13 months at the financial

26  conduct authority.  So *I could hold client money and move money into [a] security*.

27  So, uh, that's what happened.  So it wasn't like, it wasn't a win for me."  [Emphasis

28  added.]  When discussing the "know your customer" responsibilities a business like

MoonPay is obligated to abide by, Soto-Wright acknowledged: "[*W]e're selling a financial instrument* to some extent, right?" [Emphasis added.]

73. On May 26, 2021, the Malta Financial Services Authority ("MFSA") issued the following directive against MoonPay: "The MFSA considers that the Company is not in a position to adhere in full to the requirements of Chapter 3 of the Virtual Financial Assets Rulebook ('the Rules') and therefore on 26 May 2021, the MFSA directed the Company to cease the on-boarding of new clients with immediate effect." Per Chapter 3 of the Rules, a license holder in Malta must maintain effective risk management and compliance policies and procedures.

74. On April 13, 2022, MoonPay announced that "Music, sports, and entertainment VIPs invest $87 million in MoonPay," stating that "60 influential figures and organizations from the worlds of music, sports, media and entertainment have collectively invested $87M in the company."

75. Behind the scenes, MoonPay's entire business was a sham.

76. MoonPay's alleged fraudulent and deceptive conduct (described in detail below) is supported by the account of a former MoonPay employee ("Confidential Witness 1" or "CW1") who worked for the company for the majority of 2022. CW1 was one of approximately five Compliance personnel at MoonPay. According to CW1, Compliance personnel performed Enhanced Due Diligence ("EDD"), Know Your Customer ("KYC") and Anti-money Laundering ("AML") checks on MoonPay customers, which are required by law for certain types of financial transactions. Given CW1's role in the Compliance group, CW1 had unique heightened access to files and data associated with MoonPay customer financial transactions: a level of access restricted to a small handful of personnel at the Company.

77. The Compliance group was charged with ensuring that each customer was properly screened, including customers who transacted through MoonPay's partners. Low-risk customers – those that, for example, sought to transact at lower

1   dollar value and/or in fewer instances – were automatically screened through

2   automatic software.  High-risk customers, including those who sought to transact at

3   high volumes, were manually screened by a Compliance employee.

4     78. All Compliance employees, including Confidential Witness 1, utilized

5   the MoonPay Dashboard – the company's primary proprietary mainframe database

6   and platform.  The MoonPay Dashboard housed all customer information, including

7   all customer profile and transactional data.  The MoonPay Dashboard also included

8   data associated with compliance checks for all NFT purchases, including those that

9   occurred through one of MoonPay's most prominent NFT partners, OpenSea.  Such

10   checks were also performed for all transactions that were executed by or on behalf of

11   MoonPay executives.  According to CW1, every customer that transacted through

12   MoonPay would have gone through either automated screening, or for high-risk

13   customers, manual screenings completed by the Compliance group.

14     79. As Confidential Witness 1 confirmed, all intra-crypto transactions are

15   captured on the Ethereum blockchain, but the missing element in that blockchain

16   transactional trail is the initial transaction, where fiat (e.g., U.S. Dollar) is exchanged

17   for digital assets.  Importantly, the MoonPay Dashboard captures the transactional

18   data – including the person in question and, as required, data such as their address,

19   proof of income and bank account statements, driver's license, passport, or other form

20   of identification, and a picture of themselves (or "selfie") that utilizes technology to

21   detect liveness – when fiat currency is utilized to purchase ETH or by extension, an

22   NFT.

23     80. To perform their functions, the Compliance team was granted access to

24   a restricted area in the MoonPay Dashboard.  This enabled each of them (including

25   CW1) to access, view, and make changes to sensitive customer information.  All

26   MoonPay customers were subject to standard, automated KYC and AML screening.

27   However, any transactions that were above a certain monetary threshold – at or

28   around $25,000, cumulatively, over a certain timeframe – required the Compliance

1    team to manually perform EDD as well.  EDD checks were also triggered when

2    customers were based in certain known high-risk countries.  EDD checks also

3    involved so-called "wallet-screening."   This screening is performed by the

4    Compliance team using a third-party financial forensics platform called TRM Labs

5    ("TRM").  TRM assisted the Compliance team in identifying wallets that were

6    flagged for potential or actual sanctions violations, terrorist financing, darknet

7    transactions, and other nefarious or suspicious activity.  Any such hits on the TRM

8    platform required the Compliance team to conduct additional reviews to either

9    confirm such activities or approve the wallet, thereby enabling the customer

10   associated with that wallet to perform transactions via MoonPay.

11       81.    While at MoonPay, Confidential Witness 1 sought to become more

12   familiar with the Company's offerings and began questioning MoonPay's business

13   practices, specifically surrounding its Concierge service.  Moreover, CW1 became

14   aware of public reports that celebrities were being investigated and sued for

15   unlawfully promoting the sale of crypto assets, which only increased CW1's

16   suspicions of MoonPay's Concierge service.

17       82.    MoonPay's Concierge service was portrayed as an exclusive, by-

18   invitation-only service that catered to celebrities and other high-net worth individuals

19   by selling NFTs to these high-end clients, and providing additional ancillary services

20   associated with the purchase of NFTs.  According to CW1, MoonPay's Concierge

21   associates attended various industry functions and pitched the benefits of the

22   Concierge service to this demographic.  CW 1 was also present at some of these

23   functions, including one at Soho House during NFT.NYC, and another during New

24   York Fashion Week 2022.

25       83.    As time went on, CW1's concerns about MoonPay's Concierge service

26   increased, prompting further investigation by CW1.  First, CW1 began checking the

27   MoonPay Dashboard to try to identify any compliance checks that might have been

28   conducted on Concierge clients.  In particular, CW1 ran targeted searches within the

1   MoonPay Dashboard for all the highly publicized Concierge celebrity clientele,

2   including, but not limited to, Defendants Bieber, Hilton, and Ciccone.  Significantly,

3   for CW1's entire tenure at MoonPay, CW1 did not identify a single: (1) celebrity

4   client profile, (2) related compliance check results for such clients, or (3)

5   transactional information for such clients in the MoonPay Dashboard.

6       84.    Standing alone, the fact that no Concierge clients had any presence on

7   the MoonPay Dashboard was troubling enough due to the representations MoonPay

8   and the Promoter Defendants had been making publicly in connection with the

9   ostensible purchase of NFTs.  But this also raised a red flag for CW1 because not

10   including these celebrities in the Dashboard system ran contrary to the supposed

11   value-add MoonPay touted to its clients.  According to CW1, after a client is

12   screened, approved, and in the MoonPay Dashboard system, they would be able to

13   engage in unlimited crypto transactions going forward – across all MoonPay's

14   partners' platforms and services through the MoonPay Passport service – without

15   ever having to go through the compliance vetting and wallet-creation process again.

16   As such, notwithstanding whether the publicly reported/celebrity promoted

17   transactions actually occurred, the fact that no information was identified for these

18   celebrities anywhere within the MoonPay Dashboard suggested to CW1 that these

19   celebrities were not, and would not be in the future, availing themselves of the very

20   service MoonPay had claimed to provide them.

21       85.    In early 2022, CW1 expressed interest to their supervisors—Elise

22   Messerli ("Messerli") (Compliance Associate promoted to Head of Product Risk in

23   August 2022) and Pieter Schoeman ("Schoeman") (Compliance Associate promoted

24   to Head of Regulatory Compliance in August 2022)—in learning more about the

25   Concierge service.  Schoeman and Messerli reported to MoonPay co-founder, Chief

26   Operating Officer, and Chief Financial Officer, Max Crown ("Crown"), until late

27   December 2021.  After late December 2021, Schoeman and Messerli reported to

28   Compliance Director EMEA, Simon Knight.  In turn, Knight reported to Max Crown.

Crown was deeply involved in all aspects of the MoonPay business, and he was principally in charge of the Concierge service.  In addition to serving as CFO and COO and leading the Concierge program, Crown also oversaw the Compliance department.

86.    Based on CW1's ongoing interactions with Messerli and Schoeman, CW1 got the impression that neither was knowledgeable (at least to any significant degree) about the Concierge service beyond that of a typical employee.  This surprised CW1 as they expected a reasonable compliance department to have greater insight into the workings of the Concierge program than what CW1 observed in Messerli and Schoeman.[7]

87.    Confidential Witness 1 later scheduled a meeting with London-based Head of MoonPay Concierge, Charlotte Laborde.  Laborde reported to COO Crown.  She was initially hired as "Strategy Lead to the COO" and was promoted to Head of Concierge as of May 2022.  During this meeting, CW1 sought to learn more about the Company and the Concierge service specifically.  Based on the conversation with Laborde, CW1 concluded that insofar as to the practices of the Concierge service, MoonPay did not appear to pay any heed to financial regulations within the United States

88.    Given the absence of Concierge client data in the MoonPay Dashboard, as well as the meeting with Laborde and the news reports about other unlawful

---

[7]    In August 2022, MoonPay reorganized the reporting structure for the Compliance team.  From that point until October 2022, CW1 reported to the newly hired Director of Governance and Regulatory Affairs, Eduardo Gutierrez Fernandez, who, in turn, reported to the also newly hired Chief Compliance Officer, Brent Crider.  The only reporting line that remained the same was that Crown stood at the top, receiving direct reports from Crider and his subordinates.  It should also be noted that around the same time, MoonPay brought on a number of new executives including Asiff Hirji ("Hirji") who notably was the ex-president of Coinbase, and an ex-operating adviser at the leading Yuga Labs backer, venture capital firm Andreessen Horowitz.  Hirji is now acting president of MoonPay.  *See* Ben Strack, *Latest in Crypto Hiring: MoonPay Adds Range of Senior Execs*, BLOCKWORKS (July 15, 2022), https://blockworks.co/news/latest-in-crypto-hiring-moonpay-adds-range-of-senior-execs;  *Asiff    Hirji*,    LINKEDIN    (last    visited    Oct.    16,    2023), https://www.linkedin.com/in/asiff-hirji/.

THIRD AMENDED CLASS ACTION COMPLAINT - CASE NO. 2:22-cv-08909-FMO-PLA

celebrity endorsements of digital assets, CW1 drafted a memorandum expressing concerns with MoonPay's seemingly unlawful business practices. CW1 submitted the memo to Messerli and Schoeman in or around May 2022, but neither responded to the substance of the memo. Instead, both Messerli and Schoeman advised CW1 on more than one occasion over the course of at least five months that they were pressed for time and could not comment on CW1's submission. To the knowledge of CW1, Messerli and Schoeman never addressed the contents of the memo.

89.     The primary concern that CW1 outlined in the memo was that MoonPay was potentially running afoul of securities laws and other laws associated with the financial services industry. CW1 expressed concerns that celebrities were promoting the sale of these products without disclosing their own financial interests in those very same products. CW1 also expressed concerns in the memo as to whether MoonPay may have been in violation of certain licensing requirements (e.g., Broker-Dealer, FINRA, etc.) given the nature of its business. CW1 noted that the Concierge service was developed and operated solely by sales personnel and was seemingly detached from any internal legal oversight, including what CW1 deemed to be the required regulatory checks that the Compliance department should have performed. As CW1 observed, MoonPay's Concierge service was being run more like a used car dealership as opposed to a business selling sophisticated financial instruments that were subject to securities laws.

*    *    *

90.     Defendants sold and/or solicited the sales of Yuga securities by relying on a tried-and-true marketing strategy: celebrity endorsements. With the approval of the Executive Defendants and ApeDAO Board Defendants and assistance of the MoonPay Defendants and Promoter Defendants, Oseary applied this classic strategy to the modern world of blockchain-related financial products and securities.

91.     Oseary, the MoonPay Defendants, and Promoter Defendants Hilton, and Bieber each had a financial interest in MoonPay. Upon information and belief as

1  investors in MoonPay, Oseary, and the Promoter Defendants Hilton, and Bieber had

2  direct or indirect control over MoonPay and its marketing, particularly with respect

3  to those promotional efforts each of these individual Defendants personally engaged

4  in, respectively.

5  **IV.  THE  MISLEADING  PROMOTION  AND  SALE  OF  YUGA SECURITIES**

6

7  92.  After the launch of the BAYC NFT collection in March 2021, the

8  Company began a multi-pronged scheme to artificially inflate the value of Yuga's

9  digital assets and promote additional sales, of which Yuga would take a 2.5% fee on

10  every resale.

11  **A.  The First Scheme – The Deceptive Sotheby's Auction**

12  93.  The first order of business for the Company and its founders was to

13  create an air of legitimacy around the BAYC NFT collection to manufacture investor

14  interest and hype around the Bored Ape brand.  To do this, Yuga colluded with fine

15  arts broker, Defendant Sotheby's, to run a deceptive auction of a lot of 101 BAYC

16  NFTs.  This special sale was called "Ape In!"

17  94.  In the lead up to the BAYC auction, Sotheby's representatives

18  misleadingly promoted both the auction and the BAYC NFT collection on Sotheby's

19  social media accounts and with statements to various news outlets.  These promotions

20  were amplified and further disseminated by the Company through its various social

21  media accounts.

22  95.  For example, on August 27, 2021, Sotheby's Head of Contemporary Art

23  Auctions, Max Moore, posted an advertisement for the BAYC auction from his

24  Twitter account, which included a gold Bored Ape walking his golden Kennel Club

25  dog, along with the Sotheby's and BAYC logos and the dates of the BAYC auction.

26  96.  On August 28, 2021, Sotheby's promoted the BAYC auction as a

27  landmark event: "It's official.  For the first time in our 277-year history, apes and

28  kennels are storming Sotheby's.  The @BoredApeYC sale starts September 2.  Ape

In." The promotion included the same animated video of the gold Bored Ape walking his golden Kennel Club dog from Moore's earlier post. Sotheby's official Twitter account also changed its profile picture to a golden Bored Ape in front of a golden Bored Ape Kennel Club dog to publicize the BAYC auction.

97.     On August 30, 2021, the Sotheby's Twitter account again promoted the sale of BAYC NFTs, stating that "Bored Ape Yacht Club and Bored Ape Kennel Club have paved the way for what NFT art communities can be. Whether it's your online identify, a shared culture, or you just want to ape in . . . the @BoredApeYC sale starts September 2." The post then provided a link that leads investors to a Sotheby's website that solicits the sale of Yuga securities. In particular, the Sotheby's website on that day advised that there were "3 Days Until Bidding Opens" on "2 September 2021 - 10:00 EDT - New York." On September 1, 2021, the website had counted down to "1 Day Until Bidding Opens."

98.     The August 30, 2021 ad from Sotheby's also contained an animated video of Bored Apes partying at "Club Sotheby's" and promoting Yuga Labs and its NFT collections. The video directs investors to "Ape In" (*i.e.*, to make a purchase of Yuga securities), inviting them to "learn more at sothebys.com/boredape" and includes images of the BAYC and Sotheby's logos.

99.     Sotheby's Co-Head of Digital Art Sales, Michael Bouhanna, reposted Sotheby's August 30 ad, advising investors: "This is your chance to own 1% of @BoredApeYC and become the 3rd biggest owner of one of the most important and in-demand NFT projects."

100.     On September 2, 2021 Moore reposted an announcement from Farokh Sarmad that he would be hosting "the official Sotheby's x Bored Ape Yacht sale on Spaces at 11 AM ET!" Notably Sarmad is the founder and host of Rug Radio, a purportedly decentralized media platform that serves as a launchpad, incubator, brand builder, and accelerator for blockchain-related projects. According to the Rug Radio website, Yuga Labs is a "partner" with Rug Radio.

101.    Moore publicly touted the BAYC auction during the @farokh x @Sotheby's Twitter Spaces live events.  For example, on September 3, 2021, during the first Sotheby's x BAYC Twitter Space hosted by Rug Radio, Moore claimed that the BAYC NFT collection had "made it to the gold level of art" by being offered for sale by an art dealer of Sotheby's status, stating:



102.    Notably, Moore, during the promotion of another NFT auction conducted by Sotheby's, previously acknowledged that the stamp of approval from a Sotheby's endorsement can induce investors to make purchases of NFTs: "*I do expect some collectors who maybe have never purchased an NFT to make their first NFT purchase in this sale, given that it is a Sotheby's sale*."  [Emphasis added.]  Moore went on to acknowledge that Sotheby's stood to gain from the sale of NFTs beyond simply the sales themselves.   Sotheby's hoped that NFT sales (facilitated by Sotheby's) would enable it to tap into a younger demographic of investors. According to Moore, the "sales [of NFTs] should help Sotheby's attract new collectors who may not have interacted with the house before."  Moore further added: "It's a much younger audience, which I think is quite interesting for Sotheby's as well."

103.    Sebastian Fahey, Executive Lead for the Sotheby's Metaverse and Managing Director of the company's business in Europe, the Middle East and Asia noted that "'[w]hen Sotheby's first entered the world of NFTs earlier this year, it was

immediately clear that we had so far only scratched the surface of the potential of this new medium, and NFTs.'"  During the same interview with Fahey, Moore added: "'Since then, we have spent months exploring every aspect of the digital art landscape, aligning with some of the most influential minds of the NFT movement to architect a custom marketplace that prioritises curation and customisation.'"

104.   This falls in line with Moore's statement in April 2021 regarding Sotheby's designs capitalizing on the booming NFT market and its investors: "My primary focus right now is establishing these roots [with NFT investors like Plaintiffs and the Class], these connections, establishing these relationships, understanding what drives their collecting habit . . . . ***Then we'll be able to kind of target them in a way that we would never have done before***." [Emphasis added.]

105.   On September 9, 2021, the Sotheby's Auction House held the promoted auction on behalf of Yuga.  As the auction was underway, Moore continued to promote the sale of BAYC NFTs by pointing to the then-current bid of $20 million for the lot of BAYC NFTs.  In the end, Sotheby's claimed to have sold the lot of BAYC NFTs to a purportedly anonymous buyer for $24.4 million.  This bid far exceeded the upper estimate of $18 million—$240,000 per BAYC NFT—that Sotheby's had publicly predicted.  This price was more than $100,000 more than the floor price for BAYCs at the time.

106.   Bouhanna stated in a Twitter post on September 9, 2021: "Our Ape In! auction @Sothebys just achieved an outstanding $26.2M – a great indicator of the level of confidence in this amazing NFT project.  This is just the beginning.  Congrats to BAYC."

107.   More importantly, following the final bid on the lot of BAYC NFTs, a Sotheby's representative affirmed during the September 9, 2021 @farokh x @Sotheby's Twitter Space that the winning bidder was a "traditional" collector.  Upon information and belief, this Sotheby's representative was Max Moore.  Notably, Moore has, during the promotion of another Sotheby's NFT auction, both

1   used the term and confirmed its distinction from new crypto investors naïve to
2   Sotheby's as a trading platform: "'These new crypto investors have a very different
3   aesthetic and a very different taste profile than a traditional collector would and so
4   it's important to provide a mix and a range of collectible at Sotheby's to attract a wide
5   variety of audience.'"

6       108.   Indeed, concurrent reports confirmed Sarmad's recap of the September
7   9th Twitter Space conversation.  While recordings of the @farokh x @Sotheby's
8   Twitter spaces are not publicly available, contemporaneous accounts by those
9   listening live during these spaces recalled hearing the "traditional" remark from a
10  Sotheby's representative.  For example, Sarmad stated: "Winner of the $24.4M lot of
11  101 Bored Apes is a traditional buyer and had to KYC through Sotheby's."

12      109.  Likewise, a longstanding member of the BAYC community,
13  TheGovernoreth, also confirmed that Moore had "said that the buyer of the 101 ape
14  lot was a traditional art collector," adding that such a feat hadn't "happened in an
15  NFT auction before."  The post also commented on the positive financial impact that
16  the Sotheby's auction (and related news coverage) had on the value of the BAYC
17  NFTs.  In particular, it observed that a "Huge supply shortage [was] incoming" and
18  that BAYC NFTs were going "to the moon."  This post demonstrates that Yuga's
19  promotional messaging related to the Sotheby's auction created an expectation of
20  profits among Yuga investors.  The misleading promotion created the impression for
21  investors that: (1) this was a demonstration of approval from the traditional art world
22  that would legitimize NFTs as an asset class generally and encourage more
23  investment from new buyers of Yuga's NFT collections (which, in turn, would have
24  an appreciative effect on the value of the BAYC NFTs), and (2) a supply shortage
25  would cause the price of existing BAYC NFTs to increase so high it would
26  figuratively be on the moon (which, again, would result in an increase in the value of
27  their Yuga assets).
28

110. The Company's official Twitter account also misleadingly promoted the successful sale of the BAYC NFT lot during the Sotheby's auction and congratulated the undisclosed "buyer," stating: "What an historic moment for the club: the @Sotheby's auction of 101 Bored Apes has closed at over $24m. Congratulations and THANK YOU to the whole ape community. To the buyer, I think we speak for everybody when we say: WELCOME TO THE CLUB. 🦍🍻⛰"[8]

111. In an *ARTnews* article published on the same day as the BAYC auction (i.e., September 9, 2021) Sotheby's Bouhanna discussed the BAYC auction and confirmed that "legacy art collectors were also heavily involved in the bidding."

112. Bouhanna further directly promoted the BAYC NFT collection (and implicitly confirmed the authenticity of Sotheby's BAYC auction) in written statements to traditional news outlets. For example, again on September 9, 2021, Bouhanna downplayed the possibility of any danger to investors of there being an NFT market bubble, particularly for the BAYC NFT collection. In particular, Bouhanna stated that "although there is financial speculation on NFTs, [Bouhanna] sees the Bored Apes as works of art." Bouhanna then unambiguously declared "the NFT market is not a bubble," explaining:

> People were talking about a bubble in March, in June etc, and then we see that the market is even stronger today so I think they've been proven wrong . . . I think it's a very organic market with great collectors who have great appreciation of art."

---

[8]    Bored Ape Yacht Club (@BoredApeYC). TWITTER (Sept. 9, 2021 10:39 AM), https://twitter.com/BoredApeYC/status/1435976278797164551?s=20.

113.    The promotions of the Sotheby's auction of the BAYC NFT collection were effective in cloaking the Yuga securities in the air of legitimacy.  As one news outlet observed: "The fact that this [BAYC NFT] auction is being handled by the Contemporary Art department at Sotheby's *speaks volumes*."  [Emphasis added.]

114.    Shortly after the Sotheby's auction and its related promotions, BAYC NFTs hit a then-new all-time high floor price around 43 ETH per NFT.

115.    This initial boost, however, was rooted in deception.  Sotheby's representations that the undisclosed buyer was a "traditional" collector had misleadingly created the false impression that the market for BAYC NFTs had crossed over to a mainstream audience.  At the time, there was significant uncertainty regarding the future of the NFT market and true value of various NFT collections.  Yuga's promotional campaign with Sotheby's was designed to allay investor concerns and encourage investment in the NFT market, which Yuga controlled a significant portion of the then-existing market share.

116.    The Sotheby's promotions also emphasized that the auction had been even more successful than anticipated, raking in $24.4 million instead of the upper estimate of $18 million that Sotheby's had publicly predicted.  This, too, created an expectation of profits for Yuga investors.  The promotional message conveyed was: BAYC NFTs were selling for millions at a legitimate auction, and demand for these supposedly undervalued digital assets was so highly that they were selling for approximately 35% more than expected (even by those whose business it is to accurately value such things, i.e. Sotheby's).

117.    The Company and its founders likewise touted the Sotheby's stamp of approval that the auction was above board.  But the reality of the winning "bid" of the Sotheby's auction exposes the falsity of those statements.  In truth, it was not a "traditional" buyer that made the winning bid in the BAYC NFT auction, but rather the now-defunct cryptocurrency exchange FTX.

118.   FTX has several deep ties to Yuga such that it would be mutually beneficial for both Yuga and FTX (as well as Sotheby's) if the BAYC NFT collection were to rise in price and trading volume activity.  Upon information and belief, given the extensive financial interests shared by Yuga, Sotheby's and FTX, each knew that FTX was the real buyer of the lot of BAYC NFTs at the Sotheby's auction at the time that Sotheby's representatives were publicly representing that a "traditional" buyer had made the purchase.

119.   According to the transaction data available on the Ethereum blockchain, following the auction, on September 22, 2021, Sotheby's transferred the lot of BAYC NFTs to wallet address  0xf8e0C93Fd48B4C34A  4194d3AF436b13032E641F3, which, upon information and belief, is owned/controlled by FTX.  This wallet previously sent 13 ETH to a "Blockfolio"/FTX US exchange in April of 2020 – prior to the launch of FTX US in May 2020 and FTX's NFT sales platform in December 2021.  This form of interaction often indicates a relationship between this wallet and the exchange.

120.   Moreover, for the launch of its NFT platform, on December 1, 2021, FTX put out a promotional video that featured more BAYC NFTs from the Sotheby's auction.  Promoter Defendant Stephen Curry, who, as discussed further below, misleadingly promoted the FTX  platform and the BAYC NFT collection, tacitly endorsed this joint FTX/BAYC ad, replying: "Cool announcement video, but my editing skills are missed 😂."  Importantly, the promotional video showcased certain BAYC NFTs which were plainly identifiable from the lot of BAYC NFTs from the Sotheby's auction.  For example, BAYC NFT #5812 and #3432 can be seen in the video, and as of the initial filing of this complaint, remain in wallets owned and/or controlled by FTX.

121.   FTX even promoted the listing of precisely "101" BAYC NFTs on FTX US.  Moreover, when the BAYC NFTs were sold on the FTX US NFT exchange, the securities initially needed to be transferred to a deposit wallet that had frequent and

1    large transactions with other known FTX and/or Alameda wallets. In fact, as

2    discussed further below, these wallets received millions of dollars' worth of ApeCoin

3    under highly dubious circumstances.

4         122.  Indeed, screenshots of FTX's NFT marketplace indicate that the only

5    BAYC NFTs available for purchase were exclusively from the lot of BAYC NFTs at

6    the Sotheby's auction. For example, one image posted on November 23, 2021

7    showed BAYC NFTs #4465, 5211, 7468, 7824, 7826, 7976, 7978, and 8181, which

8    all were transferred to the same wallet that held BAYC NFTs #5812 and #3432

9    discussed above. The floor price for BAYC NFTs fell 9.7% from 49 ETH on

10   November 19, 2021, down to 44.21 ETH on November 23, 2021, when news that

11   FTX was the Sotheby's auction's real winning bidder was revealed to the market.

12        123.  Ultimately, the Sotheby's auction was a huge promotion for Yuga and

13   the BAYC NFT collection's legitimacy as an investment. Behind this scheme,

14   Defendants Yuga and Sotheby's were conspiring with FTX to manipulate the price

15   of the BAYC NFT collection. The misleading promotions of the auction by the

16   Company and Sotheby's successfully induced additional purchases of the BAYC

17   NFT collection. Moreover, this first deceptive scheme set the stage for Yuga to

18   misleadingly offer and sell additional financial products by raising the profile of the

19   Bored Ape brand with the public.

20        **B.    The Second Scheme – Deceptive Marketing Campaign**

21             **1.    Promoter Defendants**

22   Defendants Fallon, Universal, and Winklemann

23        124.  One instance of Oseary and MoonPay's solicitation scheme being

24   executed took place during an episode of the *Tonight Show* that aired on November

25   11, 2021. In a broadcast to millions of viewers, Defendant Fallon promoted MoonPay

26   and the BAYC NFT collection during an interview with Defendant Winkelmann.

27   Fallon announced that he "got his first NFT" through MoonPay, claiming that he "did

28   his homework" on how to purchase an NFT and found MoonPay, which Fallon

asserted was "like the PayPal of crypto." After shilling MoonPay's services and credibility, Fallon announced that he "bought an ape" (i.e., BAYC NFT #599), to which guest Winkelmann expressed approval. Winkelman posted the *Tonight Show* promotion of the BAYC NFTs and MoonPay to his personal Instagram account, wherein it received over 676,000 views. Upon information and belief, MoonPay and/or Oseary, along with the Executive Defendants, recruited and paid Fallon and Winkelmann to promote both MoonPay and the BAYC collection of NFTs during this segment on the *Tonight Show*. Notably, Winkelmann is a business partner with Oseary in another NFT platform company, WENEW.

125. Fallon did not disclose that he had a financial interest in MoonPay or that he was likewise financially interested, directly or indirectly, in the increased sale and popularity of Yuga securities. Fallon also did not disclose that MoonPay had actually transferred BAYC NFT #599 as part of an elaborate scheme for Fallon to promote the Yuga digital assets to his millions of viewers.

126. Nor did broadcast partner Defendant Universal disclose that this purportedly organic segment on the *Tonight Show* was, in reality, a paid advertisement for the BAYC collection of NFTs and MoonPay by two celebrities (Fallon and Winkelmann) who are business partners with an investor (Oseary) in both Yuga and MoonPay without any sort of commercial disclaimer.

127. That same day, the MoonPay Twitter account posted a clip from the segment with Fallon promoting MoonPay and the BAYC NFTs with a caption stating: "So this just happened. @jimmyfallon reveals to @beeple on the #TheTonightShow that he just bought his first Bored Ape by @BoredApeYC with MoonPay! 🚀👀." Upon information and belief, MoonPay's specific use of the rocket ship emoji in this promotion was intended convey to Yuga investors that the BAYC segment on the *Tonight Show* would have a positive impact on the value of Yuga's digital assets and cause their price to go up so high it would reach the moon. Further, Moonpay's statement that "[s]o this just happened" misleadingly suggested

to investors that the promotion of MoonPay and the BAYC NFT collection on the *Tonight Show* was something that occurred spontaneously. Likewise, MoonPay's statement that Fallon had "just bought his first Bored Ape by @BoredApeYC with MoonPay!" failed to disclose that in truth, Fallon's segment with Winkelmann was just a promotion of the BAYC NFTs and MoonPay that was orchestrated behind the scenes by Oseary, Soto-Wright, and the Executive Defendants.

128. MoonPay also posted a video of the Fallon segment to its TikTok account with a message thanking Fallon, Winkelmann, and BAYC for the promotion. The video received more than 814,000 views.

129. Notably, MoonPay's transfer to Fallon of BAYC NFT #599 was one of the first times that MoonPay ever transacted in a BAYC NFT.

130. On November 12, 2021, Fallon promoted the BAYC NFT he supposedly "bought," asking the Yuga Twitter account if he had "[p]ermission to come a bored?" That same day, Defendant Soto-Wright responded to Fallon's promotion stating: "Congrats @jimmyfallon & @BoredApeYC! We 🤝 you from @MoonPayHQ!" On November 17, 2021, Fallon again promoted the BAYC NFTs, asking his 53.1 million Twitter followers to "[n]ame my ape! Drop your suggestions below" and tagging "@BoredApeYC #BAYC #BoredApeYachtClub #NFTs." These promotions from Soto-Wright and Fallon failed to disclose that Fallon's promotion of the BAYC NFTs and MoonPay was not because of Fallon's genuine interest in BAYC NFTs but rather solely due to the financial interest Fallon shared with Soto-Wright, Oseary, and the Executive Defendants.

131. Following his *Tonight Show* promotion, Fallon continued to promote the collection of BAYC NFTs and to solicit sales thereof on social media. For example, Fallon created a Twitter account for his BAYC NFT #599 with the user name "Bored and Breezy." On November 23, 2021, Fallon promoted the sale of BAYC NFTs, stating: "Captain Breezy reporting for duty. All a-bored!"

132.   This promotion gave investors the false impression that Fallon was going to be a leader or "captain" in the future BAYC community, suggesting that his continued involvement and leadership with BAYC would grow the BAYC ecosystem and increase the value of their investments.  Plaintiffs saw Fallon's promotion of the Yuga NFTs and were induced to purchase and/or continue to hold Yuga digital assets.

133.   Plaintiffs saw the promotions by Defendants Fallon and Winkelmann (which were authorized by Defendant Universal) on the *Tonight Show* regarding the Company's collection of BAYC NFTs, as well as Fallon's promotions on his social media accounts.  Plaintiffs were induced to purchase and/or continue to hold Yuga securities as a result of these misleading promotions.

134.   Upon information and belief, Defendants Fallon and Winkelmann received Yuga Financial Products and/or other forms of consideration as part or all of their compensation for promoting the Yuga securities specifically or the Yuga brand generally.  Moreover, Defendants Fallon and Winkelmann directly benefited financially from the increased valuation that MoonPay would experience with such overwhelming celebrity exposure.

Defendants Fallon, Universal, and Hilton

135.   Concurrently, Fallon also continued promoting BAYC NFTs on the *Tonight Show*, and Universal continued to approve that such promotions could be aired on the network without disclaimer.  In an even more contrived segment that aired during an episode of the *Tonight Show* on January 24, 2022, Fallon interviewed Defendant Paris Hilton, and they both misleadingly promoted the BAYC collection of NFTs.  Fallon first tried to bolster Hilton's credentials in the NFT sector by telling the audience and investors that *Forbes* magazine had named Hilton as one of the "top 50 most influential people in the NFT space."   Fallon then immediately began promoting the BAYC NFT collection with Hilton.  Hilton claimed that she "saw" Fallon's previous BAYC segment with Winkelmann, and "copied" Fallon's use of MoonPay to "buy an ape."  Hilton feigned interest in the BAYC NFT collection and

1    claimed BAYC NFT #1294 was "[her] ape" and she selected it because it "reminded"

2    Hilton of herself.  When the audience snickered at Hilton's half-hearted explanation

3    for "purchasing" that particular BAYC NFT (which bore no apparent resemblance to

4    Hilton's appearance), Fallon jumped in to show off his own BAYC NFT #599, which

5    sported a boat captain's hat and other funny accessories.  Fallon also insisted that he

6    "bought" BAYC NFT #599 because it reminded him of himself, to which the

7    audience agreed and laughed off the exchange.  This original segment has been

8    uploaded on the *Tonight Show*'s official YouTube channel, which has received

9    approximately 595,000 views as of the date of this filing.  Upon information and

10   belief, the *Tonight Show*'s channel on YouTube is owned and/or controlled by

11   Defendant Universal.

12       136.  Hilton and MoonPay also promoted Hilton's appearance on the *Tonight*

13   *Show* on their own extensive social media accounts.  On January 24, 2022, MoonPay

14   posted that BAYC NFT #1294's owner "is known to enjoy 'The Simple Life' even

15   though they are appearing on prime time TV 'tonight.'  Who could it be?  👀"

16   Defendant Hilton responded to this message with a "wink" emoji.  MoonPay also

17   posted a video of the *Tonight Show* segment on its TikTok page, which received

18   almost 14,000 views.

19       137.  But neither Hilton nor MoonPay disclosed that MoonPay transferred

20   BAYC NFT #1294 to Hilton on January 25, 2022, meaning Hilton did not actually

21   own BAYC NFT #1294 like she falsely claimed to millions of *Tonight Show* viewers

22   when the segment aired on January 25, 2022.  And neither MoonPay nor Hilton

23   disclosed that Hilton did not "buy" BAYC NFT #1294 as she represented – rather

24   BAYC NFT #1294 was transferred to her as part of an elaborate scheme to promote

25   Yuga Financial Products.  Fallon also falsely claimed that he "bought an ape," even

26   though MoonPay actually transferred BAYC NFT #599 to him a couple months prior

27   as part of the same promotional scheme.

28

138.   The next day, on January 25, 2022, in response to a Twitter post that proclaimed: "Wait @ParisHilton bought my ape?!   HOLY @#$%!!!," Hilton confirmed the sale and claimed that she "Loves it!"

139.   The *Tonight Show*'s official Twitter account posted a 1:44 minute clip on January 25, 2022, of the entire segment promoting the BAYC NFT collection through MoonPay.   Defendant Fallon was also on Twitter that day reposting his *Tonight Show* promotion of the BAYC NFT collection along with Defendant Hilton. In addition to a link to the *Tonight Show*'s Twitter post, Defendant Fallon included the caption "#WAGMI."   The hashtag "#WAGMI" refers to the phrase "we are all gonna make it."   The inclusion of this hashtag with the BAYC NFT solicitation indicated that financial gain would be realized by investors in BAYC NTFs and suggested to investors that Defendant Fallon was personally aligned with them instead of promoting the interests of himself and his cohorts Defendants Oseary and Hilton.

140.   On January 31, 2022, Hilton posted the following message on Twitter with an animated cartoon version of the Fallon interview of Hilton:



141.   Hilton's Twitter promotions on January 25 and January 31, 2022, gave investors the false impression that Hilton: (1) actually bought the BAYC NFT; and

38

1   (2) was enthusiastically "hanging out in the metaverse" with Fallon and that they

2   were "BoredApeBesties."  In truth, Hilton was only promoting the BAYC NFTs and

3   MoonPay because she was financially motivated to make those statements.  Nor did

4   Hilton include an "ad" disclaimer in either of the January 25th or January 31st posts

5   that would disclose to investors that this was a paid advertisement for the BAYC

6   collection of NFTs and MoonPay.  Plaintiffs saw the promotions by Fallon and Hilton

7   (which were authorized by Defendant Universal) on the *Tonight Show* regarding the

8   Company's collection of BAYC NFTs, as well as Hilton's and Fallon's promotions

9   on their respective social media accounts.

10      142.   Importantly, Hilton and MoonPay purposefully did not disclose Hilton's

11  direct financial interest in MoonPay and, relatedly, the increased sale of Yuga

12  securities through MoonPay.  And again, there was no disclosure from any of the

13  *Tonight Show's* production companies, namely Defendant Universal, regarding

14  Hilton's and/or Fallon's financial interests in MoonPay or compensation for

15  promoting the BAYC NFTs.  Notably, according to an internal workplace policy

16  mandated by Universal, all employees, including Defendant Fallon, must "disclose

17  and obtain approval for all outside work, financial interests and other personal

18  activities/relationships that may create or appear to create a conflict."[9]  The same

19  policy says that employees should not "use company info, resources, time, etc. for

20  personal benefit."  Thus, upon information and belief, Universal knew about Fallon's

21  ties to Oseary and Yuga, along with Hilton's ties to MoonPay, and approved the

22  promotion of BAYC NFTs on the *Tonight Show* before it was publicly aired without

23  disclaimers.  These omissions gave the public the false impression that Hilton had

24  been inspired to purchase a BAYC NFT after hearing that Fallon had organically

25  purchased one of his own, when, in truth, the entire *Tonight Show* segment was just

---

[9]   Brian Contreras, *Jimmy Fallon hyped his Bored Ape NFTs on 'The Tonight Show.' Conflict of Interest?*, L.A. Times (Jan. 26, 2022), https://www.latimes.com/business/technology/story/2022-01-26/jimmy-fallon-nft-ape-nbc (discussing Fallon's potential conflict of interest and providing a link to the Universal policy).

1    a paid promotion for the BAYC collection of NFTs and MoonPay. Reporting on this
2    segment noted that a "glossy-eyed Jimmy Fallon conducted one of the most forced
3    interviews" in the history of the *Tonight Show* during this segment with Defendant
4    Hilton.

5       143.    Plaintiffs were induced to purchase and/or continue to hold Yuga
6    securities as a result of these misleading promotions by Fallon and Hilton.

7       144.    Upon information and belief, Fallon and Hilton received Yuga Financial
8    Products and/or other forms of consideration as part or all of their compensation for
9    promoting the Yuga securities specifically or the Yuga brand generally. Moreover,
10    Fallon and Hilton financially benefited from the increased valuation that MoonPay
11    would experience with such celebrity exposure.

12       145.    If the Sotheby's auction and the *Rolling Stone* article put the Company
13    and its founders on the map, Fallon and Hilton's *Tonight Show* promotions brought
14    the BAYC directly into the homes of mainstream America. But this was just the
15    beginning for Oseary's plans for Defendants.

16    <u>Defendant Bieber</u>

17       146.    Other members of Oseary's network follow a similar pattern of
18    promoting the BAYC collection of NFTs in connection with MoonPay. Indeed,
19    Oseary, in particular, was the architect of Defendants' plan for marketing the BAYC
20    NFTs. His primary business is managing various high-profile music acts and other
21    entertainment celebrities, including Defendant Madonna Ciccone. Oseary previously
22    ran a successful talent agency called Maverick Management ("Maverick"), which, by
23    itself and in conjunction with talent management powerhouse Live Nation,
24    represented dozens of the most famous athletes and entertainers in the United States.
25    Several of these athletes and entertainers just so happen to also have "joined the
26    BAYC" in the "metaverse" and eagerly promoted that fact to would-be investors.[10]

27

28    _____

[10]    For example, Oseary's Maverick agency represented MoonPay investor the Weekend, who also shilled the BAYC brand in the thinly-veiled promotional music

147.    For example, on January 31, 2022, Defendant Bieber promoted his purported purchase of BAYC NFT #3001 to his 262 million followers on Instagram.[11] The Company then amplified the Bieber promotion by reposting it on the BAYC Twitter account the same day.

148.    Reports indicated that Bieber paid approximately $1.29 million for his Bored Ape purchase, which was upwards of five times the floor price with similar characters.  But this gross overpayment was meaningless to Bieber since, upon information and belief, he did not actually pay any money of his own for this BAYC NFT, but rather received it through a series of transactions for the purpose of compensating him.  Instead, Bieber received BAYC NFT #3001 as a form of compensation for promoting the BAYC NFTs and Yuga Financial Products to his hundreds of millions of social media followers.

149.    On February 7, 2022, Bieber announced that he had "purchased" a second NFT from the Bored Ape collection (i.e., BAYC NFT #3850) for around $470,000.  This BAYC NFT is considered to be particularly rare, ranking below 1% in rarity.  Upon information and belief, BAYC NFT #3850 was given to Bieber as compensation for continuing to promote and solicit sales of the Yuga securities.

150.    Plaintiffs saw Defendant Bieber's promotion of the Company's collection of BAYC NFTs and were induced to purchase and/or continue to hold Yuga securities as a result of these misleading promotions.

151.    Upon information and belief, Defendant Bieber received Yuga Financial Products and/or other forms of consideration as part or all of their compensation for

---

video with rapper Post Malone.  Similarly, Ape DAO Board Defendant Alexis Ohanian recruited his wife, tennis superstar Serena Williams, to promote BAYC NFTs.  Likewise, upon information and belief, Ape DAO Board Defendant Amy Wu utilized her relationships at crypto exchange FTX to recruit world champion athlete Defendant Curry to solicit sales of the BAYC collection of NFTs.  None of these celebrity endorsements of BAYC NFTs disclosed the underlying financial interests and relationships involved.

[11]    Justin Bieber (@justinbieber), INSTAGRAM (Jan. 31, 2022), https://www.instagram.com/p/CZZhdyzFITO/?utm_source=ig_web_copy_link.

1   promoting the Yuga securities specifically or the Yuga brand generally.  Moreover,

2   Defendant Bieber financially benefited from the increased valuation that MoonPay

3   would experience with such celebrity exposure.

4   <u>Defendants Wu and Curry</u>

5        152.    While Oseary was employing the other Promoter Defendants to publicly

6   promote the Bored Ape ecosystem and solicit sales of the Yuga Financial Products,

7   other Company insiders were also furthering the manipulative scheme to sell the

8   unregistered Yuga Financial Products.  For example, ApeDAO Board Defendant Wu

9   leveraged her connections with FTX to recruit Promoter Defendant Curry to solicit

10  sales of the Yuga Financial Products.  A February 15, 2022 article titled "FTX's Amy

11  Wu: How Crypto and Gamers Can All Get Along" described Defendant Wu as a

12  "prominent investor in gaming startups, [who] recently jumped from Lightspeed

13  Ventures to FTX to lead the crypto giant's new $2 billion Web3 venture fund – a

14  position that will entail spreading bets from FTX's war chest across new trends in

15  gaming."  Wu explained that she believed "'[t]he fun is actually around the game

16  mechanics and tokenomics of the game, right?  ***There's [sic] ways to make like 100x***

17  ***or 500x return on the token*** . . . .  And that's sort of the focus of a lot of these games,

18  and so ***it attracts a certain type of player, which tends to be traders that are looking***

19  ***at the game as kind of like almost like a financial instrument***."  [Emphasis added.]

20  Wu's "[c]ryptocurrency exchange FTX will funnel a chunk of its growing war chest

21  into a new venture capital arm, FTX Ventures, the firm announced today.  The $2

22  billion VC fund will be led by Amy Wu, previously General Partner at Lightspeed

23  Venture Partners."

24       153.    Wu previously led Lightspeed's own investment into FTX, plus FTX

25  and Lightspeed teamed up with Solana Ventures in November 2021 to launch a $100

26  million Web3 gaming co-investment fund.  In working with disgraced FTX founder

27  and CEO Sam Bankman-Fried, whom she described as an "extraordinary CEO," Wu

28  began to see the potential benefits of joining the rising FTX firm: "When I look at

what company could potentially have the most impact in the industry, but then also in the world," she told Decrypt, "I think FTX is one of the most impactful that I've had the pleasure of working with."

154.    On February 18, 2022, FTX Ltd ("FTX") posted a teaser commercial for its now-bankrupt cryptocurrency exchange, which featured Defendant Curry and an ice sculpture of a Bored Ape.  Curry can be seen brushing off flakes of ice from the unmistakable features of the BAYC NFTs.  FTX posted this teaser on its official Twitter account with the following caption alluding to the BAYC NFTs: "When learning about crypto, you'll be anything but bored."

155.    BAYC retweeted FTX's post as "cool as ice," tagging both FTX and Defendant Curry.

156.    Plaintiffs saw the off-brand promotion from Defendant Curry (and enabled by Defendant Wu) regarding the Company's collection of BAYC NFTs and were induced to purchase and/or continue to hold Yuga securities as a result of this misleading promotion.

157.    Defendant Curry's commercial with FTX was only one of several promotions with BAYC.

158.    After Defendant Curry purchased BAYC NFT #7990 on August 28, 2021, for 55 ETH from wallet address 0x3bEcf83939f34311b6bEe 143197872d877501B11 (the "SC30 Wallet"), he changed his Twitter picture to BAYC NFT #7990 and added "BAYC" to his profile in front of his 15.4 million Twitter followers.

159.    On March 29, 2022 FTX uploaded the full commercial with Defendant Curry to its official YouTube channel.  While the commercial itself was for FTX, there were multiple not-so-hidden references to the BAYC collection of NFTs. Notably, the thumbnail of the video prominently features Curry and the Bored Ape sculpture:

160.    The slogan for this campaign also contained the same BAYC reference (i.e., "bored") that was in the teaser commercial.  The commercial itself showed Curry in various "everyday" activities while a narrator harasses Curry for advice about cryptocurrency and what tokens to buy.  The most significant of these segments is when Curry can be seen working on an ice sculpture of a Bored Ape.  While it is unclear whether other NFT projects are being referenced in this commercial, it is obvious that Curry is concurrently promoting BAYC NFTs given the unmistakable similarity to the art style of the BAYC NFT collection and the ice sculpture that Curry is working on.  This promotion did not include any disclosure or disclaimer concerning the connection between FTX and Yuga (via Defendants Wu or Sotheby's), who had significant overlapping financial interests.  Instead, the commercial encouraged uninformed investors to invest in digital assets like the BAYC NFTs, while at the same time giving a "wink" disclaimer that this was not financial advice to attempt to provide Curry with plausible deniability regarding his promotion of the Yuga Financial Products.

161.    Defendant Curry also directly promoted BAYC NFT #7990 as his social media profile picture.    The NFT itself was transferred to wallet address

0x3becf83939f34311b6bee143197872d877501b11, which is labeled "SC30." Upon information and belief, this wallet is owned or controlled by either Defendant Curry or Curry's investment company "SC30." According to OpenSea, BAYC NFT #7990 was transferred to a wallet that has been publicly labeled as "SC30."

162. Plaintiffs saw Curry's thinly-veiled promotion of the collection of BAYC NFTs in the FTX commercial, as well as Curry's promotion of Yuga securities on his social media account. Plaintiffs were induced to purchase and/or continue to hold Yuga securities as a result of this misleading promotion.

163. Defendant Curry also lent his celebrity status to the Company's Discord, which, as noted, was a significant place for Yuga investors to congregate. For example, Curry posted the following selfie on the Company's Discord chat:



THIRD AMENDED CLASS ACTION COMPLAINT - CASE NO. 2:22-CV-08909-FMO-PLA

164.    Curry's appearance in the Company's Discord had a significant impact on inducing investors to purchase Yuga Financial Products as they reasonably believed that Curry's appearances were the result of organic interest in the BAYC NFT collection instead of being a part of his undisclosed agreement to promote FTX and its affiliates like Yuga in exchange for $28 million.

165.    Defendant Curry also wore clothing with the BAYC logo, including to media events where he spoke as a member of the Golden State Warriors:



166.    Upon information and belief, Defendant Curry received Yuga Financial Products and/or other forms of consideration (such as a portion of the $28 million promotional payment from FTX allocated for the cross promotion of FTX affiliate, Yuga) as part or all of his compensation for promoting the Yuga securities specifically or the Yuga brand generally.    Moreover, Defendant Curry directly financially benefited from the increased valuation that MoonPay would experience with such overwhelming celebrity exposure.

Defendant Winkelmann

167.    Following his appearance on the *Tonight Show* with Defendant Fallon, Winklemann continued to promote the Company and solicit sales of the Yuga

Financial Products.  For, example, on May 12, 2022, Defendant Winkelmann posted an original piece of art created by him, promoting the image of a Bored Ape and citing to "Yuga Labs" in the caption.  This was one of several such promotions of the Bored Ape ecosystem by Winkelmann.  In fact, on one occasion on August 22, 2022, Winkelman went so far as to offer 1,000 ApeCoin tokens to 200 of his followers on Twitter as part of a promotional contest.

Defendant Ciccone

168.    A combined search of Etherscan and OpenSea shows that a wallet owned/controlled by Defendant Ciccone received BAYC NFT #4988 directly from MoonPay.  This transaction did not involve a purchase by Ciccone but rather the NFT was simply transferred to her wallet address 0x8ea95Bdc5cDddC0b7EbAd841F0c1f2cA6168b6a9 (the "Ciccone Wallet").  According to Etherscan and OpenSea, on March 14, 2022, the MoonPay Wallet first paid 180 ETH for BAYC NFT #4988, which at the time was the equivalent $466,461.  On March 23, 2022, the MoonPay wallet sent BAYC NFT #4988 to wallet address 0x6ef962ea7e64e771d3a81bce4f95328d76d7672b (which appears to have been used as a pass-through wallet).  Finally, six weeks later, BAYC NFT #4988 was sent to Ciccone's wallet on May 7, 2022.  Ciccone received an NFT worth almost a half million dollars from MoonPay for her statements promoting Yuga securities.

169.    Transactions within the Ciccone Wallet also reveal that Defendant Ciccone received Otherdeed #4988 directly from the Otherside deployer wallet 0x8ea95bdc5cdddc0b7ebad841f0c1f2ca6168b6a9 (the "Otherside Wallet") on May 16, 2022.

170.    The Ciccone Wallet also received 100 plots of virtual land in Otherside on August 5, 2022.

171.    But there are no free lunches, and these were not simple gifts.  Rather, upon information and belief, MoonPay was an indirect way for Oseary and Executive

Defendants Aronow, Solano, Muniz, Shoemaker, Ehrlund, and Lyons to pay Ciccone to promote and/or solicit sales and re-sales of the Yuga securities.

172.    An examination of BAYC NFT transactions in the wallet by Ciccone in conjunction with her social media accounts shows that she received this particularly rare and valuable BAYC NFT #4988 before she promoted BAYC to would-be investors.  Shortly after MoonPay acquired BAYC NFT #4988 for Ciccone, on March 24, 2022, Ciccone promoted it and the teased metaverse on her Twitter account.

173.    Plaintiffs saw the promotion from Ciccone regarding the Company's collection of BAYC NFTs and were induced to purchase and/or continue to hold Yuga securities as a result of this misleading promotion.

174.    Neither MoonPay nor Ciccone disclosed that Ciccone's manager and business partner Oseary had a financial interest in MoonPay and, relatedly, the increased sale of BAYC NFTs.  Further, Ciccone failed to include an "ad" disclaimer in this post to disclose to investors that this was a paid advertisement for the BAYC collection of NFTs and MoonPay (as opposed to a genuine expression of interest in the BAYC collection or gratitude to the MoonPay Defendants for assisting in her "enter[ing] the Metaverse").

175.    MoonPay responded to Ciccone's tweet, stating that the company chose BAYC NFT #4988 for Ciccone because "we heard it call your name and it felt like home."

176.    Ciccone's promotion of the BAYC NFTs and its related metaverse implied to investors that she personally selected her BAYC NFT because she was genuinely interested in the BAYC ecosystem and wanted to be a part of its growing future.  But given MoonPay's statement, it appears that, in truth, Ciccone did not even bother to choose her BAYC NFT herself, but rather it was selected for her by MoonPay, thus demonstrating that her enthusiasm for the collection of BAYC NFTs was fake.

177.    In the following weeks, Ciccone further promoted BAYC in several news outlets, including *Variety* magazine and the London newspaper *The Independent*.  For example, in the July 27, 2022 issue of *Variety* magazine – which featured Defendant Oseary on the cover with the tagline that stated "Music Mogul of the Year – NFT King: Madonna and U2 Manager Guy Oseary is Leveraging His Success to Become the Next Great Tech Whisperer" – Ciccone insisted that she "'was hellbent on getting an Ape and really specific about what I wanted: the Ape with a leather motorcycle cap on and multicolored teeth.'"  Ciccone went on to state: "'I was told that it was inspired by me, and modeled after me, and it was bought by a woman who's a fan of mine.  She was gonna sell it to me, but it was way too expensive.'"

178.    On July 28, 2022, *The Independent* published an article titled: "'I was hellbent on getting an Ape': Madonna annoyed she didn't get the NFT character she wanted." *The Independent* reported the "63-year-old singer has revealed that she was quite 'mad' over being beaten to a bid for Bored Ape No 3756."

179.    Defendant Ciccone's statements about her inability to obtain the BAYC NFT that was her first choice misleadingly suggested to investors that the Yuga securities were in such high demand and so exclusive that even a highly-connected celebrity like Defendant Ciccone could not get any specific NFT that she wanted. Likewise, Ciccone's statement that she wanted to buy a particular BAYC NFT but did not because it was "too expensive" indicated to investors that the BAYC NFTs were highly valuable such that one of the most successful and iconic pop singers in the world could not afford to enter the exclusive club on her own terms.  These statements were made to induce investors into believing that the Yuga securities were investments that held extraordinary value, growth potential, and would provide future financial opportunities.  Indeed, Plaintiffs saw the various promotions from Defendants Ciccone, Oseary, and the MoonPay Defendants regarding the Company's

1    collection of BAYC NFTs and were induced to purchase and/or continue to hold

2    Yuga securities as a result of this misleading promotion.

3    Defendants Adidas

4        180.    On December 2, 2021, Adidas announced on Twitter that it purchased a

5    BAYC NFT as part of an upcoming collaboration with the Company into "the

6    Metaverse," stating that the collaboration was "just the beginning" followed by a

7    rocket ship emoji to indicate to investors that the price and value of Yuga NFTs was

8    going to rise precipitously as a result of this (and future) collaboration with Adidas.

9    Adidas then changed its Twitter profile @adidasoriginals avatar to a Bored Ape NFT,

10   again indicating to investors that the Yuga Financial Products were investments with

11   the prospect of financial gain that were also backed by mega corporations like Adidas

12   whose promotions of the Yuga Financal Products had extensive reach.

13       181.    On December 19, 2021, Bajwa promoted the financial success of the

14   Adidas Metaverse NFT collaboration with BAYC, that Sotheby's earned $100M

15   from NFT sales in 2021, that "78% of bidders were new to Sotheby's and half were

16   under 40," and that Yuga was "co-developing a play-to-earn game with [Yuga backer

17   and promoter] @animocabrands. To be launched in Q2 2022." This promotion about

18   the successful collaboration with Adidas signaled to investors that the Yuga-

19   dominated NFT market was lucrative and expanding, and that Yuga had future plans

20   to grow its brand with Adidas' support. These signals indicated the further increase

21   of the value of the Yuga digital assets to investors.

22       182.    These promotions by Adidas and its collaboration with BAYC

23   throughout December 2021 caused the floor price of the BAYC NFT collection to

24   spike, rising from approximately 47 ETH on December 1, 2021 before the promotion,

25   to approximately 58.6 ETH by December 31, 2021.

26

27

28

### 2.    Yuga Defendants

<u>Defendant Yuga Labs</u>

183.    As Defendant Soto-Wright admitted: the "hardest thing to solve" when building a new company was "getting those customers on your platform."

184.    After the Sotheby's auction set the stage, the Company brought in Defendant Oseary and his troupe of celebrity influencers and venture capital connections to begin the second scheme to sell Yuga securities: deceptively promote the artificially inflated BAYC NFTs to investors like Plaintiffs and the Class.

185.    One of Oseary's first moves was to orchestrate the promotion of the BAYC NFT collection in a feature article in *Rolling Stone* magazine.

186.    On November 1, 2021, *Rolling Stone* published an article titled "How Four NFT Novices Created a Billion-Dollar Ecosystem of Cartoon Apes" (the "*Rolling Stone* article"), which likened Defendants Solano and Aronow to "internet rock stars" and repeatedly touted the financial success of Yuga's BAYC NFT collection.  The *Rolling Stone* article notes that Defendants Solano and Aronow "started out with unsharpened goals of capitalizing on a very clear trend."

187.    In conjunction with the publication of the *Rolling Stone* article, the Company collaborated with *Rolling Stone* magazine on the latter's collector edition magazine featuring "never-before-seen BAYC artwork."  The issue offered investors the chance to see "early sketches of the swamp club, get to know the original apes, and find out how the creative minds behind one of the ***most valuable NFT collections*** in history bring their ideas to life" [Emphasis added.]  Most importantly, the cover of this issue prominently featured a BAYC NFT.

188.    The Company promoted a video of the *Rolling Stone* cover showcasing the BAYC NFT and advised BAYC investors that auction details would be forthcoming.  The Company then promoted and held an auction on the BAYC and MAYC NFT *Rolling Stone* covers on November 15, 2021, and a similar BAYC

1    *Rolling Stone* cover auction in June 2022 for both a BAYC NFT and "a print of the

2    art signed by Yuga Labs' founders, the artist, and the CEO of Rolling Stone."

3        189.   The Company itself also solicited sales at various events like "ApeFest

4    2021" which was held in New York on November 3, 2021 as an exclusive event for

5    only BAYC or MAYC NFT owners. Significantly, Yuga's ApeFest 2021 event was

6    sponsored and promoted by MoonPay, apparently using funds generated from sales

7    and transaction fees related to the Yuga NFTs, and promoted an ApeFest ticket

8    giveaway to Twitter followers. NFT artist, Oseary associate, and Defendant

9    Winkelmann also promoted the ApeFest 2021 event on his Twitter account.

10       190.   On March 16, 2022, the Company and BAYC announced the formation

11    of the ApeCoin DAO and the launch of the ApeCoin Token as the "official currency

12    of the BAYC ecosystem." BAYC stated that ApeCoin would be available "to all"

13    and was "expected to begin trading on major crypto exchanges." BAYC explained

14    that Yuga would be "gifting ApeCoin DAO as a 1/1 NFT featuring a blue version of

15    the BAYC logo," and "[t]his NFT transfers full IP rights of the derivative logo to the

16    ApeCoin DAO, who will decide how the IP should be used." Further, 15% of the

17    total supply of ApeCoin would be made available to BAYC and MAYC NFT holders

18    and 62% of the total ApeCoin supply would be "allocated to the ApeCoin

19    Community." BAYC then directed its followers to visit apecoin.com, which

20    informed investors how to purchase ApeCoin.

21    <u>Defendant Oseary</u>

22       191.   In addition to promoting the large number of celebrities that purportedly

23    "joined the club" (i.e., purchased a BAYC NFT), Oseary used his own personal

24    Twitter account to promote and solicit sales of BAYC NFTs.

25       192.   In fact, Oseary's Twitter feed is littered with promotions for BAYC

26    NFTs and other Yuga Financial Products. For example, on November 1, 2021,

27    Oseary posted a picture of the cover of *Rolling Stone* magazine with the following

28    caption: "First @RollingStone NFT cover . . . Congrats @BoredApeYC."

193.    On January 20, 2022, Oseary promoted a tweet from Serena Williams that posted her BAYC NFT (which she received from her husband, Defendant Ohanian, who is a member of the ApeDAO board of directors).  That same day, Oseary similarly promoted a tweet from professional soccer player Neymar da Silva Santos, Jr. that said: "I am an ape!  #community #art #BoredApeYC."  Notably, not only did these promotions take place on the same day within a few hours, but both BAYC NFTs promoted by Oseary, Williams, and Neymar were the rare "pink" Bored Apes, which were more valuable and indicated a common source of origin.

194.    On March 11, 2022, Oseary advertised the availability of new NFTs to Yuga NFT holders.

195.    On March 16, 2022, Oseary promoted ApeCoin to investors, stating that the trading volume for ApeCoin over a 24-hour period was almost as much as the second largest cryptocurrency by market cap: Ethereum (ETH). The implication of this statement was that there was strong investor demand for ApeCoin such that it could rival the demand for the much more well-established ETH, and that this demand would increase the value of ApeCoin.

196.    On March 17, 2022, Oseary also bragged about the early success of ApeCoin, advised investors that purchases of ApeCoin could be made on the major cryptocurrency exchanges like "binance, coinbase, ftx, gemini, kraken." Oseary further promoted that the ApeCoin launch was the "first of its kind" to be listed on major exchanges on "day 1," indicating that there was significant interest from investors who wanted to buy ApeCoin – so much that all the crypto exchanges had listed ApeCoin immediately upon launch (as opposed to the more commonly expected slow rollout on one exchange at a time as the crypto project gains traction). It further implied to investors that, as trading of ApeCoin was increased via multiple listings on crypto exchanges, this would create a corresponding increase in the value of ApeCoin.  This messaging by Oseary created an expectation of profit for investors.

197.   On April 30, 2022, Oseary similarly promoted the success of an Otherdeed mint, emphasizing that he was "awestruck at the demand [for the Otherdeed NFTs] shown tonight."  This promotion, focusing on the demand for Yuga digital assets, furthered the expectation for investors that the increased demand for the finite supply of Yuga NFTs would result in an increase in the value of their initial investments.

198.   That same day, Oseary promoted the use of ApeCoin to purchase Otherdeed NFTs on OpenSea.

199.   Plaintiffs saw the promotions from Defendant Oseary regarding the BAYC NFTs and were induced to purchase and/or continue to hold Yuga Financial Products as a result of these misleading promotions.

Defendant Solano

200.   In addition to the promotions Solano made via the Company's social media accounts, Solano promoted the sale of Yuga Financial Products on his own personal social media accounts.

201.   On April 24, 2021, Solano tweeted that the BAYC NFT presale had started and that members could join the club on Discord.

202.   On April 25, 2021, Solano promoted the Company's promotional giveaway for the presale.

203.   On April 29, 2021, Solano promoted the sale of two "rare" BAYC NFTs. Additionally, on May 20, 2021 Solano noted that the "floor has crept up today," and discussed the floor price on "OS" or marketplace OpenSea.

204.   On August 29, 2021, following the launch of the BAYC NFT collection, Solano bragged on the Company's Discord about how successful the sale was and how the value of the BAYC NFTs was rising such that they were worth millions.  In particular, Solano stated that the BAYC NFTs had "sold out over the course of one wild night" and had become one of "the most distributed NFT collections of our kind." Solano also advertised that there were some "million-dollar apes." Solano

1    further stated that Yuga "had so many celebrities and athletes ape-in to the club that

2    it's beginning to feel like we could field entire sports teams."

3        205.    This promotion by Solano was misleading and created a false

4    expectation of profits for investors.  First, by promoting that there were "million-

5    dollar apes" following the BAYC NFT launch, Solano indicated to investors that the

6    price of Yuga's digital assets was increasing exponentially, rising from the initial

7    launch price of around $220 to be worth approximately $1M – a staggering 454,445%

8    increase in value. Second, by advertising that "so many celebrities and athletes" were

9    purchasing BAYC NFTs, Solano signaled to investors two things. First, that there

10   was organic demand for the Yuga digital assets from high-profile and wealthy

11   individuals and, by implication, that these individuals "bought in" early on an

12   investment that would appreciate in value.  Second, Solano signaled that investors

13   should, like these successful celebrities and athletes that were in the know, "ape in"

14   and purchase Yuga digital assets.

15       206.    On September 14, 2021, days after the highly promoted Sotheby's

16   auction, Solano posted that he would be on a panel about a Christie's auction of four

17   apes, furthering the fraudulent messaging from Sotheby's and the Company that

18   traditional art collectors were interested in acquiring the BAYC NFT as legitimate,

19   high art.

20       207.    On July 16, 2022, Solano promoted the thousands of users of Yuga's

21   new Otherside metaverse, indicating to investors that Yuga management would

22   continue to grow and maintain the Otherside and, in turn, this would increase the

23   value of their investments in the Yuga Financial Products.

24       208.    Despite being an avid commenter to the BAYC's members only Discord

25   chatroom between April 2021 and August 2021 under the username "Garga03," there

26   are notably no comments from Solano between August 30, 2021 and December 4,

27   2021 and December 6, 2021 and March 31, 2022 during the meteoric rise of the Yuga

28   Financial Products.  Yet Defendant Muniz noted in a February 2022 interview that

1  the "founders were living and breathing in Discord with them 24 hours a day.
2  Supporting [the BAYC members] and answering questions and being truly a part of
3  the community themselves."  Solano's notable absence of messages, combined with
4  Muniz's statement that Solono, a founding BAYC member, was on Discord "24 hours
5  a day" to promote the Bored Ape ecosystem and solicit sales of the Yuga Financial
6  Products, indicates his discussions may have been removed or deleted.

7  <u>Defendant Aronow</u>

8      209.   Aronow made numerous Yuga Financial Product posts under his
9  @GordonGoner Twitter handle to his more than 150,000 followers.

10     210.   On April 20, 2021, Aronow announced the launch of BAYC on Twitter.

11     211.   On April 26, 2021, Aronow promoted the promotional "Giveaway"
12  during presale of BAYCs in an effort to solicit further and increase sales of the BAYC
13  NFT collection.

14     212.   On April 27, 2021, Aronow hyped the pricing structure for the BAYC
15  NFT collection and the purported excitement within the BAYC community and
16  investors:



THIRD AMENDED CLASS ACTION COMPLAINT - CASE NO. 2:22-CV-08909-FMO-PLA

213. On April 30, 2021, Aronow solicited sales of Yuga digital assets by encouraging potential investors to "ape in" to BAYC (i.e., purchase a Yuga Financial Product).

214. On August 21, 2021, Defendant Aronow bragged "Not bad for a high school dropout" in response to a post that said, "Don't look now but #BAYC Market Cap just crossed a BILLION." In this public exchange, Solano furthered investors' expectation of profits from investing in Yuga digital assets. First, Solano positively acknowledged the increase in the BAYC NFTs' market capitalization, which indicated that Yuga had a common interest in seeing the value of its digital asset portfolio grow from the increase in market capitalization. Second, this exchange demonstrates that promotions investors received were focused on the value of BAYC NFTs and were purchasing the Yuga digital assets with an expectation of profit. It further indicates that the Company's executives understood that BAYC NFT investors were doing so with the expectation of profiting handsomely and misleadingly stoked that expectation with this (and similar) promotions. Third, by remarking "not bad for a high school dropout," Aranow indicated that the BAYC launch was financially successful despite his lack of formal education in order to give investors the false impression that they, too, could become similarly successful by purchasing BAYC NFTs and see the value of their investments increase as the market cap grew. In truth, the increased price and trading volume was inflated due to manipulative trading strategies.

215. Aronow reposted a picture of the November 2021 BAYC and Adidas promotion on the Burj Khalifa, along with a reference to a since deleted Twitter space conversation with Solano:

1
2
3
4
5
6
7
8
9
10
11
12
13



14      216.    Aronow repeatedly announced ApeCoin's launch on March 16, 2022:

15
16



17
18
19
20
21
22
23
24
25
26
27
28



217.    Aronow boasted that ApeCoin was being listed by now defunct FTX, without disclosing that the Company has multiple ties to FTX via Defendant Wu, including, but not limited to, the Sotheby's auction and Defendant Curry's promotion:



218.    Aronow advised that holders of an NFT within the BAYC ecosystem would be able to claim ApeCoin tokens:



219.    Aronow announced the Otherside launch on April 30, 2022:



220.    Aronow also reposted an announcement that Defendant Curry was promoting BAYC in his Twitter bio:



221.   Despite being an avid commenter to the BAYC's members-only Discord chatroom between April 2021 and October 2021 under the username "GordonGoner#0607," there are notably no comments from Aronow in the chatroom after August 6, 2021 during the meteoric rise of the Yuga Financial Products.  Yet Defendant Muniz noted in a February 2022 interview that the "founders were living and breathing in Discord with them 24 hours a day.  Supporting [the BAYC members] and answering questions and being truly a part of the community themselves." Aronow's notable absence of messages, combined with Muniz's statement that Aronow, a founding BAYC member, was on Discord "24 hours a day," indicates his discussions may have been removed or deleted.

222.   The scheme to promote the BAYC NFTs is not the first time Aronow has been accused of attempting to mislead investors.  In May 2021, a crypto company called Bitmex took Aronow to arbitration over a disputed domain name in the action *HDR Global Trading Limited v. Aronow*, Claim No. FA2104001943672.  According to the complaint, Aronow had bought the domain name bitmex.guru in 2018, which Bitmex argued was clearly designed to trick people looking for the real Bitmex website.  Aronow did not appear, and the arbitrator ordered that the domain name be transferred after his default in the proceeding.

Defendant Muniz

223.   On February 18, 2022, Defendant Muniz did an interview with D3 Network that was widely circulated on social media where she promoted investment into Yuga Financial Products.  Muniz stated that investing in Yuga Financial Products "is a little bit like the next frontier, it's the wild west, its opportunity!  It's hope, it's excitement!"

224.   On March 16, 2022, Defendant Muniz reposted a picture of a Bored Ape holding an ApeCoin to her 15,000 Twitter followers to celebrate the launch.

225.    On March 19, 2022, Defendant Muniz falsely stated that "Already, a new economy is possible with the IP of Apes, Punks, and Meebits, owned by the community."

226.    In a March 22, 2022 interview, Defendant Muniz falsely stated that Otherside will be inclusive to NFTs beyond just those managed by Yuga Labs, and that "a few different game studios" are helping develop Otherside.  "We're opening the door to effectively a walled garden and saying 'Everybody's welcome.'"

227.    In connection with the Coinbase movie, Defendant Muniz stated, "We're seeing how NFTs are evolving to be automobiles of entry and participation in networks, video games, merchandise, and now interactive leisure."  Muniz furthered stated that "This can be a breakthrough challenge and we're excited to see how this shapes the way forward for Web3 for all communities."

228.    In an interview with Tech Crunch on July 19, 2022, Defendant Muniz laid out a grand vision for the Yuga Financial Products in the metaverse, stating "There will be lots of metaverses . . .  A lot of the other metaverses out there, I think the most interesting question will be: Are they open?  Or are they closed?"  Muniz continued, "Do you own yourself in this world? I think that's the first question.  Like, do you own you?"

229.    In this interview, Muniz further promoted that because gaming startup Improbable's technology would be used for Otherside, outside developers would build on the platform as well.  Muniz stated that "As a developer, you have the flexibility to be able to build whatever makes sense in your world and whatever vision you can come up with," adding that "It's a free, open world, do whatever you want, say whatever you want – unless you're invading on other people's rights effectively and their safe space."

230.    Doubling down on Yuga's capabilities, Muniz stated that "We're really seeing this as multiplatform.  You know, it's desktop and mobile . . . VR is going to be an important platform for us,"  Muniz added that, "While there is likely going to

62

1  be a local component to this where people are running a local version of the game

2  and the world, you still want the link and you still want someone to be able to tweet

3  something out and say 'Hey, holy shit, I just slayed this dragon,' and then anybody

4  can join and all of a sudden be popped into exactly where you are at that exact

5  moment and see it live."

6      231.   On August 3, 2022, Muniz promoted the Company's upcoming launch

7  of the Otherside along with an interview she had with Dean Takahashi at

8  VentureBeat.com touting the product.

9      232.   In this interview, Defendant Muniz compared the robustness and

10  capabilities of Yuga to that of international media conglomerate Disney, signaling to

11  potential investors that Executive Defendants had positioned the Company to become

12  bigger than Disney and by implication that, like initial investors in Disney, investors

13  in Yuga Financial Products would benefit financially from their early investments in

14  the Company.  Defendant Muniz stated that:

15          Our real vision for Otherside is for it to be an open, interoperable world.
        If you think of this as – I'll use a very strange analog that isn't right,
16          but it's the easiest way to explain it.  This is our digital Disney World.
        What's cool about this digital Disney World and why it's differentiated
17          is it's an open world. It's not just a place for our IP. It's not just a place
        for apes and mutants and punks and Otherside characters.  It's a place
18          for anybody.  It's for your own character.  That's the identity part and
        the ownership part.  If you're a Cool Cat you're welcome.  If you're
19          something new that you've cooked up in your brain and you want to
        create a new character for yourself in this world, you can use our SDK
20          to do that.  That's the vision.

21          Not only is it a place where all characters and all identities are welcome,
        but also it's a place that's not just for our rides and attractions, going
22          back to the Disney World analogy.  Anybody can build.  We're going
        to build things, rides and attractions for the world.  We're going to have
23          layers of gameplay and different experiences that people can do so it's
        engaging and fun.  But that SDK will enable all sorts of creators and
24          developers, big and small.  Hobbyists, independents, game studios,
        they'll also be able to build rich creative experiences for the world and
25          for the audience.

26      233.   On December 20, 2022, Muniz touted the growth prospects of the

27  Company and the intellectual property rights granted to investors in Yuga's NFT

28  collections.  In particular, Muniz acknowledged that she "like[d] to use the analog of

THIRD AMENDED CLASS ACTION COMPLAINT - CASE NO. 2:22-cv-08909-FMO-PLA

Web3 Disney" when promoting Yuga to investors, declaring that "BAYC is Yuga Labs' Mickey Mouse . . . while CryptoPunks and Meebits are the company's equivalent of the Star Wars and Marvel acquisitions.  Otherside, the metaverse platform Yuga is building, is like its Disney World."  According to Muniz, a key difference between Yuga and Disney was that, unlike Disney, Yuga shared the ownership of intellectual property rights with holders of Yuga Financial Products: "We might own 30% to 40% of the market, but also our holders own 30% to 40% of the market, and I mean that in an IP sense.  ***Our collections are some of the only collections that truly give away IP rights. . . .  You have exclusive commercial IP rights, and that also means, by the way, Yuga does not***." [Emphasis added.]

234.   These statements above were false and misleading because they significantly overstated Yuga's gaming and software development capabilities.  In reality, the promised gaming capabilities and Otherside metaverse failed to meet expectations and misled investors suffered financial harm as a result.

235.   Further, despite the numerous indications of market manipulation of the Yuga Financial Products (*see infra* ¶¶311-316 (Moonpay and the Company wash trading allegations)), Muniz brushed aside concerns there was a "contradiction in a Web3 company owning a set of collections that are responsible for 30% to 40% of the market volume." reassured investors in an interview recorded the month prior to ApeCoin's launch that Yuga Labs was "completely open" and "completely transparent" in their business operations.

236.   Muniz also stated a February 2022 interview that she (like Executive Defendants Solano and Aronow) was an avid user of Twitter, Discord, and Slack and used the username "@VStrange" on those platforms to discuss the Yuga Financial Products with investors.  She repeated her devotion to the BAYC Discord channels in November 2022, when she spoke on the mainstage at Web Summit 2022 encouraging attendees to "go into the Discord and see it for yourselves" and boasting about recent conversations she had with BAYC Discord members discussing

1  ApeFest.  Yet after Plaintiffs filed their initial Complaint in this action on December

2  8, 2022, Muniz's VStrange Discord account no longer exists, indicating her

3  discussions about the Yuga Financial Products were deleted.

4  <u>Defendant Lyons</u>

5      237.  Prior to officially serving as a member of the Yuga board, Defendant

6  Lyons operated as an agent of the Company to promote and solicit sales of the Yuga

7  Financial Products.  For example, in August 2021, Lyons posted a cross promotion

8  for BAYC and Cryptopunks to his Instagram page and more than 32,000 followers.

9      238.  On March 22, 2022, Lyons again promoted his involvement in Yuga and

10 BAYC financing:



21     239.  On April 30, 2022, Lyons again promoted the sale of the Yuga Financial

22 Products by posting a BAYC video, and tagging the ApeCoin Dao, BAYC, and the

23 Company.

24     240.  On May 12, 2022, Lyons posted another BAYC promotional video in

25 his Instagram video.

26     241.  Lyons' promotion of the Bored Ape ecosystem continued via another

27 video post, specifically teasing the Otherside metaverse launch in September 2022.

28

242.    The promotional efforts by Oseary, the Executive Defendants Aronow, Solano, Muniz, and Lyons, the MoonPay Defendants, and the Promoter Defendants were effective at artificially inflating the popularity of, and interest in, the suite of digital assets sold by Yuga Financial Products.  For example, following these promotional activities, the floor price and trading volume for BAYC NFTs exploded. On April 30, 2022, the day of the BAYC metaverse launch, the floor price for BAYC NFTs reached the maximum price of 144.9 ETH (at the time was worth approximately $395,000), which represents a 145% increase from its floor price of 49.5 ether at the start of the Class Period.  Trading volume also spiked to 12,698 ether on April 30, 2022 – up almost 280% from the 3345 ether trading volume at the start of the Class Period.

### 3.    MoonPay Defendants

Defendant MoonPay

243.    On-chain transactions confirm that MoonPay purchased, and then subsequently transferred, numerous Bored Ape NFTs from wallet address 0xd75233704795206de38cc 58b77a1f660b5c60896, publicly labeled as "MoonPay" (the "MoonPay Wallet" or "MoonPay.eth Wallet"), to numerous celebrities and several of the Promoter Defendants so they could promote the Yuga Financial Products.  Though MoonPay attempted to conceal these transactions under the guise of its Concierge service, upon information and belief, these celebrities and Promoter Defendants received Yuga Financial Products and/or other forms of consideration as part or all of their compensation for promoting the Yuga Financial Products specifically or the Yuga brand generally.  Moreover, Promoter Defendants directly financially benefited from the increased valuation that MoonPay would experience with such overwhelming celebrity exposure.

244.    For example, on October 27, 2021, MoonPay transferred BAYC NFT #129 to rapper Lil Baby at wallet address 0xc86B12d850FdBBF3260a7BAAE862F85857aAdBBa (the "Lil Baby Wallet").

66

MoonPay then posted several TikTok videos of Defendant Soto-Wright with Lil Baby and showing him how to mutate the BAYC NFT he just "purchased." The mutation video had 2.8 million views alone. On November 25, 2021, MoonPay posted another video of Lil Baby attempting to explain how he acquired BAYC NFT #129 from MoonPay to promote MoonPay's purported "concierge service."

245. On November 4, 2021, future board member of the ApeDAO, Defendant Bajwa promoted a BAYC party taking place and teased that celebrity musician "Da Baby" had "mutated his ape right before going on stage at @BoredApeYC party tonight 👀 . . . probably nothing."

246. On December 1, 2021, the MoonPay Wallet transferred BAYC NFT #5384 to wallet address 0xc213e5d1ba49e3069b7ed5ce1f53ed299b966c73, which is labeled as "diplo.eth." That same day, MoonPay investor Thomas Pentz (a famous DJ named Diplo) promoted the BAYC NFT he received from MoonPay on his Twitter account with 2.4 million followers. MoonPay also posted a video on its TikTok account of Soto-Wright and Diplo promoting BAYC. Diplo's video was part of larger promotion of MoonPay and BAYC during Miami Beach's Art Basel week, as shown by another video MoonPay posted to its TikTok account featuring Diplo and Defendant Soto-Wright.

247. On December 3, 2021, MoonPay transferred BAYC NFT #2759 to rapper Gunna at wallet address 0xd99D96fD90cF9F52f8Ad96d252DeD0ec 77F3D239 (the "Gunna Wallet"). Gunna then got BAYC NFT #2759 tattooed on his leg and stated in a since deleted Instagram post, "I Bought A @boredapeyachtclub NFT worth 300K No Cap!" Gunna wrote on Instagram "His Name is BUTTA Thanks @moonpay!"

248. On December 31, 2021, MoonPay transferred BAYC NFT #6877 to rapper Meek Mill at wallet address 0x82a8DD0Bd212A47780132CC2d1AA 56a70E7Fd9e9 (the "Meek Mill Wallet"). Defendant Soto-Wright, also known as "IvanHodl," then promoted this MoonPay transfer by posting a Happy New Year

1   message to his Instagram Stories with a picture of himself, Lil Baby, and Meek Mill

2   with BAYC NFT #6877.



3

4

5

6

7

8

9

10

11

12

13

14

15

16   249.   On January 8, 2022, MoonPay transferred BAYC NFT #3980 to

17   Canadian DJ Vivie-Ann Bakos, known professionally as BLOND:ISH at wallet

18   address   0xAc0a7656b5D62e7D54b11F8b5294CE0ac1bb7118   (the   "Blondish

19   Wallet").

20   250.   On January 14, 2022, MoonPay transferred BAYC NFT #9977 to rapper

21   Lil Durk at wallet address 0x1FFEad999b467249AFd 2EfBA336a0b6c820E17aC

22   (the "Lil Durk Wallet").  Lil Durk then changed his Instagram profile picture to

23   BAYC NFT #9977 and posted a photograph with Defendant Soto-Wright and his

24   purported BAYC "purchase" to Instagram stories and his 15 million followers.  A

25   few months later, MoonPay posted a video of Soto-Wright giving Lil Durk an "Intro

26   to NFTs" talk.

27

28



251.  On January 26, 2022, MoonPay transferred BAYC NFT #6141 to Gwenyth Paltrow at wallet address 0x31185f782A7C11044566d70d FCF1c8175486f451 (the "Paltrow Wallet").  Paltrow then announced to investors and her 2.6 million Twitter followers that she had "joined" the BAYC, thanked MoonPay's fraudulent concierge service and posted a video of BAYC NFT #6141 transforming into a Bored Ape that resembled her.

252.  All of these promotions for Yuga and facilitated by MoonPay (and its founder Defendant Soto-Wright) failed to disclose that the various Promoter Defendants were MoonPay backers and had a financial interest in its success, which, in turn, caused them to have a vested interest in the increase in sales of Yuga securities and the use of MoonPay.

253.  On February 25, 2022, the MoonPay Wallet transferred BAYC NFT #7434 to quarterback Colin Kaepernick at wallet address 0xAabD4b4837C5617D84fA06c976483F05bd9eDD7C (the "Kaepernick Wallet").  Weeks later, Yuga listed Kaepernick and the BAYC NFT #7434 that MoonPay gave

1    him as one of the 36 people, brands, and venture capital firms that took part in its
2    seed round.

3        254.   MoonPay also directly solicited sales of Yuga securities.  For example,
4    on January 11, 2022, MoonPay posted a picture of a joint MoonPay x BAYC mural
5    on its Twitter account. In addition to the mural of a Bored Ape with the MoonPay
6    and Yuga corporate logos, the posted image contained a QR code that directed
7    investors to the MoonPay website.  On the landing page it states: "Crypto just got
8    easy.  A fast and simple way to buy and sell crypto" and there is a button stating,
9    "Buy crypto."

10       255.   And as alleged above, MoonPay repeatedly posted videos of celebrities
11   with Soto-Wright, including Defendants Fallon and Hilton.

12       256.   Upon information and belief, as the Company, Executive Defendants,
13   MoonPay Defendants, and Promoter Defendants were engaged in the aforementioned
14   fraudulent promotions, Defendant Adidas, along with assistance of the MoonPay
15   Defendants and the Executive Defendants, was engaging with other celebrities,
16   influencers, and tastemakers behind the scenes to recruit them into the conspiracy to
17   solicit and sell the Yuga securities through MoonPay.

18       257.  On or about March 17, 2022, celebrity jeweler and social media
19   influencer Ben "Baller" Yang made a stunning disclosure regarding the promotion of
20   Yuga securities by the Company, the MoonPay Defendants, and Defendant Adidas,
21   confirming their collective participation in the fraudulent scheme concocted by
22   Oseary and the Executive Defendants.  In a now-deleted Twitter Spaces live video,
23   which was memorialized in a YouTube video, Yang describes his own personal
24   experience with the misleading promotional scheme as follows:

25       **[Yang]:** "Real talk, not once, not twice, three times I've been offered a
     Bored Ape through MoonPay.  I've had Adidas hit me up in my DMs
26   on Instagram: "Hey Ben, do you want to co-host a space with us?  Oh
     do you own a Bored Ape?"  No I fucking don't. . . .  I don't know what
27   it was but the fact that some of these super top tier all-star NBA players

28

have them, and I was like this is all cap.[12]  I mean, there was an NDA they tried to send my agent . . . .

**[Other Speaker]:** There's definitely NDAs in everything they do. . . .

**[Yang]:** But what I'm saying if I was to accept one of the Bored Apes . . . .

**[Other Speaker 2]:** They want you to not disclose that they had purchased the Ape for you.

**[Yang]:** Exactly, yeah.  You know what the craziest thing about that is that a lot of celebrities who are going into this are probably just stoked to get the ape and they don't even realize a lot of them probably a lot of them don't consult their legal and shit like that beforehand. ***But they are actually asking you to commit fraud on their behalf***.

258.  Yang's account of the MoonPay scheme is corroborated by another social media influencer, Canadian DJ Vivie-Ann Bakos, known professionally as BLONDISH.  Beginning January 8, 2022, Bakos began posting her praise and support of MoonPay and BAYC, and thanked MoonPay's "concierge" service:

259.  Bakos continued to promote MoonPay and the BAYC NFT collection in January 2022.  For example, on January 27, 2022, Bakos replied to a MoonPay promotional announcement for its NFT Checkout with "Tothemoonpay."  That same day, Bakos also promoted the BAYC NFT collection, tagging MoonPay investor and actress Gwyneth Paltrow and announcing that it was " 🧘 👾  time for an ape meditation collab."

260.  More significantly, Bakos explained the MoonPay scheme in a message on Discord, admitting that "they gift some apes to artists."  Bakos noted that the purpose of the scheme was meant to promote "mass adoption" of the Bored Ape NFTs:

---

[12]    The term "cap" is slang for an exaggeration or outright lie.



261.    Media reports have likewise confirmed the allegations of improper celebrity promotion on the part of MoonPay.  On June 9, 2022, *The Block* reported that MoonPay presented top celebrities BAYC NFTs as gifts in the hope of boosting its profile.  Two people with direct knowledge of the matter told *The Block* that MoonPay did give at least some of the celebrities the BAYC NFTs without expecting payment.

262.    As Defendant Soto-Wright previously admitted, the "hardest thing to solve" when building a new company was "getting those customers on your platform."  Confidential Witness 1's disclosures, combined with the revelations from Bakos and Baller, demonstrate that Soto-Wright (with the assistance of Adidas) resorted to fraud to solve this problem for MoonPay and Yuga.  And much like Sotheby's knowingly directly promoted and facilitated the first scheme to sell unregistered BAYC NFTs to investors, MoonPay knowingly promoted and facilitated the second scheme to misleadingly offer and solicit sales of BAYC NFTs via the MoonPay platform.

Defendant Soto-Wright

263.    On April 13, 2022, Defendant Soto-Wright touted his involvement in Hollywood, stating "Hollywood is using smart contracts and blockchain technology to assert their creative intellectual property rights."  Soto-Wright continued, stating that "Major global sports franchises have used digital tokens and NFT collectibles to transform fan engagement.  And recording artists are beginning to explore how NFTs

1  can give them more control over royalty rights.  These are the underpinnings of a

2  creator economy renaissance."

3      264.  On April 28, 2022, following the partnership with Defendant Soto-

4  Wright and MoonPay, FaZe Clan co-founder FaZe Banks heavily promoted

5  investment into Yuga Financial Products.  While in Los Angeles, and pursuant to the

6  promotional agreement with MoonPay and Soto-Wright, Banks told his followers

7  that, "I'm praying and hoping that on the 30th this karma boomerang smacks this

8  d**k with this BAYC Otherside land sale.  Again I have $1,000,000 set aside

9  specifically to dump into this.  Unsure if that'll even be possible, but will be investing

10  as much as I can . . . .  This play is truly the most obvious bulletproof play there's

11  ever been in Web3."  Banks continued to promote the Yuga Financial Products,

12  stating, "Historically if you've ever had the opportunity to not only mint BAYC

13  product, but get in anywhere remotely close to mint you're probably rich if you

14  weren't already.  Also, it's only ever been a poor decision to sell anything Yuga has

15  dropped.  Sellers have only ever been punished."  "People will undersell this, jump

16  on this opportunity," he added.  "It is reasonable to expect a 10x gain on mint.

17  Conservatively . . . .  This could be a life-changing play for me."

18      265.  In the midst of the celebrity promotions like those described above,

19  Defendant Soto-Wright conducted a written interview with media outlet, *The Block*.

20  Soto-Wright falsely described the creation of the Concierge service as spreading via

21  word of mouth, stating: "So I helped one artist figure it out.  They told another who

22  then asked for help.  Word started to spread."  Soto-Wright later falsely described it

23  as an accident, stating "A really happy accident I'd say.  100% organic."

24      266.  When asked to confirm whether celebrities were not paid to promote

25  MoonPay, Soto-Wright demurred, vaguely stating: "Everyone that uses MoonPay

26  Concierge has a commercial relationship with the company in the sense that this is a

27  commercial service we offer our clients.  We provide the support and then we invoice

28  for services rendered."  In a follow-up to a question on what fees are charged to

1  concierge clients, Soto-Wright even more vaguely responded that "[w]e're focused
2  on delivering value to our clients.  And I think our growing list of MoonPay concierge
3  clients agrees."

4  **4.**      **ApeCoin DAO Defendants**

5      267.    As part of the announcement about the formation of the ApeDAO and
6  Ape Foundation, Defendant Ohanian stated: "Today we're making the 'Club' bigger
7  with ApeCoin . . . .  Web3 is being integrated into our art, music, and culture more
8  and more everyday and it all starts with community.  I believe this community will
9  build, expand, partner, and disrupt in a massive way."

10      268.    Plaintiffs saw the promotions from Defendant Ohanian regarding the
11  Company's collection of BAYC NFTs and were induced to purchase and/or continue
12  to hold Yuga securities as a result of these misleading promotions.

13      269.    Defendant Wu posted a picture of an BAYC NFT with the following
14  thread on her official Twitter account: "So honored to join the @apecoin DAO board,
15  launched today along with the $APE token."  "Love or hate NFTs, they have captured
16  the consumer imagination and continue to be on the onboarding ramp for the
17  mainstream into web3.  @BoredApeYC is leading the way as the #1 NFT brand,
18  becoming a household name and building the next gen 'Disney' of our generation."
19  "@BoredApeYC has led innovation on IP frameworks, like giving NFT holders full
20  commercial rights to their IP without a royalty.  This has accelerated awareness rather
21  than leaked value."    "More NFT brands are being minted, creating hybrid
22  entertainment and retail empires, licensing their IP and creating 1st and 3rd party
23  merchandise, games, shows, etc. and using hybrid web2/web3 marketing playbooks,
24  leveraging and creating celebrity, and creating culture."  "I'm absolutely honored to
25  play a supporting role with @FTX_Official in the future of @ApeCoin DAO at the
26  nexus of culture, gaming, entertainment. LFG!  🚀 🚀 🐵."

27      270.    Wu also touted Yuga Financial Products as "long term" investments.
28  For example, on May 12, 2022, Wu, replying to the May 11, 2022 promotion of

Yuga's metaverse on the official @OthersideMeta Twitter account, touted the long-term viability and growth prospects for the BAYC metaverse: "Step 1 open world lobby, step 2 game studios building player experiences in game, step 3 #BAYC metaverse.  Roblox was founded 18 yrs ago.  ***Bullish for the long-term here with this @yugalabs team!*** 🦍 🦍 🚀 ." [Emphasis added.]

271.    On January 2, 2022, ApeDAO Board Defendant Bajwa promoted the growth of Yuga Financial Products to investors, stating that celebrity rapper "@Eminem purchased a @BoredApeYC NFT for 123.45 ETH" and touted that the MAYC NFTs "saw $71M in trading volumes the last week."

**C. The ApeCoin Token Sale and Otherside Virtual Land Sale**

272.    As investor interest in the BAYC NFTs and broader ecosystem was reaching a fevered pitch, Yuga and Executive Defendants Aronow, Solano, Muniz, Shoemaker, and Ehrlund launched the ApeCoin token ("APE").

273.    Yuga and the Executive Defendants announced it would be launching the ApeCoin token on October 8, 2021, via a Twitter post.  At the time, it was not yet named.  Yuga's announcement starts, "Good evening, apes.  Been hearing a question around the club a lot: WEN TOKEN?  Wen token indeed . . . .  Some thoughts below."  Yuga's announcement further discusses that Yuga must "construct a legally compliant token and set it up in a responsible, sustainable way."  Yuga also mentions the token is meant to "benefit our club members, and bring the BAYC ecosystem to a much wider audience."  Yuga represented it would launch the token "in a sound way."  Yuga finally links the coming ApeCoin directly to Bored Ape Yacht Club and Yuga itself, saying that, "if info [about the ApeCoin] doesn't come from our official @BoredApeYC or @yugalabs Twitter, it's not us."

274.    Defendants enriched themselves and other insiders with billions of dollars of APE Coins.  Eighty million APE (8%) went to the BAYC founders, including Defendants Solano and Aronow.  One hundred fifty million APE (15%) went to the Company.  One hundred forty million APE (14%) went to "launch

contributors" made up of Company partners and investors. One hundred fifty million APE (15%) went to holders of the BAYC and MAYC NFTs. The remaining 470 million APE (47%) went to the ApeCoin DAO treasury, over which Defendants Solano and Aronow, the Company, and their investors and partners maintain considerable influence through the voting rights granted by their hundreds of millions of ApeCoins.

275. Much like a stock issuance, Defendants thus issued themselves exorbitant amounts of ApeCoin that would grant themselves voting rights to influence and control any decision surrounding ApeCoin. In addition, Defendants, through the Company, the ApeDAO, and the Ape Foundation (the ApeCoin DAO's Board), would promote, market, and sell the token.

276. ApeCoin reached an all-time high of over $26 before plummeting to approximately $1.77 per coin in August 2023. The Company, its founders, and its investors' allotment of 230 million total ApeCoins they issued to themselves were thus worth about $6 billion at ApeCoin's all-time high, and are currently still worth more than $410 million, even with prices reaching an all-time low in August 2023.

277. In an attempt to shield the Company executives from liability related to the solicitation and sale of the unregistered securities, Oseary and Yuga's outside legal counsel formed the ApeCoin DAO, in conjunction with the Ape Foundation. The ApeCoin DAO's board or "Special Council," which consisted of ApeDAO Board Defendants Alexis Ohanian, Amy Wu, Maaria Bajwa, and non-Defendants Yat Siu and Dean Steinbeck, who governed and controlled both the DAO and the Foundation. Executive Defendants and ApeDAO Defendants used their influence and ApeCoin voting rights to pay themselves exorbitant salaries of over $20,000 per month using the 470 million ApeCoin in the ApeDAO treasury to further cash in on their scheme at the expense of retail investors.

278. Put another way, Oseary—with the assistance of the Executive Defendants and ApeDAO Board Defendants—created the Ape Foundation and

1    ApeDAO Board in order to maintain the "veneer of plausible deniability – an
2    independent entity allocating tokens to a company and its founders, rather than that
3    company and its founders pumping their own investments."

4    279.   But according to a July 25, 2022 article, "What is ApeCoin and Who is
5    Behind This Cryptocurrency?," it is the Company (not the Foundation, DAO, or its
6    board) that is "responsible for all major projects and acquisitions related to the Bored
7    Ape Yacht Club family.  If you want to do something with the intellectual property
8    of the collection, you have to go through the company."  Within that article, Muniz
9    is quoted as having plans to "adopt ApeCoin as the primary currency for all new
10   products and services," which, as the article notes, "ties the asset's value to the
11   success of the Bored Ape collection as one all."

12   280.   Yuga and Executive Defendants' attempts to distance themselves from
13   the issuance of the ApeCoin was nothing more than a façade.  Indeed, the so-called
14   Ape Foundation and ApeCoin DAO were, in truth, just alter egos for the Company
15   and used as a front for the Company to obscure its and the Executive Defendants'
16   role as statutory sellers and solicitors of unregistered securities, namely, ApeCoin.
17   Despite Yuga and Executive Defendants' efforts to use shallow legal schemes to
18   shield themselves from liability for issuing the ApeCoin securities, Yuga admitted
19   publicly, as early as October 2021, that it would be responsible for the development
20   and issuance of the ApeCoin token.

21   281.  On March 16, 2022, ApeDAO Board Defendants announced the
22   impending launch of ApeCoin, releasing the following statements on the verified
23   ApeCoin Twitter account, which, upon information and belief, is owned/controlled
24   by ApeDAO Board Defendants:

25   • "Introducing ApeCoin ($APE), a token for culture, gaming, and
26      commerce used to empower a decentralized community building at the
27      forefront of web3."

28

- "ApeCoin is owned and operated by the ApeCoin DAO, a decentralized organization where each token holder gets to vote on governance and use of the Ecosystem Fund.  Holding ApeCoin is the only requirement for membership in the ApeCoin DAO."

- "The DAO is supported by Ape Foundation, which was created to act as the legal steward of ApeCoin and administer the decisions made by the ApeCoin DAO community.  (Basically someone needs to sign the checks.)"

- "62% of the total supply of ApeCoin is allocated to the ApeCoin community, a portion of which (15% of total supply) will be available to claim starting tomorrow at 8:30 am ET."

- "The airdrop claim consisting of 15% of the total supply of ApeCoin will be made available to @BoredApeYC NFT holders (Bored Apes and Mutant Apes, as well as #BAKC dogs paired with either #BAYC or #MAYC)."

- "***For everyone else who wants to ape in: ApeCoin will be available to all and is expected to begin trading on major crypto exchanges ASAP***. We'll tweet as that happens!"

282.    On that same day, Yuga's official Twitter proclaimed: "We're excited to announce we're adopting ApeCoin as the primary token for the Bored Ape Yacht Club ecosystem as well as future products and services."  Yuga coordinated ApeCoin's adoption by various influencers and brands and highlighted that adoption on its Twitter page.

283.    Yuga advertised that ApeCoin would be the ecosystem's governance token, allowing ApeCoin holders to participate in the ApeCoin DAO by voting "on how the Ecosystem Fund will be distributed by the APE Foundation to promote a diverse and self-sustaining ecosystem."

284.    Yuga also advertised that ApeCoin would also provide "access to certain parts of the ecosystem that are otherwise unavailable, such as exclusive games, merch, events, and services."

285.    That same day, March 17, 2022, the ApeCoin Twitter account (which was controlled by ApeDAO Defendants Ohanian, Wu, and Bajwa) promoted a Twitter Space hosted by Yuga-affiliate Farokh and featuring each of the ApeDAO Defendants who solicited purchases of ApeCoin during this event.

286.    According to the Yuga Labs Pitch Deck that, upon information and belief, was used to secure the funding for Yuga, the Company and the Executive Defendants had made staggering profits off of the sales of the Yuga Financial Products in 2021, and the focus for 2022 would be on the Company's entrance to the metaverse and online gaming.

287.    The Yuga Labs Pitch Deck signaled the importance of the celebrity endorsements, bragging that "[c]elebrities are buying Apes to signal that they know what's up."  The Yuga Labs Pitch Deck also introduced ApeCoin, stating "APECoin will be the currency of our metaverse.  One unifying coin with which to power our app store like marketplace."

288.    Yuga planned for the Otherside MetaRPG to launch with a land sale. These virtual plots of land would purportedly "corresponded to real land" in the Yuga game.  In order to increase demand for its ApeCoin token, Yuga announced that these virtual plots of land could be purchased only with ApeCoin tokens.

289.    The Yuga Labs Pitch Deck stated:

- The MetaRPG will be made up of 200k land plots total; all launched through Animoca.
- Genesis drop will be 100k plots.
    - 30% of that will go to BAYC/MAYC, leaving ~70k for public sale (and then another 100k in follow up drop).

1                ○   The conservative estimate for the land price is 1

2                    ETH each plot = $200M in primary sales for the

3                    genesis drop alone.

4      290.   The Yuga Pitch Deck also provided the following income statement:



| Income Statement | | $ IN MILLIONS |
| --- | --- | --- |
| | Budget 2022 | Actual 2021 |
| Total Revenue | $ 539.30 | $ 137.58 |
| Cost of Goods Sold | 6.49 | 6.23 |
| Gross Profit | $ 532.81 | $ 131.35 |
| Profit % | 98.8% | 95.5% |
| Expense | | |
| Advertising and Community Building | 15.25 | 2.03 |
| Product and Technology | 37.06 | 0.19 |
| Payroll and Benefits | 17.10 | 0.06 |
| Legal and Professional | 3.20 | 0.64 |
| Other Expenses | 5.00 | 1.32 |
| Total Expense | $ 77.61 | $4.24 |
| Net Revenue | $ 455.20 | $ 127.11 |
| Net Revenue % | 84.4% | 92.4% |

291. Notably, Yuga's expenses for "Advertising and Community Building" in 2021 were $2,030,000, whereas the budget for 2022 was $15,250,000. This massive 650% increase in expenditures for promotions occurred around the same time that Defendant Oseary joined the Company as a minority partner and would be funded by pooling funds generated by investors' purchases and Yuga's sale of ApeCoin and Otherside virtual land deeds.

292. ApeCoin is promoted as the main currency of the BAYC ecosystem and its sales exploded as a result of Defendants' promotional efforts.

293. After just one day of trading, the Ethereum-based ApeCoin had a market capitalization of almost $2 billion.

294. Yuga's NFT and ApeCoin schemes positioned it to raise capital and launch another financial product: so-called virtual land NFTs or Otherdeeds. Yuga generated additional investment and interest in its NFTs and ApeCoin by advertising, in its Otherdeeds promotions, that Yuga NFTs would be integrated into the Otherland ecosystem and that ApeCoin was both a currency that could be used to buy and sell

THIRD AMENDED CLASS ACTION COMPLAINT - CASE NO. 2:22-cv-08909-FMO-PLA

other goods and services in the Otherland ecosystem and was the only way to buy Otherdeeds NFTs.

295.    Specifically, on March 22, 2022, the Company announced that it closed its Series Seed funding round, led by a host of venture capital firms that had direct ties to Yuga, including, but not limited to, Andreessen Horowitz's a16z crypto fund (Defendant Lyons), Sound Ventures (Defendant Oseary), SevenSevenSix (Defendant Ohanian), Lightspeed Ventures (Defendant Wu formerly served as a Lightspeed Ventures partner before leaving to join FTX Ventures), and FTX Ventures (Defendant Wu served as the web3 investment leader before stepping down from both FTX Ventures and the ApeDAO Board within days of the FTX collapse).  Yuga brought in another $450 million during this round.  The announcement also promoted its metaverse virtual land project, Otherside.

296.    The announcement contained the following statements from Defendants Muniz, Lyons, and Oseary, respectively:

> "Already, a new economy is possible with the IP of Apes, Punks, and Meebits, owned by the community," said Nicole Muniz, CEO of Yuga Labs.  "The possibilities for blockchain's impact on culture are endless, and so we are building a beautiful, interoperable world for people to explore and play in.  There's a lot to come."

> "Yuga Labs has quickly become a web3 culture, gaming, and entertainment empire," said Chris Lyons, general partner at a16z crypto.  "Mainstream adoption in web3 is accelerating at lightning speed, and Yuga is at the forefront of merging culture and innovation for everyone to enter the metaverse.  We're thrilled to invest in this brilliant team and their vision, and help forge the next frontier of community-owned entertainment."

> "This capital will give Yuga speed to market on many things underway, and bring in new partners with strategic thinking that share the vision," said Yuga Labs partner Guy Oseary.

297.    On March 27, 2022, Defendant Ohanian promoted ApeCoin tokens and the Bored Ape Yacht Club brand in the 2022 Academy Awards show, posting a picture of an ApeCoin cufflink and the following text: "#OSCARS2022 MUST-HAVE RED CARPET ACCESSORY @BOREDAPEYACHTCLUB."   Ohanian

posted pictures of himself and Serena Williams on the red carpet at the Oscars and close up pictures of his ApeCoin cufflinks.

298.  On April 26, 2022, Defendant Oseary submitted a proposal to the ApeDAO titled: "AIP Idea: Guy Oseary as ApeCoin Representative," which essentially requested that Oseary be given up to 1% of the Ecosystem Fund as a slush fund for him to "utilize on behalf of the APE Foundation." The proposal disclosed, in relevant part, that the unfettered slush fund would allow Oseary to "discreetly" recruit celebrity promotors and use the ApeCoin allocation as their payments. Further, Oseary admitted that such strategic partnerships were entered into because they provided a higher "ROI" (i.e., a return on investment) for Yuga and its investors. In other words, Oseary acknowledged that Yuga's digital assets were investments, and he was proposing to increase its value by hiring promoters that would generate sales in excess of cost for the promotions. Oseary stated that discreetly paying promoters to market the Yuga digital assets would be financially beneficial for Yuga investors as it would result in a higher return on that investment. Oseary also touted his own successful business ventures, and acknowledged that he was a contributor to the ApeCoin launch and was "incentivized" to make the enterprise a success.

299.  On April 30, 2022, a few days after the Adidas Phase 2 promotion and Oseary's ApeDAO proposal, the Company minted the virtual land for its Otherside metaverse. Within 24 hours, Yuga, Oseary, the Executive Defendants, and the ApeDAO Board Defendants generated more than $561 million from Otherside's "Otherdeed" NFT sales. Each Otherdeed NFT was promoted to potential investors as the "key to claiming land" in Otherside and its metaverse game. Further, Defendants promoted ApeCoin as the sole means to acquire the Otherdeed NFTs and claim the purportedly undervalued virtual land deed.

300.  Some 55,000 NFTs were minted at 305 APE each, which means each Otherdeed cost about $5,800 given ApeCoin's price (approximately $19) at time of mint. Yuga raked in over $318.7 million from this mint alone. Because the

1    Otherdeed NFTs could be purchased only with APE, the mint also generated

2    substantial demand for the APE Token, which Defendants continued to sell to the

3    public at inflated prices.

4    301.  On July 16, 2022, Yuga published a "Litepaper" describing the

5    Otherside metaverse project.  The Litepaper acknowledged that nearly all significant

6    functionalities had not yet been developed and that purchases of Otherside land would

7    thus need to rely on Yuga's efforts to develop and maintain the promoted metaverse.

8    302.  On September 7, 2022, the Ape Foundation announced that it was

9    seeking a three-month extension for the ApeDAO Board Defendants' six-month

10    inaugural term.  In the letter to the "ApeCoin Community," the Ape Foundation stated

11    that "the community hasn't submitted any viable AIPs specifying what this handover

12    looks like, who might take over, or how we might conduct an election.  This suggests

13    the original election specifications were ambiguous."  Accordingly, the Ape

14    Foundation proposed to extend the term, claiming that keeping the ApeDAO Board

15    Defendants in their positions would "provide continuity and stability: the Foundation

16    doesn't just execute what the community wants – it makes sure we are compliant with

17    legal and regulatory requirements and guidance so we can operate effectively."  The

18    letter proposal concluded by directing investors with questions to speak with

19    ApeDAO Board Defendant Bajwa.

20    303.  That same day, Defendant Wu posted the following message on her

21    Twitter account: "Grateful for a dynamic 6 month serving on the first @apecoin DAO

22    Special Council!  We are asking the community for an extension of 3 months to focus

23    on ironing out a first election process that balances continuity, fairness, and

24    transparency."  Wu's post linked to "AIP-113: Extending AIP-1 – the DAO Process,"

25    which "propose[d] a three-month extension of the terms laid out in AIP-1 to (1)

26    provide time for the development of a proper and thorough Ape Foundation election

27    framework and process; (2) allow the community to better understand and ultimately

28

1  engage with whatever process emerges; and (3) enable the DAO to continue

2  functioning coherently beyond September 30."

3  304.  On November 11, 2022, Defendant Wu resigned from her position as

4  the leader of FTX's investment arm following the revelations that FTX executives

5  had been improperly commingling investor assets and receiving personal loans from

6  the FTX hedge fund, Alameda Research.  Replacement CEO John Ray III (known as

7  the person brought in to clean up the Enron bankruptcy), in a filing with the Delaware

8  bankruptcy court, stated the following regarding FTX's Lehman Brothers-style

9  collapse that occurred during Wu's tenure:

10      Never in my career have I seen such a complete failure of
11  corporate controls and such a complete absence of trustworthy financial
    information as occurred here . . .  From compromised systems integrity
    and faulty regulatory oversight abroad, to the concentration of control
12      in the hands of a very small group of inexperienced, unsophisticated
    and potentially compromised individuals, this situation is
13      unprecedented.

14  305.  Wu was a senior executive at FTX during the time it suffered from an

15  "unprecedented and complete failure of corporate controls."  Eight days after

16  resigning from FTX, on November 19, 2022, Wu announced that she would not

17  continue to serve as an ApeDAO Board member after the expiration of her one-year

18  term in December 2022.  The announcement further disclosed that Defendant Bajwa

19  and board member Dean Steinbeck also resigned from the ApeDAO Board under

20  the same terms.

21  306.  Another way that Yuga Labs promoted sales of its BAYC NFT

22  collection and ApeCoin tokens was through films.  On April 11, 2022, Yuga

23  announced that the Company and Coinbase would be collaborating to produce a

24  three-part movie series, the "Degen Trilogy," to promote BAYC and ApeCoin.  The

25  first installment was released in June 2022 at the 4th annual "NFT.NYC" event.  The

26  Company later published this first part of the trilogy on YouTube on July 26, 2022.

27              *    *    *

28

307.   Ultimately, as one marketing report noted, the BAYC NFT collection (and Yuga itself) "would have never become so popular if it wasn't for its aggressive and engaging social media marketing strategies, particularly on Twitter."

**D.    Other Manipulations of the Price and Market for Yuga Financial Products**

308.   Like the cryptocurrency industry, the NFT industry is plagued by illicit trading activity.  Wash trading, or transactions in which a seller is on both sides of the trade in order to paint a misleading picture of an asset's value and liquidity, is a particular area of concern for NFTs.  Throughout the Class Period, this practice was especially easy with NFTs, including the Yuga NFTs, as many NFT trading platforms allowed users to trade by simply connecting their various wallets to the platform, with no need to demonstrate arm's length transactions.

309.   "Circular Trades" are well-known techniques used by wash traders, in which the same wallets repeatedly buy and sell the same or different NFTs.  The process involves the transfer of funds between two wallets to create fake trading volume, making it appear as if the NFT is being actively traded.  Circular trading undermines the integrity of the market by creating false demand, misleading investors and affecting the prices.

310.   In the "Seller Funded" washing trading pattern, the seller provides funds to facilitate the sale of the NFT in the marketplace.  The fake transactions in Seller Funded wash trading inflates the volume and the price of the NFT artificially.  The illusion of high demand drives up the price, especially when the purported purchaser is a celebrity or influential taste maker.

311.   "Outlier transactions" are another form of wash trades.  Outlier transactions occur when parties trade at highly inflated prices outside of the overall pattern of trades.  Outlier transactions can significantly deviate the average value of prices paid for an NFT, especially if it was a supposed celebrity purchase.

312. Through these methods, pervasive wash trading has artificially inflated the price and volume of the Yuga NFTs. BAYC #8099, for example, exhibits signs of wash trading.[13] Researchers found that related wallets significantly increased the price from $95,000 to $166,000 in transactions between them, before selling the artificially inflated priced NFT into the market. These inflated transactions affect volume figures and sales averages and create a misleading picture for investors about the popularity of the NFT collections.

313. The wash trading problem in the NFT industry has been extensively studied by researchers and blockchain companies. Researchers with MIT and Columbia University, for example, put out a research paper entitled NFT Wash Trading Detection.[14] In addition to BAYC NFT #8099, the researchers specifically identified BAYC NFTs #6946, 1332, 8498, 5862, and 8259 as having their price increased due to wash sales cycles. Even when using conservative detection techniques, researchers flagged 72 wash sales cycles for BAYC NFTs, 52 wash sale cycles for Mutant Apes, and 29 wash sales cycles for Otherdeeds.

314. Likewise, Zash, a company that launched a "Wash Trading Detection Service" also identified BAYC NFT #3221 has exhibiting signs of wash trading.[15] Furthermore, the Zash article highlights BAYC NFTs #947, 1763, 8739, and 3738 as exhibiting wash trading identifiers. Zash found that for BAYC NFTs #3221 and 8738, over 60% of transactions were identified as suspected wash trades. Likewise, the trading volume from suspected wash traded BAYC NFTs accounted for 96-99% of all trading volume associated with those NFTs.

---

[13] On the Mark Data, *Using Network Graphs to Visualize Potential Fraud on Ethereum Blockchain*, MEDIUM (Dec. 20, 2022), https://onthemarkdata.medium.com/using-network-graphs-to-visualize-potential-fraud-on-ethereum-blockchain-1d8cc0ad361d.

[14] Derek Liu, et al., *NFT Wash Trading Detection*, MIT AND COLUMBIA UNIV. (Feb. 7, 2023), https://arxiv.org/pdf/2305.01543.pdf.

[15] *Zash Launches 'Wash Trading Detection Service*,' COINMARKETCAP (Dec. 22, 2022), https://coinmarketcap.com/community/articles/63a509afd16ae879abc15cb8/.

THIRD AMENDED CLASS ACTION COMPLAINT - CASE NO. 2:22-CV-08909-FMO-PLA

315.    Zash also found that, for 30 days on the OpenSea platform, over 5% of the Mutant Ape NFT trading volume was from suspected wash trades.

316.    Moreover, according to a report issued by *CoinTelegraph Research* entitled "bitsCrunch NFT Wash Trade Report for 2022," Yuga's Otherdeeds NFT collection was ranked as a Top 10 collection of 2022 by number of wash traded NFTs.

317.    These manipulative techniques, and more, were also used by MoonPay and Ivan Soto-Wright as part of their orchestrated pump of the price of the Yuga Financial Products.

318.    MoonPay as a company, and Soto-Wright personally, traded in Yuga NFTs while having material non-public information about the celebrity endorsement deals and the sources of the funds used for these purchases.

319.    Soto-Wright made these purchases through his "IvanHodl.eth" Wallet, at Ethereum wallet address 0x695626A661831A618ae846482FE8abF6c8d4529C (also referred to as the "Soto-Wright Wallet"). The IvanHodl wallet was funded by the Moonpay.eth wallet as well as by the Ethereum wallet address 0x7AFC12C8DD2e6591581D95586eB2c2A4905a12a9 (the "Funding Wallet").

320.    The Moonpay.eth wallet was funded by the Funding Wallet, as well as wallets associated with Binance and FTX. Wallets associated with FTX provided millions of dollars' worth of ETH during the Class Period, much of which was used in the various transactions identified below that were effectuated to artificially inflate the price and trading volume of Yuga NFTs.

321.    To begin, on August 30, 2021, Ivan Soto-Wright used the Soto-Wright Wallet to purchase Mutant Ape NFT #3016 for 9.899 ETH ($31,958.53), a price far exceeding the floor price, which was around 5 ETH at the time ($13,300). Mutant Apes NFTs were first released two days prior, on August 28, 2021.

322.    On September 18, 2021, Soto-Wright used the Soto-Wright Wallet to purchase BAYC NFT #8410 for 45 ETH ($154,609.20), a price far above the floor price. The then-present floor price was approximately 35 ETH ($119,000).

THIRD AMENDED CLASS ACTION COMPLAINT - CASE NO. 2:22-CV-08909-FMO-PLA

323.    On September 24, 2021, Soto-Wright used the Soto-Wright Wallet to purchase two BAKC NFTs, BAKC NFT #8386 at 13 ETH ($38,101.18) and BAKC NFT #119 at 3.18 ETH ($9,320.13), each above the floor price, with the 13 ETH purchase being approximately 4.5 times the then-present floor price of 2.85 ETH.

324.    On October 5, 2021, Soto-Wright used the Soto-Wright Wallet to purchase a BAYC NFT #2589 for 65 ETH ($228,545.85), when the floor price was 38.5 ETH ($130,395.65).

325.    On October 25, 2021, Soto-Wright used the Soto-Wright Wallet to purchase a BAYC NFT #1554 for 35.97 ETH ($147,582), which was above the floor price.

326.    On October 27, 2021, MoonPay, through its MoonPay Wallet, purchased a BAYC NFT #129 above the floor price.  The next day, MoonPay transferred BAYC NFT #129 to Lil Baby, a hip hop star that was part of MoonPay's Series A funding round.

327.    On November 8, 2021, MoonPay purchased a BAYC NFT #599 for 46.6 ETH, far exceeding the floor price of 30 ETH.  Less than ten minutes later, MoonPay transferred BAYC NFT #599 to Jimmy Fallon.

328.    On November 11, 2021, MoonPay purchased a BAYC NFT #5384 for 54 ETH, far exceeding the floor price of 30 ETH.

329.    On November 15, 2021, MoonPay purchased a MAYC NFT #1315 above the floor price.

330.    Also on November 15, 2021, at approximately 7:34 PM, MoonPay purchased a BAYC NFT for 250 ETH, a price that was many multiplies of the floor price.  Thereafter at 8:27pm, MoonPay purchased a BAYC NFT at 50 ETH, which was also significantly higher than the floor price.  Two minutes later at 8:29 PM, MoonPay purchased a BAYC NFT for 55 ETH.  Three minutes later at 8:32 PM, MoonPay purchased a BAYC NFT for 45 ETH.  One minute later at 8:33 PM, MoonPay purchased a BAYC NFT for 50 ETH.  At 8:51 PM, MoonPay purchased a

1    BAYC NFT for 44.9 ETH.  Finally, at 8:53 PM, MoonPay purchased a BAYC NFT

2    for 48.88 ETH.  Each of these transactions were significantly above the then-current

3    floor price.  The floor price of BAYC NFTs rose dramatically in the wake of these

4    manipulative trades, rising from 30 ETH on November 13, 2021 to around 39 ETH

5    on November 16, 2021.

6        331.   On November 18, 2021, MoonPay purchased a BAYC NFT #9883 for

7    60 ETH.  The price floor went from 39 ETH on November 16, 2021 to 49 ETH on

8    November 19, 2021.

9        332.   On November 26, 2021, MoonPay purchased a BAYC NFT #2263 for

10   69 ETH, far exceeding the floor price of 43.7 ETH.

11       333.   On November 27, 2021, MoonPay purchased a BAYC NFT #7380 for

12   55.5 ETH, again significantly higher than the 43.7 ETH floor price.

13       334.   On December 3, 2021, MoonPay purchased a BAYC NFT #2759 for 70

14   ETH, far above the floor price of 49 ETH.

15       335.   On December 7, 2021, MoonPay purchased one BAYC NFT #6723,

16   MAYC NFT ##23446 and 23447, and BAKC NFT #894 for 85 ETH.  This purchase

17   was far above what would have been a combined floor price of approximately 63.53

18   ETH for the four Yuga NFTs.

19       336.   On December 23, 2021, MoonPay purchased a BAYCNFT #6958 for

20   54.44 ETH, far above the price floor of 49 ETH.

21       337.   On January 1, 2022, MoonPay purchased a BAYCNFT for 65.2 ETH,

22   significantly above the price floor of 58 ETH.

23       338.   On January 6, 2022, MoonPay purchased a MAYC NFT for 18.95 ETH,

24   far exceeding the floor price of 14 ETH.

25       339.   On January 7, 2022, MoonPay purchased a MAYC NFT for 19.4 ETH,

26   significantly above the floor price of approximately 14 ETH.

27       340.   On January 9, 2022, MoonPay purchased a BAYCNFT for 79.5 ETH,

28   far exceeding the floor price of 67 ETH.

1    341.   On January 11, 2022, MoonPay purchased a BAYC NFT for 80 ETH,
2    far exceeding the floor price of 67 ETH.  Less than 15 seconds later, MoonPay
3    purchased a BAYC NFT for 90 ETH, again far exceeding the 67 ETH floor price.

4    342.   On January 14, 2022, MoonPay purchased a BAYC NFT for 79 ETH,
5    far exceeding the 74 ETH floor price.  Later that day, MoonPay made a purchase of
6    a BAYC NFT for 111 ETH, once again significantly exceeding the 74 ETH floor
7    price.

8    343.   To make all of these purchases, as noted above, the Moonpay.eth wallet
9    was being funded by the Funding Wallet, as well as wallets associated with FTX and
10    Binance.  On January 21, 2022, in two transactions, an FTX wallet sent 647 ETH and
11    249 ETH to the Moonpay.eth wallet address.

12    344.   On January 22, 2022, MoonPay made a purchase of a BAYC NFT for
13    119 ETH, far exceeding the floor price of 83 ETH.

14    345.   On January 24, 2022, MoonPay made a purchase of a BAYC NFT for
15    93.69 ETH, far exceeding the floor price of 83 ETH.

16    346.   On January 26, 2022, MoonPay made a purchase of a BAYC NFT for
17    105 ETH, far exceeding the floor price of 83 ETH.

18    347.   On February 9, 2022, MoonPay purchased a BAYC NFT for 100 ETH,
19    which exceeded the floor price.  Also on February 9, 2022, MoonPay received 124
20    ETH from the Binance wallet.

21    348.   On February 11, 2022, MoonPay received 250 ETH from the FTX
22    wallet.  Thereafter on February 13, 2022, MoonPay received approximately 300 ETH
23    from the FTX wallet in three transactions.

24    349.   On February 16, 2022, MoonPay purchased a BAYC NFT for 105 ETH,
25    far exceeding the floor price of 97 ETH.  On February 17, 2022, MoonPay received
26    250 ETH from the FTX wallet.

27
28

350.   On February 18, 2022, MoonPay won an auction to buy a BAYC NFT for 200 WETH ("wrapped" eth), which far exceeded the price floor of approximately 97 ETH.

351.   On February 22, 2022, MoonPay made a purchase of a BAYC NFT for 120 ETH, significantly above the floor price of 89 ETH.  Also on February 22, 2022, MoonPay received 100 ETH from the FTX wallet.

352.   On February 23, 2022, MoonPay made a purchase of a BAYC NFT for 95 ETH, far exceeding the floor price of 89 ETH.  Also on February 23, 2022, MoonPay received 99 ETH from the FTX wallet.

353.   On February 25, 2022, MoonPay purchased a BAYC NFT for 569 ETH, approximately $1.5 million, which was many multiples of the then-current floor price of 89 ETH.  Also on February 25, 2022, MoonPay received 550 ETH from the FTX wallet.

354.   On March 2, 2022, MoonPay purchased a BAYC NFT for 112.5 ETH, significantly above the floor price of 82 ETH.  Also on March 2, 2022, MoonPay received 192 ETH from the Binance wallet.

355.   On March 8, 2022, MoonPay received 75 ETH from the FTX wallet.

356.   On March 9, 2022, MoonPay purchased a BAYC NFT for 86.9 ETH, far exceeding the floor price of 65 ETH.  Less than 20 minutes later, MoonPay purchased another BAYC NFT significantly above the floor price for 77 ETH.  Also on March 9, 2022, MoonPay received 160 ETH from the FTX wallet.

357.   On March 10, 2022, MoonPay received 284 ETH in two transactions from the FTX wallet.  On March 11, 2022, MoonPay received 150 ETH from the FTX wallet.

358.   On March 13, 2022, MoonPay purchased a BAYC NFT for 100 ETH, significantly above the floor price of 70 ETH.

359.   On March 14, 2022, MoonPay purchased a BAYC NFT for 180 ETH, a price far exceeding the floor price of 88.16 ETH.  The floor price rose from 70 ETH

on March 13, 2022 to 88 ETH on March 16, 2022.  Also on March 14, 2022, MoonPay received 125 ETH from the FTX wallet.

360.   On March 15, 2022, MoonPay received 88 ETH from the FTX wallet. On March 16, 2022, MoonPay received 12 ETH from the FTX wallet.

361.   On March 17, 2022, MoonPay purchased three BAYC NFTs in the span of a minute.  These purchases, at 106.9 ETH, 108 ETH, and 108.4 ETH, were all significantly above the floor price of approximately 88 ETH.  Also on March 17, 2022, MoonPay received 322 ETH from the FTX wallet.

362.   On March 21, 2022, MoonPay made a purchase of a BAYC NFT for 110 ETH, far exceeding the floor price of 77 ETH.  Also on March 21, 2022, MoonPay received 110 ETH from the FTX wallet.

363.   On March 23, 2022, MoonPay received 115 ETH from the FTX wallet. On March 29, 2022, MoonPay received 217 ETH from the FTX wallet.  On April 2, 2022, MoonPay received 42 ETH from the FTX wallet in two transactions.  On April 3, 2022, MoonPay received 6.9 ETH from the FTX wallet.  On April 5, 2022, MoonPay received 200 ETH from the FTX wallet.

364.   On April 6, 2022, MoonPay purchased a BAYC NFT for 195 ETH, a price significantly higher than the floor price of 107 ETH.  Also on April 6, 2022, MoonPay received 194 ETH from the FTX wallet.

365.   On April 9, 2022, MoonPay made a purchase of a BAYC NFT for 130 ETH, far exceeding the floor price of 105 ETH.

366.   On April 17, 2022, MoonPay made a purchase of a BAYC NFT for 130 ETH, far exceeding the floor price of 101 ETH.  Also on April 17, 2022, MoonPay received 130 ETH from the FTX wallet.

367.   On April 20, 2022, MoonPay made a purchase of a BAYC NFT for 155 ETH, significantly higher than the floor price of approximately 101 ETH.  Also on April 20, 2022, MoonPay received 155 ETH from the FTX wallet.

368.   On April 22, 2022, MoonPay made a purchase of a BAYC NFT for 129.99 ETH, significantly exceeding the floor price of approximately 108 ETH.

369.   On April 23, 2022, MoonPay received 45 ETH from the FTX wallet.

370.   On April 25, 2022, Soto-Wright received one Otherside Land NFT as part of a mint of 360 Otherside NFTs.  This insider mint was five days before the public mint on April 30, 2022.

371.   On April 30, 2022, MoonPay made a purchase of a BAYC NFT for 265 ETH, a price far exceeding the floor price of 128 ETH.  Also on April 30, 2022, MoonPay received transfers of 155 ETH and 265 ETH from the FTX wallet.

372.   On May 13, 2022, MoonPay received 100 ETH from the FTX wallet. On May 16, 2022, MoonPay received 150 ETH from FTX.

373.   On May 19, 2022, MoonPay made a purchase of a BAYC NFT for 169.69 ETH, a significantly higher price than the floor price of approximately 92 ETH.  Also on May 19, 2022, MoonPay received 97 ETH from the Binance wallet.

374.   On May 19, 2022, MoonPay made a purchase of a BAYC NFT for 97 ETH, which was again above the floor price.

375.   On June 7, 2022, MoonPay made a purchase of a BAYC NFT for 103 ETH, significantly above the floor price of around 86 ETH.  Also on June 7, 2022, MoonPay received 100 ETH from the FTX wallet.

376.   On July 5, 2022, MoonPay made a purchase of a BAYC NFT for 125 ETH, significantly above the floor price of 88.16 ETH.  Also on July 5, 2022, MoonPay received 125 ETH from the Binance wallet.

377.   MoonPay continued to receive transfers from FTX in the summer of 2022, before FTX began experiencing the liquidity issues that ultimately led to its downfall.  After receiving just 1 ETH on October 17, 2022, and just 3 ETH on October 27, 2022, the ETH transfers from FTX stopped.  Without the steady flow of liquidity from FTX, MoonPay was unable to continue to manipulate the price of the

Yuga NFTs, leading to significant drop in value and price floor among the collections.

## V.    ADDITIONAL EVIDENCE OF MANIPULATIVE ACTS

378.    Given the close relationships between Yuga and FTX, the criminal trial and sentencing of Sam Bankman-Fried has provided a unique insight into the connections between the companies and the various related entities.    Evidence submitted by the prosecution contain specific references to Yuga Labs, BAYC, the Sotheby's Auction, ApeCoin, and the Otherdeed land sale.

379.    An internal FTX/Alameda spreadsheet of projects that FTX entities invested in has a "Yuga Labs (BAYC)" entry.    The entry reflects that the investment was in Yuga equity, the status was closed, and the investment amount was $50 million.    The lead was Defendant Amy Wu.    Another entry notes that the valuation of Yuga was $4 billion.    The closing date for the investment was March 7, 2022, around the height of the celebrity promotions.

380.    The spreadsheet also has a "BAYC (Sotheby Auction)" entry.    The entry reflects an "OTC, Token" investment for $24,400,000.    The token quantity is listed at 101.    This entry is noted as "exited" with a "Latest/Exit Token Price" listed at $334,503.    The "Token P&L" entry shows a profit of over $9.3 million.    Upon information and belief, this spreadsheet memorializes the payment from FTX to Sotheby's for the "winnng bid" in the Bored Ape auction, which both Yuga and Sotheby's had misleadingly promoted as being placed by a "traditional" art buyer.

## VI.    THE DUMP – THE PRICE OF YUGA SECURITIES PLUMMETS

381.    The meteoric rise of the BAYC NFTs did not last long, and the floor price of the BAYC NFT collection began to deflate from its artificially inflated high after the failed launch of the BAYC metaverse with the botched sale of virtual land in the Otherside on April 30, 2022.    With celebrity promoters distancing themselves from the Yuga Financial Products; the disclosure of the U.S. Securities & Exchange Commission ("SEC") investigation of Yuga; the implosion of FTX and Alameda;

1    and further regulatory scrutiny of unregistered securities sold as crypto assets on

2    exchanges like Coinbase and Binance, the value of the Yuga Financial Products

3    dropped significantly.

4    382.    In June 2022, exchanges that provided investors yield on their crypto

5    investments began to experience liquidity issues and lock users out.  Voyager was

6    one of the largest such platforms and was one of the few platforms where investors

7    could earn yield on their ApeCoin.  On June 22, 2022, Voyager announced that it had

8    significant exposure to bankrupt hedge fund Three Arrows Capital, raising significant

9    survivability concerns at the exchange.[16]  In response, the price of ApeCoin dropped

10   from $4.37 to $3.97, or approximately 9%.

11   383.    By August 2022, the MoonPay outlier transactions propping up the floor

12   prices had ceased.  Fewer and fewer celebrities were promoting Bored Apes and the

13   Yuga ecosystem.  Without the celebrities endorsing the Yuga assets and without floor

14   prices and volumes being pumped by MoonPay, the Yuga Financial Products each

15   suffered diminution in value with decreased sales volume and fewer unique buyers.[17]

16   All of the Yuga Financial Products hit visible low points between August 19th and

17   23rd.  The Bored Ape NFT floor price dropped from 82.48 ETH on August 10, 2022

18   to 66.9 ETH on August 23, 2022.  The Mutant Ape NFT floor price also fell from

19   15.25 ETH on August 10, 2022, to a floor price of 11 ETH on August 19, 2022.  The

20   Otherdeed NFTs fell from a floor price of 2.02 ETH on August 7, 2022 to a floor

21   price of 1.47 ETH on August 22, 2022.  Likewise, ApeCoin dropped from $7.56 on

22   August 5, 2022 to $4.64 on August 28, 2022.

23

24

---

25   [16]    Sheldon Reback & Michael Bellusci, *Voyager Digital Plunges on Three
26   Arrows Exposure, Analyst Downgrade*, COINDESK (June 22, 2022),
     https://www.coindesk.com/business/2022/06/22/voyager-digital-requests-loan-
27   repayment-from-3ac-considers-issuing-default-notice/.

     [17]    Herman Hayes, *Purchases at Bored Ape Yacht Club Fall by 90% to 16-Month
28   Low*, BITKAN (Oct. 8, 2022), https://bitkan.com/news/purchases-at-bored-ape-yacht-
     club-fall-by-90-to-16-month-low-5479.

THIRD AMENDED CLASS ACTION COMPLAINT - CASE NO. 2:22-cv-08909-FMO-PLA

384.    In September 2022, the price of ApeCoin and the Yuga NFTs dropped significantly in anticipation of a significant token unlock for "launch contributors" of ApeCoin. In the 30 days prior to the unlock, ApeCoin dropped 26%.[18] On September 16, 2022 alone, ApeCoin dropped approximately 9% in advance of the unlock on September 17, 2022.[19]

385.    On October 11, 2022, *Bloomberg* reported that the SEC was conducting an investigation of Yuga Labs over whether the sales of its digital assets violate federal securities laws.[20]  *Bloomberg* reported that the SEC was examining whether certain NFTs are more akin to stocks and should follow the same disclosure rules. *Bloomberg* also reported that the SEC was investigating the distribution of ApeCoin. Yuga told *Bloomberg i*n a statement that it was "fully cooperating" with the inquiry. In response to the news regarding the SEC investigation, the ApeCoin token dropped approximately 14%.[21]

386.    Yuga's NFTs likewise dropped in value in the wake of the disclosure of the SEC investigation. The Bored Ape NFT floor price dropped from 75.5 ETH on October 10, 2022 to 72.421 ETH on October 15, 2022. The Mutant Ape NFT price floor dropped from 14.96 ETH on October 10, 2022 to 13.440 on October 13, 2022. The Otherside NFTs likewise dropped from a price floor of approximately 1.6 ETH on October 10, 2022 down to 1.11 ETH on October 21, 2022.

387.    The downfall of FTX had a significant impact on the price of the Yuga Financial Products. When both FTX and Alameda Research filed for Chapter 11

---

[18]    Andrew Hayward, *ApeCoin Treasury Set to Unlock 25 Million APE Tokens for Launch Contributors*, DECRYPT (Sept. 16, 2022), https://decrypt.co/109939/apecoin-treasury-unlock-25m-ape-tokens?amp=1.

[19]    *Id.*

[20]    Matt Robinson, *Bored-Ape Creator Yuga Labs Faces SEC Probe Over Unregistered Offerings*, BLOOMBERG (Oct. 11, 2022), https://www.bloomberg.com/news/articles/2022-10-11/bored-ape-creator-yuga-labs-faces-sec-probe-over-unregistered-offerings#xj4y7vzkg.

[21]    Andrew Hayward, *ApeCoin Sinks 10% After Report of SEC Probe Into Bored Apes Creator Yuga Labs*, DECRYPT (Oct. 11, 2022), https://decrypt.co/111682/apecoin-crashes-sec-probe-bored-ape-yuga-labs.

Bankruptcy on November 11, 2022, each of the Yuga Financial Products had a material drop in value in the days leading up to and following the announcement. At the time of the bankruptcy, FTX and Alameda held a number of Yuga Financial Products, which were now at risk of being subject to forced liquidation in the bankruptcy.

388. At the time of the FTX meltdown, users identified dozens of Yuga NFTs that were held by FTX/Alameda that could be subject to liquidation or auction in connection with the bankruptcy.[22] Nevertheless, on November 14, 2022, the ApeDAO Defendants via the official ApeCoin Twitter account misleadingly stated that the "Ape Foundation did not, and does not currently, hold any assets on FTX."[23] But on April 26, 2023, a director of Coinbase tweeted that NFTs belonging to Alameda/FTX were transferred to a multi-signature wallet belonging to the liquidator.[24] Thirty-two BAYC NFTs were identified as being affected, including especially rare tokens in the form of four "trippy" Apes, three "gold" apes, and one "suited" ape. Twenty-nine Otherside NFTs were also affected, as were two Mutant Apes NFTs, three M1 mutant serum NFTs, and three M2 mutant serum NFTs.

389. On November 5, 2022, prior to the disclosure of the liquidity issues with FTX, the BAYC NFT floor price was 64.8 ETH. In the wake of the FTX bankruptcy, the floor price of the BAYC NFT fell to approximately 50 ether (*i.e.*, approximately $62,000) on November 14, 2022. The floor price continued to drop, reaching 48 ETH on November 17, 2022.

---

[22]    Dr.Jones (@DrJones0305), TWITTER (Nov. 18, 2022 2:19 AM), https://twitter.com/DrJones0305/status/1593730628972863494?s=20&t=IHy6PXZgDHgX-Sc5h6rmRg.

[23]    ApeCoin (@apecoin), TWITTER, Nov. 14, 2022, https://x.com/apecoin/status/1592141303747575808?s=20.

[24]    Oluwapelumi Adejumo, *FTX takes control of NFTs worth over $4M*, CRYPTOSLATE (Apr. 27, 2023), https://cryptoslate.com/ftx-takes-control-of-nfts-worth-over-4m/.

390.    The same is true for Yuga's Mutant Apes, which had a floor price of 11 ETH prior to the FTX disclosures.  Following the FTX and Alameda bankruptcy, the floor price of Mutant Apes dropped to 8.99 ETH on November 17, 2022.

391.    Likewise, the floor price of the Otherdeed NFT dropped from 1.192 ETH on November 5, 2022 to 0.8 ETH on November 17, 2022.

392.    Prices for the Yuga NFT collections have not recovered.

393.    Similarly, the FTX disclosures caused a significant drop in the price of ApeCoin.  On November 5, 2022, ApeCoin traded at $5.10 per token, and dropped to $2.70 by November 13, 2022.

394.    On October 6, 2023, the Company announced on its website that it was laying off employees as part of a broader restructuring and pivoting towards online gaming.  The Company's new CEO, Daniel Alegre, admitted that Yuga "was not optimized to build and manage everything in house."  Alegre also conceded that there "have been a few rocky rollouts, particularly in our gaming execution. . . .  We need to make greater progress with the development of Otherside."[25]

395.    While investors suffered, Yuga insiders prospered.  For example, Oseary made off with, upon information and belief, tens of millions of dollars (if not more) for his part in the misconduct alleged herein.  Notably, Oseary admitted that his involvement with the alleged scheme to solicit and sell Yuga Financial Products "changed [his] life financially beyond [his] wildest dreams."[26]

396.    Prices of the Yuga Financial Products have dropped precipitously since the heyday of the misleading and manipulative celebrity promotions.  The BAYC

---

[25]    Richard Whiddington, *NFT Startup Yuga Labs Is Laying Off U.S. Employees Amid Its Ongoing Pivot to a Gaming Metaverse*, ARTNET NEWS (Oct. 11, 2023), https://news.artnet.com/market/yuga-labs-lays-off-us-staff-2376181#:~:text=Yuga%20Labs%2C%20the%20Web3%20startup,Labs's%20website%20on%20October%206.

[26]    Reepx (@reep_x), TWITTER (Feb. 4, 2023, 2:01 AM), https://twitter.com/reep_x/status/1621765882627112961?t=u80YueKWgsut3kjiud_V-Q&s=19 (posting an excerpt from a Twitter Spaces recording where Oseary made these statements).

NFTs' floor price continued to drop, reaching a Class Period low of 21.99 ETH (approximately $36,536.45) on August 22, 2023.  This is down from the all-time high of approximately 128 ETH (or $369,891.84) that occurred on April 30, 2022, in the midst of the celebrity promotions and as MoonPay was manipulating prices with its outlier transactions.

397.   Mutant Apes had a floor price high of 35.58 ETH ($99,962.01) on April 27, 2022, in the midst of the celebrity promotions and MoonPay outlier transactions.  Since that time, the floor price of the Mutant Apes has dropped precipitously, reaching a low of 4.29 ETH ($7,147.07) on August 22, 2023.

398.   The Otherdeed floor price went from a Class Period high of approximately 5.0 ETH (about $14,149.94) on May 1, 2022 all the way down to a Class Period low of 0.4 ETH (worth only $643.60) on September 25, 2023.

399.   ApeCoin tokens have likewise suffered a severe diminution in value.  After reaching a Class Period high of $23.65 on April 28, 2022 in the lead up the Otherdeed launch, the price of ApeCoin has cratered.  ApeCoin reached its all-time low on October 10, 2023 at just $1.01.

400.   In response to complaints of negligence and waste by the ApeDAO, Yuga investors tried to diminish the ApeDAO Board's control over the Ape Foundation.  But due to their self-appointed role as gatekeepers for any proposals to the Foundation, the ApeDAO Defendants thwarted investors' efforts to reform.  For example, on June 11, 2023, a Yuga investor submitted AIP-277: Re-evaluating ApeCoin DAO Special Council Salary Structure.[27]   This proposal sought an "immediate salary cut of 50%" for the Special Council members (which included Ohanian, Wu, and Bajwa).[28]   The ApeDAO Board Defendants, however, did not allow this proposal to be voted on by the ApeDAO members.  In violation of the

---

[27]   *AIP-277: Re-evaluating ApeCoin DAO Special Council Salaries Structure*, APECOIN.COM DAO FORUM (June 11, 2023), https://forum.apecoin.com/t/aip-277-re-evaluating-apecoin-dao-special-council-salaries-structure/13703.

[28]   *Id.*

THIRD AMENDED CLASS ACTION COMPLAINT - CASE NO. 2:22-CV-08909-FMO-PLA

ApeDAO guidelines, the ApeDAO Board refused to send the proposal to the larger ApeCoin community and instead kicked it back as being "Returned for Reconstruction" because, according to the ApeDAO Board, modifying the salaries for the Special Council members would implicate certain pre-existing contractual obligations entered into by the Special Council. But under the ApeCoin DAO guidelines, a board member may be removed or replaced prior to the term pursuant to a majority vote of token holders. Thus, it stands to reason that if a Special Council member could be terminated for whatever reason regardless of the terms of their contract, the Ape Foundation should be able to vote on salary modifications. This inexplicable inability to vote on this AIP was directly raised on July 23, 2023, during the discussions on the AIP (which were reviewed by the ApeDAO Board).[29] Nevertheless, this AIP remains stuck in the line for review by the Special Council despite them sending subsequently submitted and more complex AIPs to vote.

401. Relatedly, on October 8, 2023, an investor submitted an AIP to the Ape Foundation seeking a vote of no confidence in the ApeCoin Special Council. The abstract of the proposal stated as follows: "In a time of much economic uncertainty as well as the rapidly declining value of the $APE token and its failure to reach its intended goals, this AIP also seeks to reduce the number of Special Council members, reduce their salaries in the process, and enforce strict professional guidelines for the nominations of the Special Council members."[30]

402. The Vote of No Confidence AIP further revealed the unnecessary expenditures by the ApeDAO (which were approved by the ApeDAO Board Defendants): over $1.2 million on Special Council salaries (*i.e.*, $20,833 per month for each including Ohanian, Wu, and Bajwa); "$900,000 on Webslingers (admin,

---

[29] *Response to AIP-277: Re-evaluating ApeCoin DAO Special Council Salaries Structure*, APECOIN.COM DAO FORUM (July 23, 2023), https://forum.apecoin.com/t/aip-277-re-evaluating-apecoin-dao-special-council-salaries-structure/13703/317

[30] *Special Council – Vote of No Confidence*, APECOIN.COM DAO FORUM (Oct. 8, 2023), https://forum.apecoin.com/t/special-council-vote-of-no-confidence/19275.

THIRD AMENDED CLASS ACTION COMPLAINT - CASE NO. 2:22-CV-08909-FMO-PLA

finance, etc) @ $75k per month"; and various "undisclosed sums to third-parties (e.g. Meta Law and others)."[31] The AIP went on to list several failures of the DAO and issues where the DAO's conduct benefitted the ApeDAO Board Defendants (as well as Oseary, the Company, and Executive Defendants Solano and Aronow) at the expense of investors:

> As a startup created around Mar 22, the Special Council has thus far failed not only to adhere to the guidelines setup by the founders, but has also placed itself above those very same guidelines in terms of performance, transparency and accountability. Some examples:
>
> 1.    It has failed to provide explanation to the community as to the provenance surrounding a $2.5M loan that is a part of the DAO financial reports. . . .
>
> 2.    It has failed to provide the DAO community with audited financial reports as specified and required by the very same RFC that hired the previous Cartan Group and their replacement, the current WebSlingers group. . . .
>
> 3.    It has failed to adhere to the very same AIP-2 that created the voting process in which the community that voted on it was assured - by the language of the AIP - that "Without a voting system in place, arriving at consensus on proposals would be centralized, with only a few people holding decision-making abilities. This proposal aims to avoid this result." The resulting and much-maligned voting system, in the form of a few whale wallets (people)[32] controlling the outcomes of the voting, has failed to uphold this simple concept of fairness and equality.
>
> 4.    It has failed to meet the goals and direction of the DAO by refusing to take steps towards the prosperity of the DAO in terms of the automation and speedy resolutions to approved AIPs. . . .
>
> 5.    It has failed to meet the accountability and transparency pledged to the DAO community in many instances. To the extent that it recently required an AIP-282 (what does the SC actually do) and AIP-305 (accountability practices).
>
> 6.    It has seemingly placed itself above the rules of the DAO by refusing to honor an AIP request by a long-standing community member. In the fiasco over AIP-277 which sought to reduce the SC salaries, the author was advised that his AIP could not be sent to vote due to the fact that if it passed - as by all accounts it would have - it would require the Ape Foundation to breach current employment

---

[31]    *Id.*

[32]    Upon information and belief, a significant percentage of these so-called ApeCoin whale wallets are collectively created/owned/controlled by the Company, Executive Defendants Aranow and Solano, the ApeDAO Board Defendants Ohanian, Wu, and Bajwa, and/or Individual Defendant Oseary.

contracts that it had signed.  And so, the author had to put up another AIP-337 which only took into account future SC salaries. . . .

7.    It has failed, as per "See Phase 9: Implementation, item at #3" to disclose to the DAO community the failure in the disposition of approved AIPs.  To wit, AIP-209 which was voted for in May 2023, still wasn't funded as of Aug 9, 2023.  For such an expensive and impactful AIP, despite several inquiries, the SC has thus far failed to provide any insight as to why this AIP was not funded during that time span, nor to the current disposition of said AIP. . . .

8.    Despite the fact that the DAO was setup as a not-for-profit grants governing body, the historical record of the grants offered has created a situation whereby a litany of whale wallets - who probably would rather not see the treasury be spent because it affects their holdings - determine the outcome and disposition of even the most impactful AIPs which clearly benefit the DAO. The Special Council has failed to take steps to uphold and maintain the fairness and equality that the founding members envisioned and intended for the DAO; and one in which One APE equals One APE was the rallying cry.

## VII.    THE YUGA FINANCIAL PRODUCTS ARE SECURITIES UNDER *HOWEY*

### A.    Yuga Financial Products Investors Invested Money

403.    Plaintiffs and the Class invested fiat, including U.S. dollars, and digital currencies, such as Bitcoin and Ethereum, to purchase Yuga Financial Products.

404.    Defendants marketed and sold Yuga Financial Products to retail investors as an investment through global, online cryptocurrency exchanges during on-going, continuous offerings.

405.    Every purchase of Yuga Financial Products by a member of the public was an investment contract.

406.    Defendants' promotional statements and marketing materials contained specific crypto industry terms that marketed the Yuga Financial Products to Plaintiffs and Class members as investments with the prospect of financial gain.

407.    For example, Defendants pervasively used the term "Ape in" or "aping in" within their promotional statements and marketing materials.  This phrase is not merely a play on words related to the "Bored Apes," but rather has a particular meaning to crypto investors.  Investors who "ape in" do so because they see others

making significant profits and want to join the trend while the investment is still undervalued. "People often 'ape in' when they see a token gaining hype and don't want to miss out on potential profits." By using this term in promotional materials associated with the sale of Yuga digital assets, Defendants indicated to investors that the Yuga digital assets were undervalued investments with the potential for exponential returns. This promotional message was amplified by the concurrent promotions of the massive initial price increases for Yuga NFTs. *See supra* ¶58 (Solano highlighting the "million dollar apes" that had risen from the initial floor price of around $200); ¶¶105-106 (Sotheby's promoting the $24 million sale of BAYC NFTs at its "Ape In" auction and how it exceeded prior sale price predictions); ¶148 (Bieber promoting his purchase of a BAYC NFT, which he purportedly "paid" five times the then-current floor price for similar BAYC NFTs); ¶¶94, 147 (the Company similarly promoting the Sotheby's sale and the Bieber post); ¶152 (Wu touting the "100x to 500x" returns Yuga Financial Product investors could realize when the Company entered the gaming sector with the Otherside metaverse).

408. Defendants also used particular emojis to convey a similar message of prospective financial gain for Yuga investors, namely the rocket ship and moon emojis. As the SEC explained in a Consent Order related to the misleading promotion of a different cryptocurrency: "***The rocket ship image—along with other space images, analogies, and phrases such as "to the moon"—are widely-used in the crypto asset space to signal expectations that a token will dramatically increase in value***."[33] Put another way "[i]t's probably fair to assume that the majority of the crypto community on social media is familiar with the idea that a rocket ship emoji indicates positive sentiment and, as such, is often associated with positive

---

[33] *In the Matter of Paul Anthony Pierce*, No. 3-21305, SEC Order Instituting Cease and Desist (Feb. 17, 2023), https://www.sec.gov/files/litigation/admin/2023/33-11157.pdf (emphasis added).

performance predictions." [34]  Here, Defendants' use of the moon and rocket ship emojis to market the Yuga Financial Products indicated to crypto investors that the Yuga Financial Products would dramatically increase in value.

409.  Defendants also used variations of the phrase "to the moon" or "mooning" in their promotions to potential investors. Moon/Mooning is used to describe a cryptocurrency that is projected as having a strong upward market trend; when a cryptocurrency is mooning, it means its price is skyrocketing so high that it's figuratively going to the moon.[35]  This catchphrase similarly alludes to a cryptocurrency experiencing a "sky-high valuation" or "soaring prices."  The expression is often used in an attempt to convince others to invest.  In such instances, crypto promoters use it to indicate that "it's a good time to invest" since the coin will purportedly soon "go to the moon."[36]  That phrase is also used "to shill a cryptocurrency, where malicious investors hype a coin to sway the market in favor of their crypto assets."[37]  Here, Defendants' references to moons in promotional statements for marketing the Yuga Financial Products indicated to investors a prospect of financial gain from the purchase of the Yuga NFTs.

410.  Similarly, Defendants used the term "WAGMI" in their Yuga promotions, which is an acronym that stands for "We're All Gonna Make It."  This term is used in the crypto industry as a positive market sentiment for an investment in a given project and understood to mean that investors in the project would be financially successful notwithstanding any temporary downturn in the price action. Additionally, this promotional phrase is understood by crypto investors to mean that

---

[34]    Tristan Green, *Emojis can predict better crypto trading outcomes, according to scientists*, COINTELEGRAPH (Feb. 19, 2024), https://cointelegraph.com/news/emojis-predict-better-crypto-trading-outcomes-according-scientists.

[35]    *Crypto Slang: 28 Terms You Should Know*, cyrpto.com (Aug. 31, 2022), https://crypto.com/en/university/crypto-slang-terms-you-should-know.

[36]    *To The Moon Meaning*, LEDGER ACADEMY (Oct. 4, 2023), https://www.ledger.com/academy/glossary/to-the-moon.

[37]    *Id*.

THIRD AMENDED CLASS ACTION COMPLAINT - CASE NO. 2:22-CV-08909-FMO-PLA

every investor in a given project was similarly situated and would "all" similarly benefit from the anticipated increase in the underlying value of their investments (as opposed to only the project's founders or other insiders "making it" rich). Here, the use of the WAGMI term by Defendant Fallon (and then amplified by the Company) to market the Yuga Financial Products indicated to investors: (1) a prospect of financial gain from purchasing a BAYC NFT; (2) that Fallon was personally invested and involved in the Yuga ecosystem; and (3) that Fallon and all other BAYC NFT investors (including Plaintiffs and the class) were equally poised to financially "make it" based on their mutual investments in the Yuga Financial Products.

411. Defendants also promoted the general financial success of the BAYC NFT collection, indicating to investors an expectation of profit as their Yuga investment increased in valued from a continuation of that success. For example, Defendants made statements about the increase in the floor price of BAYC NFTs, the market cap for the BAYC NFT collection, and the trading volume for each of the Yuga Financial Products. *Supra* ¶¶195, 203, 212, 214, 271. These statements reveal that Defendants themselves were actively monitoring the price movement of the Yuga Financial Products and using these financial metrics as a part of its marketing strategy. By touting the increase in value-related metrics for the Yuga Financial Products, Defendants indicated to investors that this was an investment poised for future growth that would provide purchasers with a financial gain.

412. Defendants also publicized partnerships with multiple venture capital firms that had made "investments" in Yuga and indicated that these financial institutions would support Yuga's promises of creating and maintaining the Bored Ape Ecosystem. Most notably, on March 22, 2022, the Company promoted its partnerships with a host of venture capital firms that had made investments in Yuga's seed funding round. Defendants Muniz, Lyons, and Oseary each made statements related to the venture capital backers and connected this backing with the ability of the Company to successfully grow the Yuga NFT business. *See supra* ¶¶238, 296.

ApeDAO board member Defendant Lyons was even identified strictly as a member of venture capital firm a16z in the Company press release.  Yuga, the Executive Defendants, and ApeDAO Defendants' promotion of the Company's relationships with multiple venture capital firms indicated to potential investors that a purchase of a Yuga Financial Product was an investment with the prospect of financial gain.  The messaging to investors was straightforward: major venture capital firms believe there is money to be made from early investing in Yuga, so investors should follow the "smart money" and also invest in Yuga via its NFT collections and/or ApeCoin while the respective prices were purportedly undervalued.

413.  Defendants similarly promoted Yuga's partnership with celebrity promoters and influencers as a form of social proof for the purpose of inducing investor purchases of Yuga Financial products.  These partnership promotions indicated to investors that the interest from such high-profile partnerships would cause a related increase in the value of the investors' Yuga Financial Product purchases resulting from the influx of new investors brought in by the celebrity promoter partnerships.

414.  In June 2021, in response to a question from a BAYC NFT holder about the valuation of two "Goldens" (*i.e.*, rare BAYC NFTs), Executive Defendant Aronow stated that those two Yuga digital assets were worth "all the eth."  This response from the Company's management created an impression that the Yuga Financial Products were undervalued and thus a good investment opportunity with the prospect of future gain. reasonable expectation of profits based on Yuga's efforts, because Yuga and the Executive Defendants acknowledge both their efforts in creating intrinsic value of the NFTs, and the rising intrinsic value of the NFTs as the reasonable expectation of profits from their efforts begins to manifest.

415.  On at least one occasion, Yuga Executive Defendants explicitly referenced a rate of return that promoted the prospect of financial gain to investors. Specifically, in a February 15, 2022 promotional piece, ApeDAO Defendant Wu

touted the potential for financial gain through the merger of the Yuga digital assets with the gaming sector, claiming that there were "ways to make like 100x or 500x return on the token . . . . so it attracts a certain type of player, which tends to be traders that are looking at the game as kind of like almost like a financial instrument."

416.   In purchasing the Yuga Financial Products, Plaintiffs committed their investments to the enterprise in such a manner as to subject themselves to financial loss.   For example, Plaintiffs and the Class turned over substantial amounts of money in exchange for Yuga's specific promises to develop the Otherside metaverse, which the Company would make accessible at otherside.xyz, a website owned and controlled by Yuga.  Yuga also promised to build a software development kit (SDK) to create "an infinite ecosystem entirely available in our in-game marketplace." It boasted: "IT'S NOT ONLY A GAME, IT'S A WHOLE NEW ECONOMY."  On the very next page of its slide deck, the Company explained that APE Coin was "the currency of our metaverse."  The Company also stated that "the MetaRPG will launch with a land sale.  These land plots will correspond to real land in our game." Yuga further noted that the "initial land sale will include teases to future paired NFTs such as in-game characters, resources, artifacts and more." Yuga highlighted the profit expectation by advertising that "once minted as paired NFTs, token holders will be able to trade & sell these as well (triggering secondary sales for token beyond the primary land)."

417.   Yuga further advertised that "after the land sale the game economy will begin with owners taking stock of what they have. And beginning to trade, horde, buy and sell."

418.   Yuga's slide deck tied ApeCoin and Otherdeeds sales directly to its efforts to increase the value of those assets.  It projected approximately $189 million in revenue from the sales of these assets and budgeted $37.06 million to Product and Technology, 195 times more than the $190,000 it spent in 2021. Yuga similarly

1   budgeted $17.1 million to Payroll and Benefits in 2022, 285 times the $60,000 it

2   spent in 2021.

3       419.   When Yuga failed to develop the Otherside metaverse and other

4   promised milestones, the value of its associated virtual land (Otherdeeds NFTs) and

5   currency (APE Coin) decreased precipitously.  Moreover, the development of the

6   Otherside metaverse was a pivotal part of Defendants' general promotion of the Yuga

7   NFT ecosystem to investors.  Thus, the value of the BAYC and MAYC NFTs

8   similarly decreased when Defendants failed to live up to its promotions for a "whole

9   new economy" in the Otherside metaverse.

10      **Otherdeed NFTs**

11      420.   The Company, the ApeDAO Defendants, and Executive Defendants

12  Aronow and Solano repeatedly used variations of the term "Ape in" in the

13  promotional materials and marketing campaign for the Otherdeed NFTs to indicate

14  to potential investors the prospect of future gain and solicit sales from investors

15  looking to profit.  *See supra* ¶416 (Yuga); ¶197 (Oseary); ¶62 (ApeDAO

16  Defendants); ¶213 (Aronow); and ¶¶204, 205 (Solano).

17      421.   The Company used variations of the term "moon" and/or rocketship

18  emoji in the promotional materials and marketing campaign for the Otherdeed NFTs

19  to indicate to potential investors the prospect of future gain and to solicit sales from

20  investors looking to profit.  *See infra* ¶¶448-49.  Defendants Moonpay and Soto-

21  Wright also promoted Yuga's partnership with celebrity promoters and influencers

22  to specifically induce investor purchases of Otherdeed NFTs.  For example,

23  Defendant Moonpay used its partnership with a group of popular gaming influencers

24  known as the FazeClan to promote sales of the Otherdeed NFTs to investors

25  interested in the gaming sector.  *See supra* ¶264.  This blunt promotion created an

26  expectation of profits, declaring that "investing" in Otherdeed NFTs was "truly the

27  most obvious bulletproof play there's ever been in Web3."  The partnership

28  promotions also indicated to investors that the continuation of other such high-profile

partnerships would result in a related increase in the value of the investors' Yuga Financial Product purchases from the influx of new investors brought in by the partnership announcement.

422.  Defendants' promotions of Otherdeed NFTs were marketed to investors solely as an investment with the prospect of future gain from the development of the Otherside metaverse.  Purchasers of Yuga Labs' Otherdeed NFTs could not have acquired them for "consumptive use," because at the time of sale in April 2022, the Otherside metaverse did not yet exist, and the NFTs conferred no present utility or access to any functioning digital environment.  Any purported consumptive-use benefits were not yet in play at the time of purchase, as the Otherside platform was still in development and its launch was merely promised for the future.  The Otherdeed NFTs therefore resembled the undeveloped orange groves in *SEC v. W.J. Howey Co.,* 328 U.S. 293 (1946), where investors purchased plots of land that had to be cultivated and managed by the promoter before any income or use could be realized.  Like the orange groves in *Howey*, the Otherdeed NFTs required Yuga's continued managerial efforts – namely, the design, creation, and operation of the Otherside metaverse - before they could have any consumptive function or intrinsic utility.  Accordingly, purchasers necessarily bought the Otherdeed NFTs as investments in Yuga's ongoing enterprise, expecting future profits or appreciation once the promised virtual world was created and operational.

**ApeCoin**

423.  The Company, Sotheby's, the ApeDAO Defendants, and Executive Defendants Solano and Aronow repeatedly used variations of the term "Ape in" in the promotional materials and marketing campaign for ApeCoin NFTs to indicate to potential investors the prospect of future gain and solicit sales from investors looking to profit.  *See supra* ¶¶93, 94 (Yuga); ¶¶93, 96-98, 106 (Sotheby's); ¶281 (ApeDAO Defendants); ¶213 (Aronow); and ¶¶204, 205 (Solano).

424. Defendant Moonpay used variations of the term "moon" and/or the moon and rocket ship emojis in the promotional materials and marketing campaign for the ApeCoin to indicate to potential investors the prospect of future gain and solicit sales from investors looking to profit. *See supra* ¶¶127 (Moonpay).

425. ApeDAO Defendant Wu often used the rocketship emoji in her promotions for ApeCoin and the Yuga NFT collections to indicate to potential investors the prospect of future gain and to solicit sales of ApeCoin from investors looking to profit. *See supra* ¶¶ 269, 270. These promotions were used by Defendant Wu to signal expectations to investors that ApeCoin would dramatically increase in value. Relatedly, as part of the ApeCoin launch announcement and her membership on the ApeDAO, Wu stated that she was "[b]ullish for the long-term with this @yugalabs team." *See supra* ¶270. Wu's use of the financial term "bullish" and reference to the "long-term," in conjunction with the inclusion of the rocketship emoji, signaled to investors that the market for the Yuga Financial Products was, and would continue to be, strong, and that early investors in ApeCoin would financially benefit from the skyrocketing increase in value of ApeCoin in the long term.

426. Defendants Aronow and Solano, on behalf of Yuga, further promoted the prospect of financial gain from the purchase of ApeCoin to potential investors, thereby indicating that this was an investment with the expectation of profit. For example, Defendant Aronow promoted the Company's success in getting ApeCoin listed on large cryptocurrency exchanges, signaling to investors the prospect of financial gain from the increase in the market for ApeCoin. *See supra* ¶¶190, 217. Similarly, Defendant Oseary made statements about the rising volume of trading volume of ApeCoin and the token's "day 1" listings on several cryptocurrency exchanges, which also indicated to investors a prospect of future financial gain as an increase in trading of ApeCoin on major cryptocurrency exchanges from "day 1" would have an appreciative impact on the value of ApeCoin as it was widely accessible for purchases. *See supra* ¶196. Further, by touting the increased trading

1  volume for ApeCoin, Defendant Oseary also indicated to investors that this was an
2  investment poised for future growth that would provide purchasers with a financial
3  gain.  These statements demonstrate that Defendants were actively monitoring the
4  trading of ApeCoin and using these financial metrics as a part of the general
5  marketing strategy for ApeCoin specifically and the Bored Ape Ecosystem generally.

6  427.   ApeCoin could not have been purchased for any genuine "consumptive
7  use" at the time of its March 2022 launch because the Yuga Labs ecosystem that
8  purportedly would give the token practical function did not yet exist.  When the
9  ApeCoin initial coin offering occurred, there was no operating metaverse, game, or
10 platform in which the token could be used for goods, services, or gameplay—only
11 Yuga's promise that such uses would be created in the future.  The token's supposed
12 "utility" was entirely prospective, dependent on Yuga's later development of the
13 Otherside Metaverse and related applications.  Plaintiffs therefore could not have
14 acquired ApeCoin for any present consumptive purpose, but rather, committed
15 capital to a scheme whose future value and usefulness would arise only through
16 Defendants' continued managerial efforts.  ApeCoin functioned as an investment in
17 the enterprise itself, not as a means of immediate consumption.

18 **BAYC NFTs**

19 428.   The Company, Defendants Sotheby's, Moonpay, Adidas, and Executive
20 Defendants Aronow and Solano repeatedly used variations of the term "Ape in" in
21 the promotional materials and marketing campaign for the BAYC NFTs to indicate
22 to potential investors the prospect of future gain and solicit sales from investors
23 looking to profit.  *See supra* ¶¶93, 94 (Yuga); ¶¶93, 96-98, 106 (Sotheby's); ¶¶128,
24 175 (Moonpay); ¶¶180-181 (Adidas); ¶213, 217 (Aronow); and ¶¶204, 205 (Solano).

25 429.   Defendants Moonpay, Adidas, Fallon, and the Company used variations
26 of the term "moon" and/or the moon and rocketship emojis in the promotional
27 materials and marketing campaign for the BAYC NFTs to indicate to potential
28 investors the prospect of future gain and to solicit sales from investors looking to

1  profit.  *See supra* ¶127 (Moonpay); ¶180 (Adidas); ¶130 (Fallon); and *infra* ¶¶448-

2  49 (Yuga).

3    430.   Defendant Fallon and the Company used the hashtag and/or term

4  "WAGMI" in the promotional materials and marketing campaign for the BAYC

5  NFTs to indicate to potential investors the prospect of future gain and to solicit sales

6  from investors looking to profit.  *See supra* ¶139 (Yuga, Fallon).

7    431.   Executive Defendants Aronow and Solano, on behalf of Yuga, promoted

8  the prospect of financial gain from the purchase of the BAYC NFTs to potential

9  investors, thereby indicating that this was an investment with the expectation of

10 profit.  For example, in March 2021, Defendants Aronow and Solano  made

11 statements about the increase in both the floor price of BAYC NFTs and the market

12 cap for the BAYC NFT collection.  *See supra* ¶214 (Aronow); ¶203 (Solano).

13 Similarly, Defendant Aronow made statements about the rising volume of trading of

14 the BAYC NFT collection, which indicated to investors a prospect of future financial

15 gain, as an increase in trading of BAYC NFTs would have an appreciative impact on

16 the value of those digital assets.  These statements also confirm that Defendants

17 Aronow and Solano were actively monitoring the price movement of the Yuga

18 Financial Products and using that financial metric to personally communicate with

19 and solicit sales from potential investors.  By touting the increases in floor price of

20 BAYC NFTs, in market capitalization, and in the Yuga NFT collection's trading

21 volume, Defendants indicated to investors that this was an investment poised for

22 future growth that would provide purchasers with a financial gain.

23    432.   Defendants promoted Yuga's partnership with venture capital firms as a

24 means to solicit further sales of BAYC NFTs and other Yuga Financial Products.  For

25 example, Defendant Lyons announced the partnership between the Company and

26 a16z (Lyons' venture capital firm), and promoted that a16z was "leading the $450M

27 financing" of the Bored Ape Ecosystem and Yuga.  *See supra* ¶238 (Lyons); *see also*

28 ¶295 (Yuga's seed funding press release).  By referring to the project's backing by

large venture capital firm a16z and pointing to the hundreds of millions of dollars already raised from successful funding rounds, the Company and Defendant Lyons created an expectation of profits in Yuga investors that was motivated by the prospect of financial gain when making their investments in the Yuga Financial Products.

433.    Defendants similarly promoted Yuga's partnership with celebrity promoters and influencers in order to solicit investment in the Yuga Financial Products.  For example, the Company, Executive Defendants Solano and Aronow, Defendant Sotheby's, Defendant Ohanian, Promoter Defendants Fallon and Hilton promoted their partnerships with numerous celebrities that were supposedly "joining the club."  *See supra* ¶¶ 58, 98, 110, 204, 267, 273, 297.  These partnership promotions indicated to investors that the continuation of such high-profile partnerships would result in a related increase in the value of the investors' Yuga Financial Product purchases from the influx of new investors brought in by the partnership announcement.

434.   The BAYC NFTs could not have been purchased for consumptive use at the time of sale because the Yuga ecosystem that purportedly gave them function— such as the Otherside metaverse, gaming environment, or integrated platform—did not yet exist.  Plaintiffs could not use the BAYC NFTs for any practical or immediate purpose other than to hold them as digital assets in anticipation of prospective gains based on future developments that Yuga promised to deliver.   While Yuga occasionally promoted certain social or event-based benefits for holders, these limited activities were incidental and not the reason for Plaintiffs' purchases.  No Plaintiff attended such events or otherwise used the BAYC NFTs for any personal or experiential consumption.  Instead, purchasers acquired BAYC NFTs because of the expectation that Yuga's continued efforts to build its metaverse, brand partnerships, and token economy would enhance their value.  Any "membership" or "community" marketing surrounding the NFTs served primarily to sustain the initial interest and demand, not to provide actual consumption utility.  Thus, as a matter of economic

1  reality, BAYC NFTs were purchased as financial investments in Yuga's developing

2  enterprise rather than as consumable goods.

3  **MAYC NFTs**

4  435.  Defendants repeatedly used variations of the term "Ape in" in the

5  promotional materials and marketing campaign for the MAYC NFTs to indicate to

6  potential investors the prospect of future gain and solicit sales from investors looking

7  to profit.  *See supra* ¶¶188-189 (Yuga).

8  436.  The Company used variations of the term "moon" and/or rocketship

9  emoji in the promotional materials and marketing campaign for the MAYC NFTs to

10  indicate to potential investors the prospect of future gain and solicit sales from

11  investors looking to profit.  *See infra*  ¶¶448-49.

12  437.  ApeDAO Defendant Bajwa also promoted the $71M in trading volume

13  for MAYC during the last week in December 2021.  *See supra* ¶271.  By touting the

14  increased trading volume for MAYC NFTs, Defendant Bajwa effectively promoted

15  the MAYC NFTs as an investment poised for future growth that would provide

16  purchasers with a financial gain.  These statements also reveal that Defendant Bajwa

17  (and, by inference, the entire ApeDAO Board) were personally monitoring the

18  trading of MAYC NFTs and using that financial metric as a part of her general

19  marketing strategy for the MAYC NFT collection specifically and the Bored Ape

20  Ecosystem generally.

21  438.  Defendants promoted Yuga's partnership with celebrity promoters and

22  influencers as a form of social proof for the purpose of inducing investor purchases

23  of Yuga Financial Products.  For example, ApeDAO Defendant Bajwa promoted the

24  partnership of the Company and celebrity rapper Lil Baby who had purportedly

25  "mutated his ape" (i.e. converted his BAYC NFT to a MAYC NFT) as part of a live

26  performance for Yuga investors.  *See supra* ¶245.  Similarly, on multiple occasions

27  Defendant Moonpay and its CEO Defendant Soto-Wright promoted their

28

partnerships with celebrities that were "joining the club." *See supra* ¶¶127-130, 136, 146.

439.   As with the BAYC NFTs, the MAYC NFTs could not have been purchased for consumptive use at the time of sale because the Yuga ecosystem that purportedly gave them function—such as the Otherside metaverse, gaming environment, or integrated platform—did not yet exist.  Plaintiffs could not use the MAYC tokens for any practical or immediate purpose other than to hold them as digital assets in anticipation of prospective gains based on future developments that Yuga promised to deliver.  While Yuga occasionally promoted certain social or event-based benefits for holders, these limited activities were incidental and not the reason for Plaintiffs' purchases.  No Plaintiff attended such events or otherwise used the MAYC NFTs for any personal or experiential consumption.  Instead, purchasers acquired MAYC NFTs because of the expectation that Yuga's continued efforts to build its metaverse, brand partnerships, and token economy would enhance their value.  Any "membership" or "community" marketing surrounding the NFTs served primarily to sustain the initial interest and demand, not to provide actual consumption utility.  Thus, as a matter of economic reality, MAYC NFTs were purchased as financial investments in Yuga's developing enterprise rather than as consumable goods.

**B.    Yuga Financial Products Investors Were Intertwined in a Common Enterprise with Defendants**

**Horizontal Commonality**

440.   The hallmark of a horizontal common enterprise is the tying of each investor's fortune to the fortunes of the other investors, which, in turn, depend upon the profitability of the enterprise as a whole.

441.   Plaintiffs invested money into the common enterprise of the Yuga Financial Products with the expectation that profits would come solely from the efforts of others, including from the Executive Defendants' development of the Yuga

1    NFT ecosystem and continued development of additional financial products such as
2    the Otherside metaverse that the Executive Defendants claimed would increase the
3    value of existing Yuga Financial Products.

4        442.   The funds Plaintiffs paid to purchase the Yuga Financial Products were
5    pooled by the Executive Defendants to continue the development of the Yuga NFT
6    ecosystem, including by providing funds for the Executive Defendants to hire
7    technical personnel necessary for the development of additional financial products
8    and to promote those products and their relationship to the existing Yuga Financial
9    Products.  As a result, investors including Plaintiffs and Class members shared in the
10   risks and benefits of the investment.

11       443.   The pooling of funds for the development of the Yuga ecosystem was
12   necessary to ensure that the Yuga NFT ecosystem did not collapse.

13       444.   The prospective profits of Plaintiffs and the Class, if any, are intertwined
14   with the fortunes of Yuga, its founders, and the Executive Defendants.  In the publicly
15   available Yuga Pitch Deck, Executive Defendants acknowledged that Yuga used the
16   funds from its ApeCoin and NFT sales to fund its operations.  Similarly, in the
17   ApeDAO Governance Working Group Q3 Quarterly report, Defendants reported that
18   ApeCoin sales funded all of the ApeDAO's operational costs.  Defendants used
19   investor monies from NFT and ApeCoin sales to grow the underlying Bored Ape
20   ecosystem to prop up the value of the Yuga Financial Products.  For those same
21   reasons, Defendants further publicized Roadmap Activations related to the planned
22   Bored Ape Ecosystem to be funded by NFT and ApeCoin sales.  Roadmap 1.0,
23   released in April 2021, promoted the "activation" of the MAYC NFT (which created
24   another entry point into the Bored Ape Ecosystem at a lower price point than the
25   BAYC NFT—a promotion designed to attract investors that had less money to invest
26   but still wanted to benefit financially from assets included the Bored Ape Ecosystem.
27   Roadmap 2.0, released in September 2021, promoted the activation of the Otherside
28   Metaverse, the Otherdeed NFTs, and ApeCoin.

445.   The Company, its founders, the Executive Defendants, and Defendant Oseary additionally issued themselves millions of ApeCoin tokens with value inextricably linked to Yuga's efforts.

446.   The interplay between the Yuga NFT collections, ApeCoin, and the Bored Ape Ecosystem was significant.   While the Yuga NFT collections and ApeCoin were not minted on a public blockchain controlled by the Company, the value of and market for the Yuga NFTs was nevertheless highly dependent upon the Company's continued maintenance and operation of the Bored Ape Ecosystem.

447.   The Executive Defendants announced the development of Otherside, and its potential to increase the value of the existing Yuga Financial Products, in mid-March, 2022, shortly after the market capitalization of BAYC had dropped from a high of approximately $3.1 billion on February 1, 2022 to around $1.6 billion and the market capitalization of MAYC had dropped from a high of approximately $1.3 billion on January 31, 2022 to a low of $651 million.

448.   Defendant Yuga announced Otherside on Twitter, posting a promotional video featuring NFTs from BAYC, MAYC, and other Yuga NFTs.

449.   The promotional video included graphics including the phrase "FOMO" or "Fear of Missing Out," a cryptocurrency term used to discuss the motivations of buyers seeking rapid appreciation of the value of their assets, and an animated rocket ship (an allusion to the rocket ship emoji known among cryptocurrency investors as a symbol used to indicate rapid upward price movement), taking all Yuga NFTs on a ride up an erupting volcano.

450.   In its promotional materials, Defendant Yuga further advised that owners of BAYC and MAYC NFTs would automatically receive a portion of the available Otherdeed NFTs, which caused investors seeking to financially gain from the purchase to Otherdeed NFTs to purchase BAYC and MAYC NFTs in order to be eligible for the Otheredeed NFT distribution to then-current BAYC and MAYC NFT holders.

451.    In its promotional materials, Defendant Yuga touted Otherside as a place where all Yuga NFTs would, for the first time, be able to move and interact with each other in a digital environment and as a place that, "doesn't take cash, credit, or checks. The economy here runs on ApeCoin. Should you aim to purchase any item in Otherside, it's APE you need."

452.    Yuga publicized Otherside in a FAQ on its website, posing the question, "Can I sell or trade specific things on my [Otherside] land?" and touting Otherdeeds NFTs as a "dynamic NFT, built as a collection of all the elements" that would evolve and increase in value as a result of future development and whose "true potential can only be revealed with time."

453.    The announcement and subsequent promotion of Otherside and its relationship to existing Yuga Financial Products caused a rapid increase in the price of the other Yuga Financial Products.

454.    The market capitalization of BAYC surged from a low of around $1.6 billion before the Otherside announcement to a high of more than $4.1 billion in around two months.

455.    The market capitalization of MAYC similarly surged from a low of $651 million before the Otherside announcement to a high of more than $2.1 billion in around two months.

456.    The Executive Defendants were also responsible for supporting the Yuga Financial Products, pooling investors' assets , and controlling those assets.

457.    Plaintiffs and class Members pooled their funds paid pursuant to Yuga's NFT creator fees into a common wallet address owned and/or controlled by Yuga and/or the Executive Defendants, the proceeds of which were distributed to the Company.  For example, when Lead Plaintiff Palombini purchased his MAYC token, a portion of his purchase price was a creator fee that went to Yuga Labs.  This fee was transferred to an Ethereum address associated with OpenSea (0x5b3256965e7C3cF26E11FCAf296DfC8807C01073) where it was pooled with

creator fees paid by other investors to pay the creator fees to Yuga.  For example, Palombini's fee was pooled with the fee paid by Lead Plaintiff Johnson in purchasing his MAYC token, as Lead Plaintiff Johnson paid creator fees to Yuga through this same pooling address.  The creator fees paid in connection with Lead Plaintiff Palombini's Otherdeed NFT purchase and Plaintiff Boekweg's BAYC token purchase similarly went to the same pooling address.  In their pitchdeck used to attract investment, Yuga Labs recognized these pooled creator fees as part of it "total revenues" of the Company, and after subtracting things like costs of advertising, payroll and benefits, and other expenses, recognized the creator fees as "Net Revenue."  *See* Pitch Deck at 82, 84-85 (presenting financial metrics of the pooled creator fees as "Net Rev Secondary Sales").[38]

**Otherdeed NFTs**

458.   Sales of Otherdeed NFTs were used to fund the Company's and the ApeDAO's day-to-day operations, as well as to build and/or maintain the greater Bored Ape Ecosystem.  Each sale of Otherdeed NFTs was subject to the 2.5% creator fee programmed into every Yuga NFT transaction.  As described above, the income generated from these fees was used by the Company and ApeDAO to conduct business, engage legal counsel, provide employee compensation, and fund research and development of the Company's existing and future business interests.  *See supra* ¶457.  All Otherdeed NFT investors would receive a *pro rata* share of any increases or decreases in the value of their underlying investment that stemmed from Yuga's ongoing business operations and marketing strategies for the Yuga Financial Products.

**ApeCoin**

459.   ApeCoin was used by Defendants to fund the Company's and the ApeDAO's day-to-day operations, as well as to build and maintain the greater Bored

---

[38]    Yuga Labs Pitch Deck – BAYC and Apecoin – 2022, https://drive.google.com/file/d/1BQB_y1E5XgVv9kzEBHgxqczOtA5Ev49k/view?pli=1.

Ape Ecosystem. For example, according to the ApeDAO Governance Working Group Q3 Quarterly Report, ApeCoin was primarily used to fund all of the ApeDAO's initial operational costs. In particular, from July 2023 to October 2023, the ApeDAO spent 64,729.28 in $APE (valued at approximately $100,000 at the time) on employee compensation, legal fees, security, and project management expenses. Consequently, investors' fortunes were tied to the Company and ApeDAO – if ApeCoin's price went to zero, the Company and ApeDAO would be unable to operate; if the Company or ApeDAO closed shop, the value of investors ApeCoin purchases (as well as the value of the related BAYC, MAYC, and Otherdeed NFT collections) would decrease. The financial fallout described above following the Defendants' failure to develop the hyped Otherside demonstrates the interplay.

460.   As another example, the ApeDAO approved a proposal (AIP-209) to use ApeCoin in connection with the Ape Accelerator, a launchpad "designed to help strengthen the ApeCoin and BAYC ecosystem by incubating and facilitating projects that contribute to, and utilize, ApeCoin and BAYC IP ecosystem growth."

461.   AIP-280 was another approved proposal of the ApeDAO that involved the use of ApeCoin to fund and develop the Bored Ape Ecosystem for the financial gain of Yuga investors. According to that proposal, "[b]y integrating ApeCoin into the game, $Ape becomes another in-game asset in Meta Merge for new holders and game players to enjoy gamified experiences based on real-world utility. We aim to reinforce and leverage ApeCoin and its ecosystem by creating new user experiences through the power of the game. Thus, this integration will provide an ecosystem where players can utilize APE tokens within the game, alongside the other benefits they know APE tokens for."

462.   Additionally, AIP-408: Q2/Q3 2024 Governance Working Group Budget revealed the extensive common enterprise between investors, the Company and the ApeDAO. This implemented proposal initially requested approximately

$1.2M worth of ApeCoin to fund the ApeDAO operations. The "Overall Cost" section of AIP-408 states:

> The total funding request for this budget is $1,271,900.00 denominated in APE. Of these funds, $668,000.00 will be either locked and delegated to the community as governance tokens or distributed back into the ecosystem via small grants and reward programs. Any surplus will be reported and rolled into the Q4/Q1 2024/25 Governance Working Group Operations Budget. Remaining funds from AIP-317, including repaid loans provided to the Metaverse and Marketing & Communications Working Groups for costs related to establishing their legal structures, will be reported and accounted for as discretionary funding **to be used for, but not limited to, general contingency, new initiative development, community rewards, community grants, business and stakeholder development, and in-person ApeCoin DAO Working Group representation**. [emphasis added].

Notably, the implemented AIPs demonstrate that Yuga investors and Defendants were consistently pooling their investments together and would split any net profits in accordance with their *pro rata* investments. Conversely, any unused or surplus investments by the Company would be "distributed back into the ecosystem."

**BAYC NFTs**

463.    From the outset, sales of BAYC NFTs were used to fund the Company's and the ApeDAO's day-to-day operations, as well as to build and/or maintain the greater Bored Ape Ecosystem. Each sale of BAYC NFTs was subject to the 2.5% creator fee programmed into every Yuga NFT transaction. As described above, the income generated from these fees was used by the Company and ApeDAO to conduct business, engage legal counsel, provide employee compensation, and fund research and development of the Company's existing and future business interests. *See supra* ¶457. All BAYC NFT investors would receive a *pro rata* share of any increases or decreases in the value of their underlying investment that stemmed from Yuga's ongoing business operations and marketing strategies for the Yuga Financial Products.

**MAYC NFTs**

464.    Sales of MAYC NFTs were used to fund the Company's and the ApeDAO's day-to-day operations, as well as to build and/or maintain the greater

1    Bored Ape Ecosystem.  Each sale of MAYC NFTs was subject to the 2.5% creator

2    fee programmed into every Yuga NFT transaction.  As described above, the income

3    generated from these fees was used by the Company and ApeDAO to conduct

4    business, engage legal counsel, provide employee compensation, and fund research

5    and development of the Company's existing and future business interests. *See supra*

6    ¶457.  All MAYC NFT investors would receive a *pro rata* share of any increases or

7    decreases in the value of their underlying investment that stemmed from Yuga's

8    ongoing business operations and marketing strategies for the Yuga Financial

9    Products.

10        **Vertical Commonality**

11        465.   The fortunes of Yuga investors were tied to the fortunes of the Company

12    and its promoters.

13        466.   Defendant Aronow, in an April 24, 2021 Discord post, explicitly

14    represented to Yuga investors that "the entire community benefits from each ape

15    sold."  Upon information and belief, Aronow was referring to both the increase in

16    value of the underlying Yuga NFT resulting from each sale and the redeployment of

17    money received the 2.5% creator fee to fund the development and maintenance of the

18    Bored Ape Ecosystem.

19        467.   Further, Defendants each (as either an institution or individual) held

20    significant stakes in the ApeCoin and/or the Yuga NFT collections, and thus

21    proportionately shared in the profits and risk of the project.  For example, 80 million

22    APE (8% of all tokens minted) went to Yuga's founders, including Defendants

23    Solano and Aronow.  Four hundred seventy million APE (47%) went to the ApeCoin

24    DAO treasury, of which Defendants Solano and Aronow, the Company, and the

25    ApeDAO Defendants maintained considerable influence through the voting rights

26    granted by their hundreds of millions of ApeCoins.  Moreover, Defendant Solano

27    owns at least one BAYC NFT (BAYC #3) and uses it as his online avatar.  He also

28

owns MAYC #10006 and Otherdeed #3 and #25,092.[39]    Solano also holds at least 12,849.1 APE tokens on his Garga.eth address.[40]    Defendant Aronow owns at least one BAYC NFT (BAYC #1) and uses it as his online avatar.   He also owns MAYC #10,002 and Otherdeed #1 and #25,098.[41]    Defendant Aronow also holds 12,968 APE tokens in this same address.[42]    Defendant Soto-Wright likewise owns BAYC #2589,    #8410,    MAYC   #3016,   and   Otherdeed   #27797,   #8410,   and #2589.[43]    Defendant Ohanian owns BAYC #822 and previously used it as his online avatar.  Defendant Ohanian also owns MAYC #11645.[44]  Finally, Defendant Oseary famously owns BAYC #8699.[45]  Oseary also owns at least nine MAYC tokens, 11 Otherdeed tokens,[46] and 28,472 APE tokens.[47]

---

[39]    Search OpenSea, GargaVault (Jan. 2023), https://opensea.io/GargaVault?collectionSlugs=boredapeyachtclub,mutant-ape-yacht-club,otherdeed).

[40]    Etherscan https://etherscan.io/address/0x03546b22bc80b3e6b64c4445963d981250267a68 (last visited Oct. 9, 2025).

[41]    Search OpenSea, gordongoner, https://opensea.io/gordongoner?collectionSlugs=boredapeyachtclub,mutant-ape-yacht-club,otherdeed.

[42]    Etherscan, https://etherscan.io/address/0x46efbaedc92067e6d60e84ed6395099723252496 (last visited Oct. 10, 2025).

[43]    Search OpenSea, ivanhodl, https://opensea.io/ivanhodl?collectionSlugs=boredapeyachtclub,mutant-ape-yacht-club,otherdeed.

[44]    Search OpenSea, goodkarma2005, https://opensea.io/goodkarma2005?collectionSlugs=boredapeyachtclub,mutant-ape-yacht-club.

[45]Anna Chan, *Club's Creators Sign With Madonna's Manager Guy Oseary*, NFTNOW (Oct.   12,   2021),   https://nftnow.com/news/bored-ape-yacht-club-sign-with-guy-oseary/#:~:text=%E2%80%9CMany%20people%20still%20have%20not,%E2%80%9D.

[46]    Search  OpenSea,  guyo,  https://opensea.io/guyo?collectionSlugs=mutant-ape-yacht-club,boredapeyachtclub,otherdeed.

[47] Etherscan, https://etherscan.io/token/0x4d224452801aced8b2f0aebe155379bb5d594381?a=0x7472895a8f31acb070deefa8fd496d4a40e262b3.

468.    By holding the same securities as Plaintiffs and the Class, the fortunes of Defendants were tied to the fortunes of the investors in each respective Yuga Financial Product.

469.    Vertical commonality also exists where an investor in the scheme and the scheme operators share the profits that are generated when the investor recruits new investors/members.  Thus, the "pyramid scheme" structure exists for the Yuga Financial Products.  Investors in the Yuga Financial Products and the Company, Executive Defendants, and ApeDAO Defendants proportionately shared the increase in the value of their Yuga holdings (on a *pro rata* basis) that occurred when new investors "joined the club" by purchasing Yuga Financial Products.

**C.    Yuga's Marketing Led Investors to Purchase the Yuga Financial Products with a Reasonable Expectation of Profit from Owning Them**

470.    Investors in the Yuga Financial Products, including Plaintiffs and the Class, made their investments with a reasonable expectation of profits.

471.    A purchaser may expect to realize a return through participating in distributions or through other methods of realizing appreciation on the asset, such as selling at a gain in a secondary market.  The reasonable expectation of profits can also be present when the digital asset that gives the holder rights to realize gain from capital appreciation of the asset can be traded on a secondary market or platform.  Further, this reasonable expectation can arise when the defendants (1) are able to benefit from their efforts as a result of holding the same class of assets as those being sold to the public or (2) continue to expend funds from proceeds to enhance the functionality or value of the network or digital asset.  Additionally, the reasonable expectation is created when the digital asset is marketed, directly or indirectly, using (1) the expertise of the defendants or their ability to build or grow the value of the network or digital assets; (2) the promise to build a business or operation as opposed to delivering a currently available goods or services for use on an existing network; or (3) the availability of a market for the trading of the digital asset, particularly where

1   the defendants implicitly or explicitly promise to create or otherwise support a trading

2   market for the digital asset.

3       472.   Each of these bases for establishing a reasonable expectation of profits

4   among investors is separately present here.  Furthermore, Defendants repeatedly used

5   profit-focused emojis like the rocket ship and moon in promotional statements and

6   marketing materials that all meant one thing: the promise of a financial return on an

7   investment in the Yuga Financial Products. The extensive and consistent promotional

8   messaging from Defendants described above, established within investors a

9   reasonable expectation that a purchase of any of the respective Yuga Financial

10  Products would provide a financial gain.  *See also* Additional Reliance Allegations

11  at ¶¶497-505.

12      **D.    Yuga's Marketing Led Investors to Expect Profits from the Yuga**

13          **Financial Products to Be Derived from the Managerial Efforts of the Executive Defendants**

14      473.   Plaintiffs and the Class have entirely passive roles vis-à-vis the success

15  of the Yuga Financial Products or the Bored Ape ecosystem.  Rather, the success of

16  the Bored Ape ecosystem, and the profits the Class reasonably expected to derive

17  from investing in the Yuga Financial Products, are dependent on the essential

18  technical, entrepreneurial, and managerial efforts of the Company, Executive

19  Defendants, and the ApeDAO Board Defendants.

20      474.  For example, when NFT exchange OpenSea temporarily delisted

21  numerous Bored Apes from its platform in June 2022, the Company, Executive

22  Defendants, and ApeDAO Board Defendants used their managerial efforts to work

23  with OpenSea to resolve the issue and ensure that it did not happen again.

24      475.  And when issues arose with NFT purchases in March 2023, the

25  Company, Executive Defendants, and ApeDAO Board Defendants announced to

26  investors on Discord that they used their managerial efforts to send ETH to the

27  affected wallets "covering the difference between the amount paid and floor."

28

476.   Plaintiffs and the Class reasonably expected Executive Defendants and ApeDAO Board Defendants to provide significant managerial efforts, to develop and improve the Bored Ape ecosystem, and to provide and/or secure exchanges through which Yuga Financial Products can be traded or liquidated.  Defendants repeatedly represented that they would provide significant managerial efforts to achieve these objectives and make Yuga Financial Products a profitable investment by developing and attracting users to the Bored Ape ecosystem.

477.   For example, on January 3, 2022, Yuga publicly stated that "we see ourselves as temporary stewards of [the BAYC] IP that is in the process of becoming more and more decentralized.  Our ambition is for this to be a community-owned brand, with tentacles in world-class gaming, events, and streetwear.  We think there's still work to be done to ensure that what we hand over to the community is in as strong a position as it can be."

478.   According to an April 17, 2021 promotion on the BAYC Twitter account, "the more apes sell, the more we get to work on future membership benefits," a statement directly tying the sales of Yuga NFTs to the Company's operations.  That promotion also indicated that one of the Roadmap Activations promoted to investors was "an interative [sic] NFT breeding arcade game: MUTANT APES!"  These marketed activations, including the creation and development of the MAYC NFT-related breeding arcade game, required technical and operational expertise that Plaintiffs and the class did not and could not have, but would rather solely come from the efforts of the Company, Executive Defendants, and ApeDAO Defendants.  Similarly, on April 24, 2021 Defendant Aronow personally spoke to investors on the Yuga Discord channel and represented that the Yuga Financial Products would have "inherent, long-term, value" through Yuga's own efforts, "Namely, the Roadmap Activations."  That same day, Defendant Solano also personally solicited investors on Discord and similarly represented that Yuga's efforts, such as "The Bathroom and other Roadmap Activations . . . give intrinsic

value to holding an ape token."  Notably, Yuga and its executives were solely responsible for building the Bathroom platform and effectuating the Roadmap Activations.  As a result, investors were entirely reliant on the Yuga management's efforts to maintain and foster the intrinsic value of the Yuga Financial Products.



479.   Yuga represented that the value of its Yuga Financial Products was "a top priority of ours."  For example, Yuga acknowledged that it would develop "breeding" which would generate additional valuable Yuga Financial Products for BAYC holders, such as MAYC (which, in turn, generated additional ApeCoins). Yuga represented that "nothing we do with breeding will hurt the collections value, it's a top priority of ours."

480.   In an April 29, 2021 post on Discord, Defendant Aronow acknowledged that "the more apes sell, the more the project grows in scope, due to the Roadmap Activations."  Aronow further described a cycle wherein "each sale moves the project forward towards more activations."  These Roadmap Activations were a simple way for Yuga and the Executive Defendants to describe their plans to improve the value of the Yuga Financial Products through Yuga's and Executive Defendants' efforts.

481.   Yuga used the proceeds of its sales and royalties of the Yuga Financial Products to purchase other valuable intellectual property, including CryptoPunks, one of the first and most valuable NFTs on the Ethereum blockchain.

482.   Yuga Financial Products therefore derives its value entirely from the usefulness and popularity of the Bored Ape ecosystem, which is, in turn, highly, if not entirely, dependent on the significant technical, entrepreneurial, and managerial efforts of the Company and Executive Defendants.  The purchase of Yuga Financial Products is thus an investment in a common enterprise, with an expectation of profits, based upon the efforts of its promoter, the Defendants.

483.   A key factor in determining whether a digital asset is a security or not is whether there is a centralized entity behind the digital asset.[48]  The Company is a registered Delaware corporation since February 8, 2021 and has maintained itself as the centralized entity behind the Yuga Financial Products throughout their entire existence, notwithstanding the creation of the shell entity of the so-called Ape Foundation or ApeDAO.

## MECHANICS OF PLAINTIFFS' PURCHASES

484.   Plaintiffs purchased their NFTs on exchanges based in the United States, including OpenSea.  Yuga NFTs are ERC-721 tokens on the Ethereum blockchain, the nodes of which reside in the United States, including in California and this District.

485.   OpenSea's website describes the mechanics of how purchases are made and how fees are collected and distributed to OpenSea as well as the original creators of the NFT.  According to OpenSea's Help Center, and consistent with the experience of Plaintiffs, the buyer is responsible for paying the full item price, a portion of which (2.5%) is received by OpenSea as its fees.[49]  In addition to OpenSea's fees, buyers pay what are known as "creator earnings" which refer to the portion of the NFT sale price paid to the original creator of the NFT when the item moves from wallet to wallet after a purchase.  On OpenSea, creator earnings are either optional or enforced.

---

[48]    *Id*. (noting that the "decentralized structure" of Bitcoin and Ethereum placed these digital assets outside the "disclosure regime of the federal securities laws").

[49]    OpenSea Help Center, https://support.opensea.io/hc/en-us/articles/14068991090067-What-fees-do-I-pay-on-OpenSea- (last visited Oct. 9, 2025).

THIRD AMENDED CLASS ACTION COMPLAINT - CASE NO. 2:22-cv-08909-FMO-PLA

Pursuant to the OpenSea Help Center, if a purchase included creator earnings "a portion of the item price you paid will go to the creator of the NFT."[50]  For the Yuga NFTs, the creator earning fees were enforced and buyers were charged a 2.5% fee that was paid to Yuga.

486.   In connection with their Yuga NFT purchases on OpenSea, Plaintiffs paid this fee to Yuga.  The fee structure described by the OpenSea Help Center is consistent with the data captured on the Ethereum blockchain for Plaintiffs' purchases.

487.   By way of example, for his Mutant Ape NFT purchase on April 17, 2022, Plaintiff Johnson paid 30 ETH in total.  1.5 ETH of this purchase, or 5%, was paid in fees.  This 5% in fees aligns exactly with OpenSea's 2.5% fee combined with Yuga's 2.5% creator earning royalty.  Thus, 0.75 ETH (approximately $2,295.21 given eth's price at the time) was paid to Yuga in connection with this Yuga NFT purchase.  The payment of this fee to Yuga thus places Plaintiff Johnson in direct privity with Yuga Labs in connection with this transaction.

488.   This was not the only time Plaintiff paid creator fees to Yuga, which were subsequently used to fund the Company's operations..

489.   For his Mutant Ape NFT purchase on August 29, 2021, Plaintiff Titcher paid a total of 5.3 ETH.  0.265 ETH of this purchase, or 5%, was paid in fees.  This 5% in fees aligns exactly with OpenSea's 2.5% fee combined with Yuga's 2.5% creator royalty.  Thus, 0.1325 ETH (approximately $427.35 at the time) was paid to Yuga in connection with this Yuga NFT purchase.  The payment of this fee to Yuga thus places Plaintiff Titcher in direct privity with Yuga in connection with this transaction.

490.   The creator royalty for the Otherdeed Yuga NFTs was set to 5%.  For his purchase of his Otherdeed Yuga NFT on May 1, 2022, Plaintiff Titcher paid a total of 6.7 ETH.  0.5025 ETH of this purchase, or 7.5%, was paid in fees.  This 7.5%

---

[50]    *Id.*

1    in fees aligns exactly with OpenSea's 2.5% fee combined with Yuga's 5% creator

2    royalty for the Otherdeed NFTs.  Thus, 0.335 ETH (approximately $946.72 at the

3    time) was paid to Yuga in connection with this Yuga NFT purchase.  The payment

4    of this fee to Yuga thus places Plaintiff Titcher in direct privity with Yuga in

5    connection with this transaction.

6         491.   Plaintiffs' Yuga NFT purchases on OpenSea followed the same pattern

7    with portions of their respective NFT purchase prices going directly to Yuga in the

8    form of the enforced creator royalties.  Thus, these Plaintiffs are in direct privity with

9    Yuga for their NFT purchases.

10        492.   Records of absent class Members' transactions on OpenSea and the

11   concomitant fees paid to Yuga are likewise reflected on the Ethereum blockchain and

12   can be tracked using a common methodology.

13        493.   Plaintiffs purchased ApeCoin on exchanges located in the United States,

14   including on Coinbase, which is based in California.  The ApeCoin purchased by

15   Plaintiffs are ERC-20 tokens on the Ethereum blockchain, nodes of which reside in

16   the United States, including in California and this District.

17        494.   Yuga released ApeCoin through a series of offshore legal fictions in an

18   attempt to avoid liability for a blatant ICO of unregistered securities.

19        495.   ApeCoin was created by Yuga and the ApeDAO Special Council and

20   was provided to U.S.-based cryptocurrency exchanges.  ApeCoin tokens were lent to

21   market makers like Alameda Research and Wintermute Trading LTD who provided

22   liquidity for exchanges where retail investors like Plaintiffs made purchases.  Because

23   the tokens were loaned to the market makers, the legal title to the tokens remained

24   with the token issuers.

25        496.   Plaintiffs purchased their ApeCoin tokens on U.S.-based exchanges like

26   Coinbase.  Coinbase's terms of service disavow that Coinbase passes title to retail

27   investors on its platform.  Coinbase's terms of service explicitly foreclose the

28   possibility that, as an exchange facilitating the trading of ApeCoin tokens, Coinbase

THIRD AMENDED CLASS ACTION COMPLAINT - CASE NO. 2:22-CV-08909-FMO-PLA

took possession of the title to the ApeCoin tokens that were passed to investors who purchased ApeCoin tokens on Coinbase.  Instead, Coinbase positioned itself as a mechanism for sellers like Yuga, the ApeDAO Special Council, and their market marking partners to pass title of ApeCoin tokens directly to buyers like Plaintiffs and other class Members.

## ADDITIONAL RELIANCE ALLEGATIONS

497.  Plaintiffs Smith, Titcher, Grand, Patel, and Palombini saw the promotions by Sotheby's and the Company on the lead up to, during, and immediately following the auction of a lot of BAYC NFTs held on September 9, 2021.  These promotions of the auction and the winning bidder being a traditional art collector, the legitimacy of Yuga and its NFT collections, and the growth/adoption potential for Yuga Financial Products were a primary factor in inducing Titcher to make his first purchase of a MAYC NFT on August 29, 2021 and then continue to hold on to that NFT subsequently.  Similarly, the Sotheby's promotion induced Plaintiff Palombini to make his purchase on April 30, 2021.  Likewise, Smith saw and relied on the representations from Sotheby's concerning traditional art collectors when making his purchase of Yuga Financial Products on March 22, 2022, March 23, 2022, March 24, 2022, May 9, 2022, May 11, 2022, and July 22, 2022.  Smith, Titcher, Grand, Patel, and Palombini are well aware of Sotheby's longstanding reputation as one of the premier auction houses in the world and relied on the representations by the Company and Sotheby's regarding the auctions' legitimacy. Smith, Titcher, Grand, Patel, and Palombini reasonably believed that the fact that Sotheby's was conducting an auction of the BAYC NFTs was a positive indication of the Company's future growth prospects for the Yuga Financial Products being offered.  In addition to Sotheby's, Smith, Titcher, Grand, Patel, Johnson, and Palombini were aware of *Rolling Stone* magazine and its reputation as a high-profile publication that acts as a cultural tastemaker, and they specifically saw the Company's November 1, 2021 promotion of BAYC NFTs on the cover of *Rolling*

*Stone*. Smith, Titcher, Grand, Patel, Johnson, and Palombini also saw Defendant Oseary's promotion of the same as being the "First @RollingStone NFT cover." These promotions furthered the marketing message from the Company and its insiders regarding the legitimacy of Yuga and the growth potential for Yuga Financial Products, and it was a primary factor in inducing Titcher to continue to hold onto his first purchase of a MAYC NFT as well as to inducing Smith, Titcher, Grand, Johnson, and Palombini purchase additional Yuga Financial Products. Smith, Titcher, Grand, Patel, Johnson, and Palombini reasonably believed these promotions to be a validation of the relevancy and legitimacy of the BAYC NFTs and Yuga as a NFT company with staying power.

498.    Smith, Titcher, Grand, Johnson, Patel, H. Patel, and Palombini are aware of Defendant Fallon from his many years as a famous comedian and television talk show host. Similarly, Smith, Titcher, Grand, Patel and Palombini know of Defendant Hilton from her years as a reality television star, as well as being the heiress to the Hilton hotel empires. Titcher followed the social media accounts of Fallon and Hilton during the Class Period, and he, Smith, Grand, Patel, H. Patel, and Palombini regularly saw posts from and about Fallon and Hilton on Twitter via the trending or discovery features of the platform. Smith, Titcher, Grand, Patel, H. Patel, Johnson, and Palombini were likewise aware of Defendant Winkelmann as being a famous contemporary digital artist. Smith, Titcher, Grand, Patel, H. Patel, Johnson, and Palombini saw and/or were aware of the first promotion of the BAYC NFT collection and the statements by Defendants Fallon and Winkelmann regarding MoonPay during the November 11, 2021 episode of the *Tonight Show*, as well as the related promotions by Fallon (November 12, 2021; November 17, 2021), Winkelmann (November 11, 2021), and MoonPay (November 11, 2021) on their respective Twitter and/or Instagram accounts. Smith, Titcher, Grand, Patel, Johnson, and Palombini also saw the second promotion of the BAYC NFT collection and MoonPay occurring during the *Tonight Show* episode that aired on January 24, 2022, and the related

1   promotions by Fallon (January 25, 2022), Hilton (January 24, 2022; January 25,

2   2022, January 31, 2022), MoonPay (January 24, 2022), and Universal (January 24,

3   2022).  Smith, Titcher, Grand, Patel, and Palombini reasonably believed that both

4   Fallon and Hilton had purchased BAYC NFTs (as opposed to being given them in

5   exchange for promoting the Company, MoonPay, and the Yuga Financial Products).

6   Further, Smith, Titcher, Grand, Patel, and Palombini reasonably believed that

7   Fallon's and Hilton's promotions on the *Tonight Show* were vetted and approved by

8   Defendant Universal, since Universal has ultimate control over what is aired on its

9   network, including the segments during the show, as well as owning and/or

10  controlling the *Tonight Show*'s official social media accounts that continued to

11  promote the segment after the show's initial airing.  These promotions induced

12  Titcher to continue to hold onto his first purchase of a MAYC NFT as well as

13  inducing Smith, Titcher, Grand, Patel, H. Patel, and Palombini to purchase additional

14  Yuga Financial Products subsequently.

15      499.    Smith, Titcher, Grand, Patel, H. Patel, and Palombini are also avid music

16  listeners, particularly of pop music.  Thus, Smith, Titcher, Grand, Patel, H. Patel, and

17  Palombini have been aware of Defendant Ciccone from her decades of being a world

18  famous pop star.  Smith, Titcher, Grand, Patel, H. Patel, and Palombini regularly see

19  posts from and about Ciccone on various social media platforms via the trending or

20  discovery features of the platform.  Smith, Titcher, Grand, Patel, H. Patel, and

21  Palombini specifically saw Ciccone's March 24, 2022 promotion of Yuga Financial

22  Products and MoonPay, which was also promoted on MoonPay's Twitter account on

23  March 24, 2022.  Smith, Titcher, Grand, and Palombini also saw and relied on

24  Ciccone's promotional statements in *Variety* magazine.  These promotions induced

25  Smith and Titcher to continue to hold onto their first purchases of Yuga Financial

26  Products as well as inducing Smith, Titcher, Grand, Patel, H. Patel, and Palombini to

27  purchase additional Yuga Financial Products subsequently, as they reasonably

28

believed that Ciccone's professed enthusiasm for the Bored Ape ecosystem and purported use of the MoonPay concierge service was genuine.

500.    Smith, Titcher, Grand, Patel, Palombini, and Johnson similarly know of Defendant Bieber from his successful career as a pop singer and often saw posts from and about Bieber on social media.  Defendant Bieber's promotion induced H. Patel to make his purchases of Yuga Financial Products on February 8, 2022, March 18, 2022, March 20, 2022, April 23, 2022, May 1, 2022, May 9, 2022, August 22, 2022, August 30, 2022, October 13, 2022, and December 20, 2022.  Similarly, Smith, Titcher, Johnson, Grand, Patel, H. Patel, and Palombini specifically saw and relied on the January 31, 2022 promotion by Defendant Bieber that he had not only purchased a BAYC NFT, but had done so at price that was significantly above the then-current floor price for BAYC NFTs.  Smith, Titcher, Grand, Johnson, H. Patel, and Palombini also saw Bieber's February 7, 2022 promotion of the BAYC NFT collection on his personal Twitter account.  Smith, Titcher, Grand, Patel, H. Patel, and Johnson reasonably believed that Bieber genuinely purchased the BAYC NFTs at such a high price because Bieber determined that was the true value of the BAYC NFT and was making the purchase of the BAYC NFT as part of his multi-million-dollar investment strategy.  This promotion in particular induced Titcher to continue to hold onto his first purchase of a MAYC NFT as well as inducing Smith, Titcher, Palombini, Grand, Patel, H. Patel, and Johnson to purchase additional Yuga Financial Products when they otherwise would not have done so.

501.  In addition, Smith, Titcher, Grand, Patel, H. Patel, Johnson, and Palombini are life-long fans of professional sports, particularly basketball.  Smith, Titcher, Grand, Patel, Johnson, and Palombini are aware of Defendant Curry as a world champion basketball player with significant wealth and influence, Smith, Titcher, Grand, Patel, H. Patel, Johnson, and Palombini saw Curry's promotion of the BAYC NFT collection within the FTX commercial posted on February 18, 2022. Smith, Grand, Patel, and Titcher also saw Curry's September 2, 2021 post in the

1   BAYC Discord and believed that Curry's participation with the BAYC Discord

2   indicated a genuine interest as opposed to being part of a manipulative promotional

3   scheme.  Smith, Titcher, Grand, Patel, H. Patel, Johnson, and Palombini reasonably

4   believed that Curry was a legitimate purchaser of BAYC NFTs with a genuine

5   interest in the Bored Ape ecosystem, and that Curry had made his purchase of the

6   BAYC NFT as part of his multi-million-dollar investment strategy.   These

7   promotions in particular induced Titcher to continue to hold onto his first purchase

8   of a MAYC NFT as well as inducing Smith, Titcher, Grand, Patel, H. Patel, Johnson,

9   and Palombini to purchase additional Yuga Financial Products when they otherwise

10  would not have done so.

11         502.   The statements and promotions by Defendants Fallon, Winkelmann,

12  Hilton, Ciccone, Bieber, and Curry gave Plaintiffs the false impression that these

13  celebrities had purchased BAYC NFTs as investors, and that they were making the

14  Yuga Financial Products a part of their respective multi-million-dollar investment

15  strategies.  Each of these promotions, individually and collectively, induced Smith to

16  make his purchases of Yuga Financial Products on March 2, 2022, March 23, 2022,

17  and March 24, 2022; Titcher to make his purchases of Yuga Financial Products on

18  March 17, 2022, April 29, 2022, and May 1, 2022; Palombini to make his purchases

19  of Yuga Financial Products on April 30, 2022, May 2, 2022, May 5, 2022, and May

20  9, 2022; Grand to make his purchases on March 20, 2022: Patel to make his purchases

21  from January 20, 2022 through June 21, 2023; H. Patel to make his purchases of Yuga

22  Financial Products on February 8, 2022, March 18, 2022, March 20, 2022, April 23,

23  2022, May 1, 2022, May 9, 2022, August 22, 2022, August 30, 2022, October 13,

24  2022, and December 20, 2022; and Johnson to make his purchases of Yuga Financial

25  Products on February 1, 2022, April 15, 2022, April 17, 2022, April 19, 2022, April

26  21, 2022, April 24, 2022, April 26-27, 2022, and April 29, 2022.  These promotions

27  also induced Titcher to continue to hold on to his MAYC NFT investment when he

28  otherwise would not have done so.

503. Smith, Titcher, Grand, Patel, H. Patel, Johnson, and Palombini also followed the Yuga Twitter account (and related social media accounts controlled by Yuga and its insiders like the official BAYC (@BoredApeYC), Otherside (@othersidemeta) accounts), as well as being in the Company's Discord during the Class Period and saw the promotions that the Company, Executive Defendants Aronow and Solano, and/or ApeDAO Board Defendants posted (or approved/caused to be posted) on those platforms. For example, Smith, Titcher, Johnson, and Palombini saw and relied on the statements by the Company and Executive Defendants Muniz and Lyons contained in the March 16, 2022 press release for ApeCoin and the Otherside NFT launch by the Company. Similarly, Smith, Titcher, Grand, Patel, Johnson, and Palombini saw and relied on the Company's March 19, 2022 promotional video for the Otherside NFT collection when making their subsequent purchases of Yuga Financial Products. The misleading statements and omissions within these promotions from the Company and Executive Defendants Aronow, Solano, Muniz, and Lyons, in conjunction with the above-mentioned promotions from Defendants Fallon, Winkelmann, Hilton, Bieber, Ciccone, and Curry induced Titcher to purchase Yuga Financial Products on March 17, 2022, April 29, 2022, and May 1, 2022; induced Palombini to purchase Yuga Financial Products on April 30, 2022, May 2, 2022, May 5, 2022, and May 9, 2022; induced Smith to make his purchases of Yuga Financial Products on March 22, 2022, March 23, 2022, March 24, 2022, May 9, 2022, May 11, 2022, and July 22, 2022; induced Grand to purchase Yuga Financial Products on March 20, 2022; induced Patel to purchase Yuga Financial Products from January 20, 2022 through June 21, 2023; induced H. Patel to make his purchases of Yuga Financial Products on February 8, 2022, March 18, 2022, March 20, 2022, April 23, 2022, May 1, 2022, May 9, 2022, August 22, 2022, August 30, 2022, October 13, 2022, and December 20, 2022; and induced Johnson to make his purchases of Yuga Financial Products on February 1, 2022, April

15, 2022, April 17, 2022, April 19, 2022, April 21, 2022, April 24, 2022, April 26-27, 2022, and April 29, 2022.

504. Similarly, Smith, Titcher, Grand, Patel, H. Patel, and Johnson followed the ApeCoin official twitter page (which, upon information and belief, is owned and/or controlled by the ApeDAO Board Defendants and/or the Company) and saw the March 16, 2022 promotion introducing ApeCoin tokens to investors and touting this digital asset as being able to be used for gaming and "commerce." These promotions, in addition to the March 16 and March 19 promotions by the Company, Executive Defendant Muniz, and Lyons caused Smith, Titcher, Grand, Patel, and Johnson to purchase Yuga Financial Products and to continue to hold their investments in Yuga securities when they otherwise would not have done so.

505. Smith, Titcher, Johnson, Grand, Patel, and Palombini also saw the statements and promotions from Defendant Aronow that were posted and/or reposted on various social media platforms. For example, Smith, Titcher, Grand, Patel, and Johnson saw Defendant Aronow's August 21, 2021 Twitter post touting the increase of the BAYC NFTs' market cap to $1 billion. Smith, Titcher, Grand, Patel, and Johnson reasonably believed Aronow's statement indicated that the price of Yuga Financial Products would continue to rise and that this increase was the result of genuine investor interest. These misleading statements and omissions by Aronow induced Smith, Titcher, Grand, Patel, Johnson, and Palombini to purchase Yuga Financial Products and to continue to hold their investments in Yuga securities when they otherwise would not have done so.

**CLASS ACTION ALLEGATIONS**

506. Plaintiffs bring this action, individually and on behalf of a nationwide Class, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and/or 23(b)(3), defined as follows:

> All persons who, during the Class Period, purchased the Yuga Financial Products and were subsequently damaged thereby.

507.   The Class Period is defined as the period between April 24, 2021, and October 6, 2023.  Plaintiffs reserve the right to expand or amend the Class Period based on discovery produced in this matter.

508.   Excluded from the Class are: (a) Defendants; (b) Defendants' affiliates, agents, employees, officers and directors; (c) Plaintiffs' counsel and Defendants' counsel; and (d) the judge assigned to this matter, the judge's staff, and any member of the judge's immediate family.  Plaintiffs reserve the right to modify, change, or expand the Class definition set forth above based on discovery and further investigation.

509.   **Numerosity**: The Class is so numerous that joinder of all members is impracticable.  On December 1, 2022, there were more than 103,000 unique account holders of Yuga securities.

510.   **Commonality**: Common questions of law and fact exist as to all members of each Class.  These questions predominate over questions affecting individual Class members.  These common legal and factual questions include, but are not limited to:

a.    whether the Executive Defendants with the Promoter Defendants fraudulently marketed the Yuga securities;

b.    whether Executive Defendants conspired to artificially inflate the price of the Yuga Financial Products and then sell the Yuga securities to unsuspecting investors;

c.    whether Defendants have been unjustly and wrongfully enriched as a result of their conduct;

d.    whether the proceeds that the Defendants obtained as a result of the sale of the Yuga Financial Products rightfully belong to Plaintiffs and Class members;

1    e.  whether Defendants should be required to return money they
2 received as a result of the sale of Yuga Financial Products to Plaintiffs and Class
3 members; and

4    f.  whether Plaintiffs and Class members have suffered damages,
5 and, if so, the nature and extent of those damages.

6   511. **Typicality**: Plaintiffs have the same interest in this matter as all Class
7 members, and Plaintiffs' claims arise out of the same set of facts and conduct as the
8 claims of all Class members.  Plaintiffs' and Class members' claims all arise out of
9 uniform misrepresentations, omissions, and unlawful, unfair, and deceptive acts and
10 practices related to the sale of Yuga Financial Products.

11   512. **Adequacy**: Plaintiffs have no interests that conflict with the interests of
12 the Class and are committed to pursuing this action vigorously.  Plaintiffs have
13 retained counsel competent and experienced in complex consumer class action
14 litigation.  Accordingly, Plaintiffs and their counsel will fairly and adequately protect
15 the interests of the Class.

16   513. **Superiority**: A class action is superior to all other available means of
17 fair and efficient adjudication of the claims of Plaintiffs and members of the Class.
18 The injury suffered by each individual Class member is relatively small compared to
19 the burden and expense of individual prosecution of the complex and extensive
20 litigation necessitated by Defendants' conduct.  It would be virtually impossible for
21 individual Class members to effectively redress the wrongs done to them.  Even if
22 Class members could afford individualized litigation, the court system could not.
23 Individualized litigation would increase delay and expense to all parties, and to the
24 court system, because of the complex legal and factual issues of this case.
25 Individualized rulings and judgments could result in inconsistent relief for similarly
26 situated individuals.  By contrast, the class action device presents far fewer
27 management difficulties, and provides the benefits of single adjudication, economy
28 of scale, and comprehensive supervision by a single court.

514.   Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the Class as a whole.

**PRESUMPTION OF RELIANCE**

515.   Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)   the omissions and misrepresentations were material;

(c)   Yuga Financial Products are traded in an efficient market;

(d)   the Yuga Financial Products were liquid and traded with moderate to heavy volume during the Class Period;

(e)   the Yuga Financial Products traded on various national cryptocurrency exchanges in the United States;

(f)   the Company was covered by securities analysts;

(g)   the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Yuga Financial Products; and

(h)   Plaintiffs and members of the Class purchased, acquired, and/or sold Yuga Financial Products between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed without knowledge of the omitted or misrepresented facts.

516.   Five factors are typically applied to determine whether a particular security meets the "efficient market" requirement: (1) whether the security trades at a high volume; (2) whether analysts follow and report on the security; (3) whether the security has market makers and arbitrageurs; (4) whether the Company is eligible to file SEC registration forms S-3; and (5) whether there are empirical facts showing a cause-and-effect relationship between unexpected corporate events or financial

releases and an immediate response in the stock market. As discussed more thoroughly above, these factors weigh in favor of finding that the Yuga securities were traded in an efficient market. For example, when the initial complaint in this action was filed, ApeCoin was trading a daily average volume of $183.7M.[51] Next, as detailed herein, analysts reported on the Yuga Financial Products at issue repeatedly throughout the Class Period. Each of these analyst reports was publicly available to investors. And the price of Yuga Financial Products changed in relation to public statements or reports about the activities of the Company. Indeed, the market price of Yuga securities reacted promptly to the dissemination of public information regarding the Bored Ape Yacht Club, the ApeDAO, Yuga Labs, and MoonPay. The Yuga securities also used the Executive Defendants and ApeDAO Board Defendants to serve as market makers for Yuga securities liquidity. The Defendants also engaged firms like Alameda and Wintermute to serve as market makers for the Yuga Financial Products' liquidity.

## VIII. COMMON IMPACT OF ARTIFICIAL INFLATION OF PRICES OF YUGA SECURITIES

517. As set forth above, Defendants had a common scheme to artificially inflate the price of Yuga securities. The prices of all of the Yuga securities were manipulated by the same misconduct and therefore were subject to the same impact. The misleading promotions and artificial increase in value of one Yuga security, such as the BAYC NFTs, had an impact on and carried over to Plaintiffs' and Class members' belief that the other Yuga products (MAYC, ApeCoin and Otherdeed) marketed by those same Defendants would also be successful and increase in price.

518. Defendants jointly marketed the Yuga securities to further enforce their across-the-board marketing success. Defendants were motivated to maintain artificially inflated prices for all Yuga securities. The profits of Defendants were

---

[51] *ApeCoin*, BEINCRYPTO (last visited Oct. 16, 2023), https://beincrypto.com/price/apecoin/.

dependent on the 2.5% royalty fee that the Company retained on every resale of a Yuga NFT.  All of the Yuga securities derive their value entirely from the usefulness and popularity of the Bored Ape ecosystem, which is, in turn, highly, if not entirely, dependent on the perceived technical, entrepreneurial, and managerial efforts of the Company and Executive Defendants.  Plaintiffs and Class members believed that their purchase of Yuga securities was an investment in a common enterprise, with an expectation of profits, based upon the efforts of their promoters, the Defendants.

519.   Common impact as to all of the Yuga securities is evident by the fact that prices of these securities dropped during the same time period as a result of the same adverse disclosures about the Company.

**CAUSES OF ACTION**

**<u>FIRST CAUSE OF ACTION</u>**

**Unregistered Offering and Sale of Securities in
Violation of Sections 5 and 12(a)(1) of the Securities Act of 1933
(Against the Company, Executive Defendants, ApeDAO Defendants, Moonpay
Defendants, and Promoter Defendants Winklemann, Ciccone, Hilton, Fallon,
Bieber, Curry and Sotheby's)**

520.   Plaintiffs restate and reallege all preceding allegations in the paragraphs above as if fully set forth herein, and further allege the following:

521.   The Company, Executive Defendants, and ApeDAO Board Defendants are collectively referred to in this cause of action as the "Statutory Seller Defendants."

522.   The Company, Executive Defendants, ApeDAO Defendants, MoonPay Defendants, and Promoter Defendants Winklemann, Ciccone, Hilton, Fallon, Bieber, Curry, and Sotheby's are collectively referred to in this cause of action as the "Solicitation Defendants."

523.   Statutory Seller Defendants and the Solicitation Defendants, and each of them, by engaging in the conduct described above, directly or indirectly, made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to

1  be carried through the mails or in interest commerce for the purpose of sale or for

2  delivery after sale.

3      524.   Yuga Financial Products are securities within the meaning of Section

4  2(a)(1) of the Securities Act, 15 U.S.C. §77b(a)(1).

5      525.   Plaintiffs and members of the Class purchased Yuga Financial Product

6  securities.

7      526.   No registration statements have been filed with the SEC nor have been

8  in effect with respect to any of the offerings alleged herein.  No exemption to the

9  registration requirement applies.

10     527.   SEC Rule 159A provides that, for purposes of Section 12(a)(2), an

11  "issuer" in "a primary offering of securities" shall be considered a statutory seller.

12  17 C.F.R. §230.159A(a).  The Securities Act in turn defines "issuer" to include every

13  person who issues or proposes to issue any security.  15 U.S.C. §77b(a)(4).  The

14  Statutory Seller Defendants are issuers of Yuga Financial Products and, as noted

15  above, are in privity with every purchaser of Yuga's various NFT collections (*i.e.*,

16  the BAYC, MAYC, and Otherdeed NFTs) via the "creator's fee" collected by the

17  Company on every sale of Yuga NFts and with every purchaser of ApeCoin via their

18  provisioning of ApeCoin tokens to the liquidity pools that Plaintiffs and Class

19  members purchased from.

20     528.   The Solicitation Defendants are also liable under the solicitation prong

21  of §12(a)(1).  The U.S. Supreme Court has held that statutory sellers under §12(a)(1)

22  also include the buyer's immediate seller and any person who actively solicited the

23  sale of the securities to plaintiff and did so for financial gain.  That is, §12(a)(1)

24  liability extends to sellers who actively solicit the sale of securities with a motivation

25  to serve their own financial interest or those of the securities owner.  As specifically

26  alleged herein, the Solicitation Defendants all actively solicited sales of the Yuga

27  Financial Products on social media, proprietary web sites, press releases, television,

28  and/or traditional print media.  Thus, they are each liable under the solicitation prong,

1  in addition to any liability flowing from their direct issuance of Yuga Financial

2  Products.

3      529.   By reason of the foregoing, the Company, Executive Defendants

4  Aronow, Solano, Muniz, Shoemaker, Ehrlund, Lyons, ApeDAO Defendants

5  Ohanian, Wu, Bajwa, MoonPay and its CEO Defendant Soto-Wright, and Promoter

6  Defendants Oseary, Winklemann, Ciccone, Hilton, Fallon , Bieber, Curry, and

7  Sotheby's, each violated Sections 5(a), 5(c), and 12(a) of the Securities Act, 15

8  U.S.C. §§77e(a), 77e(c), and 77l(a).

9      530.   As a direct and proximate result of the Statutory Seller Defendants'

10  unregistered sale of securities and/or the Solicitation Defendants' solicitation of sales

11  of unregistered securities, Plaintiffs and the Class have suffered damages in

12  connection with their Yuga Financial Product purchases.

13                    **SECOND CAUSE OF ACTION**

14          **Violation of Sections 15 of the Securities Act of 1933**
    **(Against the Executive Defendants, ApeDAO Board Defendants, and**
15          **Individual Defendants Oseary, Soto-Wright, and Universal)**

16      531.   Plaintiffs restate and reallege all preceding allegations in the paragraphs

17  above as fully set forth herein, and further allege the following:

18      532.   This Count is asserted against Executive Defendants Aronow, Solano,

19  Ataly, Ali, Muniz, Shoemaker, Ehrlund, Oseary, ApeDAO Board Defendants Lyons,

20  Ohanian, Wu, and Bajwa, and Individual Defendants Oseary, Soto-Wright, and

21  Universal (collectively referred to in this cause of action as the "Control Person

22  Defendants") under Section 15 of the Securities Act of 1933, 15 U.S.C. §77o.

23      533.   The Control Person Defendants, by virtue of their offices, ownership,

24  agency, agreements or understandings, and specific acts were, at the time of the

25  wrongs alleged herein, and as set forth herein, controlling persons within the meaning

26  of Section 15 of the Securities Act of 1933.  The Control Person Defendants, and

27  each of them, had the power and influence and exercised the same to cause the

28  unlawful offer and sale of Yuga Financial Products securities as described herein.

534.   The Control Person Defendants, separately or together, possess, directly or indirectly, the power to direct or cause the direction of the management and policies of Yuga and/or MoonPay, through ownership of voting securities, by contract, subscription agreement, or otherwise. Defendant Universal possessed the power over content of the *Tonight Show* segments, including the misleading Yuga-related segments by Defendant Fallon that were aired on television.   Likewise, Defendant Universal had control over its own social media channels, which reposted the misleading *Tonight Show* segments.

535.   The Control Person Defendants also have the power to direct or cause the direction of the management and policies of the Company and/or MoonPay.

536.   The Control Person Defendants, separately or together, have sufficient influence to have caused the Company and/or MoonPay to submit a registration statement for the Yuga Financial Products.

537.   The Control Person Defendants, separately or together, jointly participated in the Company's and MoonPay's failure to register Yuga Financial Products.

538.   By virtue of the conduct alleged herein, the Control Person Defendants are liable for the wrongful conduct complained of herein and are liable to Plaintiffs and the Class for rescission and/or damages suffered.

## **THIRD CAUSE OF ACTION**

**Violation of Sections 10b of the Securities Exchange Act of 1934
and Rule 10b-5(b) thereunder
(Fraudulent Statement Liability)
(Against the Executive Defendants, the MoonPay Defendants,
the ApeDAO Board Defendants, and Sotheby's)**

539.   Plaintiffs restate and reallege all preceding allegations in the paragraphs above as if fully set forth herein, and further allege the following:

540.   Plaintiffs bring this claim for violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78j(b), and Rule 10b-5(b) promulgated thereunder, 17 C.F.R. §240.10b-5(b).

541. The Yuga Financial Products are securities within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. §77b(a)(1).

542. Section 10(b) and Rule 10b-5(b) make it illegal, in connection with the purchase or sale of any security, "for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange . . . to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." *Id.*

543. The Executive Defendants, the MoonPay Defendants, Wu, and Sotheby's (with the aid of the other Defendants) carried out a plan, scheme, and course of conduct that was intended to and did deceive the retail investors – Plaintiffs and the other Class members – who acquired Yuga Financial Products pursuant to the continuous offering and thereby caused them to purchase Yuga Financial Products at artificially inflated prices.

544. In connection with the continuous offer and sale of the Yuga Financial Products, the Executive Defendants, the MoonPay Defendants, Wu, and Sotheby's disseminated, approved, and/or endorsed the false statements described herein, which they knew or recklessly should have known were materially misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not materially misleading.

545. The Executive Defendants, the MoonPay Defendants, Wu, and Sotheby's employed devices, schemes, and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary to make the statements made not misleading; and engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the Class members that resulted in artificially high market prices for the Yuga Financial Products, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

546.   Yuga fundamentally misrepresented the nature of the Yuga Financial Products, hawking them as memberships into a "fan club on steroids that encourages owners of the NFTs to move through an ever-growing and exclusive list of events and opportunities" instead of unregistered securities with highly inflated prices due to wash trading and other manipulative practices.  Yuga also represented that the Bored Ape NFT collection had achieved over $1 billion in trading volume, but failed to disclose that the NFT collections were significantly plagued by wash trading.

547.   Further, in offering the Yuga Financial Products, the Executive Defendants failed to disclose material aspects of Yuga's business, and made materially misleading statements, or omitted to state material facts necessary to make statements made, in the light of the circumstances under which the statements were made, not misleading.

548.   Likewise, in promoting the Yuga Financial Products, the MoonPay Defendants made materially misleading and incomplete statements.  MoonPay falsely stated the celebrities had bought their Bored Apes, when in fact they had been gifted them from MoonPay.  MoonPay omitted the material information that it was engaging in manipulative trading.

549.   Similarly, in promoting the Yuga Financial Products, Sotheby's falsely stated that the winning bidder in the Sotheby's BAYC auction was a "traditional" collector and that "legacy art collectors were also heavily involved in the bidding."

### A.    Misrepresentations and Omissions

550.   Defendants' untrue statements and omissions of material facts in connection with the sale of Yuga Financial Products are highlighted in ¶58 (Solano, Yuga);  ¶¶114-119 (Sotheby's);  ¶¶211-212 (Solano);  ¶226 (Aronow);  ¶137 (Moonpay);  ¶¶286-287 (Soto-Wright, Moonpay);  ¶290 (Wu);  ¶292 (Bajwa);  ¶333 (ApeDAO Defendants).  They include, but are not limited to, the following examples:

551.   In order to make those statements not misleading, Defendants were obligated to disclose that:

a.  The buyer at the Sotheby's auction was not a traditional art buyer, but was instead cryptocurrency industry insiders with FTX;

b.  The price and volume of the Yuga NFTs was heavily impacted by wash trading and other manipulative practices;

c.  A large number of the original mints of the Bored Ape NFTs were minted by Binance and/or FTX insiders;

d.  MoonPay, Soto-Wright, and Oseary were orchestrating a widespread celebrity shilling scheme;

e.  MoonPay and Soto-Wright were making manipulative trades themselves to increase trading volume and price;

f.  The Promotor Defendants had ownership interests in MoonPay and stood to financially gain from their promotions;

g.  MoonPay was gifting Bored Ape NFTs to influencers and not expecting payment for them;

h.  ApeCoin would not actually be used on NFT exchanges and would not be accepted to buy luxury goods; and

i.  Market making firms like Alameda Research and Wintermute were given secret loans of ApeCoin.

**B.  Materiality**

552.  The forgoing misrepresentations and omissions were each material. These representations related to critical issues concerning the viability of the Yuga Financial Product holders' investments.

553.  These misrepresentations and omissions related to, among other things: (i) the extent to which the Yuga Financial Products were subject to manipulative trading practices; and (ii) whether the hype around the Yuga Financial Products was genuine and organic or orchestrated pursuant to a fraudulent scheme. If a reasonable investor knew that the Yuga Financial Products were subject to manipulative trading practices and were the subject of a celebrity shilling scheme, then that investor would

1   reasonably expect the price of Yuga Financial Products to be substantially lower,

2   given that the investment would be much riskier.

3       554.   Accordingly, there is a substantial likelihood that the disclosure of the

4   omitted facts would have been viewed by the reasonable investor as having

5   significantly altered the "total mix" of information made available.

6       **C.    Scienter**

7       555.   The Executive Defendants, MoonPay Defendants, Wu, and Sotheby's

8   acted with scienter in engaging in the forgoing misconduct, in that they either had

9   actual knowledge of the misrepresentations and omissions of material facts set forth

10  herein, or acted with reckless disregard for the truth in that they failed to ascertain

11  and to disclose such facts, even though such facts were available to them.

12      556.   The Executive Defendants knew that the trading done by Binance and/or

13  FTX insiders close to the mint had outsized impacts.  Yuga knew that the celebrity

14  promotions had been done at the behest of Oseary and MoonPay.  Based on their

15  control of the smart contracts to mint the Bored Apes and their oversight of trading

16  activity, the Executive Defendants knew that the Yuga Financial Products were being

17  subjected to manipulative trading that increased volume and prices.

18      557.   The MoonPay Defendants knew that the Promotor Defendants had not

19  paid for their Bored Apes and that MoonPay had gifted them to promote the Yuga

20  Financial Products.   The MoonPay Defendants knew that they were making

21  manipulative outlier transactions to boost floor prices and increase trading volumes.

22      558.   The ApeDAO Board Defendants knew that the Promoter Defendants

23  had not actually paid for their Bored Apes and that it was a marketing ploy.  The

24  ApeDAO Board Defendants also knew ApeCoin was subject to price manipulation

25  as entities like Alameda Research and Wintermute were given secret loans.  The

26  ApeDAO Board Defendants knew that there was significant marketing to promote

27  that ApeCoin could be used for luxury items, but knew that there would be no follow

28  through.  The ApeDAO Defendants knew that that ApeDAO structure was a pure

1    legal fiction, and an attempt by Yuga to effectuate a pure unregistered securities

2    offering.

3       559.    Sotheby's knew that a traditional art collector was not the winning

4    bidder for the Bored Ape Auction. Sotheby's knew that FTX was the winning bidder

5    but hid this fact in order for the Yuga Financial Products to have a veneer of

6    credibility in the mainstream art world.

7       **D.      Reliance, Economic Loss, and Loss Causation**

8       560.    As a result of the publication and dissemination of the materially false

9    and misleading information and failure to disclose material facts, as set forth above,

10    the prices of the Yuga Financial Products were artificially inflated.

11       561.    In ignorance of the fact that the prices of the Yuga Financial Products

12    were artificially inflated, and relying directly or indirectly on the false, misleading,

13    and materially incomplete statements that the Executive Defendants, MoonPay

14    Defendants, and Sotheby's made and approved, or upon the integrity of the market

15    in which the Yuga Financial Products were sold, or on the absence of material adverse

16    information that these Defendants knew or recklessly should have known of but failed

17    to disclose in public statements, Plaintiffs and the other Class members acquired

18    Yuga Financial Products at artificially high prices and were damaged thereby.

19       562.    As a direct and proximate result of the Executive Defendants', MoonPay

20    Defendants', and Sotheby's wrongful conduct, Plaintiffs and the other Class

21    members suffered damages in connection with the respective purchases of Yuga

22    Financial Products and are entitled to an award compensating them for such damages.

23       563.    Indeed, the price of the Yuga Financial Products dropped significantly

24    as Defendants disclosed, and the market discovered, the truth concerning the celebrity

25    promotions, the true demand for Yuga NFTs, and the Yuga ecosystem's prospects

26    for the future.

27       564.    In addition, as a direct and proximate result of the Executive

28    Defendants', the MoonPay Defendants', and Sotheby's wrongful conduct, these

Defendants have generated and retained ill-gotten gains in connection with the promotion and sale of the Yuga Financial Products, such that Plaintiffs and the other Class members are entitled to the disgorgement of Defendants' ill-gotten gains acquired from such misconduct.

565. As a direct and proximate result of the false and misleading statements and omissions made by the Executive Defendants, the MoonPay Defendants, and Sotheby's to investors in order to solicit the sale of unregistered securities, Plaintiffs and the Class have suffered damages in connection with their Yuga Financial Product purchases.

566. Plaintiffs bring this claim for violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78j(b), and Rule 10b-5(b) promulgated thereunder, 17 C.F.R. §240.10b-5(b).

567. The Yuga Financial Products are securities within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. §77b(a)(1).

568. Section 10(b) and Rule 10b-5(b) make it illegal, in connection with the purchase or sale of any security, "for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange . . . to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." *Id.*

## **FOURTH CAUSE OF ACTION**

**Violation of Sections 10b of the Securities Exchange Act of 1934 and Rule 10b-5(a) and (c) thereunder**
**(Scheme Liability)**
**(Against all Defendants)**

569. Plaintiffs restate and reallege all preceding allegations in the paragraphs above as if fully set forth herein, and further allege the following:

570. The Class Period for this cause of action is defined as the period between April 23, 2021 and the date of this filing.

571. Plaintiffs bring this claim for violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §78j(b), and Rule 10b-5(a) and (c) promulgated thereunder, 17 C.F.R. §240.10b-5(a) and (c).

572. The Yuga Financial Products are securities within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. §77b(a)(1).

573. Subsections (a) and (c) of Rule 10b-5 allow a allow a suit against defendants who, with scienter, "employ any device, scheme, or artifice to defraud," or "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. §240.10b-5.

574. Unlike a claim under subsection (b) of Rule 10b-5, a claim of liability for violations of subsections (a) and (c) does not require an allegation that the defendant made a false or misleading statement; rather, liability is premised on a course of deceptive or manipulative conduct.

575. Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, carried out a plan, scheme, and course of conduct which was intended to, and throughout the Class Period, did manipulate the price and trading activity of Yuga Financial Products to the detriment of the investing public, including Plaintiffs and other Class members, in connection with the purchase and/or sale of Yuga Financial Products.

576. Defendants conspired and employed devices, schemes, and artifices and engaged in acts, practices, and a course of business as alleged herein to unlawfully manipulate and profit from the manipulation for the price of and market for Yuga Financial Products.

577. Defendants' actions alleged herein constitute manipulative acts. Through fraudulent market making and price signaling conduct, the Company, Executive Defendants, ApeDAO Board Defendants, Sotheby's, and MoonPay Defendants falsely increased both the price of the Yuga Financial Products and appearance of market activity for the same. Concurrently, the Company, Executive

1    Defendants, ApeDAO Board Defendants, MoonPay Defendants, and Promoter

2    Defendants engaged in a scheme to use a misleading marketing campaign meant to

3    leverage the celebrity Promoter Defendants' influence in order to artificially inflate

4    the price of and market for Yuga Financial Products.

5        578.   These manipulative acts were intended to and did deceive the retail

6    investors – Plaintiffs and the other Class members – who acquired Yuga Financial

7    Products during the Class Period and thereby caused them to purchase Yuga Financial

8    Products at artificially inflated prices.  Thus, Plaintiffs and other Class members

9    suffered losses as a result of the Scheme Liability Defendants' two primary deceptive

10   schemes and related acts, which manipulated the Yuga Financial Product

11   marketplace.

12       579.   Plaintiffs and other members of the Class were damaged by relying on

13   an assumption of an honest and fair market, free of manipulation, when buying and

14   selling Yuga Financial Products in the marketplace.

15       580.   Defendants acted with scienter in connection with the manipulative acts

16   alleged herein in that they acted knowingly and/or recklessly when they artificially

17   inflated the price of the Yuga Financial Products and thereby interfered with the

18   market for Yuga securities.

19       581.   As a direct and proximate result of Defendants' wrongful conduct,

20   Plaintiffs and other members of the Class were damaged as a result of their purchase

21   or sale of Yuga Financial Products.

22       582.   By virtue of the foregoing, each Defendant has violated Section 10(b) of

23   the Exchange Act, and Rule 10b-5(a) and (c) promulgated thereunder.

### FIFTH CAUSE OF ACTION

**Violation of Sections 20(a) of the Securities Exchange Act of 1934**
**(Against the Executive Defendants, ApeDAO Board Defendants, and**
**Individual Defendants Oseary, Soto-Wright, and Universal)**

27       583.   Plaintiffs restate and reallege all preceding allegations in the paragraphs

28   above as if fully set forth herein, and further allege the following:

584.   This Count is asserted against Executive Defendants Aronow, Solano, Muniz, Shoemaker, Ehrlund, ApeDAO Board Defendants Lyons, Ohanian, Wu, and Bajwa, and Individual Defendants Oseary, Soto-Wright, and Universal (collectively, the "Control Person Defendants") under Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §78t(a).

585.   The Control Person Defendants, by virtue of their offices, ownership, agency, agreements or understandings, and specific acts were, at the time of the wrongs alleged herein, and as set forth herein, controlling persons within the meaning of Section 20(a) of the Securities Exchange Act.  The Control Person Defendants, and each of them, had the power and influence and exercised the same to cause the unlawful scheme to artificially increase the interest in and price of the Yuga Financial Products.

586.   The Control Person Defendants, separately or together, possess, directly or indirectly, the power to direct or cause the direction of the management and policies of the Company and/or MoonPay, through ownership of voting securities, by contract, subscription agreement, or otherwise.

587.   Executive Defendants Aronow, Solano, Muniz, Shoemaker, Ehrlund, and Lyons were all directors and officers of the Company for the relevant time period. While not explicitly named as directors of the Company, ApeDAO Board Defendants Ohanian, Wu, and Bajwa nevertheless were responsible for making the same high-level decisions for the Company that would normally be carried out by directors. Thus, the Executive Defendants and ApeDAO Board Defendants have the power to direct or cause the direction of the management and policies of Yuga.  Similarly, Defendants Soto-Wright serves as the CEO of MoonPay, and thus has the power to direct or cause the direction of the management and policies of MoonPay. Defendant Universal possessed the power over content of the *Tonight Show* segments, including the misleading Yuga-related segments by Defendant Fallon that were aired on

1    television.  Likewise, Defendant Universal had control over its own social media

2    channels, which reposted the misleading *Tonight Show* segments.

3         588.   The Control Person Defendants, separately or together, have sufficient

4    influence to have caused the Company and MoonPay to engage in the fraudulent

5    conduct described above.

6         589.   The Control Person Defendants, separately or together, jointly

7    participated in the Company's and MoonPay's fraudulent conduct described above.

8         590.   By virtue of the conduct alleged herein, the Control Person Defendants

9    are liable for the wrongful conduct complained of herein and are liable to Plaintiffs

10    and the Class for rescission and/or damages suffered.

11    **SIXTH CAUSE OF ACTION**

12    **Violations of California Corporate Securities Law of 1968**

13    **Cal. Corp. Code §§25400 and 25500**<br>**(Manipulation Sections)**

14    **(Against the Company, Executive Defendants, ApeDAO Board Defendants,**<br>**MoonPay, Soto-Wright, Promoter Defendants, and Sotheby's)**

15         591.   Plaintiffs restate and reallege all preceding allegations in the paragraphs

16    above as if fully set forth herein, and further allege the following:

17         592.   Plaintiffs Titcher and Smith bring this claim individually and on behalf

18    of the members of the Class against the Company, Executive Defendants Aronow,

19    Solano, Muniz, Shoemaker, Ehrlund, and Lyons, ApeDAO Board Defendants

20    Ohanian, Wu, and Bajwa, MoonPay, Defendant Soto-Wright, and Sotheby's are

21    collectively referred to in this cause of action as the "Market Manipulation

22    Defendants."

23         593.   Section 25400 makes it illegal, in connection with the purchase or sale

24    of any security, for any person in California, directly or indirectly, to effect, alone or

25    with one or more other persons, a series of transactions in any security creating actual

26    or apparent active trading in such security or raising the price of such security, for

27    the purpose of inducing the purchase or sale of such security by others.  Cal. Corp.

28    Code §25400(b).

594. Other common examples of manipulation include, but are not limited to: (i) transferring record ownership of securities in order to hide the true identity of the beneficial owner, which is known as "parking"; (ii) sending a false pricing signal to the public market; and (iii) price leadership by the manipulator.

595. The Company and MoonPay, and their respective executives (i.e., Executive Defendants, ApeDAO Board Defendants, and Defendant Soto-Wright), directly or indirectly, singly or in concert, by the use of the means or instrumentalities of interstate commerce, of the mails, for the purpose of creating a false or misleading appearance of active trading in ApeCoin tokens, or a false or misleading appearance with respect to the market for the Yuga Financial Products: (a) have engaged in improper parking; (b) have sent a false price signal to the market for Yuga NFTs; (c) have engaged in unlawful "price leadership." Concurrently, MoonPay and Soto-Wright (on behalf of the Company and Executive Defendants) engaged in various manipulative wash trading activities, including using circular trades, seller funded wash trading, and making outlier transactions.

596. As noted above, the Company and MoonPay, with the assistance and/or approval of Executive Defendants, ApeDAO Board Defendants, and Defendant Soto-Wright, manipulated the price of Yuga Financial Products by: (a) transferring record ownership of ApeCoin tokens between the Company, MoonPay, and non-party FTX in order to hide the true identity of the beneficial owner (*i.e.*, Executive Defendants, ApeDAO Board Defendants, and Soto-Wright) in these seller funded wash trades, (b) having sent a false price increase signal to the market for Yuga NFTs by having MoonPay repeatedly purchase Yuga NFTs at a price significantly higher than the then-current floor price for those Yuga NFTs (*i.e.*, outlier transactions), (c) having engaged in unlawful "price leadership" by having MoonPay repeatedly bidding for and purchasing Yuga NFTs at a price significantly higher than the then-current floor price for those Yuga NFTs, and/or (d) having engaged in circular trades to create the appearance of trading activity and a market for the Yuga Financial Products. Scheme

Liability Defendants each made misleading statements regarding the exponential increase in the price of Yuga Financial Products since launch.  The Company purposefully did not disclose to investors that the percentage increases that they were collectively touting were the result of price manipulation as opposed to real trading activity of Yuga Financial Products.

597.    Concurrently, Defendant Sotheby's engaged in a series of transactions with FTX during the Sotheby's auction that created apparent active trading in the Yuga NFTs and/or raising the price of Yuga NFTs, for the purpose of inducing the purchase or sale of Yuga NFTs by others.

598.    Promoter Defendants engaged in a series of BAYC transactions, creating actual or apparent active trading, for the purpose of inducing the purchase or sale of BAYC NFTs and Yuga Financial Products by others, including Plaintiffs. Upon information and belief, each of the Promoter Defendants received a BAYC NFT and/or other fiat or cryptocurrency from MoonPay and/or Yuga as compensation for promoting the sale of the Yuga securities, including BAYC NFTs.  The statements and promotions by Defendants Fallon, Winkelmann, Hilton, Ciccone, Bieber, and Curry gave Plaintiffs the false impression that these celebrities had purchased BAYC NFTs as investors, and that they were making the Yuga Financial Products a part of their respective multimillion-dollar investment strategies, and as a result, induced Plaintiffs Titcher, Palombini, and Smith to make purchases of Yuga Financial Products.  In addition to the allegations set forth above, these transactions that created actual or apparent active trading, for the purpose of inducing the purchase or sale of BAYC NFTs and Yuga securities by others, including Plaintiffs, included:

- Ciccone obtained BAYC NFT #4988 from MoonPay and subsequently promoted the BAYC collection of NFTs.
- Hilton announcing on the *Tonight Show* that she "copied" Fallon's use of MoonPay to "buy an ape" and acknowledged purchasing BAYC NFT #1294 on Twitter.

- Fallon announcing on the *Tonight Show* that he "bought an ape," i.e., BAYC NFT #599, after being paid to promote MoonPay and the BAYC collection of NFTs.  In addition, Fallon promoting the purchases of other Promoter Defendants, including Hilton and Winklemann.
- Winkelmann being paid to promote MoonPay and the BAYC collection of NFTs, and Winkelmann's additional promotion and marketing of the purchases made by Fallon and Hilton.
- Bieber announcing his purchase of a $1.29M BAYC NFT, which he did not actually pay for, but rather received through a series of transactions for the purpose of compensating him.  Instead, Bieber received BAYC NFT #3001 as a form of compensation for promoting the BAYC NFTs and Yuga Financial Products to his hundreds of millions of social media followers.  In addition, On February 7, 2022, Bieber announced that he had "purchased" a second NFT from the Bored Ape collection (*i.e.*, BAYC NFT #3850) for around $470,000.  This BAYC NFT is considered to be particularly rare, ranking below 1% in rarity.  Upon information and belief, BAYC NFT #3850 was given to Bieber as compensation for continuing to promote and solicit sales of the Yuga securities.
- Curry's promotion and solicitation of the BAYC Collection of NFTs and Yuga Financial Products in exchange for payment.

599.  The subsequent collapse of the market for, and price of, the Yuga Financial Products after the manipulative activity has ceased following the collapse of FTX further demonstrates the manipulative nature of the alleged conduct by the Market Manipulation Defendants.

600.  These manipulations of the Yuga Financial Products were part of the Defendants' goal of selling their unregistered securities to Plaintiffs and the Class at artificially inflated prices.  The collapse of the price of Yuga Financial Products after the manipulative conduct alleged herein ceased further demonstrates that the

158

1  Company, Executive Defendants, ApeDAO Board Defendants, MoonPay, Soto-
2  Wright, Promoter Defendants, and Sotheby's violated Cal. Corp. Code, §25500(a)-
3  (b).

4      601.   Plaintiffs and other members of the Class were damaged by relying on
5  an assumption of an honest and fair market, free of manipulation, when buying and
6  selling Yuga Financial Products in the marketplace.

7      602.   The Company, Executive Defendants, ApeDAO Board Defendants,
8  MoonPay, Soto-Wright, Celebrity Defendants, and Sotheby's acted with scienter in
9  connection with the manipulative acts alleged herein in that they acted knowingly
10 and/or recklessly when they artificially inflated the trading volume and price of Yuga
11 Financial Products and thereby interfered with the market for Yuga Financial
12 Products.  Further, statements by Defendants coupled with the transactions' history
13 on the Ethereum blockchain and the testimony of a Confidential Witness plausibly
14 indicate that each of them knew that they were engaging in wash trading, outlier
15 transactions, circular trading, matching orders, and other manipulative efforts to raise
16 the price of the Yuga Financial Products.

17     603.   As a direct and proximate result of the wrongful conduct of the
18 Company, Executive Defendants, ApeDAO Board Defendants, MoonPay, Soto-
19 Wright, and Sotheby's, Plaintiffs and other members of the Class were damaged as a
20 result of their purchase or sale of Yuga Financial Products.

21     604.   By reason of the foregoing, the Company, Executive Defendants,
22 ApeDAO Board Defendants, MoonPay, Soto-Wright, and Sotheby's have violated,
23 and unless restrained and enjoined will again violate, Cal. Corp. Code, §25500(a)-
24 (b).

25     605.   By virtue of the conduct alleged herein, the Company, Executive
26 Defendants, ApeDAO Board Defendants, MoonPay, Soto-Wright, and Sotheby's are
27 liable for the wrongful conduct complained of herein and are liable to Plaintiffs and
28 the Subclass for rescission and/or damages suffered.

\*        \*        \*

606.   In the event that the Court determines that any of the Yuga Financial Products are not "securities" and, thus, not subject to the federal and/or state securities law claims set forth in Claims 1-6, the following state law consumer protection causes of action set forth in Claims 7-10 are pled in the alternative:

### SEVENTH CAUSE OF ACTION

**Violation of the California Unfair Competition Law**
**Cal. Bus. & Prof. Code §17200**
**(Based on Unlawful Acts and Practices)**
**(In the Alterantive, Against All Defendants)**

607.   Plaintiffs restate and reallege all preceding allegations in the paragraphs above as if fully set forth herein, and further allege the following:

608.   Plaintiffs Titcher and Smith are residents of the State of California.

609.   Plaintiffs Titcher and Smith paid for or purchased Yuga Financial Products in California and thus the deceptive transactions alleged herein occurred in California.

610.   At all relevant times there was in full force and effect the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §17200, *et seq.*, which prohibits, *inter alia*, "any unlawful, unfair, or fraudulent business act or practice" and "unfair, deceptive, untrue, or misleading advertising."

611.   An act can be alleged to violate any or all three of the three prongs of the UCL – unlawful, unfair, or fraudulent.

612.   The "unlawful" prong of the UCL prohibits anything that can properly be called a business practice and that at the same time is forbidden by law.  By proscribing "any unlawful" business practice, the UCL permits injured consumers to "borrow" violations of other laws and treat them as unlawful competition that is independently actionable.  In other words, an "unlawful" business practice under the UCL is a practice that violates any other law.

613.    Any violation of the California false advertising laws (*e.g.*, Cal. Bus. & Prof. Code §17500) necessarily violates the "unlawful" prong of the UCL.  Likewise, any violations of other state consumer protection laws, such as New York G.B.L. §349(a); NJSA §§56:81-156 also constitutes a violation of the unlawful prong of the UCL.

614.    Defendants engaged in deceptive acts and practices under California law by taking advantage of the lack of knowledge, ability, experience, or capacity of Plaintiffs to a grossly unfair degree, including but not limited to, in the following ways:

(a)    knowingly and intentionally misrepresenting that it was not a traditional art collector but rather the Yuga-affiliated FTX that was the purportedly winning bidder of the Sotheby's auction and that the entire auction was a scheme to promote the BAYC NFT collection in order to artificially inflate their price;

(b)    knowingly and intentionally concealing the specific roles and overlapping ownership and/or financial interests in Yuga and MoonPay by the Executive Defendants, ApeDAO Board Defendants, and Promoter Defendants Oseary, Fallon, Winkelmann, Hilton, and Ciccone;

(c)    failing to disclose that the promotions by Promoter Defendants Fallon (who was under the control of Defendant Universal), Winkelmann, Hilton, Ciccone, Bieber, and Curry were the result of them being paid to promote (or having a vested financial interest in the promotion of) the Yuga Financial Products instead of an organic interest/support of the Bored Ape ecosystem;

(d)    knowingly and intentionally using and/or failing to disclose the use of the Promoter Defendants to instill trust in uninformed investors to promote the financial benefits of a highly speculative and risky investment in Yuga Financial Products in an effort to manipulate and artificially inflate the price and trading volume of the Yuga Financial Products and allow the Company, Executive

1  Defendants, and ApeDAO Board Defendants to profit from the sale of Yuga

2  Financial Products at those inflated prices;

3      (e)    knowingly and intentionally misrepresenting and/or failing to

4  disclose that the MoonPay Concierge service promoted by Defendants Soto-Wright,

5  MoonPay, Oseary, Fallon, Winkelmann, Hilton, and Ciccone, was being used as a

6  front for the undisclosed payments from the Executive Defendants and Defendant

7  Oseary to Promoter Defendants Fallon, Winkelmann, Hilton, and Ciccone in

8  exchange for misleadingly promoting the Yuga Financial Products to investors; and

9      (f)    failing to disclose that Defendant Adidas was working with

10  MoonPay and the Company to actively conceal via NDA that the promotions from

11  Promoter Defendants and other non-named celebrity influencers were paid for.

12      615.   The Company, Sotheby's, and the Executive Defendants Aronow and

13  Solano did not disclose that the winning bidder of the Sotheby's auction was FTX

14  and not a traditional art collector.  Nor did the Company, Executive Defendants, or

15  ApeDAO Board Defendants disclose that the Promoter Defendants were paid

16  promoters and/or had overlapping underlying financial interests in Yuga and

17  MoonPay.  Plaintiffs would have found it material to their decisions to purchase

18  Yuga Financial Products to know whether or not insiders, who were given the Yuga

19  Financial Products, had the ability to sell those Yuga Financial Products and create

20  massive downward pressure.  Likewise, had Plaintiffs been made aware of that

21  information at the times of their respective purchases, it would have altered their

22  decision to both purchase the Yuga Financial Products for the price they paid as well

23  and hold on to those Yuga Financial Products when they otherwise would not have

24  done so.

25      616.   The facts that the Defendants misrepresented and concealed were

26  material to the decisions of Plaintiff Titcher and the members of the Class about

27  whether to pay for or purchase Yuga Financial Products (at all or for the price they

28

paid), in that they would not have proceeded with their transactions but for the deceptive, fraudulent, and false acts and practices.

617.   Upon making a statement of fact regarding the winning bidder of the Sotheby's auction, this gave rise to a duty to disclose that information, and by failing to disclose that information, Defendants are liable for UCL fraud by omission.

618.   For example, the Company's misleading statements and omissions concerning the ability to use Yuga Financial Products and their related intellectual property rights relate to the central functionality of the product.  The omissions about the intellectual property rights given to investors in the BAYC and MAYC NFT collections, as well as the omissions concerning the ability to use ApeCoin and virtual land in the Otherside, were only known to Executive Defendants and were contrary to representations and omissions previously made concerning the ability to use Yuga Financial Products to purchase goods and services.

619.   Further, Defendants, collectively and individually, had superior knowledge of information regarding the ownership interests and ability to use the Yuga Financial Products as advertised.  The fact that the Promoter Defendants had undisclosed financial interests in Yuga and MoonPay was not known to Plaintiffs Titcher and Smith or the members of the Class when each was respectively deciding whether to purchase Yuga Financial Products, as this information was in the exclusive possession of the Company, Executive Defendants, and ApeDAO Board Defendants.

620.   The Company and Executive Defendants used their business associate Defendant Oseary to act as a middleman between the public and the Company's founders in order to actively conceal the true nature of the Promoter Defendants' business relationships with the Company, MoonPay, and the insiders of both.

621.   Defendants intended for Plaintiffs Titcher and Smith and the members of the Class to pay for Yuga Financial Products in reliance upon the deceptive and fraudulent acts and practices described herein.

163

622.    Had any of the Defendants disclosed the omitted information, Plaintiffs Titcher and Smith would have been aware of it because (a) they saw the actual promotions by Promoter Defendants Sotheby's, Fallon, Winkelmann, Hilton, Bieber, Ciccone, Curry, and Adidas, and would have concurrently seen any disclosure on the promotions themselves had it been included, and (b) they follow, directly or indirectly, the social media accounts of, and news reports on, Defendants Sotheby's, Fallon, Hilton, Bieber, Curry, and Adidas.

623.    As a direct and proximate result of Defendants' unlawful, unfair, and deceptive practices, Plaintiffs and Class members suffered damages.  The Executive Defendants' activities with the Promoter Defendants caused Plaintiffs and the Class members to purchase and/or hold the Yuga Financial Products when they otherwise would not have done so.

624.    The statements from Executive Defendants and Promoter Defendants Sotheby's, Fallon, Hilton, and Bieber are specific detailed factual assertions, actionable under the UCL and are not puffery.

625.    For example, Executive Defendant Aronow's August 21, 2021 Twitter post stated that the BAYC NFT collection had over a billion dollars in market capitalization.  This statement from Aronow is a specific detailed factual assertion the Executive Defendants were using to encourage purchases and increase the prices of the Yuga Financial Products.  At the same time, Aronow failed to disclose that these metrics were the result of conduct by the Executive Defendants that allowed insiders to disproportionately increase investments in the Yuga Financial Products.

626.    Taken together, the misleading statements and omissions of the Defendants contributed to the deceptive marketing tactics as a whole, which were used to solicit sales of Yuga Financial Products.

627.    In the event that Plaintiffs' securities and consumer law claims are found to be inapplicable to the wrongdoing alleged herein against Defendants, Plaintiffs

1   will be unable to obtain monetary damages in an amount that would make Plaintiffs

2   and the members of the Class whole.

3       628.   In addition, Plaintiffs Titcher and Smith and the Class lack an adequate

4   remedy at law because the elements of the other state securities and consumer law

5   claims require proof of conduct beyond that which must be shown to establish

6   liability under the UCL and FAL.

7       629.   The lack of an adequate remedy at law entitles Plaintiffs and the Class

8   to pursue equitable restitution under the UCL.

9       630.   Concurrently, restitution under the UCL would be more certain, prompt,

10   or efficient than the legal remedies available with state securities and consumer law

11   claims.  For example, the price premium damages model will likely require expert

12   analysis to calculate, whereas equitable restitution will only require a showing of

13   what each member of the Class paid for their Yuga Financial Products.  Restitution

14   would, therefore, be much more prompt and efficient than this remedy at law.

15       631.   Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts

16   or practices by Defendants, to obtain restitution and disgorgement of all monies

17   generated as a result of such practices, and for all other relief allowed under Cal.

18   Bus. & Prof. Code §17200.

19   **<u>EIGHTH CAUSE OF ACTION</u>**

20   **Violation of the California Unfair Competition Law**
**Cal. Bus. & Prof. Code §17200**

21   **(Based on Unfair Acts and Practices)**
**(In the Alternative, Against All Defendants)**

22

23       632.   Plaintiffs restate and reallege all preceding allegations in the paragraphs

24   above as if fully set forth herein, and further allege the following:

25       633.   Plaintiffs Titcher and Smith are residents of the State of California.

26       634.   Plaintiffs Titcher and Smith paid for or purchased Yuga Financial

27   Products in California and thus the deceptive transactions alleged herein occurred in

28   California.

635.   At all relevant times there was in full force and effect the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §17200, *et seq.*, which prohibits, *inter alia*, "any unlawful, unfair, or fraudulent business act or practice" and "unfair, deceptive, untrue, or misleading advertising."

636.   Defendants engaged in business acts and practices deemed "unfair" under the UCL, because of the conduct, statements, and omissions described above.

637.   Defendants have engaged in, and continue to engage in, conduct that violates the legislatively declared policies of: (1) California Civil Code §§1572,1573, 1709, 1710, 1711 against committing fraud and deceit; (2) California Civil Code §1770 against committing acts and practices intended to deceive consumers regarding the representation of goods in certain particulars; and (3) the Federal Tort Claims Act ("FTCA"), 15 U.S.C. §45(a)(1), against unfair or deceptive practices. Defendants gain an unfair advantage over their competitors, whose practices relating to other similar products must comply with these laws.

638.   Defendants' affirmative acts in soliciting sales of Yuga Financial Products are unfair within the meaning of the UCL because they constituted immoral, unethical, oppressive, and unscrupulous activity, caused substantial injury to consumers, and provided no benefit to consumers or competition.

639.   The gravity of the harm to consumers caused by actions of Defendants far outweighs the utility of their conduct. According to a "Data Spotlight" from the Federal Trade Commission from June 3, 2022 (the "FTC Data Spotlight"), titled: "Reports show scammers cashing in on crypto craze," "[s]ince the start of 2021, more than 46,000 people have reported losing over $1 billion in crypto to scams – that's about one out of every four dollars reported lost, more than any other payment method. The median individual reported loss? A whopping $2,600."[52]

---

[52]   Emma Fletcher, *Data Spotlight: Reports show scammers cashing in on crypto craze*, FED. TRADE COMM'N (June 3, 2022), https://www.ftc.gov/news-events/data-visualizations/data-spotlight/2022/06/reports-show-scammers-cashing-crypto-craze.

640.   The FTC Data Spotlight further stated that "[r]eports point to social media and crypto as a combustible combination for fraud.  Nearly half the people who reported losing crypto to a scam since 2021 said it started with an ad, post, or message on a social media platform."[53]  Furthermore, "[d]uring this period, nearly four out of every ten dollars reported lost to a fraud originating on social media was lost in crypto, far more than any other payment method."[54]  Of the reported crypto fraud losses that began on social media, most are investment scams.[55]  Indeed, since 2021, $575 million of all crypto fraud losses reported to the FTC were about bogus investment opportunities, far more than any other fraud type.  Defendants engaged in the exact kind of bogus crypto "investment opportunity" scam that the FTC Data Spotlight reported on as causing hundreds of millions (and rising) of dollars of damage to investors.

641.   The conduct of Defendants – including, but not limited to, failing to disclose that (1) it was not a traditional art collector but rather the Yuga-affiliated FTX that was the purportedly winning bidder of the Sotheby's auction and that the entire auction was a scheme to promote the BAYC NFT collection in order to artificially inflate their price; (2) the promotions by Promoter Defendants Fallon (who was controlled by Defendant Universal), Winkelmann, Hilton, Ciccone, Bieber, and Curry were the result of them being paid to promote (or had a vested financial interest in the promotion of) the Yuga Financial Products instead of an organic interest/support of the Bored Ape ecosystem; (3) the MoonPay Concierge service promoted by Defendants Soto-Wright, MoonPay, Oseary, Fallon, Winkelmann,

---

[53]     *Id*. ("From January 1, 2021 through March 31, 2022, 49% of fraud reports to the FTC indicating cryptocurrency as the payment method specified that the scam started on social media, compared to 37% in 2020, 18% in 2019, and 11% in 2018.").

[54]     *Id*. ("From January 1, 2021 through March 31, 2022, $1.1 billion was reported to the FTC as lost to fraud originating on social media.").

[55]     *Id*. ("From January 1, 2021 through March 31, 2022, people reported to the FTC that $417 million in cryptocurrency was lost to fraud originating on social media.  $273 million of these losses were to fraud categorized as investment related, followed by romance scams ($69 million), and business imposters ($35 million).").

Hilton, and Ciccone was not the legitimate service described by them, but rather a vehicle by which the Executive Defendants and Defendant Oseary made undisclosed payments to Promoter Defendants Fallon, Winkelmann, Hilton, and Ciccone in exchange for misleadingly promoting the Yuga Financial Products to investors; (4) Defendant Adidas helped the Company and MoonPay conceal the payments to celebrity promoters for marking Yuga's digital assets; and (5) Executive Defendants and ApeDAO Board Defendants held a significant portion of the Float at the time of the ApeCoin token launch and thus, could (and did) create massive downward pressure on the price of ApeCoin tokens by freely selling their allocations to investors – was and is substantially injurious to consumers.  Such conduct has caused, and continues to cause, substantial injury to consumers because consumers would not have continued with the transaction but for the deceptive, fraudulent, false, and unfair acts and practices alleged herein.  For example, the Company and Executive Defendant Shoemaker continue to rely on the deceptive celebrity promotions described herein to further solicit sales of the Yuga Financial Products.  On March 23, 2023, the Company posted a second-year anniversary video that contained a montage of the deceptive promotions at issue here and of the Promoter Defendants engaging in the same misconduct as occurred during the Class Period.  Shoemaker, once again, amplified the misleading Yuga promotions on her personal Twitter account, reposting the anniversary video and stating that she was "Super proud of everything this company and super epic community have achieved in such a short time.  Can't wait to see what's still to come 🚀 keep slaying BAYC fam 🔷 ." [56]

642.  Consumers have overpaid for Yuga Financial Products and the injury alleged herein is not outweighed by any countervailing benefits to consumers or competition.  Indeed, no benefit to consumers or competition results from the alleged conduct of Defendants.  Since consumers reasonably rely on the representations, and

---

[56]    Jasmine Shoemaker (@SodaOps), TWITTER (Apr. 23, 2022 2:15 PM), https://twitter.com/SodaOps/status/1650201780939259904?s=20.

1  could not have known about the omitted disclosures, and the injury results from
2  ordinary use of their product, consumers could not have reasonably avoided such
3  injury.

4      643.   Defendants willfully and knowingly engaged in the deceptive and unfair
5  acts and practices described above and knew or should have known that those acts
6  and practices were unlawful and thus in violation of Cal. Bus. & Prof. Code §17200,
7  *et seq.*

8      644.   These particular facts that each Defendant omitted and concealed were
9  material to the decisions of Plaintiff Titcher and the members of the Class about
10 whether to pay for Yuga Financial Products, in that they would not have proceeded
11 with the transaction but for the deceptive and unfair acts and practices.

12     645.   Defendants' conduct harmed competition.   While the Company,
13 Executive Defendants, and ApeDAO Board Defendants cut corners and minimized
14 costs, their competitors spent the time and money necessary to promote financial
15 products and/or digital assets that complied with the applicable state and federal laws.
16 Further, the injuries suffered by Plaintiffs are not outweighed by any countervailing
17 benefits to consumers or competition.  And because Defendants are solely responsible
18 for their respective promotional activities and related disclosures (or lack thereof),
19 there is no way Plaintiff Titcher or the members of the Class could have known about
20 the payments that Promoter Defendants received for pretending that they were
21 interested in the BAYC NFT collection of the Bored Ape ecosystem.  There were
22 reasonably available alternatives to further Yuga's and MoonPay's legitimate
23 business interests, such as including disclaimers, other than the conduct alleged
24 herein.

25     646.   Defendants engaged in deceptive acts and practices under California law
26 by taking advantage of the lack of knowledge, ability, experience, or capacity of
27 Plaintiffs to a grossly unfair degree, including but not limited to, in the following
28 ways:

1    (a)    knowingly and intentionally misrepresenting that it was not a traditional art collector but rather the Yuga-affiliated FTX that was the purportedly winning bidder of the Sotheby's auction and that the entire auction was a scheme to promote the BAYC NFT collection in order to artificially inflate its price;

5    (b)    knowingly and intentionally concealing the specific roles and overlapping ownership and/or financial interests in Yuga and MoonPay by the Executive Defendants, ApeDAO Board Defendants, and Promoter Defendants Oseary, Fallon (with the approval and/or assistance of Defendants Universal and EHD), Winkelmann, Hilton, and Ciccone;

10    (c)    failing to disclose that the promotions by Promoter Defendants Fallon (with the approval and/or assistance of Defendants Universal and EHD), Winkelmann, Hilton, Ciccone, Bieber, and Curry were the result of them being paid to promote (or having a vested financial interest in the promotion of) the Yuga Financial Products instead of an organic interest/support of the Bored Ape ecosystem;

15    (d)    knowingly and intentionally using and/or failing to disclose the use of the Promoter Defendants to instill trust in uninformed investors to promote the financial benefits of a highly speculative and risky investment in Yuga Financial Products in an effort to manipulate and artificially inflate the price and trading volume of the Yuga Financial Products and allow the Company, Executive Defendants, and ApeDAO Board Defendants to profit from the sale of Yuga Financial Products at those inflated prices;

22    (e)    knowingly and intentionally misrepresenting and/or failing to disclose that the MoonPay Concierge service promoted by Defendants Soto-Wright, MoonPay, Oseary, Fallon, Winkelmann, Hilton, and Ciccone was being used as a front for the undisclosed payments from the Executive Defendants and Defendant Oseary to Promoter Defendants Fallon, Winkelmann, Hilton, and Ciccone in exchange for misleadingly promoting the Yuga Financial Products to investors; and

28

1    (f)    failing to disclose that Defendant Adidas helped the Company and

2    MoonPay to conceal Yuga's payments to celebrity promoters.

3    647.    The facts that Defendants misrepresented and concealed were material

4    to the decisions of Plaintiffs Titcher and Smith and the members of the Class about

5    whether to pay for or purchase Yuga Financial Products (at all or for the price they

6    paid), in that they would not have proceeded with their transactions but for the

7    deceptive, fraudulent, and false acts and practices.

8    648.    Defendants intended for Plaintiffs Titcher and Smith and the members

9    of the Class to pay for Yuga Financial Products in reliance upon their deceptive and

10   fraudulent acts and practices.

11   649.    Had any of the Defendants disclosed the omitted information, Plaintiffs

12   would have been aware of it because (a) they saw the actual promotions by Promoter

13   Defendants Sotheby's, Fallon (who was controlled by Defendant Universal), Hilton,

14   Bieber, and Curry, and would have concurrently seen any disclosure on the

15   promotions themselves had it been included; and (b) they follow, directly or

16   indirectly, the social media accounts of, and news reports on, the Company and its

17   affiliated social media accounts and Defendants Sotheby's, Fallon, Hilton, Bieber,

18   and Curry.

19   650.    As a direct and proximate result of Defendants' unlawful, unfair, and

20   deceptive practices, Plaintiffs and Class members suffered damages. The activities

21   of Executive Defendants, ApeDAO Board Defendants, with Defendants MoonPay,

22   Soto-Wright, and the Promoter Defendants caused Plaintiffs and the Class members

23   to purchase and/or hold the Yuga Financial Products when they otherwise would not

24   have done so.

25   651.    The statements from Executive Defendants and Promoter Defendants

26   Sotheby's, Fallon (who was controlled by Defendant Universal), Winkelmann,

27   Hilton, Bieber, and Curry are actionable and not puffery.

28

652.    For example, Executive Defendant Aronow's August 21, 2021 Twitter post stated that the BAYC NFT collection had over a billion dollars in market capitalization.  This statement from Aronow is a specific detailed factual assertion the Executive Defendants were using to encourage purchases and increase the price of the Yuga Financial Products.  At the same time, Aronow failed to disclose that these metrics were the result of conduct by the Executive Defendants that allowed insiders to disproportionately increase investments in the Yuga Financial Products.

653.    Taken together, the misleading statements and omissions of the Defendants contributed to the deceptive marketing tactics as a whole, which were used to solicit sales of Yuga Financial Products.

654.    In the event that Plaintiffs' securities and consumer law claims are found to be inapplicable to the wrongdoing alleged herein against Defendants, Plaintiffs will be unable to obtain monetary damages in an amount that would make Plaintiffs and the members of the Class whole.

655.    In addition, Plaintiffs and the Class lack an adequate remedy at law because the elements of the other state securities and consumer law claims require proof of conduct beyond that which must be shown to establish liability under the UCL and FAL.

656.    The lack of an adequate remedy at law entitles Plaintiffs and the Class to pursue equitable restitution under the UCL.

657.    Concurrently, "restitution under the . . . UCL would be more certain, prompt or efficient than the legal remedies" available with state securities and consumer law claims.  *See Anderson v. Apple Inc.*, 500 F. Supp. 3d 993, 1009 (N.D. Cal. 2020) (citing *Am. Life Ins. Co. v. Stewart*, 300 U.S. 203, 214 (1937)).  For example, the price premium damages model will likely require expert analysis to calculate, whereas equitable restitution will only require a showing of what each member of the Class paid for their Yuga Financial Products.  Restitution would, therefore, be much more prompt and efficient than this remedy at law.

658.   Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices by Defendants, to obtain restitution and disgorgement of all monies generated as a result of such practices, and for all other relief allowed under California Business & Professions Code §17200.

## NINTH CAUSE OF ACTION

**Violation of the California Unfair Competition Law**
**Cal. Bus. & Prof. Code §17200**
**(Based on Fraudulent Acts and Practices)**
**(In the Alterantive, Against All Defendants)**

659.   Plaintiffs restate and reallege all preceding allegations in the paragraphs above as if fully set forth herein, and further allege the following:

660.   Plaintiffs Titcher and Smith are residents of the State of California.

661.   Plaintiffs Titcher and Smith paid for or purchased Yuga Financial Products in California and thus the deceptive transactions alleged herein occurred in California.

662.   At all relevant times there was in full force and effect the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §17200, *et seq.*, which prohibits, *inter alia*, "any unlawful, unfair, or fraudulent business act or practice" and "unfair, deceptive, untrue, or misleading advertising."

663.   "'[A]n act can be alleged to violate any or all three of the three prongs of the UCL – unlawful, unfair, or fraudulent.'" *Stearns v. Select Comfort Retail Corp.*, 763 F. Supp. 2d 1128, 1149 (N.D. Cal. 2010) (quoting *Berryman v. Merit Prop. Mgmt, Inc.*, 152 Cal. App. 4th 1554 (2007)).

664.   Any violation of the California false advertising laws (*e.g.*, §17500) necessarily violates the "fraudulent" prong of the UCL.

665.   To meet the heightened pleading standard of Rule 9(b) for claims that sound in fraud, plaintiffs must plead "the who, what, when, where, and how' of the alleged fraud. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (citation modified).

666.   In order to have standing under California law for a UCL claim, a plaintiff must meet the injury-in-fact requirement.  This requirement is met where a plaintiff can show that, by relying on a misrepresentation on a product label, they paid more for a product than they otherwise would have paid, or bought it when they otherwise would not have done so.  A plaintiff's claims under this California statute are governed by the "reasonable consumer" test.  Under the reasonable consumer standard, a plaintiff must show that 'members of the public are likely to be deceived.

667.   Nondisclosure or concealment may also constitute actionable fraud when, *inter alia*, the defendant actively conceals a material fact from the plaintiff" or "makes partial representations but also suppresses some material facts.  In fact, allegations of intentional and systematic concealment by the defendants of highly material facts, which were peculiarly within their knowledge and which [plaintiffs] did not suspect and could not have discovered satisfactorily pleads a claim of fraud by omission.

668.   Further, a fraud by omission claim exists when defendants not only had exclusive knowledge of the material facts, but knew that the plaintiff was acting under a misapprehension, which they had cultivated.

669.   Under California law a duty to disclose may arise without any confidential relationship where defendant alone has knowledge of material facts that are not accessible to the plaintiff. These factors do not require a fiduciary relationship so long as there exists "some relationship" between the defendant and plaintiff, such as between buyer and seller.

670.   These particular facts that each Defendant omitted and concealed were material to the decisions of Plaintiffs Titcher and Smith and the members of the Class about whether to pay for or purchase Yuga Financial Products (at all or for the price they paid), in that they would not have proceeded with the transaction but for the deceptive, fraudulent, and false acts and practices.  For example, misleading statements and omissions concerning the ability to use Yuga Financial Products and

1  their related intellectual property rights relate to the central functionality of the
2  product, which is required to plead a fraud by omission claim under the UCL. The
3  omissions about the intellectual property rights given to investors in the BAYC and
4  MAYC NFT collections, as well as the omissions concerning the ability to use
5  ApeCoin and virtual land in the Otherside, were only known to Executive Defendants
6  and were contrary to representations and omissions previously made concerning the
7  ability to use Yuga Financial Products to purchase goods and services.

8      671.  Defendants, collectively and individually, had superior knowledge of
9  information regarding the ownership interests and ability to use the Yuga Financial
10  Products as advertised. The fact that the Promoter Defendants had undisclosed
11  financial interests in Yuga and MoonPay was not known to Plaintiffs or the members
12  of the Class when each was respectively deciding whether or not to purchase Yuga
13  Financial Products, as this information was in the exclusive possession of the
14  Company, Executive Defendants, and ApeDAO Board Defendants.

15      672.  To state a claim for active concealment, a plaintiff must allege specific
16  affirmative acts on the part of the defendants in hiding, concealing or covering up the
17  matters complained of. Here, the Company and Executive Defendants used their
18  business associate Defendant Oseary to act as a middleman between the public and
19  the Company's founders in order to actively conceal the true nature of the Promoter
20  Defendants' business relationships with the Company, MoonPay, and the insiders of
21  both.

22      673.  Defendants intended for Plaintiffs and the members of the Class to pay
23  for Yuga Financial Products in reliance upon the deceptive and fraudulent acts and
24  practices described herein.

25      674.  Defendants engaged in deceptive acts and practices under California law
26  by taking advantage of the lack of knowledge, ability, experience, or capacity of
27  Plaintiffs to a grossly unfair degree, including but not limited to, in the following
28  ways:

(a)     knowingly and intentionally misrepresenting that it was not a traditional art collector but rather the Yuga-affiliated FTX that was the purportedly winning bidder of the Sotheby's auction and that the entire auction was a scheme to promote the BAYC NFT collection in order to artificially inflate their price;

1.     knowingly and intentionally concealing the specific roles and overlapping ownership and/or financial interests in Yuga and MoonPay by the Executive Defendants, ApeDAO Board Defendants, and Promoter Defendants Oseary, Fallon, Winkelmann, Hilton, and Ciccone;

(b)     failing to disclose that the promotions by Promoter Defendants Fallon (who was under the control of Defendant Universal), Winkelmann, Hilton, Ciccone, Bieber, and Curry were the result of them being paid to promote (or having a vested financial interest in the promotion of) the Yuga Financial Products instead of an organic interest/support of the Bored Ape ecosystem;

(c)     knowingly and intentionally using and/or failing to disclose the use of the Promoter Defendants to instill trust in uninformed investors to promote the financial benefits of a highly speculative and risky investment in Yuga Financial Products, in an effort to manipulate and artificially inflate the price and trading volume of the Yuga Financial Products and allow the Company, Executive Defendants, and ApeDAO Board Defendants to profit from the sale of Yuga Financial Products at those inflated prices;

(d)     knowingly and intentionally misrepresenting and/or failing to disclose that the MoonPay Concierge service promoted by Defendants Soto-Wright, MoonPay, Oseary, Fallon, Winkelmann, Hilton, and Ciccone was being used as a front for the undisclosed payments from the Executive Defendants and Defendant Oseary to Promoter Defendants Fallon, Winkelmann, Hilton, and Ciccone in exchange for misleadingly promoting the Yuga Financial Products to investors; and

(e)     failing to disclose that Defendant Adidas had helped the Company and MoonPay to conceal Yuga's payments to celebrity promoters.

675.  Had any of the Defendants disclosed the omitted information, Plaintiffs would have been aware of it because (a) they saw the actual promotions by Promoter Defendants Sotheby's, Fallon, Hilton, Bieber, and Curry, and would have concurrently seen any disclosure on the promotions themselves had it been included, and (b) they follow, directly or indirectly, the social media accounts of, and news reports on, Defendants Sotheby's, Fallon, Hilton, Bieber, Curry, and Adidas.

676.  As a direct and proximate result of Defendants' unlawful, unfair, and deceptive practices, Plaintiffs and Class members suffered damages.  The Executive Defendants' activities with the Promoter Defendants caused Plaintiffs and the Class members to purchase and/or hold the Yuga Financial Products when they otherwise would not have done so.

677.  The statements from Executive Defendants and Promoter Defendants are actionable and not puffery.  The distinguishing characteristics of puffery are vague, highly subjective claims as opposed to specific, detailed factual assertions. Under California law, there is no requirement that for a statement to be actionable it must also be false – the UCL also prohibits advertising which, although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public.  Significantly, even if certain statements would be non-actionable on their own, where there are multiple statements at issue, courts must consider "as a whole."  The alleged misstatements from Executive Defendants and Promoter Defendants are specific, detailed factual assertions these Defendants were using to encourage purchases and increase the price of the Yuga Financial Products.  At the same time, the Executive Defendants and Promoter Defendants each failed to disclose that the MoonPay service was a sham created to effectuate undisclosed Yuga promoter payments and that the rise in the price and trading activity for Yuga Financial Products was due to deceptive conduct by Defendants as opposed to genuine interest from investors.

678.   Taken together, the misleading statements and omissions of the various Defendants contributed to the deceptive marketing tactics as a whole, which were used to solicit sales of Yuga Financial Products.

679.   In the event that Plaintiffs' securities and consumer law claims are found to be inapplicable to the wrongdoing alleged herein against Defendants, Plaintiffs will be unable to obtain monetary damages in an amount that would make Plaintiffs and the members of the Class whole.

680.   In addition, Plaintiffs and the Class lack an adequate remedy at law because the elements of the other state securities and consumer law claims require proof of conduct beyond that which must be shown to establish liability under the UCL and FAL.

681.   The lack of an adequate remedy at law entitles Plaintiffs and the Class to pursue equitable restitution under the UCL.

682.   Concurrently, "restitution under the . . . UCL would be more certain, prompt, or efficient than the legal remedies" available with state securities and consumer law claims.  For example, the price premium damages model will likely require expert analysis to calculate, whereas equitable restitution will only require a showing of what each member of the Class paid for their Yuga Financial Products. Restitution would, therefore, be much more prompt and efficient than this remedy at law.

683.   Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices by Defendants, to obtain restitution and disgorgement of all monies generated as a result of such practices, and for all other relief allowed under Cal. Bus. & Prof. Code §17200.

## TENTH CAUSE OF ACTION

**Violation of the Florida Deceptive and Unfair Trade Practices Act**
**Fl. Stat. Section 501.201**
**(In the Alterantive, Against All Defendants)**

684.    Plaintiffs restate and reallege all preceding allegations in the paragraphs above as if fully set forth herein, and further allege the following:

685.    Plaintiffs Grand and Patel are residents of the State of Florida.

686.    Plaintiffs Grand and Patel paid for or purchased Yuga Financial Products in Florida and thus, the deceptive transactions alleged herein occurred in Florida.

687.    Chapter 501, Fla. Stat., of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") is to be liberally construed to protect the consuming public, such as Plaintiffs in this case, from those who engage in unfair methods of competition, or unconscionable, deceptive or unfair acts or practices in the conduct of any trade or commerce.

688.    Plaintiffs are "consumers" within the meaning of Fla. Stat. §501.203(7).

689.    By soliciting investor funds in the manner in which they did, Defendants engaged in "trade and commerce" within the meaning of Fla. Stat. §501.203(8).

690.    The elements comprising a consumer claim for damages under FDUTPA are: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages.

691.    Under FDUTPA, deception occurs if there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment.  Under Florida law, an objective test is employed in determining whether the practice was likely to deceive a consumer acting reasonably.  That is, a party asserting a deceptive trade practice claim need not show actual reliance on the representation or omission at issue.

692.   Here, Plaintiffs Grand and Patel nevertheless did, in fact, reasonably rely on the alleged misleading statements and omissions when making their respective decisions to purchase the Yuga Financial Products.

693.   A plaintiff's claims under FDUPTA are governed by the "reasonable consumer" test, which applies the same 'reasonable consumer' test for deception as applied in interpreting FDUTPA.").

694.   Plaintiffs Grand and Patel relied on the misleading statements and omissions alleged herein when deciding to purchase the Yuga Financial Products at artificially inflated prices.

695.   To establish an unfair practice, the plaintiff must show that it is one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

696.   Defendants engaged in business acts and practices deemed "deceptive" because of the conduct, statements, and omissions described above, including, but not limited to, the following:

   a.   knowingly and intentionally concealing the specific roles and economic interests related to Yuga and the Yuga Financial Products of the Executive Defendants, ApeDAO Defendants, Promoter Defendants, and MoonPay Defendants;

   b.   failing to disclose that the huge increase in price of the BAYC NFT collection in December 2021 was caused by manipulation by Defendants Aronow, Solano, Muniz, Oseary, and Sotheby's instead of being due to an organic increase in interest from traditional art investors;

   c.   leading investors to believe that the ApeCoin token would be available for use as a native currency within the larger Bored Ape ecosystem when there was no such capability; and

697.   knowingly and intentionally using and/or failing to disclose the use of Moonpay and the Promotor Defendants to instill trust in uninformed

THIRD AMENDED CLASS ACTION COMPLAINT - CASE NO. 2:22-CV-08909-FMO-PLA

investors to promote the financial benefits of a highly speculative and risky investment in Yuga Financial Products, in an effort to manipulate and artificially inflate the price and trading volume of the Yuga Financial and allow Defendants to sell their own allocations of Yuga Financial Products at those artificially inflated prices and/or to collect increased fees from the secondary sales of the BAYC, MAYC, and Otherdeed NFT collections.

698. These acts and omissions constitute both deceptive and unfair trade practices because the false representations and omissions made by Defendants have a tendency or capacity to deceive consumers, such as Plaintiffs, into investing in the Yuga Financial Products to their collective financial detriment.  Such conduct is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

699. Had the Promoter Defendants, Executive Defendants, or ApeDAO Defendants disclosed the omitted information, Plaintiffs would have been aware of it because (a) they saw the actual promotions by these Defendants and would have concurrently seen any disclosure on the promotions themselves had it been included, and (b) because they each follow, directly or indirectly, the social media accounts of, and news reports on, the Company, Executive Defendants, ApeDAO Defendants, and Promoter Defendants.

700. As a direct and proximate result of Defendants' deceptive trade practices, Plaintiffs Grand and Patel, and the members of the Class, suffered damages. The activities of the Defendants caused Plaintiffs Grand and Patel and the members of the Class to purchase and/or hold the Yuga Financial Products when they otherwise would not have done so.

701. The materially false statements and omissions as described above, and the fact that this was a misleading investment, were unfair, unconscionable, and

deceptive practices perpetrated on Plaintiffs which would have likely deceived a reasonable person under the circumstances.

702. Defendants were on notice at all relevant times that the false representations of material facts described above were being communicated to prospective investors (such as Plaintiffs) by their authorized agents.

703. As a result of the false representations and violations of the laws described above, Plaintiffs have been damaged by, among other things, overpaying for the Yuga Financial Products that were artificially inflated by Defendants.

704. Plaintiffs have also been damaged in other and further ways subject to proof at trial. For example, as alleged herein, the Executive Defendants promoted the ability to use the BAYC NFTs and ApeCoin tokens within the forthcoming Otherside metaverse. As noted above, Plaintiffs were induced to purchase ApeCoin and NFTs within the Bored Ape ecosystem because of these particular promotions.

705. The statements from Defendants Aronow, Solano, Muniz, Ehrlund, and Lyons (individually or on behalf of the Company as Yuga executives with authority and control over Yuga's social media account); statements from ApeDAO Defendants Ohanian, Wu, and Bajwa (individually or on behalf of the ApeDAO as members of the ApeDAO Special Council with authority and control over the ApeDAO website and social media accounts); and statements from Promoter Defendants Sotheby's, Adidas, Oseary, Winklemann, Ciccone, Hilton, Fallon (with the consent of and/or aided and abetted by Defendant Universal), Bieber, and Curry are all actionable and not puffery. Under Florida law, specific and measurable claims are not puffery and may be the subject of deceptive advertising claims. And while statements of opinion and puffery (i.e., exaggerated advertising, blustering, and boasting upon which no reasonable buyer would rely) are not actionable, a statement of opinion may be actionable if it fairly implies a factual basis.

706. As alleged further above, Defendants' statements claimed, among other things, that the price and trading volume was poised for continued upward growth,

that various Promotor Defendants paid for the BAYC NFT they touted on social media, and that Yuga investors gained all of the intellectual property rights available for the BAYC NFT collection upon purchase of a Yuga Financial Products.  These statements are specific and measurable, and they relate to specific strategies and metrics the Company said it was using to encourage purchases and increase the price of the Yuga Financial Products.  At the same time, each of the Defendants failed to disclose that these metrics were the result of manipulations by the MoonPay Defendants, Executive Defendants, and Sotheby's to disproportionately increase the price of the Yuga Financial Products.

707.   Taken together the misleading statements and omissions of Defendants contributed to the deceptive marketing tactics as a whole, which were used to solicit sales of Yuga Financial Products.

708.   Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices by Defendants, to obtain restitution and disgorgement of all monies generated as a result of such practices, and for all other relief allowed under Florida law.

709.   Pursuant to Fla. Stat. §§501.211(1) and 501.2105, Plaintiffs are entitled to recover from Defendants the reasonable amount of attorneys' fees Plaintiffs have had to incur in representing their interests in this matter.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that this Court:

A.    Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Class defined above;

B.    Appoint Plaintiffs as representatives of the Class and their counsel as Class counsel;

THIRD AMENDED CLASS ACTION COMPLAINT - CASE NO. 2:22-CV-08909-FMO-PLA

C.    Award all actual, general, special, incidental, statutory, punitive, and consequential damages and restitution to which Plaintiffs and Class members are entitled;

D.    Award post-judgment interest on such monetary relief;

E.    Grant appropriate injunctive and/or declaratory relief;

F.    Award reasonable attorneys' fees and costs; and

G.    Grant such further relief that this Court deems appropriate.

## JURY DEMAND

Plaintiffs, individually and on behalf of the putative Class, demand a trial by jury on all issues so triable.

DATED: October 10, 2025    **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

*/s/ John T. Jasnoch*
John T. Jasnoch (CA 281605)
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel.: 619-233-4565
jjasnoch@scott-scott.com

*Lead Counsel for Plaintiffs*

Aaron M. Zigler (CA 327318)
Nidya Gutierrez (CA 330209)
**ZIGLER LAW GROUP, LLC**
308 S. Jefferson Street | Suite 333
Chicago, IL 60661
Tel: 312-673-8427
aaron@ziglerlawgroup.com
nidya.gutierrez@ziglerlawgroup.com

THIRD AMENDED CLASS ACTION COMPLAINT - CASE NO. 2:22-CV-08909-FMO-PLA

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

James Q. Taylor-Copeland (CA 284743)
**TAYLOR-COPELAND LAW**
501 W. Broadway, Suite 800
San Diego, CA 92101
Telephone: (619) 400-4944
Facsimile: (619) 566-4341
james@taylorcopelandlaw.com

*Additional Counsel for Plaintiffs*

THIRD AMENDED CLASS ACTION COMPLAINT - CASE NO. 2:22-CV-08909-FMO-PLA

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 10, 2025, I electronically filed the foregoing with the Clerk using CM / ECF, which will send notification via electronic means to all counsel of record.

DATED: October 10, 2025

*/s/ John T. Jasnoch*
John T. Jasnoch

THIRD AMENDED CLASS ACTION COMPLAINT - CASE NO. 2:22-CV-08909-FMO-PLA