1  John T. Jasnoch (CA 281605)
   jjasnoch@scott-scott.com
2  **SCOTT+SCOTT ATTORNEYS AT LAW LLP**
   600 W. Broadway, Suite 3300
3  San Diego, CA 92101
   Tel.: 619-233-4565
4  Fax: 619-233-0508

5  *Lead Counsel for Plaintiffs and the Proposed Class*

6              **UNITED STATES DISTRICT COURT**
               **CENTRAL DISTRICT OF CALIFORNIA**
7

8  JOHNNY JOHNSON, EZRA            Case No.: 2:22-cv-08909-FMO-PLA
   BOEKWEG, MARIO PALOMBINI,
9  and ADAM TITCHER, JONATHAN      **PLAINTIFFS' OPPOSITION TO**
   SMITH, NEAL PATEL, HIREN        **DEFENDANT YUGA LABS'**
   PATEL, and DAVID GRAND,         **MOTION TO DISMISS THIRD**
10 Individually and on Behalf of All  **AMENDED CLASS ACTION**
   Others Similarly Situated,      **COMPLAINT**
11
                                   Judge: Fernando M. Olguin
12              Plaintiffs,        Date: December 4, 2025
                                   Time: 10:00 a.m.
13      v.                         Courtroom: 6D

14 YUGA LABS, INC., et al.,

15              Defendants.

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................1

I.    RELEVANT BACKGROUND.................................................................2

      A.    Relevant Procedural Background................................................2

      B.    Relevant Factual Background .....................................................3

            1.    The TAC Adds Objective Profit-Focused Marketing
                  Allegations ........................................................................3

            2.    The TAC Strengthens the "Common Enterprise"
                  Allegations and Pleads the Pooling of Investor Funds ...............4

            3.    The TAC Expands Allegations of Purchasers'
                  Reasonable Expectation of Profits ....................................5

II.   ARGUMENT............................................................................................7

      A.    Legal Standards ..........................................................................7

      B.    The Products were Sold in Securities Transactions .............................7

            1.    Plaintiffs Sufficiently Pled an "Investment of Money".............7

                  a.    Defendants' Repeated Promises of Outsized
                        Returns ....................................................................8

                  b.    Pervasive Imagery Promising a Dramatic Value
                        Increase ...................................................................9

            2.    Plaintiffs Sufficiently Pled a "Common Enterprise"...............14

                  a.    Horizontal Commonality Is Adequately Pled.................15

                  b.    Strict Vertical Commonality is Adequately Pled ..........18

            3.    Plaintiffs Adequately Pled a Reasonable Expectation of
                  Profits Based on Defendants' Efforts ......................................20

                  a.    Expectation of Profits ....................................................20

                  b.    The Efforts of Others....................................................21

CONCLUSION................................................................................................22

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

# <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

5

*Callahan & Blaine, APLC v. Indian Harbor Ins. Co.*,
    2025 WL 2958870 (C.D. Cal. June 25, 2025) .....................................13

6

7

*CFTC v. R.J. Fitzgerald & Co., Inc.*,
    173 F. Supp. 2d 1295 (M.D. Fla. 2001) ...............................................10

8

9

*Crews v. Rivian Auto., Inc.*,
    2023 WL 4361098 (C.D. Cal. July 3, 2023) .........................................14

10

11

*De Ford v. Koutoulas*,
    2023 WL 2709816 (M.D. Fla. Mar. 30, 2023), *reconsideration
    denied*, No. 6:22-CV-652-PGB-DCI, 2023 WL 3584077 (M.D.
    Fla. May 22, 2023), *appeal dismissed*, No. 23-12109-E, 2023 WL
    6213424 (11th Cir. July 31, 2023) ..........................................................9

12

13

*Dufoe v. DraftKings Inc.*,
    2024 WL 3278637 (D. Mass. July 2, 2024) ..........................................17

14

15

*Friel v. Dapper Labs*,
    657 F. Supp. 3d 422 (S.D.N.Y. 2023) ........................................9, 12, 13

16

17

*Harper v. O'Neal*,
    746 F. Supp. 3d 1360 (S.D. Fla. 2024) ...........................................10, 18

18

19

*Hocking v. Dubois*,
    839 F.2d 560 (9th Cir. 1988), *opinion withdrawn*, 863 F.2d 654
    (9th Cir. 1988) ........................................................................................15

20

21

*Hocking v. Dubois*,
    885 F.2d 1449 (9th Cir. 1989) .........................................................14, 15

22

23

*Holland v. CryptoZoo Inc.*,
    2025 WL 2492970 (W.D. Tex. Aug. 14, 2025)......................................21

24

25

*Hunichen v. Atonomi LLC*,
    2019 WL 7758597 (W.D. Wash. Oct. 28, 2019), *report and
    recommendation adopted*, 2020 WL 1929372 (W.D. Wash. Apr.
    21, 2020) .................................................................................................14

26

27

28

ii

*In re Ripple Labs, Inc. Litig.*,
   2024 U.S. Dist. LEXIS 109252 (N.D. Cal. June 20, 2024)................................22

*Patterson v. Jump Trading LLC*,
   710 F. Supp. 3d 692 (N.D. Cal. 2024), *aff'd*, No. 24-2489, 2025
   WL 215519 (9th Cir. Jan. 16, 2025), *cert. denied*, 2025 WL
   2823817 (U.S. Oct. 6, 2025)..........................................................14, 15, 22

*Revak v. SEC Realty Corp.*,
   18 F.3d 81 (2d Cir. 1994) ....................................................................15

*Robinson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   337 F. Supp. 107 (N.D. Ala. 1971), *aff'd*, 453 F.2d 417 (5th Cir.
   1972) ..................................................................................................10

*SEC v. Dalius*,
   2023 WL 3988425 (C.D. Cal. May 24, 2023)........................................15

*SEC v. LBRY, Inc.*
   639 F. Supp. 3d 211 (D.N.H. 2022).......................................12, 13, 18

*SEC v. NAC Foundation, LLC*,
   512 F. Supp. 3d 988 (N.D. Cal. 2021)..............................14, 18, 19

*SEC v. Payward, Inc.*,
   2024 WL 4511499 (N.D. Cal. Aug. 23, 2024) ....................................14

*SEC v. RG Reynolds Enters., Inc.*,
   952 F.2d 1125 (9th Cir. 1991) ..............................................14, 15, 18

*SEC v. Ripple Labs Inc.*,
   682 F. Supp. 3d 308 (S.D.N.Y. July 13, 2023)....................................22

*SEC v. Telegram Group, Inc.*,
   448 F. Supp. 3d 352 (S.D.N.Y. 2020) ..............................................18

*SEC v. Terraform Labs Pte. Ltd.*,
   684 F. Supp. 3d 170 (S.D.N.Y. 2023) ...............................................22

*SEC v. W.J. Howey Co.*,
   328 U.S. 293 (1946).........................................................................7, 18

*SEC v. Wahi*,
   2024 WL 896148 (W.D. Wash. Mar. 1, 2024)......................14, 15, 22

iii

*United Hous. Found., Inc. v. Forman*,
    421 U.S. 837 (1975)............................................................................................13

*Warfield v Alaniz*,
    569 F.3d 1015 (9th Cir. 2009) ........................................................................7, 8

**Other Authorities**

*In the Matter of Paul Anthony Pierce*, No. 3-21305, SEC Order
    Instituting Cease and Desist (Feb. 17, 2023),
    https://www.sec.gov/files/litigation/admin/2023/33-11157.pdf..........................9

*What Does It Mean to Ape In When Trading Crypto?*, July 7, 2025
    https://www.bitrue.com/blog/what-does-ape-in-when-trading-
    crypto-mean ........................................................................................................11

Lead Plaintiffs Johnny Johnson, Ezra Boekweg, and Mario Palombini ("Lead Plaintiffs"), and additional named plaintiffs Adam Titcher, Jonathan Smith, Neal Patel, Hiren Patel, and David Grand (together, with the Lead Plaintiffs, "Plaintiffs"), by their counsel, respectfully submit this memorandum of law in opposition to the Yuga Labs Defendants' Motion to Dismiss the Third Amended Complaint (ECF No. 290) (the "Yuga MTD") and state as follows:

## INTRODUCTION

The issue before the Court on this Motion is straightforward: are the Yuga Financial Products "securities" under the Securities Act of 1933. This Court dismissed Plaintiff's prior complaint holding that it did not plead with sufficient particularity the elements of the so-called *Howey* test: (1) investment of money, (2) in a common enterprise, and (3) with an expectation of profits from the efforts of others. The amended pleading now provides the necessary factual support for the Court to find that the Yuga Financial Products were each promoted and sold as investment contracts (i.e., securities).

*First*, the TAC alleges that the Yuga Labs ("Yuga") and ApeDAO Defendants promoted the Yuga Financial Products as *for-profit investments*, using a host of methods to reach investors, including direct communications and extensive social media marketing campaigns. These promotions contained statements objectively indicating that this was an investment opportunity poised for exponential growth. In particular, these statements included: (1) the outsized rate of return Yuga investors could expect from their purchase of a Yuga Financial Product; (2) rocket-ship images that the Court previously found "objectively mean[s] one thing: a financial return on investment"; and (3) specific investment and finance jargon indicating that the Yuga Financial Products were profit-focused investments. These clear and specific allegations establish both the first prong ("investment of money") and the related "expectation of profits" sub-element of the third prong. The other sub-

PLAINTIFFS' OPPOSITION TO DEFENDANT YUGA LABS' MOTION TO DISMISS
CASE NO. 2:22-CV-08909-FMO-PLA

element of the third prong ("efforts of others") was already found sufficient in the previous pleading and remains so in the TAC.

*Second*, the TAC contains an entire section devoted to allegations of a common enterprise. This section describes, in detail, a pooling of investors' and Defendants' funds that demonstrates horizontal commonality, and how investors' and Defendants' fortunes were tied to each other such that there was vertical commonality between them.

As shown below, the TAC addresses each of the pleading deficiencies previously identified by the Court and firmly establishes all three prongs of the *Howey* test. Accordingly, Plaintiffs request that Yuga's Motion to Dismiss and related Joinder motions be denied.

## I.    RELEVANT BACKGROUND

### A.    Relevant Procedural Background

On August 20, 2024, the Court ordered supplemental briefing on whether the Yuga Financial Products qualified as securities, culminating in the September 30, 2025 Order dismissing the Second Amended Complaint ("SAC") with leave to amend. ECF No. 288 (the "Order").

The Court held that the SAC failed to allege that: (1) Yuga's marketing objectively led purchasers to expect profits rather than solely consumptive benefits; (2) investors shared a "common enterprise," because the SAC lacked the necessary "interplay between the NFTs and the ill-defined ecosystem"; and (3) statements about NFT prices and trading volume were "a closer call" but still insufficient without explicit "profit-focused" promotions. *See* Order at 10-19.

Plaintiffs filed the Third Amended Complaint ("TAC") on October 10, 2025 (ECF No. 289), adding new profit-focused marketing allegations, clarifying investor fund pooling, and explaining how Yuga's and investors' fortunes were intertwined. Defendants filed the present Motion to Dismiss on October 24, 2025, with joinders by other Defendants.

**B.     Relevant Factual Background**

**1.     The TAC Adds Objective Profit-Focused Marketing Allegations**

The TAC adds allegations that Yuga and its promoters explicitly marketed the Yuga Financial Products as high-return investment opportunities.  In particular, in their promotional materials Defendants solicited sales of Yuga Financial Products by using various emojis along with finance terms indicating that Yuga's financial products were poised for significant increase in value.  ¶¶109, 127, 180, 408-410, 421, 424-25, 429, 436, 449, 472.[1]  These profit-oriented statements include touting "100x to 500x" and "life-changing" returns.  ¶¶152, 264.

Defendants also used crypto-specific emoji images in promotional materials, such as the rocket ship or moon emojis, to signify that the price of the Yuga Financial Products is rising and people must act quickly or miss out on significant profits. MoonPay (¶127), Adidas (¶180), Fallon (¶130), Yuga (¶¶448-49), Wu (¶152). Likewise, Defendants repeatedly used the crypto term 'ape in' to urge people to invest in Yuga's products before their prices appreciated and the opportunity for exponential gains was lost. ¶¶93, 94, (Yuga); ¶¶93, 96-98, 106 (Sotheby's); ¶281 (ApeDAO Defendants); ¶213 (Aronow); and ¶¶204, 205 (Solano).    Similarly, Defendant Fallon used the term 'WAGMI' (crypto slang for "we're all going to make it [rich]"), when promoting his *Tonight Show* clip with Defendant Hilton, which the official Yuga Twitter account then reposted, amplifying its reach.  ¶¶139, 410.

The TAC alleges that Yuga executives and promoters referenced price appreciation, floor prices, and market capitalization of the BAYC collections.  For example, Defendants Solano and Aronow promoted the "price ramps" of BAYC NFTs (¶212), bragged when the "BAYC Market Cap just crossed a billion" (¶214), and publicly linked the NFTs' value to Yuga's roadmap and venture-capital backing (¶¶203-205, 238, 296).

---

[1]     Unless otherwise indicated, "¶_" and "¶¶_" references are to the TAC.

### 2. The TAC Strengthens the "Common Enterprise" Allegations and Pleads the Pooling of Investor Funds

The TAC provides facts alleging that investor funds were not isolated by specific product but were instead pooled and deployed to sustain the ongoing Yuga enterprise as a whole. Specifically, the TAC adds detailed allegations regarding how investor funds were pooled and used to build and sustain Yuga's "Bored Ape Ecosystem." The TAC now makes clear that Yuga itself acknowledged using proceeds from the sale of its NFTs to fund its own operations. ¶442. The TAC also identifies particular wallets controlled by Yuga into which investor funds were pooled (¶457) and alleges that Yuga's own pitch deck publicly represented that these funds were used to pay development and ecosystem expenses. *Id.* It further pleads that the value and market activity surrounding the NFTs were necessary components of what Yuga described as the "Bored Ape Ecosystem," which functioned as a unified enterprise fueled by investor capital. ¶444.

The TAC also included specific "interplay" allegations related to the integration of NFTs, ApeCoin, and Otherside metaverse. For example, the TAC alleges that the Otherside metaverse was to be "entirely fueled by ApeCoin," and that participation required ownership of BAYC or MAYC NFTs. ¶¶450–51. This structure bound all purchasers together in a single interdependent system: NFT ownership was both the price of admission to the metaverse and the mechanism by which Yuga's revenues, and thus investors' potential returns, were generated. Yuga described the Otherdeed NFTs, representing "land" within the Otherside, as "dynamic NFTs" whose "true potential can only be revealed with time" (¶452), explicitly signaling that value appreciation would depend on the Company's future managerial and technical efforts.

The TAC alleges that Yuga's announcement of the Otherside and its promised "dynamic NFTs" immediately caused prices of all Yuga Financial Products to surge (¶¶453–55), confirming that investors' fortunes rose and fell together as a result of

a unified enterprise. Yuga's internal "profit-sharing" mechanism for Otherdeed NFT holders, who were to receive pro rata benefits from the appreciation driven by Yuga's ongoing operations and marketing (¶458), further evidences both pooling of investor funds and a shared expectation of collective financial gain. When the Otherside venture ultimately failed, investors' losses mirrored the collapse of Yuga's promotional narrative, illustrating that all participants were financially intertwined in a single enterprise. These allegations closely resemble the *Dapper Labs* and *DraftKings* pleadings that tied NFT value to the success of a proprietary ecosystem. The TAC also adds new facts establishing strict vertical commonality, showing that Defendants' fortunes rose and fell with those of investors. Plaintiffs now allege that Yuga, Oseary, and the Executive Defendants retained millions of ApeCoin tokens and multiple NFTs from each collection (¶445), directly aligning their personal wealth with investor performance. These allegations address the Court's finding that Yuga's "creator fees" decoupled its earnings from investor outcomes, demonstrating instead that Yuga's financial success depended on maintaining and increasing the market value of its products.

### 3. The TAC Expands Allegations of Purchasers' Reasonable Expectation of Profits

The TAC now provides the explicit profit-based promotions the Court found wanting, including Defendants' use of rocket-ship emojis indicating rapid price growth, "life-changing" return statements, and celebrity endorsements touting price appreciation, each of which conveyed that Yuga products were speculative investments (¶¶195, 203–14, 269–71, 420–39). It further pleads that Defendants and their celebrity promoters, including MoonPay and Soto-Wright, publicly promised extraordinary gains, telling investors that "it's only ever been a poor decision to sell

PLAINTIFFS' OPPOSITION TO DEFENDANT YUGA LABS' MOTION TO DISMISS
CASE NO. 2:22-CV-08909-FMO-PLA

anything Yuga has dropped," and promoting Yuga assets as "bulletproof plays" (¶264).

The TAC alleges with particularity dozens of explicit profit-inducing statements.  For example, the TAC pleads numerous examples of Yuga's "profit signaling" across multiple platforms, including advertisements disguised as genuine posts (¶¶95, 99, 101, 109, 130–31, 138, 140, 147, 180, 193), late-night television and magazine appearances (¶¶124–26, 135–36, 139, 177–78), Discord discussions where Solano and Aronow directly solicited investors (¶¶55, 58, 201-204), and curated BAYC apparel (¶¶163, 165).  Across these media, Defendants used crypto-industry slang (e.g., moon and "WAGMI" ("we are all going to make it") accompanied by the ape, rocket-ship, and moon emoji images (¶¶109, 127, 180, 408–10, 421, 424–25, 429, 436, 449, 472), all of which objectively communicate to investors that Yuga asset prices would rise sharply.

The TAC also highlights Yuga's own statements promoting that investors' financial gain would stem from Yuga's continued operations.  For example, the official BAYC Twitter account stated that "the more apes sell, the more we get to work on future membership benefits," a message that directly tied Yuga's revenue and investor activity to ongoing development and expected returns.  ¶478.  By linking its operational success to secondary-market sales and community "benefits," Yuga explicitly confirmed that purchasers' fortunes would depend on Yuga's efforts, not their own, thereby satisfying the final element of *Howey*'s third prong.

In addition, the TAC retains and reinforces the Court's prior finding that the "efforts of others" element was satisfied.  It elaborates on how Yuga's management, marketing campaigns, and metaverse development constituted the "undeniably significant" managerial efforts that determined product value.  The TAC thus builds upon what the Court had already credited as sufficient and fortifies the causal link between Yuga's work and investors' anticipated profits.

PLAINTIFFS' OPPOSITION TO DEFENDANT YUGA LABS' MOTION TO DISMISS
CASE NO. 2:22-CV-08909-FMO-PLA

Accordingly, the TAC addresses each deficiency identified in the Order and now pleads a complete factual basis for all elements of the *Howey* test.

## II.    ARGUMENT

### A.    Legal Standards

Under the federal securities laws, "the term 'security' [] include[s] the commonly known documents traded for speculation or investment," such as "'investment contract[s].'" *SEC v. W.J. Howey Co.* ("*Howey*"), 328 U.S. 293, 297 (1946). "In other words, an investment contract . . . [is] a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party . . . ." *Id.* at 298-99. This definition favors substance over form and looks to "economic reality," and is thus "capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Id.* at 299. The Ninth Circuit distilled the so-called *Howey* test into three parts: (1) an investment of money; (2) in a common enterprise; (3) with an expectation of profits produced by the efforts of others. *See Warfield v Alaniz*, 569 F.3d 1015, 1020 (9th Cir. 2009).

### B.    The Products were Sold in Securities Transactions

#### 1.    Plaintiffs Sufficiently Pled an "Investment of Money"

"Under *Howey*, courts conduct an objective inquiry into the character of the instrument or transaction offered based on what the purchasers were 'led to expect.'" *See Warfield*, 569 F.3d at 1021. Here, the facts alleged in the TAC establish that Defendants promoted the Yuga Financial Products in myriad ways that objectively led purchasers to reasonably believe they were making investments for financial gain. These objective facts are bolstered by Plaintiffs' own subjective beliefs that

7

their respective purchases of Yuga Financial Products were investments whose value would increase as a result of Defendants' efforts.

### a.    Defendants' Repeated Promises of Outsized Returns

The TAC includes numerous examples of Yuga Financial Products marketed through the promise of outsized financial gains, using the language of investment returns, i.e., conveying that the value of Yuga Financial Products would increase by a lofty multiple above the initial purchase price.

For example, Defendant Wu touted the "100x to 500x" returns Yuga Financial Product purchasers could realize when the Company achieved its promised entrance into the gaming sector with the Otherside metaverse. *See* ¶152 (additionally advertising that this "attracts as certain type of player, which tends to be traders that are looking at the game as kind like. . . a financial instrument"). Likewise, a celebrity promoter hired by Defendants Moonpay and Soto-Wright made similar promotional statements specifically referencing an expected rate of return from Yuga purchases. His blunt promotion of the Otherdeed NFTs is set forth below:

> Again I have $1,000,000 set aside specifically to dump into this. Unsure if that'll even be possible, but ***will be investing as much as I can*** . . . . This play is ***truly the most obvious bulletproof play there's ever been in Web3*** . . . . Historically ***if you've ever had the opportunity to not only mint BAYC product, but get in anywhere remotely close to mint you're probably rich if you weren't already.*** Also, ***it's only ever been a poor decision to sell anything Yuga has dropped***. Sellers have only ever been punished." "People will undersell this, ***jump on this opportunity . . . It is reasonable to expect a 10x gain on mint. Conservatively . . . . This could be a life-changing play for me.***" ¶264 (emphasis added).

Here, like in *Warfield* (*see* 569 F.3d at 1021-22), these promotions of Yuga Financial Products indicated a rate of return that far exceeded returns from the stock market, which, in turn, lead objectively reasonable investors, including Plaintiffs, to expect profits from their respective investments. As the Court previously determined, profit-focused promotions that reference a rate of return support a finding that the transactions were "investments of money." *See* Order at 9-10.

### b.    Pervasive Imagery Promising a Dramatic Value Increase

Defendants repeatedly used the rocket-ship and moon emojis, along with the ape emoji, to specifically reference the financial products related to the Bored Ape Ecosystem and promote these as investments whose value would skyrocket.  *See, e.g.*, ¶127 (Moonpay), ¶180 (Adidas); ¶130 (Fallon); ¶¶269-70 (Wu); ¶¶448-49 (Yuga).  Defendants' use of such emojis in their promotional materials satisfies the first *Howey* prong.

The Order acknowledged that "profit-focused" promotional statements that use the "rocket ship" or other similar emoji images "objectively mean one thing: a financial return on investment."  Order at 18 (citing *Friel v. Dapper Labs*, 657 F. Supp. 3d 422, 443 (S.D.N.Y. 2023)).  Indeed, as the Securities and Exchange Commission explained in a Consent Order related to the misleading promotion of a different cryptocurrency: "The rocket ship image—along with other space images, analogies, and phrases such as 'to the moon'—are widely-used in the crypto asset space to signal expectations that a token will dramatically increase in value."[2]  Similarly, another court found that the first prong was established where plaintiffs' expectation of profits "flowed, at least in part, from [defendant's] alleged public promotion of LGBCoin as an asset with significant upside."  *De Ford v. Koutoulas*, 2023 WL 2709816, at *14 (M.D. Fla. Mar. 30, 2023), *reconsideration denied*, No. 6:22-CV-652-PGB-DCI, 2023 WL 3584077 (M.D. Fla. May 22, 2023), *appeal dismissed*, No. 23-12109-E, 2023 WL 6213424 (11th Cir. July 31, 2023).  The *De Ford* court cited promotional materials that used the profit-focused "moon" phrase to support its conclusion that the first prong of *Howey* was satisfied.  *Id*. at *14.

Defendants also used various investing terms or financially related metrics in their promotions of the Yuga Financial Products.  For example, Defendant Wu

---

[2]    *In the Matter of Paul Anthony Pierce,* No. 3-21305, SEC Order Instituting Cease and Desist (Feb. 17, 2023), https://www.sec.gov/files/litigation/admin/2023/33-11157.pdf.

touted long-term viability and growth prospects for the Yuga Financial Products, claiming she was "Bullish for the long-term here with this @yugalabs team! 🐇 🐇 🐒 🏴 .".Notably, the term "bullish" in "trade parlance" refers to the belief that the underlying investment will "rise" in value.  *See Robinson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 337 F. Supp. 107, 109 (N.D. Ala. 1971), *aff'd*, 453 F.2d 417 (5th Cir. 1972); *CFTC v. R.J. Fitzgerald & Co., Inc.*, 173 F. Supp. 2d 1295, 1307 (M.D. Fla. 2001) (noting that "[b]ullish refers to an expectation of an increase in price or volatility").  By promoting a "bullish" "long-term" outlook on Yuga's future financial prospects in marketing materials, Defendant Wu led purchasers to have a reasonable expectation of future profit from their investments in the Yuga Financial Products.

Similarly, Defendants made multiple statements promoting the increase in: (1) the floor price of BAYC NFTs (¶¶203, 212); (2) the market cap for the BAYC NFT collection (¶214); and (3) the trading volume for each of the Yuga Financial Products (¶¶195, 271).  Each of these promotions further emphasized to Plaintiffs and the Class that purchases of Yuga Financial Products were investments.  For example, Defendant Aronow's April 27, 2021 promotion of the "price ramp" for the BAYC NFT collections (*see* ¶212) refers to a pricing strategy where the price typically increases over time.  It is often used by businesses to attract new customers with initial lower costs, with the price gradually increasing based on a predetermined schedule.  Thus, by referencing the lower "flat price" of BAYC NFTs initially at 0.08 ETH and then tethering that statement to future "Roadmap Activations," Aronow indicated to Yuga purchasers that their initial investments would increase in value over time in line with the Roadmap Activations schedule.  *See Harper v. O'Neal*, 746 F. Supp. 3d 1360, 1376 (S.D. Fla. 2024) (finding Plaintiff's sufficiently alleged "they were led to reasonably expect profits from the Astrals [NFT] purchases" where Defendants advertised "that the project would grow and look to achieve a floor price").

Further showing the profit-focused nature of the promotions of the Yuga Financial Products, Defendants touted the partnerships with multiple venture capital firms that had made "investments" in Yuga and indicated that these financial institutions would support Yuga's promises of creating and maintaining the Bored Ape Ecosystem. Defendants Muniz, Lyons, and Oseary each made statements related to the venture capital backers and connected this backing with the ability of the Company to successfully grow the Yuga NFT business (*see* ¶¶238, 296), and these statements objectively led investors to believe the Yuga Financial Products would increase in value as a result of the managerial efforts of the Executive and ApeDAO Defendants and the support of their venture capitalist backers.

Defendants also used the term "Ape in" or "aping in" within a majority of Yuga-related promotional statements and marketing materials. *See*, *e.g.*, ¶¶93-94, 416 (Yuga); ¶197 (Oseary); ¶¶93, 96-98, 106 (Sotheby's); ¶¶128, 175 (Moonpay); ¶¶ 62, 281 (ApeDAO Defendants); ¶213 (Aronow); and ¶¶204, 205 (Solano); ¶¶180-81 (Adidas). This phrase has a particular meaning to crypto investors: it refers "to buying a new token immediately after its launch" in the belief that "getting in early will lead to massive short-term gains."[3] This profit-focused solicitation was coupled with several others from Defendants that consistently touted the massive price increases for Yuga NFTs. *See also* ¶58 (Solano's August 29, 2021 promotion highlighting the "million dollar apes" that had risen from the initial floor price of around $200); ¶¶105-106 (Sotheby's September 9, 2021 promotion of the $24 million sale of BAYC NFTs at its "Ape In" auction and how it exceeded prior sale price predictions); ¶148 (Bieber promoting his purchase of a BAYC NFT, which he purportedly "paid" five times the then-current floor price for similar BAYC NFTs); ¶¶95, 147 (the Company similarly promoting the Sotheby's sale on August 27, 2021 and the Bieber purchase on January 31, 2022). Taken together with the promotions

---

[3]    *What Does It Mean to Ape In When Trading Crypto?*, BITRUE (July 7, 2025) https://www.bitrue.com/blog/what-does-ape-in-when-trading-crypto-mean.

of record high sales, exponentially higher than their initial mint price, it is "plausible that [Defendants here] objectively led purchasers to expect that they would realize the same gains" from "aping in" and purchasing Yuga Financial Products. *See Dapper Labs*, 657 F. Supp. 3d at 444.

Finally, as explained in *SEC v. LBRY, Inc.*, the surrounding context of the promotional materials at issue can create a situation where reasonable purchasers "would understand that the tokens being offered represented investment opportunities - even if [the Company] never said a word about it." 639 F. Supp. 3d 211, 220 (D.N.H. 2022) (finding that "by retaining hundreds of millions of LBC for itself, LBRY also signaled that it was motivated to work tirelessly to improve the value of its blockchain for itself and any LBC purchasers. This structure, which any reasonable purchaser would understand, would lead purchasers of LBC to expect that they too would profit from their holdings of LBC as a result of LBRY's assiduous efforts."). Similarly, as detailed below, the Yuga Defendants retained hundreds of millions of ApeCoin tokens and multiples of the BAYC, MAYC, and Otherdeed NFTs, which signaled to purchasers that the Company and its executives would work to improve the value of all the Yuga Financial Products within the Bored Ape Ecosystem for both themselves and any retail purchasers like Plaintiffs and the class.

In sum, the TAC alleges that Defendants made multiple, consistent, and explicit profit-focused statements specifically promoting the Yuga Financial Products as investments with the promise of future gain. These factual allegations directly cure the issues raised in the Order regarding the first prong of *Howey* (*see* Order at 7-12) and more than adequately establish that the Yuga Financial Products were promoted to Plaintiffs and the class as investments.

Despite the steady drumbeat of Defendants' marketing focused on investment returns deployed through vivid imagery referencing how the Yuga Financial Products would increase in value and teeming with references to investing and

finance terms, the Motion erroneously clings to the idea that any consumptive use precludes a transaction from being considered an investment. *See* Yuga MTD at 11-13. But this Court has already correctly recognized that a transaction can constitute an investment contract even when the product may also have consumptive use. *See* Order at 8 n.4 (citing *Dapper Labs*, 657 F. Supp. 3d at 445 and *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 852 (1975)); *see also LBRY*, 639 F. Supp. 3d at 220 ("Nothing in the case law suggests that a token with both consumptive and speculative uses cannot be sold as an investment contract.").

The Supreme Court decision in *Forman* does not hold otherwise, as in that case, the Court explicitly found that "there can be no doubt that investors were attracted ***solely*** by the prospect of acquiring a place to live, and not by financial returns on their investments." 421 U.S. at 842 (emphasis added). Here, unlike in *Forman*, regardless of any speculative consumptive uses the Yuga Financial Products may or may not have had at any point in time, Defendants' promotional materials for the Yuga Financial Products were littered with language objectively indicating to purchasers that this was a speculative investment poised for exponential financial growth. Defendants even concede that certain promotional statements could imply a financial gain. *See* Yuga MTD at 13. This is enough at the pleading stage to establish *Howey*'s first prong. *See LBRY*, 639 F. Supp. 3d at 221 ("While some unknown number of purchasers may have acquired LBC in part for consumptive purposes, this does not change the fact that the objective economic realities of LBRY's offerings of LBC establish that it was offering it as a security.").[4]

---

[4]    Defendants wrongfully argue that Plaintiffs improperly attempted to "plead around" the Order and claim that earlier "admissions" in the SAC related to consumptive use remain binding and can be considered now. Yuga MTD at 4 n.5, 11-12. This is wrong twice over. First, as discussed above, concurrent promotions for consumptive uses are not dispositive on the investment of money prong analysis. *See LBRY*, 639 F. Supp. 3d at 221. Second, the so-called improperly deleted factual allegations in the SAC that Defendants cite to are not "admissions" that the Court can take judicial notice of. *See* Yuga MTD at 4 n.5 and 7. *Callahan & Blaine, APLC v. Indian Harbor Ins. Co.*, 2025 WL 2958870, at *2 (C.D. Cal. June 25, 2025)

### 2.     Plaintiffs Sufficiently Pled a "Common Enterprise"

The Ninth Circuit has found both horizontal and vertical commonality can satisfy the common enterprise prong of the Howey test. *See SEC v. RG Reynolds Enters., Inc*., 952 F.2d 1125, 1134 (9th Cir. 1991).  The commonality prong "has been construed by [the Ninth] Circuit as demanding either an enterprise common to the investor and the seller, promoter or some third party (vertical commonality) or an enterprise common to a group of investors (horizontal commonality)." *Hocking v. Dubois*, 885 F.2d 1449, 1455 (9th Cir. 1989).  District courts, applying the Ninth Circuit case law, have found both forms of commonality in cases involving cryptocurrency and NFTs, in particular.  *See, e.g*., *SEC v. NAC Foundation, LLC*, 512 F. Supp. 3d 988, 996 (N.D. Cal. 2021); *Patterson v. Jump Trading LLC*, 710 F. Supp. 3d 692, 711 (N.D. Cal. 2024), *aff'd,* No. 24-2489, 2025 WL 215519 (9th Cir. Jan. 16, 2025), *cert. denied,* 2025 WL 2823817 (U.S. Oct. 6, 2025); *SEC v. Payward, Inc.,* 2024 WL 4511499, at *15 (N.D. Cal. Aug. 23, 2024);  *Hunichen v. Atonomi LLC*, 2019 WL 7758597, at *12–13 (W.D. Wash. Oct. 28, 2019), *report and recommendation adopted*, 2020 WL 1929372 (W.D. Wash. Apr. 21, 2020); *SEC v. Wahi*, 2024 WL 896148, at *5 (W.D. Wash. Mar. 1, 2024).

Both horizontal commonality and strict vertical commonality are present here. Investors pooled their funds with other investors—and with Defendants—to fund the development of the Yuga Financial Product ecosystem, establishing horizontal commonality.  Yuga marketing materials even admit to pooling and promoted that the pooled funds are being used to develop the Yuga ecosystem.   Vertical commonality is also present because Defendants retained a significant amount of the Yuga Financial Products and the value of all of the Yuga Financial Products were

---

(finding that an "'amended complaint supersedes an original complaint, and a court may not consider facts or allegations from the original complaint that are not included in the amended complaint'"); and *Crews v. Rivian Auto., Inc.*, 2023 WL 4361098, at *12 (C.D. Cal. July 3, 2023) ("[W]ithdrawn allegations are neither the law of the case nor conclusive judicial admissions.").

dependent on the development of the Yuga ecosystem, including the creation and promotion of Otherside.  Defendants' arguments to the contrary are based on stale decisions that do not grapple with the type of digital assets at issue here and ignore entirely recent Ninth Circuit decisions specifically addressing cryptocurrencies and NFTs.

### a.    Horizontal Commonality Is Adequately Pled

In horizontal commonality, there is a "relationship shared by two or more investors who pool their investments together and split the net profits and losses in accordance with their pro rata investments." *Hocking v. Dubois*, 839 F.2d 560, 566 (9th Cir. 1988), *opinion withdrawn*, 863 F.2d 654 (9th Cir. 1988), *and on reh'g*, 885 F.2d 1449 (9th Cir. 1989).   The hallmark of a horizontal common enterprise is "the tying of each individual investor's fortunes to the fortunes of the other investors," which, in turn, "depend upon the profitability of the enterprise as a whole . . . ." *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994); *see Hocking*, 839 F.2d at 566.  For example, horizontal commonality is established when a group of investors' funds are pooled, such as to develop a business, and their fortunes are thereby tied to one another.  *See, e.g.*, *R.G. Reynolds Enters., Inc.*, 952 F.2d at 1134 (horizontal commonality exists where investor assets were pooled to "finance the construction of a plant where their ore was to be refined"); *SEC v. Dalius*, 2023 WL 3988425, at *8 (C.D. Cal. May 24, 2023) ("'Generally, pooling occurs when the funds received by the promoter through an offering are, essentially, reinvested by the promoter into the business,'" and "'such reinvestment increases the value of the instrument offered.'").  Courts in this circuit have found this element established by evidence that funds were pooled together to support the development of a crypto ecosystem that would increase the value of the crypto assets.  *See Wahi*, 2024 WL 896148, at *5; *Patterson*, 710 F. Supp. 3d at 711.

Here, mindful of the Court's frustration with the organization of the SAC and lack of clarity for the horizontal commonality allegations specifically (*see* Order at

15

14-15), the TAC now provides an entire section devoted exclusively to common enterprise allegations (with 17 paragraphs of general horizontal commonality allegations relevant to all Yuga Financial Products (¶¶440-57), as well as individual subsections for each of the Otherdeed NFTs, ApeCoin, BAYC NFTs, and MAYC NFTs, respectively (¶¶458-64)).   These allegations describe the Bored Ape Ecosystem and the interconnection between the BAYC, MAYC, and Otherdeed NFT collections and ApeCoin, including both a pooling together of funds for the development of an ecosystem and a retention of each of those assets by Defendants. In particular, the TAC alleges:

- The Executive Defendants pooled the money from purchases of the Yuga Financial Products to reinvest into the business and continue development of the Bored Ape Ecosystem, including by hiring technical personnel and promoting the Yuga Financial Products, ¶442;

- The pooling of funds was necessary to prevent the ecosystem from collapsing, ¶443;

- The Executive Defendants admitted that they reinvested proceeds from NFT sales to fund operations, grow the ecosystem, and increase value of each of the Yuga Financial Products separately and collectively, ¶444;

- Executive Defendants used sales of ApeCoin to support all operational expenses, *id.*;

- Yuga, Oseary, and the Executive Defendants held millions of ApeCoin tokens, linking their fortunes with ApeCoin investors, ¶445;

- The Company touted the interconnection between the NFT collections in a promotional video for the Otherside metaverse that included "an animated rocket ship (an allusion to the rocket ship emoji image), taking all Yuga NFTs on a ride up an erupting volcano." ¶¶448-49;

- That Defendants advertised that Yuga Financial Products would collectively increase in value with the development of the ecosystem, including Otherside metaverse, ¶¶446-52;

- Defendants' advertisements about its pooling of funds and resulting development of the ecosystem did, in fact, cause a doubling in the price of the Yuga Financial Products, ¶¶453-55;

- Funds from Plaintiffs' and Class members' purchases were pooled in particular wallets owned and controlled by Defendants, ¶457;

- Yuga acknowledged the pooling of funds in an investor pitchdeck, showing payment of ecosystem development expenses coming from those pooled funds, *id*.; and,

- Collective pooling occurred with all of the Yuga Financial Products, ¶¶458-464.

Additionally, the TAC further describes the interplay between the various Yuga NFTs and ApeCoin in the Bored Ape Ecosystem (¶¶228-32, 269, 281-82, 286, 296, 459, 477), as well as Defendants' control over the direction of the Company and ApeDAO via self-granted voting rights from ApeCoin allocations and the ability to deploy funds from the ApeDAO-controlled wallets that were required to build and maintain the Bored Ape Ecosystem, including the Otherside metaverse. ¶466. These allegations collectively demonstrate the same interdependence between the proprietary ecosystem for the Yuga Financial Products and the value of the same that the Court found present in *Dapper Labs* and *Dufoe v. DraftKings Inc.*, 2024 WL 3278637, at *6 (D. Mass. July 2, 2024). *See* Order at 14-15. The TAC's allegations with respect to the Otherside metaverse are on all fours with metaverse NFTs analyzed in *Harper*, where the court found plaintiffs adequately alleged a common enterprise because "while the community and investors own a specific NFT within the project (and can increase that specific NFT's value through gameplay), the

17

investors and players have no control over the success of the investment into the Astrals metaverse." 746 F. Supp. 3d at 1374.

Unable to deny the sufficiency of the allegations included in the TAC, Defendants instead recycle arguments insisting that the development of the ecosystem—which would purportedly create some amorphous consumptive use that has never existed and could only exist through Defendants' efforts—somehow negates a common enterprise. *See* Yuga MTD at 11. Not so. As noted above, "[n]othing in the case law suggests that a token with both consumptive and speculative uses cannot be sold as an investment contract." *LBRY, Inc.*, 639 F. Supp. 3d at 220. Commonality is not defeated, "simply because some []purchases were made with consumptive intent. Were it otherwise, the Securities Act would be unable to adapt to the 'countless and variable schemes devised by those who seek the use of the money of others on the promise of profits' wherever a token held some consumptive utility." *Id.* (quoting *Howey*, 328 U.S. at 299).

### b.    Strict Vertical Commonality is Adequately Pled

Strict vertical commonality may be established by showing "that the fortunes of the investors are linked with those of the promoters." *R.G. Reynolds Enters., Inc.*, 952 F.2d at 1130 *accord SEC v. Telegram Group, Inc.*, 448 F. Supp. 3d 352, 369–70 (S.D.N.Y. 2020) (finding that "strict vertical commonality" existed because the issuer's "fortunes are directly tied to the fortunes of the [investors], which will rise and fall with the success or failure of the TON Blockchain"). Courts in this Circuit have found strict vertical commonality in crypto asset cases where the "defendants retained a healthy share of [the assets] for their personal and corporate coffers," thereby linking their own fortunes with those of the investors. *S.E.C. v. NAC Found., LLC*, 512 F. Supp. 3d 988, 996 (N.D. Cal. 2021). This is true especially where, as here, "proceeds would fund the development of the [] ecosystem . . . ." *Id.* Where such a scheme exists, the founders have tied their fortunes to the investors, "as measured by the trading value of their [assets], the future trading value of [the

asset], *or* the general success of their enterprise (which would, as a matter of efficient market theory, drive the price of both digital assets)." *Id.*

The TAC specifically alleges that the fortunes of investors, including Plaintiffs, were tied to the fortunes of the Defendants. In particular, the TAC alleges that Defendants distributed 80 million APE tokens to Yuga's founders, including Defendants Solano and Aronow, and retained 470 million APE tokens for the ApeDAO, which worked to develop the Yuga ecosystem. ¶467. This linked the fortunes of those Defendants and each ApeCoin investor since any price fluctuations for the token would uniformly impact all holders. Executive and ApeDAO Defendants also retained BAYC, MAYC, and Otherdeed NFTs, similarly linking their fortunes with investors in BAYC, MAYC, and Otherdeed NFTs, respectively. *Id.*

In addition, the development of the Defendant-controlled Bored Ape Ecosystem and its general success was directly tied to the fortunes of investors, since the Executive and ApeDAO Defendants used proceeds generated from initial sales of Yuga Financial Products and those from the creator fees associated with each Yuga NFT sale to fund operations. ¶¶457-464. For example, from July 2023 to October 2023, 64,729 APE tokens (which notably were only available to Defendants to use as a result of their unilateral decision to allocate themselves millions of ApeCoin during the initial mint) were used on employee compensation, legal fees, security, and project management expenses for the development of the Yuga ecosystem. ¶459.

An increase in the value of the Yuga Financial Products would benefit investors directly and would benefit Defendants both through their own holdings and by allowing the Yuga Defendants to pay larger amounts for ecosystem development. Conversely, a decrease in the value of the Yuga Financial Products would directly harm investors and Defendants' own holdings and could also harm Defendants' fortunes by rendering them incapable of paying for the further development and

promotion of the Yuga ecosystem. *Id.* The ApeDAO Working Group Budget makes this tying of fortunes clear—the APE tokens would "be used for, but not limited to, general contingency, new initiative development, community rewards, community grants, business and stakeholder development, and in-person ApeCoin DAO Working Group Representation." ¶462.

### 3. Plaintiffs Adequately Pled a Reasonable Expectation of Profits Based on Defendants' Efforts

#### a. Expectation of Profits

The TAC specifically lays out each of the Yuga Financial Products at issue and how each was promoted with a focus on profits (including through the various Defendants' use of the rocket ship and moon emoji images). *See* ¶¶420-22 (profit focused promotions of Otherdeed NFTs); ¶¶423-27 (profit focused promotions of ApeCoin); ¶¶428-34 (profit focused promotions of BAYC NFTs); ¶¶435-39 (profit focused promotions of MAYC NFTs). Further, as explained above, the TAC describes specific promotions by, or published at the behest of, Defendants Wu, Moonpay, and Soto-Wright that directly promoted to investors the possibility exponential returns on investment in the Yuga Financial Products. ¶¶127, 152, 264.

In the Order, the Court noted how the analysis of this sub-element of the third *Howey* prong overlaps somewhat with the first prong insomuch as the inquiry looks at whether the purchase at issue was made as an investment for profit. *See* Order at 17. The Order acknowledged that "statements about NFT prices and trade volumes are a closer call" but found that these statements by themselves failed to establish an expectation of profit. *Id.* at 18. The Order then compared the facts alleged in the SAC with those alleged in the *Dapper* case. *Id.* Notably, the Order emphasized that while the defendants in *Dapper* had also announced sales volumes and the prices of noteworthy NFTs via social media, the *Dapper* court's conclusion that the promise of profits had been made was also based on the defendants' use of, *inter alia*, the "'rocket ship' . . . emoji images." *Id.* Ultimately, the Order found that, without

similarly explicit allegations of "profit focused" promotions, it was "not objectively reasonable for plaintiffs to base expectations of profits on those statements." *Id*.

The TAC now prominently alleges the exact same "profit based" elements that, in conjunction with the "closer call" statements about NFT prices and trading volumes previously alleged in the SAC, were found in *Dapper* to satisfy the third prong of the *Howey* test.

In addition, the TAC alleges that Defendants Muniz, Lyons, and Oseary each made statements related to the venture capital backers and connected this backing with the ability of the Company to successfully grow the Yuga NFT business (*see* ¶¶238, 296). Promotions about the "team" behind the investment and their credentials can support a finding that *Howey*'s third prong is satisfied. *See Holland v. CryptoZoo Inc*., 2025 WL 2492970, at *27 (W.D. Tex. Aug. 14, 2025), (NFT case where court found that "[a]ll in all, Plaintiffs were led to believe purchasers would later receive benefits, including, among other things, rewards, exclusive access to other cryptocurrency assets, and the support of an online ecosystem to use and market CZ NFTs. Viewed together . . . Defendants' public statements regarding future opportunities, ***the credentials of the 'massive team,'*** and the promise of future benefits—are more than sufficient to meet the third *Howey* prong") (emphasis added) (citation modified).

Defendants' arguments on this issue (*see* Yuga MTD at 21-23) are all non-sequiturs that cannot overcome the facts alleged in the TAC and how closely they mirror the facts that this Court previously agreed were sufficient to establish this sub-element of *Howey*'s third prong.

### b. The Efforts of Others

The Order found that the "efforts of others" sub-element of the third prong of the *Howey* test had been met in the SAC. Order at 18-20. For the reasons stated therein, Plaintiffs assert that the same finding should apply to the allegations contained in the TAC. Despite this previous finding of sufficiency on the issue,

Defendants nevertheless insist that Plaintiffs cannot satisfy this sub-element because they purchased Yuga Financial Products on the secondary market. Yuga MTD at 23 n.12 (citing *SEC v. Ripple Labs Inc.*, 682 F. Supp. 3d 308 (S.D.N.Y. July 13, 2023)). Defendants' reliance on the *Ripple* case as support for this assertion is misplaced. In fact, the opposite conclusion was reached in *SEC v. Terraform Labs Pte. Ltd.,* 684 F. Supp. 3d 170, 197 (S.D.N.Y. 2023) and its reasoning should be adopted here. The court explicitly declined defendants' request to adopt the reasoning from the *Ripple* case, but instead criticized that particular finding: "*Howey* makes no such distinction between purchasers. . . . That a purchaser bought the coins directly from the defendants or, instead, in a secondary resale transaction has no impact on whether a reasonable individual would objectively view the defendants' actions and statements as evincing a promise of profits based on their efforts." *Id.* at 197-98 (finding secondary market purchasers could rely on the efforts of others because "[s]imply put, secondary-market purchasers had every bit as good a reason to believe that the defendants would take their capital contributions and use it to generate profits on their behalf").

Courts in this Circuit have consistently followed *Terraform* and declined to draw a distinction between secondary-market purchasers and those who purchase directly from the issuer. *See Wahi*, 2024 WL 896148, at *6; *In re Ripple Labs, Inc. Litig.*, 2024 U.S. Dist. LEXIS 109252, at *23 (N.D. Cal. June 20, 2024); *Patterson*, 2024 WL 49055, at *11– 12. The same finding is warranted here.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully submit that the Yuga Motion and any related Joinder Motions should be denied in their entirety.

DATED: November 13, 2025      Respectfully submitted,

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

*/s/ John T. Jasnoch*
John T. Jasnoch (CA 281605)
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-233-4565
Facsimile: 619-233-0508
jjasnoch@scott-scott.com

*Lead Counsel for Plaintiffs*

**TAYLOR-COPELAND LAW**
James Q. Taylor-Copeland (CA 284743)
501 W. Broadway, Suite 800
San Diego, CA 92101
Telephone: 619-400-4944
Facsimile: 619-566-4341
james@taylorcopelandlaw.com

**ZIGLER LAW GROUP, LLC**

Aaron M. Zigler (CA 327318)

Nidya Gutierrez (CA 330209)

308 S. Jefferson Street, Suite 333

Chicago, IL 60661

Telephone: 312-673-8427

Facsimile: 312-535-5773

aaron@ziglerlawgroup.com

nidya@ziglerlawgroup.com

*Additional Counsel for Plaintiffs*

PLAINTIFFS' OPPOSITION TO DEFENDANT YUGA LABS' MOTION TO DISMISS
CASE NO. 2:22-CV-08909-FMO-PLA

# CERTIFICATE OF COMPLIANCE

The undersigned counsel of record for Plaintiffs certifies that this brief contains 6,944 words, which

_____ complies with the word limit of L.R. 11-6.1.

_X_ complies with the 7,000-word limit set by court order dated September 30, 2025 (ECF No. 288).

DATED: November 13, 2025

*/s/ John T. Jasnoch*
John T. Jasnoch

PLAINTIFFS' OPPOSITION TO DEFENDANT YUGA LABS' MOTION TO DISMISS
CASE NO. 2:22-CV-08909-FMO-PLA

## <u>CERTIFICATE OF SERVICE</u>

I, John T. Jasnoch, hereby certify that on November 13, 2025, I electronically filed the foregoing with the Clerk using CM / ECF, which will send notification via electronic means to all counsel of record.

DATED: November 13, 2025

*/s/ John T. Jasnoch*
John T. Jasnoch

PLAINTIFFS' OPPOSITION TO DEFENDANT YUGA LABS' MOTION TO DISMISS
CASE NO. 2:22-CV-08909-FMO-PLA